Steve W. Berman (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email: steve@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: shanas@hbsslaw.com

Robert C. Hilliard (*pro hac vice* to be filed)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Tel: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ADRIAN HOLLEY, ALOYSIUS WILLIAM REITER, ALVIN WASHINGTON, ANDREW GUDGEL, ANNETTE CANNON JOHNSON, ANTHONY ADAMS, ANTHONY B. WILSON, ANTHONY TYRONE JACKSON, ANTIQUA SHIRLEY, ANTONIO KINCEY, ANTONIO LAVELLE JACKSON, BARRY TODD MOSES, BARRY WEATHERLEY, BETTIE JEAN THOMAS, BRADLEY MCDONALD, BRANDON SLEDGE, BRIAN MAXEY, CARLOS PROCTOR, CHRISTIAN TORRES, CHRISTINE COPE, CLARENCE E. SOUTHALL JR., CLAUDIO MOREIRA, COLETTE EVA GILMER, CURTIS PRITCHETT, CYNTHIA DURANT, CYNTHIA LORRAINE SPEARS, D'ANDRE L. HALE, DAMECO GATES, DANIEL J. MCLEAN, DANIEL SCHENSKE-SHELTON, DARRON BARNES, DARRYL FLAMMER, | No. _____ <br><br> COMPLAINT FOR DAMAGES <br><br> **JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DARYL LINDSAY,DAVID GONZALES,
DAVID JOHNSON, DAVID MALONEY,
DAVID ONEAL BOZEMAN, DAVID ZAJAC,
DEMETRIUS WATERS, DENNIS PHILLIPS,
DESHAWN C. MITCHELL, DINAH HARDY,
DOUGLAS LEROY PHIPPS, DUANE LEWIS,
DUSHAWN WALKER, DWAYNE ROSS,
EARL ROBERTS III, ELIZABETH ANNE
FLOURNOY, EMILY JEAN BUTLER,
EMMANUEL DESIRE, FAYKEITA
DUNBAR WEARING, FELIPE JUNE
QUIAMBAO, FRED MONROE COBBETT
JR., GEORGIA ELAINE TANNER, GILBERT
JAMES, INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE FOR THE
ESTATE OF TAMMY GUYDON, GLORIA
LYNN GREEN, GRACE MARIE THOMAS,
GREGORY ALLAN MYERS, HECTOR
MANUEL BEDOYA, HERBIE D.
DEHORNEY, JAMAL LORANSO SMITH,
JERMAINE CARTER, JERMAINE
FLEMING, JERRY MILLER, JOHN DOE 1,
JOHN LEE PULLEN, JUAN VILLARREAL
SR., KATHI RAY, KATINA HALL, KELLY
GARDNER, KELVIN MCCALL, KENNETH
SMITH, KENNETH TAROY, KENT HOREN,
KENYON DETAI BELYEU, KEVIN
MCQUAY, KHALIQ MUHAMMAD,
KIMBERLY PORTER, KYLE MALONE,
LAQUISHA PARK, LATANGA SPARKS,
LELA WILSON, LEVINE LEVINGSTON-
JONES, MARCUS MCCOY, MARGARET
BEACHAM, MARISA DUBOSE, MARK D
DECOSTA, MARK DAVID KILLEEN,
MARK WILLIAMS, MARTIN W. COOPER,
MATTHEW JON CRENSHAW, MATTHEW
YALE, MAURIZIO MARCHESE, MEL M.
ALLEN, MELVIN SNODDY, MICHAEL
TRIBBLE, MICHAEL WILLIAMS,
MILLICENT YVETTE FOSTER, NICHOLAS
JONES, NOEL FLORES, PATRICIA ANN
BRILEY, PATRICIA MICHELLE FIELDS,
PETER PARMENTER, PHYLLIS MALONE,
RAYMOND MCNARY-WILLIS,
RAYMOND PRESSLEY, RENNE BLACK,
RHONDA FAYE COOK, RICHARD
MOONEY, RICHARD O'QUAIN, ROBERT

LEE DAVIS JR., ROBERT SACKETT,
RODERICK EUGENE COOPER, RODGER
BRUNSON, RONALD ALAN CONNER,
RONNIE A. POWERS, RUBY ALTAMEEMY,
RUSSELL SEELYE, SABRINA DOOLEY,
SCOTT WASCHER, SHAJUANA POPE,
SHANE PRIDDY, SHARON ANN
MALCOLM-SMITH, SHAYLENE S.
JOHNSON, STACEY COOK, STEPHEN
CALHOUN, STEPHEN DUANE MILLER,
TAMARA PERRY, TAMMY FRAZIER,
TONY HOOKER, TONY MARTIN,
TREVYON PAUL RYAN WILLIS, TROY
OBERHOLTZER, VICTOR WILLIAMS,
WANDA STOKES JAMES, WAYNE
ALBERT SAGE, WILLIAM PATTERSON
JR., WILLIAM SAUNDERS, WILLIE
DANIEL TURNER, WILTON TOWE.

                                    Plaintiffs,

        v.

GILEAD SCIENCES, INC.,

                                    Defendant.

1
2

**TABLE OF CONTENTS**

<u>Page</u>

3

I.      NATURE OF THE ACTION ................................................................................. 1

4

II.     JURISDICTION AND VENUE ........................................................................... 4

5

III.    INTRADISTRICT ASSIGNMENT ..................................................................... 5

6

IV.     PARTIES .............................................................................................................. 5

7

V.      FACTUAL ALLEGATIONS ............................................................................. 61

8

     A.      Background ............................................................................................. 62

9

          1.      Laws and Regulations Governing the Approval and Labeling of
            Prescription Drugs ..................................................................... 62

10
11

          2.      Tenofovir and Gilead's TDF- and TAF- Containing Drug Products
            Indicated for Use in Treating HIV ............................................. 65

12

     B.      Gilead Knew Before Viread Was Approved That TDF Posed a Significant
            Safety Risk ............................................................................................. 69

13
14

     C.      Gilead's Knowledge of TDF Toxicity Grew As Patients' Kidneys and Bones
            Were Damaged By the TDF Drugs ........................................................ 72

15

     D.      Before Gilead Developed Stribild, It Knew That Renal Adverse Events Were
            More Likely When Patients Took TDF As Part Of A Boosted Regimen ........ 76

16
17

     E.      Before Gilead Developed Each of the TDF Drugs, It Knew that TAF Was Less
            Toxic to Kidneys and Bones than TDF .................................................. 77

18

     F.      Gilead Withheld its Safer TAF Design to Protect its TDF Sales and Extend
            Profits on its HIV Franchise .................................................................. 84

19
20

     G.      Gilead Knowingly Designed its TDF Drugs To Be Unreasonably Dangerous
            and Unsafe to Patients' Kidneys and Bones .......................................... 86

21

     H.      Gilead Obtained FDA Approval for its TAF-Based Products by Relying on
            Studies Demonstrating TAF's Superiority over TDF ............................ 89

22

     I.      Gilead Markets TAF as Superior to TDF .............................................. 91

23

     J.      Gilead Failed to Adequately Warn about the Risks of TDF .................. 95

24

          1.      Gilead Failed to Adequately Warn Doctors about the Risks of TDF ............. 96

25

          2.      Gilead Failed to Adequately Warn Patients about the Risks of TDF ........... 104

26

VI.     TOLLING OF THE STATUTE OF LIMITATIONS .......................................106

27

VII.    CLAIMS FOR RELIEF ....................................................................................108

28

COUNT I STRICT PRODUCTS LIABILITY – DESIGN DEFECT UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND WISCONSIN ............................................................... 108

COUNT II STRICT PRODUCTS LIABILITY – FAILURE TO WARN UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, AND WISCONSIN ............................................................. 110

COUNT III INDIANA PRODUCTS LIABILITY ACT, BURNS IND. CODE ANN. §§ 34-20-1-1 *ET SEQ.* ............................................................................................................... 112

COUNT IV LOUISIANA PRODUCTS LIABILITY ACT, LA. R.S. §§ 9:2800.51 *ET SEQ.* ........ 113

COUNT V MISSISSIPI PRODUCTS LIABILITY ACT, MISS. CODE ANN. §§ 11-1-63 ........... 114

COUNT VI NEW JERSEY PRODUCTS LIABILITY ACT, N.J. STAT. §§ 2A:58C-1 *ET SEQ.* ... 114

COUNT VII OHIO PRODUCT LIABILITY ACT, ORC ANN. §§ 2307.71 *ET SEQ.* .................... 115

COUNT VIII WASHINGTON PRODUCTS LIABILITY ACT, REV. CODE WASH. §§ 7.72-010 *ET SEQ.* ............................................................................................................... 116

COUNT IX NEGLIGENCE AND GROSS NEGLIGENCE UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, AND WISCONSIN ............................................................... 117

COUNT X FRAUD BY OMISSION UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, AND WISCONSIN ............................................................. 121

COUNT XI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE LAWS OF THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND VIRGINIA ....................................................... 123

COUNT XII VIOLATION OF STATE CONSUMER PROTECTION LAWS ............................. 125

     a.     Alabama, Ala. Code §§ 8-19-1, *et seq* ..................................................... 127

     b.     Arizona, Ariz. Rev. Stat. Ann. §§ 44-1521 *et seq* ................................. 128

     c.     Arkansas, Ark. Code Ann. §§ 4-88-101 *et seq* ....................................... 128

d.    California, California Civil Code §§ 1750 *et seq.*, Cal. Bus. & Prof. Code §§ 17200 *et seq.* and § 17500 ..............................................................................128

e.    Colorado, Colo. Rev. Stat. §§ 6-1-101 *et seq* .............................................................129

f.    Delaware, 6 Del. C. § 2511 *et seq* .............................................................................130

g.    Illinois, 815 ILCS 505/1 *et seq.* and 815 ILCS 510 *et seq* ..........................................130

h.    Indiana, Ind. Code § 24-5-0.5-1 *et seq* ......................................................................131

i.    Maryland, Md. Com. Law Code Ann. § 13-101 *et seq* ..............................................131

j.    Minnesota, Minn. Stat. §§ 325F.68 *et seq.*, §§ 325D.44 *et seq* ................................132

k.    Missouri, Mo. Rev. Stat. §§ 407.010 *et seq* ..............................................................133

l.    Nevada, Nev. Rev. Stat. §§ 598.0903 *et seq* .............................................................133

m.    New Jersey, N.J. Stat. Ann. §§ 56:8-1 *et seq* ............................................................133

n.    New Mexico, N.M. Stat. Ann. §§ 57-12-1 *et seq* .....................................................134

o.    New York, N.Y. Gen. Bus. Law § 349 ........................................................................134

p.    North Carolina, N.C. Gen. Stat. §§ 75-1.1 *et seq* .....................................................135

q.    Ohio, Ohio Rev. Code §§ 1345.01 *et seq* ..................................................................135

r.    Oklahoma, 15 Okla. Stat. §§ 751 *et seq* ....................................................................135

s.    Oregon, Or. Rev. Stat. Ann. §§ 646.605 *et seq* .........................................................136

t.    Rhode Island, R.I. Gen. Laws §§ 6-13.1 *et seq* .........................................................136

u.    South Carolina, S.C. Code Ann. §§ 39-5-10 *et seq* ..................................................137

v.    Texas, Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq*................................................137

w.    Wisconsin, Wis. Stat. §§ 100.18..................................................................................138

PRAYER FOR RELIEF ............................................................................................................139

JURY DEMAND........................................................................................................................139

1    Plaintiffs bring this civil action for damages against Defendant Gilead Sciences, Inc.

2  ("Gilead" or "Defendant"). Based on the investigation of counsel, Plaintiffs allege on information

3  and belief as follows:

4                          **I.      NATURE OF THE ACTION**

5    1.    This action arises out of injuries Plaintiffs sustained as a result of ingesting the

6  prescription drug Stribild, or Stribild and one or more of the prescription drugs Viread, Truvada,

7  Atripla, and Complera, which are manufactured and marketed by Gilead for the treatment of Human

8  Immunodeficiency Virus-1 ("HIV") infection.[1]

9    2.    Gilead designed each of the drugs to contain a form of the compound tenofovir that

10  Gilead knew was toxic to patients' kidneys and bones. Tenofovir is a nucleotide analogue reverse

11  transcriptase inhibitor ("NRTI"), one of the classes of antiretroviral drugs used to treat HIV. NRTIs

12  work by blocking an enzyme HIV needs to replicate. Gilead did not discover tenofovir. Scientists in

13  Europe discovered tenofovir in the 1980s, and though the anti-HIV properties of tenofovir were

14  promising, it had a downside: it cannot not be administered effectively by mouth.

15    3.    Because an intravenous tenofovir formulation had little sales potential, Gilead

16  developed a form of tenofovir, tenofovir disoproxil, which can be taken orally.[2] The fumaric acid salt

17  of tenofovir disoproxil is tenofovir disoproxil fumarate ("TDF"). When a patient takes a pill

18  containing TDF, the patient's body converts TDF into tenofovir. Although TDF can be taken by

19  mouth, a high dose of 300 mg is typically required to achieve the desired therapeutic effect.

20    4.    Gilead designed TDF 300 mg to be an active ingredient in five drugs that are

21  approved to treat HIV:  Viread (TDF 300 mg tablets), approved October 26, 2001; Truvada (TDF

22  300 mg/emtricitabine 200 mg tablets), approved August 2, 2004; Atripla (TDF 300 mg/emtricitabine

23  200 mg/efavirenz 600 mg tablets), approved July 12, 2006; Complera (TDF 300 mg/emtricitabine

24

25    [1] Viread is also indicated to treat Hepatitis B. And Truvada is also indicated for use in
   combination with safe sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of
26  sexually acquired HIV-1 in adults at high risk.

27    [2] Tenofovir disoproxil is a prodrug form of tenofovir. Prodrugs are pharmacologically inactive
   compounds that can be more efficiently absorbed into the bloodstream and then converted into the
28  active form of the drug within the body.

COMPLAINT FOR DAMAGES - 1
Case No.:
010759-11 1080167 V1

200 mg/rilpivirine 25 mg tablets), approved August 10, 2011; and Stribild (TDF 300 mg/emtricitabine 200 mg/elvitegravir 150 mg/cobicistat 150 mg tablets), approved August 27, 2012 (collectively, these are the "TDF Drugs").

5.       Before Gilead began selling its first TDF Drug, Viread, in 2001, Gilead knew that TDF posed a safety risk to patients' kidneys and bones. Gilead knew that two of its other antiviral drugs with structures similar to tenofovir, cidofovir and adefovir dipivoxil, had been highly nephrotoxic (i.e., toxic to kidneys) and that preclinical data for TDF showed that it could cause significant kidney and bone damage. Gilead also knew that the relatively high dose of TDF created a greater risk of toxic effects, and that bone and kidney toxicities were even more likely to be seen with long-term use of TDF for the treatment of a virus that, for the foreseeable future, has no cure.

6.       Gilead's knowledge of the toxic effects of TDF only grew as patients began treatment with and were injured by each successive TDF product. By the time Gilead designed Stribild, it had ten years' worth of cumulative evidence that TDF injured patients' kidneys and bones.

7.       Gilead also knew, before it obtained approval to market Viread and Gilead's subsequent TDF Drugs, that it had discovered a safer tenofovir prodrug, tenofovir alafenamide fumarate ("TAF"). TAF is absorbed into the cells HIV targets much more efficiently than TDF. As a result, TAF can be administered at a dramatically reduced dose compared to TDF, but still achieve the same or higher concentrations of active tenofovir in the target cells. Because TAF can be administered at a much lower dose than TDF, its use is associated with less toxicity and fewer side effects. A 25 mg dose of TAF achieves the same therapeutic effect as a 300 mg dose of TDF, with a better safety profile. Despite knowing that TAF could be given at a much lower, safer dose, Gilead designed Viread, Truvada, Atripla, Complera, and Stribild to contain TDF rather than safer TAF.

8.       Falsely claiming that TAF was not different enough from TDF, Gilead abruptly shelved its TAF design in 2004. However, as John Milligan, Gilead's President and Chief Executive Officer, later admitted to investment analysts, the real reason Gilead abandoned the TAF design was that TAF was *too different* from TDF. Once Gilead's first TDF product, Viread, was on the market, Gilead did not want to hurt TDF sales by admitting that its TDF-based products are unreasonably and unnecessarily unsafe.

COMPLAINT FOR DAMAGES - 2
Case No.:
010759-11 1080167 V1

9.      It was crucial at that time for Gilead to increase Viread sales, which comprised 53% of Gilead's total product sales in 2002, and 68% of Gilead's total product sales in 2003. Gilead was so desperate to expand Viread sales that it repeatedly misrepresented Viread's safety profile when promoting the drug to doctors—falsely calling it a "miracle drug" with "no toxicities."

10.      In addition, Gilead knew that by withholding the safer TAF design, it could extend the longevity of its HIV drug franchise and make billions two times over: first, with TDF medications until TDF patent expiration, which would begin by no later than 2018, and second, with TAF medications until TAF patent expiration as late as 2032.  Only once Gilead realized billions in sales through most of the TDF patent life did it seek to market safer TAF-based versions of its HIV medications.

11.      Finally, in 2015, Gilead began selling the first of its TAF-designed medicines and convinced doctors to switch their patients from TDF-based to TAF-based regimens by demonstrating TAF's superior safety profile over TDF with respect to kidney and bone toxicity—the very benefits that Gilead could have and should have incorporated into its prior product designs but withheld from doctors and patients for over a decade.

12.      Gilead also made Stribild even more dangerous to Plaintiffs when it designed the drug to include cobicistat in combination with 300 mg TDF. Cobicistat is a pharmacoenhancer or "booster" that inhibits the breakdown of elvitegravir, another active ingredient in Stribild. Cobicistat allows elvitegravir to persist in the patient's system long enough to permit once-daily dosing.

13.      Gilead knew years before it developed Stribild that: (a) higher tenofovir concentrations in patients' blood, as opposed to the target cells, endangers the kidneys; (b) tenofovir concentrations in patients' blood increase significantly when patients take tenofovir with a booster; and (c) TDF-associated renal toxicity occurs more frequently in patients taking TDF as part of a boosted regimen.

14.      When Gilead developed its first TAF-based antiviral product, Genvoya—which is Stribild with TAF in place of TDF—Gilead reduced the dose of TAF from 25 mg to 10 mg to account for the fact that cobicistat significantly increases tenofovir concentrations. Gilead knew to reduce the dose of TAF in Genvoya before it submitted Stribild to the FDA for marketing approval.

COMPLAINT FOR DAMAGES - 3
Case No.:
010759-11 1080167 V1

1   Despite this knowledge, Gilead did not reduce the dose of TDF when it designed Stribild. Stribild is
2   even more toxic to patients' kidneys and bones than Gilead's other TDF-based products.

3        15.    In addition to withholding safer designs, Gilead failed to adequately warn physicians
4   and patients about the risks and safe use of TDF. Gilead provided only the weakest, inadequate
5   warnings to doctors and patients about the need for frequent monitoring of all patients for TDF-
6   associated kidney and bone damage—preventing doctors from detecting early signs of TDF toxicity.

7        16.    Gilead provides stronger monitoring warnings to physicians and patients in the
8   European Union than it does in the United States for the exact same TDF products. Contrary to its
9   U.S. labeling, Gilead has consistently recommended, since the approval of its first TDF Drug in the
10  EU, that doctors in the EU monitor all TDF Drug patients for multiple markers of TDF toxicity on a
11  frequent, specified schedule. There is no scientific or medical rationale for these differences. Gilead
12  was more concerned with increasing or maintaining crucial U.S. sales than it was in safeguarding
13  patients from the known risks of TDF.

14       17.    Gilead intentionally withheld a safer alternative design of TDF Drugs it knew to be
15  dangerously toxic to patients' kidneys and bones, while failing to adequately warn about the risks
16  and safer use of the defective drugs, solely to make more money. Accordingly, Plaintiffs bring this
17  action to recover damages for their personal injuries and seek punitive damages arising from
18  Gilead's willful and wanton conduct.

19                              **II.    JURISDICTION AND VENUE**

20       18.    Jurisdiction exists under 28 U.S.C. § 1332(d) because this is a mass action involving
21  claims for monetary relief of 100 or more persons that involve common questions of law or fact;
22  some Plaintiffs are citizens of a state different from Gilead; Plaintiffs' claims exceed $5 million in
23  the aggregate, exclusive of interest and costs; and Plaintiffs' claims exceed the sum or value of
24  $75,000, exclusive of interest and costs.

25       19.    Jurisdiction also exists under 28 U.S.C. § 1332(a) for those Plaintiffs who are citizens
26  of states other than California. Non-California Plaintiffs and Gilead are citizens of different states
27  and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

28

COMPLAINT FOR DAMAGES - 4
Case No.:
010759-11 1080167 V1

20.     Venue is proper in this District under 28 U.S.C. §§ 1391(1)-(2). Defendant resides in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

### III.     INTRADISTRICT ASSIGNMENT

21.     Pursuant to Civil L.R. 3-2(c), this action shall be assigned to the San Francisco Division or the Oakland Division because Gilead resides and has its principal place of business in San Mateo County.

### IV.     PARTIES

22.     Plaintiffs are consumers who ingested Stribild or Stribild and one or more of Gilead's other TDF Drugs.

23.     Plaintiffs suffered personal injuries caused by ingesting TDF.

24.     Plaintiff Adrian Holley is and was at all relevant times a citizen of the State of Alabama and domiciled in Alexander City, Alabama. Plaintiff Adrian Holley purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused demineralization of Plaintiff's bones, resulting in a diagnosis of low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

25.     Plaintiff Aloysius William Reiter is and was at all relevant times a citizen of the State of Missouri and domiciled in St. Louis, Missouri. Plaintiff Aloysius William Reiter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2004 to 2012, Truvada from 2012 to 2014, and Stribild until 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to a fracture of Plaintiff's

toe. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

26.     Plaintiff Alvin Washington is and was at all relevant times a citizen of the State of Florida and domiciled in Orlando, Florida. Plaintiff Alvin Washington purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2014, Atripla from 2014 to 17, and Stribild from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to develop kidney dysfunction and severe kidney failure, which has caused or contributed to Plaintiff's depression and disability. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including dialysis three times per week for approximately two years. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

27.     Plaintiff Andrew Gudgel is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Durant, Oklahoma. Plaintiff Andrew Gudgel purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2009 to 2014 and Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28.     Plaintiff Annette Cannon Johnson is and was at all relevant times a citizen of the State of Maryland and domiciled in Baltimore, Maryland. Plaintiff Annette Cannon Johnson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney damage and be diagnosed with chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

29.     Plaintiff Anthony Adams is and was at all relevant times a citizen of the State of Florida and domiciled in Ft. Lauderdale, Florida. Plaintiff Anthony Adams purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla, Truvada and Stribild from 2004 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with osteoporosis, and which caused or contributed to fractures of Plaintiff's shins. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life, including limitations on Plaintiff's activities as an avid cycler and runner, as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

30.     Plaintiff Anthony B. Wilson is and was at all relevant times a citizen of the State of Georgia and domiciled in Augusta, Georgia. Plaintiff Anthony B. Wilson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with severe osteoporosis in his twenties

and which caused or contributed to a fracture to Plaintiff's wrist. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including extremely painful weight bearing exercises. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

31.     Plaintiff Anthony Tyrone Jackson is and was at all relevant times a citizen of the State of Georgia and domiciled in Stone Mountain, Georgia. Plaintiff Anthony Tyrone Jackson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to July of 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer significant bone demineralization. At only thirty-two years of age, Plaintiff has difficulty lifting his leg without assistance, is in constant pain, and was forced to leave his career as a mass transit specialist. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

32.     Plaintiff Antiqua Shirley is and was at all relevant times a citizen of the State of Georgia and domiciled in Gainesville, Georgia. Plaintiff Antiqua Shirley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2003 to 2008, Truvada from 2009 to 2010, Atripla from 2009 to 2015 and Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. At the young age of thirty-eight, Plaintiff's injuries have caused Plaintiff to limit her physical activity and have resulted in a determination that Plaintiff is disabled. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

1    has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of

2    life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other

3    injuries and damages to be proven at trial.

4         33.    Plaintiff Antonio Kincey is and was at all relevant times a citizen of the State of

5    Nevada and domiciled in Las Vegas, Nevada. Plaintiff Antonio Kincey purchased and ingested the

6    following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2011 to 2016.

7    As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested

8    and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff

9    to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff

10   required and incurred and will continue to require and incur expenses in connection with medical

11   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

12   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

13   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

14        34.    Plaintiff Antonio Lavelle Jackson is and was at all relevant times a citizen of the State

15   of Ohio and domiciled in Euclid, Ohio. Plaintiff Antonio Lavelle Jackson purchased and ingested the

16   following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2011 to 2013 and Stribild

17   from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF

18   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

19   TDF Drugs caused Plaintiff to suffer significant bone injury, which his healthcare provider attributed

20   to TDF. Plaintiff required and incurred and will continue to require and incur expenses in connection

21   with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure

22   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

23   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

24        35.    Plaintiff Barry Todd Moses is and was at all relevant times a citizen of the State of

25   Alabama and domiciled in Moody, Alabama. Plaintiff Barry Todd Moses purchased and ingested the

26   following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2017. As a result of

27   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

28   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused bone

COMPLAINT FOR DAMAGES - 9
Case No.:
010759-11 1080167 V1

demineralization in Plaintiff, resulting in a diagnosis of osteopenia and osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

36.     Plaintiff Barry Weatherley is and was at all relevant times a citizen of the State of New York and domiciled in Bronx, New York. Plaintiff Barry Weatherley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2009 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which caused or contributed to multiple fractures to Plaintiff's feet. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

37.     Plaintiff Bettie Jean Thomas is and was at all relevant times a citizen of the State of Virginia and domiciled in Alexandria, Virginia. Plaintiff Bettie Jean Thomas purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

38.     Plaintiff Bradley McDonald is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff Bradley McDonald purchased and

COMPLAINT FOR DAMAGES - 10
Case No.:
010759-11 1080167 V1

1

2

3

4

5

6

7

8

9

ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2007, Atripla from 2007 to 2014 and Stribild from April 2014 to September 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

10

11

12

13

14

15

16

17

18

19

     39.     Plaintiff Brandon Sledge is and was at all relevant times a citizen of the State of Louisiana and domiciled in Monroe, Louisiana. Plaintiff Brandon Sledge purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer end-stage renal failure, requiring hospitalization and dialysis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including hospitalization and dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

20

21

22

23

24

25

26

27

     40.     Plaintiff Brian Maxey is and was at all relevant times a citizen of the State of Missouri and domiciled in St. Louis, Missouri. Plaintiff Brian Maxey purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2007 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

28

COMPLAINT FOR DAMAGES - 11
Case No.:
010759-11 1080167 V1

suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

41.    Plaintiff Carlos Proctor is and was at all relevant times a citizen of the State of Maryland and domiciled in Clinton, Maryland. Plaintiff Carlos Proctor purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer damages to his kidneys, resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

42.    Plaintiff Christian Torres is and was at all relevant times a citizen of the State of Florida and domiciled in Hialeah, Florida. Plaintiff Christian Torres purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer low bone density at the young age of twenty-five. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, including loss of mobility, and has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

43.    Plaintiff Christine Cope is and was at all relevant times a citizen of the State of Texas and domiciled in New Braunfels, Texas. Plaintiff Christine Cope purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Complera and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis.

COMPLAINT FOR DAMAGES - 12
Case No.:
010759-11 1080167 V1

1
2
3
4

Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

5
6
7
8
9
10
11
12
13
14

44.     Plaintiff Clarence E. Southall Jr. is and was at all relevant times a citizen of the State of Texas and domiciled in Missouri City, Texas. Plaintiff Clarence E. Southall Jr. purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from April 2016 to November 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to experience dangerously high levels of creatinine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

15
16
17
18
19
20
21
22
23
24
25

45.     Plaintiff Claudio Moreira is and was at all relevant times a citizen of the State of Florida and domiciled in Pierson, Florida. Plaintiff Claudio Moreira purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, and Stribild for approximately 10 years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

26
27
28

46.     Plaintiff Colette Eva Gilmer is and was at all relevant times a citizen of the State of South Carolina and domiciled in Columbia, South Carolina. Plaintiff Colette Eva Gilmer purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2016 to

August 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to a compound fracture in Plaintiff's spine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

47.     Plaintiff Curtis Pritchett is and was at all relevant times a citizen of the State of North Carolina and domiciled in Gastonia, North Carolina. Plaintiff Curtis Pritchett purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2013 and Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, resulting in a diagnosis of kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

48.     Plaintiff Cynthia Durant is and was at all relevant times a citizen of the State of Minnesota and domiciled in Brooklyn Park, Minnesota. Plaintiff Cynthia Durant purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Truvada, then Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs.  Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

49.     Plaintiff Cynthia Lorraine Spears is and was at all relevant times a citizen of the State of California and domiciled in Playa Del Rey, California. Plaintiff Cynthia Lorraine Spears purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild, Truvada, and Viread for a total of approximately six years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from Fanconi syndrome, bone demineralization, and a fracture of Plaintiff's foot. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

50.     Plaintiff D'Andre L. Hale is and was at all relevant times a citizen of the State of Ohio and domiciled in Cincinnati, Ohio. Plaintiff D'Andre L. Hale purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla, Truvada, and Stribild from 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to experience proteinuria. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

51.     Plaintiff Dameco Gates is and was at all relevant times a citizen of the State of California and domiciled in Hawthorne, California. Plaintiff Dameco Gates purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

suffer from bone demineralization and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

52.     Plaintiff Daniel J. McLean is and was at all relevant times a citizen of the State of Florida and domiciled in St. Petersburg, Florida. Plaintiff Daniel J. McLean purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney dysfunction, including a reduction in his kidney function to 50 percent. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

53.     Plaintiff Daniel Schenske-Shelton is and was at all relevant times a citizen of the State of Florida and domiciled in Orlando, Florida. Plaintiff Daniel Schenske-Shelton purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2016 and Stribild in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney failure.  Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

54.     Plaintiff Darron Barnes is and was at all relevant times a citizen of the State of Maryland and domiciled in Baltimore, Maryland. Plaintiff Darron Barnes purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2014 to

2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction and disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

55.      Plaintiff Darryl Flammer is and was at all relevant times a citizen of the State of Maryland and domiciled in Silver Spring, Maryland. Plaintiff Darryl Flammer purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer dangerously high creatinine levels and bone demineralization, resulting in a diagnosis of osteoporosis and fractures to Plaintiff's hips and ankle. Plaintiff's injuries required Plaintiff to use a wheelchair for mobility and caused Plaintiff mental pain, distress and anguish as a result of being unable to care for his elderly mother.  Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

56.      Plaintiff Daryl Lindsay is and was at all relevant times a citizen of the State of Texas and domiciled in Milano, Texas. Plaintiff Daryl Lindsay purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia and which caused or contributed to Plaintiff suffering fractures in his hips and ankles. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

1    endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

2    a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

3    and damages to be proven at trial.

4        57.    Plaintiff David Gonzales is and was at all relevant times a citizen of the State of

5    Colorado and domiciled in Denver, Colorado. Plaintiff David Gonzales purchased and ingested the

6    following TDF Drugs for an FDA-approved use of the drugs: Truavda and Stribild from 2008 to

7    2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

8    ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

9    Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff

10   required and incurred and will continue to require and incur expenses in connection with medical

11   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

12   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

13   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

14       58.    Plaintiff David Johnson is and was at all relevant times a citizen of the State of

15   Florida and domiciled in DeFuniak Springs, Florida. Plaintiff David Johnson purchased and ingested

16   the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and

17   Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective

18   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

19   the TDF Drugs caused Plaintiff to suffer chronic kidney disease and bone demineralization, for

20   which Plaintiff was diagnosed with osteoporosis, and which caused or contributed to numerous

21   compression fractures in Plaintiff's spine. Plaintiff required and incurred and will continue to require

22   and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

23   endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

24   a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

25   and damages to be proven at trial.

26       59.    Plaintiff David Maloney is and was at all relevant times a citizen of the State of

27   Colorado and domiciled in Lakewood, Colorado. Plaintiff David Maloney purchased and ingested

28   the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, and Stribild. As a

result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from kidney dysfunction and damage to Plaintiff's kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

60.     Plaintiff David Oneal Bozeman is and was at all relevant times a citizen of the State of Mississippi and domiciled in Moss Point, Mississippi. Plaintiff David Oneal Bozeman purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla, Stribild and Complera beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and kidney failure requiring surgery and hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization and surgery. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

61.     Plaintiff David Zajac is and was at all relevant times a citizen of the State of Wisconsin and domiciled in Milwaukee, Wisconsin. Plaintiff David Zajac purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

COMPLAINT FOR DAMAGES - 19
Case No.:
010759-11 1080167 V1

62.     Plaintiff Demetrius Waters is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff Demetrius Waters purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla, Complera and Stribild from 2008 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from kidney dysfunction and damage to Plaintiff's kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

63.     Plaintiff Dennis Phillips is and was at all relevant times a citizen of the State of Pennsylvania and domiciled in Stroudsburg, Pennsylvania. Plaintiff Dennis Phillips purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla for approximately one year in 2014 and Stribild from 2015 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer loss of kidney function and stage 3 chronic kidney disease. Plaintiff's injuries have caused and will continue to cause extreme pain, mental anguish, fear and distress relating to swelling caused by his condition and related shortness of breath. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

64.     Plaintiff Deshawn C. Mitchell is and was at all relevant times a citizen of the State of New York and domiciled in Bronx, New York. Plaintiff Deshawn C. Mitchell purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Complera from 2013 to 2015 and Stribild beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, resulting in renal failure and a diagnosis of chronic kidney disease and requiring hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

65.     Plaintiff Dinah Hardy is and was at all relevant times a citizen of the State of Mississippi and domiciled in Jackson, Mississippi. Plaintiff Dinah Hardy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2013 to 2015 and Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to her kidneys, resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

66.     Plaintiff Douglas Leroy Phipps is and was at all relevant times a citizen of the State of California and domiciled in Pomona, California. Plaintiff Douglas Leroy Phipps purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2012 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused damage to Plaintiff's kidneys, for which Plaintiff was diagnosed with stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

67.     Plaintiff Duane Lewis is and was at all relevant times a citizen of the State of California and domiciled in Sacramento, California. Plaintiff Duane Lewis purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Complera from 2013 to 2014 and Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with osteoporosis and which caused two of Plaintiff's vertebrae to fracture. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

68.     Plaintiff Dushawn Walker is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Dushawn Walker purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

69.     Plaintiff Dwayne Ross is and was at all relevant times a citizen of the State of Florida and domiciled in Palmetto, Florida. Plaintiff Dwayne Ross purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney

dysfunction beginning at the young age of forty, and bone demineralization, for which he was diagnosed with osteoporosis at the young age of forty-one. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

70.     Plaintiff Earl Roberts III is and was at all relevant times a citizen of the State of Delaware and domiciled in Seaford, Delaware. Plaintiff Earl Roberts III purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread for approximately one year, Truvada from 2014 to 2015 and Stribild for approximately six months in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer weakness of the bones, which caused or contributed to fractures to Plaintiff's ribs. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life including an inability to perform his employment transporting medical patients, as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

71.     Plaintiff Elizabeth Anne Flournoy is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Elizabeth Anne Flournoy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2005 and Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney failure, for which she has had to undergo multiple dialysis treatments per week for more than a decade. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer bone demineralization, for which she was diagnosed with osteoporosis and for which she had to undergo painful bone marrow scrapings and other testing and treatment. Plaintiff required and incurred and will continue to require and incur expenses in connection with

medical treatment as a result of these injuries, including dialysis, diagnostic testing, physician visits, hectoral injections, physical therapy and other treatments. Plaintiff must also use a walker or a cane when for mobility. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, including the total loss of her career, loss of enjoyment of life, and other injuries and damages to be proven at trial.

72.     Plaintiff Emily Jean Butler is and was at all relevant times a citizen of the State of South Carolina and domiciled in Georgetown, South Carolina. Plaintiff Emily Jean Butler purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

73.     Plaintiff Emmanuel Desire is and was at all relevant times a citizen of the State of Florida and domiciled in Hernando, Florida. Plaintiff Emmanuel Desire purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and low bone density, which caused or contributed to a fall in which Plaintiff suffered cuts to his face, arms and legs. Plaintiff's physicians have also recommended that Plaintiff retire early due to his injuries. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

COMPLAINT FOR DAMAGES - 24
Case No.:
010759-11 1080167 V1

74.     Plaintiff Faykeita Lenore Wearing is and was at all relevant times a citizen of the State of Pennsylvania and domiciled in Philadelphia Pennsylvania. Plaintiff Faykeita Lenore Wearing purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2009 and Stribild from 2012 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff's injuries have required her to use a cane for walking, leave her career and go on disability. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff, who is under age 50, to suffer acute kidney failure and coma. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization and dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

75.     Plaintiff Felipe June Quiambao is and was at all relevant times a citizen of the State of New Mexico and domiciled in Espanola, New Mexico. Plaintiff Felipe June Quiambao purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer low bone density and loss of kidney function. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

76.     Plaintiff Fred Monroe Cobbett Jr. is and was at all relevant times a citizen of the State of Mississippi and domiciled in Olive Branch, Mississippi. Plaintiff Fred Monroe Cobbett Jr. purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,

Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer kidney failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including hospitalization and dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

77. Plaintiff Georgia Elaine Tanner is and was at all relevant times a citizen of the State of Texas and domiciled in Killeen, Texas. Plaintiff Georgia Elaine Tanner purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla to 2016 and Stribild beginning in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

78. Plaintiff Gilbert James, individually and as personal representative for the Estate of Tammy Guydon, is and was at all relevant times a citizen of the State of Arkansas and domiciled in Little Rock, Arkansas. Plaintiff, Gilbert James is the husband of Tammy Guydon, deceased. Decedent, Tammy Guydon purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2013 to 2016 and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Decedent ingested and was injured by the foregoing TDF Drugs. Decedent's ingestion of the TDF Drugs caused Decedent to suffer kidney failure, which ultimately resulted in her death. Decedent's ingestion of the defective TDF Drugs also caused Decedent to suffer bone demineralization and weakening of her bones. Decedent required and

incurred expenses in connection with medical treatment as a result of these injuries, including hospitalization and dialysis. As a direct and proximate result of Defendant Gilead's wrongful conduct, Decedent Tammy Guydon suffered severe bodily injuries, pain, suffering, mental anguish, loss of enjoyment of life and loss of earnings and/or earning capacity, up to the time of her death. Decedent's death was a direct and proximate result of Defendant's wrongful conduct and the injuries caused to Decedent by Defendant's wrongful conduct. Plaintiff James Gilbert, individually and in his capacity as representative for the Estate of Tammy Guydon, has suffered loss of consortium in the past and future, including loss of the relationship, loss of affection, society, assistance, emotional support, care, comfort, solace, companionship, protection, and services; past and future pecuniary losses including earning capacity, advice, counsel, services, care, maintenance, support, and contributions that he would, in reasonable probability, have received had his wife lived; past and future mental anguish; and past and future pecuniary losses including earning capacity; and the necessary expenses for any emergency care and funeral and burial expenses of Decedent Tammy Guydon; and other damages to be proven at trial.

79.     Plaintiff Gloria Lynn Green is and was at all relevant times a citizen of the State of Alabama and domiciled in Birmingham, Alabama. Plaintiff Gloria Lynn Green purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from approximately 2011 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused damage to and weakening of Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

80.     Plaintiff Grace Marie Thomas is and was at all relevant times a citizen of the State of Louisiana and domiciled in St. Gabriel, Louisiana. Plaintiff Grace Marie Thomas purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life including loss of mobility and personal freedom as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

81.     Plaintiff George Allen Myers is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff George Allen Myers purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild, Complera, Truvada, and Atripla from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from bone demineralization, for which he was diagnosed with osteoporosis, and which has caused or contributed to multiple rib fractures. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

82.     Plaintiff Hector Manuel Bedoya is and was at all relevant times a citizen of the State of California and domiciled in Ponoma, California. Plaintiff Hector Manuel Bedoya purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild, Viread, and Truvada. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

COMPLAINT FOR DAMAGES - 28
Case No.:
010759-11 1080167 V1

83.     Plaintiff Herbie Kay Dehorney is and was at all relevant times a citizen of the State of California and domiciled in Moreno Valley, California. Plaintiff Herbie Kay Dehorney purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2004, Truvada from 2004 to 2007, Atripla from 2007 to 2011, Complera from 2011 to 2013 and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization at the young age of forty-four, which caused or contributed to a fracture of Plaintiff's jaw. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including physical therapy. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

84.     Plaintiff Jamal Loranso Smith is and was at all relevant times a citizen of the State of Nevada and domiciled in Las Vegas, Nevada. Plaintiff Jamal Loranso Smith purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Complera prior to 2013 and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer stage 3 chronic kidney disease and bone demineralization resulting in a diagnosis of low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

85.     Plaintiff Jermaine Carter is and was at all relevant times a citizen of the State of Ohio and domiciled in New Philadelphia, Ohio. Plaintiff Jermaine Carter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

1    Plaintiff to suffer damages to his kidneys, resulting in a diagnosis of chronic kidney disease. Plaintiff

2    required and incurred and will continue to require and incur expenses in connection with medical

3    treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

4    suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

5    earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

6           86.    Plaintiff Jermaine Fleming is and was at all relevant times a citizen of the State of

7    Maryland and domiciled in Baltimore, Maryland. Plaintiff Jermaine Fleming purchased and ingested

8    the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2012. As a

9    result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

10   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

11   suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis while only in his

12   forties. Plaintiff required and incurred and will continue to require and incur expenses in connection

13   with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure

14   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

15   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

16          87.    Plaintiff Jerry Miller is and was at all relevant times a citizen of the State of New

17   York and domiciled in Syracuse, New York. Plaintiff Jerry Miller purchased and ingested the

18   following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of

19   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

20   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

21   reduced kidney function. Plaintiff required and incurred and will continue to require and incur

22   expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

23   will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

24   his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

25   damages to be proven at trial.

26          88.    Plaintiff John Doe 1 is and was at all relevant times a citizen of the State of North

27   Carolina and domiciled in Winston-Salem, North Carolina. Plaintiff John Doe 1 purchased and

28   ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild for

COMPLAINT FOR DAMAGES - 30
Case No.:
010759-11 1080167 V1

approximately four years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with low bone density at the young age of thirty-four. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

89.     Plaintiff John Lee Pullen is and was at all relevant times a citizen of the State of Maryland and domiciled in Charles County, Maryland. Plaintiff John Lee Pullen purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2005 to 2011, Complera from 2011 to 2015 and Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteopenia at the young age of forty-five. Plaintiff's osteopenia and related deterioration have occurred in his spine, which has caused plaintiff extreme pain and suffering as well as continual numbness in his left foot and has caused Plaintiff to lose over an inch in height. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including working out, sexual relations, visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff John Lee Pullen must often use a cane or walker for mobility due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty climbing stairs in his three-level townhome. Plaintiff's injuries have also had a negative impact on his career as an IT consultant for a federal agency in that his injuries have caused him to require time off from work and require Plaintiff to take frequent breaks. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery and physical therapy. Plaintiff has endured

and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

90.     Plaintiff Juan Villareal Sr. is and was at all relevant times a citizen of the State of Arizona and domiciled in Phoenix, Arizona. Plaintiff Juan Villareal Sr. purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to 2016.  As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer from renal failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

91.     Plaintiff Kathi Ray is and was at all relevant times a citizen of the State of Oregon and domiciled in McMinnville, Oregon. Plaintiff Kathi Ray purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2010 to 2013 and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff's ingestion of the TDF Drugs has also caused Plaintiff to suffer stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

92.     Plaintiff Katina Hall is and was at all relevant times a citizen of the State of Alabama and domiciled in Birmingham, Alabama. Plaintiff Katina Hall purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild for approximately five years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested

and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused bone demineralization in Plaintiff's hips, bilaterally, resulting in a diagnosis of low bone density at the young age of 35. As a result, Plaintiff Katina Hall has extreme difficulty walking and has endured multiple back surgeries due to deterioration and to relieve the severe pain in her back, hips and legs, despite physical therapy. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery. Plaintiff's physicians have recommended bilateral hip replacements as a result of the damage to her bones. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

93.     Plaintiff Kelly Gardner is and was at all relevant times a citizen of the State of Missouri and domiciled in Kansas City, Missouri. Plaintiff Kelly Gardner purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla beginning in 2006 and Stribild for approximately six months. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with severe osteoporosis and which caused or contributed to Plaintiff's bilateral femur fractures. Plaintiff Kelly Gardner, a once active soccer mom with a professional career, has been forced by her injuries to use a walker, cane or wheelchair for mobility, to retire early from her career and to go on medical disability. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery, frequent hospital visits, and implantation of bone stimulators. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

94.     Plaintiff Kelvin McCall is and was at all relevant times a citizen of the State of Florida and domiciled in Fort Lauderdale, Florida. Plaintiff Kelvin McCall purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to January 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

COMPLAINT FOR DAMAGES - 33
Case No.:
010759-11 1080167 V1

and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer severe kidney dysfunction requiring hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

95.     Plaintiff Kenneth Smith is and was at all relevant times a citizen of the State of Rhode Island and domiciled in Providence, Rhode Island. Plaintiff Kenneth Smith purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2007, Truvada 2008 to 2012 and Stribild beginning in approximately 2013. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer acute renal failure, which required inpatient hospitalization and dialysis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization and dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

96.     Plaintiff Kenneth Taroy is and was at all relevant times a citizen of the State of Oregon and domiciled in Ontario, Oregon. Plaintiff Kenneth Taroy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2010 to 2014, Complera from 2012 to 2013 and Stribild from 2013 to February of 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer stage 3 chronic kidney disease. Plaintiff's injuries have required Plaintiff, at less than thirty years of age, to undergo significant changes in his lifestyle, including limiting his activity and leaving his employment as a bank teller. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these

COMPLAINT FOR DAMAGES - 34
Case No.:
010759-11 1080167 V1

1    injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

2    enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

3    capacity, and other injuries and damages to be proven at trial.

4        97.    Plaintiff Kent Horen is and was at all relevant times a citizen of the State of Arizona

5    and domiciled in Phoenix, Arizona. Plaintiff Kent Horen purchased and ingested the following TDF

6    Drug for an FDA-approved use of the drug: Stribild from 2014 to 2017. As a result of Gilead's

7    wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the

8    foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone

9    demineralization, for which Plaintiff was diagnosed with low bone density, and loss of several inches

10   of height. Plaintiff required and incurred and will continue to require and incur expenses in

11   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

12   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

13   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

14   to be proven at trial.

15       98.    Plaintiff Kenyon Detai Belyeu is and was at all relevant times a citizen of the State of

16   Arizona and domiciled in Phoenix, Arizona. Plaintiff Kenyon Detai Belyeu purchased and ingested

17   the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2017. As a

18   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

19   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused damage to

20   Plaintiff's kidneys, including a reduction in kidney function to 53 percent. Plaintiff required and

21   incurred and will continue to require and incur expenses in connection with medical treatment as a

22   result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

23   anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

24   loss of earning capacity, and other injuries and damages to be proven at trial.

25       99.    Plaintiff Kevin D. McQuay is and was at all relevant times a citizen of the State of

26   Pennsylvania and domiciled in Allentown, Pennsylvania. Plaintiff Kevin D. McQuay purchased and

27   ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2017.

28   As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

1    and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

2    suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused

3    or contributed to multiple fractures to Plaintiff's ankles. Plaintiff required and incurred and will

4    continue to require and incur expenses in connection with medical treatment as a result of these

5    injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

6    enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

7    capacity, and other injuries and damages to be proven at trial.

8           100.    Plaintiff Khaliq Muhammad is and was at all relevant times a citizen of the State of

9    New York and domiciled in Bronx, New York. Plaintiff Khaliq Muhammad purchased and ingested

10   the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a

11   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

12   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

13   suffer damage to Plaintiff's kidneys, including a sixty percent loss of kidney function. Plaintiff

14   required and incurred and will continue to require and incur expenses in connection with medical

15   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

16   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

17   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

18          101.    Plaintiff Kimberly Porter is and was at all relevant times a citizen of the State of

19   Mississippi and domiciled in Sardis, Mississippi. Plaintiff Kimberly Porter purchased and ingested

20   the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2012 and

21   Stribild from 2013 to 2015. As a result of Gilead's wrongful conduct with respect to the defective

22   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

23   the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed

24   with osteoporosis. Plaintiff's injuries have required her to use a cane, walker or wheelchair to

25   achieve mobility. Plaintiff required and incurred and will continue to require and incur expenses in

26   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

27   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

28

1  injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

2  to be proven at trial.

3      102.    Plaintiff Kyle Malone is and was at all relevant times a citizen of the State of New

4  Jersey and domiciled in Mount Laurel, New Jersey. Plaintiff Kyle Malone purchased and ingested

5  the following TDF Drugs for an FDA-approved use of the drugs: Stribild from 2015 to 2016 and

6  Truvada from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective

7  TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

8  the TDF Drugs caused Plaintiff, who today is only 32 years old, to suffer bone demineralization, for

9  which Plaintiff was diagnosed with osteopenia and which also caused or contributed to numerous

10  fractures of Plaintiff's fingers and toes. Plaintiff required and incurred and will continue to require

11  and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

12  endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

13  a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

14  and damages to be proven at trial.

15      103.    Plaintiff Laquisha Park is and was at all relevant times a citizen of the State of Texas

16  and domiciled in League, Texas. Plaintiff Laquisha Park purchased and ingested the following TDF

17  Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2015 to 2017. As a result of

18  Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was

19  injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer

20  bone demineralization, for which Plaintiff was diagnosed with bone density loss. Plaintiff required

21  and incurred and will continue to require and incur expenses in connection with medical treatment as

22  a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

23  anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a

24  loss of earning capacity, and other injuries and damages to be proven at trial.

25      104.    Plaintiff Latanga Sparks is and was at all relevant times a citizen of the State of

26  Georgia and domiciled in Brunswick, Georgia. Plaintiff Latanga Sparks purchased and ingested the

27  following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2006 to June

28  2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

COMPLAINT FOR DAMAGES - 37
Case No.:
010759-11 1080167 V1

ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life, including a diminished ability to run or play with her children as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

105.     Plaintiff Lela Wilson is and was at all relevant times a citizen of the State of Alabama and domiciled in Athens, Alabama. Plaintiff Lela Wilson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug.  Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer acute renal failure, requiring inpatient hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

106.     Plaintiff Levine Levingston-Jones is and was at all relevant times a citizen of the State of North Carolina and domiciled in Mocksville, North Carolina. Plaintiff Levine Levingston-Jones purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada for approximately five years and Stribild for approximately one year in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer tubular dysfunction and other damage to her kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

107.    Plaintiff Marcus McCoy is and was at all relevant times a citizen of the State of North Carolina and domiciled in Durham, North Carolina. Plaintiff Marcus McCoy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2010 to 2016 and Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer reduced kidney function. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

108.    Plaintiff Margaret Beacham is and was at all relevant times a citizen of the State of Tennessee and domiciled in Clarksville, Tennessee. Plaintiff Margaret Beacham purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2008 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone weakness and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

109.    Plaintiff Marisa Dubose is and was at all relevant times a citizen of the State of Mississippi and domiciled in Pascagoula, Mississippi. Plaintiff Marisa Dubose purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Viread from 2015 to 2017 and Stribild beginning in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer chronic kidney disease, which required inpatient hospitalization. Plaintiff, a young mother, lost her job as a result of the injuries caused by the TDF Drugs and suffers from the mental anguish and stress of worrying how she will

support her children. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

110.     Plaintiff Mark D. DeCosta is and was at all relevant times a citizen of the State of Rhode Island and domiciled in Providence, Rhode Island. Plaintiff Mark D. DeCosta purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2012 to 2013 and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to be diagnosed with weakening of the bones while only in his twenties. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

111.     Plaintiff Mark David Killeen is and was at all relevant times a citizen of the State of Nevada and domiciled in Las Vegas, Nevada. Plaintiff Mark David Killeen purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to experience high levels of creatinine, kidney failure requiring hospitalization, and stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

112.    Plaintiff Mark Williams is and was at all relevant times a citizen of the State of Georgia and domiciled in Decatur, Georgia. Plaintiff Mark Williams purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from October 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, or contributed to such condition, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

113.    Plaintiff Martin W. Cooper is and was at all relevant times a citizen of the State of Arizona and domiciled in Tucson, Arizona. Plaintiff Martin W. Cooper purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2006, Atripla from 2006 to 2008, Truvada from 2008 to 2012 and Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to a fracture to Plaintiff's hip. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure decreased mobility, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

114.    Plaintiff Matthew Jon Crenshaw is and was at all relevant times a citizen of the State of New Jersey and domiciled in Kearny, New Jersey. Plaintiff Matthew Jon Crenshaw purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla in 2006, Truvada from 2010 to 2014 and Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with

respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff, who is only thirty-three years of age, to suffer acute kidney failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

115.    Plaintiff Matthew Yale is and was at all relevant times a citizen of the State of California and domiciled in Alameda, California. Plaintiff Matthew Yale purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2013 and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from kidney dysfunction and osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

116.    Plaintiff Maurizio Marchese is and was at all relevant times a citizen of the State of Rhode Island and domiciled in Warwick, Rhode Island. Plaintiff Maurizio Marchese purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2015 to 2017 and Stribild beginning in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer numerous episodes of kidney failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

COMPLAINT FOR DAMAGES - 42
Case No.:
010759-11 1080167 V1

117.    Plaintiff Mel M. Allen is and was at all relevant times a citizen of the State of Minnesota and domiciled in Minneapolis, Minnesota. Plaintiff Mel M. Allen purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused damage to Plaintiff's kidneys, reducing his kidney function to thirty percent and resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

118.    Plaintiff Melvin Snoddy is and was at all relevant times a citizen of the State of New York and domiciled in Albany, New York. Plaintiff Melvin Snoddy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2009 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff's ingestion of the TDF Drugs also caused damage to Plaintiff's kidneys, including reduced kidney function, for which Plaintiff may need dialysis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

119.    Plaintiff Michael Tribble is and was at all relevant times a citizen of the State of Mississippi and domiciled in Gulfport, Mississippi. Plaintiff Michael Tribble purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2009 to 2017 and Stribild from 2017 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

the TDF Drugs caused Plaintiff to suffer weakening of the bones and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

120.    Plaintiff Michael Williams is and was at all relevant times a citizen of the State of California and domiciled in Twentynine Palms, California. Plaintiff Michael Williams purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff suffer dangerously high levels of creatinine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

121.    Plaintiff Millicent Yvette Foster is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Millicent Yvette Foster purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Complera and Stribild from 2001 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drug caused Plaintiff to be diagnosed with osteoporosis and which caused Plaintiff to require bilateral hip replacements. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including bilateral hip replacement surgery. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

122.    Plaintiff Nicholas Jones is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Nicholas Jones purchased and ingested

the following TDF Drug for an FDA-approved use of the drug: Stribild from 2017 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer a loss of kidney function, including function reduced to 30 percent, which required inpatient hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

123.     Plaintiff Noel Flores is and was at all relevant times a citizen of the State of Texas and domiciled in McAllen, Texas. Plaintiff Noel Flores purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla, Complera and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer acute renal failure, which required inpatient hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

124.     Plaintiff Patricia Ann Briley is and was at all relevant times a citizen of the State of Indiana and domiciled in Indianapolis, Indiana. Plaintiff Patricia Ann Briley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2011 to 2013 and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer loss of kidney function and bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to fractures to Plaintiff's ankle. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will

1

2

3

continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

4

5

6

7

8

9

10

11

12

13

125.     Plaintiff Patricia Michelle Fields is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Patricia Michelle Fields purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to January of 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

14

15

16

17

18

19

20

21

22

23

24

126.     Plaintiff Peter Parmenter is and was at all relevant times a citizen of the State of Washington and domiciled in Renton, Washington. Plaintiff Peter Parmenter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2005 to 2015 and Stribild from 2015 to approximately 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

25

26

27

28

127.     Plaintiff Phyllis Malone is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Phyllis Malone purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer stage 3 chronic kidney disease and excruciating pain in her kidneys and lower back. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

128.    Plaintiff Raymond McNary-Willis is and was at all relevant times a citizen of the State of Florida and domiciled in Bradenton, Florida. Plaintiff Raymond McNary-Willis purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2005, Truvada from 2005 to 2007, and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction and bone demineralization, for which he was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff's physicians have recommended that Plaintiff undergo hip replacement surgery to address the demineralization of Plaintiff's hips. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

129.    Plaintiff Raymond Pressley is and was at all relevant times a citizen of the State of South Carolina and domiciled in Lake City, South Carolina. Plaintiff Raymond Pressley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2003 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, loss of kidney function and extremely low Glomerular Filtration Rate levels. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these

injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

130.    Plaintiff Renne Black is and was at all relevant times a citizen of the State of Maryland and domiciled in Baltimore, Maryland. Plaintiff Renne Black purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Complera from 2015 to 2016 and Stribild from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer weakening of the bones, which caused or contributed to fractures to Plaintiff's ankles, bilaterally. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

131.    Plaintiff Rhonda Faye Cook is and was at all relevant times a citizen of the State of Texas and domiciled in Dallas, Texas. Plaintiff Rhonda Faye Cook purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone deterioration and weakening, which caused or contributed to damage and curvature to Plaintiff's spine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

132.    Plaintiff Richard Mooney is and was at all relevant times a citizen of the State of Alabama and domiciled in Cullman, Alabama. Plaintiff Richard Mooney purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild in 2012 and Truvada beginning

later in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of TDF Drugs caused Plaintiff to suffer weakening of his bones diagnosed at the young age of twenty-eight, and resulting fractures of the foot and ankle, which have caused Plaintiff extreme pain. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

133.    Plaintiff Richard O'Quain is and was at all relevant times a citizen of the State of Louisiana and domiciled in Lake Charles, Louisiana. Plaintiff Richard O'Quain purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2012 to 2015 and Stribild beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs.  Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer reduced kidney function. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

134.    Plaintiff Robert Lee Davis Jr. is and was at all relevant times a citizen of the State of Mississippi and domiciled in Gulfport, Mississippi. Plaintiff Robert Lee Davis Jr. purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild until 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

135.   Plaintiff Robert Sackett is and was at all relevant times a citizen of the State of Texas and domiciled in Dallas, Texas. Plaintiff Robert Sackett purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild from 2001 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

136.   Plaintiff Roderick Eugene Cooper is and was at all relevant times a citizen of the State of Texas and domiciled in Houston, Texas. Plaintiff Roderick Eugene Cooper purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff has been advised by his doctors that he will be required to undergo knee and hip replacement surgeries. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

137.   Plaintiff Rodger Brunson is and was at all relevant times a citizen of the State of Georgia and domiciled in Loganville, Georgia. Plaintiff Rodger Brunson purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, Complera and Stribild from 2001 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

COMPLAINT FOR DAMAGES - 50
Case No.:
010759-11 1080167 V1

ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including physical therapy. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

138.    Plaintiff Ronald Alan Conner is and was at all relevant times a citizen of the State of Georgia and domiciled in Lawrenceville, Georgia. Plaintiff Ronald Alan Conner purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, Complera and Stribild until 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to fractures to Plaintiff's knee. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

139.    Plaintiff Ronnie A. Powers is and was at all relevant times a citizen of the State of North Carolina and domiciled in Candler, North Carolina. Plaintiff Ronnie A. Powers purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney failure and chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

140.    Plaintiff Ruby Altameemy is and was at all relevant times a citizen of the State of Mississippi and domiciled in Gulfport, Mississippi. Plaintiff Ruby Altameemy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2006 to 2017 and Stribild during 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia and which caused or contributed to fractures to Plaintiff's knee and wrist. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

141.    Plaintiff Russell Seelye is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Tulsa, Oklahoma. Plaintiff Russell Seelye purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread for 4 years, Truvada from 2008 to 2016, Stribild for approximately one year, and Atripla from 2017 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to Plaintiff suffering a hip fracture and multiple compression fractures to Plaintiff's spine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

142.    Plaintiff Sabrina Dooley is and was at all relevant times a citizen of the State of Illinois and domiciled in Chicago, Illinois. Plaintiff Sabrina Dooley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild from August 2013 to May 2017 and Truvada from May 2017 to April 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs.

Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

143.    Plaintiff Scott Wascher is and was at all relevant times a citizen of the State of California and domiciled in Bakersfield, California. Plaintiff Scott Wascher purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and low bone density at the young age of thirty-five. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

144.    Plaintiff Shajuana Pope is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Shajuana Pope purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer a loss of kidney function. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

1    145.    Plaintiff Shane Priddy is and was at all relevant times a citizen of the State of Ohio

2    and domiciled in Oak Harbor, Ohio. Plaintiff Shane Priddy purchased and ingested the following

3    TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a result of Gilead's

4    wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the

5    foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone

6    demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and

7    incurred and will continue to require and incur expenses in connection with medical treatment as a

8    result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

9    anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

10   loss of earning capacity, and other injuries and damages to be proven at trial.

11   146.    Plaintiff Sharon Ann Malcolm-Smith is and was at all relevant times a citizen of the

12   State of Ohio and domiciled in Portsmouth, Ohio. Plaintiff Sharon Ann Malcolm-Smith purchased

13   and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada,

14   Atripla and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF

15   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

16   TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

17   osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in

18   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

19   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

20   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

21   to be proven at trial.

22   147.    Plaintiff Shaylene S. Johnson is and was at all relevant times a citizen of the State of

23   Florida and domiciled in Miami, Florida. Plaintiff Shaylene S. Johnson purchased and ingested the

24   following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2011 to 2013 and Stribild

25   from 2013 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF

26   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

27   TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

28   osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in

1

2

3

4

connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

5

6

7

8

9

10

11

12

13

14

15

16

148.    Plaintiff Stacey Cook is and was at all relevant times a citizen of the State of South Carolina and domiciled in Moncks Corner, South Carolina. Plaintiff Stacey Cook purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to July of 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused Plaintiff to suffer degeneration in her spine and constant pain in her jaw, shoulders, back, knees and ankles. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgeries and physical therapy. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

17

18

19

20

21

22

23

24

25

26

27

149.    Plaintiff Stephen Calhoun is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Oklahoma City, Oklahoma. Plaintiff Stephen Calhoun purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2016 and Stribild from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization at the young age of thirty-eight. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28

COMPLAINT FOR DAMAGES - 55
Case No.:
010759-11 1080167 V1

150.    Plaintiff Stephen Duane Miller is and was at all relevant times a citizen of the State of Texas and domiciled in San Antonio, Texas. Plaintiff Stephen Duane Miller purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2010 to 2015 and Stribild from 2015 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs.  Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer reduced kidney function at the young age of thirty-nine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

151.    Plaintiff Tamara Perry is and was at all relevant times a citizen of the State of Georgia and domiciled in Riverdale, Georgia. Plaintiff Tamara Perry purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis in her early forties. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

152.    Plaintiff Tammy Frazier is and was at all relevant times a citizen of the State of Tennessee and domiciled in Nashville, Tennessee. Plaintiff Tammy Frazier purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2012 to 2014 and Stribild from 2014 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia and which caused or contributed to fractures to Plaintiff's leg, wrist and jaw. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer kidney failure. Plaintiff required

and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

153.    Plaintiff Tony Hooker is and was at all relevant times a citizen of the State of North Carolina and domiciled in Wilmington, North Carolina. Plaintiff Tony Hooker purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2010 to 2013 and Stribild from 2013 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

154.    Plaintiff Tony Martin is and was at all relevant times a citizen of the State of California and domiciled in Oakland, California. Plaintiff Tony Martin purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2008 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from bone demineralization, for which he was diagnosed with osteoporosis, and which caused or contributed to severe damage to Plaintiff's knees. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including three knee surgeries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

155.    Plaintiff Treyvon Paul Ryan Willis is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff Treyvon Paul Ryan Willis

purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization and damage to Plaintiff's bones at the young age of twenty-eight. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

156.    Plaintiff Troy Oberholtzer is and was at all relevant times a citizen of the State of Pennsylvania and domiciled in Philadelphia, Pennsylvania. Plaintiff Troy Oberholtzer purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2013 and Stribild from 2013 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia while only in his forties. Plaintiff's injuries have caused and continue to cause constant pain, limited mobility and resulting lifestyle changes, including loss of Plaintiff's career. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

157.    Plaintiff Victor Williams is and was at all relevant times a citizen of the State of Maryland and domiciled in Capitol Heights, Maryland. Plaintiff Victor Williams purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which has caused or contributed to a fracture of Plaintiff's toe. Plaintiff required

and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

158.    Plaintiff Wanda Stokes James is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Wanda Stokes James purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Atripla and Stribild from 2003 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with weakening of the bones and which caused or contributed to fractures in Plaintiff's toes. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

159.    Plaintiff Wayne Albert Sage is and was at all relevant times a citizen of the State of California and domiciled in San Diego, California. Plaintiff Wayne Albert Sage purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2009 to 2014 and Stribild from 2014 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from kidney dysfunction, which required hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

160.    Plaintiff William Patterson Jr. is and was at all relevant times a citizen of the State of Texas and domiciled in Houston, Texas. Plaintiff William Patterson Jr. purchased and ingested the

following TDF Drugs for an FDA-approved use of the drugs: Complera from 2011 to 2017 and Stribild in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

161.    Plaintiff William Saunders is and was at all relevant times a citizen of the State of Florida and domiciled in Lakeland, Florida. Plaintiff William Saunders purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney dysfunction or an exacerbation of kidney dysfunction, including a low estimated glomerular filtration rate of forty-two mL per minute. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

162.    Plaintiff Willie Daniel Turner is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Willie Daniel Turner purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which caused or contributed to a fracture to Plaintiff's right shoulder. Plaintiff's injuries cause him extreme pain, especially because he is right-handed and is a professional truck driver. Plaintiff required and incurred and will continue to require and incur

expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

163.    Plaintiff Wilton Towe Jr. is and was at all relevant times a citizen of the State of Georgia and domiciled in Adairsville, Georgia. Plaintiff Wilton Towe Jr. purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild from approximately 2006 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis in his forties and which caused or contributed to a fracture of Plaintiff's lumbar spine at the L4-L5 level. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including painful spinal fusion surgery, physical therapy and Reclast infusions. Plaintiff has endured and will continue to endure constant and intense bone pain, limitations on his physical activities, and loss of his career as a result of the injuries caused by the defective TDF Drugs. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

164.    Defendant Gilead Sciences, Inc. is a Delaware corporation with its principle place of business at 333 Lakeside Drive, Foster City, California. Gilead is a biopharmaceutical company that develops, manufactures, markets, and sells prescription medicine, including but not limited to Viread, Truvada, Atripla, Complera, Stribild, Genvoya, Odefsey, and Descovy. Gilead reported revenue of $26.1 billion dollars in 2017 and has operations worldwide.

## V.    FACTUAL ALLEGATIONS

165.    Gilead's "Company Overview" states: "With each new discovery and investigational new drug candidate, we seek to improve the care of patients living with life-threatening diseases

around the world."[3] It would more accurately state: We seek to improve the care of patients living

with life-threatening diseases *only if and when it suits the company's financial needs.*

**A.     Background.**

        **1.     Laws and Regulations Governing the Approval and Labeling of Prescription Drugs.**

      166.     The Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") requires

manufacturers that develop a new drug product to file a New Drug Application ("NDA") in order to

obtain approval from the Food and Drug Administration ("FDA") before selling the drug in interstate

commerce. 21 U.S.C. § 355.

      167.     The NDA must include, among other things, data regarding the safety and

effectiveness of the drug, information on any patents that purportedly cover the drug or a method of

using the drug, and the labeling proposed to be used for the drug. 21 U.S.C. § 355(b).

      168.     Manufacturers with an approved NDA must review all adverse drug experience

information obtained by or otherwise received by them from any source, including but not limited to

postmarketing experience, reports in the scientific literature, and unpublished scientific papers. 21

C.F.R. § 314.80(b).

      169.     After FDA approval, manufacturers may only promote drugs in a manner consistent

with the contents of the drug's FDA-approved label. 21 C.F.R. § 202.1. The FDA's Division of Drug

Marketing, Advertising, and Communications monitors manufacturers' promotional activities and

enforces the FDCA and its implementing regulations to ensure compliance.

      170.     Under what is known as the Changes Being Effected ("CBE") regulation, a

manufacturer with an approved NDA can make certain changes to its label without prior FDA

approval by simply sending the FDA a "supplemental submission." 21 C.F.R. § 314.70(c)(6)(iii).

      171.     Changes to the labeling a manufacturer can make pursuant to CBE without prior FDA

approval include those to "add or strengthen a contraindication, warning, precaution, or adverse

---

[3] *See, e.g.*, Gilead Sciences Company Overview, available at
http://www.gilead.com/~/media/Files/pdfs/other/US%20Corporate%20Overview%20%20111014.pdf

COMPLAINT FOR DAMAGES - 62
Case No.:
010759-11 1080167 V1

reactions for which the evidence of causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter" and "to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. § 314.70(c)(6)(iii)(A) and (C).

172.    A manufacturer must revise its label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitively established." 21 C.F.R. § 201.57(c)(6).

173.    The warnings section of the label "must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy." *Id*. at § 201.57(c)(6)(iii). According to an FDA Guidance for Industry on the warnings and precautions section of the labeling, "[i]nformation about the frequency of testing and expected ranges of normal and abnormal values should also be provided if available."[4]

174.    Adverse reactions must be added to the label where there "is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id*. at § 201.57(c)(7).

175.    A 2008 amendment to these regulations provides that a CBE supplement to amend the labeling for an approved product must reflect "newly acquired information." 73 Fed. Reg. 49609. "Newly acquired information" is not limited to new data but also includes "new analysis of previously submitted data." "[I]f a sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id*. at 49607.

---

[4] https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM075096.pdf.

COMPLAINT FOR DAMAGES - 63
Case No.:
010759-11 1080167 V1

176.     Under the 1984 Hatch-Waxman Amendments to the Act, Congress sought to expedite the entry of less expensive generic versions of brand name drugs by simplifying the generic approval process. A generic manufacturer seeking to sell a generic version of a brand name drug may file an Abbreviated New Drug Application ("ANDA"), which relies on the brand manufacturer's safety and efficacy data. The ANDA filer must demonstrate that its proposed generic product is therapeutically equivalent to the brand name drug, meaning that it: (a) contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug; and (b) is bioequivalent to the brand drug (i.e., the drugs exhibit the same rate and extent of absorption).

177.     As a counter-balance to the abbreviated process for the approval of generic drugs, Hatch-Waxman may grant brand manufacturers a period of market exclusivity upon approval of the NDA. For example, Hatch-Waxman grants a five-year period of exclusivity (regardless of any patent protection) to products containing chemical entities not previously approved by the FDA. Under this five-year exclusivity, the FDA cannot even accept an ANDA to make a generic version of the drug for four or five years from NDA approval (depending upon whether the generic asserted that the brand's patents were invalid or not infringed).

178.     Hatch-Waxman also streamlined the process for brand manufacturers to attempt to enforce their patents against potential infringement by generic manufacturers. If an ANDA contains a certification that the patents the brand has listed in its NDA are invalid or will not be infringed by the ANDA generic product (a "Paragraph IV certification"), the brand manufacturer can automatically delay FDA approval of the generic drug by suing the generic manufacturer for patent infringement. If the brand manufacturer brings a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of two and a half years, or (b) the issuance of a court decision that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii).

179.     Generic drugs that are therapeutically equivalent to the brand name drug may be automatically substituted for the brand at the pharmacy counter. Due to state automatic substitution laws that permit or require generic substitution, once a generic version of a brand-name drug enters

the market, the generic quickly captures the vast majority of the brand's sales, often obtaining 80% or more of unit sales within the first six months. On average, generics capture 90% of brand unit sales within the first year of generic entry.

**2.    Tenofovir and Gilead's TDF- and TAF- Containing Drug Products Indicated for Use in Treating HIV.**

180.    Tenofovir (chemical name, 9-(2-Phosphonomethoxypropyl)adenine ("PMPA")) is a type of medicine called a nucleotide analog reverse transcriptase and HBV polymerase inhibitor ("NRTI").

181.    In order for HIV to infect a healthy human cell, the virus must convert its ribonucleic acid ("RNA") based genome into a strand of complementary deoxyribonucleic acid ("DNA"). This process of converting the virus's RNA into DNA is reverse transcription, and is performed by an enzyme named reverse transcriptase. Reverse transcription occurs inside the human cell that the virus is infecting.

182.    NRTIs prevent the reverse transcriptase from converting its RNA into DNA, preventing the infection of the cell and spread of HIV. In order for NRTIs to stop HIV from infecting a cell, the drug must be absorbed into the cell and "activated" by the cell's biological machinery. The "activated" form of tenofovir is known as tenofovir-diphosphate ("TFV-DP").

183.    When used to treat HIV infection, tenofovir must be administered in combination with other anti-HIV drugs, a practice known as "combination antiretroviral therapy" or "cART." By using a combination of different classes of medications, physicians can customize treatment based on factors including how much virus is in the patient's blood, the particular strain of the virus, and disease symptoms. The aim of cART is to reduce the viral load, i.e., the amount of virus per unit of blood or plasma, of patients to levels where commercial viral load tests cannot detect the presence of the virus (generally a concentration of lower than 50 HIV-1 RNA copies per mL of plasma). A cART treatment regimen can incorporate multiple standalone pills or a single pill coformulated with all drugs necessary for the regimen.

184.    Gilead did not discover tenofovir. Tenofovir was discovered in the mid-1980s by the collaborative research efforts of scientists in Prague and Belguim. Although the anti-HIV properties

of tenofovir were promising, it had a significant downside. When tenofovir is administered by mouth, very little of it is absorbed into the body.

185.    Because an intravenous formulation had little sales potential, Gilead developed a prodrug form of tenofovir that can be taken orally. Prodrugs are pharmacologically inactive compounds that can be more efficiently absorbed into the bloodstream and then converted into the active form of the drug within the body.

186.    One prodrug of tenofovir is tenofovir disoproxil (chemical name, bis(isopropyloxycarbonyloxymethyl)-PMPA or bis-POC PMPA). The fumaric salt of tenofovir disoproxil is tenofovir disoproxil fumarate, commonly known as TDF.

187.    While TDF is able to be taken by mouth, the proportion of tenofovir that enters the cells is relatively low. In order to have the desired therapeutic effect, a high dose of TDF must be administered. The standard dose of TDF for HIV treatment and prevention in adults is relatively large – 300 mg, taken once a day. A general principle of toxicology is that the "dose makes the poison," i.e., larger doses are generally associated with higher rates of toxicity and adverse events. Tenovofir is no different.

188.    Gilead has received FDA approval for five TDF-based drugs for the treatment of HIV.

189.    On October 26, 2001, the FDA approved Gilead's NDA 21356 for Viread (300 mg TDF) tablets for use in combination with other antiretroviral agents for the treatment of HIV-1 infection. Gilead submitted limited clinical data supporting approval of the drug. Gilead had not completed Phase III clinical studies. Gilead excluded from its clinical trials people who had serious preexisting kidney dysfunction. And Gilead only studied Viread in treatment-experienced patients (those who had previously been treated for HIV). In 2008, the FDA approved an additional Viread indication for the treatment of Chronic Hepatitis B.

190.    On August 2, 2004, the FDA approved Gilead's NDA 21752 for Truvada tablets, which is a combination product containing 300 mg TDF (i.e., Viread) and 200 mg emtricitabine, for use in combination with other antiretroviral agents for the treatment of HIV-1 infection in adults. Neither of the active ingredients in Truvada was new. The FDA approved the Truvada application based primarily on data showing the fixed-dose combination drug was bioequivalent to its separate

components. On July 16, 2012, the FDA approved an additional indication for the use of Truvada in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk.

191.    On July 12, 2006, the FDA approved Gilead's NDA 21937 for Atripla tablets, which is a combination product containing 300 mg TDF, 200 mg emtricitabine, and 600 mg efavirenz, for use alone as a complete regimen or in combination with other retroviral agents for the treatment of HIV-1 infection in adults. Gilead submitted no clinical data in support of NDA 21937. None of the active ingredients in Atripla were new. Approval was based on a demonstration of bioequivalence between the individual components and the fixed-dose combination.

192.    On August 10, 2011, the FDA approved Gilead's NDA 202123 for Complera tablets, which is a fixed dose combination product containing 300 mg TDF, 200 mg emtricitabine, and 25 mg rilpivirine, for use as a complete regimen for the treatment of HIV-1 infection in treatment-naïve adults (i.e., adults who had not been previously treated for HIV). None of the active ingredients in Complera were new. Gilead submitted no new clinical safety or efficacy trials in connection with NDA 20123. Approval was based on the results of bioequivalence studies comparing the combination product to the individual component drugs.

193.    On August 27, 2012, the FDA approved Gilead's NDA 203100 for Stribild, which is a fixed dose combination product containing 300 mg TDF, 200 mg emtricitabine, 150 mg elvitegravir, and 150 mg cobicistat, for use as a complete regimen for the treatment of HIV-1 infection in treatment-naïve adults. Although elvitegravir and cobicistat had not been previously approved by the FDA, the FDA gave Gilead's Stribild NDA a 10-month standard review because there were already multiple regimens available for treatment naïve patients including one pill, once-a-day regimens.

194.    Before the FDA approved Viread in 2001, Gilead had discovered another prodrug version of tenofovir, which it originally called GS-7340 and which is now known as tenofovir alafenamide ("TAF"). TDF and TAF are two prodrug versions of the same parent drug, tenofovir, though TAF requires a dose more than ten times smaller than TDF to achieve the same therapeutic effect.

195.    TAF differs from TDF in its penetration into target cells. Unlike TDF, which is converted into the parent drug tenofovir in the gastrointestinal tract, liver, and blood, TAF is not converted into tenofovir until it has been absorbed by the cell. This allows TAF to be more efficiently absorbed by "target cells"—i.e., cells that HIV infects or "targets"—compared to TDF. This more efficient absorption allows TAF to achieve far greater intracellular concentrations of the activated drug (tenofovir-diphosphate) in target cells than even a dramatically larger dose of TDF. This enhanced efficiency in absorption leads to plasma concentrations of tenofovir that are 90% lower than TDF, while still maintaining intracellular concentrations of activated drug in target cells that is the same or higher than TDF. The lowered plasma concentrations of tenofovir found with TAF result in reduced toxicity compared to TDF, making TAF safer to use than TDF.

196.    On November 5, 2015, the FDA approved Gilead's first TAF-based design—NDA 207561 for Genvoya tablets, a fixed dose combination product which contains 10 mg TAF, 200 mg emtricitabine, 150 mg elvitegravir, and 150 mg cobicistat. Genvoya is indicated for the treatment of HIV-1 infection in adults and pediatric patients 12 years of age or older who have no antiretroviral treatment history or to replace the current antiretroviral regimen in those who are virologically suppressed (HIV-1 RNA less than 50 copies per mL) on a stable antiretroviral regimen for at least 6 months with no history of treatment failure and no known substitutions associated with resistance to the individual components of Genvoya. The TDF-based counterpart to Genvoya is Stribild. Genvoya is identical to Stribild except for the substitution of TAF for TDF.

197.    On March 1, 2016, the FDA approved Gilead's NDA 208351 for Odefsey tablets, which is a combination product containing 25 mg TAF, 200 mg emtricitabine, and 25 mg rilpivirine, for use as a complete regimen for the treatment of HIV-1 infection in patients 12 years of age and older as initial therapy in those with no antiretroviral treatment history with HIV-1 RNA less than or equal to 100,000 copies per mL; or to replace a stable antiretroviral regimen in those who are virologically-suppressed (HIV-1 RNA less than 50 copies per mL of blood or plasma) for at least six months with no history of treatment failure and no known substitutions associated with resistance to the individual components of Odefsey. The TDF-based counterpart to Odefsey is Complera. Odefsey is identical to Complera except for the substitution of TAF for TDF.

198.     On April 4, 2016, the FDA approved Gilead's NDA 208215 for Descovy tablets, which is a fixed dose combination product containing 25 mg TAF and 200 mg emtricitabine, for use in combination with other antiretroviral agents, for treatment of HIV-1 infection in adults and pediatric patients 12 years of age or older. The TDF-based counterpart to Descovy is Truvada. Descovy is identical to Truvada except for the substitution of TAF for TDF.

199.     Upon information and belief, Gilead has not sought FDA approval of a standalone TAF drug product for the treatment of HIV. Viread, therefore, has no TAF-based counterpart for the treatment of HIV infection. Although the FDA approved Gilead's NDA 208464 for Vemlidy (300 mg TAF) tablets on November 10, 2016, Gilead only sought approval to market Vemlidy for the treatment of Hepatitis B infection in adults with compensated liver disease and thus cannot be marketed for the treatment of HIV.

**B.     Gilead Knew Before Viread Was Approved That TDF Posed a Significant Safety Risk.**

200.     Before Gilead's first TDF product, Viread, received FDA approval in 2001, Gilead knew that two of its other antiviral drugs that are structurally similar to tenofovir caused significant kidney damage.

201.     Tenofovir is a member of a class of molecules known as "acyclic nucleoside phosphonates." Two of Gilead's other antiviral drugs—cidofovir and adefovir[5]—are also acyclic nucleoside phosphonates.

202.     Cidofovir injection, marketed as Vistide, was Gilead's first commercial product. When the FDA approved Vistide in 1996, it carried a black box warning stating that renal impairment is the drug's major toxicity and renal failure resulting in dialysis or contributing to death have occurred with as few as one or two doses of Vistide.

203.     In December 1999, Gilead abandoned development of NRTI prodrug adefovir dipovoxil for the treatment of HIV after it proved so toxic to patients' kidneys in the later stages of Phase III clinical trials. In Gilead's clinical trial GS-408, 59% of patients demonstrated severe kidney

---

[5] Like tenofovir, only a prodrug of adefovir—adefovir dipivoxil—can be effectively administered orally.

toxicity after 72 weeks. One patient in the trial died due to multiorgan failure subsequent to kidney failure. Based on this experience, Gilead knew that adefovir dipivoxil was associated with delayed nephrotoxicity—meaning that its toxic effects might not be felt for some time after continued use. Gilead would later develop and market adefovir dipivoxil as Hepsera for treatment of hepatitis B virus infection. Critically, Gilead recognized that if it reduced the dose of adefovir dipivoxil from 120 mg—as used in trial GS-408 for the treatment of HIV—to 10 mg (the dose in Hepsera), an effective dose for hepatitis B virus treatment, the risk of nephrotoxicity is dramatically reduced.

204.    Tenofovir has a nearly identical structure to adefovir, varying only by the presence of a methyl group (i.e., a carbon atom bound to three hydrogen atoms) in tenofovir, which replaces a hydrogen atom in adefovir. As Gilead recognized in its 10-K for the year ending December 31, 2000, due to its experiences with nephrotoxicity in Phase III clinical trials of adefovir dipivoxil, delayed toxicity issues similar to those experienced with adefovir dipivoxil could arise with TDF.

205.    Gilead also knew that while prodrugs allow the drug to be efficiently absorbed into the bloodstream and then converted into an active form within the body, the conversion of the TDF prodrug into free tenofovir outside the cell, and the presence of high levels of free tenofovir in the blood, endangers the kidneys.

206.    The primary purpose of the kidney is to filter out toxins and waste products from the blood, as well as help maintain the delicate balance of water, salts and other compounds in a person's blood. The functional unit of the kidney is the nephron, a microscopic structure that consists of two primary components: a renal "corsipucle" and a renal "tubule." On average, each kidney contains hundreds of thousands to millions of nephrons.

207.    The renal corsipucle is the component of the nephron that directly filters the blood. Blood flows through a network of capillaries (small blood vessels) known as the glomerulus. The walls of these capillaries work as a filter, allowing certain compounds, as well as water, to pass through. The fluid that is filtered through the capillary walls in the glomerulus, known as the filtrate, is collected by a structure known as Bowman's capsule. One of the primary ways kidney function is measured is by the rate of blood that is filtered by the glomeruli. This is known as the glomerular filtration rate or "GFR."

COMPLAINT FOR DAMAGES - 70
Case No.:
010759-11 1080167 V1

208.     In Bowman's capsule, the filtrate is collected and drains into the other primary component of the nephron, the tubule. Glomerular filtration is highly effective at removing many toxins, but it also filters out many compounds, like water and electrolytes, that a person needs. In the tubule, the cells lining the tubule put these crucial, non-toxic compounds back into the blood, as well as filter out remaining toxins that glomerular filtration did not remove. After the filtrate exits the tubule, it drains into the bladder. This processed filtrate is urine.

209.     This system of filtering the blood is extremely important and delicate. TDF primarily damages the nephron tubule, due to hyper-concentration of free tenofovir within the tubule cells of the nephron, which results in cell death or dysfunction. If the tubule cells are dysfunctional or dead, they are unable or less able to perform the vital function of filtering waste and/or toxins and reabsorbing beneficial compounds. Moreover, because tenofovir is renally eliminated, patients are exposed to an increased concentration of tenofovir as the kidneys become damaged.

210.     Since scientists first synthesized TDF, studies have consistently shown that it could cause significant kidney and bone damage. For example, an animal study published in 1999 showed that high doses of tenofovir were associated with significant bone toxicity in both simian immunodeficiency virus (SIV, the non-human primate version of HIV) infected and uninfected rhesus macaques, with a quarter of the treated animals experiencing significant bone toxicity.

211.     Gilead's preclinical studies of TDF showed that it could be toxic to kidneys and bones. Preclinical animal studies of TDF showed evidence of renal toxicity and that TDF exposure caused bone toxicity in the form of softening of the bones (osteomalacia) and reduced bone mineral density. Nephrotoxicity in animal models was related to dose as well as to duration of therapy.

212.     Gilead also knew that the relatively high dose of TDF needed to achieve the desired therapeutic effect created a greater risk of toxic effects, and that bone and kidney toxicities were even more likely with the long-term use of TDF which was needed to combat a disease with no known cure.

**C.    Gilead's Knowledge of TDF Toxicity Grew As Patients' Kidneys and Bones Were Damaged By the TDF Drugs.**

213.    As soon as Gilead began marketing Viread, patients started experiencing the nephrotoxic effects of TDF.

214.    In November 2001, less than one month after Viread entered the market, the first published case of TDF-associated acute renal failure occurred. Thereafter, additional reports of TDF-associated kidney damage, including but not limited to Fanconi syndrome, renal failure, renal tubular dysfunction, and nephrogenic diabetes insipidus, began to appear in the medical literature. Many of those adverse events occurred in patients without preexisting kidney dysfunction.

215.    Gilead was also seeing renal adverse events in its postmarketing safety data. In fact, the most common serious adverse events reported to Gilead were renal events, including renal failure,[6] Fanconi syndrome,[7] and serum creatinine increase.[8]

216.    In the first two years Viread was on the market, 40% of Viread adverse events reports received by Gilead were related to the renal/urinary system. This included 49 cases of increased creatinine, 16 cases of hypophosphatemia,[9] 42 cases of renal insufficiency, 51 cases of acute renal failure, 6 cases of chronic renal failure, and 32 cases of Fanconi syndrome. These numbers are far less than the true incidence of kidney damage experienced by Viread patients during this timeframe because postmarketing adverse events are underreported.

217.    Gilead had to update its Viread labeling at least four times to describe the kidney damage patients experienced when taking TDF:

---

[6] When the kidney cannot filter the blood normally, a patient is usually diagnosed with "renal failure."

[7] If damage to the tubule prevents the reabsorption of beneficial molecules from filtrate, the levels of these beneficial compounds can become dangerously low in the blood. This is known as Fanconi syndrome.

[8] One of the compounds that is filtered both by the glomerulus and by secretion through the nephron tubule is creatinine. Creatinine is a compound that is produced by the breakdown of muscle tissue and created at a relatively constant rate by the body. If the kidney is damaged, the ability of the body to remove creatinine from the blood can be reduced, resulting in high levels of creatinine in the blood.

[9] Hypophosphatemia is a low level of phosphorus in the blood, which can indicate that the ability of the nephron tubule to reabsorb phosphorus from the filtrate is damaged.

COMPLAINT FOR DAMAGES - 72
Case No.:
010759-11 1080167 V1

a.   On December 2, 2002, Gilead added that patients had suffered renal impairment, including increased creatinine, renal insufficiency, kidney failure, and Fanconi syndrome, with Viread use;

b.   On October 14, 2003, Gilead added more kidney disorders, including acute renal failure, proximal tubulopathy,[10] and acute tubular necrosis;[11]

c.   On May 12, 2005, Gilead added nephrogenic diabetes insipidus;[12] and

d.   On March 8, 2006, Gilead added polyuria[13] and nephritis[14] to the list of renal and urinary disorders that patients had experienced while on TDF.

As Gilead knew, injuries were not limited to patients with a history of renal dysfunction or other risk factors.

218.   Gilead's long-term clinical data also demonstrated that TDF was damaging patients' bones. 48-week data showed greater decreases from baseline in bone mineral density at the lumbar spine and hip in patients taking Viread compared to those receiving other HIV drugs. At 144 weeks, there was a significantly greater decrease from baseline in bone mineral density at the lumbar spine in patients taking Viread compared to those receiving other HIV drugs, as well as significant increases in biochemical markers of bone turnover in patients taking Viread. And once Gilead began conducting clinical trials with Viread in adolescent and pediatric patients, the effects of TDF on adolescent and pediatric patients' bones were similar to the effects seen with adult patients.

219.   After Gilead brought Truvada to market, the medical literature continued to identify cases of TDF-associated kidney damage, including in patients without pre-existing renal dysfunction or co-administration with another nephrotoxic drug.

220.   Several new studies presented at the February 2006 Conference on Retroviruses and Opportunistic Infections ("CROI") highlighted the frequency of nephrotoxicity in TDF-treated

---

[10] Proximal tubulopathy refers to damage or dysfunction to the portion of the nephron tubule that is closest to Bowman's capsule.

[11] Acute tubular necrosis refers to the death of the cells that line the nephron tubule.

[12] Nephrogenic diabetes insipidus refers to a condition characterized by the production of a large amount of dilute urine as a result of kidney dysfunction. It is thought to be related to damage to the nephron tubule.

[13] Polyuria refers to the excessive production of urine.

[14] Nephritis refers to the inflammation of the kidneys.

patients. In one study, CDC investigators analyzed longitudinal data from 11,362 HIV-infected patients, all of whom had GFR >90mL/min at baseline, and found that treatment with TDF was significantly associated with mild and moderate renal insufficiency. In another, observational study of 497 patients initiating TDF treatment, 17.5% developed renal dysfunction. The most severe declines in renal function were associated with TDF treatment as part of a boosted regimen.

221.    In 2007, Gilead scientists published an article discussing the company's knowledge of TDF safety issues over the first four years of TDF treatment. Gilead reported that 0.5% of patients enrolled in a global expanded access program experienced a serious renal adverse event, including acute and chronic renal failure and Fanconi syndrome. A "serious" adverse event meant one resulting in hospitalization or prolongation of hospitalization, death, disability, or requiring medical intervention to prevent permanent impairment. Gilead also reported that through April 2005 the most common serious adverse events reported to Gilead's postmarketing safety database were renal events, including renal failure, Fanconi syndrome, and serum creatinine increase.

222.    Although this Gilead article demonstrates the company's clear and early knowledge of serious TDF toxicity in a significant number of patients, it downplayed the incidence of TDF-associated renal toxicity. In its Medical Review of the Stribild NDA, the FDA noted the limitations of Gilead's data, including the short duration of treatment, the voluntary nature of adverse event reporting in some countries, and the fact that Gilead only assessed serious adverse events, and not renal events leading to drug discontinuation or non-serious renal adverse events. According to the FDA, any of these factors may have led to an underestimation of the true incidence of renal events of interest. The FDA similarly questioned Gilead's data on the incidence of renal adverse events based on its postmarketing safety database given the voluntary nature of reporting.

223.    Moreover, even if Gilead's data accurately captured the percentage of patients experiencing serious renal adverse events (which it did not), it would still represent a very large number of patients who experienced significant health problems due to TDF toxicity. For example, in late 2015, according to data from Symphony Health Solutions, nearly 500,000 people in the U.S. were ingesting TDF daily. Using Gilead's numbers, approximately 2,500 of those patients would

likely experience severe kidney damage. Now that TDF has been on the market for nearly two decades, many thousands of patients have likely experienced severe TDF-induced kidney damage.

224.    In May 2007, Gilead had to update its labeling to recognize that TDF-associated renal damage also caused osteomalacia (softening of the bones) in patients. In November 2008, Gilead modified the labeling to state that patients taking TDF had experienced osteomalacia due to proximal renal tubulopathy as bone pain, and that it might contribute to fractures.

225.    In August 2008, Gilead had to update its labeling to recognize finally that TDF caused both "new onset" and "worsening" renal impairment—meaning, as Gilead knew years prior, that TDF was injuring patients' kidneys even though they had no preexisting renal dysfunction.

226.    During 2009-2011, studies continued to show that TDF caused a significant loss of renal function in HIV-infected patients.

227.    Multiple articles described how the incidence of TDF-induced nephrotoxicity was underreported because studies often excluded patients who were likely to exhibit nephrotoxic effects, including patients who combined TDF in a ritonavir-boosted regimen or with another nephrotoxic drug, older patients or those with advanced HIV disease, or those with mild baseline renal dysfunction. Notwithstanding selection bias that tended to hide TDF-associated kidney dysfunction, the evidence was clear that TDF caused renal tubular dysfunction in a significant percentage of HIV-infected patients.

228.    In April 2012, researchers at the San Francisco Veterans' Administration Medical Center and the University of California, San Francisco published their analysis of the medical records of more than 10,000 HIV-positive veterans in the national VA healthcare system, which is the largest provider of HIV care in the United States. The study authors found that for each year of tenofovir exposure, risk of protein in urine—a marker of kidney damage—rose 34%, risk of rapid decline in kidney function rose 11%, and risk of developing chronic kidney disease rose 33%. The risks remained after the researchers controlled for other kidney disease risk factors such as age, race, diabetes, hypertension, smoking, and HIV-related factors.

229.    By the time it reviewed the Stribild NDA, the FDA stated that the safety profile of TDF was, by that point, "well-characterized in multiple previous clinical trials and is notable for

TDF-associated renal toxicity related to proximal renal tubule dysfunction and bone toxicity related to loss of bone mineral density and evidence of increased bone turnover."[15]

230.    With each passing year and each successive TDF product, Gilead learned even more about TDF's toxicity. Despite this knowledge, Gilead repeatedly designed the TDF Drugs to contain TDF as the tenofovir delivery mechanism rather than safer TAF.

**D.    Before Gilead Developed Stribild, It Knew That Renal Adverse Events Were More Likely When Patients Took TDF As Part Of A Boosted Regimen.**

231.    Before Gilead first started marketing Viread, it knew that patients' exposure to tenofovir increases significantly when tenofovir is co-administered with a ritonavir-boosted protease inhibitor: the maximum concentration of tenofovir increased 31%; the minimum concentration of tenofovir increased 29%; and the area under the curve (the actual body exposure to the drug after dose administration) increased 34%.

232.    In the first few years TDF was on the market, many reported cases of tenofovir-related renal damage involved patients taking TDF with a ritonavir-boosted protease inhibitor—leading authors to conclude that the risk of TDF-associated renal toxicity increased for patients on a boosted regimen. This is consistent with other patient populations at increased risk for renal toxicity, including those with low body weight and those taking another nephrotoxic drug; each is associated with higher levels of tenofovir exposure.

233.    As Gilead recognized in the Precautions section of the July 1, 2004 Viread label: "[h]igher tenofovir concentrations could potentiate Viread-associated adverse events, including renal disorders."[16]

234.    Gilead further stated: "Atazanavir [another protease inhibitor] and lopinavir/ritonavir have been shown to increase tenofovir concentrations. The mechanism of this interaction is unknown. Patients receiving atazanavir and lopinavir/ritonavir and Viread should be closely

---

[15] FDA Center for Drug Evaluation and Research Summary Review for NDA 203100 at 10, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000SumR.pdf.

[16] Viread (tenofovir disoproxil fumarate) Tablets label at 17, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2004/21356slr010_viread_lbl.pdf.

monitored for Viread-associated adverse events. Viread should be discontinued in patients who develop Viread-associated adverse events."[17]

235.    Case study authors similarly called for careful monitoring of patients taking TDF in a boosted regimen, given the frequency of renal damage in such patients.

236.    A 2008 Journal of Infectious Diseases article reported that the odds of developing significant renal function reduction were 3.7 times higher for patients receiving a regimen containing tenofovir plus ritonavir-boosted protease inhibitor than for those receiving tenofovir plus nonnucleoside reverse transcriptase inhibitor-based therapy, even after adjusting for viral load.

**E.    Before Gilead Developed Each of the TDF Drugs, It Knew that TAF Was Less Toxic to Kidneys and Bones than TDF.**

237.    Before the FDA approved Viread, Gilead had already discovered a different design for an orally available version of tenofovir that is more potent than TDF, meaning that it can be administered at a significantly lower dose with fewer side effects than TDF.

238.    Unlike TDF, TAF is not converted into tenofovir until it has been absorbed by the cell. As a result, TAF is more efficiently absorbed by the cells HIV targets compared to TDF. This more efficient absorption allows TAF to achieve far greater intracellular concentrations of the activated drug (tenofovir-diphosphate) in target cells than even a dramatically larger dose of TDF, while achieving plasma concentrations of tenofovir that are 90% lower than TDF. The lowered plasma concentrations of tenofovir found with TAF result in reduced toxicity compared to TDF, making TAF safer to use than TDF.

239.    On July 21, 2000, Gilead filed a provisional patent application which described TAF (then called GS-7340) as 2-3 times more potent than TDF while providing 10 times the intracellular concentration of tenofovir than TDF. Gilead also demonstrated that dosing with TAF resulted in dramatically higher concentrations of drug in all organs except the kidneys and the liver, compared with TDF. This suggested that TAF is uniquely able to target cells that HIV infects, while not concentrating in the kidney.

---

[17] *Id.*

COMPLAINT FOR DAMAGES - 77
Case No.:
010759-11 1080167 V1

240.     In a 2001 paper, Gilead scientists described the remarkable results achieved when studying the metabolism of TAF in blood. The paper, "Metabolism of GS-7430, A Novel Phenyl Monophosphoramidate Intracellular Prodrug of PMPA, In Blood," compared the distribution of the active drug tenofovir in blood cells and plasma after exposure to either GS-7430 or tenofovir disoproxil (which was still in clinical development at the time of the study). What Gilead found was that one need only ***one thousandth of the dose*** of GS-7340 compared to tenofovir to achieve the same level of inhibition of HIV replication in vitro. Gilead also found that one need to use only one tenth the dose of GS-7340 compared to TDF to reach the same levels of active tenofovir inside cells.

241.     Gilead researchers presented the results of its GS-7340 study at a February 2002 Conference on Retroviruses. John Milligan, then Gilead's Vice President of Corporate Development and currently its President and Chief Executive Officer, said that Gilead's goal with GS-7340 was to deliver a more potent version of tenofovir that can be taken in lower doses, resulting in better antiviral activity and fewer side effects. Milligan said that "there's a great need to improve therapy for HIV patients."[18]

242.     Gilead's preclinical studies of TAF also indicated that TAF is less likely to accumulate in renal proximal tubules than TDF, supporting the potential for an improved renal safety profile.

243.     Gilead's 2001 10-K highlighted the benefits of GS-7340 over Viread: "Both GS 7340 and Viread are processed in the body to yield the same active chemical, tenofovir, within cells. However, the chemical composition of GS 7340 may allow it to cross cell membranes more easily than Viread, so that with GS 7340, tenofovir may be present at much higher levels within cells. As a result, GS 7340 may have greater potency than Viread and may inhibit low-level HIV replication in cells that are otherwise difficult to reach with reverse transcriptase inhibitors."[19]

---

[18] Special Coverage: 9th Conference on Retroviruses – New drugs, new data hold promise for next decade of HIV treatment, AIDS Alert, May 1, 2002.

[19] Gilead Sciences, Inc. Form 10-K For the fiscal year ended December 31, 2001 at 13, available at https://www.sec.gov/Archives/edgar/data/882095/000091205702011690/a2073842z10-k.htm.

COMPLAINT FOR DAMAGES - 78
Case No.:
010759-11 1080167 V1

244.    At the end of the first quarter of 2002, Gilead told investors that it had initiated Phase I/II testing of GS-7340. In an earnings call, Gilead stated that it had initiated a dose escalation study for GS-7340 through which Gilead intended to prove that GS-7340 was more potent than Viread, meaning that it could be administered at a safer, lower dose.

245.    In an October 28, 2003 earnings call, Gilead told analysts that data from the ongoing Phase I/II study of GS-7340 "look[ed] promising."[20]

246.    In December 2003, Mark Perry, then Gilead's Executive Vice President of Operations, told investors that Gilead was "excited" about GS-7340. Gilead expected GS-7340 to achieve "more potency at lower doses and increase the therapeutic index for" tenofovir.[21] The "therapeutic index" is a comparison of the amount of a therapeutic agent that causes the therapeutic effect compared to the amount that causes toxicity.

247.    In January 2004, Gilead repeatedly referred to the positive results from clinical studies of GS-7340 in calls with analysts and disclosures to the investment industry. On a January 29, 2004 earnings call, Gilead stated that, based on these positive results, it was designing a Phase II program for GS-7340 to determine the safety and efficacy of the compound in treatment naïve patients and in highly treatment experienced patients.

248.    At a May 2004 Deutsche Bank Securities Healthcare Conference, Gilead said that it knew GS-7340 could be dosed at a fraction of the Viread dose and give a greater antiviral response.

249.    However, on October 21, 2004, shortly after the FDA approved Truvada, Gilead abruptly announced that it would abandon its GS-7340 design. It stated:

> Earlier this year as a result of positive data from a small phase I/II study of GS 7340, we began designing a phase II program to determine the safety and efficacy of the compound in treatment-naive patients and in highly treatment experienced patients. Since that time we have witnessed the increasing use of Viread across all HIV patient populations, and we have also received approval for and launched Truvada.

---

[20] Event Brief of Q3 2003 Gilead Sciences Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 28, 2003.

[21] Gilead Sciences at Harris Nesbitt Gerard Healthcare Conference 2003 – Final, FD (Fair Disclosure) Wire, Dec. 11, 2003.

> Based on our internal business review and ongoing review of the scientific data for GS 7340, we came to the conclusion that it would be unlikely that GS 7340 would emerge as a product that could be highly differentiated from Viread.[22]

250.     Prior to its October 2004 announcement, Gilead never indicated that there might be an issue with differentiating GS-7340 from Viread or expressed any other negative view of the prospects of GS-7340. To the contrary, Gilead repeatedly touted the positive results of preclinical and clinical studies of GS-7340 and the benefits of GS-7340 over Viread.

251.     Gilead's "internal business review" was the real driver of its decision to abandon a design it knew to be safer than Viread.

252.     In May 2005, despite Gilead's misrepresentation that GS-7340 was not worth pursuing, Gilead scientists reported the favorable results they achieved with GS-7340, including its benefits over Viread, in an issue of Antimicrobial Agents and Chemotherapy. Reuters Health News covered the article:

> After oral administration of GS 7340 to dogs, tenofovir concentrations were 5- to 15-fold higher in lymph nodes than after tenofovir DF administration, the researchers note. Except for kidney and liver, tissue concentrations of tenofovir were generally higher after GS 7340 than after tenofovir DF administration.

> "The high concentrations of tenofovir observed in lymphatic tissues after oral administration of GS 7340 are expected to result in increased clinical potency relative to tenofovir DF and could have a profound effect on the low-level virus replication that occurs in tissues with suboptimal drug exposure during HAART," the authors conclude.

> "With GS 7340," the researchers add, "it should be possible to reduce the total dose of tenofovir, thereby minimizing systemic exposure, while at the same time increasing antiviral activity."[23]

253.     Moreover, even though Gilead purportedly abandoned TAF, Gilead filed seven applications for patents on TAF between 2004 and 2005.

---

[22] https://www.gilead.com/news/press-releases/2004/10/gilead-discontinues-development-of-gs-9005-and-gs-7340-company-continues-commitment-to-research-efforts-in-hiv.

[23] Novel tenofovir prodrug preferentially targets lymphatic tissue, Reuters Health Medical News, June 1, 2005.

COMPLAINT FOR DAMAGES - 80
Case No.:
010759-11 1080167 V1

254.   Despite recognizing the safety benefits of TAF, Gilead kept its GS-7340 design on the shelf for years—knowingly exposing patients taking its TDF-containing drug products to greater risks of kidney and bone toxicity.

255.   It was not until approximately October 2010—*six years* after Gilead shelved its safer tenofovir prodrug and after Gilead designed combination products Truvada and Atripla to contain TDF rather than safer TAF—that Gilead renewed development of the safer TAF design.

256.   Once Gilead renewed development of its TAF design, it again touted the benefits of TAF over TDF—as if it had never falsely claimed that TAF could not be "highly differentiated" from TDF.

257.   Despite having discovered the benefits of TAF before 2001, Gilead repeatedly misrepresented TAF as "new." The benefits of TAF that Gilead described in 2010 and beyond were known to Gilead years earlier. And the clinical results Gilead achieved with TAF would have been achieved years earlier but for Gilead's decision to slow-walk and withhold the safer TAF design purely for financial gain.

258.   In an October 19, 2010 earnings call, Gilead's Chief Scientific Officer Norbert Bischofberger explained to investors how GS-7340's safety profile was superior to Viread, particularly with respect to kidney and bone toxicity:

> 7340 is a prodrug that actually delivers more active antivirally active components into the compartment in the body where it's really needed which means lymphocytes mostly. What that means is you can take a lower dose, and actually our clinical study would indicate 1/6th to 1/10th the Viread dose and you would actually get higher efficacy with less exposure. So we're looking at this to be used in sub population where people have a concern with Viread, and the one with renal impairment, elderly people that have reduced renal function, and the other population will be adults that have pre-existing or suspicion of bone disease, osteoporosis, and that's where we are initially going to position the compound.[24]

---

[24] Q3 2010 Gilead Sciences Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 19, 2010.

259.     Giving a statement at the Capital Markets Healthcare Conference on March 2, 2011,
John Milligan, then Gilead's President and Chief Operating Officer, told investors the real reason
Gilead previously refused to design its products to contain safer GS-7340—it did not want to hurt
TDF sales by stepping on its TDF marketing message:

> One of the reasons why we were concerned about developing 7340
> was we were trying to launch Truvada versus Epzicom[25] at that time.
> And to have our own study suggesting that Viread wasn't the safest
> thing on the market, which it certainly was at the time. . . . It didn't
> seem like the best. It seemed like we would have a mix[ed] message.
> And in fact that Viread story is split out to be a fairly safe product over
> the years. There are some concerns still on kidney toxicity and there
> are some concerns about bone toxicity.[26]

260.     Milligan called GS-7340 a "kinder, gentler version of Viread."[27]

261.     At the March 14, 2011 Roth Capital Partners Growth Stock Conference, Gilead stated
that the ability to dose GS-7340—the "kinder, gentler" version of Viread—lower than Viread was
important because GS-7340 is safer, particularly as patients take the medication for the long term.[28]

262.     At the NASDAQ OMS 26th Investor Program in June 2011, Gilead described GS-
7340 as a "very exciting product" which was then in dosing studies to determine just how low GS-
7340 could be dosed. Gilead explained the benefit of lower dosing to aging patients and those who
have been on the medication for a long time:

> And we had recently this year had presented 14-day monotherapy
> results from a study we had done at 50 and 100 mg of 7340 versus the
> 300 mg of Viread today. And what we have shown was viral load
> reductions were greater in the lower doses of 7340 and the plasma
> tenofovir levels were actually much reduced from what we see with
> Viread.

> We're currently now in a Phase Ib looking at even lower doses. We are
> studying 8 mg, 25 and 40 mg of GS-7340. This is important because as
> the age of the AIDS population continues to increase, as the median
> age is now just about 50 years old, you get issues with aging such as

[25] Epzicom is a combination medication, containing abacavir and lamuvidine, indicated to treat HIV sold by Gilead's competitor GlaxoSmithKline, now Viiv Healthcare, Ltd. The FDA approved both Epzicom and Truvada in August 2004.

[26] Gilead Sciences at RBC Capital Markets Healthcare Conference – Final, FD (Fair Disclosure) Wire, Mar. 2, 2011.

[27] *Id*.

[28] Gilead Sciences at Roth Capital Partners OC Growth Stock Conference – Final, FD (Fair Disclosure) Wire, Mar. 14, 2011.

> renal function and bone mineral density that can become bigger issues
> for these patients and we think that it's a currently unmet medical need
> to address those concerns of the aging population in HIV.[29]

Yet, Gilead knew well before 2010-2011 that people with HIV were living longer lives. Since the introduction of effective combination antiretroviral therapy in late 1995 and early 1996, many people with HIV have lived a normal lifespan.

263.    On January 24, 2012, Gilead announced that it had begun Phase II clinical trials of GS-7340 and identified a dose that is ten times lower than Viread while providing greater antiviral efficacy.

264.    On October 31, 2012, Gilead announced that a Phase II clinical trial evaluating TAF met its primary objective. The study compared a once-daily single tablet regimen containing TAF 10 mg/elvitegravir 150 mg/cobicistat 150 mg/emtricitabine 200 mg with Stribild (TDF 300 mg/elvitegravir 150 mg/cobicistat 150 mg/emtricitabine 200 mg) among treatment-naïve adults. Compared to Stribild, the TAF-containing regimen demonstrated better markers of bone and kidney effects that were statistically significant. The study showed that TAF is effective at a fraction of the dose of Viread and provides safety advantages.

265.    In January 2013, Gilead began Phase III clinical development of TAF. Announcing the beginning of Phase III development, then-CEO Martin mischaracterized TAF as "new."[30]

266.    Gilead finally submitted an application to market its first TAF-containing product, Genvoya, to the FDA on November 5, 2014 (though it could have done so years earlier had it not shelved the safer design to make more money).

267.    When the FDA approved Genvoya on November 5, 2015, John C. Martin, then Chairman and CEO of Gilead, announced that "there is still a need for new treatment options that may help improve the health of people as they grow older with the disease."[31] Martin misrepresented

---

[29] Gilead Sciences Inc. at NASDAQ OMS 26th Investor Program – Final, FD (Fair Disclosure) Wire, June 21, 2011.

[30] Gilead Sciences at JPMorgan Global Healthcare Conference – Final, FD (Fair Disclosure) Wire, Jan. 7, 2013.

[31] US FDA approvals Gilead's Single Table Regiment Genvoya for Treatment of HIV-1 Infection, Business Wire, Nov. 5, 2015.

that TAF was "new" and concealed that Gilead had known about this safer version of tenofovir for over a decade but purposefully withheld it from the market solely to protect its monopoly profits and extend Gilead's ability to profit on TAF regimens for the next decade or more.

**F.      Gilead Withheld its Safer TAF Design to Protect its TDF Sales and Extend Profits on its HIV Franchise.**

268.      Gilead first developed and sought FDA approval for its TDF line of products even though it knew TAF was safer.

269.      Then Gilead shelved its TAF design in 2004 because it did not want to hurt TDF sales by admitting that TDF is unreasonably and unnecessarily unsafe.

270.      Gilead continued to withhold its TAF design for the next decade. Gilead knew that by withholding the safer TAF design, it could extend the longevity of its HIV drug franchise and make billions two times over: first, with TDF medications until TDF patent expiration, which would begin by no later than 2018, and second, with TAF medications until TAF patent expiration as late as 2032.

271.      But Gilead also knew that timing was key. While it wanted to delay the TAF-designed products to maximize profits on its TDF Drugs, it also knew that it had to get its TAF-based products on the market sufficiently in advance of TDF patent expiration. Gilead knew that once doctors switched their patients from TDF to TAF, doctors would be highly unlikely to switch their patients back to TDF-based regimens once generic TDF became available. By converting TDF prescriptions to TAF prescriptions (which cannot be automatically substituted at the pharmacy counter with a generic TDF product), Gilead could save a substantial percentage of sales from going generic.

272.      Only once Gilead had realized billions in sales through most of the TDF patent life—having built Viread sales up to $1.1 billion and the TDF portfolio up to $11 billion in sales in 2015—did Gilead create TAF-based versions of its prior TDF Drugs and work to convert its TDF Drug sales to TAF drug sales.

273.      Once TAF entered the market, Gilead successfully convinced a large percentage of doctors to switch from TDF-based to TAF-based regimens by highlighting TAF's improved safety profile with respect to bone and kidney toxicity—the very benefits that Gilead could have and should

have incorporated into its product design from the beginning but withheld from patients with each successive TDF Drug for over a decade.

274.    In addition, by delaying the filing of an NDA for its first TAF product, for which it received five-year regulatory exclusivity, Gilead knew that it was also delaying the entry of any generic manufacturer who could successfully challenge Gilead's TAF patents as invalid or not infringed. Due to its regulatory exclusivity, no generic manufacturer can even file an ANDA with a Paragraph IV certification seeking to market a generic version of Genvoya until November 2019 and then, upon Gilead's suit against the generic, Gilead can automatically delay generic entry by up to an additional 30 months.

275.    Gilead boasted about TAF's potential to extend its HIV franchise, which has been the core of its business.

276.    Milligan told investment analysts in 2010 that the safer TAF-designed products could replace the whole TDF franchise which would provide a "great deal of longevity. . . ."[32] Milligan similarly told investors at a Deutsche Bank Securities Inc. Healthcare Conference in May 2011 that TAF was a "new" drug that "could potentially bring quite a bit of longevity to the Gilead portfolio."[33]

277.    As Milligan told analysts at a Goldman Sachs Global Healthcare Conference in June 2011, Gilead would be "offering a product called 7340, which we believe is a lower dose, better safety profile, more potent, differentiated drug relative to Viread. And so, our ability to develop and get that onto the market prior to [TDF] patent expiration will be key to us, to maintain the longevity."[34]

278.    Gilead withheld its safer TAF design until it suited Gilead's bottom line at the expense of patients' health.

---

[32] Gilead Sciences at 22nd Annual Piper Jaffray Healthcare Conference – Final, FD (Fair Disclosure) Wire, Nov. 30, 2010.

[33] Gilead Sciences Inc. at Deutsche Bank Securities Inc. Health Care Conference – Final, FD (Fair Disclosure) Wire, May 3, 2011.

[34] Gilead Sciences Inc. at Goldman Sachs Global Healthcare Conference – Final, FD (Fair Disclosure) Wire, June 7, 2011.

**G.     Gilead Knowingly Designed its TDF Drugs To Be Unreasonably Dangerous and Unsafe to Patients' Kidneys and Bones.**

279.    Despite knowing that TDF causes kidney and bone damage and that TAF is safer for patients' kidneys and bones, Gilead designed the TDF Drugs to contain TDF rather than safer TAF as the orally available version of tenofovir.

280.    In addition to withholding the safer TAF design of Stribild, Gilead made Stribild even more dangerous to patients when it formulated the drug to include 300 mg TDF with cobicistat.

281.    Stribild is a fixed dose combination containing 300 mg TDF, emtricitabine, elvitegravir, and cobicistat. Elvitegravir is an integrase strand transfer inhibitor (INSTI). Cobicistat has no antiretroviral effect; it is a pharmacoenhancer that increases the plasma concentrations of elvitegravir. Regimens that include a pharmacoenhancer like cobicistat are called "boosted" regimens.

282.    Gilead's early development of elvitegravir used ritonanir as the boosting agent. Gilead knew before Viread entered the market in 2001 that coadministration of TDF with ritonvanvir-boosted lopinavir significantly increased tenofovir concentrations. By 2004, the Viread label warned doctors to carefully monitor patients taking both TDF and ritonavir/lopinavir. And scientific literature published years before Gilead developed Stribild indicated that renal toxicity associated with TDF was more frequent in patients receiving TDF in combination with boosted protease inhibitors.

283.    Although Gilead ultimately replaced ritonavir with cobicistat as the boosting agent in Stribild, the two boosters are structurally similar. Gilead learned during development of Stribild that tenofovir levels in patients receiving Stribild (TDF with cobicistat) were similar to the tenofovir levels experienced in patients who took TDF in combination with a ritonavir-boosted protease inhibitor. Gilead knew that tenofovir levels are 25-35% higher when combining TDF in a boosted regimen.

284.    Despite knowing that combining TDF with cobicistat would significantly increase tenofovir levels in patients' blood, Gilead did not reduce the dose of TDF when it formulated Stribild. Gilead's Stribild clinical trials showed an increased rate of serious renal adverse events that

led to treatment discontinuation. Stribild is even more toxic to patients' kidneys and bones than unboosted TDF.

285.    When Gilead formulated its first TAF-based drug, Genvoya—which was Stribild with TAF in place of TDF—Gilead reduced the dose of TAF to account for the fact that cobicistat increases tenofovir concentrations. A Phase I TAF dosing trial showed that TAF 25 mg was the optimal dose to achieve activity similar to a 300 mg dose of TDF. When formulating Genvoya, however, Gilead further reduced the TAF dose to 10 mg because, when given with cobicistat, TAF 10 mg achieves exposure similar to TAF 25 mg when given without cobicistat.

286.    Gilead knew to reduce the dose of TAF to 10 mg when given with cobicistat before Gilead sought FDA approval for Stribild.  Pursuant to Gilead's Phase I study GS-US-311-0101, conducted between June 6, 2011 and August 31, 2011, Gilead determined that co-administration of TAF with cobicistat significantly increased the body's exposure to TAF and active tenofovir. It found that the body's drug exposure across time (known as the "area under the curve" in pharmacokinetic parlance) increased 2.7-fold with respect to TAF and 3.3-fold with respect to tenofovir when given with cobicistat. Gilead addressed this drug interaction by reducing the dose of TAF from 25 mg to 10 mg in the Genvoya tablet. When Gilead began its study GS-US-292-0103 on October 5, 2011, it used a TAF dose of 10 mg in the Genvoya combination because "the TAF dose is 10 mg when combined with COBI in the [fixed dose combination] versus 25 mg when not combined with COBI."[35]

287.    Critically, Gilead reduced the TAF dose when formulating Genvoya even though patients' plasma exposure to tenofovir when taking TAF is already significantly less than their tenofovir exposure when taking TDF due to TAF's enhanced entry and absorption into target cells.

288.    Moreover, in July 2011, months before Gilead submitted its Stribild NDA to the FDA, Gilead sought FDA approval of reduced doses of TDF (Viread) in 150 mg, 200 mg, and 250 mg strengths for the treatment of HIV-1 infection in pediatric patients ages 2-12. That same month,

---

[35] FDA Center for Drug Evaluation and Research, Genvoya NDA 207561 Clinical Pharmacology and Biopharmaceutics Review(s) at 32, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000ClinPharmR.pdf.

Gilead also sought approval of Viread 40 mg oral powder for the treatment of HIV-1 infection in pediatric patients 2 years and older.[36] The FDA approved the lower dosage strength TDF tablets and oral powder in early January 2012—over six months before the FDA approved the Stribild NDA. There was no reason Gilead could not have similarly reduced the dose of TDF in Stribild—when it knew that failing to reduce the dose would increase the drug's toxicity.

289.    As a direct result of Gilead's decision not to use a safer design, Stribild proved to be toxic to patients' kidneys and bones.

290.    In the clinical trials of Stribild over 48 weeks, eight patients in the Stribild group compared to one in the comparator groups discontinued the drug study due to renal adverse events, including kidney failure and Fanconi Syndrome. Four of these patients developed laboratory findings consistent with proximal renal tubular dysfunction. The laboratory findings in these four subjects improved but did not completely resolve upon discontinuation of Stribild. The signature toxicity of the Stribild group was proximal renal tubular dysfunction.

291.    The FDA's Medical Review described the notable adverse events that led to study discontinuation more frequently in the Stribild group as a "constellation of renal [Adverse Events] (e.g. renal failure, Fanconi syndrome, and increased blood creatinine)."[37]

292.    According to the FDA, the "most important safety risks of Stribild use are associated with two key toxicities: renal adverse events (particularly proximal renal tubular dysfunction) and bone toxicity. Both of these events have previously been associated with use of TDF . . . ."[38]

293.    The FDA noted that "published literature suggests that the renal toxicity associated with TDF may be more frequent in patients receiving TDF in combination with PIs, including ritonavir,"[39] and the "review team remains concerned that COBI may exacerbate the known renal

---

[36] In the EU, Gilead recommends that adults with creatinine clearance below 50 mL/min take Viread oral powder to reduce their doses of TDF.

[37] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Medical Review at 9, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000MedR.pdf.

[38] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Cross Discipline Team Member Review at 17, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000CrossR.pdf.

[39] *Id*. at 18.

toxicity associated with TDF."[40] In its Summary Review of the Stribild NDA, the FDA concluded: "it appears that the combination of COBI with TDF may have more renal toxicity than TDF alone as highlighted in the clinical reviews and the renal consult."[41]  The FDA expressed concern that the data reviewed for the Stribild NDA represented an increased hazard signal even compared to regimens containing TDF combined with another boosting agent.

294.    Due to Stribild's renal toxicity, Stribild use is restricted in patients with impaired renal function. Stribild's label states that doctors should not initiate Stribild in patients with estimated creatinine clearance below 70 mL per minute, and Stribild should be discontinued if estimated creatinine clearance declines below 50 mL per minute as dose interval adjustment cannot be achieved. Moreover, in the EU—though not in the U.S. —Gilead warns doctors that Stribild should not be initiated in patients with creatinine clearance below 90 mL per minute unless, after review of all available treatment options, it is considered that Stribild is the preferred treatment for the individual patient.

295.    Gilead's post-approval Stribild data continued to show renal adverse effects. In the clinical trials of Stribild over 96 weeks, two additional Stribild patients discontinued the study due to a renal adverse reaction. In the clinical trials of Stribild over 144 weeks, three additional Stribild patients discontinued the study due to a renal adverse reaction. In addition, one patient who received ritonavir-boosted atazanavir plus Truvada (i.e., a boosted TDF regimen) in the comparator group developed laboratory findings consistent with proximal renal tubular dysfunction leading to drug discontinuation after week 96.

**H.    Gilead Obtained FDA Approval for its TAF-Based Products by Relying on Studies Demonstrating TAF's Superiority over TDF.**

296.    In seeking FDA approval of its first TAF-based antiviral drug product, Genvoya, Gilead told the FDA that TAF has better entry and concentration in HIV-target cells than TDF,

---

[40] *Id.*

[41] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Summary Review at 16, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000SumR.pdf.

thereby allowing the administration of smaller doses and reducing systemic tenofovir exposure, renal

toxicity and bone effects, without sacrificing efficacy.

297.    Gilead established during Phase I clinical development of TAF that doses as low as 8

to 25 mg of TAF had antiviral activity comparable to the approved dose of TDF 300 mg. Gilead

selected the 25 mg TAF dose as the optimal dose for Phase 2 and 3 studies based on its antiviral

activity. Gilead included TAF 10 mg in Genvoya because it provides similar exposures to TAF 25

mg when coadministered with cobicistat.

298.    Gilead supported the safety and efficacy of Genvoya with two clinical trials that

compared Genvoya to its TDF-containing counterpart, Stribild. In those studies, a 10 mg oral dose of

TAF in Genvoya resulted in greater than 90% lower concentrations of active tenofovir in plasma as

compared to a 300 mg oral dose of TDF in Stribild. Due to these lower plasma concentrations,

Gilead expected that the kidney and bone toxicities associated with TDF would occur at a lower rate

with TAF.  And, as expected, the trials showed that rates of biomarkers for tenofovir-induced renal

and bone toxicities were less with Genvoya than Stribild.

299.    In seeking FDA approval of Genvoya in 2014, Gilead relied on TAF data obtained by

Gilead more than a decade earlier—before the company abruptly shelved its TAF design in pursuit

of more money. Gilead submitted in its Genvoya NDA data from: (a) early clinical development

showing that TAF provided greater intracellular distribution of tenofovir yielding lower plasma

tenofovir levels than TDF; (b) preclinical studies that indicated TAF is less likely to accumulate in

renal proximal tubules, supporting the potential for an improved renal safety profile; and (c) Phase I

dosing studies supporting doses of TAF far lower than the standard 300 mg dose of TDF.

300.    Reviewing these studies, the FDA stated that: "Based on the design of the pivotal

clinical trials, safety can be directly compared between TAF (Genvoya) and TDF (as Stribild) in

subjects initiating treatment."[42] According to the FDA, the studies showed that "the rates of signature

TFV [tenofovir] toxicities related to bone mineral density and renal laboratory parameters were

---

[42] FDA Center for Drug Evaluation and Research Genvoya NDA 207561 Summary Review at 10, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000SumR.pdf.

lower [than TDF], likely due to the fact that the TAF prodrug yields lower plasma concentrations of TFV."[43]

301.    As a result of its improved renal safety profile over TDF, Gilead's TAF-containing products are better tolerated by patients with renal impairment.

302.    For example, Genvoya requires no dosage adjustment for patients with creatinine clearance greater than or equal to 30 mL per minute, whereas its TDF-containing counterpart Stribild is not recommended for patients with creatinine clearance below 70 mL per minute and Stribild should be discontinued if creatinine clearance falls below 50 mL per minute as dose interval adjustment cannot be achieved. Due to its superior safety profile, Genvoya has an expanded indication for renally impaired individuals with creatinine clearance greater than or equal to 30 mL per minute.

303.    As a result of its improved bone toxicity safety profile over TDF, the labels for Gilead's TAF-containing products no longer include bone effects in the Warnings and Precautions sections of the those labels.

304.    The FDA agreed that bone effects need only be displayed in the Adverse Events section of TAF drug labeling because "[w]ith respect to bone toxicity, TAF appears to have substantially less of an adverse effect on bone mineral density (BMD) than TDF."[44]

305.    Gilead removed bone toxicity from the Warnings and Precautions sections of the Genvoya label in December 2016 and from the Odefsey and Descovy labels in 2017. Bone toxicity remains in the Warnings and Precautions sections of the labels of Gilead's TDF Drugs to this day.

I.      **Gilead Markets TAF as Superior to TDF.**

306.    Gilead's TAF-based product websites, including the Genvoya site, market the TAF-based drugs as superior to Gilead's TDF-containing products with respect to kidney health. Gilead recognizes that: "Kidneys play a key role in keeping you healthy, working around the clock to remove waste from your blood. That's why it's so important to take care of them, especially if you

---

[43] *Id*. at 15.

[44] FDA Center for Drug Evaluation and Research Vemlidy NDA 208464 Summary Review at 5, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208464Orig1s000SumR.pdf.

2fb95e2ea732b98e

have HIV-1."[45] Gilead states that the TAF-based products have "less impact on kidney lab tests" than other approved HIV-1 treatments, including Stribild, Atripla, and Truvada. The website also highlights that unlike its TDF products, the TAF-based products are "FDA-approved for people with mild-to-moderate kidney problems and can be used in some people with lowered kidney function without changing the dose."[46]

307.    Gilead's TAF-based product websites, including the Genvoya site, market the TAF-based drugs as superior to Gilead's TDF-containing products with respect to bone health. Gilead recognizes that: "Because HIV-1 medicines may impact your bones, it's important to protect your bone health. If you're under 30 years of age, you're still developing bone mass. If you're over 30, your bones have fully developed and it's important to try to maintain them."[47] The site touts clinical studies which demonstrate that the TAF-containing products "had less impact on hip and lower spine bone mineral density than the other approved HIV-1 treatments," including Stribild, Atripla, and Truvada.[48]

308.    Gilead also touts TAF as safer than TDF to scientists, clinical investigators, and doctors attending the annual Conference on Retroviruses and Opportunistic Infections ("CROI").

309.    In 2015, Gilead scientists presented to CROI attendees data evaluating the safety and efficacy of Genvoya in patients with mild to moderate renal impairment. Gilead stated that "TDF has been associated with clinically significant renal and bone toxicity," and "[r]elative to TDF 300 mg, TAF at an equivalent dose of 25 mg has 90% lower circulating plasma TFV, while maintaining high antiviral activity."[49] This first study of a single-tablet antiviral regimen without dose adjustment in patients with mild to moderate renal impairment demonstrated the efficacy and renal and bone safety of Genvoya in this patient population.

---

[45] *See* https://www.genvoya.com/hiv-kidney-bone-health.

[46] *Id*.

[47] *Id*.

[48] *Id*.

[49] http://www.croiconference.org/sites/default/files/posters-2015/795.pdf.

310.    In 2016, Gilead scientists presented to CROI attendees data evaluating the renal safety of TAF in patients with a high risk of kidney disease. Gilead stated that TDF "has been associated with an increased risk of [chronic kidney disease] . . . . " and "[d]ue to a 91% lower plasma tenofovir level, tenofovir alafenamide (TAF) relative to TDF has demonstrated a significantly better renal safety profile and no discontinuations due to renal adverse events through 2 years in 2 randomized, double-blind studies . . . comparing TAF to TDF . . . . "[50] With respect to high risk renal patients, Gilead concluded that "[a]ntiretroviral-naïve adults with both high and low risk for [chronic kidney disease] treated with TAF had more favorable renal outcomes compared to those treated with TDF."[51]

311.    Gilead also presented at the 2016 CROI data demonstrating that TAF is safer to kidneys than TDF in the longer-term. Showing data through 96 weeks, Gilead concluded that "[c]linically significant renal events were less frequent in patients receiving" TAF vs. TDF and these "data provide further support for the improved renal safety profile of TAF compared with TDF."[52]

312.    In 2017, Gilead scientists presented to CROI attendees data showing that switching patients with low bone mineral density from a TDF-based to a TAF-based regimen results in increased BMD and a reversion from osteoporosis, leading Gilead to conclude that "[s]witching from TDF to TAF may be an important treatment strategy to increase bone mineral density in those at the highest fracture risk."[53]

313.    Also in 2017, Gilead scientists presented to CROI attendees 144-week data establishing the superiority of TAF over TDF with respect to efficacy as well as kidney and bone safety. At week 144, TAF: was "superior to [TDF] on virologic efficacy," had "significantly less impact than [TDF] on renal biomarkers," and had "significantly less impact than [TDF] on BMD."[54]

---

[50] http://www.croiconference.org/sites/default/files/posters-2016/681.pdf.

[51] Id.

[52] http://www.croiconference.org/sites/default/files/posters-2016/682.pdf.

[53] http://www.croiconference.org/sites/default/files/posters-2017/683_Brown.pdf.

[54] http://www.croiconference.org/sites/default/files/posters-2017/453_Arribas.pdf.

314.    In 2018, Gilead scientists presented to CROI attendees 96-week data that showed that switching to a TAF-based regimen resulted in "significant increases in bone mineral density at hip and spine" and "improved biomarkers of renal tubular function."[55]

315.    Gilead's sales force has used data showing the superior safety profile of TAF over TDF to convince doctors to switch patients from TDF-based to TAF-based products.

316.    Gilead President and COO Milligan told analysts during a November 10, 2015 Credit Suisse Healthcare Conference that he expected Gilead's sales representatives to be successful in switching the market from TDF to Genvoya based on favorable data showing the benefits of TAF over TDF. Milligan viewed switching patients from Stribild to Genvoya as "the most likely thing to happen very commonly, because it's very seamless for the patient. You're not really changing much; you're just getting a better version of Stribild."[56] Milligan also touted the benefit of switching Atripla patients, who, at that point, had a decade of TDF toxicity buildup, to Genvoya, which, he said, gives patients the benefits of TDF with a better safety profile.

317.    In order to prevent or combat the cumulative buildup of kidney and bone toxicity associated with TDF (which Gilead itself caused by withholding the safer TAF design), Gilead's message was: "if you're a new patient, start with a TAF-based single-tablet regimen, because that's going to be highly efficacious and very safe and very tolerable for long-term usage. And if you're on a Viread-based regimen, it's a great idea to convert, switch, upgrade to a TAF-based regimen as soon as possible."[57]

318.    According to Milligan, Genvoya was the most successful launch ever for an HIV therapy. After six months on the market, Genvoya was the most prescribed regimen for treatment-naïve and switch patients.

---

[55] http://www.croiconference.org/sites/default/files/posters-2018/1430_Mills_504.pdf.

[56] Gilead Sciences Inc. at Credit Suisse Healthcare Conference – Final, FD (Fair Disclosure) Wire, Nov. 10, 2015.

[57] Gilead Sciences Inc. at Piper Jaffray Healthcare Conference – Final, FD (Fair Disclosure) Wire, Dec. 1, 2015.

319.     Gilead's conversion strategy continued with FDA approval of Gilead's subsequent TAF-based products. As Milligan stated in March 2016, the marketplace was moving to TAF because patients need the safest possible medication:

> [A]s I look at TAF right now there's a very strong medical rationale for TAF versus Viread. And so what we're seeing in the marketplace with the launch of Genvoya and then with the recent approval of Odefsey is the desire to move patients from a TDF containing regimen to a TAF containing regimen. . . it's very interesting that the field wants to move to the safest medication, I think should move to the safest medication because it's a great opportunity for patients to stay on care for another 10 to 20 years which is really where we're at with most of these patients. They're going to need decades more care and so you need the gentlest, safest option for patients. . . . [58]

320.     Gilead's 2017 Annual Report attributes strong growth in its HIV business to "widespread physician acceptance and uptake" of the TAF-based regimens.[59]

321.     In January 2018, Milligan stated that "physicians and patients prefer TAF dramatically over our TDF-containing backbones," noting that its TAF-based products had achieved more than 56% of the market share of its TDF-containing regimen.[60] TAF-based products now make up at least 74% of Gilead's TDF- and TAF-based drug products for HIV treatment.

322.     Gilead could have and should have incorporated the benefits of TAF, which doctors and patients "prefer dramatically" over TDF, into its products years earlier.

**J.      Gilead Failed to Adequately Warn about the Risks of TDF.**

323.     In addition to withholding a safer TAF-based design despite knowing the risk its TDF Drugs posed to patients' kidneys and bones, Gilead failed to adequately warn physicians and patients about the risks and safe use of TDF.

---

[58] Gilead Sciences Inc. at Barclays Global Healthcare Conference – Final, FD (Fair Disclosure_ Wire, Mar. 15, 2016.

[59] Gilead Sciences 2017 Year in Review at 7, available at file:///C:/Users/annej/Downloads/Gilead%20FINAL%202017%20Year%20in%20Review%20(3).pdf.

[60] Gilead Sciences Inc. at JPMorgan Healthcare Conference – Final, FD (Fair Disclosure) Wire, Jan. 8, 2018.

1          **1.       Gilead Failed to Adequately Warn Doctors about the Risks of TDF.**

2          324.    Because tenofovir is primarily cleared out of the body by the kidneys, a patient

3   experiences even greater exposure to tenofovir as the kidneys become impaired—causing even

4   greater harm. As a result, early detection is key to preventing serious, potentially irreversible renal

5   injury. Frequent monitoring for TDF-induced toxicity is also critical because patients are typically

6   asymptomatic in the early stages. Gilead, however, downplayed the risks of TDF and the need to

7   monitor all patients in order to inflate sales.

8          325.    During the first years Viread was on the market, Gilead relied on Viread sales for a

9   significant portion of its operating income. For 2002, Viread's first full year on the market, Viread

10  sales comprised 53% of Gilead's total product sales. In 2003, Viread accounted for 68% of Gilead's

11  total product sales.

12         326.    Gilead stated in its 2002 10-K that its operations would suffer if Viread did not

13  maintain or increase its market acceptance. Gilead also stated that if additional safety issues were

14  reported for Viread, this could "significantly reduce or limit our sales and adversely affect our results

15  of operations."[61] Gilead made similar statements in its 2003 and 2004 10-K filings.

16         327.    To make sure that safety issues did not depress or slow the growth of Viread sales,

17  which were crucial to Gilead's operations, Gilead dramatically increased its sales force and

18  marketing budget, and trained its sales representatives to misrepresent Viread's safety profile. At the

19  direction of Gilead's senior management, Gilead representatives told doctors that Viread was a

20  "miracle drug," "extremely safe," and "extremely well-tolerated" with "no toxicities."

21         328.    According to a 2009 shareholder lawsuit filed against Viread, Viread's then-Chief

22  Executive Officer John C. Martin frequently referred to Viread as a "miracle drug" at sales force

23  meetings. According to a former employee, Gilead was trying to overcome the perception in the

24  medical community that Viread was like Gilead's previous HIV drugs and would likely cause kidney

25  damage.

26

27         ─────────────────
           [61] Gilead Sciences, Inc. Form 10-K For the fiscal year ended Dec. 31, 2002 at 24 available at
28  https://www.sec.gov/Archives/edgar/data/882095/000104746903008695/a2105292z10-k.htm.

329.    On March 14, 2002, FDA sent Gilead a Warning Letter admonishing Gilead for engaging in promotional activities that contained false and misleading statements in violation of the Federal Food, Drug and Cosmetic Act. The FDA stated that Gilead unlawfully minimized Viread's risks, including with respect to kidney toxicity, and overstated its efficacy.

330.    Despite this warning, Gilead continued to unlawfully promote Viread by minimizing its safety risks. During a June 2003 sales force training, Gilead instructed sales representatives to respond to anticipated physician concerns about Viread's nephrotoxicity by downplaying that many patients taking Viread had experienced the adverse effects of kidney toxicity—some of them severe —including but not limited to renal failure, acute renal failure, Fanconi syndrome, proximal tubulopathy, increased creatinine, and acute tubular necrosis.

331.    The FDA issued another Warning Letter to Viread on July 29, 2003, stating that Gilead's sales representatives had repeatedly omitted or minimized material facts regarding the safety profile of Viread. Among other things, the FDA required Gilead to retrain its sales force to ensure that Gilead's promotional activities complied with the Federal Food, Drug and Cosmetic Act and accompanying regulations. But Gilead had achieved its goal: rapidly increased Viread sales.

332.    In subsequent years, Gilead continued to downplay the risks of TDF-induced toxicity when promoting its TDF Drugs to doctors by misrepresenting the drug as safe, dismissing case reports of acute renal failure and other TDF-associated adverse events as purportedly unavoidable side effects of tenofovir in an otherwise "safe" drug, and discouraging doctors from monitoring patients for drug-induced toxicity using more sensitive markers of kidney function.

333.    In addition to misrepresenting the safety profile of TDF when promoting TDF to doctors, Gilead also downplayed the importance of patient monitoring in its TDF Drug labeling despite the importance of early detection of TDF-induced toxicity. The dangerous inadequacies in Gilead's drug labeling were compounded by the misleading marketing messages it gave to doctors.

334.    From Viread's product approval on October 26, 2001 through May 20, 2007, Gilead's TDF labeling failed to warn doctors that all patients needed to be monitored for adverse kidney effects. During this time, Gilead only recommended monitoring patients taking TDF Drugs for renal adverse effects if patients were at risk for, or had a history of, renal impairment or if they were taking

another nephrotoxic drug. This monitoring recommendation was woefully inadequate because, as Gilead was well aware, TDF-associated renal toxicity had harmed patients who were not at risk for, or did not have a history of, renal impairment.

335.    Gilead failed to include any warning about the need to monitor bone effects until October 14, 2003 and that warning was limited to patients with certain risk factors. Since then, Gilead has only suggested that doctors monitor, and only informs patients that monitoring may be necessary, for patients with certain risk factors for bone adverse effects.

336.    Gilead failed to warn about the need for universal monitoring even though it knew that all patients taking TDF are at risk for renal and bone adverse effects.

337.    Gilead failed to warn about the need for universal monitoring even after patients without pre-existing risk factors experienced kidney and bone effects.

338.    Gilead failed to warn about the need for universal renal monitoring even though patients with a certain level of renal impairment should not take its TDF products or, if TDF products are to be administered to certain renally impaired patients, the dosing interval must be adjusted. The Viread and Truvada labels require a dosing interval adjustment for patients with creatinine clearance of 30-49 mL per minute, and Complera cannot be taken by patients with a creatinine clearance of less than 50 mL per minute. Frequent monitoring of all patients' kidney function is necessary to ensure that patients' kidneys are healthy enough to continue treatment or patients receive a needed dose interval adjustment.

339.    By failing to warn doctors to monitor all patients for TDF-associated toxicity, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing injuries that would have been prevented or lessened through early detection.

340.    On May 21, 2007, Gilead added to the Viread label a recommendation that doctors calculate creatinine clearance (one measure of kidney function) in all patients before initiating treatment with a TDF-based product and as clinically appropriate during therapy. Gilead

recommended monitoring of creatinine clearance and serum phosphorus only for patients at risk for renal impairment.[62]

341.    The "all patients" monitoring recommendation for Viread, Truvada, Atripla, and Complera remained inadequate because it instructed doctors to assess just one, insufficently sensitive marker of kidney function.[63] Without using sufficiently sensitive markers of kidney function, substantial kidney injury can occur before it is measurable. As a result, the detection of TDF-induced nephrotoxicity often comes too late, resulting in kidney injury that may be irreversible. Gilead should have warned doctors to test all patients for additional markers of kidney function, such as serum phosphorus and/or urine glucose.[64]

342.    Phosphorus is a mineral that plays an important role in many physiologic systems, including keeping bones healthy and strong. Normal working kidneys maintain balanced levels of phosphorus in the blood. Low levels of phosphorus in the blood are indicative of impaired kidney function. Moreover, low serum phosphate is itself dangerous; low levels of phosphorus in the blood can cause a range of health problems, including serious bone and heart damage.

343.    Serum phosphorus is a more sensitive marker of nephron tubule function than creatinine clearance. This is because the nephron tubule is responsible for reabsorbing phosphorus from the glomerular filtrate. When the nephron tubule is damaged, it cannot reabsorb enough phosphorus, allowing the phosphorus to be excreted via urine. By monitoring patients' serum phosphorus, doctors are able to pick up more subtle changes in kidney function that would otherwise

---

[62] Gilead did not add similar warnings to the Truvada and Atripla labels until 2008. Complera's label included such a warning at the time of FDA approval in 2011. And when Gilead began marketing Stribild in 2012, it warned doctors to assess some measures of kidney function in all patients but failed to warn doctors to monitor all patients for serum phosphorus. These warnings remained inadequate.

[63] It was not until 2018 that Gilead strengthened the Truvada, Atripla, and Complera labels to recommend that all patients receive monitoring for serum creatinine, estimated creatinine clearance, urine glucose, and urine protein. Gilead has not made this change to the Viread label.

[64] The "all patients" monitoring recommendation for Stribild upon approval was inadequate because it failed to warn doctors to measure serum phosphorus. On August 30, 2017, Gilead strengthened the Stribild label to recommend that all patients be monitored for serum creatinine, serum phosphorus, estimated creatinine clearance, urine glucose, and urine protein. But, on August 8, 2018, Gilead again weakened the Stribild label to warn doctors to monitor serum phosphorus only in patients with chronic kidney disease.

go undetected.  Moreover, a possible mechanism for TDF-induced bone injuries is related to the wasting of minerals through the urine. This is due to dysfunction in the nephron tubule, which prevents reabsorption of minerals from the glomerular filtrate. If patients knew earlier that their kidneys were dysfunctional, subsequent bone injuries could be avoided.

344.    By failing to warn doctors to monitor additional markers of all patients' kidney function, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing patients' injuries that would have been prevented or lessened through early detection.

345.    Gilead's "all patients" monitoring recommendation for its TDF Drugs also remains inadequate because it fails to instruct doctors how frequently doctors should assess patients' kidney function. By the time a doctor assesses a patient's kidney function when "clinically appropriate," the patient is likely to have already experienced adverse toxic effects, some of which might be irreversible. Regularly scheduled, frequent monitoring of kidney function is necessary to catch early signs of TDF-induced toxicity and prevent injury because patients are generally asymptomatic during the early stages.

346.    Moreover, after May 21, 2007, the TDF labels do not disclose that adverse kidney and bone events occurred in patients without pre-existing risk factors—which, combined with the warning to only routinely monitor patients at risk—gives the false impression that TDF is only harmful to people otherwise at risk for kidney and bone injuries. By failing to warn doctors as to the frequency of monitoring, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing injuries that could have been prevented or lessened through early detection.

347.    Gilead's monitoring instructions for at risk patients taking Viread, Truvada, Atripla, and Complera, and patients taking Stribild are also inadequate because they fail to recommend a specific, frequent monitoring schedule for doctors to assess patients' kidney function.

348.    Gilead's warnings about the need to monitor patients for the renal effects of TDF in the U.S. are far weaker than those given by Gilead to physicians and patients in the European Union. From the approval of the first TDF product in the EU, Gilead's European labeling (known there as the Summary of Product Characteristics or "SmPC") has recommended that doctors in the EU routinely monitor, on a specific schedule, all patients taking TDF Drugs for adverse renal effects. In

addition, Gilead's "all patient" monitoring instruction in the EU is not limited to testing only for creatinine clearance. In its EU labeling, Gilead recommends that doctors also monitor all TDF Drug patients' serum phosphorus levels on the specified, frequent schedule.

349.    Viread's initial 2002 SmPC states that: "The monitoring of renal function (serum creatinine and serum phosphate) is recommended at baseline before taking tenofovir disoproxil fumarate and at routine intervals during therapy every four weeks."

350.    In 2004, Gilead updated its Viread SmPC to change the recommended monitoring schedule for patients without pre-existing risk factors for renal events to before taking TDF, every four weeks during the first year of treatment, and then every three months thereafter. Gilead instructed doctors to give consideration to more frequent monitoring of renal function for patients at risk for, or with a history of, renal dysfunction and those with renal insufficiency.

351.    Gilead recommends in Viread's most current SmPC "that renal function (creatinine clearance and serum phosphate) is assessed in all patients prior to initiating therapy with tenofovir disoproxil fumarate and that it is also monitored after two to four weeks of treatment, after three months of treatment, and every three to six months thereafter in patients without renal risk factors." For patients at risk for renal impairment, Gilead states that more frequent monitoring of renal function is required.

352.    In 2005, when Truvada was approved for marketing in the EU, Gilead's Truvada SmPC recommended: "Careful monitoring of renal function (serum creatinine and serum phosphate) . . . before taking Truvada, every four weeks during the first year, and then every three months. In patients with a history of renal function or in patients who are at risk for renal dysfunction, consideration should be given to more frequent monitoring of renal function." In Truvada's most recent SmPC, Gilead continues to recommend frequent, routine monitoring for patients without pre-existing risk factors for renal disease: at treatment initiation and then "after two to four weeks of use, after three months of use and every three to six months thereafter." For patients at risk for renal disease, Gilead warns that more frequent monitoring of renal function is required.

353.    In 2006, Gilead issued a "Dear Doctor" letter to physicians in the EU about the importance of frequent, routine monitoring of all TDF patients' renal function. Gilead issued no such letter to doctors in the U.S., though the risk to patients' kidneys was the same.

354.    In 2007, when Atripla was approved for use in the EU, Gilead's Atripla SmPC recommended that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored every four weeks during the first year and then every three months. For patients at risk, Gilead stated that consideration must be given to more frequent monitoring. In Atripla's most recent SmPC, Gilead recommends that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored after two to four weeks of use, after three months of treatment and every three to six months thereafter in patients without renal risk factors. For patients at risk, Gilead states that more frequent monitoring is required.

355.    In 2011, when Complera (under the trade name Eviplera) was first approved for marketing in the EU, Gilead's SmPC recommended that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored every four weeks during the first year and then every three months. For patients at risk, Gilead stated that consideration must be given to more frequent monitoring. In Complera's/Eviplera's most recent SmPC, Gilead recommends that creatinine clearance be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored after two to four weeks of use, after three months of treatment and every three to six months thereafter in patients without renal risk factors. For patients at risk, Gilead states that more frequent monitoring is required.

356.    Since 2013, when Stribild received approval for marketing in the EU, through today, Gilead's SmPC has recommended that during treatment, doctors monitor all patients' creatinine clearance, serum phosphate, urine glucose, and urine protein every four weeks during the first year of treatment and then every three months during Stribild therapy. For patients at risk, Gilead states that more frequent monitoring is required.

357.   Gilead's SmPCs for its TDF-based products in the EU also contain additional instructions to physicians to increase monitoring when a patient's serum phosphate is less than 1.5 mg/dl or creatinine clearance is less than 50 mL per second, and when to consider treatment interruption or discontinuation in light of the results of frequent monitoring.

358.   Unlike Gilead's U.S. labeling, Gilead's EU labeling for Viread and Truvada also discloses that a higher risk of renal impairment has been reported in patients receiving TDF in combination with cobicistat, and doctors should carefully evaluate whether it is appropriate to prescribe TDF in combination with cobicistat in patients with renal risk factors.

359.   There is no medical, clinical, or scientific basis for the differences between the warnings contained in Gilead's labeling for its TDF-based products in the U.S. and its labeling for the same products in the EU. Gilead knew that it should instruct doctors to monitor all patients for multiple markers of kidney function on a frequent schedule but did not do so in the U.S.

360.   Until 2018, Gilead's warnings about the need to monitor patients for renal effects of Viread, Truvada, Atripla, and Complera were also far weaker than the warnings it gives to monitor patients for renal effects of TAF, even though TAF is far less toxic to kidneys than TDF. Gilead has consistently warned doctors to monitor all patients taking TAF-based drugs for multiple markers of renal function, including urine glucose and urine protein, not just estimated creatinine clearance.

361.   Gilead was more concerned with increasing or maintaining TDF Drug sales in the U.S. by downplaying the safety risk and the need for careful, frequent monitoring of all patients than it was in safeguarding patients from the known risks of TDF toxicity.

362.   Pursuant to the CBE regulations, Gilead could have strengthened the Warnings, Precautions, and Adverse Events sections of its labels for its FDA-approved TDF-based drugs unilaterally, without requiring prior FDA approval.

363.   To the extent the 2008 regulations requiring "newly acquired information" apply, Gilead could have strengthened the Warnings and Precautions sections of its labels unilaterally, without requiring prior FDA approval, based on increasing post-approval marketing evidence that patients with and without prior risk factors were experiencing kidney and bone adverse effects, and expanding support within the scientific community to frequently monitor multiple indicators of renal

function in all patients. The FDA would not have rejected a label change strengthening monitoring recommendations to protect all patients from known risks of TDF-induced kidney and bone adverse effects. Gilead gave stronger warnings in the EU for the exact same products.

364.    Moreover, each time Gilead sought FDA approval for a new TDF Drug, it could have strengthened its label before the drug obtained FDA approval. Gilead bears primary responsibility for its drug labeling. The FDA would not have prevented Gilead from strengthening its monitoring warnings in advance of FDA approval. Upon information and belief, Gilead did not disclose to the FDA that it gave stronger monitoring warnings in the EU for the exact same products nor did it disclose its scientific or medical reasons for doing so.

**2.      Gilead Failed to Adequately Warn Patients about the Risks of TDF.**

365.    Gilead failed to adequately warn patients about the risks of TDF, and the need to routinely monitor all patients taking TDF, in direct-to-consumer advertising and in patient labeling.

366.    Gilead promoted its TDF Drugs directly to patients through direct-to-consumer advertising, including print and online media. Like its sales force's promotion to doctors, Gilead's consumer advertising downplayed the risks of TDF toxicity by, among other things, hiding risk information relative to the benefits of the drugs, and suggesting that kidney and bone adverse events only occurred in, and monitoring was only necessary for, patients with risk factors for such injuries.

367.    For example, a print advertisement for Truvada that appeared in the November 2004 edition of *The Advocate*, the oldest and largest lesbian, gay, bisexual, and transgender magazine in the U.S., stated under the heading "Important Safety Information" that: "If you have had kidney problems or take other medicines that can cause kidney problems, your medical professional should do regular blood tests to check your kidneys." Yet Gilead knew by this time that adverse kidney events were not limited to at risk patients, and thus should have warned doctors and patients about the need for frequent monitoring of all patients.

368.    On March 26, 2010, the FDA issued another Warning Letter to Gilead, this time in connection with Gilead's direct-to-consumer print advertising for Truvada. The FDA stated that Gilead's Truvada advertisement was false and misleading because it overstated the efficacy of Truvada and minimized the risks associated with the drug, in violation of the Federal Food, Drug,

and Cosmetic Act and FDA implementing regulations. The FDA noted that Truvada is associated with "serious risks" like new onset or worsening renal impairment, including cases of acute renal failure and Fanconi syndrome (renal tubular injury with severe hypophosphatemia), and decreases in bone mineral density, including cases of osteomalacia (associated with proximal renal tubulopathy and which may contribute to fractures). The agency stated that Gilead's Truvada advertising was false or misleading because it failed to present the risks associated with Truvada with a prominence and readability comparable to the statements regarding the drug's benefits.

369.    In addition to the reasons set forth in the Warning Letter, the Truvada advertising was also false and misleading because, like the earlier Truvada advertising, it continued to suggest that kidney problems only occurred in, and monitoring was also necessary for, patients that had had kidney problems in the past or took other medications that can cause kidney problems.

370.    Upon information and belief, Gilead's other direct-to-consumer advertising for Viread, Truvada, Atripla, and Complera similarly failed to adequately warn patients about the true risk of TDF and the need to routinely monitor all patients for TDF-associated kidney and bone effects.

371.    Gilead's patient package inserts for Viread, Truvada, Atripla, and Complera also failed to warn about all patients' need to be routinely monitored by their doctors for adverse kidney and bone effects. The patient package inserts said nothing for years about monitoring anyone other those who were already at risk for kidney and bone problems despite Gilead's knowledge that TDF was injuring patients without identified risk factors for such injuries.

372.    Gilead's patient package inserts for Viread, Truvada, Atripla, and Complera failed to adequately warn patients even after Gilead had inadequately updated the warnings in its prescriber labeling.

373.    For example, Gilead did not disclose to patients that Viread may cause "new or worse kidney problems" until more than two years after Gilead added that warning to the Viread prescriber labeling. And Gilead waited many more years before it added the "new or worse kidney problems" disclosure to the patient package inserts for other TDF products; it did not appear in the Truvada patient package insert until June 17, 2013 and did not appear in the Atripla patient package insert

until July 25, 2018—nearly five and ten years respectively after Gilead first warned doctors that TDF may cause "new onset or worsening renal impairment."

374.    Gilead similarly delayed disclosing to patients in the patient package inserts about doctors' need to assess all plaintiffs' kidney function prior to initiating treatment with TDF. Although Gilead added that warning to the Viread prescriber labeling in May 2007, it did not tell patients that "[y]our healthcare provider should do blood tests to check your kidneys before you start treatment" with TDF until August 16, 2012 for Viread, May 15, 2018 for Truvada, July 25, 2018 for Atripla, and January 25, 2013 for Complera. At a minimum, Gilead was grossly negligent in failing to ensure that its warnings to patients were consistent with those it gave to doctors and the patient warnings it gave were consistent among its various TDF Drugs.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

375.    Gilead misrepresented that TAF was "new" despite knowing that it had discovered the benefits of TAF even before Viread was approved in 2001.

376.    Gilead misrepresented the reasons that it shelved TAF in 2004, asserting that TAF could not be differentiated from TDF when it knew that TAF was, in fact, highly differentiated from TDF.

377.    Gilead concealed that it shelved TAF in 2004 in order to extend the lifecycle of its HIV product portfolio while patients were injured by TDF-induced kidney and bone toxicity.

378.    Gilead misrepresented that it renewed development of TAF because of the needs of an aging HIV population. Gilead knew by 2004 when it halted TAF development that, as a result of cART, many HIV patients had a normal life expectancy.

379.    For years, Gilead has publicized the pretext for its decision to halt and then renew TAF development in order to conceal the existence of Plaintiffs' claims.

380.    Gilead concealed that it did not reduce the dose of TDF in Stribild even though it knew to reduce the tenofovir prodrug dose when combined with cobicistat.

381.    Gilead concealed the true risk of kidney and bone injuries TDF posed to patients who did not have pre-existing risk factors for such injuries and concealed from U.S. doctors and patients what it knew about the need to monitor all patients for TDF associated toxicity.

382.    Because of Gilead's misrepresentations and omissions, plaintiffs did not know and had no reason to suspect that Gilead's wrongdoing was the cause of their injuries and could not have discovered their claims.

383.    No reasonable person taking TDF-based drugs and experiencing kidney and bone toxicities would have suspected that Gilead purposefully withheld a safer design that would have ameliorated those very side effects.

384.    No reasonable person without prior risk factors for renal or bone harm taking TDF-based drugs and experiencing kidney and bone toxicities would have suspected that Gilead failed to adequately warn them because the label misleadingly suggests that only patients with pre-existing risk factors were in danger.

385.    No reasonable person would have suspected that Gilead provided stronger warnings to patients and doctors in the EU than it did in the U.S. for the exact same TDF products.

386.    Gilead's misrepresentations and omissions would lead a reasonable person to believe that he or she did not have a claim for relief.

387.    Because of Gilead's misrepresentations and omissions, neither Plaintiffs nor any reasonable person would have had reason to conduct an investigation. Once Plaintiffs suspected that Gilead's wrongdoing was the cause of their injuries, they were diligent in trying to uncover the facts.

388.    Gilead's misrepresentations and omissions regarding its refusal to earlier market TAF-designed products and the true risks of TDF constitute continuing wrongs that continue to this day.

# VII.   CLAIMS FOR RELIEF[65]

## COUNT I

### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### UNDER THE LAWS OF THE STATES OF ALABAMA,[66] ARIZONA, ARKANSAS, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND WISCONSIN

389.   Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

390.   Gilead is the manufacturer and seller of the TDF Drugs.

391.   The TDF Drugs reached Plaintiffs without substantial change to the condition in which they were sold.

392.   The TDF Drugs are unreasonably dangerous and unsafe for their intended purpose because they include TDF, which causes kidney and bone toxicity, as the design for delivering tenofovir to the body. The design defect existed in these products at the time they left Gilead's possession.

393.   Stribild is also unreasonably dangerous and unsafe for its intended purpose because it combines 300 mg TDF with cobicistat, which enhances TDF toxicity. The design defects existed in Stribild at the time it left Gilead's possession.

394.   The TDF Drugs are not as safe as current technology could make them, nor were they as safe as then-current technology could make them when Gilead first manufactured and distributed each of the TDF Drugs.

395.   The TDF Drugs were not incapable of being made safe at the time of manufacture and distribution. Gilead knew, before it manufactured and distributed each of the TDF Drugs, that TAF was more potent than TDF and reduced the risk of kidney and bone toxicity compared to TDF.

---

[65] Plaintiffs assert claims under the laws of the states in which they reside and ingested the relevant TDF Drugs.

[66] The Alabama Plaintiffs assert their claims under the judicially-created Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").

1    Gilead also knew that it could reduce the dose of TDF in Stribild and achieve the same antiviral

2    response with less kidney and bone toxicity. The TDF Drugs are therefore not unavoidably unsafe.

3        396.    The risks of patient harm associated with TDF-induced kidney and bone toxicity were

4    both known to and foreseeable to Gilead.

5        397.    Gilead could have reduced or prevented the foreseeable risks of harm associated with

6    TDF by adopting a reasonable and feasible alternative design. Gilead could have incorporated the

7    safer TAF design, which it knew reduces the risks of kidney and bone toxicity and is safer than TDF,

8    into the TDF Drugs before they were approved by the FDA. Gilead did utilize the TAF design

9    instead of TDF in other FDA-approved products that are identical to the TDF Drugs except for the

10   substitution of TAF for TDF. Gilead markets its TAF-designed products as safer than the TDF Drugs

11   and advocates that doctors switch their patients from a TAF-designed to a TDF-designed product

12   because of TAF's superior safety profile with respect to kidney and bone toxicity.

13       398.    A drug product containing TAF could have and would have been FDA approved and

14   on the market years earlier if Gilead had not purposefully shelved the TAF design for approximately

15   six years in order to make more money.

16       399.    Gilead could have reduced or prevented the foreseeable risks of harm associated with

17   Stribild by adopting another reasonable and feasible alternative design. Gilead could have reduced

18   the dose of TDF in Stribild before it was approved by the FDA because, as it knew for years,

19   tenofovir concentrations rise significantly when tenofovir is combined with a boosting agent like

20   cobicistat. The reasonableness and feasibility of this alternative design is demonstrated by, *inter alia*,

21   the fact that Gilead reduced the dose of the tenofovir prodrug TAF in Genvoya, which is identical to

22   Stribild except for the substitution of TAF for TDF.

23       400.    The likelihood and severity of the kidney and bone injuries suffered by patients like

24   Plaintiffs far outweighed Gilead's burden in taking safety measures to reduce or avoid the harm.

25   Given the sheer number of people taking the TDF Drugs, including over the long-term, there was a

26   high likelihood that TDF would injure a very large number of patients, and that a significant number

27   of those injuries would be irreversible. Gilead's burden was small. Gilead had already discovered the

28   safer TAF method of introducing tenofovir into the body before it sought FDA approval for each of

COMPLAINT FOR DAMAGES - 109
Case No.:
010759-11 1080167 V1

the TDF Drugs and using the TAF design would have no adverse impact on the utility of the products.

401.    TAF-based alternative designs, and a reduced TDF dose design of Stribild, would have accomplished the product's purpose at lesser risk. This is how Gilead markets its TAF-designed products today—a as equally or more effective than the TDF Drugs with a reduced risk of kidney and bone toxicity.

402.    Gilead knew that ordinary patients would use the TDF Drugs without knowledge of the hazards involved in such use. The TDF Drugs failed to perform as an ordinary consumer would expect.

403.    Gilead knowingly designed its TDF Drugs with TDF rather than safer TAF to maximize profits on its portfolio of TDF profits and extend the lifecycle of its HIV franchise, which formed the backbone of Gilead's operations. Gilead withheld its safer TAF design to make more money at the expense of patients' health.

404.    The benefit in promoting enhanced accountability through strict products liability outweighs the benefit of a product that Gilead should have and could have made safer years earlier.

405.    Plaintiffs ingested one or more of the TDF Drugs for an approved purpose and experienced bone and/or kidney injuries while taking TDF.

406.    Plaintiffs' bone and kidney toxicity-related injuries were directly and proximately caused by TDF while Plaintiffs used the TDF Drugs in a reasonably foreseeable manner.

## COUNT II

**STRICT PRODUCTS LIABILITY – FAILURE TO WARN
UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS,
CALIFORNIA, COLORADO, FLORIDA, GEORGIA, ILLINOIS, MARYLAND,
MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA,
OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, AND WISCONSIN**

407.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

408.    Gilead is the manufacturer and seller of the TDF Drugs.

COMPLAINT FOR DAMAGES - 110
Case No.:
010759-11 1080167 V1

409. Gilead was aware of the risks TDF posed to patients' kidneys at bones, and the risks TDF posed to patients' kidneys and bones were knowable, at the time Gilead manufactured, sold, or distributed the TDF Drugs.

410. The risks TDF posed to patients' kidneys and bones were known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution.

411. The need to frequently monitor all TDF patients for kidney toxicity using more than one marker of kidney function to ensure the safe use of TDF was known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution of the TDF Drugs.

412. TDF posed a substantial danger to patients' kidneys and bones.

413. Ordinary consumers and physicians would not have recognized the potential risks TDF posed to patients' kidneys and bones.

414. Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the risks TDF posed to patients' kidneys and bones, and the proper and safe use of the TDF Drugs.

415. The inadequate warnings and instructions Gilead did provide were minimized, eroded, and nullified by Gilead's improper promotion of the TDF Drugs to doctors.

416. Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians that all TDF patients needed to be monitored frequently, on a specific schedule, for TDF-associated toxicity.

417. Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians that all TDF patients' kidney function needs to be monitored by measuring more than one insufficient marker of kidney function.

418. Plaintiffs were injured by using TDF in a reasonably foreseeable way.

419. The lack of adequate warnings and instructions was a substantial factor in causing Plaintiffs' injuries.

420. Had Gilead adequately warned and instructed Plaintiffs, Plaintiffs would have taken the TDF Drugs in a safer way.

421. Had Gilead adequately warned and instructed Plaintiffs' doctors, Plaintiffs' doctors would have read and heeded such adequate warnings and instructions.

422.    Plaintiffs' properly warned physicians would have monitored Plaintiffs differently. As a result, Plaintiffs' properly warned physicians would have detected TDF toxicity earlier, thus preventing or lessening Plaintiffs' injuries.

423.    Plaintiffs' bone and kidney toxicity-related injuries were directly and proximately caused by Gilead's inadequate warnings.

## COUNT III

### INDIANA PRODUCTS LIABILITY ACT, BURNS IND. CODE ANN. §§ 34-20-1-1 *ET SEQ.*

424.    Indiana Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

425.    Gilead sold or otherwise put the TDF Drugs into the stream of commerce in a defective condition unreasonably dangerous to users and consumers like Plaintiffs.

426.    The TDF Drugs are defective in design and because Gilead failed to adequately warn about the dangers and proper use of the products.

427.    Indiana Plaintiffs are in the class of persons that Gilead should reasonably foresee as being subject to the harm caused by the TDF Drugs' defective condition.

428.    Gilead is in the business of selling pharmaceuticals like the TDF Drugs.

429.    The TDF Drugs were expected to and did reach users and consumers like Plaintiffs without substantial alteration in the condition in which Gilead sold them.

430.    At the time Gilead conveyed the TDF Drugs to another party, the TDF Drugs were in a defective condition not contemplated by reasonable persons among those considered expected users or consumers of the products and that will be unreasonably dangerous to the expected user or consumer when used in reasonably expected ways of handling or consumption.

431.    The TDF Drugs are defective because Gilead failed to properly and adequately label the products to give reasonable warnings of the danger about the products or give reasonably complete instructions on proper use of the products. By exercising reasonable diligence, Gilead could have made adequate warnings and instructions available to users like Plaintiffs.

432.    Gilead failed to exercise reasonable care under the circumstances in designing the TDF Drugs and in providing warnings or instructions regarding the TDF Drugs.

433.    The TDF Drugs were not incapable of being made safe for their reasonably expectable use.

434.    Indiana Plaintiffs suffered physical injuries to their kidneys and/or bones which were proximately caused by the TDF Drugs.

## COUNT IV

## LOUISIANA PRODUCTS LIABILITY ACT, LA. R.S. §§ 9:2800.51 *ET SEQ.*

435.    Louisiana Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

436.    The TDF Drugs are unreasonably dangerous in design because, at the time they left Gilead's control, there existed an alternative design for the products that were capable of preventing Plaintiffs' injuries, and the likelihood that the products' design would cause Plaintiffs' damage and the gravity of that damage outweighed Gilead's burden in adopting the alternative design. There is no adverse effect of using the alternative design on the utility of the product.

437.    At the time the TDF Drugs left Gilead's control, Gilead knew and in light of then-existing reasonably available scientific and technical knowledge should have known of the design characteristic that caused the damage or the danger of such characteristic.

438.    At the time the TDF Drugs left Gilead's control, Gilead knew and in light of then-existing reasonably available scientific and technical knowledge should have known of the alternative design.

439.    The TDF Drugs are unreasonably dangerous due to the lack of an adequate warning. At the time the TDF Drugs left Gilead's control, and after the TDF Drugs left Gilead's control, the TDF Drugs possessed a characteristic that may cause damage and Gilead failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users of the products. The TDF Drugs are dangerous to an extent beyond which would be contemplated by the ordinary user, with ordinary knowledge common to the community as to the product's characteristics.

440.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Louisiana Plaintiffs' injuries and damages for which recovery is sought.

## COUNT V

### MISSISSIPI PRODUCTS LIABILITY ACT, MISS. CODE ANN. §§ 11-1-63

441.    Mississippi Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

442.    Gilead designed the TDF Drugs in a defective manner.

443.    The TDF Drugs failed to function as expected and there existed a feasible design alternative that would have, to a reasonable probability, prevented the harm without impairing the utility, usefulness, practicality or desirability of the products to users or consumers.

444.    The TDF Drugs are also defective because Gilead failed to provide adequate warnings or instructions as to the safe use of the products.

445.    At the time the TDF Drugs left Gilead's control, Gilead knew, or in light of reasonably available knowledge should have known, about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize the dangerous condition of the TDF Drugs.

446.    The TDF Drug warnings that Gilead provided did not sufficiently warn of the dangers or the safe use of the products.

447.    The defective condition of the TDF Drugs rendered the products unreasonably dangerous to users and consumers like Mississippi Plaintiffs.

448.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Plaintiffs' injuries and damages for which recovery is sought.

## COUNT VI

### NEW JERSEY PRODUCTS LIABILITY ACT, N.J. STAT. §§ 2A:58C-1 *ET SEQ.*

449.    New Jersey Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

COMPLAINT FOR DAMAGES - 114
Case No.:
010759-11 1080167 V1

450.    The TDF Drugs are not reasonably fit, suitable or safe for their intended purpose because Gilead designed them in a defective manner and failed to give adequate warnings or instructions at the time the TDF Drugs left Gilead's control and thereafter.

451.    At the time the TDF Drugs left Gilead's control, there was a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the products.

452.    The TDF Drugs are not unavoidably unsafe and the harm was not caused by an unavoidably unsafe aspect of the products.

453.    The TDF Drug warnings that Gilead provided did not sufficiently warn of the dangers or safe use of the products.

454.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused New Jersey Plaintiffs' injuries and damages for which recovery is sought.

**COUNT VII**

**OHIO PRODUCT LIABILITY ACT, ORC ANN. §§ 2307.71 *ET SEQ*.**

455.    Ohio Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

456.    At the time the TDF Drugs left Gilead's control, the foreseeable risks associated with the design exceeded the benefits of the design.

457.    At the time the TDF Drugs left Gilead's control, there existed a practical and technically feasible alternative design or formulation that would have prevented the harm for which Plaintiffs seek to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product.

458.    The TDF Drugs were and are not unavoidably unsafe. Based on the state of technical, scientific and medical knowledge at the time the TDF Drugs left Gilead's control, Gilead could have made the TDF Drugs safe by utilizing the TAF design.

459.    At the time the TDF Drugs left Gilead's control, Gilead knew, or in the exercise of reasonable care, should have known about the risk of TDF-induced kidney and bone toxicity and

Gilead failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided regarding that risks, in light of the likelihood that the product would cause harm to patients' kidneys and bones and the severity of that harm.

460.    At the relevant time after the TDF Drugs left Gilead's control, Gilead knew, or in the exercise of reasonable care, should have known about the risk of TDF-induced kidney and bone toxicity and Gilead failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided regarding the risks, in light of the likelihood that the product would cause harm to patients' kidneys and bones and the severity of that harm.

461.    At the time the TDF Drugs left Gilead's control, they did not conform to Gilead's representations regarding the safety of the drugs.

462.    The defective condition of the TDF Drugs proximately caused Ohio Plaintiffs' injuries and damages for which recovery is sought.

**COUNT VIII**

**WASHINGTON PRODUCTS LIABILITY ACT, REV. CODE WASH. §§ 7.72-010 *ET SEQ.***

463.    Washington Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

464.    The TDF Drugs are not reasonably safe as designed and not reasonably safe because adequate warnings or instructions were not provided.

465.    At the time of manufacture, the likelihood that the TDF Drugs would cause Plaintiffs' harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

466.    At the time of manufacture, the likelihood that the TDF Drugs would cause Plaintiffs' harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions inadequate and Gilead could have provided adequate warnings or instructions.

467.    After the time of manufacturer, Gilead learned or a reasonably prudent manufacturer should have learned about a danger connected with the TDF Drugs. Gilead's failure to exercise

reasonable care to inform consumers about the dangers after it learned about them rendered the warnings or instructions inadequate.

468.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Washington Plaintiffs' injuries and damages for which recovery is sought.

## COUNT IX

**NEGLIGENCE AND GROSS NEGLIGENCE**
**UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, AND WISCONSIN**

469.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

470.    Gilead has a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including the TDF Drugs.

471.    Gilead has a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that its pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

472.    Gilead has a duty to monitor the adverse effects associated with its pharmaceutical products, including the TDF Drugs.

473.    Gilead has a continuing duty to warn of the adverse effects associated with its pharmaceutical products, including the TDF Drugs, to avoid reasonably foreseeable risks.

474.    Gilead has a duty to identify any laboratory tests helpful in identifying adverse reactions and the recommended frequency with which such tests should be performed.

475.    Gilead has a duty to exercise reasonable care when it undertakes affirmative acts for the protection of others.

476.    Gilead owes these duties to Plaintiffs because it was foreseeable to Gilead that patients like Plaintiffs would ingest and consequently be endangered by its TDF Drugs.

477.    Gilead knew that the TDF design it incorporated into the TDF Drugs was associated with risks of kidney and bone toxicity and caused injuries that resulted from kidney and bone toxicity

– including in patients not otherwise at risk for such injuries. Gilead's knowledge that TDF harmed patients' kidneys and bones only grew with each year TDF was on the market. By the time Stribild entered the market, Gilead had more than a decade's worth of knowledge that TDF was toxic to kidneys and bones.

478.    Gilead knew that combining 300 mg of TDF with cobicistat resulted in even greater toxicity, and that it could reduce the tenofovir prodrug dose when combined with cobicistat and achieve the same therapeutic effects. Despite this knowledge, Gilead did not reduce the TDF dose in Stribild.

479.    Gilead knew, before its first TDF Drug and every subsequent TDF Drug was approved by the FDA, that TAF is safer than TDF in that it reduces the risks of kidney and bone toxicities associated with TDF. Despite knowing that TAF would reduce foreseeable harm to patients' kidneys and bones, Gilead repeatedly incorporated the TDF design into the TDF Drugs prior to FDA approval and prevented patients from taking a safer TAF-based product so Gilead could make more money.

480.    Based, *inter alia*, on its duty to monitor the adverse effects associated with Viread, Truvada, Atripla, Complera, and Stribild, Gilead knew that the likelihood and severity of the harm associated with TDF was great. Thousands of patients experienced damage to their kidneys and bones as a result of TDF exposure—some of it severe and irreversible. The likelihood and severity of the kidney and bone injuries suffered by patients like Plaintiffs far outweighed Gilead's burden in taking safety measures to reduce or avoid the harm. Gilead had already designed the safer TAF method of introducing tenofovir into the body before it sought FDA approval for the TDF Drugs. Gilead had also reduced the TAF dose when combined with cobicistat in Genvoya, when it was developing Stribild.

481.    Gilead failed to exercise ordinary care in the design, manufacture, and sale of the TDF Drugs.

482.    Gilead failed to use the amount of care in designing the TDF Drugs that a reasonably careful manufacturer would have used to avoid exposing patients to foreseeable risks of harm.

483.    Gilead undertook to develop and market a safer TAF-designed product to sell to wholesalers and other direct purchasers of pharmaceuticals. Gilead recognized that its development and marketing of safer TAF-designed products was for the protection of patients like Plaintiffs. By shelving the safer TAF design purely for monetary gain and misrepresenting why it was abandoning the safer TAF design, Gilead failed to exercise reasonable care in the performance of this undertaking that increased the risk of harm to patients like Plaintiffs. Gilead's failure to exercise reasonable care resulted in physical harm to Plaintiffs.

484.    Gilead failed to use the amount of care in warning about the risks and safe use of the TDF Drugs that a reasonably careful manufacturer would have used to avoid exposing patients to foreseeable risks of harm.

485.    Gilead knew or reasonably should have known that the TDF Drugs were dangerous or likely to be dangerous when used in a reasonably foreseeable manner.

486.    Gilead knew or reasonably should have known that Plaintiffs and Plaintiffs' physicians would not realize the danger posed by inadequate monitoring of patients taking TDF Drugs.

487.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the need to monitor all patients taking the TDF Drugs. For years, Gilead failed to recommend that doctors monitor anyone other than patients "at risk" for TDF-induced kidney and/or bone injuries. When Gilead finally added a weak instruction regarding the monitoring of all patients for kidney damage, it only warned doctors to monitor patients for one insufficient marker of kidney dysfunction that was incapable of detecting many dangerous changes in kidney dysfunction, and failed to warn doctors to monitor TDF patients on a frequent schedule. Gilead's monitoring warnings with respect to "at risk" Viread, Truvada, Atripla, and Complera users and Stribild users were also inadequate because they failed to warn doctors to monitor patients on a specific, frequent schedule.

488.    A reasonable manufacturer and seller under the same or similar circumstances would have instructed Plaintiffs and Plaintiffs' physicians on the safe use of the TDF Drugs, i.e., use where doctors frequently monitored all TDF patients for TDF-associated toxicity, including monitoring for kidney damage using more than one inadequate test.  Gilead knew to warn doctors to frequently

1    monitor all patients for kidney damage using more than one inadequate test because it did so in the

2    European Union.

3         489.    Gilead's failure to adequately warn Plaintiffs and Plaintiffs' doctors about the need to

4    monitor TDF Drug patients was compounded by Gilead's misrepresentations to doctors during sales

5    detailing and other promotional activities. Gilead's promotion of the TDF Drugs undermined the

6    efficacy of its existing (inadequate) warnings.

7         490.    Plaintiffs were injured by using TDF in a reasonably foreseeable way.

8         491.    The lack of adequate warnings was a substantial factor in causing Plaintiffs' injuries.

9         492.    Had Gilead adequately warned Plaintiffs' doctors, Plaintiffs' doctors would have read

10   and heeded such adequate warnings.

11        493.    Plaintiffs' properly warned physicians would have monitored Plaintiffs differently. As

12   a result, Plaintiffs' properly warned physicians would have detected TDF toxicity earlier, thus

13   preventing or lessening Plaintiffs' injuries.

14        494.    Plaintiffs were injured as a direct and proximate result of Gilead's negligence.

15        495.    Gilead's conduct constitutes gross negligence and willful misconduct.

16        496.    By designing the TDF Drugs to contain TDF when it knew TDF harmed patients'

17   kidneys and bones, and intentionally withholding the safer TAF design from patients, while failing to

18   adequately warn of the known risks and safe use of TDF, Gilead acted in reckless disregard of, or

19   with a lack of substantial concern for, the rights of others. By designing Stribild to contain 300 mg

20   TDF when it knew to reduce the tenofovir prodrug dose with combined with cobicistat, Gilead acted

21   in reckless disregard of, or with a lack of substantial concern for, the rights of others.

22        497.    Gilead intentionally designed the TDF Drugs to contain 300 mg TDF and withheld

23   the safer designs from patients while in disregard of the known risk of TDF-induced kidney and/or

24   bone toxicity, making it highly probable that harm would result.

25        498.    Gilead knew that its conduct would harm patients like Plaintiffs but Gilead withheld

26   its safer designs to make more money.

COMPLAINT FOR DAMAGES - 120
Case No.:
010759-11 1080167 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT X**

**FRAUD BY OMISSION**
**UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS,**
**CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS,**
**MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH**
**CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND,**
**SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, AND**
**WISCONSIN**

499.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

500.    Gilead has a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including the TDF Drugs.

501.    Gilead has a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that its pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

502.    Gilead has a duty to monitor the adverse effects associated with pharmaceutical products, including Stribild.

503.    Gilead has a duty to exercise reasonable care when it undertakes affirmative acts for the protection of others.

504.    Gilead owes these duties to Plaintiffs because it was foreseeable to Gilead that patients like Plaintiffs would ingest and consequently be endangered by the TDF Drugs.

505.    Gilead also owed a duty to speak because it was in possession of information about TDF and TAF that was not readily available to Plaintiffs and Plaintiffs' physicians, made partial representations about TDF and TAF to Plaintiffs and Plaintiffs' physicians while suppressing material facts, and actively concealed material information about TDF and TAF from Plaintiffs and Plaintiffs' physicians, including that: (a) Gilead knew about the safer TAF design for delivering tenofovir into the body prior to seeking and receiving FDA approval for the TDF Drugs but designed the TDF Drugs to include TDF anyway, even though it knew that TDF posed a significant and increased safety risk to patients' kidneys and bones; (b) the toxicity associated with tenofovir was not unavoidable; (c) the real reason Gilead abandoned its TAF design in 2004 was not because TAF could not be sufficiently differentiated from TDF; (d) Gilead had already determined that it should

COMPLAINT FOR DAMAGES - 121
Case No.:
010759-11 1080167 V1

reduce the dose of tenofovir prodrug when combining it with cobicistat at the time it was developing Stribild but Gilead did not reduce the TDF dose in Stribild as it did with Genvoya; (e) Gilead purposefully withheld the TAF design, which it knew was safer than TDF, solely to make more money; and (f) Gilead knew to warn doctors to frequently monitor all patients for the adverse effects of TDF toxicity using more than one insufficient marker of kidney function even though it did not do so in its warnings to doctors in the U.S.

506.    Gilead knew that this information was not readily available to Plaintiffs and their doctors, and Plaintiffs and their doctors did not have an equal opportunity to discover the truth. Plaintiffs and their doctors had no practicable way of discovering the true state and timing of Gilead's knowledge.

507.    Gilead intentionally omitted from its prescriber and patient labeling an adequate warning regarding the need for doctors to monitor all TDF patients, on a frequent, specific schedule, for the adverse effects of TDF-associated bone and kidney toxicity. Gilead intentionally omitted an adequate monitoring warning in order to conceal the true risk of its TDF-based antiviral products, and to inflate sales by inducing doctors to prescribe, and patients like Plaintiffs to consume, its TDF Drugs. By providing inadequate warnings that were contrary to those it gave with respect to the exact same drugs in the EU, Gilead partially disclosed material facts. Gilead had a duty of complete disclosure once it began to speak.

508.    Plaintiffs and their doctors justifiably relied on Gilead's product labeling and other representations.

509.    Had Gilead not omitted this information about the safe use of its drugs from the prescriber and patient labeling, doctors would have performed, and patients would have insisted upon, frequent and adequate monitoring for the kidney and bone problems that have injured Plaintiffs. But for Gilead's omissions, Plaintiffs would have consumed the TDF Drugs in a safer way.

510.    If Plaintiffs had been adequately monitored for kidney and bone problems while taking TDF, they would not have been injured or their injuries would have been less severe.

511.   Gilead intentionally concealed from Plaintiffs and their doctors the fact that Gilead had already developed the safer TAF mechanism but designed the TDF Drugs to contain TDF instead of the safer TAF design in order to maximize profits on its TDF-based products and extend its ability to profit on its HIV franchise for years to come. Gilead actively concealed these material facts by, *inter alia*, misrepresenting: (a) that any tenofovir-induced toxicity was rare and unavoidable; (b) why Gilead had purportedly abandoned development of TAF in 2004; and (c) that TAF was "new" once Gilead finally introduced the safer TAF design over a decade later.

512.   Gilead also intentionally concealed from Plaintiffs and their doctors that Gilead knew that the tenofovir prodrug dose should be reduced when combined in a fixed dose combination pill with cobicistat, but did not reduce the TDF dose in Stribild as it did with Genvoya.

513.   By concealing that Gilead was aware of but had withheld the safer designs, Gilead intended to and did induce Plaintiffs' doctors to prescribe, and Plaintiffs to ingest, one or more of the TDF Drugs, thereby causing Plaintiffs' injuries.

514.   Plaintiffs and their doctors justifiably relied on Gilead's omissions regarding TAF.

515.   Had Gilead disclosed that it was aware of, but intentionally withheld, the safer TAF mechanism for delivering tenofovir into the body, Plaintiffs would have ingested TDF in a safer manner.

516.   Plaintiffs' doctors would have ensured that Plaintiffs ingested TDF in a safer manner through increased and/or more careful monitoring for TDF-induced kidney and bone toxicity, or by prescribing TDF without coadministration with cobicistat.

517.   Plaintiffs were injured as a direct and proximate result of Gilead's material omissions.

## COUNT XI

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE LAWS OF THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND VIRGINIA**

518.   Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

519.   Gilead is the manufacturer and seller of the TDF Drugs.

COMPLAINT FOR DAMAGES - 123
Case No.:
010759-11 1080167 V1

520.     An implied warranty of fitness for human consumption runs from Gilead to consumers like Plaintiffs.

521.     Gilead impliedly warranted to Plaintiffs and their doctors that the TDF Drugs were of merchantable quality, and fit and safe for the use for which they were intended.

522.     Plaintiffs ingested the TDF Drugs for the treatment of HIV, Hepatitis B, or PrEP, which is the purpose for which the drugs were manufactured, sold, and prescribed.

523.     Plaintiffs relied on Gilead's skill or judgment to provide a product suitable for this purpose. Gilead is in the business of designing, manufacturing, selling, and marketing prescription drugs and specializes in drugs for the treatment or prevention of HIV, and treatment of Hepatitis B.

524.     Gilead had reason to know that Plaintiffs and their doctors would rely on Gilead's skill or judgment.

525.     The TDF Drugs are unfit for the purpose for which they were purchased because they are toxic to patients' kidneys and bones when put to their intended and ordinary use, causing injuries to Plaintiffs.

526.     The dangers the TDF Drugs posed to Plaintiffs' kidneys and bones were known and knowable to Gilead at the time of manufacture and sale. Yet Gilead marketed the TDF Drugs without adequate warnings about the risks or safe use of TDF of which it knew or should have known.

527.     Plaintiffs suffered kidney and/or bone injuries as a result of ingesting the TDF Drugs.

528.     In addition to the common law, the conduct alleged herein constitutes a breach of the implied warranty of merchantability under the Uniform Commercial Code as codified by the following statutes:

      a.     Alabama, Code of Alabama § 7-2-314

      b.     Arkansas, A.C.A. § 4-2-314

      c.     California, U Com Code § 2314

      d.     Colorado, Colorado R.S. 4-2-314

      e.     Delaware, 6 Del. C. § 2-314

      f.     Illinois, 810 ILCS 5/2-314

      g.     Maryland, Md. Comm. Law Code Ann. § 2-314

1        h.     Minnesota, Minn. Stat. Ann. § 336.2-314

2        i.      Missouri, Mo. Ann. Stat. § 400.2-314

3        j.      Nevada, Nev. Rev. Stat. § 104.2314

4        k.     New Mexico, N.M. Stat. Ann. § 55-2-314

5        l.      New York, N.Y. U.C.C. § 2-314

6        m.    North Carolina, N.C. Gen. Stat. Ann. § 25-2-314

7        n.     Oregon, Or. Rev. Stat. § 72.3140

8        o.     Rhode Island, R.I. Gen. Laws § 6A-2-314

9        p.     South Carolina, S.C. Code Ann. § 36-2-314

10       q.     Tennessee, Tenn. Code Ann. § 47-2-314

11       r.      Texas, Tex. Bus. & Com. Code § 2314

12       s.      Virginia, Va. Code Ann. § 8.2-314

13     529.    On November 9, 2018, Plaintiffs sent a letter to Gilead via certified mail giving

14 official notice of Gilead's breach of the implied warranty of merchantability. Plaintiffs' notice letter

15 is attached as Exhibit A.

**COUNT XII**

**VIOLATION OF STATE CONSUMER PROTECTION LAWS**

18     530.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth

19 below.

20     531.    Plaintiffs are consumers within the meaning of the following states' consumer

21 protection laws because they are natural persons who purchased one or more of the TDF Drugs for

22 personal, family, or household use.

23     532.    The TDF Drugs are goods and merchandise within the meaning of the following

24 states' consumer protection laws.

25     533.    Gilead manufactured, sold, and marketed its TDF Drugs in trade or commerce,

26 including within each of the 50 U.S. States.

27     534.    Gilead engaged in unconscionable, unfair, false, fraudulent, misleading, and deceptive

28 acts and practices in connection trade or commerce involving its TDF Drugs.

COMPLAINT FOR DAMAGES - 125
Case No.:
010759-11 1080167 V1

535.    Gilead intentionally suppressed, concealed, and omitted material facts in its promotional, marketing, and labeling communications about the risks and benefits of the TDF Drugs to Plaintiffs and Plaintiffs' doctors, including but not limited to, that: 1) all TDF patients should be carefully and frequently monitored for adverse kidney and bone effects on a frequent schedule; 2) Gilead had already developed the safer TAF design for delivering tenofovir into the body but nevertheless designed the TDF Drugs to contain TDF, and withheld the safer SAF design, in order to maximize profits on its TDF-based products and extend its ability to profit on its HIV franchise for years to come; and 3) Gilead knew that the tenofovir prodrug dose should be reduced when combined in a fixed dose combination pill with cobicistat, but did not reduce the TDF dose in Stribild.

536.    Gilead intentionally misrepresented material facts in its promotional, marketing, and labeling communications about the risks and benefits of the TDF Drugs to Plaintiffs and Plaintiffs' doctors, including but not limited to, that the TDF Drugs: 1) presented limited risk of kidney and bone toxicity resulting from purportedly unavoidable side effects of tenofovir; and 2) did not require careful, frequent monitoring of all TDF Drug patients for TDF-associated kidney and bone toxicity.

537.    Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Hundreds of thousands of consumers in the U.S. have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

538.    Gilead's conduct was likely to mislead and did mislead reasonable consumers and members of the public.

539.    Gilead's misrepresentations and omissions were material and affected Plaintiffs' and Plaintiffs' doctors' conduct.

540.    Gilead intended that others rely on its deceptive and misleading omissions and misrepresentations regarding its TDF Drugs.

541.     Plaintiffs and their doctors reasonably relied on Gilead's deceptive and misleading omissions and misrepresentations regarding its TDF Drugs.

542.     Plaintiffs' doctors prescribed, and Plaintiffs ingested, one or more of the TDF Drugs in reliance on Gilead's unconscionable, false, misleading and/or deceptive acts, misrepresentations, and omissions.

543.     Plaintiffs were directly and proximately injured as a result of Gilead's deceptive conduct. But for Gilead's omissions and misrepresentations, Plaintiffs would have ingested the TDF Drugs in a safer way—through better monitoring and/or by not taking Stribild (TDF in combination with cobicistat) —thus preventing or reducing Plaintiffs' injuries and monetary expenses in connection therewith.

544.     Plaintiffs suffered ascertainable losses as a result of Gilead's violations of the state consumer protection statutes alleged herein. Plaintiffs will prove the full extent and amount of their damages at trial.

545.     The conduct alleged herein violates the state consumer protection statutes as further alleged below.

a.     **Alabama, Ala. Code §§ 8-19-1, *et seq*.**

546.     Alabama Plaintiffs intend to assert a claim under the Alabama Deceptive Trade Practices Act, alleging that Gilead committed unconscionable, false, misleading and/or deceptive acts and practices in the conduct of trade or commerce in violation of Ala. Code § 8-19-5(27), and violated Ala. Code § 8-19-5(5) and (7) by representing that the TDF Drugs have characteristics, benefits, and qualities they do not have, and are of a particular standard and quality when they are another.

547.     On November 9, 2018 Alabama Plaintiffs made a written demand for relief in satisfaction of the Act and will amend this Complaint to add claims under the Act once the required notice period has elapsed. Plaintiffs' notice letter is attached as Exhibit A.

548.     These paragraphs are included for notice purposes only and are not intended to assert a claim under the Alabama Deceptive Trade Practices Act at this time.

**b.      Arizona, Ariz. Rev. Stat. Ann. §§ 44-1521 *et seq*.**

549.     Gilead committed false, deceptive, and unfair acts or practices and misrepresented, concealed, suppressed or omitted material facts with the intention that others rely on such misrepresentation, concealment, suppression or omission in connection with the sale of the TDF Drugs in violation of Ariz. Rev. Stat. Ann. § 44-1522(A).

550.     Arizona Plaintiffs suffered monetary damages as a proximate result of Gilead's violation of the Arizona Consumer Fraud Act.

551.     Arizona Plaintiffs seek their actual and punitive damages.

**c.      Arkansas, Ark. Code Ann. §§ 4-88-101 *et seq*.**

552.     Gilead committed unconscionable, false, misleading and/or deceptive acts and practices in the conduct of trade or commerce in violation of Ark. Code Ann. §§ 4-88-107(a)(1), (10) and § 4-88-108(1)-(2).

553.     Arkansas Plaintiffs suffered actual financial losses as a proximate result of their reliance on Gilead's unlawful practices, including but not limited to the cost of the TDF Drugs that injured them and medical expenses.

554.     Arkansas Plaintiffs seek their actual damages, attorneys' fees, and any additional damages permitted by statute.

**d.      California, California Civil Code §§ 1750 *et seq*., Cal. Bus. & Prof. Code §§ 17200 *et seq*. and § 17500**

555.     Gilead violated California Civil Code §§ 1750 et. seq. (the "Consumer Legal Remedies Act" or "CLRA") by intentionally: 1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of CLRA § 1770(a)(5); 2) representing that goods or services are of a particular standard, quality, or grade if they are another in violation of CLRA § 1770(a)(7); and 3) advertising goods or services with intent not to sell them as advertised in violation of CLRA § 1770(a)(9).

556.     Gilead's conduct violates the Cal. Bus. & Prof. Code §§ 17200 *et seq*. (the "California Unfair Competition Law" or "UCL") prohibition against unfair, unlawful, or fraudulent business acts or practices.

557.    Gilead's conduct violates the Cal. Bus. & Prof. Code § 17500 (the "False Advertising Law" or "FAL") prohibition against untrue and misleading advertising. Gilead disseminated false and misleading marketing and promotional materials and advertisements that Gilead knew or should have known were untrue or misleading.

558.    Gilead had a duty to disclose the omitted material facts about TDF and TAF because it: (a) was in possession of information about TDF and TAF that was not readily available to Plaintiffs and Plaintiffs' physicians; (b) made partial representations about TDF and TAF to Plaintiffs and Plaintiffs' physicians while suppressing material facts; and (c) actively concealed material information about TDF and TAF from Plaintiffs and Plaintiffs' physicians.

559.    California Plaintiffs suffered damages, including lost money or property, as a proximate result of Gilead's unlawful practices.

560.    California Plaintiffs intend to seek actual damages, restitution, punitive damages, costs, and attorneys' fees arising from Gilead's violations of the CLRA. On November 9, 2018, California Plaintiffs made a written demand for relief in satisfaction of the CLRA and will amend this Complaint to add damage claims under the Act once the required notice period has elapsed. Plaintiffs' notice letter is attached as Exhibit A. This paragraph is included for notice purposes only and is not intended to assert a claim under the CLRA for damages at this time.

561.    California Plaintiffs seek restitution and restitutionary disgorgement arising from Gilead's violations of the UCL and FAL.

        **e.      Colorado, Colo. Rev. Stat. §§ 6-1-101 *et seq*.**

562.    Gilead violated Colo. Rev. Stat. §§ 6-1-101 *et seq*. (the "Colorado Consumer Protection Act") by: 1) knowingly making a false representation as to the characteristics or benefits of the TDF Drugs in violation of Colo. Rev. Stat. § 6-1-105(1)(e); and 2) representing that TDF Drugs are of a particular standard or quality when Gilead knew or should have known they are of another in violation of Colo. Rev. Stat. § 6-1-105(1)(g).

563.    Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers

like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has impacted other consumers and has significant potential to do so in the future.

564.    Colorado Plaintiffs were injured as a result of Gilead's violations of the Colorado Consumer Protection Act.

565.    Colorado Plaintiffs seek actual damages, costs, attorneys' fees, and treble damages arising from Gilead's bad faith (fraudulent, willful, knowing, or intentional) conduct as alleged herein.

**f.      Delaware, 6 Del. C. § 2511 *et seq*.**

566.    Gilead has violated 6 Del. C. § 2513 which prohibits the use of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission in connection with the sale of any merchandise.

567.    Gilead's unfair and unlawful practices occurred in part within Delaware. Gilead sold, promoted, and advertised its TDF Drugs, and distributed its TDF Drugs with misleading and deceptive labeling, within Delaware and Plaintiffs residing in Delaware ingested Gilead's TDF Drugs in Delaware.

568.    Delaware Plaintiffs seek their actual damages and punitive damages arising from Gilead's violations of the Delaware Consumer Fraud Act.

**g.      Illinois, 815 ILCS 505/1 *et seq*. and 815 ILCS 510 *et seq*.**

569.    Gilead has engaged in the following conduct in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and Illinois Uniform Deceptive Trade Practices Act: 1) engaging in unfair methods of competition or deceptive acts or practices, including the use of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact in the conduct of trade or commerce in violation of 815 ILCS 505/2; 2) representing that the TDF Drugs have characteristics or benefits that they do not have in violation of 815 ILCS 510/2(a)(5); and 3) representing that the TDF Drugs are of a particular standard, quality or grade when they are of another in violation of 815 ILCS 501/2(a)(7).

570.     Gilead misrepresented and concealed material facts with the intent that others rely on the concealment or misrepresentation of material facts.

571.     Illinois Plaintiffs suffered actual pecuniary losses proximately caused by Gilead's violations of the Illinois Acts.

572.     Illinois Plaintiffs seeks actual damages, punitive damages, reasonable attorneys' fees, and costs.

**h.      Indiana, Ind. Code § 24-5-0.5-1 *et seq*.**

573.     Gilead has engaged in the following conduct in violation of Ind. Code § 24-5-0.5-1 *et seq*.: 1) committing unfair or deceptive acts, omissions, or practices in connection with a consumer transaction in violation of Ind. Code § 24-5-0.5-3(a); 2) representing that the TDF Drugs has performance, characteristics, or benefits it does not have which the supplier knows or reasonably knows it does not have in violation of Ind. Code § 24-5-0.5-3(b)(1); and 3) representing that the TDF Drugs is of a particular standard or quality that it is not and if the supplier knows or should reasonably know that it is not in violation of Ind. Code § 24-5-0.5-3(b)(2).

574.     Plaintiffs suffered damages, including lost money or property, as a proximate result of Gilead's violations of Ind. Code § 24-5-0.5-1 *et seq*.

575.     Indiana Plaintiffs intend to seek actual damages, punitive damages for Gilead's willful deceptive acts, and reasonable attorneys' fees. On November 9, 2018, Indiana Plaintiffs made a written demand for relief in satisfaction of the Act and will amend this Complaint to add damage claims under the Act once the required notice period has elapsed. Plaintiffs' notice letter is attached as Exhibit A. This paragraph is included for notice purposes only and is not intended to assert a claim under the Act for damages at this time.

**i.      Maryland, Md. Com. Law Code Ann. § 13-101 *et seq*.**

576.     Gilead committed the following violations of Md. Com. Law Code Ann. § 13-101 *et seq*.: 1) false and misleading oral or written statements or other representations of any kind which have the capacity, tendency, or effect of deceiving or misleading consumers in violation of Md. Com. Law Code Ann. § 13-301(1); 2) representations that the TDF Drugs have a characteristic or benefit which they do not have in violation of Md. Com. Law Code Ann. § 13-301(2)(i); 3)

COMPLAINT FOR DAMAGES - 131
Case No.:
010759-11 1080167 V1

1   representations that the TDF Drugs are of a particular standard or quality which they are not in

2   violation of Md. Com. Law Code Ann. § 13-301(2)(iv); 4) failure to state a material fact if the failure

3   deceives or tends to deceive in violation of Md. Com. Law Code Ann. § 13-301(3); and 5) deception,

4   fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or

5   omission of any material fact with the intent that a consumer rely on the same in connection with the

6   sale of consumer goods in violation of Md. Com. Law Code Ann. § 13-301(9).

7   577.   Maryland Plaintiffs suffered injuries and losses as a result of Gilead's violations of

8   Md. Com. Law Code Ann. § 13-101 *et seq.*

9   578.   Maryland Plaintiffs seek actual damages and reasonable attorneys' fees.

10   **j.      Minnesota, Minn. Stat. §§ 325F.68** *et seq.***, §§ 325D.44** *et seq.***

11   579.   Gilead's conduct constitutes fraud, false pretense, false promise, misrepresentation,

12   misleading statements, or deceptive practices with the intent that others rely thereon in violation of

13   Minn. Stat. §§ 325F.69(1).

14   580.   Gilead's conduct constitutes 1) representing that goods have characteristics or benefits

15   they do not have in violation of Minn. Stat. §§ 325D.44(2)(5); and 2) representing that goods are of a

16   particular standard or quality when they are another in violation of Minn. Stat. §§ 325D.44(2)(7).

17   581.   Gilead's conduct significantly impacted the public as actual or potential consumers of

18   Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead

19   has directed its misleading marketing and promotional messages to the market generally. Consumers

20   like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead.

21   Gilead's conduct has previously impacted other consumers and has significant potential to do so in

22   the future.

23   582.   Minnesota Plaintiffs were injured by Gilead's violations of Minn. Stat. §§ 325F.68 *et*

24   *seq.*, §§ 325D.44 *et seq.*

25   583.   Minnesota Plaintiffs seek damages, costs of investigation, and reasonable attorneys'

26   fees.

27

28

1        **k.      Missouri, Mo. Rev. Stat. §§ 407.010** *et seq.*

2        584.    Gilead's conduct constitutes deception, fraud, false pretense, false promise,

3    misrepresentation, unfair practice, and the concealment, suppression, or omission of any material fact

4    in trade or commerce in violation of Mo. Rev. Stat. §§ 407.020(1).

5        585.    Missouri Plaintiffs suffered damages including an ascertainable loss as a result of

6    Gilead's violation of Mo. Rev. Stat. §§ 407.010 *et seq.*

7        586.    Missouri Plaintiffs seek damages, punitive damages, attorneys' fees, and costs.

8        **l.      Nevada, Nev. Rev. Stat. §§ 598.0903** *et seq.*

9        587.    Gilead committed a deceptive trade practice within the meaning of Nev. Rev. Stat. §§

10   598.0903 *et seq.* by: 1) knowingly making a false representation as to the characteristics and benefits

11   of the TDF Drugs in violation of Nev. Rev. Stat. §§ 598.0915(5); 2) representing that the TDF Drugs

12   are of a particular standard or quality when it knew they are of another standard or quality in

13   violation of Nev. Rev. Stat. §§ 598.0915(7); 3) knowingly making false representations in a

14   transaction in violation of Nev. Rev. Stat. §§ 598.0915(15); and 4) knowingly failing to disclose a

15   material fact in connection with the sale of the TDF Drugs in violation of Nev. Rev. Stat. §§

16   598.0923(2).

17       588.    Nevada Plaintiffs were damaged as a result of Gilead's violations of Nev. Rev. Stat.

18   §§ 598.0903 *et seq.*

19       589.    Nevada Plaintiffs seek actual damages, costs of suit, and reasonable attorneys' fees.

20       **m.     New Jersey, N.J. Stat. Ann. §§ 56:8-1** *et seq.*

21       590.    Gilead's conduct constitutes an unconscionable commercial practice, deception,

22   fraud, false pretense, false promise, misrepresentation, and the knowing, concealment, suppression,

23   or omission of any material fact with intent that others rely upon such concealment, suppression or

24   omission in connection with the sale or advertisement of merchandise in violation of N.J. Stat. Ann.

25   §56:8-2.

26       591.    The TDF Drugs are merchandise within the meaning of N.J. Stat. Ann. §56:8-2

27   because they are objects, goods, or anything offered, directly or indirectly, to the public for sale.

28

592.   New Jersey Plaintiffs suffered an ascertainable loss of moneys or property as a result of Gilead's violations of N.J. Stat. Ann. §56:8-2.

593.   New Jersey Plaintiffs seek damages, treble damages, and reasonable attorneys' fees and costs of suit.

**n.   New Mexico, N.M. Stat. Ann. §§ 57-12-1 *et seq*.**

594.   Gilead's conduct constitutes unfair, unconscionable, or deceptive trade practices in the conduct of trade or commerce in violation of N.M. Stat. Ann. § 57-12-3.

595.   The conduct by Gilead that Plaintiffs challenge herein occurred in the regular course of Gilead's trade or commerce.

596.   New Mexico Plaintiffs suffered a loss of money or property as a result of Gilead's violations of N.M. Stat. Ann. § 57-12-3.

597.   New Mexico Plaintiffs seek actual damages, up to three times Plaintiffs' actual damages in light of Gilead's willful violations, attorneys' fees, and costs.

**o.   New York, N.Y. Gen. Bus. Law § 349**

598.   Gilead's conduct constitutes deceptive acts or practices in the conduct of any business, trade or commerce in violation of N.Y. Gen. Bus. Law § 349.

599.   Gilead's conduct was directed at consumers.

600.   Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

601.   New York Plaintiffs were injured by reason of Gilead's violations of N.Y. Gen. Bus. Law § 349.

602.   New York Plaintiffs seek actual damages, three times actual damages in an amount not to exceed $1,000 in light of Gilead's willful or knowing violations, and reasonable attorneys' fees.

COMPLAINT FOR DAMAGES - 134
Case No.:
010759-11 1080167 V1

1

**p.     North Carolina, N.C. Gen. Stat. §§ 75-1.1 *et seq*.**

2      603.    Gilead's conduct constitutes unfair methods of competition and unfair or deceptive

3  acts or practices in or affected commerce in violation of N.C. Gen. Stat. §§ 75-1.1.

4      604.    Plaintiffs could not discover the truth by exercise of reasonable diligence and they

5  were induced to forego any investigation by Gilead's misrepresentations.

6      605.    Gilead's violations of N.C. Gen. Stat. §§ 75-1.1 proximately caused North Carolina

7  Plaintiffs' injuries.

8       606.    North Carolina Plaintiffs seek actual damages, treble damages, and attorneys' fees in

9  light of Gilead's willful violations.

10     **q.     Ohio, Ohio Rev. Code §§ 1345.01 *et seq*.**

11     607.    Gilead's conduct constitutes unfair or deceptive acts or practices in connection with a

12  consumer transaction in violation of Ohio Rev. Code § 1345.02.

13     608.    Gilead represented that the TDF Drugs have characteristics or benefits that it does not

14  have in violation of Ohio Rev. Code § 1345.02(B)(1).

15     609.    Gilead represented that the TDF Drugs are of a particular standard or quality that they

16  are not in violation of Ohio Rev. Code § 1345.02(B)(2).

17     610.    Ohio Plaintiffs suffered damages as a result of Gilead's violations of Ohio Rev. Code

18  § 1345.02.

19     611.    Ohio Plaintiffs seek their actual damages plus an amount not exceeding $5,000 in

20  noneconomic damages, and reasonable attorneys' fees in light of Gilead's knowing violations.

21     **r.     Oklahoma, 15 Okla. Stat. §§ 751 *et seq*.**

22     612.    Gilead made false or misleading representations, knowingly or with reason to know,

23  as to the characteristics and benefits of the TDF Drugs in violation of 15 Okla. Stat. § 753(5).

24     613.    Gilead made false or misleading representations, knowingly or with reason to know,

25  that the TDF Drugs were of a particular standard when they of another in violation of 15 Okla. Stat.

26  § 753(7).

27     614.    Gilead's conduct constitutes unfair and deceptive practices in violation of 15 Okla.

28  Stat. §§ 752, 753(20).  Gilead committed misrepresentations, omissions, or other practices that

COMPLAINT FOR DAMAGES - 135
Case No.:
010759-11 1080167 V1

deceived or could reasonably be expected to deceive or mislead a person to their detriment. Gilead's conduct offends the established public policy of encouraging the marketing of safer drugs and adequately warning consumers about the risks of existing drugs. Gilead's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

615. Oklahoma Plaintiffs suffered actual injury and damages as a result of Gilead's violations of 15 Okla. Stat. § 751 *et seq.*

616. Oklahoma Plaintiffs seek actual damages, costs of suit, reasonable attorneys' fees, and civil penalties are permitted under 15 Okla. Stat. § 761.1.

**s.    Oregon, Or. Rev. Stat. Ann. §§ 646.605 *et seq.***

617. Gilead represented that the TDF Drugs have characteristics or benefits that they do not have in violation of Or. Rev. Stat. Ann. § 646.608(1)(e).

618. Gilead represented that the TDF Drugs are of a particular standard or quality when they are of another in violation of Or. Rev. Stat. Ann. § 646.608(1)(g).

619. Gilead engaged in unfair or deceptive conduct in violation of Or. Rev. Stat. Ann. § 646.608(1)(u).

620. Oregon Plaintiffs suffered injuries and damages in the form of an ascertainable loss of money or property as a result of Gilead's violations of Or. Rev. Stat. Ann. § 646.608.

621. Oregon Plaintiffs seek the greater of actual damages or $200, punitive damages, reasonable attorneys' fees, and costs.

**t.    Rhode Island, R.I. Gen. Laws §§ 6-13.1 *et seq.***

622. Gilead represented that the TDF Drugs have characteristics or benefits that they do not have in violation of R.I. Gen. Laws § 6-13.1-1(6)(v).

623. Gilead represented that the TDF Drugs are of a particular standard or quality when they are of another in violation of R.I. Gen. Laws § 6-13.1-1(6)(vii).

624. Gilead's conduct constituted methods, acts, or practices that misled or deceived the members of the public in a material respect in violation of R.I. Gen. Laws § 6-13.1-1(6)(xiv).

625.     Gilead's conduct offends the established public policy of encouraging the marketing of safer drugs and adequately warning consumers about the risks of existing drugs. Gilead's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

626.     Rhode Island Plaintiffs suffered an ascertainable loss of money or property as a result of Gilead's violations of R.I. Gen. Laws § 6-13.1-1.

627.     Rhode Island Plaintiffs seek the greater of actual damages or $200, punitive damages, costs of suit, and reasonable attorneys' fees.

#### u.     South Carolina, S.C. Code Ann. §§ 39-5-10 *et seq.*

628.     Gilead's conduct constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of S.C. Code Ann. § 39-5-20(a).

629.     Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

630.     South Carolina Plaintiffs suffered an ascertainable loss of money or property as a result of Gilead's violations of S.C. Code Ann. § 39-5-20(a).

631.     South Carolina Plaintiffs seek factual damages, three times Plaintiffs' actual damages as a result of Gilead's willful or knowing violations, reasonable attorneys' fees, and costs.

#### v.     Texas, Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.*

632.     Gilead's conduct constitutes false, misleading, or deceptive acts or practices in the conduct of trade or commerce in violation of Tex. Bus. & Com. Code Ann. § 17.46(a).

633.     Gilead represented the TDF Drugs as having characteristics or benefits that they do not in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(5).

634.     Gilead represented that the TDF Drugs are of a particular standard or quality that they are not in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(7).

635.     Gilead represented that a warranty conferred or involved rights which it does have have or involve in violation of Tex. Bus. & Com. Code Ann. § 17.46(20).

636.     Gilead failed to disclose information concerning the TDF Drugs which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(24).

637.     Gilead knowingly and intentionally violated the Texas Deceptive Trade Practices-Consumer Protection Act.

638.     Texas Plaintiffs suffered economic damages as a result of Gilead's violations of Tex. Bus. & Com. Code Ann. § 17.46.

639.     Texas Plaintiffs intend to seek economic damages, three times Plaintiffs' economic damages and mental anguish damages in light of Gilead's knowing and intentional violations, and reasonable and necessary attorneys' fees and court costs.

640.     On November 9, 2018, Texas Plaintiffs made a written demand for relief in satisfaction of the Texas Deceptive Trade Practices-Consumer Protection Act and will amend this Complaint to add claims for damages under the Act once the required notice period has elapsed. Plaintiffs' notice letter is attached as Exhibit A.

641.     These paragraphs are included for notice purposes only and are not intended to assert a claim for damages under the Texas Deceptive Trade Practices-Consumer Protection Act at this time.

### w.     Wisconsin, Wis. Stat. §§ 100.18

642.     Gilead made untrue, deceptive, or misleading statements or representations to the public with the intent to induce the purchase of the TDF Drugs in violation of Wis. Stat. § 100.18.

643.     Wisconsin Plaintiffs suffered a pecuniary loss as a result of Gilead's violations of Wis. Stat. § 100.18.

644.     Wisconsin Plaintiffs seek actual damages, costs of suit, and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court enter an order or judgment against Gilead and in favor of Plaintiff, and grant the following relief:

A.      Declare, adjudge, and decree the conduct of Gilead as alleged herein to be unlawful, unfair, and/or deceptive and otherwise in violation of the law;

B.      Award Plaintiffs actual, compensatory, and/or statutory damages in an amount to be proven at trial;

C.      Award Plaintiffs punitive and exemplary damages as permitted by law and the statutes cited herein in an amount to be proven at trial;

D.      Award Plaintiffs restitution and restitutionary disgorgement to restore ill-gotten gains received by Gilead as a result of the unfair, wrongful, and deceptive conduct alleged herein;

E.      Award Plaintiffs the costs of bringing this suit, including reasonable attorneys' fees; and

F.      Award Plaintiffs such other and further relief as to which Plaintiffs may be entitled in law or equity.

**JURY DEMAND**

645.    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury on all matters so triable.

DATED: Nov. 16, 2018.                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:___*/s/*____*Shana E. Scarlett*_____
   Shana E. Scarlett (SBN 217895)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: shanas@hbsslaw.com

Steve W. Berman (*pro hac vice* to be filed)
Anne F. Johnson (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292

COMPLAINT FOR DAMAGES - 139
Case No.:
010759-11 1080167 V1

Fax: (206) 623-0594
Email: steve@hbsslaw.com
Email: annej@hbsslaw.com

Robert C. Hilliard (*pro hac vice* to be filed)
Katrina R. Ashley (*pro hac vice* to be filed)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Tel: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com
Email: kashley@hmglawfirm.com

Benjamin L. Crump (*pro hac vice* to be filed)
BEN CRUMP LAW, PLLC
122 S. Calhoun Street
Tallahassee, Florida 32301
Tel: (850) 224-2020
Fax: (850) 224-2021
Email: ben@bencrump.com

*Attorneys for Plaintiffs*