Debra E. Pole (SBN 97816)
dpole@sidley.com
Alycia Degen (SBN 211350)
adegen@sidley.com
Joshua Anderson (SBN 211320)
janderson@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:  213.896.6000

Daniel A. Spira (*admitted pro hac vice*)
dspira@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  312.853.7000

Inn-Young Park (SBN 324129)
ipark@sidley.com
SIDLEY AUSTIN LLP
555 California St., Suite 2000
San Francisco, CA 94104
Telephone: 415.772.1200

*Attorneys for Defendant Gilead Sciences, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN HOLLEY, et al.,<br><br>       *Plaintiffs,*<br>  vs.<br><br>GILEAD SCIENCES, INC.,<br><br>       *Defendant.* | Case No. No. 3:18-cv-06972-JST<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Assigned to: Hon. Jon S. Tigar<br>Hearing Date:  April 25, 2019<br>Hearing Time:  2:00 p.m.<br>Location:  Courtroom 9 |
| CHARANDA DOWDY, et al.,<br><br>       *Plaintiffs,*<br>  vs.<br><br>GILEAD SCIENCES, INC.,<br><br>       *Defendant.* | Case No. No. 3:19-cv-00481-JST<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Assigned to: Hon. Jon S. Tigar<br>Hearing Date:  April 25, 2019<br>Hearing Time:  2:00 p.m.<br>Location:  Courtroom 9 |

1

## CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINTS

PLEASE TAKE NOTICE that on April 25, 2019, at 2:00 p.m., or as soon thereafter as counsel may be heard, in Courtroom 9 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Gilead Sciences, Inc. ("Gilead") will and hereby does move to dismiss Plaintiffs' Complaints.

This Motion to Dismiss is brought pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(6), and 12(e) on the following grounds:  (1) Each of Plaintiffs' claims is preempted by federal law; (2) Plaintiffs' failure to warn theory of liability fails because Plaintiffs do not sufficiently allege causation; (3) Plaintiffs' design defect theory of liability fails because Gilead had no duty or obligation to introduce, at an earlier date, medications different from those allegedly used by Plaintiffs; and (4) Plaintiffs' fraud-based claims fail, because Plaintiffs have not sufficiently pled those claims in accordance with Federal Rules 8(a) and 9(b).

This Motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the pleadings and filings in these actions; and such further evidence or argument properly before the Court.

Dated: February 27, 2019

SIDLEY AUSTIN LLP

By:  */s/ Joshua Anderson*
Debra E. Pole (Bar No. 97816)
dpole@sidley.com
Joshua Anderson (Bar No. 211320)
janderson@sidley.com
Alycia A. Degen (Bar No. 211350)
adegen@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Defendant Gilead Sciences, Inc.*

-1-

GILEAD SCIENCES, INC.'S CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES, NOS. 3:18-CV-06972-JST, 3:19-CV-00481-JST

1
2

# <u>TABLE OF CONTENTS</u>

3  MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

4  INTRODUCTION ................................................................................................. 1

5  BACKGROUND ................................................................................................... 3

6      A.    Gilead's TDF Medications ................................................................. 3

7      B.    Gilead's TAF Medications ................................................................. 4

8      C.    Plaintiffs' Allegations and Causes of Action ................................... 4

9  LEGAL STANDARD............................................................................................. 5

10  ARGUMENT ........................................................................................................ 6

11  I.    PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW. .................. 6

12      A.    Federal Regulations Regarding New Drug Applications and Design and
13          Labeling Changes.............................................................................. 6

14      B.    Federal Law Preempts Plaintiffs' Design Defect Claims. ............... 8

15      C.    Federal Law Preempts Plaintiffs' Failure to Warn Claims. ........... 13

16      D.    Plaintiffs' Remaining Causes of Action Are Preempted By Federal Law ................. 15

17  II.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE CAUSATION TO SUSTAIN
        THEIR FAILURE-TO-WARN THEORY. .................................................... 17

18  III.    GILEAD HAD NO DUTY TO INTRODUCE TAF-CONTAINING
19          MEDICATIONS AT AN EARLIER DATE. .................................................... 20

20  IV.    PLAINTIFFS FAIL TO PLEAD THEIR FRAUD AND CONSUMER
        PROTECTION LAW CLAIMS WITH THE REQUISITE LEVEL OF
21          PARTICULARITY.................................................................................... 21

22  CONCLUSION.................................................................................................... 24

23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Actimmune Mktg. Litig.*,
No. 08-cv-2376, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009), *aff'd*, 464 F. App'x
651 (9th Cir. 2011) .............................................................................................................23

*AIDS Healthcare Foundation, Inc. v. Gilead Sciences, Inc.*,
No. 16-cv-443, 2016 WL 3648623 (N.D. Cal. July 6, 2016), *aff'd*, 890 F.3d 986
(Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 415 (2018) .......................................2, 20, 21

*Andren v. Alere, Inc.*,
207 F. Supp. 3d 1133 (S.D. Cal. 2016) ..............................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................................................5, 6

*Aston v. Johnson & Johnson*,
248 F. Supp. 3d 43 (D.D.C. 2017) .....................................................................................10

*Barnhill v. Teva Pharms. USA, Inc.*,
819 F. Supp. 2d 1254 (S.D. Ala. 2011) .............................................................................17

*Beavers-Gabriel v. Medtronic, Inc.*,
15 F. Supp. 3d 1021 (D. Haw. 2014) .................................................................................23

*Bias v. Wells Fargo & Co.*,
942 F. Supp. 2d 915 (N.D. Cal. 2013) ...............................................................................21

*Block v. Abbott Labs.*,
No. 99-cv-7457, 2002 WL 485364 (N.D. Ill. Mar. 29, 2002) ...........................................17

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ...........................................................................................................14

*Byrd v. Janssen Pharm., Inc.*,
333 F. Supp. 3d 111 (N.D.N.Y. 2018) ...............................................................................18

*Casanova v. Ulibarri*,
595 F.3d 1120 (10th Cir. 2010) .........................................................................................23

*In re Celexa & Lexapro Mktg. and Sales Prods. Liab. Litig.*,
779 F.3d 34 (1st Cir. 2015) ......................................................................................7, 14, 16

*Colville v. Pharmacia & Upjohn Co LLC*,
565 F. Supp. 2d 1314 (N.D. Fla. 2008) .............................................................................17

-ii-

GILEAD SCIENCES, INC.'S CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES, NOS. 3:18-CV-06972-JST, 3:19-CV-00481-JST

*Dunson v. Cordis Corp.*,
   No. 16-cv-3076, 2016 WL 3913666 (N.D. Cal. July 20, 2016) ......................................19

*Fleming v. Janssen Pharm., Inc.*
   186 F. Supp. 3d 826 (W.D. Tenn. 2016)..........................................................................10

*Germany v. Javitch, Block & Rathbone LLP*,
   No. 05-cv-191, 2005 WL 2008489 (S.D. Ohio Aug. 22, 2005) ......................................23

*Gustavsen v. Alcon Labs., Inc.*,
   903 F.3d 1 (1st Cir. 2018)..........................................................................................10, 16

*In re Hydroxycut Mktg. & sales Practices Litig.*,
   801 F. Supp. 2d 993 (S.D. Cal. 2011) ............................................................................21

*Johnson v. Zimmer, Inc.*,
   No. 02-cv-1328, 2004 WL 742038 (D. Minn. Mar. 31, 2004) ......................................17

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ...........................................................................6, 21, 22

*King v. Danek Med., Inc.*,
   37 S.W.3d 429 (Tenn. Ct. App. 2000) ...........................................................................18

*Lujano v. Gilead Sciences, Inc.*,
   No. BC702302 (Cal. Super Ct. Feb. 13, 2019) ........................................12, 13, 15, 19

*Lynch v. Olympus Am., Inc.*,
   No. 18-cv-512, 2018 WL 5619327 (D. Colo. Oct. 30, 2018)....................................18, 19

*Markowitz v. Davol Inc.*,
   No. 15-cv-2418, 2015 WL 12696031 (C.D. Cal. June 19, 2015) ...................................19

*Marolda v. Symantec Corp.*,
   672 F. Supp. 2d 992 (N.D. Cal. 2009) ............................................................................21

*McGee v. Boehringer Ingelheim Pharms., Inc.*,
   No. 4:16-cv-2082, 2018 WL 1399237 (N.D. Ala. Mar. 20, 2018) ..........................7, 14, 15, 16

*Mutual Benefit Pharm. Co. v. Bartlett*,
   570 U.S. 472 (2013)..........................................................................................6, 9, 12, 13

*In re NJOY, Inc. Consumer Class Action Litig.*,
   No. 14-cv-428, 2014 WL 12586074 (C.D. Cal. Oct. 20, 2014) .....................................22

*Opperman v. Path, Inc.*,
   87 F. Supp. 3d 1018 (N.D. Cal. 2014) ............................................................................23

*Patterson v. Bayer Healthcare Pharms., Inc.*,
   No. 1:14-cv-1087, 2015 WL 778997 (E.D. Cal. Feb. 24, 2015) ....................................23

-iii-

*Patton v. Forest Labs., Inc.*,
    No. 17-cv-922, 2018 U.S. Dist. LEXIS 160368 (C.D. Cal. Sept. 19, 2018) ..........................15, 23

*Perez v. Nidek Co., Ltd.*,
    711 F.3d 1109 (9th Cir. 2013) ...................................................................................................14

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)..............................................................................................................9, 12

*Small v. Amgen, Inc.*,
    No. 2:12-cv-476, 2016 WL 4942078 (M.D. Fla. Jan. 25, 2016) ................................................10

*Tapia v. Davol, Inc.*,
    116 F. Supp. 3d 1149 (S.D. Cal. 2015)........................................................................................19

*Thom v. Bristol-Myers Squibb Co.*,
    353 F.3d 848 (10th Cir. 2003) ...................................................................................................18

*Trejo v. Johnson & Johnson*,
    13 Cal. App. 5th 110 (2017), *petition for review denied*, No. S243672 (Oct. 11,
    2017) ......................................................................................................................................10, 12

*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016)................................................................................. *passim*

*Utts v. Bristol-Myers Squibb Co.*,
    251 F. Supp. 3d 644 (S.D.N.Y. 2017).........................................................................8, 14, 15, 16

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .....................................................................................................6

*Vitanza v. Upjohn Co.*,
    778 A.2d 829 (Conn. 2001) ........................................................................................................18

*White v. R.J. Reynolds Tobacco Co.*,
    109 F. Supp. 2d 424 (D. Md. 2000) ............................................................................................17

*Willett v. Baxter Int'l., Inc.*,
    929 F.2d 1094 (5th Cir. 1991) ....................................................................................................17

*Wilson v. Taser Int'l, Inc.*,
    No. 4:06-cv-0179, 2008 WL 11334209 (N.D. Ga. June 12, 2008) .............................................17

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..................................................................................................................8, 9

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ............................................................................................ *passim*

-iv-

GILEAD SCIENCES, INC.'S CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES, NOS. 3:18-CV-06972-JST, 3:19-CV-00481-JST

*In re Zyprexa Prods. Liab. Litig.*,
    277 F.R.D. 243 (E.D.N.Y. 2011) ............................................................................................. 18

**Statutes**

21 U.S.C. § 355 .......................................................................................................................... 6, 11

21 U.S.C. § 355(d) .......................................................................................................................... 11

**Other Authorities**

21 C.F.R. § 314.3 ................................................................................................................... 8, 13, 15

21 C.F.R. § 314.70(b) ............................................................................................................... 10, 16

21 C.F.R. § 314.70(b)(2)(i) ......................................................................................................... 9, 11

21 C.F.R. § 314.70(b)(2)(v) ............................................................................................................ 13

21 C.F.R. § 314.70(c)(6)(iii) ........................................................................................................... 13

21 C.F.R. § 314.70(c)(6)(iii)(A) ....................................................................................................... 8

21 C.F.R. § 314.70(h) ...................................................................................................................... 11

Fed. R. Civ. P. 8(a) ........................................................................................................................... 2

Fed. R. Civ. P. 8(a)(2) ....................................................................................................................... 5

Fed. R. Civ. P. 9(b) .................................................................................................................. *passim*

Fed. R. Civ. P. 12(e) ........................................................................................................................ 23

-v-

GILEAD SCIENCES, INC.'S CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES, NOS. 3:18-CV-06972-JST, 3:19-CV-00481-JST

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Gilead Sciences, Inc. ("Gilead") develops and markets life-saving medications, including Viread, Truvada, Atripla, Complera, and Stribild (collectively, "TDF medications")—HIV medications containing the prodrug tenofovir disoproxil fumarate ("TDF").  In these duplicative product liability lawsuits, *none* of the 165 Plaintiffs who allegedly used these medications allege that the medications were ineffective for treating HIV.  Nor could they make such allegations.  TDF medications are approved by the U.S. Food and Drug Administration ("FDA") for the treatment and/or prevention of HIV infection; TDF medications are core components of the U.S. Department of Health and Human Services' ("HHS") preferred regimens for HIV antiretroviral therapy[1]; and TDF has been denominated as an "essential" medicine by the World Health Organization ("WHO").[2]

Rather, Plaintiffs allege that they suffered kidney and/or bone injuries as a result of using these medications, and assert claims based on two theories: (1) Gilead should have altered the design of the TDF medications by replacing TDF with an allegedly superior drug, tenofovir alafenamide fumarate ("TAF"), and/or by reducing the dose of TDF in Stribild; and (2) Gilead failed to adequately warn Plaintiffs or their physicians about kidney and bone risks from the TDF medications and the need to "monitor" patients for these risks.  Each of Plaintiffs' claims should be dismissed.

*First*, all of Plaintiffs' claims are preempted by federal law.  The sole theories in support of Plaintiffs' causes of action for Strict Liability – Design Defect (*Holley* Compl., Count I; *Dowdy* Compl., Count I)—that Gilead should have replaced TDF with TAF, or that Gilead should have reduced the amount of TDF in Stribild—are preempted, given that Gilead could not have made these design changes without first obtaining FDA approval.  Likewise, Plaintiffs' claims for Strict Liability – Failure to Warn (*Holley* Compl., Count II; *Dowdy* Compl., Count II) should be dismissed

---

[1] *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents Living with HIV*, DEP'T OF HEALTH AND HUM. SERV., at F-5 (Oct. 25, 2018), http://www.aidsinfo.nih.gov/ContentFiles/AdultandAdolescentGL.pdf.

[2] *WHO Model List of Essential Medicines*, WORLD HEALTH ORG., at 19-21 (Mar. 2017), http://www.who.int/selection_medicines/list/en/.

1  as preempted by federal law, because (a) Plaintiffs fail to allege any "newly acquired information"

2  that would have allowed Gilead to strengthen warnings in the TDF medications' labeling without

3  prior FDA approval, and (b) Plaintiffs cannot assert state law claims based on Gilead's alleged

4  failure to provide safety data to FDA or Plaintiffs' second-guessing of FDA's decision about what

5  risk disclosures to require in approved drug labeling.  Each of Plaintiffs' other causes of action

6  (*Holley* Compl., Counts III-XII; *Dowdy* Compl., Counts III-VII) are premised on these same flawed

7  design defect and failure to warn theories, and are therefore preempted for the same reasons.

8       *Second*, Plaintiffs' claims based on their failure to warn theory of liability should be

9  dismissed for the additional reason that they do not sufficiently allege causation—*i.e.*, that stronger

10  or different warnings would have changed their doctors' prescribing decisions.  At most, Plaintiffs

11  merely allege that additional warnings would have resulted in their physicians "monitor[ing]

12  Plaintiffs differently," or "monitor[ing] Plaintiffs more frequently and more effectively."  *Holley*

13  Compl. ¶ 422; *Dowdy* Compl. ¶ 306.  This does not suffice to plead the causation element required

14  to support Plaintiffs' claims.

15       *Third*, Plaintiffs' claims premised on Gilead's design of its medications with TDF instead of

16  TAF should be dismissed on the additional basis that Gilead had no duty or obligation to introduce

17  medications containing TAF at an earlier time.  Indeed, in *AIDS Healthcare Foundation, Inc. v.*

18  *Gilead Sciences, Inc.*, the court already rejected similar allegations, holding that:  "**Gilead . . . had**

19  **no obligation to introduce the improved [TAF] product at an earlier date**."  No. 16-cv-443, 2016

20  WL 3648623, at *9 (N.D. Cal. July 6, 2016), *aff'd*, 890 F.3d 986 (Fed. Cir. 2018), *cert. denied*, 139

21  S. Ct. 415 (2018) (emphasis added).

22       *Fourth*, Plaintiffs' claims for Fraud by Omission (*Holley* Compl., Count X; *Dowdy* Compl.,

23  Count V) and Violation of State Consumer Protection Laws (*Holley* Compl., Count XII; *Dowdy*

24  Compl., Count VII) fail, because Plaintiffs have not sufficiently pled these causes of action in

25  accordance with Federal Rule of Civil Procedure 8(a), let alone Federal Rule of Civil Procedure

26  9(b).  Plaintiffs do not sufficiently allege, for instance, facts supporting when they or their doctors

27  were exposed to any alleged misrepresentations, what alleged misrepresentations they or their

28  doctors were exposed to, or if or how they or their doctors relied on any such misrepresentations.

1  Plaintiffs' boilerplate assertions that "Plaintiffs and their doctors justifiably relied on Gilead's

2  omissions," and "reasonably relied on Gilead's deceptive and misleading omissions and

3  misrepresentations," fall well short of federal pleading requirements.  *Holley* Compl. ¶ 514, 541;

4  *Dowdy* Compl. ¶¶ 359, 386.

5      Accordingly, Plaintiffs' Complaints should be dismissed.

6                                  **BACKGROUND**

7      **A.      Gilead's TDF Medications**

8      Each of the TDF medications—Viread, Truvada, Atripla, Complera, and Stribild—is a

9  prescription medication developed and marketed by Gilead "for the treatment of Human

10 Immunodeficiency Virus-1 ('HIV') infection."  *Holley* Compl. [D.E. 1 in 3:18-cv-06972] ¶ 1;

11 *Dowdy* Compl. [D.E. 1 in 3:19-CV-00481] ¶ 1.  Each of these medications is a fixed dose pill

12 containing TDF, a prodrug of the compound tenofovir, alone or combined with one or more other

13 drugs.  *Holley* Compl. ¶ 4; *Dowdy* Compl. ¶ 4; *see also Holley* Compl. ¶ 3 n.2; *Dowdy* Compl. ¶ 3

14 n.2.  "Tenofovir is a nucleotide analogue reverse transcriptase inhibitor ('NRTI')," which "work[s]

15 by blocking an enzyme HIV needs to replicate."  *Holley* Compl. ¶ 2; *Dowdy* Compl. ¶ 2.

16     On October 26, 2001, FDA approved Viread, the brand name for TDF, for the treatment of

17 HIV-1 infection in combination with other antiretroviral agents.  *Holley* Compl. ¶ 189; *Dowdy*

18 Compl. ¶ 73.  On August 2, 2004, FDA approved Truvada, a combination of TDF and emtricitabine

19 (another NRTI), for the same use.  *Holley* Compl. ¶ 190; *Dowdy* Compl. ¶ 74.  On July 12, 2006,

20 FDA approved Atripla, a combination of TDF, emtricitabine, and efavirenz (a non-nucleoside

21 reverse transcriptase inhibitor ("NNRTI")), for the treatment of HIV-1 infection, either on its own or

22 in combination with other antiretroviral agents.  *Holley* Compl. ¶ 191; *Dowdy* Compl. ¶ 75.  On

23 August 10, 2011, FDA approved Complera, a combination of TDF, emtricitabine, and rilpivirine

24 hydrocholoride (another NNRTI), also for treatment of HIV-1 infection.  *Holley* Compl. ¶ 192;

25 *Dowdy* Compl. ¶ 76.  On August 27, 2012, FDA approved Stribild, a combination of TDF,

26 emtricitabine, elvitegravir, and cobicistat "for use as a complete regimen for the treatment of HIV-1

27 infection in treatment-naive adults."  *Holley* Compl. ¶ 193; *Dowdy* Compl. ¶ 77.  Subsequently, FDA

28 approved Viread for treatment of Hepatitis B and Truvada as part of an HIV prevention regimen,

                                              -3-

known as pre-exposure prophylaxis ("PrEP").  *Holley* Compl. ¶ 1 n.1; *Dowdy* Compl. ¶ 1 n.1.

To this day, HHS continues to include TDF, at the strongest recommendation level, in "Recommended Initial Regimens for Most People with HIV."  *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents Living with HIV*, DEP'T OF HEALTH AND HUM. SERV., at F-5 (Oct. 25, 2018), http://www.aidsinfo.nih.gov/ContentFiles/AdultandAdolescentGL.pdf. Likewise, the WHO includes TDF on its list of the medicines "deemed essential for addressing the most important public health needs globally."  *WHO Model List of Essential Medicines*, WORLD HEALTH ORG., at 19-21 (Mar. 2017, *amended* Aug. 2017), http://www.who.int/selection_medicines/list/en/.

### B.    Gilead's TAF Medications

Like TDF, TAF is also a prodrug of tenofovir.  *Holley* Compl. ¶ 194; *Dowdy* Compl. ¶ 78. Plaintiffs' Complaints refer to three Gilead medications containing TAF:  Genvoya (TAF, emtricitabine, elvitegravir, and cobicistat), Odefsey (TAF, emtricitabine, and rilpivirine hydrochloride), and Descovy (TAF and emtricitabine).  *Holley* Compl. ¶¶ 196-98; *Dowdy* Compl. ¶¶ 80-82.  FDA approved these three medications on November 5, 2015, March 1, 2016, and April 4, 2016, respectively, all for the treatment of HIV-1 infection.  *Id.*  FDA has not approved a standalone TAF medication for the treatment or prevention of HIV,[3] nor has it approved a medication combining TAF, emtricitabine, and efavirenz for the treatment or prevention of HIV.

### C.    Plaintiffs' Allegations and Causes of Action

Plaintiffs each allegedly took Stribild, or Stribild preceded or followed by one or more of Gilead's other TDF medications, for treatment of HIV, treatment of Hepatitis B, or HIV prevention (*i.e.*, PrEP); not all of these drugs are indicated for all of these conditions.  *Holley* Compl. ¶¶ 1 n.1, 22, 522; *Dowdy* Compl. ¶¶ 1 n.1, 21, 367.[4]  None of the 165 Plaintiffs allege that these medications were ineffective for the treatment or prevention of HIV, or for treatment of Hepatitis B.  Instead,

---

[3] FDA has approved a standalone TAF medication (Vemlidy) to treat chronic hepatitis B virus infection in adults with compensated liver disease.  *Holley* Compl. ¶ 199; *Dowdy* Compl. ¶ 83.

[4] The Complaints do not identify which Plaintiffs (if any) allegedly took these products for treatment of Hepatitis B or PrEP, rather than for the treatment of HIV.

Plaintiffs allege that as a result of taking these medications, they suffered kidney and/or bone injuries. *Holley* Compl. ¶¶ *Id*. 24-163; *Dowdy* Compl. ¶¶ 23-47.[5] Plaintiffs further allege that "Gilead designed Viread, Truvada, Atripla, Complera, and Stribild to contain TDF rather than safer TAF," *Holley* Compl. ¶ 7; *Dowdy* Compl. ¶ 7, and that "[i]n addition to withholding safer designs, Gilead failed to adequately warn physicians and patients about the risks and safe use of TDF," by providing "inadequate warnings to doctors and patients about the need for frequent monitoring of all patients for TDF-associated kidney and bone damage," *Holley* Compl. ¶ 15; *Dowdy* Compl. ¶ 15. *See also, e.g., Holley* Compl. ¶¶ 397, 399; *Dowdy* Compl. ¶¶ 281, 283 ("Gilead could have incorporated the safer TAF design" into its products and "could have reduced the dose of TDF in Stribild"), *Holley* Compl. ¶ 414; *Dowdy* Compl. ¶ 298 ("Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the risks TDF posed to patients' kidneys and bones").

Based on these allegations, Plaintiffs assert claims for Strict Liability – Design Defect (*Holley* Compl., Count I; *Dowdy* Compl., Count I); Strict Liability – Failure to Warn (*Holley* Compl., Count II; *Dowdy* Compl., Count II); alleged violations of state Products Liability Acts (*Holley* Compl., Counts III-VIII; *Dowdy* Compl., Count III); Negligence and Gross Negligence (Holley Compl., Count IX; *Dowdy* Count IV); Fraud by Omission (*Holley* Compl., Count X; *Dowdy* Compl., Count V); Breach of Implied Warranty of Merchantability (*Holley* Compl., Count XI; *Dowdy* Compl., Count VI); and alleged Violations of State Consumer Protection Laws (*Holley* Compl., Count XII; *Dowdy* Compl., Count VII).

## LEGAL STANDARD

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citation omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "To survive a motion to dismiss, a

---

[5] None of the Plaintiffs alleges when he or she suffered these injuries. *See id.*

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (citation omitted).  The plausibility standard requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).

Additionally, Federal Rule 9(b) "requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud . . . .'"  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)).  "'Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged.'"  *Id.* (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  Even if fraud is not an element of a plaintiff's claims, "[w]hen an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim."  *Vess*, 317 F.3d at 1107; *see also Kearns*, 567 F.3d at 1125-26, 1128 (affirming dismissal of complaint that was "grounded in fraud" under Rule 9(b)).

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Each of Plaintiffs' claims is premised on allegations that: (1) Gilead should have designed its medications with TAF instead of TDF and/or should have designed Stribild with less TDF; or (2) Gilead failed to adequately warn Plaintiffs or their physicians about kidney and bone risks associated with its TDF medications and the need to "monitor" patients for these risks.  As set forth below, all of these claims are preempted by federal law, and should be dismissed.

### A.    Federal Regulations Regarding New Drug Applications and Design and Labeling Changes

"The Food, Drug, and Cosmetic Act of 1938 ('FDCA') is a federal law that regulates the manufacture, use, or sale of drugs."  *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 176 (S.D.N.Y. 2016) (citing *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 196 (2005)).  Pursuant to the FDCA, a drug manufacturer must submit a new drug application ("NDA") to the FDA in order "to obtain authorization to market a new drug."  *Id.* at 177; *see also* 21 U.S.C. § 355.  "The process of submitting an NDA is both onerous and lengthy."  *Mutual Benefit Pharm. Co. v. Bartlett*, 570 U.S. 472, 476 (2013).  "Such applications must include 'full reports of investigations

-6-

1    which have been made to show whether or not such drug is safe for use and whether such drug is

2    effective in use.'" *Utts*, 226 F. Supp. 3d at 177 (quoting 21 U.S.C. § 355(b)(1)); *see also, e.g.,*

3    *McGee v. Boehringer Ingelheim Pharms., Inc.*, No. 4:16-cv-2082, 2018 WL 1399237, at *3 (N.D.

4    Ala. Mar. 20, 2018) ("Before the FDA permits a manufacturer to sell a new drug, the manufacturer

5    must submit a new drug application and demonstrate that its drug is safe and effective.").  More

6    specifically, "[t]o obtain approval under the FDCA, the manufacturer must demonstrate to the FDA

7    that the drug is 'safe for use under the conditions prescribed, recommended, or suggested in the

8    proposed labeling,'" and likewise must "prove the drug's effectiveness by 'substantial evidence that

9    the drug will have the effect it purports or is represented to have under the conditions of use

10   prescribed, recommended or suggested in the proposed labeling.'"  *Utts*, 226 F. Supp. 3d at 177

11   (quoting 21 U.S.C. § 355(d)).  "Drug manufacturers must also submit proposed labeling, with

12   annotations, to be used with the drug," and "FDA's premarket approval of an NDA includes the

13   approval of the exact text in the proposed label."  *Id.* (citing 21 U.S.C. § 355; 21 C.F.R. §

14   314.50(c)(2)(i), 314.105(b)); *McGee*, 2018 WL 1399237, at *3 ("The FDA must approve the label's

15   exact text before the manufacturer can sell the new drug.").  FDA approval of drug labeling

16   constitutes "a specific finding that [the drug's] label was not 'false or misleading in any particular.'"

17   *In re Celexa & Lexapro Mktg. and Sales Prods. Liab. Litig.*, 779 F.3d 34, 36 (1st Cir. 2015) (quoting

18   21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6)).

19        "The FDCA prohibits a manufacturer from making any major changes to the 'qualitative or

20   quantitative formulation of the drug product, including inactive ingredients, or in the specifications

21   provided in the approved NDA.'" *Utts*, 226 F. Supp. 3d at 177 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

22        "In addition to regulating changes to the drug formulation, federal law regulates changes to

23   the pharmaceutical labels.  Generally speaking, a manufacturer may only change a drug label after

24   the FDA approves a supplemental application."  *Id.*; *McGee*, 2018 WL 1399237, at *3 (similar).

25   While a manufacturer may make certain changes to drug labeling without prior approval pursuant to

26   the federal "changes being effected" ("CBE") regulation "[t]o add or strengthen a contraindication,

27   warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the

28

-7-

GILEAD SCIENCES, INC.'S CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES, NOS. 3:18-CV-06972-JST, 3:19-CV-00481-JST

1   standard for inclusion in the labeling under" federal regulations, such changes may only be made on

2   the basis of "newly acquired information."  21 C.F.R. § 314.70(c)(6)(iii)(A).[6]

3         "Of course, the FDA retains authority to reject labeling changes made pursuant to the CBE

4   regulations," *Wyeth v. Levine*, 555 U.S. 555, 571 (2009)), and "[b]y expressly requiring that a CBE

5   supplement only reflect newly acquired information and 'be based on sufficient evidence of a causal

6   association,' the FDA ensures 'that scientifically accurate information appears in the approved

7   labeling.'"  *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 659-60 (S.D.N.Y. 2017) (quoting

8   *Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and*

9   *Medical Devices*, 73 Fed. Reg. 2848, 2851 (Jan. 16, 2008)).  FDA further recognizes that

10  "'[e]xaggeration of risk, or inclusion of speculative or hypothetical risks [on drug labeling], could

11  discourage appropriate use of a beneficial drug . . . or decrease the usefulness and accessibility of

12  important information by diluting or obscuring it.'"  *Id.* at 659 (quoting *Supplemental Applications*

13  *Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*, 73 Fed. Reg.

14  2848, 2851 (Jan. 16, 2008)).

15        **B.    Federal Law Preempts Plaintiffs' Design Defect Claims.**

16        Plaintiffs' Strict Liability – Design Defect causes of action (*Holley* Compl., Count I; *Dowdy*

17  Compl., Count I) are preempted by federal law.  In particular, Plaintiffs' only theories in support of

18  their design defect claims are that Gilead should have replaced one component of its medications

19  (TDF) with another drug (TAF), and that Gilead should have reduced the quantity of TDF in

20  Stribild.  *See, e.g.*, *Holley* Compl. ¶¶ 392, 397; *Dowdy* Compl. ¶¶ 276, 281 ("The TDF Drugs are

21  unreasonably dangerous and unsafe for their intended purpose because they include TDF," and

22  "Gilead could have incorporated the safer TAF design"), *Holley* Compl. ¶¶ 393, 399; *Dowdy* Compl.

23  ¶¶ 277, 283 ("Stribild is also unreasonably dangerous and unsafe for its intended purpose because it

24  combines 300 mg TDF with cobicistat," and "Gilead could have reduced the dose of TDF in

25

26  _____

    [6] "Newly acquired information is data, analyses, or other information not previously submitted to the
    Agency, which may include (but is not limited to) data derived from new clinical studies, reports of
27  adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies,
    events, or analyses reveal risks of a different type or greater severity or frequency than previously
28  included in submissions to FDA."  21 C.F.R. § 314.3.

1   Stribild"), *Holley* Compl. ¶ 401; *Dowdy* Compl. ¶ 285 ("TAF-based alternative designs, and a

2   reduced TDF dose design in Stribild, would have accomplished the product's purpose at lesser

3   risk.").

4          Those theories, however, are preempted by federal law, because such material changes would

5   have required FDA approval, making it impossible for Gilead to comply simultaneously with both a

6   purported state law duty to change the formulations of its medications and federal regulations

7   prohibiting Gilead from doing so unilaterally.  *See, e.g., Yates v. Ortho-McNeil-Janssen Pharm.,*

8   *Inc.*, 808 F.3d 281, 298 (6th Cir. 2015); *Utts*, 226 F. Supp. 3d at 185-86 (dismissing design defect

9   claim that "defendants had a pre-approval duty to submit a differently designed drug for FDA

10  approval"); 21 C.F.R. § 314.70(b)(2)(i) (defining "changes in the qualitative or quantitative

11  formulation of the drug product" as "major changes" that "requir[e] supplement submission and

12  approval prior to distribution of the product").

13         The Sixth Circuit's decision in *Yates* is directly on point.  There, plaintiff asserted a design

14  defect claim, alleging that defendants should have altered the formulation of their ORTHO EVRA®

15  patch, ***after FDA approval***, by reducing the amount of estrogen in each patch.  808 F.3d 281 at 289.

16  Applying the Supreme Court's decisions in *Wyeth*, *Bartlett*, and *PLIVA, Inc. v. Mensing*, 564 U.S.

17  604 (2011), the court held that impossibility preemption barred plaintiff's ***post***-approval design

18  defect theory, because "FDA regulations provide that once a drug, whether generic or brand-name, is

19  approved, the manufacturer is prohibited from making any major changes to the 'qualitative or

20  quantitative formulation of the drug product . . . .'  Therefore, to the extent [plaintiff] argues that

21  defendants should have altered the formulation of [the product] after the FDA had approved the

22  patch, we find this claim clearly preempted."  *Id.* at 298 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

23         Likewise, plaintiff's theory that defendants should have designed "a different drug in the first

24  instance"—plaintiff's ***pre***-approval design defect theory—also was preempted, because defendants

25  could not independently introduce an alternatively designed medication without FDA approval.  *Id.*

26  at 299-300 ("Even if [state] law requires defendants to produce and market a different design, the

27  ultimate availability to [plaintiff] is contingent upon whether the FDA would approve the alternate

28  design in the first place. . . .  Defendants could not have complied with whatever pre-approval duty

-9-

might exist without ultimately seeking the FDA's approval prior to marketing [the product], and certainly prior to [plaintiff's] use of the drug.")  Moreover, any "speculat[ion] that had defendants designed [the product] differently, the FDA would have approved the alternate design," that plaintiff "would have selected [the differently-designed product]," and "that this alternate design would not have caused" plaintiff's injuries was "too attenuated," and "several steps too far" to support a design defect cause of action.  *Id.* at 299.  Ultimately, the court found that plaintiff's pre-approval design defect theory amounted to an untenable and preempted argument that "defendants should never have sold the FDA-approved formulation of [the drug] in the first place."  *Id.* at 300.

Several other courts have similarly dismissed design defect claims, including those asserting, as here, that manufacturers should have formulated medications with different quantities of an ingredient or different ingredients altogether.  *See, e.g., Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 14 (1st Cir. 2018) ("changing the product bottle so as to disperse a different amount of prescription eye solution is a 'major change' under 21 C.F.R. § 314.70(b)," such that "plaintiffs' attempt to use state law to require such a change is preempted"); *Fleming v. Janssen Pharm., Inc.* 186 F. Supp. 3d 826, 832-33 (W.D. Tenn. 2016) (dismissing as preempted design defect claim "premised on the proposition that Defendants should have designed Invokana differently"); *Small v. Amgen, Inc.*, No. 2:12-cv-476, 2016 WL 4942078, at *2 (M.D. Fla. Jan. 25, 2016) (holding that "it is likely, even if Enbrel is capable of redesign, that any claim that Defendants should have changed Enbrel's design before seeking FDA approval would likewise be preempted"); *Utts*, 226 F. Supp. 3d at 185-86 (dismissing as preempted plaintiffs' California claims that "defendants had a pre-approval duty to submit a differently designed drug for FDA approval," and stating that "[i]nsofar as the plaintiffs' design defect claim suggests that the defendants should never have sold the FDA-approved formulation of Eliquis, such claims have been explicitly repudiated by the Supreme Court").[7]

---

[7] *See also, e.g., Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 54 (D.D.C. 2017) ("'state-law design defect claims . . . that place a duty on [pharmaceutical] manufacturers to render a drug safer by . . . altering its composition . . . are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling' and are therefore preempted") (quoting *Bartlett*, 570 U.S. at 490); *Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110, 154 (2017) ("In light of the statutes and regulations regarding new drug applications and preventing changes to drugs already approved by the FDA, defendants could not have 'unilaterally changed the active ingredient of Motrin from ibuprofen to dexibuprofen to satisfy their state law duty' without violating federal

-10-

Here, Plaintiffs' design defect theory is that Gilead should have substituted TAF for TDF in formulating its TDF medications, and that it should have altered the quantity of TDF in Stribild. *Holley* Compl. ¶¶ 392-93, 397, 399, 401; *Dowdy* Compl. ¶¶ 276-77, 281, 283, 285.  Either of these changes, however, indisputably would have required Gilead to obtain prior FDA approval.  That is true regardless of whether, in Plaintiffs view, that change should have been made ***before*** or ***after*** the TDF medications' initial FDA approvals.  *See* 21 U.S.C. § 355 (providing NDA requirements); 21 C.F.R. § 314.70(b)(2)(i) (providing that "changes in the qualitative or quantitative formulation of the drug product" require supplemental submission to, and approval from, FDA); *see also* 21 C.F.R. § 314.70(h) ("An applicant may not supplement a 505(b)(2) application to seek approval of a drug that is a different drug from the drug in the approved 505(b)(2) application.  For purposes of this paragraph (h), a drug is a different drug if it has been modified to have a different active ingredient . . . .").  Indeed, as Plaintiffs concede, when Gilead sought to market medications containing TAF instead of TDF, it was required to file and obtain FDA approval of NDAs.  *Holley* Compl. ¶¶ 196-198; *Dowdy* Compl. ¶¶ 80-82 (referring to Gilead's NDAs for Genvoya, Odefsey, and Descovy).

Additionally, Plaintiffs offer nothing more than "speculat[ion] that . . . FDA would have approved" Stribild with a reduced amount of TDF, *see Yates*, 808 F.3d at 299,[8] and there is no basis to assert that FDA would have found such a medication to have "substantial evidence" of effectiveness, 21 U.S.C. § 355(d).  Plaintiffs' theory that Gilead should have replaced TDF with TAF is similarly "too attenuated."  *Yates*, 808 F.3d at 299.  For instance, there is no basis to assume that Plaintiffs "would have selected" a differently-designed medication, *id*., particularly given that most Plaintiffs continued to take TDF-containing Stribild *after* Genvoya—which Plaintiffs describe as "identical to Stribild except for the substitution of TAF for TDF"—entered the market.  *Holley* Compl. ¶ 196; *Dowdy* Compl. ¶ 80 (FDA approved Genvoya on November 5, 2015); *Holley* Compl.

---

law."), *petition for review denied*, No. S243672 (Oct. 11, 2017).

[8] At most, Plaintiffs allege that FDA approved a lower dose of TDF in a *different* medication for pediatric patients only.  *Holley* Compl. ¶ 288; *Dowdy* Compl. ¶ 172.

-11-

¶¶ 24-163; *Dowdy* Compl. ¶¶ 23-47 (alleging that most Plaintiffs took Stribild (and/or other TDF medications) after this date, and in several instances as recently as 2018).

Plaintiffs may attempt to rely on a California Superior Court's recent decision in a case based on similar allegations to argue that their design defect claims are not preempted. Any such reliance would be misplaced. In *Lujano v. Gilead Sciences, Inc.*, No. BC702302 (Cal. Super. Ct. Feb. 13, 2019), the court first determined, relying on *Trejo*, that plaintiffs' **post**-approval design defect theory—"that [Gilead] should have substituted TAF for TDF in drugs approved by the FDA"—was preempted by federal law because "it was impossible [for Gilead] to unilaterally change the active ingredient of" the TDF medications. Slip op. at 2. The court then, however, found that plaintiffs' **pre**-approval design defect theory was not preempted. *Id.* at 2-4. The court purported to distinguish *Yates* on the basis that "a fact-finder need not speculate as to whether an application for a drug containing TAF would have been approved by the FDA," given that FDA eventually approved Gilead's TAF medications, albeit years later. *Id.* at 3. In doing so, the court ignored *Yates'* fundamental holding that, following *Mensing* and *Bartlett*, pre-approval design defect theories are preempted where "[d]efendants could not have complied with whatever pre-approval duty might exist *without ultimately seeking the FDA's approval prior to marketing [the product], and certainly prior to [plaintiff's] use of the drug*." *Yates*, 808 F.3d at 300 (emphasis added). In other words, the fact that FDA ultimately approved Gilead's TAF medications does not defeat preemption; if anything, it confirms preemption because it further cements the fact that, as in *Yates*, Gilead "could not have complied with" its purported pre-approval state law duty to design its TDF medications differently "without ultimately seeking the FDA's approval prior to marketing" and "prior to [plaintiffs'] use of" its TDF medications. *Id.* It is the fact that FDA approval was required and that Gilead could not have acted unilaterally in switching from TDF to TAF, not whether FDA approval would have been granted, that matters with respect to design defect preemption. Even with regard to the *Yates* court's reasoning that plaintiff's pre-approval design defect theory was "too attenuated" to create a state law duty, the fact that FDA eventually approved TAF medications—fourteen years after FDA approved the first TDF medication—does nothing to change the fact that there is still no basis to assume that Plaintiffs here "would have selected" a differently-designed medication (indeed,

-12-

1    most of them took TDF medications after approval of Genvoya), nor that they would not have

2    suffered the same injuries with a different medication.  *Id*. at 299.

3          The *Lujano* court also concluded that plaintiffs' pre-approval design defect theory was not

4    preempted because that theory "would not require [Gilead] to stop selling" its TDF medications, but

5    rather Gilead could "compl[y] with both state and federal law by formulating" its TDF medications

6    "with TAF" as an initial matter.  Slip op. at 4.  Under that theory, however, Gilead never could have

7    sold its FDA-approved TDF medications.  As the *Yates* court found, a "never-start selling rationale"

8    is no different than the "stop-selling rationale" that the United States Supreme Court rejected in

9    *Bartlett*—both are preempted by federal law.  *Yates*, 808 F.3d at 300.

10         Thus, Plaintiffs' pre-approval and post-approval design defect theories are both preempted.

11         **C.     Federal Law Preempts Plaintiffs' Failure to Warn Claims.**

12         Like their design defect claims, Plaintiffs' claims for Strict Liability – Failure to Warn

13    (*Holley* Compl., Count II; *Dowdy* Compl., Count II) are also preempted by federal law.  Absent

14    "newly acquired information" about safety, a drug manufacturer cannot change a drug product's

15    labeling without prior FDA approval.  *See* 21 C.F.R. § 314.70(b)(2)(v);[9] *see also Utts*, 226 F. Supp.

16    3d at 177.  As a result, failure to warn claims premised on a purported state law duty to change a

17    drug's original labeling, without an allegation of newly acquired safety information, are preempted.

18    *See, e.g., Utts*, 226 F. Supp. 3d at 184.

19         Plaintiffs' warning theory is *not* that Gilead acquired and failed to warn about new

20    information regarding kidney and bone risks *after* the launch of its TDF medications (let alone after

21    the launch of Stribild), and that Gilead should have unilaterally strengthened its warnings.  Instead,

22    Plaintiffs' theory is that Gilead knew of the relevant risks *before* FDA approved any of its TDF

23    medications.  *See, e.g., Holley* Compl. ¶ 5; *Dowdy* Compl. ¶ 5 ("Before Gilead began selling its first

24    TDF Drug, Viread, in 2001, Gilead knew that TDF posed a safety risk to patients' kidneys and

25    bones," and "preclinical data for TDF showed that it could cause significant kidney and bone

26

27    _____
      [9] Under certain circumstances, "newly acquired information" may allow a prescription drug
      manufacturer to change the labeling or strengthen a warning without prior FDA approval.  21 C.F.R.
28    § 314.70(c)(6)(iii); *see also* 21 C.F.R. § 314.3 (defining "newly acquired information").

1 damage."), *Holley* Compl. at p. 75; *Dowdy* Compl. at p. 29 ("Gilead knew before Viread was

2 approved that FDA posed a significant safety risk."); *Holley* Compl. ¶ 210; *Dowdy* Compl. ¶ 94

3 ("Since scientists first synthesized TDF, studies have consistently shown that it could cause

4 significant kidney and bone damage.") (citing a study published in 1999); *Holley* Compl. ¶ 211;

5 *Dowdy* Compl. ¶ 95 ("Gilead's preclinical studies of TDF showed that it could be toxic to kidneys

6 and bones."); *Holley* Compl. ¶ 409; *Dowdy* Compl. ¶ 293 ("Gilead was aware of the risks TDF

7 posed to patients' kidneys or bones, and the risks TDF posed to patients' kidneys and bones were

8 knowable, at the time Gilead manufactured, sold, or distributed the TDF drugs.").  Thus, Plaintiff's

9 theory necessarily is either that (a) Gilead failed to disclose kidney and bone risks to FDA when it

10 sought and obtained the initial approval and labeling for its TDF medications, or (b) FDA mistakenly

11 approved the initial labeling for these medications.  Both theories are preempted by federal law.

12       *First*, Plaintiffs cannot maintain an inadequate warning claim based on the theory that Gilead

13 failed to provide information regarding kidney and bone risks to FDA, because state law claims

14 founded on alleged misrepresentations or nondisclosures to FDA are preempted by federal law.  *See*

15 *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348-51 (2001); *see also Perez v. Nidek Co.,*

16 *Ltd.*, 711 F.3d 1109, 1119 (9th Cir. 2013) (citing *Buckman* for the holding that "'fraud-on-the-FDA'

17 claims were impliedly preempted by the FDCA because they conflicted with the federal statutory

18 scheme"); *McGee*, 2018 WL 1399237, at *4 ("To the extent [plaintiff] asserts that [defendant]

19 should have alerted the FDA about [the drug's] DKA risk before [the drug's] approval, the claim is

20 preempted because the claim is essentially one of failure to communicate with the FDA.") (citing

21 *Buckman*, 531 U.S. at 348-51).

22       *Second*, Plaintiffs also cannot state a failure to warn claim based on alleged defects in the

23 warnings provided in the *original* labeling for the TDF medications, because state law claims

24 challenging, as inadequate, warnings contained in a drug's FDA-approved original labeling are

25 preempted by federal law.  *See, e.g.*, *Utts*, 226 F. Supp. 3d at 184-85 (dismissing claims, because

26 "[t]o the extent that the failure to warn claims are premised on the adequacy of the label as approved

27 by the FDA when the drug was first marketed in the United States, they are preempted"); *see also*

28 *Celexa & Lexapro*, 779 F.3d at 42-43; *Utts*, 251 F. Supp. 3d at 662-73 (dismissing failure to warn

claims because plaintiffs failed to allege "newly acquired information" that would have allowed defendant unilaterally to change its labeling); *Patton v. Forest Labs., Inc.*, No. 17-cv-922, 2018 U.S. Dist. LEXIS 160368, *32 (C.D. Cal. Sept. 19, 2018) (dismissing failure to warn claim as preempted by federal law); *McGee*, 2018 WL 1399237, at *4-5 (similar).

Again, *Lujano* does not support a different result. The court found that plaintiffs' conclusory assertions about "accumulating evidence of the risks associated with" TDF medications were sufficient, under California state pleading standards, to allege newly acquired information and to state a claim of a purported duty to "strengthen[] warning labels." *See Lujano*, No. BC702302 at 5. Here, by contrast, Plaintiffs repeatedly allege that Gilead knew of the relevant risks *before* FDA approved any of its TDF medications. *See supra* at 13-14 (citing Complaints). And while Plaintiffs attempt to allege that Gilead also obtained additional information after FDA approved at least some TDF medications, *see Holley* Compl. ¶¶ 213-30; *Dowdy* Compl. ¶¶ 97-114, they have not sufficiently pled that any information obtained after such approvals "reveal[ed] risks of a different type or greater severity or frequency than previously included in submission to FDA," such that it constituted "newly acquired information." 21 C.F.R. § 314.3. Unlike in *Lujano*, Plaintiffs here must meet more stringent federal pleading standards; they have failed to do so. *See Utts*, 226 F. Supp. 3d at 185 ("This threadbare allegation fails to identify information that might constitute 'newly acquired information,' including whether that information, for example, revealed risks of a 'different type' or 'greater severity or frequency' than the information revealed to the FDA at the time of approval."); *Utts*, 251 F. Supp. 3d at 664-65 (dismissing failure to warn claim where plaintiffs did not sufficiently allege "that the real-world signal data for Eliquis shows a greater severity or frequency of bleeding events or deaths than previously disclosed in Eliquis' submissions to the FDA").

Accordingly, Plaintiff's Strict Liability – Failure to Warn Claims are preempted by federal law, and should be dismissed.

### D. Plaintiffs' Remaining Causes of Action Are Preempted By Federal Law.

Because Plaintiffs' remaining causes of action are based on the same flawed theories as their design defect and failure to warn claims, they are preempted by federal law for the reasons described above. In particular, Plaintiffs continue to allege in support of their additional claims that "[t]he

-15-

TDF Drugs are defective in design and . . . Gilead failed to adequately warn about the dangers and proper use of the products."  *Holley* Compl. ¶ 426 (Count III); *Dowdy* Compl. ¶¶ 309, 312 (alleging in Count III that "[t]he TDF Drugs are unreasonably dangerous in design" and "due to the lack of an adequate warning").[10]  Under such circumstances, courts have rejected similar claims as preempted. *E.g.*, *Celexa & Lexapro*, 779 F.3d at 35 (dismissing California consumer protection claims as impliedly preempted, because the FDCA "prohibits [defendant] from independently changing its FDA-approved label"); *Gustavsen*, 903 F.3d at 14 (dismissing consumer protection claims asserted under 25 states' laws as preempted, where plaintiffs sought to impose a state law obligation to require a "'major change' under 21 C.F.R. § 314.70(b)"); *Utts*, 251 F. Supp. 3d at 677 ("The breach of warranty claims are preempted, largely for the reasons already described in connection with the [complaint's] failure to warn claims. . . .  [T]here is no newly acquired information about the risk" that was allegedly undisclosed); *id*. at 680 (dismissing fraud claims as preempted because "[t]here is no newly acquired information that required or suggested that the allegedly fraudulent statements should be altered to remain truthful and non-fraudulent"); *id*. at 683 (holding that "plaintiff's consumer protection claims are preempted"); *Utts*, 226 F. Supp. 3d at 188 (dismissing breach of implied warranty claims as preempted where plaintiffs broadly alleged that medication was "inherently dangerous, unsafe and defective"); *McGee*, 2018 WL 1399237, at *3 (dismissing as preempted gross negligence claim asserted "on the same failure-to-warn premises").

---

[10] *See also Holley* Compl. ¶¶ 435-468 (similar, with regard to alleged violations of state Product Liability Acts); *id*. ¶¶ 477-479; *Dowdy* Compl. ¶¶ 322-24 (alleging in support of Negligence and Gross Negligence claims that "Gilead knew that the TDF design it incorporated into the TDF Drugs was associated with risks of kidney and bone toxicity and caused injuries that resulted from kidney and bone toxicity," that "Gilead did not reduce the TDF dose in Stribild," and that Gilead knew "that TAF is safer than TDF"); *Holley* Compl. ¶¶ 507, 511, 512; *Dowdy* Compl. ¶¶ 352, 356, 357 (alleging in support of Fraud by Omission claims that Gilead "omitted from its prescriber and patient labeling an adequate warning" regarding patient monitoring for "TDF-associated bone and kidney toxicity," Gilead "intentionally concealed from Plaintiffs and their doctors the fact that Gilead had already developed the safer TAF mechanism but designed the TDF Drugs to contain TDF instead of the safer TAF design," and Gilead concealed that it knew the TDF dose should be reduced in Stribild); *Holley* Compl. ¶ 526; *Dowdy* Compl. ¶ 371 (alleging in support of Breach of Implied Warranty claims that "Gilead marketed the TDF Drugs without adequate warnings about the risks or safe use of TDF of which it knew or should have known"); *Holley* Compl. ¶ 535; *Dowdy* Compl. ¶ 380 (alleging in support of state consumer protection law claims that Gilead concealed that "all TDF patients should be carefully and frequently monitored for adverse kidney and bone effects," that it "withheld the safer [TAF] design," and that it knew the TDF dose in Stribild should be reduced).

1    Here too, for the reasons set forth above, *see supra* §§ I.B-C, Plaintiffs' additional causes of

2    action should be dismissed as preempted by federal law.

3    **II.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE CAUSATION TO SUSTAIN
         THEIR FAILURE-TO-WARN THEORY.**

4

5    Plaintiffs' Failure to Warn claims (*Holley* Compl., Count II; *Dowdy* Compl., Count II)—and

6    each of their claims based on the same theory that Gilead failed to adequately warn about kidney and

7    bone risks and the need to "monitor" patients for these risks, *see, e.g., Holley* Compl. ¶¶ 431, 439,

8    444, 453, 459, 466, 484, 507, 526, 536; *Dowdy* Compl. ¶¶ 312, 329, 352, 371, 380—should be

9    dismissed for the additional reason that Plaintiffs fail to allege facts supporting any suggestion that

10   Gilead's purportedly insufficient warnings *caused* their injuries.

11   Each of Plaintiffs' failure to warn claims requires them to plead facts to "demonstrate a

12   causal link between the allegedly inadequate warning and the injury." *Barnhill v. Teva Pharms.*

13   *USA, Inc.*, 819 F. Supp. 2d 1254, 1261 (S.D. Ala. 2011).[11]  Moreover, under each state law at issue,

14

15   [11] A similar causation requirement exists under each state law that Plaintiffs invoke.  *See, e.g., Block
     v. Abbott Labs.*, No. 99-cv-7457, 2002 WL 485364, at *4 (N.D. Ill. Mar. 29, 2002) ("While failure-
16   to-warn law may vary from state to state, all states which recognize such a claim require, at a
     minimum, proof of causation and damages."); *D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d
17   880, 891 (D. Ariz. 2013) (plaintiffs must allege "that the medical outcome would have been different
     if different warnings had been provided to the physician, *i.e.*, that the provider would not have
18   recommended the product, or that the patient would not have suffered the injuries"); *Motus v. Pfizer,
     Inc.*, 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001) ("[a] plaintiff asserting causes of action based on a
19   failure to warn must prove not only that no warning was provided or the warning was inadequate,
     but also that the inadequacy or absence of the warning caused the plaintiff's injury"), *aff'd*, 358 F.3d
20   659, 661 (9th Cir. 2004); *Willett v. Baxter Int'l., Inc.*, 929 F.2d 1094, 1098–99 (5th Cir. 1991) ("the
     plaintiff must show that a proper warning would have changed the decision of the treating physician,
21   *i.e.* that but for the inadequate warning, the treating physician would not have used or prescribed the
     product"); *Colville v. Pharmacia & Upjohn Co LLC*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008)
22   (failure to warn claims require plaintiff to prove "that the inadequacy of the warnings proximately
     caused Plaintiff's injury"); *White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 435 (D. Md.
23   2000) ("An essential element of plaintiff's failure-to-warn claim is causation—plaintiffs must show
     that if an adequate warning had been given . . . , [he] would have heeded it, and his injury . . . would
24   have been avoided."); *Johnson v. Zimmer, Inc.*, No. 02-cv-1328, 2004 WL 742038, at *9 (D. Minn.
     Mar. 31, 2004) ("where an adequate warning could not have prevented a plaintiff's injuries,
25   causation does not exist as a matter of law"); *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th
     Cir. 2001) (under Oklahoma law, "the breach of a duty or failure to warn must be a substantial
26   contributing factor in bringing about the harm in question"); *Wilson v. Taser Int'l, Inc.*, No. 4:06-cv-
     0179, 2008 WL 11334209, at *3 (N.D. Ga. June 12, 2008) ("A plaintiff asserting a products liability
27   claim based on a failure to warn must establish that" the breach of a duty to warn "caused the
     plaintiff's injury"); *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 811 (E.D.
28   Wis. 2010) ("a plaintiff who has established both a duty and a failure to warn must also establish
     causation by showing that, if properly warned, he or she would have altered behavior and avoided

1   Gilead's duty is to adequately warn Plaintiffs' physicians, not Plaintiffs themselves.  *See, e.g. In re*

2   *Zyprexa Prods. Liab. Litig.*, 277 F.R.D. 243, 250 (E.D.N.Y. 2011) ("The learned intermediary

3   doctrine has been adopted by almost every state," and "[i]t is highly likely that the Rhode Island

4   Supreme Court will" adopt the doctrine) (internal quotation omitted).[12]  Thus, to adequately allege

5   causation, Plaintiffs must allege that their doctors would have acted differently (*i.e.*, not prescribed

6   the TDF medication(s)) had Gilead provided supposedly adequate warnings about the risks of those

7   medications.  *See, e.g., Byrd v. Janssen Pharm., Inc.*, 333 F. Supp. 3d 111, 126-27 (N.D.N.Y. 2018)

8   ("To prevail on a failure-to-warn claim involving prescription medications under New York law

9   where the warnings are directed to prescribing physicians, a plaintiff must prove that had a different,

10  more accurate warning[] been given, his physician would not have prescribed the drug in the same

11  manner.") (internal quotations omitted); *Lynch v. Olympus Am., Inc.*, No. 18-cv-512, 2018 WL

12  5619327, at *12 (D. Colo. Oct. 30, 2018) ("Plaintiff has not alleged that the failure to include

13  adequate warnings resulted in her injury because Plaintiff does not argue that adequate warnings

14  would have lead a reasonable doctor not to use the device in her case").

15       Here, Plaintiffs allege, as to their failure-to-warn theory, that if "Gilead adequately warned

16  and instructed Plaintiffs, Plaintiffs would have taken the TDF Drugs in a safer way," and "Plaintiffs'

17  properly warned physicians would have monitored Plaintiffs more frequently and more effectively,"

18  such that they "would have detected TDF toxicity earlier . . . ."  *Dowdy* Compl. ¶¶ 304, 306; *see also*

19  *id*. ¶¶ 338, 354 (similar); *Holley* Compl. ¶¶ 422, 493 (alleging that "Plaintiffs' properly warned

20  physicians would have monitored Plaintiffs differently").  First of all, as set forth above, Gilead had

21  no duty pursuant to the learned intermediary doctrine to "warn[] and instruct[] Plaintiffs."  *Holley*

22  Compl. ¶ 420; *Dowdy* Compl. ¶ 304.  In any event, Plaintiffs do not explain how they would have

23  taken these life-saving and fixed dose medications "in a safer way" (*Holley* Compl. ¶¶ 420, 509;

24

25  injury"); *King v. Danek Med., Inc.*, 37 S.W.3d 429, 453 (Tenn. Ct. App. 2000) (rejecting failure to
    warn claim for lack of causation, because plaintiffs "failed to establish that, had additional warnings

26  been given, the plaintiffs would not have sustained their injuries").

27  [12] *See also, e.g., Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 852 (10th Cir. 2003) ("Forty-four
    other jurisdictions have adopted the learned intermediary doctrine in prescription medicine cases");

28  *Vitanza v. Upjohn Co.*, 778 A.2d 829, 838 n.11 (Conn. 2001) (collecting cases).

-18-

*Dowdy* Compl. ¶¶ 304, 354), let alone how doing so would have prevented their injuries.  Nor do
Plaintiffs allege what it means to be monitored "differently" or "more effectively," or how being
monitored "differently," or "more frequently and more effectively" would have prevented their
injuries.  *Holley* Compl. ¶ 422; *Dowdy* Compl. ¶ 306.  To sufficiently do so, Plaintiffs would have
to allege that such "monitoring" would have prevented their doctors from prescribing the TDF
medication(s) that allegedly caused their injuries.  But the Complaints contain no such allegations.
Plaintiffs also fail to identify any alternative medication that they would have taken as a result of any
such "monitoring."  This is not a situation where Plaintiffs could plausibly allege that their
physicians would have prescribed ***nothing*** in place of TDF medications, and many Plaintiffs used
these medications before there were *any* FDA-approved alternatives containing TAF.  *See Holley*
Compl. ¶¶ 24-163, 196; *Dowdy* Compl. ¶¶ 23-47, 80 (alleging that many plaintiffs took TDF
medications between 2001 and 2015, before FDA approved the first TAF medication, Genvoya).

      Because Plaintiffs have failed to adequately allege causation, their claims premised on an
alleged failure to warn should be dismissed.  *See, e.g., Dunson v. Cordis Corp.*, No. 16-cv-3076,
2016 WL 3913666, *6 (N.D. Cal. July 20, 2016) (dismissing warning claim where plaintiffs "fail to
allege facts that each prescribing physician would have acted differently upon receipt of proper
warnings"); *Tapia v. Davol, Inc.*, 116 F. Supp. 3d 1149, 1158-59 (S.D. Cal. 2015) (dismissing
warning claim because plaintiff "failed to allege that if his prescribing physician had been warned,
then he would not have prescribed the Patch to Plaintiff"); *Markowitz v. Davol Inc.*, No. 15-cv-2418,
2015 WL 12696031, *4 (C.D. Cal. June 19, 2015) (dismissing warning claim because "Plaintiff fails
to sufficiently allege that his physicians would have altered their use of the Kugel Patch had [an]
adequate warning been provided"); *Lynch*, 2018 WL 5619327, at *12 (dismissing failure to warn
claims "because Plaintiff does not argue that adequate warnings would have lead a reasonable doctor
not to use the device in her case.").[13]

---

[13] *Lujano* is inapposite with regard to Plaintiffs' failure to sufficiently plead causation.  The court
there held that plaintiffs had sufficiently pled causation under more lenient *California* pleading
standards.  No. BC702302 at 7.  Here, however, under the authorities cited above, Plaintiffs have not
satisfied *federal* pleading standards regarding the causation element of their failure to warn claims.

**III.    GILEAD HAD NO DUTY TO INTRODUCE TAF-CONTAINING MEDICATIONS AT AN EARLIER DATE.**

As described above, several of Plaintiffs' claims are premised on the assertion that Gilead should have introduced TAF medications earlier, rather than seeking and obtaining FDA approval for its TDF medications.  For instance, Plaintiffs allege that "Gilead could have incorporated the safer TAF design, which it knew reduces the risks of kidney and bone toxicity and is safer than TDF, into the TDF Drugs before they were approved by the FDA," and "[a] drug product containing TAF could have and would have been FDA approved and on the market years earlier . . . if Gilead had not purposefully shelved the TAF design . . . ."  *Holley* Compl. ¶¶ 397-98; *Dowdy* Compl. ¶¶ 281-82; *see also, e.g., Holley* Compl. ¶ 483; *Dowdy* Compl. ¶ 328 (alleging in negligence claims that "[b]y shelving the safer TAF design . . . , Gilead failed to exercise reasonable care"), *Holley* Compl. ¶ 505; *Dowdy* Compl. ¶ 350 (alleging in fraud claim that "Gilead purposefully withheld the TAF design"), *Holley* Compl. ¶ 535; *Dowdy* Compl. ¶ 380 (alleging in state consumer protection law claims that Gilead "withheld the safer [TAF] design").[14]

But even if, as Plaintiffs allege, Gilead "***could*** have incorporated" TAF into its "TDF Drugs," Holley Compl. ¶ 397; *Dowdy* Compl. ¶ 281 (emphasis added), it had no legal duty or obligation to do so.  Indeed, in *AIDS Healthcare Foundation*, the court addressed strikingly similar allegations "that Gilead knew of the efficacy and safety benefits of TAF in 2004 but shelved its clinical trials until 2011, leading to FDA approval . . . in 2015, just before the patents on TDF were set to expire," which "left consumers to bear the higher bone and kidney toxicity of TDF longer than necessary." 2016 WL 3648623, at *9.  Dismissing plaintiff's Unfair Competition Law ("UCL") claim, the court recognized that plaintiff "fails to explain how this 'delay' constituted *unfair competition*.  Gilead's patents gave it a monopoly over both TDF and TAF.  ***It had no obligation to introduce the improved product at an earlier date***.  Any competitor could have beaten Gilead to market . . . ."  *Id.*

[14] *See also, e.g., Holley* Compl. ¶ 11; Dowdy Compl. ¶ 11 (alleging that Gilead "could have and should have incorporated [TAF] into its prior product designs"), *Holley* Compl. ¶ 17; *Dowdy* Compl. ¶ 17 (alleging that "Gilead intentionally withheld a safer alternative design of TDF Drugs"), *Holley* Compl. ¶ 254; *Dowdy* Compl. ¶ 138 (alleging that Gilead withheld TAF medications "despite recognizing the safety benefits"), *Holley* Compl. ¶¶ 270, 278; *Dowdy* Compl. ¶¶ 154, 162 (similar), *Holley* Compl. ¶ 279; *Dowdy* Compl. ¶ 163 ("Gilead designed the TDF Drugs to contain TDF rather than safer TAF").

(emphasis added).  Accordingly, Gilead could not be held liable under the UCL for "allegedly delaying the release of TAF . . . ." *Id.*

The court's reasoning is equally applicable to each of Plaintiffs' claims here (including their UCL and other state consumer protection law claims) that are premised on this same rejected theory that Gilead had a legal obligation to introduce TAF "at an earlier date."  *AIDS Healthcare Foundation*, 2016 WL 3648623, at *9.  Simply stated, Gilead "had no obligation to" do so, *id.*, and its alleged failure to obtain FDA approval and release medications in the timeframe that Plaintiffs now demand cannot support a cause of action.

## IV.   PLAINTIFFS FAIL TO PLEAD THEIR FRAUD AND CONSUMER PROTECTION LAW CLAIMS WITH THE REQUISITE LEVEL OF PARTICULARITY.

Plaintiffs' claims for Fraud by Omission (*Holley* Compl., Count X; *Dowdy* Compl., Count V) and alleged Violations of State Consumer Protection Laws (*Holley* Compl., Count XII; *Dowdy* Compl., Count VII) also should be dismissed because they are not pled with the level of particularity required by Rule 9(b).  Specifically, where consumer protection law claims sound in fraud, plaintiffs must satisfy Rule 9(b).  *See, e.g., Kearns*, 567 F.3d at 1125 (applying Rule 9(b) to consumer protection law claims, and recognizing that "[w]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of" California consumer protection laws); *In re Hydroxycut Mktg. & sales Practices Litig.*, 801 F. Supp. 2d 993, 1005 (S.D. Cal. 2011) (applying Rule 9(b) to several state consumer protection law claims, because they were grounded in fraud).  Likewise, fraud by omission claims are subject to Rule 9(b).  *See, e.g., Kearns*, 567 F.3d at 1127 ("Because the Supreme Court of California has held that nondisclosure is a claim for misrepresentation in a cause of action for fraud, it (as any other fraud claim) must be pleaded with particularity under Rule 9(b)."); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 935 (N.D. Cal. 2013) ("Although Plaintiffs' allegations do allege a fraud based in part on omissions, a plaintiff must still plead such claim with particularity"); *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009) ("The Ninth Circuit has recently clarified that claims of nondisclosure and omission, as varieties of misrepresentations, are subject to the pleading standards of Rule 9(b)").

Here, Plaintiffs assert Fraud by Omission based on allegations that Gilead "actively

-21-

concealed material information about TDF and TAF from Plaintiffs and Plaintiffs' physicians," and made affirmative "misrepresent[ations]" about TDF and TAF. *Holley* Compl. ¶¶ 505, 511; *Dowdy* Compl. ¶¶ 350, 356. Similarly, Plaintiffs base their state consumer protection law claims on allegations that "Gilead intentionally misrepresented material facts in its promotional, marketing, and labeling communications about the risks and benefits of the TDF Drugs to Plaintiffs and Plaintiffs' doctors," and that "Gilead intended that others rely on its deceptive and misleading omissions and misrepresentations regarding its TDF Drugs." *Holley* Compl. ¶¶ 536, 540; *Dowdy* Compl. ¶¶ 381, 385. Accordingly, these claims sound in fraud, and pursuant to Rule 9(b), must be supported by factual allegations setting forth "'the who, what, when, where, and how' of the misconduct charged." *Kearns*, 567 F.3d at 1124; *see also, e.g.*, *Andren v. Alere, Inc.*, 207 F. Supp. 3d 1133, 1140 (S.D. Cal. 2016) (applying Rule 9(b) to consumer protection "causes of action [that] are premised on material misrepresentations and fraudulent omissions"). Plaintiffs must individually allege, for instance, what specific misrepresentations were made to each of them and their doctors, and when they were exposed to any such misrepresentations. Indeed, "conclusory allegation that they 'were exposed to and saw defendant's material, deceptive marketing claims and packaging' . . . are not sufficiently particular" to satisfy Rule 9(b). *In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-cv-428, 2014 WL 12586074, at *10 (C.D. Cal. Oct. 20, 2014).

Far from satisfying their pleading burden, Plaintiffs' Complaints contain only boilerplate and collective assertions that "Plaintiffs and their doctors justifiably relied on Gilead's omissions," *Holley* Compl. ¶¶ 508, 514; *Dowdy* Compl. ¶¶ 353, 359, "Gilead's misrepresentations and omissions were material and affected Plaintiffs' and Plaintiffs' doctors' conduct," *Holley* Compl. ¶ 539; *Dowdy* Compl. ¶ 384, and "Plaintiffs and their doctors reasonably relied on Gilead's deceptive and misleading omissions and misrepresentations regarding its TDF Drugs," *Holley* Compl. ¶ 541; *Dowdy* Compl. ¶ 386. ***None*** of the 165 Plaintiffs alleges, for instance, what particular "promotional, marketing, and labeling communications" he or she or his or her doctors were exposed to, *see Holley* Compl. ¶ 536; *Dowdy* Compl. ¶ 381, when any such exposure occurred, the manner in which any "Plaintiffs' and Plaintiffs' doctors' conduct" was affected, *Holley* Compl. ¶ 539; *Dowdy* Compl. ¶

384, or any facts supporting their generalized allegations regarding reliance and materiality.[15]

Accordingly, Plaintiffs have not met their burden to "plead with particularity, *and separately*, when and how each named plaintiff was exposed to" the alleged misrepresentations.  *Opperman v. Path, Inc.,* 87 F. Supp. 3d 1018, 1050 (N.D. Cal. 2014) (emphasis in original).  "It is not sufficient to plead as a group, nor is it sufficient to simply allege general exposure without more detail."  *Id.*

Plaintiffs' Fraud by Omission and Consumer Protection Law claims should therefore be dismissed for failure to satisfy Rule 9(b).  *See, e.g., In re Actimmune Mktg. Litig.*, No. 08-cv-2376, 2009 WL 3740648, at *11 (N.D. Cal. Nov. 6, 2009) (plaintiffs failed to meet Rule 9(b) pleading requirements where "neither individual alleges with any degree of specificity that they or their doctors ever were actually the recipient of any of defendants' fraudulent misrepresentations"), *aff'd*, 464 F. App'x 651 (9th Cir. 2011); *Patton*, 2018 U.S. Dist. LEXIS 160368, *23-28 (dismissing consumer protection claim with prejudice under Rule 9(b) because plaintiffs failed to allege "specific content of [purportedly fraudulent] statements, allege when or how such statements were made, allege specifically who heard or saw the statements, or offer an acceptable reason why the statements were fraudulent"); *Patterson v. Bayer Healthcare Pharms., Inc.*, No. 1:14-cv-1087, 2015 WL 778997, at *13 (E.D. Cal. Feb. 24, 2015) (dismissing fraud based claims despite allegations that defendant's "label fail[s] to warn about" product risks, because "[a]bsent from these otherwise sufficient factual allegations is where or when [plaintiff] was exposed to the Booklet or other materials"); *Beavers-Gabriel v. Medtronic, Inc.*, 15 F. Supp. 3d 1021, 1038 (D. Haw. 2014)

---

[15] Plaintiffs' Complaints also lack basic information such as when they each suffered their injuries, why they were each taking the medication (*i.e.*, HIV treatment or prevention, or Hepatitis B), and in several instances, when they stopped using the medications at issue.  *See Holley* Compl. ¶¶ 24-163; *Dowdy* Compl. ¶¶ 23-47.  In addition to failing to meet federal pleading requirements, these shortcomings make it impossible to assess additional defenses, including a determination as to whether some or all of Plaintiffs' claims are time-barred.  Thus, if Plaintiffs' Complaints are not dismissed with prejudice, the Court should require that Plaintiffs submit a more definite statement providing such details pursuant to Federal Rule 12(e).  *See, e.g., Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010) ("requir[ing] the plaintiff to provide a more definite statement under Fed. R. Civ. P. 12(e)" may be warranted where "a specific date [omitted from the complaint] could support a dispositive defense motion"); *Germany v. Javitch, Block & Rathbone L.L.P.*, No. 05-cv-191, 2005 WL 2008489, at *2 (S.D. Ohio Aug. 22, 2005) (granting Rule 12(e) motion for more definite statement where "Plaintiffs' Complaint . . . fails to specify when the purported telephone calls took place, thereby preventing the Defendants from asserting, and the Court from considering, the [cause of action's] statute of limitations").

1   ("Missing from the Complaint . . . is the connection between Defendants' alleged misdeeds and

2   Plaintiff and Plaintiff's physicians—*i.e.*, that Plaintiff and Plaintiff's physicians relied on these

3   misrepresentations.  Although the Complaint generally asserts that 'Plaintiff and Plaintiff's

4   physicians . . . [relied] on Medtronic's concealment of information and misrepresentations about the

5   safety risks related to [the device] in deciding to use [the device] . . . , the Complaint fails to identify

6   what particular misrepresentations and/or concealments were made to Plaintiff and Plaintiff's

7   physicians (as opposed to the medical field generally), who made those particular representations

8   and/or omissions, and when those events occurred.").

9                                        **CONCLUSION**

10          For the foregoing reasons, Gilead's Consolidated Motion to Dismiss should be granted in its

11   entirety.

12   Dated: February 27, 2019                      SIDLEY AUSTIN LLP

13                                    By:    */s/ Joshua Anderson*
14                                           Debra E. Pole (Bar No. 97816)
                                             dpole@sidley.com
15                                           Joshua Anderson (Bar No. 211320)
                                             janderson@sidley.com
16                                           Alycia A. Degen (Bar No. 211350)
                                             adegen@sidley.com
17                                           SIDLEY AUSTIN LLP
                                             555 West Fifth Street
18                                           Los Angeles, CA 90013
                                             Telephone: (213) 896-6000
19                                           Facsimile: (213) 896-6600
20
                                             Daniel A. Spira (*admitted pro hac vice*)
21                                           dspira@sidley.com
                                             SIDLEY AUSTIN LLP
22                                           One South Dearborn
                                             Chicago, IL 60603
23                                           Telephone:  312.853.7000
24                                           Inn-Young Park (Bar No. 324129)
                                             ipark@sidley.com
25                                           SIDLEY AUSTIN LLP
                                             555 California St., Suite 2000
26                                           San Francisco, CA 94104
                                             Telephone: 415.772.1200
27
                                             *Attorneys for Defendant Gilead Sciences, Inc.*
28

                                        -24-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2019, I electronically filed the foregoing with the Court using the CM/ECF system, and thereby delivered the foregoing by electronic means to all counsel of record.

*/s/ Joshua Anderson*

Counsel for Defendant Gilead Sciences, Inc.