1

Steve W. Berman (*pro hac vice*)
Anne F. Johnson (*pro hac vice*)

2

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000

3

Seattle, WA 98101
Telephone: (206) 623-7292

4

Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com

5

E-mail: annej@hbsslaw.com

6

Robert C. Hilliard (*pro hac vice*)
Katrina R. Ashley (*pro hac vice*)

7

HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.

8

Corpus Christi, TX 78401
Telephone: (361) 882-1612

9

Facsimile: (361) 882-3015
E-mail: bobh@hmglawfirm.com

10

E-mail: kashley@hmglawfirm.com

11

*Attorneys for Plaintiffs*
[Additional Counsel on Signature Page]

12

13

## UNITED STATES DISTRICT COURT

14

## NORTHERN DISTRICT OF CALIFORNIA

15

ADRIAN HOLLEY, et al.,

No. 3:18-cv-06972-JST

16

Plaintiffs,

17

v.

**PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD SCIENCES, INC.'S MOTION TO DISMISS COMPLAINT**

18

GILEAD SCIENCES, INC.,

19

Defendant.

Judge:   Hon. Jon S. Tigar
Date:    May 9, 2019

20

Time:    2:00 p.m.
Dep't:   Courtroom 9, 19th Floor

21

22

CHARANDA DOWDY, et al.,

No. 3:19-cv-00481-JST

23

Plaintiffs,

**PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD SCIENCES, INC.'S MOTION TO DISMISS COMPLAINT**

24

v.

25

GILEAD SCIENCES, INC.,

Defendant.

Judge:   Hon. Jon S. Tigar
Date:    May 9, 2019

26

Time:    2:00 p.m.
Dep't:   Courtroom 9, 19th Floor

27

28

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1

**TABLE OF CONTENTS**

2

**Page**

3   I.    INTRODUCTION ...................................................................................................1

4   II.   FACTUAL ALLEGATIONS ...............................................................................2

5         A.    Gilead intentionally designed the TDF Drugs to be unreasonably dangerous. ..........2

6         B.    Gilead failed to adequately warn about the risks and safe use of TDF. ......................3

7   III.  LEGAL STANDARD ...........................................................................................5

8   IV.   PLAINTIFFS' CLAIMS ARE NOT PREEMPTED .............................................6

9         A.    Plaintiffs' design defect claims are not preempted....................................................6

10              1.    The Court should adopt the reasoning of Plaintiffs' cases and rule that Plaintiffs' design defect claims are not preempted.........................................7

11
12                    a.    Plaintiffs' cases recognize the different federal duties applicable to brand and generic drugs. .................................................7

13                    b.    Plaintiffs' cases recognize that no federal law prevents a brand drug manufacturer from making a safer product before FDA
14                          approval. ..........................................................................................9

15                    c.    Plaintiffs' cases recognize that Congress did not intend to insulate brand drug manufacturers from state tort liability. ..............10

16
17              2.    The Court should reject Gilead's poorly reasoned, non-binding cases. .........11

          B.    Plaintiffs' failure to warn claims are not preempted. .................................................13

18
19  V.    GILEAD HAS A DUTY TO USE SAFER ALTERNATIVE DESIGNS ...........................17

20  VI.   GILEAD'S CAUSATION ARGUMENT SHOULD BE REJECTED ................................19

21  VII.  PLAINTIFFS' FRAUD AND CONSUMER PROTECTION CLAIMS ARE PROPERLY PLED............................................................................................20

22  VIII. GILEAD'S REQUEST FOR A MORE DEFINITIVE STATEMENT SHOULD BE
23        DENIED ..............................................................................................................25

24  IX.   CONCLUSION ...................................................................................................25

25

26

27

28

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – i
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*In re Actimmune Mktg. Litig.*,
   No. 08-cv-02376, 2009 U.S. Dist. LEXIS 103408 (N.D. Cal. Nov. 6, 2009) ............................ 24

5

6

*In re Actos (Pioglitazone) Prods. Liab. Litig.*,
   No. 6:11-md-2299, 2014 U.S. Dist. LEXIS 1749 (W.D. La. Jan. 7, 2014) ........................... 15, 16

7

8

*AIDS Healthcare Foundation, Inc. v. Gilead Sciences, Inc.*,
   No. 16-cv-443-WHA, 2016 U.S. Dist. LEXIS 87578 (N.D. Cal. July 6, 2016) ........... 1, 17, 18, 21

9

*Andren v. Alere, Inc.*,
   207 F. Supp. 3d 1133 (S.D. Cal. 2016) ......................................................................... 24

10

11

*In re Aredia & Zometa Prods. Liab. Litig.*,
   No. 3:06-md-1760, 2010 U.S. Dist. LEXIS 129379 (M.D. Tenn. Dec. 7, 2010) ....................... 20

12

*Aston v. Johnson & Johnson*,
   248 F. Supp. 3d 43 (D.D.C. 2017) ................................................................................ 13

13

14

*Barnhill v. Teva Pharms. USA, Inc.*,
   819 F. Supp. 2d 1254 (S.D. Ala. 2011) ........................................................................ 20

15

16

*Batoh v. McNeil-PPC, Inc.*,
   167 F. Supp. 3d 296 (D. Conn. 2016) ........................................................................... 9

17

*Beavers-Gabriel v. Medtronic, Inc.*,
   15 F. Supp. 3d 1021 (D. Haw. 2014) ............................................................................ 24

18

19

*Brazil v. Janssen Research & Dev. LLC*,
   249 F. Supp. 3d 1321 (N.D. Ga. 2016) ....................................................................... 9, 11

20

21

*Brown v. Johnson & Johnson*,
   64 F. Supp. 3d 717 (E.D. Pa. 2014) ...................................................................... 9, 12, 18

22

*Bryde v. Gen. Motors, LLC*,
   No. 16-cv-02421, 2016 U.S. Dist. LEXIS 159707 (N.D. Cal. Nov. 17, 2016) ............................ 23

23

24

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ........................................................................................... 16, 17

25

26

*Caraker v. Sandoz Pharms. Corp.*,
   172 F. Supp. 2d 1018 (S.D. Ill. 2001) ....................................................................... 15, 16

27

*Estate of Cassel v. ALZA Corp.*,
   No. 12-cv-00771, 2014 U.S. Dist. LEXIS 27924 (W.D. Wis. Mar. 5, 2014) ....................... *passim*

28

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD    Case Nos. 3:18-cv-06972-JST
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – ii    & 3:19-cv-00481-JST
010759-11/1109132 V2

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
   779 F.3d 34 (1st Cir. 2015) ....................................................................... 16

*Chavez v. Whirlpool Corp.*,
   113 Cal. Rptr. 2d 175 (Cal. Ct. App. 2001).................................................. 18

*City of Charleston v. Hotels.com, LP*,
   487 F. Supp. 2d 676 (D.S.C. 2007) ............................................................. 22

*Connick v. Suzuki Motor Co.*,
   675 N.E.2d 584 (Ill. 1996).......................................................................... 21

*D'Agnese v. Novartis Pharms. Corp.*,
   952 F. Supp. 2d 880 (D. Ariz. 2013) .......................................................... 20

*Delahunt v. Cytodyne Techs.*,
   241 F. Supp. 2d 827 (S.D. Ohio 2003)........................................................ 22

*DiBartolo v. Abbott Labs.*,
   914 F. Supp. 2d 601 (S.D.N.Y. 2012) ........................................................ 20

*Edenborough v. ADT, LLC*,
   No. 16-cv-02233, 2016 U.S. Dist. LEXIS 147106 (N.D. Cal. Oct. 24, 2016)
   (Tigar, J.) ....................................................................................... 21, 22, 23

*Finney v. Ford Motor Co.*,
   No. 17-cv-06183-JST, 2018 U.S. Dist. LEXIS 93823 (N.D. Cal. June 4, 2018)
   (Tigar, J.) ................................................................................................... 23

*Fleming v. Janssen Pharms., Inc.*,
   186 F. Supp. 3d 826 (W.D. Tenn. 2016) .................................................... 13

*Georges v. Novartis Pharms. Corp.*,
   No. 06-cv-5207, 2012 U.S. Dist. LEXIS 189174 (C.D. Cal. Nov. 2, 2012) ................. 19

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
   621 N.W.2d 2 (Minn. 2001)........................................................................ 21

*Guidry v. Janssen Pharms., Inc.*,
   206 F. Supp. 3d 1187 (E.D. La. 2016) ............................................... *passim*

*Gustavsen v. Alcon Labs., Inc.*,
   903 F.3d 1 (1st Cir. 2018) .......................................................................... 13

*Hall v. Walter*,
   969 P.2d 224 (Colo. 1998) (en banc) ......................................................... 21

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD     Case Nos. 3:18-cv-06972-JST
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – iii     & 3:19-cv-00481-JST
010759-11/1109132 V2

*Haskins v. Symantec Corp.*,
   No. 13-cv-01834, 2013 U.S. Dist. LEXIS 169865 (N.D. Cal. Dec. 1, 2013) (Tigar, J.) ................................................................................................................... 21, 24

*Hess v. Chase Manhattan Bank, USA, N.A.*,
   220 S.W.3d 758 (Mo. 2007) (en banc) ................................................... 22

*In re Hester*,
   Nos. 11-04375-8, 15-00001-8, 2015 Bankr. LEXIS 3508 (Bankr. E.D.N.C. Oct. 16, 2015)............................................................................................ 22

*Hunt v. McNeil Consumer Healthcare*,
   297 F.R.D. 268 (E.D. La. 2014) ................................................... 12

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
   721 F. App'x 580 (9th Cir. 2017)................................................... 16

*Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*,
   929 A.2d 1076 (N.J. 2007) ................................................... 22

*Jones v. Lederle Labs., Div. of Am. Cyanamid Co.*,
   695 F. Supp. 700 (E.D.N.Y. 1988) ................................................... 12

*Kentwool Co. v. NetSuite Inc.*,
   No. 14-cv-05264, 2015 U.S. Dist. LEXIS 19982 (N.D. Cal. Feb. 18, 2015) (Tigar, J.) ................................................................................................................... 24

*Long v. Dell, Inc.*,
   93 A.3d 988 (R.I. 2014)................................................... 22

*Lujano, et al. v. Gilead Sciences, Inc.*,
   No. BC702302 (Cal. Super. Ct. Feb. 13, 2019)................................................... passim

*MacDonald v. Ford Motor Co.*,
   37 F. Supp. 3d 1087 (N.D. Cal. 2014) (Tigar, J.)................................ 5, 19, 22, 23

*Maestas v. Wal-Mart Stores, Inc.*,
   No. 2:16-cv-02597, 2018 U.S. Dist. LEXIS 52338 (E.D. Cal. Mar. 28, 2018) ................. 21

*McClellan v. I-Flow Corp.*,
   776 F.3d 1035 (9th Cir. 2015) ................................................... 16, 17

*McGee v. Boehringer Ingelheim Pharms., Inc.*,
   No. 4:16-cv-2082, 2018 U.S. Dist. LEXIS 45316 (N.D. Ala. Mar. 20, 2018)................. 17

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ................................................... 16

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – iv
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

*Mut. Pharm. Co. v. Bartlett,*
    570 U.S. 472 (2013) ................................................................................................... *passim*

*Newman v. McNeil Consumer Healthcare,*
    No. 10-cv-01541, 2012 U.S. Dist. LEXIS 2153 (N.D. Ill. Jan. 9, 2012) ...................................... 14

*In re NJOY, Inc. Consumer Class Action Litig.,*
    No. 14-00428, 2014 U.S. Dist. LEXIS 199368 (C.D. Cal. Oct. 20, 2014) .................................. 24

*Novell v. Migliaccio,*
    749 N.W.2d 544 (Wis. 2008) ........................................................................................... 22

*Opperman v. Path, Inc.,*
    87 F. Supp. 3d 1018 (N.D. Cal. 2014) (Tigar, J.) ......................................................................... 24

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.,*
    No. 16-cv-01393-JST, 2016 U.S. Dist. LEXIS 96122 (July 15, 2016) (Tigar, J) ...................... 25

*Osorio v. Tran,*
    No. 08-cv-4007, 2008 U.S. Dist. LEXIS 94640 (N.D. Cal. Nov. 18, 2008) ................................ 25

*Patterson v. Bayer Healthcare Pharms., Inc.,*
    No. 14-cv-01087, 2015 U.S. Dist. LEXIS 22163 (E.D. Cal. Feb. 24, 2015) .............................. 24

*Patton v. Forest Labs., Inc.,*
    No. 17-cv-00922, 2018 U.S. Dist. LEXIS 160368 (C.D. Cal. Sept. 19, 2018)...................... 16, 24

*Perez v. Nidek Co.,*
    711 F.3d 1109 (9th Cir. 2013) ....................................................................................... 16

*PLIVA, Inc. v. Mensing,*
    564 U.S. 604 (2011) ......................................................................................... 7, 8, 11, 12

*Saavedra v. Eli Lilly & Co.,*
    No. 2:12-cv-9366, 2013 U.S. Dist. LEXIS 173055 (C.D. Cal. Feb. 26, 2013) ........................... 16

*Sanders v. Francis,*
    561 P.2d 1003 (Or. 1977) ............................................................................................... 22

*In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig.,*
    288 F. Supp. 3d 1087 (D.N.M. 2017) .............................................................................. 22

*Santana Row Hotel Partners, LP v. Zurich Am. Ins. Co.,*
    No. C 05-00198 JW, 2007 U.S. Dist. LEXIS 96096 (N.D. Cal. Sept. 13, 2007)......................... 23

*Silkwood v. Kerr-McGee Corp.,*
    464 U.S. 238 (1984) ....................................................................................................... 16

*Small v. Amgen, Inc.,*
    No. 2:12-cv-476, 2016 U.S. Dist. LEXIS 188813 (M.D. Fla. Jan. 25, 2016) .............................. 13

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD    Case Nos. 3:18-cv-06972-JST
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – v    & 3:19-cv-00481-JST
010759-11/1109132 V2

*Small v. Lorillard Tobacco Co.*,
   720 N.E.2d 892 (N.Y. 1999) ........................................................................... 22

*Stengel v. Medtronic, Inc.*,
   704 F.3d 1224 (9th Cir. 2013) ........................................................................ 6

*Stephenson v. Capano Dev., Inc.*,
   462 A.2d 1069 (Del. 1983) ............................................................................. 21

*Sullivan v. Aventis, Inc.*,
   No. 14-cv-2939, 2015 U.S. Dist. LEXIS 107360 (S.D.N.Y. Aug. 12, 2015) ...................... 8, 9, 18

*Trejo v. Johnson & Johnson*,
   13 Cal. App. 5th 110 (2017) ........................................................................... 13

*Tucker v. Wright Med. Tech., Inc.*,
   No. 11-cv-03086-YGR, 2013 U.S. Dist. LEXIS 38354 (N.D. Cal. Mar. 19, 2013) .................... 18

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*,
   No. 2:13-md-02436, 2015 U.S. Dist. LEXIS 153972 (E.D. Pa. Nov. 13, 2015) ............... 9, 12, 18

*Utts v. Bristol-Myers Squibb Co.*,
   226 F. Supp. 3d 166 (S.D.N.Y. 2016) .............................................................. 13, 17

*Wendell v. GlaxoSmithKline LLC*,
   858 F.3d 1227 (9th Cir. 2017) ........................................................................ 20

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ............................................................................ *passim*

*In re Xarelto Rivaroxaban Prods. Liab. Litig.*,
   MDL No. 2592, 2017 U.S. Dist. LEXIS 114338 (E.D. La. July 21, 2017) ................. 8, 9, 10, 14

*In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*,
   MDL No. 2592, 2017 U.S. Dist. LEXIS 58056 (E.D. La. Apr. 17, 2017) ............................ 19

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*,
   808 F.3d 281 (6th Cir. 2015) ................................................................... *passim*

*Young v. Bristol-Myers Squibb Co.*,
   No. 4:16-cv-00108, 2017 U.S. Dist. LEXIS 24730 (N.D. Miss. Feb. 22, 2017) ............ 8, 9, 13, 18

*In re Zyprexa Prods. Liab. Litig.*,
   No. 04-md-1596, 2009 U.S. Dist. LEXIS 65634 (E.D.N.Y. July 22, 2009) .......................... 20

### STATUTES

15 Okla. Stat. § 751 ..................................................................................... 22

Ala. Code § 8-19-10 .................................................................................... 21

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – vi
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1

**OTHER AUTHORITIES**

2

Fed. R. Civ. P. 9(b).................................................................................................................................. 22

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.  INTRODUCTION

2   This case is about Gilead's decision to purposefully withhold safer versions of its HIV drugs

3   Viread, Truvada, Atripla, Complera, and Stribild (collectively, "TDF Drugs"), while failing to

4   adequately warn about the risks and safe use of those same defective drugs, so that Gilead could

5   make more money. Gilead's motion to dismiss[1] Plaintiffs' personal injury claims arising from

6   Gilead's callous, willful actions should be denied in all respects.

7   *First*, Gilead cannot hide behind federal preemption. When designing its HIV drugs, Gilead

8   had a choice between two versions of the active ingredient tenofovir: it could choose tenofovir

9   disoproxil fumarate ("TDF"), which it knew to be toxic to patients' kidneys and bones, or it could

10   choose safer tenofovir alafenamide fumarate ("TAF"). Because no federal law prevented Gilead from

11   designing its TDF Drugs to be safer before U.S. Food and Drug Administration ("FDA") approval,

12   Plaintiffs' design defect claims are not preempted. *See, e.g.*, Ex. 1, *Lujano, et al. v. Gilead Sciences,*

13   *Inc.*, No. BC702302 (Cal. Super. Ct. Feb. 13, 2019) ("*Lujano* Order"), at 2–4.[2] Similarly, no federal

14   law prevented Gilead from providing stronger warnings about the risks and safe use of the TDF

15   Drugs in the drugs' labels—either before or after FDA approval. Plaintiffs' failure to warn claims

16   fall squarely within *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), and are not preempted.

17   *Second*, Gilead has a duty under state tort law to use safer alternative designs that will reduce

18   the foreseeable risk of harm. Gilead is not insulated from liability in these state-law tort actions for

19   personal injury damages merely because *AIDS Healthcare Foundation, Inc. v. Gilead Sciences, Inc.*,

20   No. 16-cv-443-WHA, 2016 U.S. Dist. LEXIS 87578 (N.D. Cal. July 6, 2016), held that Gilead's

21   alleged anticompetitive conduct did not injure competition.

22   *Third*, Plaintiffs have plausibly alleged that Gilead's failure to warn proximately caused their

23   injuries. Plaintiffs allege that had adequate warnings and instructions been given, Plaintiffs' doctors

24   would have heeded them and detected TDF toxicity earlier, thus preventing or lessening Plaintiffs'

25

26   [1] Gilead Sciences, Inc.'s Consolidated Notice of Motion and Motion to Dismiss; Memorandum of Points and Authorities ("Mot."). *Holley* ECF No. 45; *Dowdy* ECF No. 30.

27   [2] All exhibits referenced herein are attached to the Declaration of Steve W. Berman in Support of

28   Plaintiffs' Revised Opposition to Motion to Dismiss, filed concurrently herewith.

1     injuries. Gilead's argument is premised on requiring Plaintiffs to meet a standard that Gilead's own

2     cases establish Plaintiffs need not meet.

3           *Finally*, Plaintiffs have sufficiently pled their fraud by omission and consumer protection

4     claims. Plaintiffs' challenge to Gilead's "unfair" conduct is not subject to Federal Rule of Civil

5     Procedure 9(b); the particularity requirement of Rule 9(b) is relaxed in omission cases; and reliance

6     is not an element of the vast majority of Plaintiffs' consumer protection claims.

7           Accordingly, and for the reasons explained further below, Gilead's motion should be denied.

## II.     FACTUAL ALLEGATIONS

**A.      Gilead intentionally designed the TDF Drugs to be unreasonably dangerous.**

10          Before Gilead began selling its first TDF Drug, Viread, in 2001, it knew that TDF could

11    damage patients' kidneys and bones. *Holley* ¶¶ 5, 200–212; *Dowdy* ¶¶ 5, 84–96.[3] Gilead's

12    knowledge of TDF's toxic effects grew rapidly as patients began taking and were injured by each

13    successive TDF Drug. *Holley* ¶¶ 6, 213–230; *Dowdy* ¶¶ 6, 97–114. Gilead knew that the most

14    common serious adverse events associated with TDF—meaning side effects leading to

15    hospitalization, death, or disability—were renal events that damaged patients' kidneys. *Holley* ¶ 221;

16    *Dowdy* ¶ 105.

17          Gilead also knew, before it began selling each of the TDF Drugs, that it had discovered TAF,

18    a safer design for delivering the active ingredient tenofovir into the body. *Holley* ¶¶ 7, 237–267;

19    *Dowdy* ¶¶ 7, 121–151. TAF, which John Milligan, Gilead's former President and Chief Executive

20    Officer, called the "kinder, gentler version of Viread" (*Holley* ¶¶ 260–261; *Dowdy* ¶¶ 144–145), is

21    safer because it can be given at a dramatically lower dose than TDF while being just as effective.

22    *Holley* ¶¶ 7, 195, 237–241; *Dowdy* ¶¶ 7, 121–125. A lower dose means less toxicity and fewer side

23    effects. *Holley* ¶¶ 7, 195, 237–241, 246, 258, 261, 277, 298, 300.[4] Yet Gilead repeatedly designed its

24    HIV drugs to contain TDF rather than safer TAF. *Holley* ¶¶ 7, 230; *Dowdy* ¶¶ 7, 114.

25

26

27          [3] All "*Holley* ¶" references are to the *Holley* Complaint, ECF No. 1 (Nov. 16, 2018), and all
      "*Dowdy* ¶" references are to the *Dowdy* Complaint, ECF No. 1 (Jan. 28, 2019).

28          [4] *See also Dowdy* ¶¶ 7, 79, 121–125, 130, 142, 145, 161, 182, 184.

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 2
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

Gilead abruptly shelved its TAF design in 2004, falsely claiming in public that TAF was no better than TDF. *Holley* ¶¶ 8, 249–250; *Dowdy* ¶¶ 8, 133–134. But Milligan later admitted that the real reason Gilead withheld the safer TAF design was because it did not want to hurt TDF sales by admitting that TDF was not the "miracle drug" Gilead claimed it was. *Holley* ¶¶ 8–9, 259; *Dowdy* ¶¶ 8–9, 143. Gilead also knew that by strategically delaying TAF, it could make billions two times over: first with TDF, and then with TAF, which enjoys longer protection from generic competition. *Holley* ¶¶ 10, 275–278; *Dowdy* ¶¶ 10, 159–162.

Once it had made billions from the TDF Drugs, Gilead simply replaced TDF with TAF. *Holley* ¶¶ 10, 196–198; *Dowdy* ¶¶ 10, 80–82. Gilead obtained FDA approval of the TAF Drugs, and convinced doctors to switch patients from TDF to TAF, by demonstrating TAF's superior safety over TDF with respect to kidney and bone toxicity—the very benefits that Gilead could have and should have incorporated into its prior product designs but withheld from patients for over a decade. *Holley* ¶¶ 11, 296–305, 315–317; *Dowdy* ¶¶ 180–189, 199–200. Gilead markets its TAF Drugs as superior to TDF because TAF is safer for kidneys and bones. *Holley* ¶¶ 306–318; *Dowdy* ¶¶ 190–202.

Gilead also designed Stribild to be even more dangerous when it did not reduce the dose of TDF when combining TDF with cobicistat, despite knowing that the interaction between tenofovir and cobicistat increases the danger to patients. *Holley* ¶¶ 13, 289–295; *Dowdy* ¶¶ 13, 173–179. When Gilead developed its first TAF Drug, Genvoya—which is Stribild with TAF in place of TDF— Gilead reduced the TAF dose to adjust for the danger of this drug interaction. *Holley* ¶¶ 14, 285; *Dowdy* ¶¶ 14, 169. But Gilead did not reduce the TDF dose in Stribild even though it reduced the TAF dose in Genvoya and had received FDA approval for other reduced-dose TDF products before it sought FDA approval for Stribild. *Holley* ¶¶ 286–288; *Dowdy* ¶¶ 170–172.

Gilead could have adopted the safer alternative designs before the FDA approved the TDF Drugs but instead chose its bottom line over patient safety. *Holley* ¶¶ 397, 399; *Dowdy* ¶¶ 281, 283.

**B.    Gilead failed to adequately warn about the risks and safe use of TDF.**

To ensure that safety concerns did not hurt crucial Viread sales (*Holley* ¶¶ 325–326; *Dowdy* ¶¶ 209–210), Gilead trained its sales team to misrepresent Viread as a "miracle drug" with "no toxicities." *Holley* ¶¶ 327–328; *Dowdy* ¶¶ 211–212. The FDA twice reprimanded Gilead for

1    unlawfully minimizing the risks of TDF. *Holley* ¶¶ 329–331; *Dowdy* ¶¶ 213–215. Yet Gilead has

2    continued to downplay the risks of TDF—by misrepresenting the drugs as safe; dismissing TDF-

3    associated adverse events as purportedly unavoidable side effects of tenofovir; and discouraging

4    doctors from monitoring patients using more sensitive markers of kidney function. *Holley* ¶ 332;

5    *Dowdy* ¶ 216. Gilead's misleading statements to doctors undermined the inadequate warnings about

6    TDF that appeared in the drug labels. *Holley* ¶ 333; *Dowdy* ¶ 217.

7           Between 2001 and May 2007, Gilead's TDF labeling failed to warn doctors that all patients

8    needed to be frequently monitored for adverse kidney effects. *Holley* ¶ 334; *Dowdy* ¶ 218. During

9    those years, Gilead limited its monitoring warnings to patients with certain renal risk factors even

10   though it learned—after FDA approval of TDF Drugs in 2001, 2004, and 2006[5]—that TDF was

11   causing serious kidney injury, including in patients who were not at risk for, and had no history of,

12   renal impairment. *Holley* ¶¶ 214, 217, 219, 334; *Dowdy* ¶¶ 98, 101, 103, 218. Gilead also

13   determined, subsequent to those FDA approvals, that it should issue stronger warnings in the

14   European Union (EU) for the exact same drugs. *Holley* ¶¶ 348–354; *Dowdy* ¶¶ 232–238.

15          After May 2007, Gilead's drug labeling remained inadequate because it instructed doctors to

16   assess just one, insufficiently sensitive marker of kidney dysfunction and failed to instruct doctors to

17   monitor patients on a frequent schedule. *Holley* ¶¶ 340–347; *Dowdy* ¶¶ 224–231. Gilead also

18   removed from its labels an acknowledgment that adverse kidney and bone events occurred in patients

19   without pre-existing risk factors, which reinforced the false impression that TDF is only harmful to

20   patients otherwise at risk for kidney and bone injuries. *Holley* ¶ 346; *Dowdy* ¶ 230. During this

21   timeframe—including after FDA approval of additional TDF Drugs in 2011 and 2012[6]—Gilead:

22   (a) faced new evidence that the incidence of TDF-associated toxicity is greater than Gilead

23   previously recognized (*Holley* ¶¶ 218, 224–228; *Dowdy* ¶¶ 102, 108–112); and (b) determined that it

24   should give stronger warnings for (i) its TDF Drugs in the EU, but not in the crucial U.S. market

25   (*Holley* ¶¶ 355–359; *Dowdy* ¶¶ 239–243) and (ii) its safer TAF drugs (*Holley* ¶ 360; *Dowdy* ¶ 244).

26

27           [5] *Holley* ¶¶ 189–191; *Dowdy* ¶¶ 73–75.

28           [6] *Holley* ¶¶ 192–193; *Dowdy* ¶¶ 76–77.

In addition, until October 14, 2003, Gilead's labeling failed to include any warning about the need to monitor patients for TDF-associated bone injury. *Holley* ¶ 335; *Dowdy* ¶ 219. Since then, Gilead has only suggested that doctors monitor patients with certain risk factors for bone adverse effects—despite learning that long-term clinical data demonstrated TDF-associated bone damage in adult, adolescent, and pediatric patients (*Holley* ¶ 218; *Dowdy* ¶ 102), and patients taking TDF experienced softening of the bones, bone pain, and fractures (*Holley* ¶ 224; *Dowdy* ¶ 108).[7]

Monitoring for TDF toxicity is critical because: early detection is key to preventing serious injury; patients are typically asymptomatic in the early stages; and kidney function must be assessed to determine whether patients' doses must be adjusted. *Holley* ¶¶ 209, 324, 338, 341, 345.[8] By failing to warn doctors to adequately monitor all patients for TDF-associated toxicity, Gilead delayed the diagnosis of harm, causing or enhancing injuries that would have been prevented or lessened through early detection. *Holley* ¶¶ 339, 344, 346; *Dowdy* ¶¶ 223, 228, 230. Had Gilead given adequate monitoring instructions, Plaintiffs' doctors would have heeded them and detected TDF toxicity earlier through better, more frequent monitoring, thus preventing or lessening Plaintiffs' injuries. *Holley* ¶¶ 407–423; *Dowdy* ¶¶ 291–307. Gilead could have strengthened its warnings for its TDF Drugs both before and after FDA approval. *Holley* ¶¶ 362–364; *Dowdy* ¶¶ 246–248.

### III.  LEGAL STANDARD

The Court must accept the facts alleged in Plaintiffs' Complaints, together with reasonable inferences to be drawn from those facts, as true. *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1091 (N.D. Cal. 2014) (Tigar, J.). Plaintiffs need only plead enough facts to state a plausible claim for relief—meaning that the facts alleged allow the Court to draw the reasonable inference that Gilead is liable for the misconduct alleged. *Id*. at 1091–92. Although fraud claims must state with particularity the circumstances constituting the fraud (*see* Fed. R. Civ. P. 9(b)), claims based on an omission can succeed without the same level of specificity. *MacDonald*, 37 F. Supp. 3d at 1096.

---

[7] Gilead also failed to adequately warn Plaintiffs about the risks and safe use of the TDF Drugs in patient labeling and direct-to-consumer advertising. *See Holley* ¶¶ 365–374; *Dowdy* ¶¶ 249–258.

[8] *See also Dowdy* ¶¶ 93, 208, 222, 225, 229.

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 5
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST & 3:19-cv-00481-JST

1

## IV.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED

2        The Court's analysis starts with the two "cornerstones" of preemption jurisprudence. *Levine*,

3   555 U.S. at 565. *First*, "the purpose of Congress is the ultimate touchstone in every pre-emption

4   case." *Id*. (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). In *Levine*, which addressed

5   whether state-law failure to warn claims were preempted by federal law governing drug approval and

6   labeling, the Court identified the "purpose of Congress" by reviewing the history of the federal

7   regulation of prescription drugs. *Id*. at 566–68. As Congress "enlarged the FDA's powers" to ensure

8   the safety and efficacy of prescription drugs, it "took care to preserve state law." *Id*. at 567. Congress

9   enacted a savings clause providing that a state-law claim would only be preempted if in "direct and

10  positive conflict" with the Federal Food Drug and Cosmetic Act ("FDCA"). *Id*. And Congress never

11  enacted an express preemption provision for prescription drugs (as it did for medical devices) despite

12  its awareness of the "prevalence of state tort litigation"—a fact *Levine* cited as "***powerful evidence***

13  ***that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and***

14  ***effectiveness***." *Id*. at 574–75 (emphasis added).

15       *Second*, the Court must "start with the assumption that the historic police powers of the States

16  [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of

17  Congress." *Id*. at 565 (quoting *Lohr*, 518 U.S. at 485). This is particularly true in cases in which

18  Congress legislated in a field traditionally occupied by the states. *See id*. Because the regulation of

19  health and safety is traditionally within the states' historic police powers, *see Lohr*, 518 U.S. at 475,

20  the presumption against preemption is particularly strong in this case.

21       Gilead has failed to meet its "considerable burden," *Stengel v. Medtronic, Inc.*, 704 F.3d

22  1224, 1227 (9th Cir. 2013), of overcoming the presumption against preemption. The clear and

23  manifest purpose of Congress was to preserve, not preempt, Plaintiffs' state-law claims. And Gilead

24  has failed to identify any direct conflict between Plaintiffs' claims and federal law that would make it

25  impossible for Gilead to comply with both its federal and state-law duties.

26  **A.    Plaintiffs' design defect claims are not preempted.**

27       Multiple courts have ruled that design defect claims regarding brand name drugs are ***not***

28  ***preempted***—rejecting the Sixth Circuit's non-binding opinion in *Yates v. Ortho-McNeil-Janssen*

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD          Case Nos. 3:18-cv-06972-JST
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 6             & 3:19-cv-00481-JST
010759-11/1109132 V2

1    *Pharms., Inc.*, 808 F.3d 281 (6th Cir. 2015), upon which Gilead relies, as poorly reasoned. Plaintiffs

2    urge the Court to adopt the analysis of the cases finding no preemption and reject the authorities

3    cited by Gilead. Plaintiffs' cases are more consistent with Supreme Court precedent, Congressional

4    intent, and the strong presumption against preemption. But even if *Yates* applied, it is distinguishable

5    under these facts. There is nothing speculative about whether the FDA would have approved the

6    safer, FDA-approved TAF design.

7        **1.**     **The Court should adopt the reasoning of Plaintiffs' cases and rule that Plaintiffs'**
        **design defect claims are not preempted.**

8

9            **a.**     **Plaintiffs' cases recognize the different federal duties applicable to brand**
            **and generic drugs.**

10       A trio of Supreme Court cases—*Levine*, *Mensing*,[9] and *Bartlett*[10]—has addressed preemption

11   in the prescription drug context. In each, the Court compared the relevant federal and state-law duties

12   to determine whether it was impossible for the drug manufacturers to comply with both. The result in

13   *Levine* (no preemption of failure to warn claim against brand manufacturer) differed from the results

14   in *Mensing* and *Bartlett* (preemption of failure to warn and design defect claims against generic

15   manufacturers) because of the different federal duties that apply to brand and generic manufacturers.

16       *Levine* held that it was not impossible for the brand name manufacturer to comply with both

17   its federal and state-law duties because brand drug manufacturers are responsible for the safety

18   disclosures contained in their labels, and the federal "changes being effected" (CBE) regulation

19   permits brand drug manufacturers to unilaterally add safety warnings to their labels after approval.

20   *Levine*, 555 U.S. at 568–73. "[A]bsent clear evidence" that the FDA would have rejected the brand

21   company's label change, it was not impossible for the brand to comply with both federal and state

22   requirements. *Id*. at 571. In other words, *Levine* "held that, because federal law accommodated state

23   law duties, the possibility of impossibility was not enough." *Mensing*, 564 U.S. at 624 n.8 (internal

24   quotation marks and citation omitted).

25

26

27        [9] *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011).

28        [10] *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013).

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 7
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1   *Mensing* reached the opposite conclusion in a case involving a generic drug because federal

2   law requires generic manufacturers to match the labeling of the brand name drug. *See Mensing*, 564

3   U.S. at 613. The Court explained:

> It is beyond dispute that the federal statutes and regulations that apply
> to brand-name drug manufacturers are meaningfully different than those
> that apply to generic drug manufacturers. . . . [D]ifferent federal statutes
> and regulations may, as here, lead to different pre-emption results.

*Id.* at 625.

7   And *Bartlett* held that a design defect claim against a generic manufacturer was preempted

8   because federal law prevented the generic from unilaterally making the drug safer. The generic could

9   not unilaterally change the drug's design because: (a) federal law requires a generic drug to match

10  the brand name drug; and (b) (unlike here) the drug at issue was incapable of being redesigned. *See*

11  *Bartlett*, 570 U.S. at 483–86. Thus, the only way the generic could have made the drug safer was to

12  strengthen the label's warnings—something *Mensing* held the generic could not do. *See id.*

13  Consistent with this Supreme Court precedent, many courts have ruled that design defect

14  claims involving brand name drugs are not preempted because brand drug manufacturers are not

15  subject to the federal "duty of sameness" that limits what generics can do to make their drugs safer.

16  *See Young v. Bristol-Myers Squibb Co.*, No. 4:16-cv-00108, 2017 U.S. Dist. LEXIS 24730, at *17–

17  18 (N.D. Miss. Feb. 22, 2017) (agreeing with the "wide array of courts" which "focus[ed] on a

18  [brand] manufacturer's wide discretion to submit proposals to the FDA for approval" in holding that

19  "there is no conflict between a manufacturer's state law duty to produce a safe drug and its federal

20  law duties to obtain approval"); *Guidry v. Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187, 1204 (E.D.

21  La. 2016) (reasoning that: "Unlike *generic* drug manufacturers, brand name drug manufacturers *do*

22  control . . . [the] chemical composition of the drug. Thus, the preemption analysis in the context of

23  brand name drugs differs entirely from that of generic drugs.") (emphasis in original); *Sullivan v.*

24  *Aventis, Inc.*, No. 14-cv-2939, 2015 U.S. Dist. LEXIS 107360, at *20 (S.D.N.Y. Aug. 12, 2015)

25  (noting that: "A manufacturer choosing among alternative designs for a brand-name drug is not

26  subject to the federal 'equivalence' restrictions that apply to generic drugs."); *see also In re Xarelto*

27  *Rivaroxaban Prods. Liab. Litig.*, MDL No. 2592, 2017 U.S. Dist. LEXIS 114338, at *12–13 (E.D.

28

1    La. July 21, 2017); *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, No.

2    2:13-md-02436, 2015 U.S. Dist. LEXIS 153972, at *72–74 (E.D. Pa. Nov. 13, 2015); *Estate of*

3    *Cassel v. ALZA Corp.*, No. 12-cv-00771, 2014 U.S. Dist. LEXIS 27924, at *13–16 (W.D. Wis. Mar.

4    5, 2014); *Brown v. Johnson & Johnson*, 64 F. Supp. 3d 717, 721 (E.D. Pa. 2014).

          **b.    Plaintiffs' cases recognize that no federal law prevents a brand drug**
                  **manufacturer from making a safer product before FDA approval.**

          The mere fact that brand drugs ultimately require FDA approval before they are sold does not

     compel preemption. The "dispositive question . . . is simply: ***Can a [brand] drug manufacturer***

     ***independently design a reasonably safe drug in compliance with its state-law duties before seeking***

     ***FDA approval? The answer is yes.***" *Guidry*, 206 F. Supp. 3d at 1208 (emphasis added). "Federal

     law does not prevent a drug manufacturer from complying with [its] state-imposed duty [to consider

     feasible alternative designs] before seeking FDA approval." *Id.* at 1209. "Far from impossible, the

     two are complimentary, preferable, and perhaps necessary to protect the public health and assure the

     safety, effectiveness, and reliability of drugs." *Id.* (citing *Levine*, 555 U.S. at 567); *see also Brazil v.*

     *Janssen Research & Dev. LLC*, 249 F. Supp. 3d 1321, 1347–48 (N.D. Ga. 2016).

          Many courts have thus held that design defect claims against brand drug manufacturers are

     not preempted where, as here, the plaintiff alleges that the manufacturer should have designed a safer

     drug before FDA approval. *See Guidry*, 206 F. Supp. 3d at 1209; *see also In re Xarelto*, 2017 U.S.

     Dist. LEXIS 114338, at *17–19 (following *Guidry* and holding that plaintiffs' pre-approval design

     defect claims were not preempted); *Young*, 2017 U.S. Dist. LEXIS 24730, at *18–21 (same);

     *Sullivan*, 2015 U.S. Dist. LEXIS 107360, at *20–21 (holding that design defect claims were not

     preempted because "counsel has cited no federal law that restricts a brand-name drug manufacturer

     from designing a reasonably safe product *prior* to FDA approval") (emphasis in original); *Estate of*

     *Cassel*, 2014 U.S. Dist. LEXIS 27924, at *13–14 (denying motion for summary judgment on

     preemption grounds because plaintiff alleged the brand manufacturer had a duty to redesign its drug

     before FDA approval); *Lujano* Order at 3–4; *Cf. Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296,

     322 (D. Conn. 2016) (holding that design defect claim was preempted because plaintiff did *not* argue

     that the brand company should have switched to a safer design before FDA approval).

1    Gilead has cited no federal law that prevented it from unilaterally changing the design of its

2    TDF Drugs before FDA approval. Gilead cites only to the general requirement that brand

3    manufacturers submit and receive approval for a New Drug Application before marketing a new

4    drug. *See* Mot. at 11 (citing 21 U.S.C. § 355).[11] But there is nothing in those requirements that

5    dictates which active ingredients Gilead must use in developing its drugs or that would have

6    prevented Gilead from initially designing its TDF Drugs to be safer. To the contrary, brand drug

7    manufacturers like Gilead are independently responsible for their own drug design. *See Guidry*, 206

8    F. Supp. 3d at 1208. Every time Gilead developed a new TDF Drug, it had a choice: it could use a

9    design it knew to be toxic to patients' kidneys and bones or it could use a safer design. The FDA had

10   nothing to do with, and is not responsible for, that choice; Gilead is.

11            **c.    Plaintiffs' cases recognize that Congress did not intend to insulate brand
                       drug manufacturers from state tort liability.**

12   Accepting Gilead's argument "would free pharmaceutical companies from state common-law

13   liability—and limit states' constitutional right to protect its residents' welfare—so long as

14   manufacturers are selling a federally approved drug." *In re Xarelto*, 2017 U.S. Dist. LEXIS 114338,

15   at *10; *see also Estate of Cassel*, 2014 U.S. Dist. LEXIS 27924, at *15. Nowhere has Congress

16   manifested its intent to supersede state law in this manner. *See Guidry*, 206 F. Supp. 3d at 1208. To

17   the contrary, "powerful evidence" supports the opposite conclusion. *Id.* (quoting *Levine*, 555 U.S. at

18   575); *see also In re Xarelto*, 2017 U.S. Dist. LEXIS 114338, at *11 ("Congress has demonstrated a

19   clear intent to preserve the functions of both the FDA and state tort remedies.").

20   Granting Gilead's motion on this issue would be contrary to *Levine*'s rejection of the

21   argument that federal law establishes both a floor and ceiling for drug regulation. *See Levine*, 555

22   U.S. at 575–79. *Levine* held that a brand company's "drug label may be inadequate under state tort

23   law, even if it has been approved by the FDA"—"strong evidence that the FDA is not the be-all-end-

24   all in drug regulations." *Guidry*, 206 F. Supp. 3d at 1207. Moreover, *Bartlett* confirmed that "federal

25   law establishes no safe-harbor for drug companies." *Bartlett*, 570 U.S. at 490. Granting Gilead's

26

27            ———————————

28            [11] The remaining federal regulations cited by Gilead govern post-approval changes. *See* Mot. at
       9, 11 (citing 21 C.F.R. § 314.70).

1  motion would "give pharmaceutical companies a right to sell a federally approved drug free from

2  common-law liability"—a notion *Bartlett* expressly disavowed. *Estate of Cassel*, 2014 U.S. Dist.

3  LEXIS 27924, at *16 (quoting *Bartlett*, 570 U.S. at 490).

4      **2.**    **The Court should reject Gilead's poorly reasoned, non-binding cases.**

5      Gilead ignores the cases Plaintiffs cite above, relying on *Yates* and other non-binding cases

6  that followed *Yates*. Gilead's authorities are highly flawed.

7      *First*, *Yates* did "not demonstrate the impossibility standard for preemption was met." *Brazil*,

8  249 F. Supp. 3d at 1347. *Yates* conceded that "counsel for defendants has cited no federal law that

9  restricts a brand-name drug manufacturer from designing a reasonably safe product prior to FDA

10  approval" and offered no evidence that the FDA would have rejected a safer design. *Yates*, 808 F.3d

11  at 299. Yet *Yates* rejected plaintiffs' pre-approval theory anyway, deeming it "too attenuated." *Id*.

12  *Yates* improperly substituted its own standard for the impossibility standard, which requires a "direct

13  and positive conflict" between state and federal law before a state-law tort claim may be preempted.

14  *See Levine*, 555 U.S. at 567.

15      *Second*, *Yates* was wrong to say the case "mirror[ed]" the facts in *Mensing*. *Yates*, 808 F.3d at

16  299. In *Mensing*, plaintiffs argued that the generic could have asked the FDA to make the brand

17  manufacturer change its drug label so the generic could then change its label. *See Mensing*, 564 U.S.

18  at 619. FDA action was required because the generic company could not change its label unless the

19  non-party brand company first changed its label. In contrast, a brand drug manufacturer can design

20  its drugs to be safer without any involvement of the FDA or other non-party.

21      *Third, Yates*' "too attenuated" standard ignores that design defect claims necessarily involve

22  the consideration of hypothetical scenarios as to the availability of a safer alternative design. *See*

23  *Guidry*, 206 F. Supp. 3d at 1208 ("[E]very defective design claim requires consideration of

24  hypothetical scenarios – what different steps *could have* been taken that *may have* prevented the

25  plaintiff's injury.") (emphasis in original). And "[i]t is not too attenuated to assume that the FDA

26  would approve a safer, alternative design of a drug that it has already approved." *Id*.

27      This is especially true since it is not Plaintiffs' burden to prove, at the motion to dismiss

28  stage, that the FDA would have approved the alternative design. It is Gilead that has failed to proffer

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 11
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1    "clear evidence" that the FDA would have rejected the safer designs. *Levine*, 555 U.S. at 571; *see*

2    *also Estate of Cassel*, 2014 U.S. Dist. LEXIS 27924, at *16 (finding no preemption where defendant

3    offered no evidence that the FDA would have rejected the design change); *In re Tylenol*, 2015 U.S.

4    Dist. LEXIS 153972, at *76–79 (same); *Brown*, 64 F. Supp. 3d at 721 (same). The "mere possibility

5    of impossibility" is not enough. *Mensing*, 564 U.S. at 624 n.8 (citation omitted). Moreover, design

6    defect claims have survived motions for summary judgment concerning the existence of a safer

7    alternative design with less compelling evidence of FDA approvability. *See, e.g.*, *Hunt v. McNeil*

8    *Consumer Healthcare*, 297 F.R.D. 268, 273–74 (E.D. La. 2014) (denying motion for partial

9    summary judgment because plaintiff presented sufficient evidence that the FDA would have

10   approved the alternative design, despite evidence that FDA previously rejected the design); *Jones v.*

11   *Lederle Labs., Div. of Am. Cyanamid Co.*, 695 F. Supp. 700, 707 (E.D.N.Y. 1988) (same). Plaintiffs

12   here should not be held to a higher standard—without the benefit of any fact or expert discovery.

13   But even if *Yates*' incorrect standard applied, it would not compel preemption here. There is

14   nothing speculative or "attenuated" about Gilead's replacement of TDF with TAF, nor the FDA's

15   approval of the safer designs. Gilead did (eventually) replace TDF with TAF because TAF is safer to

16   patients' kidneys and bones, and the FDA approved the safer TAF-based designs. *See supra* at 3;

17   *Lujano* Order at 3-4 (distinguishing *Yates* and *Mensing* from the present facts because the court need

18   not speculate as to whether a drug containing TAF would have been approved by the FDA). And

19   Gilead did (eventually) develop, and the FDA approved, a TAF-based version of Stribild with a

20   reduced dose of the tenofovir prodrug, as well as other reduced dose TDF products. *See supra* at 3.

21   *Yates* is thus distinguishable in addition to being wrong.

22   Gilead maintains that Plaintiffs' theory is still "too attenuated" because there is purportedly

23   no basis to assume that Plaintiffs would have taken the safer TAF drugs. See Mot. at 11–12. But it is

24   entirely plausible that Plaintiffs would have taken safer versions of the medicines they took had

25   Gilead originally designed them that way—as Plaintiffs allege Gilead should have done.

26   *Finally*, *Yates* wrongly equated a pre-approval theory with the "stop selling" rationale at issue

27   in *Bartlett*. In *Bartlett*, the Court rejected the argument that the generic manufacturer could have

28   complied with both its state-law and federal duties if it stopped selling the drug. *See Bartlett*, 570

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 12
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1    U.S. at 488. *Yates* labeled plaintiff's theory a "never-start selling rationale," which it then rejected

2    under *Bartlett*. *See Yates*, 808 F.3d at 300. But "[t]he pre-approval theory does not argue that a

3    manufacturer should have stopped acting, just that it should have acted *differently*." *Young*, 2017

4    U.S. Dist. LEXIS 24730, at *21 (emphasis in original); *see also Lujano* Order at 4 (holding that

5    similar allegations against Gilead were not preempted under *Bartlett*). *Yates*' "never-start selling"

6    argument ignores that "the raison d'être of products liability litigation is to penalize manufacturers

7    who design unreasonably dangerous products *in hopes that they never start selling them*. State

8    products liability law functions as a compliment to federal drug regulations to keep unreasonably

9    dangerous drugs off the market." *Guidry*, 206 F. Supp. 3d at 1208 (emphasis in original).

10       Like other courts before it, this Court should reject *Yates* as unsound and rule that Plaintiffs'

11    design defect claims are not preempted. The Court should similarly reject *Utts v. Bristol-Myers*

12    *Squibb Co.*, 226 F. Supp. 3d 166, 186 (S.D.N.Y. 2016), *Small v. Amgen, Inc.*, No. 2:12-cv-476, 2016

13    U.S. Dist. LEXIS 188813, at *5 (M.D. Fla. Jan. 25, 2016), and *Fleming v. Janssen Pharms., Inc.*,

14    186 F. Supp. 3d 826, 833 (W.D. Tenn. 2016), because those cases employed the same faulty

15    reasoning as *Yates*. Gilead's remaining cases are inapposite because they did not address allegations

16    that the manufacturer should have changed the drug design before approval. *See Gustavsen v. Alcon*

17    *Labs., Inc.*, 903 F.3d 1, 14 (1st Cir. 2018); *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 54

18    (D.D.C. 2017); *Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110, 154 (2017).

19    **B.    Plaintiffs' failure to warn claims are not preempted.**

20       Plaintiffs' claims fall squarely within *Levine* and are not preempted.

21       Consistent with *Levine*, Plaintiffs allege that Gilead should have and could have strengthened

22    its warnings and instructions for the safe use of the TDF Drugs via post-approval CBE supplement.

23    *See Holley* ¶¶ 170–173, 362–363; *Dowdy* ¶¶ 54–57, 246–247; *Levine*, 555 U.S. at 568 (brand

24    manufacturer may unilaterally strengthen its label to add warnings or instructions to increase the safe

25    use of the drug). Gilead argues that Plaintiffs have not alleged the "newly acquired information"

26    needed to change the labeling via CBE. *See Mot.* at 15. Gilead is wrong.

27       The "newly acquired information" regulation became effective in 2008. *See Levine*, 555 U.S.

28    at 568–69. Thus, Gilead could have strengthened its labels for Viread, Truvada, and Atripla (which

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 13
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

were the TDF Drugs approved in 2001, 2004, and 2006, respectively) via CBE at any time between 2001 and 2008 whether or not the change presented "newly acquired information." After the regulation took effect, Gilead could have strengthened its labels via CBE because "'newly acquired information' is not limited to new data, but also encompasses 'new analyses of previously submitted data.'" *Levine*, 555 U.S. at 569 (quoting 73 Fed. Reg. 49603 at 49604). "The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments." *Levine*, 555 U.S. at 569; *see also* 73 Fed. Reg. 49603 at 49607 ("newly acquired information" includes new analyses of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to the FDA).

*Levine* held that the manufacturer could have added, via CBE, a stronger warning about the proper administration of the drug based on accumulating evidence of injuries, even though the label already included some information about the risk. *See Levine*, 555 U.S. at 569–70 ("After the first such incident came to Wyeth's attention in 1967, it notified the FDA and worked with the agency to change Phenergan's label. In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug."); *see also In re Xarelto*, 2017 U.S. Dist. LEXIS 114338, at *14–15 (holding that "newly-acquired information" included additional adverse event information); *Newman v. McNeil Consumer Healthcare*, No. 10-cv-01541, 2012 U.S. Dist. LEXIS 2153, at *29–34 (N.D. Ill. Jan. 9, 2012) (same). So too here. After FDA approval, Gilead gained additional knowledge about the risks of TDF toxicity and the incidence of adverse events, including risks of a different type (TDF was injuring people who were not at risk for, and had no history of, renal impairment), and risks of a different severity or frequency (TDF was injuring more people than Gilead previously recognized). *See supra* at 4–5. Gilead could have analyzed this accumulating data and added a stronger warning about the risks and safer use of TDF. In fact, Gilead apparently did conduct new analyses and determined that it should add stronger warnings—yet Gilead limited those stronger warnings to the EU and its safer TAF products. *See supra* at 4. Plaintiffs' allegations regarding accumulating evidence of the risks of TDF "fit into the framework" of *Levine*, and should not be preempted. *Lujano* Order at 5.

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 14
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1    Plaintiffs also allege that Gilead should have strengthened its labels each time it submitted a

2    new TDF Drug for approval. *Holley* ¶ 364; *Dowdy* ¶ 248. As discussed above, brand drug

3    manufacturers are free to make their products safer prior to FDA approval. *See supra* at 7–10; *see*

4    *also In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 6:11-md-2299, 2014 U.S. Dist. LEXIS 1749,

5    at *34 (W.D. La. Jan. 7, 2014) (holding that failure to warn claims were not preempted because the

6    brand drug manufacturer could have strengthened its warnings both before and after approval);

7    *Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d 1018, 1037 (S.D. Ill. 2001) (same). Gilead's

8    assertion that a failure to warn claim cannot be based on a drug's original labeling is contrary to

9    *Levine*. There, the Court held that the FDA's initial and subsequent approvals of the label did not

10   preempt plaintiff's state-law tort claims. *See Levine*, 555 U.S. at 558-59 ("The warnings on

11   Phenergan's label had been deemed sufficient by the federal Food and Drug Administration (FDA)

12   when it approved Wyeth's new drug application in 1955 and when it later approved changes in the

13   drug's labeling. The question we must decide is whether the FDA's approvals provide Wyeth with a

14   complete defense to Levine's tort claims. We conclude that they do not."). *Levine* stressed that "it

15   has remained a central premise of federal drug regulation that the manufacturer bears responsibility

16   for the content of its label *at all times*." *Id*. at 570–71 (emphasis added); *see also id*. at 579 ("Failure-

17   to-warn actions . . . lend force to the FDCA's premise that manufacturers, not the FDA, bear the

18   primary responsibility for their drug labeling at all times."). Brand manufacturers like Gilead are

19   "charged both *with crafting an adequate label* and with ensuring that its warnings remain adequate

20   as long as the drug is on the market." *Id*. at 571 (emphasis added). Absent "clear evidence" that the

21   FDA would have rejected the stronger warning, there is no federal law that would have prevented

22   Gilead from "crafting an adequate label" from the outset.

23   Gilead has presented **no evidence**, let alone "clear evidence," *see Levine*, 555 U.S. at 571,

24   that the FDA would have rejected Gilead's effort to strengthen its warnings and instructions for the

25   safe use of the TDF Drugs—either before or after approval. As a result, it was not impossible for

26   Gilead to comply with both federal and state-law requirements. *See id.*

27   Rather than address *Levine*, Gilead focuses its attack on a claim Plaintiffs do not make.

28   Gilead resorts to mischaracterizing Plaintiffs' failure to warn claims as fraud-on-the-FDA claims that

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 15
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1  are purportedly preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). *See*

2  Mot. at 14. But *Buckman* is inapposite. Plaintiffs in *Buckman* challenged a company's fraudulent

3  misrepresentations to the FDA under the disclosure requirements of the Medical Device

4  Amendments to the FDCA. *See Buckman*, 531 U.S. at 343, 349. Those claims were preempted

5  because a state-law fraud-on-the-FDA claim would conflict with the FDA's federal authority to

6  punish and deter fraud against the agency. *See id.* at 348–50. *Buckman* distinguished preempted

7  fraud-on-the-FDA claims from claims, like those here, that are based on state tort law. *See id.* at

8  352–53 (distinguishing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), and *Medtronic, Inc. v.*

9  *Lohr*, 518 U.S. 470 (1996)); *see also In re Incretin-Based Therapies Prods. Liab. Litig.*, 721 F.

10  App'x 580, 583 (9th Cir. 2017) (disagreeing with the district court's characterization of plaintiffs'

11  failure to warn claims as fraud-on-the-FDA claims preempted by *Buckman*); *McClellan v. I-Flow*

12  *Corp.*, 776 F.3d 1035, 1040 (9th Cir. 2015) (distinguishing failure to warn claims from fraud-on-the-

13  FDA claims, which arise solely under the FDCA disclosure requirements).[12]

14      Plaintiffs do not allege that Gilead made any misrepresentations to the FDA and do not base

15  their claims solely on federal disclosure requirements. *Buckman*, therefore, does not control. *See*

16  *Lujano* Order at 5 (distinguishing plaintiffs' claims that Gilead failed to adequately warn of the risks

17  of TDF Drugs from the type of fraud-on-the-FDA claims preempted under *Buckman*); *see also In re*

18  *Actos*, 2014 U.S. Dist. LEXIS 1749, at *37 (holding *Buckman* inapposite in a failure to warn case);

19  *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366, 2013 U.S. Dist. LEXIS 173055, at *24 n.8 (C.D. Cal.

20  Feb. 26, 2013) (same); *Caraker*, 172 F. Supp. 2d at 1039–40 (same).

21      Gilead's non-binding cases (Mot. at 14–15) are inapposite and/or unpersuasive. Neither *In re*

22  *Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 42–44 (1st Cir. 2015), nor *Patton v.*

23  *Forest Labs., Inc.*, No. 17-cv-00922, 2018 U.S. Dist. LEXIS 160368, at *32 (C.D. Cal. Sept. 19,

24  2018), supports Gilead's argument as to pre-approval label changes because both concerned post-

25

26      _____

    [12] *Perez v. Nidek Co.*, 711 F.3d 1109, 1119 (9th Cir. 2013), cited by Gilead, held that plaintiff
27  was barred from bringing a fraud claim for failing to disclose a device's lack of FDA approval
    because, like *Buckman*—and unlike Plaintiffs' claims here—the claim was based solely on the fact
28  that the non-disclosure violated the FDCA.

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 16
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1   approval label changes. *Utts*' statement that failure to warn claims are preempted if based on the

2   adequacy of the label as first approved (*see Utts*, 226 F. Supp. 3d at 184) is unsupported by any case

3   law and contrary to *Levine*. And *McGee* is based on an erroneous reading of *Buckman*, which did not

4   hold that failure to warn claims are preempted when they assert a mere "failure to communicate with

5   the FDA." *McGee v. Boehringer Ingelheim Pharms., Inc.*, No. 4:16-cv-2082, 2018 U.S. Dist. LEXIS

6   45316, at *10 (N.D. Ala. Mar. 20, 2018). That Plaintiffs allege Gilead could have strengthened its

7   label before FDA approval does not transform Plaintiffs' failure to warn claims into claims based on

8   fraud on the FDA. Plaintiffs' claims remain based on traditional state-law principles, and do not

9   "arise solely by virtue of the [FDCA]." *McClellan*, 776 F.3d at 1040–41.

10   ## V.   GILEAD HAS A DUTY TO USE SAFER ALTERNATIVE DESIGNS

11   Gilead's reliance on *AIDS Healthcare Foundation* is misplaced. There, plaintiff alleged that

12   Gilead violated Sherman Act §§ 1–2 and state competition law by entering unlawful tying

13   agreements and bundling TAF with other products (s*ee AIDS Healthcare Found.*, 2016 U.S. Dist.

14   LEXIS 87578, at *19–28), causing plaintiff to suffer economic injury in the form of higher prices for

15   HIV drugs. *See* Ex. 2, AHF Am. Compl. ¶¶ 1, 23; *see also id.* ¶ 193 (alleging that Gilead's tying

16   practices constituted unfair competition under Section 17200 of California's Unfair Competition

17   Law ("UCL")). The court held that plaintiff's complaint failed to plead a cognizable claim that

18   Gilead's decision to bundle TAF with other active ingredients, rather than release TAF as a

19   standalone product, produced an injury to competition under Sherman Act § 2. *See AIDS Healthcare

20   Found.*, 2016 U.S. Dist. LEXIS 87578, at *22–25. Turning to plaintiff's UCL claim, the court

21   addressed plaintiff's theory (raised for the first time in its brief) that Gilead's delayed introduction of

22   TAF harmed competition by delaying the date that generic competitors could seek to challenge the

23   TAF patents. *See id.* at *27. Citing the antitrust decision it relied on in dismissing plaintiff's Sherman

24   Act claim, the court held that plaintiff's complaint failed to plead a cognizable theory that antitrust

25   law imposed a duty on a competitor to advance the introduction of a new product. *See id.* at *27–28

26   (citing *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983)). The

27   court dismissed plaintiff's UCL claim because plaintiff simply "recast" its antitrust claim as one for

28

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 17
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1    unfair competition under the UCL. *Id.* at *28 (citing *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d

2    175, 184 (Cal. Ct. App. 2001)).[13]

3          *AIDS Healthcare Foundation* is inapplicable. Plaintiffs here assert no antitrust claims and

4    allege no injury to competition. The source of the duty that Gilead owes to Plaintiffs here is state tort

5    law, not antitrust law. Gilead owes Plaintiffs a duty under state-law strict liability and negligence

6    theories to reduce foreseeable risks of danger by using a safer alternative design. *See, e.g.*, *Young*,

7    2017 U.S. Dist. LEXIS 24730, at *14 (in design defect cases, Mississippi—like "most courts in the

8    country"—applies a risk-utility test, under which the jury considers whether the manufacturer could

9    have reduced the foreseeable risk of harm by using a safer alternative design); *In re Tylenol*, 2015

10   U.S. Dist. LEXIS 153972, at *51 (under Alabama law, the manufacturer's legal duty depends on the

11   feasibility of an alternative design that averts the danger); *Sullivan*, 2015 U.S. Dist. LEXIS 107360,

12   at *17–18 (describing risk-utility test under New York law); *Estate of Cassel*, 2014 U.S. Dist. LEXIS

13   27924, at *16 (same, under Wisconsin law); *Tucker v. Wright Med. Tech., Inc.*, No. 11-cv-03086-

14   YGR, 2013 U.S. Dist. LEXIS 38354, at *23–25 (N.D. Cal. Mar. 19, 2013) (same, under California

15   law). Imposing this duty encourages drug manufacturers to use safer forms of their drugs. *See*

16   *Brown*, 64 F. Supp. 3d at 723 (holding that a reasonable jury could conclude that the defendant drug

17   manufacturer had a duty to use a different form of the active ingredient in order to make the drug

18   safer). Even if Gilead owed no duty under antitrust law and caused no injury to competition, such a

19   finding does not vitiate the duty that Gilead owed to Plaintiffs under tort law, nor does it insulate

20   Gilead from liability for causing Plaintiffs' personal injuries resulting from its failure to reduce the

21   known risks of kidney and bone toxicity by using the safer TAF design.

22          Gilead's assertion that *AIDS Healthcare Foundation* warrants dismissal of Plaintiffs' fraud

23   by omission and consumer protection claims is also wrong because those claims are based, in part,

24

25          [13] *Chavez*, 113 Cal. Rptr. 2d at 184, held that "conduct alleged to be 'unfair' because it
26   unreasonably restrains competition and harms consumers . . . is not 'unfair' if the conduct is deemed
     reasonable and condoned under the antitrust laws." Understanding plaintiff's UCL claim to be based
27   on Gilead's anticompetitive conduct, *AIDS Healthcare Foundation* did not address plaintiff's
     argument that Gilead also "left consumers to bear the higher bone and kidney toxicity of TDF longer
28   than necessary." 2016 U.S. Dist. LEXIS 87578, at *27–28.

1    on Gilead's omissions and misrepresentations with respect to TDF and TAF. They are not based, as

2    Gilead asserts (*see* Mot. at 21), solely on the fact that Gilead should have sold TAF earlier.

3    Moreover, conduct may be "unfair" and thus prohibited by state consumer protection statutes,

4    including the UCL, even if it does not violate the antitrust laws. *See, e.g.*, *MacDonald*, 37 F. Supp.

5    3d at 1099. Gilead does not argue that Plaintiffs have failed to plausibly allege that its conduct was

6    "unfair" within the broader meaning of the term.

7              **VI.    GILEAD'S CAUSATION ARGUMENT SHOULD BE REJECTED**

8              Plaintiffs allege that Gilead failed to adequately warn Plaintiffs' physicians about the risks

9    and safe use of TDF, and that those failures proximately caused Plaintiffs' injuries. Specifically,

10   Plaintiffs allege, *inter alia*, that: (a) adequate monitoring for TDF toxicity is critical because early

11   detection is key to preventing serious injury; (b) had Gilead given adequate warnings, Plaintiffs'

12   doctors would have heeded such warnings and detected TDF toxicity earlier through better, more

13   frequent monitoring; and (c) Gilead's inadequate warnings delayed the diagnosis of harm, causing or

14   enhancing injuries that would have been prevented or lessened through early detection *See supra* at

15   5. Gilead's assertion that Plaintiffs did not establish a causal link between Gilead's conduct and

16   Plaintiffs' injuries simply ignores these well-pleaded allegations. Indeed, Plaintiffs have alleged what

17   Gilead says is required—i.e., that but for Gilead's warning failures, Plaintiffs' physicians "would

18   have acted differently." *See* Mot. at 18.

19             Gilead tries to confuse the matter by arguing that Plaintiffs must allege that better monitoring

20   would have prevented Plaintiffs' doctors from prescribing TDF. *See id*. at 19. This non sequitur

21   ignores that Plaintiffs allege that better monitoring warnings (which Plaintiffs' doctors would have

22   heeded) would have prevented or lessened Plaintiffs' injuries. *See supra* at 5. Multiple courts have

23   found that similar allegations—involving changes to doctors' prescribing or treatment practices other

24   than the decision not to prescribe the drug—sufficiently established causation. *See, e.g.*, *In re Xarelto*

25   *(Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 U.S. Dist. LEXIS 58056, at *4–8 (E.D. La.

26   Apr. 17, 2017) (denying summary judgment because the evidence demonstrated that plaintiffs'

27   doctors would have monitored plaintiffs for adverse effects had they been instructed to do so);

28   *Georges v. Novartis Pharms. Corp.*, No. 06-cv-5207 (VBKx), 2012 U.S. Dist. LEXIS 189174, at

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 19
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

*15–17 (C.D. Cal. Nov. 2, 2012) (denying summary judgment because multiple courts have held that "even where physicians admitted that they still recommended [the drug at issue] knowing of their . . . risks, the changes to their prescription and treatment procedure nonetheless created triable questions of fact on specific causation"); *DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 618–19 (S.D.N.Y. 2012) (denying motion to dismiss where plaintiff alleged that her doctor would have provided "sufficient warning, screening, and monitoring" had he continued to prescribe the drug); *In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-md-1760, 2010 U.S. Dist. LEXIS 129379, at *11–12 (M.D. Tenn. Dec. 7, 2010) (denying summary judgment because the evidence demonstrated that plaintiff's doctor would have altered other treatment decisions, including monitoring plaintiff for injuries).

Plaintiffs are not required to allege that their doctors would not have prescribed the TDF Drugs. *See, e.g.*, *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1239 (9th Cir. 2017); *In re Zyprexa Prods. Liab. Litig.*, No. 04-md-1596, 2009 U.S. Dist. LEXIS 65634, at *71–73 (E.D.N.Y. July 22, 2009). Gilead's cases are not to the contrary. Rather, Gilead's cases recognize that the key is to show that the "medical outcome would have been different if different warnings had been provided to the physician." *D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d 880, 891 (D. Ariz. 2013).[14] According to *Barnhill*, which Gilead cites at page 17 of its brief, proof of proximate cause can include evidence that, "though she still would have prescribed [the drug], [the doctor] would have changed her behavior or treatment in some way that would have resulted in a different outcome for the Plaintiff." *Barnhill v. Teva Pharms. USA, Inc.*, 819 F. Supp. 2d 1254, 1261 (S.D. Ala. 2011). Plaintiffs have alleged precisely that.

## VII.   PLAINTIFFS' FRAUD AND CONSUMER PROTECTION CLAIMS ARE PROPERLY PLED

Gilead summarily asserts, in only three pages purporting to address claims brought under fifty-three statutes and common law bases for recovery, that each of the 165 fraud by omission claims (under the laws of twenty-seven states) and consumer protection claims (under twenty-six

---

[14] The cases Gilead cites at footnote 11 of its brief similarly demonstrate that the causation inquiry focuses on whether the adequate warning would have prevented the plaintiff's injury, which is exactly what Plaintiffs allege here.

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 20
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1   statutes in twenty-three states) must be dismissed for failure to state their claims with particularity

2   under Federal Rule of Civil Procedure 9(b). Gilead's blanket argument skips over key considerations

3   that require denial of its motion to dismiss.

4          *First*, only those claims grounded in fraud must be pled with particularity. "The rule does not

5   require that allegations supporting a claim be stated with particularity when those allegations

6   describe non-fraudulent conduct." *Edenborough v. ADT, LLC*, No. 16-cv-02233, 2016 U.S. Dist.

7   LEXIS 147106, at *6 (N.D. Cal. Oct. 24, 2016) (Tigar, J.). Gilead fails to establish which of

8   Plaintiffs' fifty-three different legal claims are grounded in fraud. Many of Plaintiffs' consumer

9   protection claims challenge Gilead's "unfair" conduct, which is assessed under the notice pleading

10  standard of Rule 8. *See, e.g.*, *Haskins v. Symantec Corp.*, No. 13-cv-01834, 2013 U.S. Dist. LEXIS

11  169865, at *25–26 (N.D. Cal. Dec. 1, 2013) (Tigar, J.) (holding that "unfair" conduct under the UCL

12  is not coterminous with fraud and plaintiff sufficiently alleged that it was an "unfair practice for

13  Defendant to sell a product it knew to be compromised, regardless of the content of its

14  advertisements"); *Maestas v. Wal-Mart Stores, Inc.*, No. 2:16-cv-02597, 2018 U.S. Dist. LEXIS

15  52338, at *5 (E.D. Cal. Mar. 28, 2018) (Rule 8 governed plaintiff's claim that conduct was "unfair").

16  Here, Gilead knowingly designed unreasonably dangerous TDF Drugs that injured Plaintiffs to make

17  more money (*see, e.g., Holley* ¶¶ 2–14, 17, 200–322, 530–534, 537)—conduct which is "unfair"

18  under the laws of numerous states. *See id*. ¶¶ 549, 556, 569, 573, 594, 603, 607, 614, 619, 628

19  (alleging that Gilead violated the unfair prong of various consumer protection statutes). Other than

20  its misguided argument based on the inapplicable antitrust decision, *AIDS Healthcare Foundation*,

21  Gilead does not argue that Plaintiffs failed to state a plausible claim that its conduct was "unfair."

22         *Second*, Gilead fails to establish whether Plaintiffs' claims even require reliance allegations—

23  the primary basis of Gilead's claimed entitlement to dismissal. Reliance is not an element of the vast

24  majority of Plaintiffs' consumer protection claims. *See, e.g.*, Ala. Code § 8-19-10 (reliance not an

25  element of an Alabama claim); *Hall v. Walter*, 969 P.2d 224, 237–38 (Colo. 1998) (en banc)

26  (reliance not required under Colorado law); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074

27  (Del. 1983) (reliance not required under Delaware law); *Connick v. Suzuki Motor Co.*, 675 N.E.2d

28  584, 593 (Ill. 1996) (reliance not required under Illinois law); *Grp. Health Plan, Inc. v. Philip*

1   *Morris, Inc.*, 621 N.W.2d 2, 12 (Minn. 2001) (reliance not required under Minnesota law); *Hess v.*

2   *Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007) (en banc) (reliance not

3   required under Missouri law); *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v.*

4   *Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007) (reliance not required under New Jersey law);

5   *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig.*, 288 F. Supp. 3d

6   1087, 1185–86 (D.N.M. 2017) (reliance not required under New Mexico law); *Small v. Lorillard*

7   *Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999) (reliance not required under New York law); *In re*

8   *Hester*, Nos. 11-04375-8, 15-00001-8, 2015 Bankr. LEXIS 3508, at *10–11 (Bankr. E.D.N.C. Oct.

9   16, 2015) (reliance not required under North Carolina law); *Delahunt v. Cytodyne Techs.*, 241 F.

10  Supp. 2d 827, 835 (S.D. Ohio 2003) (reliance not required under Ohio law); 15 Okla. Stat. § 751

11  (reliance not an element of Oklahoma claim); *Sanders v. Francis*, 561 P.2d 1003, 1006 (Or. 1977)

12  (reliance not required in omissions cases under Oregon law); *Long v. Dell, Inc.*, 93 A.3d 988, 1003

13  (R.I. 2014) (reliance not required under Rhode Island law); *City of Charleston v. Hotels.com, LP*,

14  487 F. Supp. 2d 676, 680 (D.S.C. 2007) (reliance not an element of South Carolina claim); *Novell v.*

15  *Migliaccio*, 749 N.W.2d 544, 550 (Wis. 2008) (reliance not an element of Wisconsin claim).

16  Plaintiffs' claims cannot be dismissed for failing to plead an element they need not plead.

17      *Finally*, Plaintiffs' omission-based claims are sufficiently pleaded under the law of this

18  District. This Court has held post-*Kearns*, -*Bias*, and -*Marolda*,[15] that "claims based on an omission

19  'can succeed without the same level of specificity required by a normal fraud claim.'" *MacDonald*,

20  37 F. Supp. 3d at 1096 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). The pleading

21  requirements of Rule 9(b) are relaxed in omission-based claims "because a plaintiff alleging an

22  omission-based fraud will not be able to specify the time, place, and specific content of an omission

23  as would a plaintiff in a false representation claim." *Id.* (citation omitted); *see also Edenborough*,

24  2016 U.S. Dist. LEXIS 147106, at *6–7 (plaintiff in an omission case "cannot plead either the

25  specific time of the omission or the place, as he is not alleging an act, but a failure to act").

26  _____

27      [15] *See* Mot. at 21 (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915 (N.D. Cal. 2013); *Marolda v. Symantec Corp.*, 672 F. Supp. 2d

28  992, 1002 (N.D. Cal. 2009)).

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 22
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1    Plaintiffs have adequately alleged the "'who what when and how,' given the inherent

2    limitations of an omission claim." *MacDonald*, 37 F. Supp. 3d at 1096. The "who" is Gilead, the

3    "what" is an adequate warning about the risks and safe use of TDF and the fact that Gilead was

4    withholding safer designs of the TDF Drugs, the "when" is prior to Plaintiffs' doctors' prescribing

5    and monitoring decisions, and the "where" is in Gilead's drug labeling, marketing, and promotional

6    materials. *See, e.g.*, *Holley* ¶¶ 507–516, 535; *Dowdy* ¶¶ 352–361, 380.

7    Plaintiffs have also satisfied the materiality and reliance elements of their omission-based

8    claims.[16] Where an omission relates to a safety concern, as it does here, it is material. *See Bryde v.*

9    *Gen. Motors, LLC*, No. 16-cv-02421, 2016 U.S. Dist. LEXIS 159707, at *35 (N.D. Cal. Nov. 17,

10   2016) (citing *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015)). And reliance—i.e.,

11   that Plaintiffs would have behaved differently—"can be presumed, or at least inferred, when the

12   omission is material." *Edenborough*, 2016 U.S. Dist. LEXIS 147106, at *21–22 (ruling that plaintiff

13   sufficiently pleaded his omission claim by alleging that, had he known about the omitted safety-

14   related information, he would have taken different action); *see also Finney v. Ford Motor Co.*, No.

15   17-cv-06183-JST, 2018 U.S. Dist. LEXIS 93823, at *11–12 (N.D. Cal. June 4, 2018) (Tigar, J.)

16   (noting that a "court may infer that a plaintiff would have behaved differently where the omission

17   was material" and holding that plaintiff sufficiently stated her omission-based fraud claim because

18   she alleged that disclosure of safety information would have changed her behavior). Similarly,

19   Plaintiffs here have adequately alleged that, had Gilead made the required disclosures, Plaintiffs'

20   doctors would have ensured that Plaintiffs took the TDF Drugs in a safer manner, either by

21   performing increased and/or more careful monitoring for TDF-induced toxicity or by prescribing

22   TDF without cobicistat. *Holley* ¶¶ 509, 516, 543; *Dowdy* ¶¶ 354, 361, 380.

23   Dismissal of Plaintiffs' omissions-based fraud and consumer protection claims is not

24   warranted under the cases cited by Gilead, which concern affirmative misrepresentations, not

25

26   [16] Whether reliance must be pleaded with particularity under Rule 9(b), or only generally under
     Rule 8, is unsettled. *See, e.g.*, *Santana Row Hotel Partners, LP v. Zurich Am. Ins. Co.*, No. C 05-

27   00198 JW, 2007 U.S. Dist. LEXIS 96096, at *33 (N.D. Cal. Sept. 13, 2007) ("Rule 9(b) applies only
     to the misrepresentations themselves; the notice pleading requirements of Rule 8 apply to the

28   elements of damages, reliance, and state of mind.").

1   omissions related to safety issues. *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1050 (N.D. Cal.

2   2014) (Tigar, J.) (dismissing misrepresentation claims for failing to allege exposure to

3   representations and omission claims that did not involve a safety issue); *Andren v. Alere, Inc.*, 207 F.

4   Supp. 3d 1133, 1140–43 (S.D. Cal. 2016) (dismissing misrepresentation claims for failing to allege

5   exposure to representations and dismissing omission claims because plaintiff did not allege a duty to

6   disclose); *In re Actimmune Mktg. Litig.*, No. 08-cv-02376, 2009 U.S. Dist. LEXIS 103408 (N.D. Cal.

7   Nov. 6, 2009) (examining only misrepresentation claims); *Hydroxycut Mktg. & Sales Practices*

8   *Litig.*, 801 F. Supp. 2d 993, 1005 (S.D. Cal. 2011) (examining only misrepresentation claims and

9   failing to examine reliance requirements under state consumer protection laws); *Patterson v. Bayer*

10  *Healthcare Pharms., Inc.*, No. 14-cv-01087, 2015 U.S. Dist. LEXIS 22163, at *32–33 (E.D. Cal.

11  Feb. 24, 2015) (failing to distinguish between representation- and concealment-based claims);

12  *Patton*, 2018 U.S. Dist. LEXIS 160368, at *23–28 (finding failure to allege specific representations

13  and failing to distinguish between representation- and omission-based claims). Nor is dismissal

14  warranted under *In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-00428, 2014 U.S. Dist.

15  LEXIS 199368 (C.D. Cal. Oct. 20, 2014), or *Beavers-Gabriel v. Medtronic, Inc.*, 15 F. Supp. 3d

16  1021 (D. Haw. 2014), which are contrary to the governing standard in this District and not

17  controlling on this Court.

18         Gilead's broad-brush challenge to Plaintiffs' fraudulent omission and consumer protection

19  claims ignores that the vast majority of Plaintiffs' claims are not fraud-based, do not require reliance,

20  or involve omissions that need not be pled with the particularity required of affirmative

21  misrepresentations. If Gilead tries to assert new, more specific arguments for the first time in its

22  reply, the Court should decline to consider them. *See Kentwool Co. v. NetSuite Inc.*, No. 14-cv-

23  05264, 2015 U.S. Dist. LEXIS 19982, at *13–14 n.3 (N.D. Cal. Feb. 18, 2015) (Tigar, J.). But to the

24  extent any of Plaintiffs' claims fall short, Plaintiffs request that the Court grant them leave to amend

25  their complaint. *See Haskins*, 2013 U.S. Dist. LEXIS 169865, at *36 ("Rule 15's policy of freely

26  giving leave to amend 'is to be applied with extreme liberality.'") (citation omitted).

27

28

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 24
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VIII.   GILEAD'S REQUEST FOR A MORE DEFINITIVE STATEMENT SHOULD BE DENIED

The Court should also deny Gilead's request for a more definite statement, which appears in footnote 15 of its brief. Gilead asserts that Plaintiffs' complaints "make it impossible to assess additional defenses, including a determination as to whether some or all of Plaintiffs' claims are time-barred" and stretches itself to non-binding authority because its "motion" must be denied under the controlling law of this District. A "Rule 12(e) motion for more definite statement is disfavored and is proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted, meaning the complaint is so vague that the defendant cannot begin to frame a response." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-cv-01393-JST, 2016 U.S. Dist. LEXIS 96122, at *28 n.6 (July 15, 2016) (Tigar, J). "[I]n this circuit and district, defendants cannot use Rule 12(e) motions to force plaintiffs to allege specific dates, even to determine the applicability of a possible statute of limitations defense." *Osorio v. Tran*, No. 08-cv-4007, 2008 U.S. Dist. LEXIS 94640, at *6 (N.D. Cal. Nov. 18, 2008) (citations omitted).

## IX.      CONCLUSION

For the foregoing reasons, Gilead's motion to dismiss should be denied. In the alternative, Plaintiffs respectfully request leave to amend their Complaints.

Dated: March 25, 2019                        Respectfully submitted,

By: */s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
Anne F. Johnson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: annej@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
E-mail: shanas@hbsslaw.com

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 25
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST

Robert C. Hilliard (*pro hac vice*)
Katrina Ashley (*pro hac vice*)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
E-mail: bobh@hmglawfirm.com
E-mail: kashley@hmglawfirm.com

*Attorneys for Plaintiffs*

PLAINTIFFS' REVISED MEMORANDUM IN OPPOSITION TO GILEAD
SCIENCES, INC'S CONSOLIDATED MOTION TO DISMISS – 26
010759-11/1109132 V2

Case Nos. 3:18-cv-06972-JST
& 3:19-cv-00481-JST