Steve W. Berman (*pro hac vice*)
Anne F. Johnson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: annej@hbsslaw.com

Robert C. Hilliard (*pro hac vice*)
Katrina R. Ashley (*pro hac vice*)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
Email: bobh@hmglawfirm.com
Email: kashley@hmglawfirm.com

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN HOLLEY, *et al.*, | No. 3:18-cv-06972-JST |
| Plaintiffs, | Hon. Jon S. Tigar |
| v. | **FIRST AMENDED CONSOLIDATED COMPLAINT FOR DAMAGES** |
| GILEAD SCIENCES, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

1

**TABLE OF CONTENTS**

2

**Page**

3

I.      NATURE OF THE ACTION ......................................................................................... 1

4

II.     JURISDICTION AND VENUE .................................................................................... 5

5

III.    INTRADISTRICT ASSIGNMENT .............................................................................. 5

6

IV.     PARTIES ...................................................................................................................... 5

7

V.      FACTUAL ALLEGATIONS ...................................................................................... 149

8

        A.      Background ..................................................................................................... 150

9

                1.      Laws and regulations governing the approval and labeling of
                        prescription drugs. ............................................................................... 150

10

                2.      Tenofovir and Gilead's TDF- and TAF- containing drug products

11

                        indicated for use in treating HIV. ........................................................ 153

12

        B.      Gilead knew before Viread was approved that TDF posed a significant safety
                risk. ................................................................................................................ 157

13

        C.      Gilead's knowledge of TDF toxicity grew as patients' kidneys and bones were

14

                damaged by the TDF Drugs. ........................................................................... 160

15

        D.      Before Gilead developed Stribild, it knew that renal adverse events were more
                likely when patients took TDF as part of a boosted regimen. ......................... 165

16

        E.      Before Gilead developed each of the TDF Drugs, it knew that TAF was less

17

                toxic to kidneys and bones than TDF. ............................................................. 166

18

        F.      Gilead withheld its safer TAF design to protect its TDF sales and extend
                profits on its HIV franchise. ........................................................................... 172

19

        G.      Gilead knowingly designed its TDF drugs to be unreasonably dangerous and

20

                unsafe to patients' kidneys and bones. ............................................................ 174

21

        H.      Gilead obtained FDA approval for its TAF-based products by relying on
                studies demonstrating TAF's superiority over TDF. ....................................... 178

22

        I.      Gilead markets TAF as superior to TDF. ......................................................... 180

23

        J.      Gilead failed to adequately warn about the risks of TDF. ................................ 184

24

                1.      Gilead failed to adequately warn doctors about the risks of TDF. ........ 185

25

                2.      Gilead failed to adequately warn patients about the risks of TDF. ....... 202

26

                3.      Gilead could have unilaterally strengthened its TDF drug labels. ......... 204

27

                        a.      Gilead could have unilaterally strengthened its warnings before

28

                                FDA approval. .......................................................................... 204

b.    Gilead could have unilaterally strengthened its warnings after FDA approval. ....................................................................205

(1)    Before August 22, 2008....................................................205

(2)    On and after August 22, 2008............................................205

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ...........................................211

VII.    CLAIMS FOR RELIEF.............................................................................213

COUNT I STRICT PRODUCTS LIABILITY – DESIGN DEFECT  UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, COLORADO, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND WISCONSIN ........................................................................................213

COUNT II STRICT PRODUCTS LIABILITY – FAILURE TO WARN UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, AND WISCONSIN........................................................................216

COUNT III INDIANA PRODUCTS LIABILITY ACT, BURNS IND.  CODE ANN. §§ 34-20-1-1 *ET SEQ.* .......................................................................217

COUNT IV LOUISIANA PRODUCTS LIABILITY ACT, LA. R.S. §§ 9:2800.51 *ET SEQ.* ........218

COUNT V MISSISSIPPI PRODUCTS LIABILITY ACT, MISS. CODE ANN. §§ 11-1-63 ........219

COUNT VI NEW JERSEY PRODUCTS LIABILITY ACT, N.J. STAT. §§ 2A:58C-1 *ET SEQ.* .......................................................................................220

COUNT VII OHIO PRODUCT LIABILITY ACT, ORC ANN. §§ 2307.71 *ET SEQ.* ...................221

COUNT VIII WASHINGTON PRODUCTS LIABILITY ACT, REV. CODE WASH. §§ 7.72-010 *ET SEQ.* ......................................................................222

COUNT IX NEGLIGENCE AND GROSS NEGLIGENCE UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, AND WISCONSIN ........................................................................................222

COUNT X FRAUD BY OMISSION UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, AND WISCONSIN ........................................................................226

COUNT XI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER
THE LAWS OF THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA,
COLORADO, DELAWARE, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI,
NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON,
RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND VIRGINIA ....... 229

COUNT XII VIOLATION OF STATE CONSUMER PROTECTION LAWS ............................. 231

    a.    Alabama, Ala. Code §§ 8-19-1 *et seq.* ................................................ 233

    b.    Arizona, Ariz. Rev. Stat. Ann. §§ 44-1521 *et seq.* ........................... 234

    c.    Arkansas, Ark. Code Ann. §§ 4-88-101 *et seq.* ................................. 234

    d.    California, California Civil Code §§ 1750 *et seq.*, Cal. Bus. &
Prof. Code §§ 17200 *et seq.* and § 17500 ........................................ 234

    e.    Colorado, Colo. Rev. Stat. §§ 6-1-101 *et seq.* ................................... 235

    f.    Delaware, 6 Del. C. § 2511 *et seq.* ................................................... 236

    g.    Illinois, 815 ILCS 505/1 *et seq.* and 815 ILCS 510 *et seq.* .............. 236

    h.    Indiana, Ind. Code § 24-5-0.5-1 *et seq.* ............................................ 237

    i.    Kentucky, Ky. Rev. Stat. Ann. §§ 367.110 *et seq.* ........................... 237

    j.    Maryland, Md. Com. Law Code Ann. § 13-101 *et seq.* .................... 238

    k.    Minnesota, Minn. Stat. §§ 325F.68 *et seq.*, §§ 325D.44 *et seq.* ........ 238

    l.    Missouri, Mo. Rev. Stat. §§ 407.010 *et seq.* .................................... 239

    m.    Nevada, Nev. Rev. Stat. §§ 598.0903 *et seq.* .................................... 239

    n.    New Jersey, N.J. Stat. Ann. §§ 56:8-1 *et seq.* ................................... 239

    o.    New Mexico, N.M. Stat. Ann. §§ 57-12-1 *et seq.* .............................. 240

    p.    New York, N.Y. Gen. Bus. Law § 349 ................................................ 240

    q.    North Carolina, N.C. Gen. Stat. §§ 75-1.1 *et seq.* ............................. 241

    r.    Ohio, Ohio Rev. Code §§ 1345.01 *et seq.* ........................................ 241

    s.    Oklahoma, 15 Okla. Stat. §§ 751 *et seq.* ........................................... 241

    t.    Oregon, Or. Rev. Stat. Ann. §§ 646.605 *et seq.* ................................ 242

    u.    Rhode Island, R.I. Gen. Laws §§ 6-13.1 *et seq.* ................................ 242

    v.    South Carolina, S.C. Code Ann. §§ 39-5-10 *et seq.* .......................... 243

    w.    Texas, Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.* ...................... 243

1

PRAYER FOR RELIEF ..................................................................................................244

2

JURY DEMAND.............................................................................................................245

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs bring this civil action for damages against Defendant Gilead Sciences, Inc. ("Gilead" or "Defendant"). Based on the investigation of counsel, Plaintiffs allege on information and belief as follows:

## I.      NATURE OF THE ACTION

1.      This action arises out of injuries Plaintiffs sustained as a result of ingesting one or more of the prescription drugs Viread, Truvada, Atripla, Complera, and Stribild, which are manufactured and marketed by Gilead for the treatment of Human Immunodeficiency Virus-1 ("HIV") infection.[1]

2.      Gilead designed each of the drugs to contain a form of the compound tenofovir that Gilead knew was toxic to patients' kidneys and bones. Tenofovir is a nucleotide analogue reverse transcriptase inhibitor ("NRTI"), one of the classes of antiretroviral drugs used to treat HIV. NRTIs work by blocking an enzyme HIV needs to replicate. Gilead did not discover tenofovir. Scientists in Europe discovered tenofovir in the 1980s, and though the anti-HIV properties of tenofovir were promising, it had a downside: it cannot not be administered effectively by mouth.

3.      Because an intravenous tenofovir formulation had little sales potential, Gilead developed a form of tenofovir, tenofovir disoproxil, which can be taken orally.[2] The fumaric acid salt of tenofovir disoproxil is tenofovir disoproxil fumarate ("TDF"). When a patient takes a pill containing TDF, the patient's body converts TDF into tenofovir. Although TDF can be taken by mouth, a high dose of 300 mg is typically required to achieve the desired therapeutic effect.

4.      Gilead designed TDF 300 mg to be an active ingredient in five drugs that are approved to treat HIV: Viread (TDF 300 mg tablets), approved October 26, 2001; Truvada (TDF 300 mg/emtricitabine 200 mg tablets), approved August 2, 2004; Atripla (TDF 300 mg/emtricitabine 200 mg/efavirenz 600 mg tablets), approved July 12, 2006; Complera (TDF 300 mg/emtricitabine 200

---

[1] Viread is also indicated to treat Hepatitis B. And Truvada is also indicated for use in combination with safe sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk.

[2] Tenofovir disoproxil is a prodrug form of tenofovir. Prodrugs are pharmacologically inactive compounds that can be more efficiently absorbed into the bloodstream and then converted into the active form of the drug within the body.

mg/rilpivirine 25 mg tablets), approved August 10, 2011; and Stribild (TDF 300 mg/emtricitabine 200 mg/elvitegravir 150 mg/cobicistat 150 mg tablets), approved August 27, 2012 (collectively, these are the "TDF Drugs").

5.    Before Gilead began selling its first TDF Drug, Viread, in 2001, Gilead knew that TDF posed a safety risk to patients' kidneys and bones. Gilead knew that two of its other antiviral drugs with structures similar to tenofovir, cidofovir and adefovir dipivoxil, had been highly nephrotoxic (i.e., toxic to kidneys) and that preclinical data for TDF showed that it could cause significant kidney and bone damage. Gilead also knew that the relatively high dose of TDF created a greater risk of toxic effects, and that bone and kidney toxicities were even more likely to be seen with long-term use of TDF for the treatment of a virus that, for the foreseeable future, has no cure.

6.    Gilead's knowledge of the toxic effects of TDF only grew as patients began treatment with and were injured by each successive TDF product. By the time Gilead designed Stribild, it had ten years' worth of cumulative evidence that TDF injured patients' kidneys and bones.

7.    Gilead also knew, before it obtained approval to market Viread and Gilead's subsequent TDF Drugs, that it had discovered a safer tenofovir prodrug, tenofovir alafenamide fumarate ("TAF"). TAF is absorbed into the cells HIV targets much more efficiently than TDF. As a result, TAF can be administered at a dramatically reduced dose compared to TDF, but still achieve the same or higher concentrations of active tenofovir in the target cells. Because TAF can be administered at a much lower dose than TDF, its use is associated with less toxicity and fewer side effects. A 25 mg dose of TAF achieves the same therapeutic effect as a 300 mg dose of TDF, with a better safety profile. Despite knowing that TAF could be given at a much lower, safer dose, Gilead designed Viread, Truvada, Atripla, Complera, and Stribild to contain TDF rather than safer TAF.

8.    Falsely claiming that TAF was not different enough from TDF, Gilead abruptly shelved its TAF design in 2004. However, as John Milligan, Gilead's President and Chief Executive Officer, later admitted to investment analysts, the real reason Gilead abandoned the TAF design was that TAF was *too different* from TDF. Once Gilead's first TDF product, Viread, was on the market, Gilead did not want to hurt TDF sales by admitting that its TDF-based products are unreasonably and unnecessarily unsafe.

9.     It was crucial at that time for Gilead to increase Viread sales, which comprised 53% of Gilead's total product sales in 2002, and 68% of Gilead's total product sales in 2003. Gilead was so desperate to expand Viread sales that when promoting the drug to doctors, it called Viread a "miracle drug" with "no toxicities." Gilead did not tell doctors the facts: that Viread posed significant risks to patients' kidneys and bones.

10.     In addition, Gilead knew that by withholding the safer TAF design, it could extend the longevity of its HIV drug franchise and make billions two times over: first, with TDF medications until TDF patent expiration, which would begin by no later than 2018, and second, with TAF medications until TAF patent expiration as late as 2032. Only once Gilead realized billions in sales through most of the TDF patent life did it seek to market safer TAF-based versions of its HIV medications.

11.     Finally, in 2015, Gilead began selling the first of its TAF-designed medicines and convinced doctors to switch their patients from TDF-based to TAF-based regimens by demonstrating TAF's superior safety profile over TDF with respect to kidney and bone toxicity—the very benefits that Gilead could have and should have incorporated into its prior product designs but withheld from doctors and patients for over a decade.

12.     Gilead also made Stribild even more dangerous to Plaintiffs when it designed the drug to include cobicistat in combination with 300 mg TDF. Cobicistat is a pharmacoenhancer or "booster" that inhibits the breakdown of elvitegravir, another active ingredient in Stribild. Cobicistat allows elvitegravir to persist in the patient's system long enough to permit once-daily dosing.

13.     Gilead knew years before it developed Stribild that: (a) higher tenofovir concentrations in patients' blood, as opposed to the target cells, endangers the kidneys; (b) tenofovir concentrations in patients' blood increase significantly when patients take tenofovir with a booster; and (c) TDF-associated renal toxicity occurs more frequently in patients taking TDF as part of a boosted regimen.

14.     When Gilead developed its first TAF-based antiviral product, Genvoya—which is Stribild with TAF in place of TDF—Gilead reduced the dose of TAF from 25 mg to 10 mg to account for the fact that cobicistat significantly increases tenofovir concentrations. Gilead knew to

reduce the dose of TAF in Genvoya before it submitted Stribild to the FDA for marketing approval. Despite this knowledge, Gilead did not reduce the dose of TDF when it designed Stribild. Stribild is even more toxic to patients' kidneys and bones than Gilead's other TDF-based products.

15.     In addition to withholding safer designs, Gilead failed to adequately warn physicians and patients about the risks and safe use of TDF. Gilead provided only the weakest, inadequate warnings to doctors and patients about the need for frequent monitoring of all patients for TDF-associated kidney and bone damage—preventing doctors from detecting early signs of TDF toxicity.

16.     Gilead provides stronger monitoring warnings to physicians and patients in the European Union (EU) than it does in the United States for the exact same TDF products. Contrary to its U.S. labeling, Gilead has consistently recommended, since the approval of its first TDF Drug in the EU, that doctors in the EU monitor all TDF Drug patients for multiple markers of TDF toxicity on a frequent, specified schedule. There is no scientific or medical rationale for these differences. Gilead was more concerned with increasing or maintaining crucial U.S. sales than it was in safeguarding patients from the known risks of TDF.

17.     Gilead could have strengthened the warnings in its U.S. labels at any time, including before and after FDA approval. After August 2008, Gilead could have unilaterally strengthened the warnings in its TDF Drug labels based on: increasing evidence that patients with and without preexisting risk factors were experiencing adverse effects with a frequency and severity greater than reported in Gilead's Viread clinical trials; expanding evidence that all patients are at risk for TDF-induced nephrotoxicity; and Gilead's own determinations to give stronger warnings regarding the exact same TDF Drugs in the EU. This post-approval information demonstrated risks of a different frequency and severity than information previously presented to the FDA.

18.     Gilead intentionally withheld a safer alternative design of TDF Drugs it knew to be dangerously toxic to patients' kidneys and bones, while failing to adequately warn about the risks and safer use of the defective drugs, solely to make more money. Accordingly, Plaintiffs bring this action to recover damages for their personal injuries and seek punitive damages arising from Gilead's willful and wanton conduct.

## II.   JURISDICTION AND VENUE

19.     Jurisdiction exists under 28 U.S.C. § 1332(d) because this is a mass action involving claims for monetary relief of 100 or more persons that involve common questions of law or fact; some Plaintiffs are citizens of a state different from Gilead; Plaintiffs' claims exceed $5 million in the aggregate, exclusive of interest and costs; and Plaintiffs' claims exceed the sum or value of $75,000, exclusive of interest and costs.

20.     Jurisdiction also exists under 28 U.S.C. § 1332(a) for those Plaintiffs who are citizens of states other than California. Non-California Plaintiffs and Gilead are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

21.     Venue is proper in this District under 28 U.S.C. § 1391(1)–(2). Defendant resides in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III.   INTRADISTRICT ASSIGNMENT

22.     Pursuant to Civil L.R. 3-2(c), this action has been assigned to the San Francisco Division. Gilead resides and has its principal place of business in San Mateo County.

## IV.   PARTIES

23.     Plaintiffs are consumers who ingested one or more of the following TDF Drugs: Viread, Truvada, Atripla, Complera, or Stribild.

24.     Plaintiffs suffered personal injuries caused by ingesting TDF.

25.     Plaintiff Adrian Holley is and was at all relevant times a citizen of the State of Alabama and domiciled in Alexander City, Alabama. Plaintiff Adrian Holley purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused demineralization of Plaintiff's bones, resulting in a diagnosis of low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

26.     Plaintiff Aloysius William Reiter is and was at all relevant times a citizen of the State of Missouri and domiciled in St. Louis, Missouri. Plaintiff Aloysius William Reiter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2004 to 2012, Truvada from 2012 to 2014, and Stribild until 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to a fracture of Plaintiff's toe. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

27.     Plaintiff Alvin Washington is and was at all relevant times a citizen of the State of Florida and domiciled in Orlando, Florida. Plaintiff Alvin Washington purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2014, Atripla from 2014 to 2017, and Stribild from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to develop kidney dysfunction and severe kidney failure, which has caused or contributed to Plaintiff's depression and disability. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including dialysis three times per week for approximately two years. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28.     Plaintiff Andrew Gudgel is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Durant, Oklahoma. Plaintiff Andrew Gudgel purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2009 to 2014 and Stribild

1    from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF

2    Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

3    TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

4    osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in

5    connection with medical treatment as a result of these injuries. Plaintiff has endured and will

6    continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

7    injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

8    to be proven at trial.

9            29.     Plaintiff Annette Cannon Johnson is and was at all relevant times a citizen of the State

10   of Maryland and domiciled in Baltimore, Maryland. Plaintiff Annette Cannon Johnson purchased

11   and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild. As a result of

12   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

13   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

14   kidney damage and be diagnosed with chronic kidney disease. Plaintiff required and incurred and

15   will continue to require and incur expenses in connection with medical treatment as a result of these

16   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

17   enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning

18   capacity, and other injuries and damages to be proven at trial.

19           30.     Plaintiff Anthony Adams is and was at all relevant times a citizen of the State of

20   Florida and domiciled in Ft. Lauderdale, Florida. Plaintiff Anthony Adams purchased and ingested

21   the following TDF Drugs for an FDA-approved use of the drugs: Atripla, Truvada and Stribild from

22   2004 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

23   Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

24   Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with

25   osteoporosis, and which caused or contributed to fractures of Plaintiff's shins. Plaintiff required and

26   incurred and will continue to require and incur expenses in connection with medical treatment as a

27   result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

28   anguish, and loss of enjoyment of life, including limitations on Plaintiff's activities as an avid cycler

FIRST AMENDED CONSOLIDATED COMPLAINT – 7
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

1    and runner, as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity,

2    and other injuries and damages to be proven at trial.

3          31.    Plaintiff Anthony B. Wilson is and was at all relevant times a citizen of the State of

4    Georgia and domiciled in Augusta, Georgia. Plaintiff Anthony B. Wilson purchased and ingested the

5    following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2015. As a result of

6    Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

7    injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

8    bone demineralization, for which Plaintiff was diagnosed with severe osteoporosis in his twenties

9    and which caused or contributed to a fracture to Plaintiff's wrist. Plaintiff required and incurred and

10   will continue to require and incur expenses in connection with medical treatment as a result of these

11   injuries, including extremely painful weight bearing exercises. Plaintiff has endured and will

12   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

13   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

14   to be proven at trial.

15          32.    Plaintiff Anthony Tyrone Jackson is and was at all relevant times a citizen of the State

16   of Georgia and domiciled in Stone Mountain, Georgia. Plaintiff Anthony Tyrone Jackson purchased

17   and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to

18   July of 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,

19   Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug

20   caused Plaintiff to suffer significant bone demineralization. At only thirty-two years of age, Plaintiff

21   has difficulty lifting his leg without assistance, is in constant pain, and was forced to leave his career

22   as a mass transit specialist. Plaintiff required and incurred and will continue to require and incur

23   expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

24   will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

25   his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

26   damages to be proven at trial.

27          33.    Plaintiff Antiqua Shirley is and was at all relevant times a citizen of the State of

28   Georgia and domiciled in Gainesville, Georgia. Plaintiff Antiqua Shirley purchased and ingested the

following TDF Drugs for an FDA-approved use of the drugs: Viread from 2003 to 2008, Truvada from 2009 to 2010, Atripla from 2009 to 2015 and Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. At the young age of thirty-eight, Plaintiff's injuries have caused Plaintiff to limit her physical activity and have resulted in a determination that Plaintiff is disabled. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

34.     Plaintiff Antonio Kincey is and was at all relevant times a citizen of the State of Nevada and domiciled in Las Vegas, Nevada. Plaintiff Antonio Kincey purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2011 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

35.     Plaintiff Antonio Lavelle Jackson is and was at all relevant times a citizen of the State of Ohio and domiciled in Euclid, Ohio. Plaintiff Antonio Lavelle Jackson purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2011 to 2013 and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer significant bone injury, which his healthcare provider attributed to TDF. Plaintiff required and incurred and will continue to require and incur expenses in connection

1    with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure

2    pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

3    lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

4    36.    Plaintiff Barry Todd Moses is and was at all relevant times a citizen of the State of

5    Alabama and domiciled in Moody, Alabama. Plaintiff Barry Todd Moses purchased and ingested the

6    following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2017. As a result of

7    Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

8    injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused bone

9    demineralization in Plaintiff, resulting in a diagnosis of osteopenia and osteoporosis. Plaintiff

10   required and incurred and will continue to require and incur expenses in connection with medical

11   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

12   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

13   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

14   37.    Plaintiff Barry Weatherley is and was at all relevant times a citizen of the State of

15   New York and domiciled in Bronx, New York. Plaintiff Barry Weatherley purchased and ingested

16   the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2009 to

17   2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

18   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

19   Plaintiff to suffer bone demineralization, which caused or contributed to multiple fractures to

20   Plaintiff's feet. Plaintiff required and incurred and will continue to require and incur expenses in

21   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

22   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

23   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

24   to be proven at trial.

25   38.    Plaintiff Bettie Jean Thomas is and was at all relevant times a citizen of the State of

26   Virginia and domiciled in Alexandria, Virginia. Plaintiff Bettie Jean Thomas purchased and ingested

27   the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild. As a

28   result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and

1    was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to

2    suffer kidney failure. Plaintiff required and incurred and will continue to require and incur expenses

3    in connection with medical treatment as a result of these injuries. Plaintiff has endured and will

4    continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

5    injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

6    to be proven at trial.

7              39.      Plaintiff Bradley McDonald is and was at all relevant times a citizen of the State of

8    California and domiciled in Los Angeles, California. Plaintiff Bradley McDonald purchased and

9    ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to

10   2007, Atripla from 2007 to 2014 and Stribild from April 2014 to September 2015. As a result of

11   Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was

12   injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer

13   kidney dysfunction. Plaintiff required and incurred and will continue to require and incur expenses in

14   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

15   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

16   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

17   to be proven at trial.

18             40.      Plaintiff Brandon Sledge is and was at all relevant times a citizen of the State of

19   Louisiana and domiciled in Monroe, Louisiana. Plaintiff Brandon Sledge purchased and ingested the

20   following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of

21   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

22   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

23   end-stage renal failure, requiring hospitalization and dialysis. Plaintiff required and incurred and will

24   continue to require and incur expenses in connection with medical treatment as a result of these

25   injuries, including hospitalization and dialysis. Plaintiff has endured and will continue to endure

26   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

27   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28

41.     Plaintiff Brian Maxey is and was at all relevant times a citizen of the State of Missouri and domiciled in St. Louis, Missouri. Plaintiff Brian Maxey purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2007 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

42.     Plaintiff Carlos Proctor is and was at all relevant times a citizen of the State of Maryland and domiciled in Clinton, Maryland. Plaintiff Carlos Proctor purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer damages to his kidneys, resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

43.     Plaintiff Christian Torres is and was at all relevant times a citizen of the State of Florida and domiciled in Hialeah, Florida. Plaintiff Christian Torres purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer low bone density at the young age of twenty-five. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of

1   life as a result of his injuries, including loss of mobility, and has suffered lost earnings and/or a loss
2   of earning capacity, and other injuries and damages to be proven at trial.

3       44.     Plaintiff Christine Cope is and was at all relevant times a citizen of the State of Texas
4   and domiciled in New Braunfels, Texas. Plaintiff Christine Cope purchased and ingested the
5   following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Complera and
6   Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff
7   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused
8   Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis.
9   Plaintiff required and incurred and will continue to require and incur expenses in connection with
10  medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,
11  suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost
12  earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

13      45.     Plaintiff Clarence E. Southall Jr. is and was at all relevant times a citizen of the State
14  of Texas and domiciled in Missouri City, Texas. Plaintiff Clarence E. Southall Jr. purchased and
15  ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from April 2016 to
16  November 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,
17  Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug
18  caused Plaintiff to experience dangerously high levels of creatinine. Plaintiff required and incurred
19  and will continue to require and incur expenses in connection with medical treatment as a result of
20  these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and
21  loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning
22  capacity, and other injuries and damages to be proven at trial.

23      46.     Plaintiff Claudio Moreira is and was at all relevant times a citizen of the State of
24  Florida and domiciled in Pierson, Florida. Plaintiff Claudio Moreira purchased and ingested the
25  following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, and Stribild
26  for approximately 10 years. As a result of Gilead's wrongful conduct with respect to the defective
27  TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of
28  the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with

osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

47.     Plaintiff Colette Eva Gilmer is and was at all relevant times a citizen of the State of South Carolina and domiciled in Columbia, South Carolina. Plaintiff Colette Eva Gilmer purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2016 to August 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to a compound fracture in Plaintiff's spine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

48.     Plaintiff Curtis Pritchett is and was at all relevant times a citizen of the State of North Carolina and domiciled in Gastonia, North Carolina. Plaintiff Curtis Pritchett purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2013 and Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, resulting in a diagnosis of kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

49.     Plaintiff Cynthia Durant is and was at all relevant times a citizen of the State of Minnesota and domiciled in Brooklyn Park, Minnesota. Plaintiff Cynthia Durant purchased and

ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Truvada, then Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

50.     Plaintiff Cynthia Lorraine Spears is and was at all relevant times a citizen of the State of California and domiciled in Playa Del Rey, California. Plaintiff Cynthia Lorraine Spears purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild, Truvada, and Viread for a total of approximately six years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from Fanconi syndrome, bone demineralization, and a fracture of Plaintiff's foot. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

51.     Plaintiff D'Andre L. Hale is and was at all relevant times a citizen of the State of Ohio and domiciled in Cincinnati, Ohio. Plaintiff D'Andre L. Hale purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla, Truvada, and Stribild from 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to experience proteinuria. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

52.     Plaintiff Dameco Gates is and was at all relevant times a citizen of the State of California and domiciled in Hawthorne, California. Plaintiff Dameco Gates purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer from bone demineralization and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

53.     Plaintiff Daniel J. McLean is and was at all relevant times a citizen of the State of Florida and domiciled in St. Petersburg, Florida. Plaintiff Daniel J. McLean purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney dysfunction, including a reduction in his kidney function to 50 percent. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

54.     Plaintiff Daniel Schenske-Shelton is and was at all relevant times a citizen of the State of Florida and domiciled in Orlando, Florida. Plaintiff Daniel Schenske-Shelton purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2016 and Stribild in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney failure. Plaintiff required and incurred and will continue

1   to require and incur expenses in connection with medical treatment as a result of these injuries,

2   including hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental

3   anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

4   loss of earning capacity, and other injuries and damages to be proven at trial.

5          55.     Plaintiff Darron Barnes is and was at all relevant times a citizen of the State of

6   Maryland and domiciled in Baltimore, Maryland. Plaintiff Darron Barnes purchased and ingested the

7   following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2014 to

8   2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

9   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

10  Plaintiff to suffer kidney dysfunction and disease. Plaintiff required and incurred and will continue to

11  require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

12  has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of

13  life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other

14  injuries and damages to be proven at trial.

15         56.     Plaintiff Darryl Flammer is and was at all relevant times a citizen of the State of

16  Maryland and domiciled in Silver Spring, Maryland. Plaintiff Darryl Flammer purchased and

17  ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild. As a

18  result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and

19  was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to

20  suffer dangerously high creatinine levels and bone demineralization, resulting in a diagnosis of

21  osteoporosis and fractures to Plaintiff's hips and ankle. Plaintiff's injuries required Plaintiff to use a

22  wheelchair for mobility and caused Plaintiff mental pain, distress and anguish as a result of being

23  unable to care for his elderly mother. Plaintiff required and incurred and will continue to require and

24  incur expenses in connection with medical treatment as a result of these injuries, including surgery.

25  Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

26  enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

27  capacity, and other injuries and damages to be proven at trial.

28

1    57.    Plaintiff Daryl Lindsay is and was at all relevant times a citizen of the State of Texas

2    and domiciled in Milano, Texas. Plaintiff Daryl Lindsay purchased and ingested the following TDF

3    Drugs for an FDA-approved use of the drugs: Viread and Stribild. As a result of Gilead's wrongful

4    conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing

5    TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization,

6    for which Plaintiff was diagnosed with osteopenia and which caused or contributed to Plaintiff

7    suffering fractures in his hips and ankles. Plaintiff required and incurred and will continue to require

8    and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

9    endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

10   a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

11   and damages to be proven at trial.

12   58.    Plaintiff David Gonzales is and was at all relevant times a citizen of the State of

13   Colorado and domiciled in Denver, Colorado. Plaintiff David Gonzales purchased and ingested the

14   following TDF Drugs for an FDA-approved use of the drugs: Truavda and Stribild from 2008 to

15   2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

16   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

17   Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff

18   required and incurred and will continue to require and incur expenses in connection with medical

19   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

20   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

21   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

22   59.    Plaintiff David Johnson is and was at all relevant times a citizen of the State of

23   Florida and domiciled in DeFuniak Springs, Florida. Plaintiff David Johnson purchased and ingested

24   the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and

25   Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective

26   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

27   the TDF Drugs caused Plaintiff to suffer chronic kidney disease and bone demineralization, for

28   which Plaintiff was diagnosed with osteoporosis, and which caused or contributed to numerous

1  compression fractures in Plaintiff's spine. Plaintiff required and incurred and will continue to require

2  and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

3  endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

4  a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

5  and damages to be proven at trial.

6       60.    Plaintiff David Maloney is and was at all relevant times a citizen of the State of

7  Colorado and domiciled in Lakewood, Colorado. Plaintiff David Maloney purchased and ingested

8  the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, and Stribild. As a

9  result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and

10  was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to

11  suffer from kidney dysfunction and damage to Plaintiff's kidneys. Plaintiff required and incurred and

12  will continue to require and incur expenses in connection with medical treatment as a result of these

13  injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

14  enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

15  capacity, and other injuries and damages to be proven at trial.

16       61.    Plaintiff David Oneal Bozeman is and was at all relevant times a citizen of the State

17  of Mississippi and domiciled in Moss Point, Mississippi. Plaintiff David Oneal Bozeman purchased

18  and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla,

19  Stribild and Complera beginning in 2004. As a result of Gilead's wrongful conduct with respect to

20  the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

21  ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and kidney failure

22  requiring surgery and hospitalization. Plaintiff required and incurred and will continue to require and

23  incur expenses in connection with medical treatment as a result of these injuries, including inpatient

24  hospitalization and surgery. Plaintiff has endured and will continue to endure pain, suffering, mental

25  anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

26  loss of earning capacity, and other injuries and damages to be proven at trial.

27       62.    Plaintiff David Zajac is and was at all relevant times a citizen of the State of

28  Wisconsin and domiciled in Milwaukee, Wisconsin. Plaintiff David Zajac purchased and ingested

the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

63.     Plaintiff Demetrius Waters is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff Demetrius Waters purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla, Complera and Stribild from 2008 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from kidney dysfunction and damage to Plaintiff's kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

64.     Plaintiff Dennis Phillips is and was at all relevant times a citizen of the State of Pennsylvania and domiciled in Stroudsburg, Pennsylvania. Plaintiff Dennis Phillips purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla for approximately one year in 2014 and Stribild from 2015 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer loss of kidney function and stage 3 chronic kidney disease. Plaintiff's injuries have caused and will continue to cause extreme pain, mental anguish, fear and distress relating to swelling caused by his condition and related shortness of breath. Plaintiff required and incurred and will continue to require and incur expenses in connection

with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

65.     Plaintiff Deshawn C. Mitchell is and was at all relevant times a citizen of the State of New York and domiciled in Bronx, New York. Plaintiff Deshawn C. Mitchell purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Complera from 2013 to 2015 and Stribild beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, resulting in renal failure and a diagnosis of chronic kidney disease and requiring hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

66.     Plaintiff Dinah Hardy is and was at all relevant times a citizen of the State of Mississippi and domiciled in Jackson, Mississippi. Plaintiff Dinah Hardy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2013 to 2015 and Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to her kidneys, resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

67.     Plaintiff Douglas Leroy Phipps is and was at all relevant times a citizen of the State of California and domiciled in Pomona, California. Plaintiff Douglas Leroy Phipps purchased and

ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2012 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused damage to Plaintiff's kidneys, for which Plaintiff was diagnosed with stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

68.     Plaintiff Duane Lewis is and was at all relevant times a citizen of the State of California and domiciled in Sacramento, California. Plaintiff Duane Lewis purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Complera from 2013 to 2014 and Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with osteoporosis and which caused two of Plaintiff's vertebrae to fracture. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

69.     Plaintiff Dushawn Walker is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Dushawn Walker purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with low bone density. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

1    suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

2    earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

3        70.    Plaintiff Dwayne Ross is and was at all relevant times a citizen of the State of Florida

4    and domiciled in Palmetto, Florida. Plaintiff Dwayne Ross purchased and ingested the following

5    TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2015. As a result of Gilead's

6    wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the

7    foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney

8    dysfunction beginning at the young age of forty, and bone demineralization, for which he was

9    diagnosed with osteoporosis at the young age of forty-one. Plaintiff required and incurred and will

10   continue to require and incur expenses in connection with medical treatment as a result of these

11   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

12   enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

13   capacity, and other injuries and damages to be proven at trial.

14       71.    Plaintiff Earl Roberts III is and was at all relevant times a citizen of the State of

15   Delaware and domiciled in Seaford, Delaware. Plaintiff Earl Roberts III purchased and ingested the

16   following TDF Drugs for an FDA-approved use of the drugs: Viread for approximately one year,

17   Truvada from 2014 to 2015 and Stribild for approximately six months in 2016. As a result of

18   Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was

19   injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer

20   weakness of the bones, which caused or contributed to fractures to Plaintiff's ribs. Plaintiff required

21   and incurred and will continue to require and incur expenses in connection with medical treatment as

22   a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

23   anguish, and loss of enjoyment of life including an inability to perform his employment transporting

24   medical patients, as a result of his injuries, has suffered lost earnings and/or a loss of earning

25   capacity, and other injuries and damages to be proven at trial.

26       72.    Plaintiff Elizabeth Anne Flournoy is and was at all relevant times a citizen of the State

27   of Georgia and domiciled in Atlanta, Georgia. Plaintiff Elizabeth Anne Flournoy purchased and

28   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2005

FIRST AMENDED CONSOLIDATED COMPLAINT – 23
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

and Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney failure, for which she has had to undergo multiple dialysis treatments per week for more than a decade. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer bone demineralization, for which she was diagnosed with osteoporosis and for which she had to undergo painful bone marrow scrapings and other testing and treatment. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including dialysis, diagnostic testing, physician visits, hectoral injections, physical therapy and other treatments. Plaintiff must also use a walker or a cane when for mobility. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, including the total loss of her career, loss of enjoyment of life, and other injuries and damages to be proven at trial.

73.     Plaintiff Emily Jean Butler is and was at all relevant times a citizen of the State of South Carolina and domiciled in Georgetown, South Carolina. Plaintiff Emily Jean Butler purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

74.     Plaintiff Emmanuel Desire is and was at all relevant times a citizen of the State of Florida and domiciled in Hernando, Florida. Plaintiff Emmanuel Desire purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

1    TDF Drugs caused Plaintiff to suffer bone demineralization and low bone density, which caused or

2    contributed to a fall in which Plaintiff suffered cuts to his face, arms and legs. Plaintiff's physicians

3    have also recommended that Plaintiff retire early due to his injuries. Plaintiff required and incurred

4    and will continue to require and incur expenses in connection with medical treatment as a result of

5    these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and

6    loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

7    capacity, and other injuries and damages to be proven at trial.

8          75.    Plaintiff Faykeita Lenore Wearing is and was at all relevant times a citizen of the

9    State of Pennsylvania and domiciled in Philadelphia Pennsylvania. Plaintiff Faykeita Lenore

10   Wearing purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs:

11   Atripla from 2006 to 2009 and Stribild from 2012 to 2015. As a result of Gilead's wrongful conduct

12   with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF

13   Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for

14   which Plaintiff was diagnosed with osteoporosis. Plaintiff's injuries have required her to use a cane

15   for walking, leave her career and go on disability. Plaintiff's ingestion of the TDF Drugs also caused

16   Plaintiff, who is under age 50, to suffer acute kidney failure and coma. Plaintiff required and

17   incurred and will continue to require and incur expenses in connection with medical treatment as a

18   result of these injuries, including inpatient hospitalization and dialysis. Plaintiff has endured and will

19   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

20   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

21   to be proven at trial.

22         76.    Plaintiff Felipe June Quiambao is and was at all relevant times a citizen of the State of

23   New Mexico and domiciled in Espanola, New Mexico. Plaintiff Felipe June Quiambao purchased

24   and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and

25   Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective

26   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

27   the TDF Drugs caused Plaintiff to suffer low bone density and loss of kidney function. Plaintiff

28   required and incurred and will continue to require and incur expenses in connection with medical

treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

77.     Plaintiff Fred Monroe Cobbett Jr. is and was at all relevant times a citizen of the State of Mississippi and domiciled in Olive Branch, Mississippi. Plaintiff Fred Monroe Cobbett Jr. purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer kidney failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including hospitalization and dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

78.     Plaintiff Georgia Elaine Tanner is and was at all relevant times a citizen of the State of Texas and domiciled in Killeen, Texas. Plaintiff Georgia Elaine Tanner purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla to 2016 and Stribild beginning in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

79.     Plaintiff Gilbert James, individually and as personal representative for the Estate of Tammy Guydon, is and was at all relevant times a citizen of the State of Arkansas and domiciled in

1   Little Rock, Arkansas. Plaintiff, Gilbert James is the husband of Tammy Guydon, deceased.

2   Decedent, Tammy Guydon purchased and ingested the following TDF Drugs for an FDA-approved

3   use of the drugs: Truvada from 2013 to 2016 and Stribild from 2013 to 2016. As a result of Gilead's

4   wrongful conduct with respect to the defective TDF Drugs, Decedent ingested and was injured by the

5   foregoing TDF Drugs. Decedent's ingestion of the TDF Drugs caused Decedent to suffer kidney

6   failure, which ultimately resulted in her death. Decedent's ingestion of the defective TDF Drugs also

7   caused Decedent to suffer bone demineralization and weakening of her bones. Decedent required and

8   incurred expenses in connection with medical treatment as a result of these injuries, including

9   hospitalization and dialysis. As a direct and proximate result of Defendant Gilead's wrongful

10  conduct, Decedent Tammy Guydon suffered severe bodily injuries, pain, suffering, mental anguish,

11  loss of enjoyment of life and loss of earnings and/or earning capacity, up to the time of her death.

12  Decedent's death was a direct and proximate result of Defendant's wrongful conduct and the injuries

13  caused to Decedent by Defendant's wrongful conduct. Plaintiff James Gilbert, individually and in his

14  capacity as representative for the Estate of Tammy Guydon, has suffered loss of consortium in the

15  past and future, including loss of the relationship, loss of affection, society, assistance, emotional

16  support, care, comfort, solace, companionship, protection, and services; past and future pecuniary

17  losses including earning capacity, advice, counsel, services, care, maintenance, support, and

18  contributions that he would, in reasonable probability, have received had his wife lived; past and

19  future mental anguish; and past and future pecuniary losses including earning capacity; and the

20  necessary expenses for any emergency care and funeral and burial expenses of Decedent Tammy

21  Guydon; and other damages to be proven at trial.

22          80.     Plaintiff Gloria Lynn Green is and was at all relevant times a citizen of the State of

23  Alabama and domiciled in Birmingham, Alabama. Plaintiff Gloria Lynn Green purchased and

24  ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from

25  approximately 2011 to 2018. As a result of Gilead's wrongful conduct with respect to the defective

26  TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

27  the TDF Drugs caused damage to and weakening of Plaintiff's bones. Plaintiff required and incurred

28  and will continue to require and incur expenses in connection with medical treatment as a result of

these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

81.     Plaintiff Grace Marie Thomas is and was at all relevant times a citizen of the State of Louisiana and domiciled in St. Gabriel, Louisiana. Plaintiff Grace Marie Thomas purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life including loss of mobility and personal freedom as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

82.     Plaintiff George Allen Myers is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff George Allen Myers purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild, Complera, Truvada, and Atripla from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from bone demineralization, for which he was diagnosed with osteoporosis, and which has caused or contributed to multiple rib fractures. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

83.     Plaintiff Hector Manuel Bedoya is and was at all relevant times a citizen of the State of California and domiciled in Ponoma, California. Plaintiff Hector Manuel Bedoya purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild, Viread, and

1   Truvada. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

2   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

3   Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff

4   required and incurred and will continue to require and incur expenses in connection with medical

5   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

6   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

7   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

8          84.     Plaintiff Herbie Kay Dehorney is and was at all relevant times a citizen of the State of

9   California and domiciled in Moreno Valley, California. Plaintiff Herbie Kay Dehorney purchased

10  and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to

11  2004, Truvada from 2004 to 2007, Atripla from 2007 to 2011, Complera from 2011 to 2013 and

12  Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

13  TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

14  the TDF Drugs caused Plaintiff to suffer bone demineralization at the young age of forty-four, which

15  caused or contributed to a fracture of Plaintiff's jaw. Plaintiff required and incurred and will continue

16  to require and incur expenses in connection with medical treatment as a result of these injuries,

17  including physical therapy. Plaintiff has endured and will continue to endure pain, suffering, mental

18  anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a

19  loss of earning capacity, and other injuries and damages to be proven at trial.

20         85.     Plaintiff Jamal Loranso Smith is and was at all relevant times a citizen of the State of

21  Nevada and domiciled in Las Vegas, Nevada. Plaintiff Jamal Loranso Smith purchased and ingested

22  the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Complera prior to 2013

23  and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the

24  defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

25  ingestion of the TDF Drugs caused Plaintiff to suffer stage 3 chronic kidney disease and bone

26  demineralization resulting in a diagnosis of low bone density. Plaintiff required and incurred and will

27  continue to require and incur expenses in connection with medical treatment as a result of these

28  injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

1    enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

2    capacity, and other injuries and damages to be proven at trial.

3            86.     Plaintiff Jermaine Carter is and was at all relevant times a citizen of the State of Ohio

4    and domiciled in New Philadelphia, Ohio. Plaintiff Jermaine Carter purchased and ingested the

5    following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2013 to

6    2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

7    ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

8    Plaintiff to suffer damages to his kidneys, resulting in a diagnosis of chronic kidney disease. Plaintiff

9    required and incurred and will continue to require and incur expenses in connection with medical

10   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

11   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

12   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

13           87.     Plaintiff Jermaine Fleming is and was at all relevant times a citizen of the State of

14   Maryland and domiciled in Baltimore, Maryland. Plaintiff Jermaine Fleming purchased and ingested

15   the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2012. As a

16   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

17   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

18   suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis while only in his

19   forties. Plaintiff required and incurred and will continue to require and incur expenses in connection

20   with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure

21   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

22   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

23           88.     Plaintiff Jerry Miller is and was at all relevant times a citizen of the State of New

24   York and domiciled in Syracuse, New York. Plaintiff Jerry Miller purchased and ingested the

25   following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of

26   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

27   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

28   reduced kidney function. Plaintiff required and incurred and will continue to require and incur

expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

89.     Plaintiff John Doe 1 is and was at all relevant times a citizen of the State of North Carolina and domiciled in Winston-Salem, North Carolina. Plaintiff John Doe 1 purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild for approximately four years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which he was diagnosed with low bone density at the young age of thirty-four. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

90.     Plaintiff John Lee Pullen is and was at all relevant times a citizen of the State of Maryland and domiciled in Charles County, Maryland. Plaintiff John Lee Pullen purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2005 to 2011, Complera from 2011 to 2015 and Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteopenia at the young age of forty-five. Plaintiff's osteopenia and related deterioration have occurred in his spine, which has caused plaintiff extreme pain and suffering as well as continual numbness in his left foot and has caused Plaintiff to lose over an inch in height. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including working out, sexual relations, visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and

therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff John Lee Pullen must often use a cane or walker for mobility due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty climbing stairs in his three-level townhome. Plaintiff's injuries have also had a negative impact on his career as an IT consultant for a federal agency in that his injuries have caused him to require time off from work and require Plaintiff to take frequent breaks. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery and physical therapy. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

91.     Plaintiff Juan Villareal Sr. is and was at all relevant times a citizen of the State of Arizona and domiciled in Phoenix, Arizona. Plaintiff Juan Villareal Sr. purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer from renal failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including inpatient hospitalization Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

92.     Plaintiff Kathi Ray is and was at all relevant times a citizen of the State of Oregon and domiciled in McMinnville, Oregon. Plaintiff Kathi Ray purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2010 to 2013 and Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff's ingestion of the TDF Drugs has also caused Plaintiff to suffer stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection

with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

93.     Plaintiff Katina Hall is and was at all relevant times a citizen of the State of Alabama and domiciled in Birmingham, Alabama. Plaintiff Katina Hall purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild for approximately five years. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused bone demineralization in Plaintiff's hips, bilaterally, resulting in a diagnosis of low bone density at the young age of 35. As a result, Plaintiff Katina Hall has extreme difficulty walking and has endured multiple back surgeries due to deterioration and to relieve the severe pain in her back, hips and legs, despite physical therapy. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery. Plaintiff's physicians have recommended bilateral hip replacements as a result of the damage to her bones. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

94.     Plaintiff Kelly Gardner is and was at all relevant times a citizen of the State of Missouri and domiciled in Kansas City, Missouri. Plaintiff Kelly Gardner purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla beginning in 2006 and Stribild for approximately six months. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with severe osteoporosis and which caused or contributed to Plaintiff's bilateral femur fractures. Plaintiff Kelly Gardner, a once active soccer mom with a professional career, has been forced by her injuries to use a walker, cane or wheelchair for mobility, to retire early from her career and to go on medical disability. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including surgery, frequent hospital

1    visits, and implantation of bone stimulators. Plaintiff has endured and will continue to endure pain,

2    suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost

3    earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

4           95.     Plaintiff Kelvin McCall is and was at all relevant times a citizen of the State of

5    Florida and domiciled in Fort Lauderdale, Florida. Plaintiff Kelvin McCall purchased and ingested

6    the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to January 2018.

7    As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

8    and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

9    suffer severe kidney dysfunction requiring hospitalization. Plaintiff required and incurred and will

10   continue to require and incur expenses in connection with medical treatment as a result of these

11   injuries, including inpatient hospitalization. Plaintiff has endured and will continue to endure pain,

12   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

13   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

14          96.     Plaintiff Kenneth Smith is and was at all relevant times a citizen of the State of Rhode

15   Island and domiciled in Providence, Rhode Island. Plaintiff Kenneth Smith purchased and ingested

16   the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2007, Truvada

17   2008 to 2012 and Stribild beginning in approximately 2013. As a result of Gilead's wrongful conduct

18   with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF

19   Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer acute renal failure, which

20   required inpatient hospitalization and dialysis. Plaintiff required and incurred and will continue to

21   require and incur expenses in connection with medical treatment as a result of these injuries,

22   including inpatient hospitalization and dialysis. Plaintiff has endured and will continue to endure

23   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

24   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

25          97.     Plaintiff Kenneth Taroy is and was at all relevant times a citizen of the State of

26   Oregon and domiciled in Ontario, Oregon. Plaintiff Kenneth Taroy purchased and ingested the

27   following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2010 to 2014, Complera

28   from 2012 to 2013 and Stribild from 2013 to February of 2018. As a result of Gilead's wrongful

conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer stage 3 chronic kidney disease. Plaintiff's injuries have required Plaintiff, at less than thirty years of age, to undergo significant changes in his lifestyle, including limiting his activity and leaving his employment as a bank teller. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

98.     Plaintiff Kent Horen is and was at all relevant times a citizen of the State of Arizona and domiciled in Phoenix, Arizona. Plaintiff Kent Horen purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with low bone density, and loss of several inches of height. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

99.     Plaintiff Kenyon Detai Belyeu is and was at all relevant times a citizen of the State of Arizona and domiciled in Phoenix, Arizona. Plaintiff Kenyon Detai Belyeu purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused damage to Plaintiff's kidneys, including a reduction in kidney function to 53 percent. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a

1    result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

2    anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

3    loss of earning capacity, and other injuries and damages to be proven at trial.

4        100.    Plaintiff Kevin D. McQuay is and was at all relevant times a citizen of the State of

5    Pennsylvania and domiciled in Allentown, Pennsylvania. Plaintiff Kevin D. McQuay purchased and

6    ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2017.

7    As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

8    and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

9    suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused

10   or contributed to multiple fractures to Plaintiff's ankles. Plaintiff required and incurred and will

11   continue to require and incur expenses in connection with medical treatment as a result of these

12   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

13   enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

14   capacity, and other injuries and damages to be proven at trial.

15       101.    Plaintiff Khaliq Muhammad is and was at all relevant times a citizen of the State of

16   New York and domiciled in Bronx, New York. Plaintiff Khaliq Muhammad purchased and ingested

17   the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a

18   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

19   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

20   suffer damage to Plaintiff's kidneys, including a sixty percent loss of kidney function. Plaintiff

21   required and incurred and will continue to require and incur expenses in connection with medical

22   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

23   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

24   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

25       102.    Plaintiff Kimberly Porter is and was at all relevant times a citizen of the State of

26   Mississippi and domiciled in Sardis, Mississippi. Plaintiff Kimberly Porter purchased and ingested

27   the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2012 and

28   Stribild from 2013 to 2015. As a result of Gilead's wrongful conduct with respect to the defective

TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff's injuries have required her to use a cane, walker or wheelchair to achieve mobility. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

103.    Plaintiff Kyle Malone is and was at all relevant times a citizen of the State of New Jersey and domiciled in Mount Laurel, New Jersey. Plaintiff Kyle Malone purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild from 2015 to 2016 and Truvada from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff, who today is only 32 years old, to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia and which also caused or contributed to numerous fractures of Plaintiff's fingers and toes. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

104.    Plaintiff Laquisha Park is and was at all relevant times a citizen of the State of Texas and domiciled in League, Texas. Plaintiff Laquisha Park purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2015 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with bone density loss. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

105.    Plaintiff Latanga Sparks is and was at all relevant times a citizen of the State of Georgia and domiciled in Brunswick, Georgia. Plaintiff Latanga Sparks purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2006 to June 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life, including a diminished ability to run or play with her children as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

106.    Plaintiff Lela Wilson is and was at all relevant times a citizen of the State of Alabama and domiciled in Athens, Alabama. Plaintiff Lela Wilson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer acute renal failure, requiring inpatient hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

107.    Plaintiff Levine Levingston-Jones is and was at all relevant times a citizen of the State of North Carolina and domiciled in Mocksville, North Carolina. Plaintiff Levine Levingston-Jones purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada for approximately five years and Stribild for approximately one year in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the

1   foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer tubular

2   dysfunction and other damage to her kidneys. Plaintiff required and incurred and will continue to

3   require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

4   has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of

5   life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other

6   injuries and damages to be proven at trial.

7       108.    Plaintiff Marcus McCoy is and was at all relevant times a citizen of the State of North

8   Carolina and domiciled in Durham, North Carolina. Plaintiff Marcus McCoy purchased and ingested

9   the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2010 to 2016 and

10  Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

11  TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

12  the TDF Drugs caused Plaintiff to suffer reduced kidney function. Plaintiff required and incurred and

13  will continue to require and incur expenses in connection with medical treatment as a result of these

14  injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

15  enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

16  capacity, and other injuries and damages to be proven at trial.

17      109.    Plaintiff Margaret Beacham is and was at all relevant times a citizen of the State of

18  Tennessee and domiciled in Clarksville, Tennessee. Plaintiff Margaret Beacham purchased and

19  ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from

20  2008 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

21  Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

22  Drugs caused Plaintiff to suffer bone weakness and damage to Plaintiff's bones. Plaintiff required

23  and incurred and will continue to require and incur expenses in connection with medical treatment as

24  a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

25  anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a

26  loss of earning capacity, and other injuries and damages to be proven at trial.

27      110.    Plaintiff Marisa Dubose is and was at all relevant times a citizen of the State of

28  Mississippi and domiciled in Pascagoula, Mississippi. Plaintiff Marisa Dubose purchased and

ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Viread from 2015 to 2017 and Stribild beginning in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer chronic kidney disease, which required inpatient hospitalization. Plaintiff, a young mother, lost her job as a result of the injuries caused by the TDF Drugs and suffers from the mental anguish and stress of worrying how she will support her children. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

111.    Plaintiff Mark D. DeCosta is and was at all relevant times a citizen of the State of Rhode Island and domiciled in Providence, Rhode Island. Plaintiff Mark D. DeCosta purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2012 to 2013 and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to be diagnosed with weakening of the bones while only in his twenties. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

112.    Plaintiff Mark David Killeen is and was at all relevant times a citizen of the State of Nevada and domiciled in Las Vegas, Nevada. Plaintiff Mark David Killeen purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to experience high levels of creatinine, kidney failure requiring hospitalization, and stage 3 chronic

1    kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in

2    connection with medical treatment as a result of these injuries, including inpatient hospitalization.

3    Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

4    enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

5    capacity, and other injuries and damages to be proven at trial.

6        113.    Plaintiff Mark Williams is and was at all relevant times a citizen of the State of

7    Georgia and domiciled in Decatur, Georgia. Plaintiff Mark Williams purchased and ingested the

8    following TDF Drug for an FDA-approved use of the drug: Stribild from October 2013 to 2017. As a

9    result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

10   was injured by the foregoing TDF Drug. As a result of Gilead's wrongful conduct with respect to the

11   defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's

12   ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, or contributed to such

13   condition, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and

14   will continue to require and incur expenses in connection with medical treatment as a result of these

15   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

16   enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

17   capacity, and other injuries and damages to be proven at trial.

18       114.    Plaintiff Martin W. Cooper is and was at all relevant times a citizen of the State of

19   Arizona and domiciled in Tucson, Arizona. Plaintiff Martin W. Cooper purchased and ingested the

20   following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2006, Atripla

21   from 2006 to 2008, Truvada from 2008 to 2012 and Stribild from 2015 to 2018. As a result of

22   Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was

23   injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer

24   bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or

25   contributed to a fracture to Plaintiff's hip. Plaintiff required and incurred and will continue to require

26   and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

27   endured and will continue to endure decreased mobility, pain, suffering, mental anguish, and loss of

28

1    enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

2    capacity, and other injuries and damages to be proven at trial.

3         115.    Plaintiff Matthew Jon Crenshaw is and was at all relevant times a citizen of the State

4    of New Jersey and domiciled in Kearny, New Jersey. Plaintiff Matthew Jon Crenshaw purchased and

5    ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla in 2006, Truvada

6    from 2010 to 2014 and Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with

7    respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs.

8    Plaintiff's ingestion of the TDF Drugs caused Plaintiff, who is only thirty-three years of age, to

9    suffer acute kidney failure. Plaintiff required and incurred and will continue to require and incur

10   expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

11   will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

12   his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

13   damages to be proven at trial.

14        116.    Plaintiff Matthew Yale is and was at all relevant times a citizen of the State of

15   California and domiciled in Alameda, California. Plaintiff Matthew Yale purchased and ingested the

16   following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2013 and

17   Stribild from 2013 to 2016. As a result of Gilead's wrongful conduct with respect to the defective

18   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

19   the TDF Drugs caused Plaintiff to suffer from kidney dysfunction and osteopenia. Plaintiff required

20   and incurred and will continue to require and incur expenses in connection with medical treatment as

21   a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

22   anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

23   loss of earning capacity, and other injuries and damages to be proven at trial.

24        117.    Plaintiff Maurizio Marchese is and was at all relevant times a citizen of the State of

25   Rhode Island and domiciled in Warwick, Rhode Island. Plaintiff Maurizio Marchese purchased and

26   ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2015 to

27   2017 and Stribild beginning in 2017. As a result of Gilead's wrongful conduct with respect to the

28   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

1    ingestion of the TDF Drugs caused Plaintiff to suffer numerous episodes of kidney failure. Plaintiff

2    required and incurred and will continue to require and incur expenses in connection with medical

3    treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

4    suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

5    earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

6          118.    Plaintiff Mel M. Allen is and was at all relevant times a citizen of the State of

7    Minnesota and domiciled in Minneapolis, Minnesota. Plaintiff Mel M. Allen purchased and ingested

8    the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and

9    Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

10   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

11   damage to Plaintiff's kidneys, reducing his kidney function to thirty percent and resulting in a

12   diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to

13   require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

14   has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of

15   life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other

16   injuries and damages to be proven at trial.

17         119.    Plaintiff Melvin Snoddy is and was at all relevant times a citizen of the State of New

18   York and domiciled in Albany, New York. Plaintiff Melvin Snoddy purchased and ingested the

19   following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild from 2009 to 2016.

20   As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested

21   and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff

22   to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff's

23   ingestion of the TDF Drugs also caused damage to Plaintiff's kidneys, including reduced kidney

24   function, for which Plaintiff may need dialysis. Plaintiff required and incurred and will continue to

25   require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

26   has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of

27   life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other

28   injuries and damages to be proven at trial.

120.     Plaintiff Michael Tribble is and was at all relevant times a citizen of the State of Mississippi and domiciled in Gulfport, Mississippi. Plaintiff Michael Tribble purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2009 to 2017 and Stribild from 2017 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer weakening of the bones and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

121.     Plaintiff Michael Williams is and was at all relevant times a citizen of the State of California and domiciled in Twentynine Palms, California. Plaintiff Michael Williams purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff suffer dangerously high levels of creatinine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

122.     Plaintiff Millicent Yvette Foster is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Millicent Yvette Foster purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Complera and Stribild from 2001 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drug caused Plaintiff to be diagnosed with osteoporosis and which caused Plaintiff to require bilateral hip replacements. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries,

including bilateral hip replacement surgery. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

123.    Plaintiff Nicholas Jones is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Nicholas Jones purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2017 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer a loss of kidney function, including function reduced to 30 percent, which required inpatient hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

124.    Plaintiff Noel Flores is and was at all relevant times a citizen of the State of Texas and domiciled in McAllen, Texas. Plaintiff Noel Flores purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla, Complera and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer acute renal failure, which required inpatient hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

125.    Plaintiff Patricia Ann Briley is and was at all relevant times a citizen of the State of Indiana and domiciled in Indianapolis, Indiana. Plaintiff Patricia Ann Briley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2011 to 2013 and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer loss of kidney function and bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to fractures to Plaintiff's ankle. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

126.    Plaintiff Patricia Michelle Fields is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Patricia Michelle Fields purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to January of 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

127.    Plaintiff Peter Parmenter is and was at all relevant times a citizen of the State of Washington and domiciled in Renton, Washington. Plaintiff Peter Parmenter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2005 to 2015 and Stribild from 2015 to approximately 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

1   his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

2   damages to be proven at trial.

3       128.    Plaintiff Phyllis Malone is and was at all relevant times a citizen of the State of

4   Georgia and domiciled in Atlanta, Georgia. Plaintiff Phyllis Malone purchased and ingested the

5   following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and

6   Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

7   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

8   the TDF Drugs caused Plaintiff to suffer stage 3 chronic kidney disease and excruciating pain in her

9   kidneys and lower back. Plaintiff required and incurred and will continue to require and incur

10  expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

11  will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

12  her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

13  damages to be proven at trial.

14      129.    Plaintiff Raymond McNary-Willis is and was at all relevant times a citizen of the

15  State of Florida and domiciled in Bradenton, Florida. Plaintiff Raymond McNary-Willis purchased

16  and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to

17  2005, Truvada from 2005 to 2007, and Stribild from 2012 to 2016. As a result of Gilead's wrongful

18  conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing

19  TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction and

20  bone demineralization, for which he was diagnosed with osteopenia. Plaintiff required and incurred

21  and will continue to require and incur expenses in connection with medical treatment as a result of

22  these injuries. Plaintiff's physicians have recommended that Plaintiff undergo hip replacement

23  surgery to address the demineralization of Plaintiff's hips. Plaintiff has endured and will continue to

24  endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has

25  suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

26  at trial.

27      130.    Plaintiff Raymond Pressley is and was at all relevant times a citizen of the State of

28  South Carolina and domiciled in Lake City, South Carolina. Plaintiff Raymond Pressley purchased

and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2003 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, loss of kidney function and extremely low Glomerular Filtration Rate levels. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

131.     Plaintiff Renne Black is and was at all relevant times a citizen of the State of Maryland and domiciled in Baltimore, Maryland. Plaintiff Renne Black purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Complera from 2015 to 2016 and Stribild from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer weakening of the bones, which caused or contributed to fractures to Plaintiff's ankles, bilaterally. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

132.     Plaintiff Rhonda Faye Cook is and was at all relevant times a citizen of the State of Texas and domiciled in Dallas, Texas. Plaintiff Rhonda Faye Cook purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone deterioration and weakening, which caused or contributed to damage and curvature to Plaintiff's spine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will

continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

133.    Plaintiff Richard Mooney is and was at all relevant times a citizen of the State of Alabama and domiciled in Cullman, Alabama. Plaintiff Richard Mooney purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild in 2012 and Truvada beginning later in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of TDF Drugs caused Plaintiff to suffer weakening of his bones diagnosed at the young age of twenty-eight, and resulting fractures of the foot and ankle, which have caused Plaintiff extreme pain. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

134.    Plaintiff Richard O'Quain is and was at all relevant times a citizen of the State of Louisiana and domiciled in Lake Charles, Louisiana. Plaintiff Richard O'Quain purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2012 to 2015 and Stribild beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer reduced kidney function. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

135.    Plaintiff Robert Lee Davis Jr. is and was at all relevant times a citizen of the State of Mississippi and domiciled in Gulfport, Mississippi. Plaintiff Robert Lee Davis Jr. purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild until 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF

Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

136.    Plaintiff Robert Sackett is and was at all relevant times a citizen of the State of Texas and domiciled in Dallas, Texas. Plaintiff Robert Sackett purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild from 2001 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, resulting in a diagnosis of stage 3 chronic kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

137.    Plaintiff Roderick Eugene Cooper is and was at all relevant times a citizen of the State of Texas and domiciled in Houston, Texas. Plaintiff Roderick Eugene Cooper purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff has been advised by his doctors that he will be required to undergo knee and hip replacement surgeries. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

1    138.    Plaintiff Rodger Brunson is and was at all relevant times a citizen of the State of

2    Georgia and domiciled in Loganville, Georgia. Plaintiff Rodger Brunson purchased and ingested the

3    following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, Complera

4    and Stribild from 2001 to 2018. As a result of Gilead's wrongful conduct with respect to the

5    defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

6    ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was

7    diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur

8    expenses in connection with medical treatment as a result of these injuries, including physical

9    therapy. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

10   enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

11   capacity, and other injuries and damages to be proven at trial.

12   139.    Plaintiff Ronald Alan Conner is and was at all relevant times a citizen of the State of

13   Georgia and domiciled in Lawrenceville, Georgia. Plaintiff Ronald Alan Conner purchased and

14   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla,

15   Complera and Stribild until 2017. As a result of Gilead's wrongful conduct with respect to the

16   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

17   ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was

18   diagnosed with osteoporosis and which caused or contributed to fractures to Plaintiff's knee. Plaintiff

19   required and incurred and will continue to require and incur expenses in connection with medical

20   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

21   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

22   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

23   140.    Plaintiff Ronnie A. Powers is and was at all relevant times a citizen of the State of

24   North Carolina and domiciled in Candler, North Carolina. Plaintiff Ronnie A. Powers purchased and

25   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and

26   Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

27   ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

28   Plaintiff to suffer kidney failure and chronic kidney disease. Plaintiff required and incurred and will

continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

141.    Plaintiff Ruby Altameemy is and was at all relevant times a citizen of the State of Mississippi and domiciled in Gulfport, Mississippi. Plaintiff Ruby Altameemy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2006 to 2017 and Stribild during 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia and which caused or contributed to fractures to Plaintiff's knee and wrist. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

142.    Plaintiff Russell Seelye is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Tulsa, Oklahoma. Plaintiff Russell Seelye purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread for 4 years, Truvada from 2008 to 2016, Stribild for approximately one year, and Atripla from 2017 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and which caused or contributed to Plaintiff suffering a hip fracture and multiple compression fractures to Plaintiff's spine. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

143.     Plaintiff Sabrina Dooley is and was at all relevant times a citizen of the State of Illinois and domiciled in Chicago, Illinois. Plaintiff Sabrina Dooley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Stribild from August 2013 to May 2017 and Truvada from May 2017 to April 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and damage to Plaintiff's bones. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

144.     Plaintiff Scott Wascher is and was at all relevant times a citizen of the State of California and domiciled in Bakersfield, California. Plaintiff Scott Wascher purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and low bone density at the young age of thirty-five. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

145.     Plaintiff Shajuana Pope is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Shajuana Pope purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer a loss of kidney function. Plaintiff required and incurred and will continue to require and incur

1    expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

2    will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

3    her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

4    damages to be proven at trial.

5        146.    Plaintiff Shane Priddy is and was at all relevant times a citizen of the State of Ohio

6    and domiciled in Oak Harbor, Ohio. Plaintiff Shane Priddy purchased and ingested the following

7    TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a result of Gilead's

8    wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the

9    foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone

10   demineralization, for which Plaintiff was diagnosed with osteoporosis. Plaintiff required and

11   incurred and will continue to require and incur expenses in connection with medical treatment as a

12   result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

13   anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

14   loss of earning capacity, and other injuries and damages to be proven at trial.

15       147.    Plaintiff Sharon Ann Malcolm-Smith is and was at all relevant times a citizen of the

16   State of Ohio and domiciled in Portsmouth, Ohio. Plaintiff Sharon Ann Malcolm-Smith purchased

17   and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada,

18   Atripla and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF

19   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

20   TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

21   osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in

22   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

23   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

24   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

25   to be proven at trial.

26       148.    Plaintiff Shaylene S. Johnson is and was at all relevant times a citizen of the State of

27   Florida and domiciled in Miami, Florida. Plaintiff Shaylene S. Johnson purchased and ingested the

28   following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2011 to 2013 and Stribild

1    from 2013 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF

2    Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

3    TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

4    osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in

5    connection with medical treatment as a result of these injuries. Plaintiff has endured and will

6    continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

7    injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

8    to be proven at trial.

9          149.    Plaintiff Stacey Cook is and was at all relevant times a citizen of the State of South

10   Carolina and domiciled in Moncks Corner, South Carolina. Plaintiff Stacey Cook purchased and

11   ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to July of

12   2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff

13   ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drugs caused

14   Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis and

15   which caused Plaintiff to suffer degeneration in her spine and constant pain in her jaw, shoulders,

16   back, knees and ankles. Plaintiff required and incurred and will continue to require and incur

17   expenses in connection with medical treatment as a result of these injuries, including surgeries and

18   physical therapy. Plaintiff has endured and will continue to endure pain, suffering, mental anguish,

19   and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of

20   earning capacity, and other injuries and damages to be proven at trial.

21         150.    Plaintiff Stephen Calhoun is and was at all relevant times a citizen of the State of

22   Oklahoma and domiciled in Oklahoma City, Oklahoma. Plaintiff Stephen Calhoun purchased and

23   ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2016

24   and Stribild from 2016 to 2018. As a result of Gilead's wrongful conduct with respect to the

25   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

26   ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization at the young age of

27   thirty-eight. Plaintiff required and incurred and will continue to require and incur expenses in

28   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

1    continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

2    injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

3    to be proven at trial.

4        151.    Plaintiff Stephen Duane Miller is and was at all relevant times a citizen of the State of

5    Texas and domiciled in San Antonio, Texas. Plaintiff Stephen Duane Miller purchased and ingested

6    the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2010 to 2015 and

7    Stribild from 2015 to 2016. As a result of Gilead's wrongful conduct with respect to the defective

8    TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

9    the TDF Drugs caused Plaintiff to suffer reduced kidney function at the young age of thirty-nine.

10   Plaintiff required and incurred and will continue to require and incur expenses in connection with

11   medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

12   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

13   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

14       152.    Plaintiff Tamara Perry is and was at all relevant times a citizen of the State of Georgia

15   and domiciled in Riverdale, Georgia. Plaintiff Tamara Perry purchased and ingested the following

16   TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2012. As a

17   result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and

18   was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

19   suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis in her early

20   forties. Plaintiff required and incurred and will continue to require and incur expenses in connection

21   with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure

22   pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered

23   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

24       153.    Plaintiff Tammy Frazier is and was at all relevant times a citizen of the State of

25   Tennessee and domiciled in Nashville, Tennessee. Plaintiff Tammy Frazier purchased and ingested

26   the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2012 to 2014 and

27   Stribild from 2014 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

28   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia and which caused or contributed to fractures to Plaintiff's leg, wrist and jaw. Plaintiff's ingestion of the TDF Drugs also caused Plaintiff to suffer kidney failure. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

154.    Plaintiff Tony Hooker is and was at all relevant times a citizen of the State of North Carolina and domiciled in Wilmington, North Carolina. Plaintiff Tony Hooker purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2010 to 2013 and Stribild from 2013 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

155.    Plaintiff Tony Martin is and was at all relevant times a citizen of the State of California and domiciled in Oakland, California. Plaintiff Tony Martin purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2008 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer from bone demineralization, for which he was diagnosed with osteoporosis, and which caused or contributed to severe damage to Plaintiff's knees. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including three knee surgeries. Plaintiff has endured and will continue to endure pain,

suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

156.    Plaintiff Treyvon Paul Ryan Willis is and was at all relevant times a citizen of the State of California and domiciled in Los Angeles, California. Plaintiff Treyvon Paul Ryan Willis purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization and damage to Plaintiff's bones at the young age of twenty-eight. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

157.    Plaintiff Troy Oberholtzer is and was at all relevant times a citizen of the State of Pennsylvania and domiciled in Philadelphia, Pennsylvania. Plaintiff Troy Oberholtzer purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2011 to 2013 and Stribild from 2013 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteopenia while only in his forties. Plaintiff's injuries have caused and continue to cause constant pain, limited mobility and resulting lifestyle changes, including loss of Plaintiff's career. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

158.    Plaintiff Victor Williams is and was at all relevant times a citizen of the State of Maryland and domiciled in Capitol Heights, Maryland. Plaintiff Victor Williams purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla

1    and Stribild. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

2    Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

3    Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

4    osteoporosis and which has caused or contributed to a fracture of Plaintiff's toe. Plaintiff required

5    and incurred and will continue to require and incur expenses in connection with medical treatment as

6    a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

7    anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

8    loss of earning capacity, and other injuries and damages to be proven at trial.

9           159.    Plaintiff Wanda Stokes James is and was at all relevant times a citizen of the State of

10   Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Wanda Stokes James purchased and

11   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Atripla and

12   Stribild from 2003 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

13   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

14   the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed

15   with weakening of the bones and which caused or contributed to fractures in Plaintiff's toes. Plaintiff

16   required and incurred and will continue to require and incur expenses in connection with medical

17   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

18   suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost

19   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

20          160.    Plaintiff Wayne Albert Sage is and was at all relevant times a citizen of the State of

21   California and domiciled in San Diego, California. Plaintiff Wayne Albert Sage purchased and

22   ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2009 to 2014

23   and Stribild from 2014 to 2015. As a result of Gilead's wrongful conduct with respect to the

24   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

25   ingestion of the TDF Drugs caused Plaintiff to suffer from kidney dysfunction, which required

26   hospitalization. Plaintiff required and incurred and will continue to require and incur expenses in

27   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

28   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

1   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

2   to be proven at trial.

3       161.    Plaintiff William Patterson Jr. is and was at all relevant times a citizen of the State of

4   Texas and domiciled in Houston, Texas. Plaintiff William Patterson Jr. purchased and ingested the

5   following TDF Drugs for an FDA-approved use of the drugs: Complera from 2011 to 2017 and

6   Stribild in 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

7   Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

8   Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

9   osteoporosis. Plaintiff required and incurred and will continue to require and incur expenses in

10  connection with medical treatment as a result of these injuries. Plaintiff has endured and will

11  continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

12  injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

13  to be proven at trial.

14      162.    Plaintiff William Saunders is and was at all relevant times a citizen of the State of

15  Florida and domiciled in Lakeland, Florida. Plaintiff William Saunders purchased and ingested the

16  following TDF Drug for an FDA-approved use of the drug: Stribild from 2013 to 2015. As a result of

17  Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

18  injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

19  kidney dysfunction or an exacerbation of kidney dysfunction, including a low estimated glomerular

20  filtration rate of forty-two mL per minute. Plaintiff required and incurred and will continue to require

21  and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has

22  endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as

23  a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

24  and damages to be proven at trial.

25      163.    Plaintiff Willie Daniel Turner is and was at all relevant times a citizen of the State of

26  Georgia and domiciled in Atlanta, Georgia. Plaintiff Willie Daniel Turner purchased and ingested the

27  following TDF Drug for an FDA-approved use of the drug: Stribild from 2015 to 2017. As a result of

28  Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which caused or contributed to a fracture to Plaintiff's right shoulder. Plaintiff's injuries cause him extreme pain, especially because he is right-handed and is a professional truck driver. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

164.    Plaintiff Wilton Towe Jr. is and was at all relevant times a citizen of the State of Georgia and domiciled in Adairsville, Georgia. Plaintiff Wilton Towe Jr. purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild from approximately 2006 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with osteoporosis in his forties and which caused or contributed to a fracture of Plaintiff's lumbar spine at the L4-L5 level. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including painful spinal fusion surgery, physical therapy and Reclast infusions. Plaintiff has endured and will continue to endure constant and intense bone pain, limitations on his physical activities, and loss of his career as a result of the injuries caused by the defective TDF Drugs. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

165.    Plaintiff Charanda Dowdy is and was at all relevant times a citizen of the State of Maryland and domiciled in Baltimore, Maryland. Plaintiff Charanda Dowdy purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and Stribild from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

the TDF Drugs caused Plaintiff to suffer damage to her kidneys, resulting in renal failure and requiring dialysis. Plaintiff's renal failure and related kidney damage has caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her anxiety associated with being dependent on dialysis due to her condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff Charanda Dowdy must undergo dialysis treatments for her kidneys due to the injuries caused by Gilead's defective TDF Drugs and is in the process of trying to obtain a kidney transplant. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

166.    Plaintiff Donald Malone is and was at all relevant times a citizen of the State of Colorado and domiciled in Lone Tree, Colorado. Plaintiff Donald Malone purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2014 and Stribild from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as multiple fractures in his back, knees and ankles. Plaintiff's condition is so painful that he requires bilateral fusion surgery followed by painful and expensive physical therapy. In addition, Plaintiff's activities and quality of life are diminished based on his physical inability to work since 2017, which has required him to file for bankruptcy protection and receive disability benefits. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

167.   Plaintiff Duane Woodson is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Duane Woodson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme fatigue, pain and suffering in his shoulders, back, hips, legs, knees, ankles, and feet. Plaintiff's condition and fatigue is so severe and painful that he can no longer lift more than twenty-five (25) pounds without back pain, jog for exercise, or stand for long periods of time. In addition, Plaintiff has difficulty climbing his apartment stairs, walking his dog daily, taking out his trash, and performing other daily activities. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

168.   Plaintiff Gilbert Liriano is and was at all relevant times a citizen of the State of New York and domiciled in Jamaica Queens, New York. Plaintiff Gilbert Liriano purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss and kidney issues, which resulted in diagnoses of osteoporosis and Stage 3 chronic kidney disease, respectively. Plaintiff's osteoporosis with related injury and chronic kidney disease have caused Plaintiff extreme pain and suffering in his back, arms, legs. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

1    anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

2    loss of earning capacity, and other injuries and damages to be proven at trial.

3        169.    Plaintiff Harlan Robinson is and was at all relevant times a citizen of the State of

4    Florida and domiciled in Miami, Florida. Plaintiff Harlan Robinson purchased and ingested the

5    following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and

6    Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective

7    TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

8    the TDF Drugs caused Plaintiff to suffer bone density loss and kidney dysfunction, which resulted in

9    diagnoses of osteoporosis and elevated creatinine levels in his kidneys, respectively, at the age of

10   forty-three. Plaintiff's osteoporosis with related deterioration and failing kidney functions have

11   caused Plaintiff extreme pain and suffering as well as a fractured left hand, right leg and damaged

12   kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection

13   with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure

14   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

15   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

16       170.    Plaintiff Howard Wait is and was at all relevant times a citizen of the State of Illinois

17   and domiciled in Chicago, Illinois. Plaintiff Howard Wait purchased and ingested the following TDF

18   Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2012. As a result of

19   Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was

20   injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer

21   bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related

22   deterioration has occurred in his back, spine and hips, which has caused Plaintiff severe and

23   debilitating pain and suffering as well as a chipped hip bone. As a result of Plaintiff's injuries, his

24   income has significantly reduced at the age of sixty. Plaintiff lost his career as a computer specialist

25   because he is not physically able to sit down for long periods of time to work on a computer. Plaintiff

26   required and incurred and will continue to require and incur expenses in connection with medical

27   treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

28

suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

171.     Plaintiff Jason Butler is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Jason Butler purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from 2010 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of Stage 4 chronic kidney disease and required dialysis treatment at the young age of thirty-six. Plaintiff's Stage 4 chronic kidney disease and related kidney damage has caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including working, driving, traveling and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on fatigue and his limited ability to participate in certain activities due to his condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff Jason Butler must undergo dialysis treatments three times per week for four hours each time due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff's injuries have also had a negative impact on his career as a restaurant manager in that his injuries have prevented him from continuing to work. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

172.     Plaintiff Jerome Singletary is and was at all relevant times a citizen of the State of Maryland and domiciled in Pikesville, Maryland. Plaintiff Jerome Singletary purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2009 to 2014 and Stribild from 2014 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

1  the TDF Drugs caused damage to Plaintiff's kidneys, resulting in a diagnosis of Stage 3 chronic

2  kidney disease. Plaintiff required and incurred and will continue to require and incur expenses in

3  connection with medical treatment as a result of these injuries. Plaintiff has endured and will

4  continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

5  injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

6  to be proven at trial.

7      173.    Plaintiff Jerry Johnson is and was at all relevant times a citizen of the State of

8  Tennessee and domiciled in Cordova, Tennessee. Plaintiff Jerry Johnson purchased and ingested the

9  following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2014. As a result of

10  Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

11  injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused damage to his

12  kidneys, which resulted in a diagnosis of chronic kidney disease at the young age of twenty-eight.

13  Plaintiff's chronic kidney disease and related kidney damage has caused Plaintiff extreme pain and

14  suffering as well as mental anguish and depression. Plaintiff's condition is so painful that he can no

15  longer participate in activities he once enjoyed, including exercising, bowling, skating, playing

16  instruments, visiting with family and friends and other activities that require movement and physical

17  exertion. In addition, Plaintiff's activities and quality of life are diminished based on his pain and

18  anxiety due to his condition, and therefore, Plaintiff refrains from engaging in many of life's

19  activities. Plaintiff Jerry Johnson must severely restrict his diet due to the injuries caused by Gilead's

20  defective TDF Drug. Plaintiff required and incurred and will continue to require and incur expenses

21  in connection with medical treatment as a result of these injuries. Plaintiff has endured and will

22  continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

23  injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

24  to be proven at trial.

25      174.    Plaintiff Jewel Barrow is and was at all relevant times a citizen of the State of New

26  York and domiciled in Poughkeepsie, New York. Plaintiff Jewel Barrow purchased and ingested the

27  following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, Complera

28  and Stribild beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective

TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney damage, which resulted in a diagnosis of Stage 3 Chronic Kidney Disease at the age of fifty-two. Plaintiff's chronic kidney disease and related kidney failure has caused Plaintiff severe pain and suffering. Plaintiff's condition is so painful that she was required to quit working and was declared disabled based on her kidney injuries. In addition, Plaintiff's activities and quality of life are diminished based on her fears associated with the future condition of her kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

175.    Plaintiff John Cameron Sim II is and was at all relevant times a citizen of the State of Minnesota and domiciled in Minneapolis, Minnesota. Plaintiff John Cameron Sim II purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild from to 2012 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization and kidney dysfunction, which resulted in the diagnoses of osteopenia and stage 3 chronic kidney disease, respectively. Plaintiff's osteopenia and related injuries have occurred in his shoulders, and lower back, which have caused Plaintiff's extreme pain and suffering. Plaintiff's inability to participate in most physical activities and loss of libido as a result of these injuries has severely impacted his quality of life. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

176.    Plaintiff Josh Sullivan is and was at all relevant times a citizen of the State of Georgia and domiciled in Augusta, Georgia. Plaintiff Josh Sullivan purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla, and Stribild beginning

in 2007. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs resulted in kidney failure and a diagnosis of chronic kidney disease at the age of forty-two. Plaintiff's chronic kidney disease and related kidney failure has caused Plaintiff severe pain and suffering as well as five lengthy hospital stays. Plaintiff's condition is so severe and painful that he was required to quit working as a professional fork lift operator and was declared disabled based on his kidney injuries at the age of forty-two. In addition, Plaintiff's activities and quality of life are diminished based on fear of further deterioration of his kidneys, difficulty ambulating, and suffering diffuse pain. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

177.    Plaintiff Kimberly Pollock is and was at all relevant times a citizen of the State of Florida and domiciled in Miami, Florida. Plaintiff Kimberly Pollock purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff's bones to demineralize resulting in a diagnosis of osteoporosis in the lumbar spine. Plaintiff's osteoporosis and related injuries have occurred in her back and lumbar spine and have caused Plaintiff extreme pain and suffering as well as use of a cane for ambulation. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

178.    Plaintiff Kristofer Vice is and was at all relevant times a citizen of the State of Louisiana and domiciled in Vinton, Louisiana. Plaintiff Kristofer Vice purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from 2005 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys and severe bone density loss, which resulted in a diagnosis of renal failure, osteoporosis and osteopenia at the young age of thirty-six. Plaintiff's renal failure, osteoporosis, osteopenia and related kidney damage has caused Plaintiff extreme pain and suffering as well as a broken back and ribs. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed including playing baseball, volleyball, dancing or any activity that requires movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and therefore, Plaintiff refrains from engaging in many activities he previously enjoyed. Plaintiff Kristofer Vice must have assistance to bathe due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty standing for prolonged periods of time. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and a loss of earning capacity, and other injuries and damages to be proven at trial.

179.     Plaintiff Lanney Moore is and was at all relevant times a citizen of the State of Alabama and domiciled in Huntsville, Alabama. Plaintiff Lanney Moore purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild beginning in 2005. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as a fractured elbow, three fractured ribs and expensive physical therapy for bone strengthening. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

180.     Plaintiff Larry Sullivan is and was at all relevant times a citizen of the State of Louisiana and domiciled in Shreveport, Louisiana. Plaintiff Larry Sullivan purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2010 to 2011 and Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteopenia at the age of forty. Plaintiff's osteopenia has occurred in his thoracic vertebrae, ribs and spine and has caused Plaintiff extreme pain and suffering as well as multiple vertebrae and rib fractures. Plaintiff's injuries, pain and suffering have required him to quit working and to live on disability benefits at the age of forty-five. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

181.     Plaintiff LaTanya Killingworth is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff LaTanya Killingworth purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2008 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused damages to Plaintiff's kidneys, resulting in a diagnosis of chronic kidney disease at the young age of forty-two. Plaintiff's chronic kidney disease has required Plaintiff to drastically alter her diet. Plaintiff's condition has resulted in her no longer being able to participate in many activities she once enjoyed, including visiting with family and friends and other activities that would require her to bring her own food and drink. In addition, Plaintiff's activities and quality of life are diminished due to pain and because Plaintiff can only take Tylenol for pain. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental

anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

182.     Plaintiff Matthew Billy Hunter is and was at all relevant times a citizen of the State of Alabama and domiciled in Fort Payne, Alabama. Plaintiff Matthew Billy Hunter purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from 2004 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as a fracture in his neck and right arm. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including water skiing, wakeboarding, parasailing, bike riding, auto repairs and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his inability to use his right arm for any type of lifting due to his condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff Matthew Billy Hunter must use only his left arm for any type of physical activity due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty sleeping. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

183.     Plaintiff Richard Biviano is and was at all relevant times a citizen of the State of Florida and domiciled in Fort Lauderdale, Florida. Plaintiff Richard Biviano purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2007. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of hypercreatinemia. Plaintiff's renal injuries resulted in lost time and wages. Plaintiff required and incurred and will continue to

1    require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff

2    has endured and will continue to endure suffering, mental anguish, and loss of enjoyment of life as a

3    result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries

4    and damages to be proven at trial.

5             184.    Plaintiff Ronald Johnson is and was at all relevant times a citizen of the State of New

6    York and domiciled in Earlton, New York. Plaintiff Ronald Johnson purchased and ingested the

7    following TDF Drugs for an FDA-approved use of the drugs: Atripla from to 2006 to 2014 and

8    Stribild from 2014 to 2015. As a result of Gilead's wrongful conduct with respect to the defective

9    TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

10   the TDF Drugs caused Plaintiff to suffer damages to his kidneys, which resulted in a diagnosis of

11   kidney failure at the young age of forty-seven. Plaintiff's kidney failure and related kidney damage

12   has caused Plaintiff extreme pain and suffering as well as constant fatigue and mental anguish.

13   Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed

14   including snowboarding, riding dirt bikes and any other activity that requires significant movement

15   and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on

16   concern about the future condition of his kidneys due to his condition, and therefore, Plaintiff

17   refrains from engaging in many of life's activities. Plaintiff required and incurred and will continue

18   to require and incur expenses in connection with medical treatment as a result of these injuries.

19   Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of

20   enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

21   capacity, and other injuries and damages to be proven at trial.

22            185.    Plaintiff Samuel Ashley Jr. is and was at all relevant times a citizen of the State of

23   Louisiana and domiciled in LaPlace, Louisiana. Plaintiff Samuel Ashley Jr. purchased and ingested

24   the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild

25   beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF

26   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

27   TDF Drugs caused Plaintiff's bones to demineralize, which resulted in a diagnosis of osteoporosis.

28   Plaintiff required and incurred and will continue to require and incur expenses in connection with

medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

186.    Plaintiff Sara Gerald is and was at all relevant times a citizen of the State of Florida and domiciled in Pembroke, Florida. Plaintiff Sara Gerald purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild from 2007 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related injuries have occurred in her arms, legs, and ankles, which has caused Plaintiff severe and debilitating pain and suffering as well as a fractured right ankle. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

187.    Plaintiff Shirley Hudson is and was at all relevant times a citizen of the State of Georgia and domiciled in Atlanta, Georgia. Plaintiff Shirley Hudson purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2005. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related injuries have caused Plaintiff extreme pain and suffering in her arms, legs, knees and feet. Plaintiff's condition is so severe and painful that she has difficulty walking, she cannot physically drive her vehicle, nor perform other activities that require movement and physical exertion. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

1    injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

2    to be proven at trial.

3         188.    Plaintiff Tamela Kemp is and was at all relevant times a citizen of the State of

4    Georgia and domiciled in Atlanta, Georgia. Plaintiff Tamela Kemp purchased and ingested the

5    following TDF Drugs for an FDA-approved use of the drugs: Atripla, Stribild and Viread beginning

6    in 2011. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

7    ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

8    Plaintiff to suffer weakening of the bones, which resulted in a diagnosis of osteoporosis. Plaintiff's

9    osteoporosis and related injuries have occurred in her back, arms, hands, legs and feet, which has

10   caused Plaintiff severe and debilitating pain and suffering as well as a fractured tibia (shin bone) at

11   the age of forty-two. Plaintiff is no longer physically able to work and is required to rely on disability

12   benefits due to her bone injuries at the age of forty-three. Plaintiff required and incurred and will

13   continue to require and incur expenses in connection with medical treatment as a result of these

14   injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss

15   enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning

16   capacity, and other injuries and damages to be proven at trial.

17        189.    Plaintiff William Thomas is and was at all relevant times a citizen of the State of

18   Maryland and domiciled in Baltimore, Maryland. Plaintiff William Thomas purchased and ingested

19   the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from

20   2008 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

21   Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

22   Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis at the

23   young age of thirty-seven. Plaintiff's osteoporosis and related injuries have occurred in his knee and

24   right foot which have caused Plaintiff extreme pain and suffering as well as fractures in his knee and

25   right foot. Plaintiff required and incurred and will continue to require and incur expenses in

26   connection with medical treatment as a result of these injuries. Plaintiff has endured and will

27   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

28

1   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

2   to be proven at trial.

3       190.    Plaintiff Aaron Jerome Lyons is and was at all relevant times a citizen of the State of

4   Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Aaron Jerome Lyons purchased and

5   ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2008 to

6   2013 and Atripla from 2013 to 2018. As a result of Gilead's wrongful conduct with respect to the

7   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

8   ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a

9   diagnosis of bone density loss. Plaintiff's bone density loss and related deteriorations have caused

10  Plaintiff extreme pain and suffering in his back, legs and knees as well as weakening bones. Plaintiff

11  required and incurred, and will continue to require and incur, expenses in connection with medical

12  treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain,

13  suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

14  earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

15      191.    Plaintiff Aaron Kenneth Taylor is and was at all relevant times a citizen of the State of

16  Texas and domiciled in Arlington, Texas. Plaintiff Aaron Kenneth Taylor purchased and ingested the

17  following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and Stribild.

18  As a result of Plaintiff Aaron Kenneth Taylor's ingestion of the foregoing TDF Drugs, Plaintiff was

19  diagnosed in 2016 with renal failure and put on dialysis. Plaintiff must endure the pain, suffering and

20  mental anguish of being diagnosed with renal failure and being on dialysis for the rest of his life.

21  Plaintiff must now live with the fact that his future is one where his kidney conditions will have to be

22  monitored closely for the rest of his life. As a result of the injuries caused to Plaintiff by Defendant

23  Gilead's products, Plaintiff sought medical treatment, including but not limited to hospitalizations,

24  dialysis, doctor appointments and continual testing. Plaintiff has endured, and will continue to

25  endure, pain, suffering and mental anguish as a result of his injuries, has suffered lost earnings or a

26  loss of earning capacity, loss of enjoyment of life, and other injuries and damages to be proved at

27  trial.

28

192.     Plaintiff Alex Wells is and was at all relevant times a citizen of the State of Tennessee and domiciled in Chattanooga, Tennessee. Plaintiff Alex Wells purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada beginning in 2010 followed by Complera until 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of weakening of the bones at the young age of twenty-three. Plaintiff's weakening of the bones and related deterioration has caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including playing ball with his son, visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and therefore, Plaintiff refrains from engaging in many of life's activities due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff's injuries have also had a negative impact on his career in that his injuries have caused him to be unable work. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

193.     Plaintiff Alphonso Wilson is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Lexington, Kentucky. Plaintiff Alphonso Wilson purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla and Stribild from 2001 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of low bone density at the young age of forty-seven. Plaintiff's low bone density and related deterioration has caused Plaintiff extreme pain and suffering as well as a broken hand. Plaintiff's condition is so painful that he can no longer participate in activities requiring

movement and physical exertion, something he once enjoyed. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition. Plaintiff Alphonso Wilson is limited in his mobility due to the injuries caused by Gilead's defective TDF Drugs, and has constant pain. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

194.    Plaintiff Angela M. Carmouche is and was at all relevant times a citizen of the State of Louisiana and domiciled in Lafayette, Louisiana. Plaintiff Angela M. Carmouche purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2008 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization for which Plaintiff was diagnosed with osteoporosis. Plaintiff's severe bone disease and related deteriorations have caused Plaintiff excruciating pain and suffering in her shoulders, back, hips, legs and knees as well as requiring bilateral total hip replacements and right knee surgery followed by painful and expensive physical therapy. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

195.    Plaintiff Arden Frost is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Arden Frost purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2009 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer severe kidney dysfunction and extensive damages to his kidneys, which resulted in a diagnosis of kidney failure requiring dialysis treatments at the age of forty-eight. Plaintiff's severe kidney failure

1    with a kidney function of ten percent (10%) and related deterioration has caused Plaintiff extreme

2    fatigue, pain and suffering as well as requiring him to endure expensive and painful dialysis

3    treatments five times per day at home while on a waiting list for kidney transplantation surgery and

4    expensive hospitalization. Plaintiff's condition is so painful and debilitating that he can no longer

5    participate in activities he once enjoyed, including working in a hospital emergency room, studying

6    to be a professional chef, traveling, eating his favorite foods, walking and standing for a long time

7    and other activities that require movement and physical exertion. In addition, Plaintiff's activities

8    and quality of life are diminished based on his constant worry and severe depression regarding the

9    future condition of his kidneys while waiting for a kidney transplantation surgery. Plaintiff must be

10   very careful not to take many over the counter medications and is required to follow a very strict

11   food diet and fluid intake monitoring due to the injuries caused by Gilead's defective TDF Drug.

12   Plaintiff required and incurred, and will continue to require and incur, expenses in connection with

13   medical treatment as a result of these injuries, including future kidney transplantation surgery

14   followed by anti-rejection medications for the remainder of his life. Plaintiff Arden Frost has

15   endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life

16   as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other

17   injuries and damages to be proven at trial.

18         196.    Plaintiff Benjamin Henry Waters is and was at all relevant times a citizen of the State

19   of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Benjamin Henry Waters purchased

20   and ingested the following TDF Drug for an FDA-approved use of the drug: Complera until 2016.

21   As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

22   and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

23   suffer bone demineralization, which resulted in a diagnosis of bone density loss at the young age of

24   forty-four. Plaintiff's bone density loss and related deterioration have caused Plaintiff extreme pain

25   and suffering as well as two broken ribs. Plaintiff's condition is so painful that he can no longer

26   participate in activities he once enjoyed, including walking, playing with nieces and nephews and

27   other activities that require movement and physical exertion. In addition, Plaintiff's activities and

28   quality of life are diminished based on his fear of breaking a bone or injuring himself due to his

FIRST AMENDED CONSOLIDATED COMPLAINT – 78
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

condition, and therefore, Plaintiff refrains from engaging in many of life's activities. Plaintiff

Benjamin Henry Waters must endure constant fatigue and greatly diminished mobility due to the

injuries caused by Gilead's defective TDF Drug, and has extreme difficulty sleeping. Plaintiff's

injuries have also had a negative impact on his career as a banquet caterer in that his injuries limit his

ability to walk and carry things. Plaintiff required and incurred, and will continue to require and

incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has

endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life

as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other

injuries and damages to be proven at trial.

197.    Plaintiff Bernell Endsley is and was at all relevant times a citizen of the State of

Tennessee and domiciled in Nashville, Tennessee. Plaintiff Bernell Endsley purchased and ingested

the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Atripla from 2012 to

2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's

severe bone density loss and related deteriorations have caused Plaintiff excruciating pain and

suffering in her back, legs and knees as well as enduring painful knee surgery. Plaintiff required and

incurred, and will continue to require and incur, expenses in connection with medical treatment as a

result of these injuries, including monitoring bone density. Plaintiff has endured, and will continue to

endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has

suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

at trial.

198.    Plaintiff Jerry Brad Vandergriff is and was at all relevant times a citizen of the State

of Tennessee and domiciled in Chattanooga, Tennessee. Plaintiff Jerry Brad Vandergriff purchased

and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Truvada

beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF

Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of Stage 3

chronic kidney disease at the age of forty. Plaintiff's severe kidney disease and related injuries have caused Plaintiff to experience excruciating pain and suffering as well as requiring hospitalization. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

199.    Plaintiff Brian Hayes is and was at all relevant times a citizen of the State of Tennessee and domiciled in Smyrna, Tennessee. Plaintiff Brian Hayes purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2008 to 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss, for which Plaintiff was diagnosed with bone demineralization and degenerative bone disease. Plaintiff's bone demineralization and related deteriorations have caused Plaintiff pain and suffering in his back, hips and legs as well as several back surgeries. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

200.    Plaintiff Bruce Kleinschmidt is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Bruce Kleinschmidt purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from May 2014 to April 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of Stage 4 chronic kidney disease with a kidney function of twenty-four percent (24%). Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff excruciating pain and suffering as well as being at a high risk of requiring dialysis treatments. Plaintiff's injuries have required Plaintiff to undergo

1   significant changes in his lifestyle, including requiring him to retire early from his career as an

2   attorney and obtaining the position of Chairman of LGBT Kentucky Bar Association. Plaintiff is at a

3   high risk of requiring expensive and painful kidney dialysis while waiting for kidney

4   transplantations, followed by having to take anti-rejection medications for the remainder of his life.

5   Plaintiff required and incurred, and will continue to require and incur, expenses in connection with

6   medical treatment as a result of these injuries, including constant kidney monitoring and

7   medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and

8   loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

9   capacity, and other injuries and damages to be proven at trial.

10          201.    Plaintiff Caroline Hunter is and was at all relevant times a citizen of the

11   Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Caroline Hunter

12   purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada

13   beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,

14   Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug

15   caused Plaintiff to suffer bone density loss, for which Plaintiff was diagnosed with bone

16   demineralization which caused deterioration of Plaintiff's bones. Plaintiff required and incurred, and

17   will continue to require and incur, expenses in connection with medical treatment as a result of these

18   injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss

19   of enjoyment of life as a result of her injuries, and other injuries and damages to be proven at trial.

20          202.    Plaintiff Carolyn Howard is and was at all relevant times a citizen of the State of

21   Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Carolyn Howard purchased and

22   ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada followed by

23   Atripla from 2006 to 2018. As a result of Gilead's wrongful conduct with respect to the defective

24   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

25   the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of

26   weakening of the bones at the young age of thirty-three. Plaintiff's weakening of the bones and

27   related deterioration have caused Plaintiff pain and suffering as well as mental anguish. Plaintiff's

28   condition is so painful that she can no longer participate in activities that require movement and

physical exertion, which she once enjoyed. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition caused by Gilead's defective TDF Drugs. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

203.    Plaintiff Charisa Maynard is and was at all relevant times a citizen of the State of Tennessee and domiciled in Fayetteville, Tennessee. Plaintiff Charisa Maynard purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney issues, which resulted in the diagnosis of acute kidney failure and chronic kidney disease at the age of forty-four. Plaintiff's severe kidney failure and related deteriorations have caused excruciating pain and suffering in her kidneys and lower back as well as requiring her to quit her career and obtain disability benefits at the age of forty-four. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring kidney functions. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

204.    Plaintiff Charles Purdie is and was at all relevant times a citizen of the State of New York and domiciled in Bronx, New York. Plaintiff Charles Purdie purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Complera from 2012 to 2015, Atripla from 2015 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of renal failure of both kidneys and being placed on dialysis. Plaintiff's renal failure and related kidney damage has caused Plaintiff extreme pain and suffering and has forced Plaintiff to

1    have to use a catheter for urination. Plaintiff's condition is so painful and limiting that he can no

2    longer participate in activities he once enjoyed, including visiting with family and friends and other

3    activities that require movement and physical exertion. In addition, Plaintiff's activities and quality

4    of life are diminished based on his being placed on dialysis due to his condition. Plaintiff Charles

5    Purdie has extreme difficulty with anxiety and worry. Plaintiff required and incurred, and will

6    continue to require and incur, expenses in connection with medical treatment as a result of these

7    injuries, including dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental

8    anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

9    loss of earning capacity, and other injuries and damages to be proven at trial.

10           205.    Plaintiff Charles Woody is and was at all relevant times a citizen of the State of

11   Tennessee and domiciled in Madisonville, Tennessee. Plaintiff Charles Woody purchased and

12   ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2005 to 2015.

13   As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

14   and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

15   suffer kidney dysfunction and bone density loss, which resulted in the diagnoses of Stage 3 chronic

16   kidney disease and osteoporosis. Plaintiff's severe kidney failure, bone density loss, and related

17   deteriorations have caused Plaintiff excruciating pain and suffering, and a severely fractured arm in

18   three places. Plaintiff required and incurred, and will continue to require and incur, expenses in

19   connection with medical treatment as a result of these injuries, including constant kidney and bone

20   density monitoring and medications. Plaintiff has endured, and will continue to endure, pain,

21   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost

22   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

23           206.    Plaintiff Christopher Michael Abraham is and was at all relevant times a citizen of the

24   State of Tennessee and domiciled in Johnson City, Tennessee. Plaintiff Christopher Michael

25   Abraham purchased and ingested the following TDF Drug for an FDA-approved use of the drug:

26   Atripla from 2008 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

27   TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the

28   TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with

osteopenia and which caused fractures to Plaintiff's shins. Plaintiff's injuries required Plaintiff, at the young age of forty-five, to undergo painful physical therapy twice per week, quit his job, and rely on disability benefits. Plaintiff's physical therapy has caused Plaintiff extreme pain and suffering as well as continual pain in his lower legs. In addition, Plaintiff's activities and quality of life are diminished based on his limited ability to walk and continuous pain in both lower legs, and therefore Plaintiff refrains from engaging in many of life's activities. Plaintiff Christopher Michael Abraham is limited in his mobility due to the injuries caused by Gilead's defective TDF Drug, and has a limited ability to perform basic activities such as walking without pain. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including surgeries and physical therapy. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

207.    Plaintiff Cindy Cowden is a citizen of the State of Florida and domiciled in St. Petersburg, Florida. Plaintiff Cindy Cowden purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2009 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis at the young age of forty-seven. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as well as fracturing her hip, ankles, hands, fingers and wrists. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed, including working, playing with grandkids, visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition, and therefore Plaintiff refrains from engaging in many of life's activities. Plaintiff Cindy Cowden must use a powerchair for mobility due to the injuries caused by Gilead's defective TDF Drug, and has extreme difficulty doing most physical activities. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including surgery and physical therapy. Plaintiff has endured,

and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

208.    Plaintiff Constance R. Walker is and was at all relevant times a citizen of the State of Louisiana and domiciled in Natchitoches, Louisiana. Plaintiff Constance R. Walker purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Complera from 2004 until 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer damage to her kidneys, which resulted in a diagnosis of Stage 3 chronic kidney disease with a fifty-percent (50%) kidney function at the young age of thirty-seven. Plaintiff's low kidney function and related kidney damage has caused Plaintiff extreme pain and suffering as well as frequent urination issues. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

209.    Plaintiff Cora Spears is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Cora Spears purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deteriorations have caused Plaintiff extreme pain and suffering in her shoulders, back, spine, legs and knees as well as a severely painful right knee, and she is forced to endure this excruciating pain every day. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring bone density. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of

enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

210.    Plaintiff Corey Malone is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Corey Malone purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Truvada beginning in 2005. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage kidney failure at the age of forty-three. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff to experience extreme pain and suffering and require him to undergo kidney dialysis treatments three times per week. Plaintiff's injuries have severely impacted his life in that he was required to amass two years of medical bills before he was eligible to receive Medicaid benefits. Plaintiff will require expensive and painful kidney transplantation followed by anti-rejection medications for his entire life. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

211.    Plaintiff Cynthia Gordon is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Cynthia Gordon purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis and put her at a high risk for bone fractures. Plaintiff's osteoporosis and related deteriorations have occurred in her hips, arms, shoulders and legs, all of which have caused and continue to cause Plaintiff extreme pain and suffering. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed, including housework, walking for exercise, standing for an extended period of time and

1  other physical activities. In addition, Plaintiff will require hip replacement surgery followed by

2  expensive and painful physical therapy in the future, possibly in the summer of 2019. Plaintiff

3  required and incurred, and will continue to require and incur, expenses in connection with medical

4  treatment as a result of these injuries, including surgery. Plaintiff Cynthia Gordon has endured, and

5  will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

6  her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

7  damages to be proven at trial.

8  212.  Plaintiff Dale Cornelius Sharp is and was at all relevant times a citizen of the State of

9  Tennessee and domiciled in Memphis, Tennessee. Plaintiff Dale Cornelius Sharp purchased and

10  ingested the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2017.

11  As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

12  and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

13  suffer damage to his kidneys, which resulted in a diagnosis of chronic kidney disease at the young

14  age of forty-four. Plaintiff's chronic kidney disease and related kidney damage has caused Plaintiff

15  extreme pain and suffering as well as mental anguish. Plaintiff's condition is so limiting that he can

16  no longer participate in activities he once enjoyed that cannot accommodate his very restrictive

17  dietary requirements. In addition, Plaintiff's activities and quality of life are diminished based on his

18  anxiety about what the future condition of his kidneys will be due to his condition, and therefore

19  Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff required and

20  incurred, and will continue to require and incur, expenses in connection with medical treatment as a

21  result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental

22  anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

23  loss of earning capacity, and other injuries and damages to be proven at trial.

24  213.  Plaintiff Daniel Davis is and was at all relevant times a citizen of the State of

25  Louisiana and domiciled in Ruston, Louisiana. Plaintiff Daniel Davis purchased and ingested the

26  following TDF Drugs for an FDA-approved use of the drugs: Complera from 2013 to 2016 and

27  Stribild from 2016 to 2017. As a result of Gilead's wrongful conduct with respect to the defective

28  TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

FIRST AMENDED CONSOLIDATED COMPLAINT – 87
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

1    the TDF Drugs caused Plaintiff to suffer severe bone demineralization, which resulted in a diagnosis

2    of osteoporosis with a high risk for bone fractures at the young age of twenty-five. Plaintiff's

3    osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering in his

4    shoulders, back, arms, elbows, hips, legs, knees and ankles. Plaintiff's condition is so debilitating

5    that he is unable to stand up without pain, has difficulty mowing his lawn and experiences severe

6    weakness in all of his limbs. Plaintiff cannot participate in activities he once enjoyed, such as

7    vigorous exercising, walking or standing or sitting for an extended period of time, jogging, jumping

8    and other activities that require movement and physical exertion. Plaintiff endured excruciating pain

9    and swelling in his ankles which resulted in missing work due to the injuries caused by Gilead's

10   defective TDF Drugs. Plaintiff required and incurred, and will continue to require and incur,

11   expenses in connection with medical treatment as a result of these injuries. Plaintiff Daniel Davis has

12   endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life

13   as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other

14   injuries and damages to be proven at trial.

15          214.    Plaintiff Darlene Robertson is and was at all relevant times a citizen of the State of

16   Louisiana and domiciled in Port Barre, Louisiana. Plaintiff Darlene Robertson purchased and

17   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Truvada

18   beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF

19   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

20   TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis.

21   Plaintiff's osteoporosis and related deteriorations have caused Plaintiff extreme pain and suffering in

22   her shoulders, back, ribs, legs and wrists, as well as a fractured wrist and several fractured ribs, and

23   she now requires the assistance of a walker for her weak legs. Plaintiff required and incurred, and

24   will continue to require and incur, expenses in connection with medical treatment as a result of these

25   injuries, including monitoring bone density. Plaintiff has endured, and will continue to endure, pain,

26   suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost

27   earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28

215.     Plaintiff Daron J. Davis is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Daron J. Davis purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2008 to 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss, for which Plaintiff was diagnosed with osteoporosis and high risk for bone fractures. Plaintiff's osteoporosis and related injuries have caused Plaintiff pain and suffering in his legs, knees and hips, and painful bilateral hip replacements followed by physical therapy. Plaintiff's condition is so painful and limiting that he can no longer participate in activities he once enjoyed, including standing or sitting or walking for an extended period of time and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of falling or injuring himself due to his condition, and thus Plaintiff is now forced to refrain from engaging in many of life's activities due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff Daron J. Davis has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

216.     Plaintiff Darrel G. Christ is and was at all relevant times a citizen of the State of Louisiana and domiciled in Eunice, Louisiana. Plaintiff Darrel G. Christ purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla beginning in September of 2008. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer severe bone demineralization and damage to his kidneys, which resulted in a diagnosis of osteoporosis and kidney failure at the age fifty-eight. Plaintiff's osteoporosis and related deterioration has caused Plaintiff extreme pain and suffering as well as constant pain in his neck, back and legs. Plaintiff's kidney failure and related kidney damage required a week inpatient hospital stay for intravenous infusion therapy, followed by strict food diet, monitoring of fluid intake and

being restricted from taking anti-inflammatory drugs. Plaintiff's condition is so painful that he no longer participates in activities he once enjoyed such as walking long distances, standing or sitting for an extended period of time, and other activities that require movement and physical exertion. Plaintiff Darrel G. Christ also endures high anxiety and has extreme difficulty going places due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including hospitalization. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

217.    Plaintiff David Keach is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff David Keach purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada, Complera and Stribild from 2004 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as well as fracturing his ankle and femur. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition. Plaintiff David Keach must live with the fact that his bone conditions are likely to worsen due to the injuries caused by Gilead's defective TDF Drugs and he has extreme difficulty with pain and mental anguish. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including surgery and physical therapy. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

218.    Plaintiff David Emory Roberts is and was at all relevant times a citizen of the State of Kentucky and domiciled in Danville, Kentucky. Plaintiff David Emory Roberts purchased and

1    ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2011 to 2017.

2    As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

3    and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

4    suffer kidney injury, which resulted in a diagnosis of Stage 3 chronic kidney disease. Plaintiff's

5    kidney disease and related deterioration has caused Plaintiff extreme fatigue, pain and suffering.

6    Plaintiff's condition is so painful and debilitating that he can no longer participate in activities he

7    once enjoyed, including eating his favorite foods, drinking his favorite beverages, standing for an

8    extended period of time and other activities that require movement and physical exertion. In addition,

9    Plaintiff's activities and quality of life are diminished based on his constant worry of the future

10   condition of his kidneys, as he works as a professional educator. Plaintiff must be very careful not to

11   take many over the counter medications and is required to follow a very strict food diet and fluid

12   intake monitoring due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and

13   incurred, and will continue to require and incur, expenses in connection with medical treatment as a

14   result of these injuries. Plaintiff David Emory Roberts has endured, and will continue to endure,

15   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

16   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

17        219.    Plaintiff David Thompson is and was at all relevant times a citizen of the State of

18   Louisiana and domiciled in Franklin, Louisiana. Plaintiff David Thompson purchased and ingested

19   the following TDF Drug for an FDA-approved use of the drug: Viread from 2015 to 2017. As a

20   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

21   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

22   suffer kidney dysfunctions, which resulted in the diagnosis of chronic kidney disease. Plaintiff's

23   kidney failure and related deteriorations have caused Plaintiff excruciating pain and suffering.

24   Plaintiff required and incurred, and will continue to require and incur, expenses in connection with

25   medical treatment as a result of these injuries, including constant kidney monitoring and

26   medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and

27   loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

28   capacity, and other injuries and damages to be proven at trial.

220.     Plaintiff De'Mon Nolan is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff De'Mon Nolan purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2011 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of bone density loss at the young age of twenty-eight. Plaintiff's bone density loss and related deterioration have caused Plaintiff pain, suffering and mental anguish. Plaintiff's condition is so painful and limiting that he can no longer participate in activities he once enjoyed that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his pain and his fear of breaking a bone or injuring himself due to his injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

221.     Plaintiff Debra Gonzalez is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Bethany, Oklahoma. Plaintiff Debra Gonzalez purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Atripla beginning in 2005. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization for which Plaintiff was diagnosed with osteopenia. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

222.     Plaintiff Delores Dodd is and was at all relevant times a citizen of the State of Louisiana and domiciled in Boyce, Louisiana. Plaintiff Delores Dodd purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Viread beginning in 2002. As a result of

1    Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

2    injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

3    kidney dysfunction which resulted in a diagnosis of Stage 3 chronic kidney disease. Plaintiff's severe

4    kidney disease and related deteriorations have caused Plaintiff to experience extreme pain and

5    suffering in her back, stomach cramps, weakness and fatigue, as well as extreme difficulty

6    concentrating. Plaintiff required and incurred, and will continue to require and incur, expenses in

7    connection with medical treatment as a result of these injuries, including constant kidney monitoring

8    and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish,

9    and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of

10   earning capacity, and other injuries and damages to be proven at trial.

11           223.    Plaintiff Demica Copelin is and was at all relevant times a citizen of the State of

12   Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Demica Copelin purchased and

13   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Stribild

14   beginning in 2003. As a result of Gilead's wrongful conduct with respect to the defective TDF

15   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

16   TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of weakening

17   of the bones. Plaintiff's weakening of the bones and related deteriorations have occurred in her arms,

18   hips, legs, back and feet, which has caused Plaintiff severe fatigue, debilitating pain and suffering.

19   Plaintiff's condition is so severe and painful that she can no longer stand for extended periods of

20   time which has affected her endurance while working long hours of housekeeping for Ochsner

21   Hospital. Plaintiff's injuries have a negative impact on her career as a hospital housekeeping

22   specialist in that her severe injuries require her to take more time off from work and require her to

23   take frequent breaks while working. Plaintiff required and incurred, and will continue to require and

24   incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has

25   endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life

26   as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other

27   injuries and damages to be proven at trial.

28

FIRST AMENDED CONSOLIDATED COMPLAINT – 93
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

224.     Plaintiff Deneen Elise Gardner is and was at all relevant times a citizen of the State of Louisiana and domiciled in Lafayette, Louisiana. Plaintiff Deneen Elise Gardner purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2003 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer weakening of the bones for which Plaintiff was diagnosed with osteoporosis. Plaintiff's severe bone disease and related deteriorations have caused Plaintiff excruciating pain and suffering in her shoulders, back, legs and knees, as well as requiring right shoulder surgery and knee surgery followed by painful and expensive physical therapy. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

225.     Plaintiff Derrick Carr is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Derrick Carr purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla in 2009 and Truvada from 2012 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in the diagnoses of kidney failure and high kidney creatinine levels. Plaintiff's failing kidney functions and related deteriorations have caused Plaintiff extreme pain and suffering. Plaintiff's injuries have had a severely negative impact on his career at Humana, and have required Plaintiff to file for bankruptcy protection due to unpaid medical bills. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

226.     Plaintiff Derrick Jones is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Derrick Jones purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Complera beginning in 2008. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with low bone density, and has caused deterioration of Plaintiff's bones at the young age of thirty-one. Plaintiff has difficulty walking because he has extreme pain and suffering in his legs. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

227.     Plaintiff Devonia Young is and was at all relevant times a citizen of the State of Tennessee and domiciled in Madison, Tennessee. Plaintiff Devonia Young purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Complera from 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney failure, which resulted in a diagnosis of acute renal failure and required emergency hospitalization at the young age of forty-one. Her injuries were severe and caused her to lose her job for six months. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including the constant monitoring of her kidneys. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

228.     Plaintiff Durrell Richard is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Durrell Richard purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2010 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

1    and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

2    suffer kidney problems, which resulted in a diagnosis of Stage 3 chronic kidney disease at the young

3    age of thirty-seven. Plaintiff's kidney disease and related deteriorations have caused Plaintiff

4    extreme pain and suffering. Plaintiff required and incurred, and will continue to require and incur,

5    expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and

6    will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

7    his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

8    damages to be proven at trial.

9        229.    Plaintiff E. Sanchel Spears is and was at all relevant times a citizen of the State of

10   Louisiana and domiciled in New Orleans, Louisiana. Plaintiff E. Sanchel Spears purchased and

11   ingested the following TDF Drug for an FDA-approved use of the drug: Complera from 2014 to

12   2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff

13   ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused

14   Plaintiff to suffer damage to her kidneys, which resulted in a diagnosis of acute renal failure at the

15   young age of forty-seven. Plaintiff's acute renal failure and related kidney damage has caused

16   Plaintiff pain and suffering and to be hospitalized. Plaintiff's condition is so limiting that she can no

17   longer participate in activities she once enjoyed that cannot meet her restricted dietary requirements.

18   In addition, Plaintiff's activities and quality of life are diminished based on her fear of the future

19   worsening of her kidneys due to her condition, and therefore Plaintiff is forced to refrain from

20   engaging in many of life's activities. Plaintiff E. Sanchel Spears must adhere to a restrictive diet due

21   to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will

22   continue to require and incur, expenses in connection with medical treatment as a result of these

23   injuries, including hospitalization. Plaintiff has endured, and will continue to endure, pain, suffering,

24   mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings

25   and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

26       230.    Plaintiff Earl Goforth is and was at all relevant times a citizen of the Commonwealth

27   of Kentucky and domiciled in Mount Vernon, Kentucky. Plaintiff Earl Goforth purchased and

28   ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2011 to 2017.

As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of low bone density at the young age of forty-five. Plaintiff's low bone density and related bone loss have occurred in his spine, which has caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including hiking, visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and thus Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff Earl Goforth must severely limit his physical activity due to the injuries caused by Gilead's defective TDF Drug and has extreme difficulty with pain in his legs and back. Plaintiff's injuries have also had a negative impact on his career as a factory worker in that his injuries have caused him to be unable to work and placed him on disability. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

231.    Plaintiff Emile Gainey is and was at all relevant times a citizen of the State of Louisiana and domiciled in Westwego, Louisiana. Plaintiff Emile Gainey purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2013. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage kidney failure at the age of fifty. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff to experience extreme pain and suffering and have forced him to be placed on kidney dialysis three times per week. Plaintiff will require expensive and painful kidney transplantation followed by lifelong anti-rejection medications. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring

1    and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish,

2    and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of

3    earning capacity, and other injuries and damages to be proven at trial.

4           232.    Plaintiff Eric Johnson is and was at all relevant times a citizen of the State of

5    Louisiana and domiciled in Natchitoches, Louisiana. Plaintiff Eric Johnson purchased and ingested

6    the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in

7    2013. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff

8    ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused

9    Plaintiff to suffer severe kidney dysfunction and damage to his kidneys, which resulted in a diagnosis

10   of acute kidney failure at the age of forty-two. Plaintiff's kidney failure and related injuries have

11   caused Plaintiff extreme fatigue, pain and suffering, and hospitalization for three months followed by

12   nursing home rehabilitation at the age of forty-two. Plaintiff's condition is so painful and debilitating

13   that he can no longer participate in activities he once enjoyed, including working in the oil and gas

14   industry, eating his favorite foods, drinking his favorite beverages, and physical exertion. In addition,

15   Plaintiff's activities and quality of life are diminished based on his constant worry of the future

16   condition of his kidneys as he may need future kidney dialysis treatments. Plaintiff must be very

17   careful not to take many over the counter medications and is required to follow a very strict food diet

18   and fluid intake monitoring due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff

19   required and incurred, and will continue to require and incur, expenses in connection with medical

20   treatment as a result of these injuries. Plaintiff Eric Johnson has endured, and will continue to

21   endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has

22   suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

23   at trial.

24          233.    Plaintiff Erma Marzett is and was at all relevant times a citizen of the Commonwealth

25   of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Erma Marzett purchased and ingested

26   the following TDF Drug for an FDA-approved use of the drug: Truvada from 2007 to 2016. As a

27   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

28   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

suffer bone demineralization, which resulted in a diagnosis of weakening of the bones. Plaintiff's weakening of the bones and related deterioration have caused Plaintiff extreme pain and suffering as well fracturing her foot. Plaintiff's condition is so painful and limiting that she can no longer participate in activities she once enjoyed, including walking and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff Erma Marzett must use a cane or walker for mobility due to the injuries caused by Gilead's defective TDF Drug, and cannot even climb stairs or walk up a hill. Plaintiff's injuries have further required her to stop driving due to her chronic bone pain. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

234.    Plaintiff Ethline Thomas is and was at all relevant times a citizen of the State of Louisiana and domiciled in Marksville, Louisiana. Plaintiff Ethline Thomas purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada beginning in 2009. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer damage to her kidneys, which resulted in a diagnosis of reduced kidney function of sixty-percent (60%) at the age of forty-three. Plaintiff's kidney dysfunction and related deteriorations have forced Plaintiff to limit her activities and caused her experience extreme pain and suffering. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

235.    Plaintiff Eunice Murphy is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Eunice Murphy purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada beginning in 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration have occurred in her spine, causing Plaintiff extreme pain and suffering as well as cramping in her hands. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed, including exercising, house maintenance, playing with grandchildren and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition, and therefore Plaintiff is now forced to refrain from engaging in many of life's activities. Plaintiff Eunice Murphy must often use a cane or walker for mobility due to the injuries caused by Gilead's defective TDF Drug and has extreme difficulty with combing her hair, walking long distances, or standing for extended periods. Plaintiff's injuries have also had a negative impact on her career as she cannot stand for extended periods of time, and this severely limits the type of work she can perform. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

236.    Plaintiff Evelyn Little is and was at all relevant times a citizen of the State of North Carolina and domiciled in Greenville, North Carolina. Plaintiff Evelyn Little purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla beginning in 2010 followed by Truvada and Complera until 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to her kidneys, which resulted in a diagnosis of renal failure and forced her to be placed on dialysis at the young age of forty-eight.

1    Plaintiff's renal failure and related kidney damage have caused Plaintiff extreme pain and suffering

2    as well as mental anguish. Plaintiff's condition is so painful and has caused such lack of mobility that

3    she can no longer participate in activities she once enjoyed, including walking, visiting with family

4    and friends and other activities that require movement and physical exertion. In addition, Plaintiff's

5    activities and quality of life are diminished due to her depression over being dependent on dialysis,

6    and Plaintiff is now forced to refrain from engaging in many of life's activities. Plaintiff Evelyn

7    Little must use a wheelchair or walker for mobility due to the injuries caused by Gilead's defective

8    TDF Drugs, and has extreme difficulty with having to be dependent on others for help. Plaintiff

9    required and incurred, and will continue to require and incur, expenses in connection with medical

10   treatment as a result of these injuries, including dialysis. Plaintiff has endured, and will continue to

11   endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has

12   suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

13   at trial.

14        237.    Plaintiff George Beverly, Jr. is and was at all relevant times a citizen of the State of

15   Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff George Beverly, Jr. purchased and

16   ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2006 to 2018.

17   As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

18   and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

19   suffer bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and

20   related deteriorations have caused Plaintiff extreme pain and suffering in his shoulders, back, and

21   legs, and have further caused him to miss work at Holmes Building Materials. Plaintiff required and

22   incurred, and will continue to require and incur, expenses in connection with medical treatment as a

23   result of these injuries, including monitoring bone density. Plaintiff has endured, and will continue to

24   endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has

25   suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

26   at trial.

27        238.    Plaintiff Gerald Starks is and was at all relevant times a citizen of the Commonwealth

28   of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Gerald Starks purchased and ingested

the following TDF Drugs for an FDA-approved use of the drugs: Atripla in 2006 and Truvada from 2007 to 2019. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer severe bone density loss and damage to his kidneys, which resulted in diagnoses of osteopenia and kidney failure at the age fifty-seven. Plaintiff's osteopenia and related deterioration have caused Plaintiff extreme pain and suffering, including constant pain in his neck, shoulders, arms, back, ribs and legs. He has suffered fractured ribs from simply sitting and holding his grandchild. Plaintiff's kidney failure and related kidney damage have caused him to be hospitalized, and have caused him to experience frequent urination issues, to be placed on a strict food diet, to have to monitor his fluid intake, and to be restricted from taking anti-inflammatory drugs. Plaintiff's condition is so painful that he can barely walk and no longer participates in activities he once enjoyed such as playing with his grandchildren, walking for long distances, standing or sitting for an extended period of time, hunting, fishing, and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his immobility due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's daily activities such as traveling, going outdoors and visiting with his fellow Army and Navy U.S. Veterans on a regular basis. Plaintiff Gerald Starks must endure debilitating and constant pain and high anxiety due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty doing daily chores. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including hospitalization. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

239.     Plaintiff Gregory A. Craig is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Gregory A. Craig purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

suffer kidney dysfunction, which resulted in a diagnosis of end stage renal failure at the age of forty-five. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff extreme pain and suffering, and he requires dialysis treatments while waiting for kidney transplantations which, once implemented, will require him to take anti-rejection medications for the remainder of his life. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

240.    Plaintiff Gregory Fink is and was at all relevant times a citizen of the State of Louisiana and domiciled in Shreveport, Louisiana. Plaintiff Gregory Fink purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Viread beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney injury, which resulted in diagnoses of Stage 4 chronic kidney disease and near end stage renal failure at the young age of thirty-nine. Plaintiff's severe loss of kidney functions and related injuries have caused Plaintiff extreme pain and suffering, as well as almost requiring dialysis treatments. Plaintiff's injuries have required Plaintiff, at the age of thirty-nine, to undergo significant changes in his lifestyle, including losing his home after losing his job and obtaining disability benefits. Plaintiff may require expensive and painful kidney dialysis followed by kidney transplantation requiring the use of anti-rejection medications for the remainder of his life. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

241.    Plaintiff Henry Percival Williams is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Henry Percival Williams purchased

and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Atripla beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in the diagnosis of severely high kidney creatinine levels. Plaintiff's failing kidney functions and related deteriorations have caused Plaintiff extreme pain and suffering and extreme fear of soon requiring dialysis treatments. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

242.    Plaintiff Hosea Allen is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Hosea Allen purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Complera from to 2014 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of renal failure and forced him to be placed on dialysis at the young age of thirty-seven. Plaintiff's renal failure, kidney damage and related dialysis have caused Plaintiff pain and suffering and mental anguish. Plaintiff's condition is so limiting that he can no longer participate in activities he once enjoyed, including visiting with family and friends and other activities that require extended social interaction. In addition, Plaintiff's activities and quality of life are diminished based on his frequent urination due to his condition, and therefore Plaintiff is now forced to refrain from engaging in many of life's activities due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including hospitalization and dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

243.     Plaintiff Jacqueline Garrett is and was at all relevant times a citizen of the State of Louisiana and domiciled in Shreveport, Louisiana. Plaintiff Jacqueline Garrett purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Atripla beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of high creatinine levels with sixty-percent (60%) kidney function. Plaintiff's low kidney functions and related deteriorations have caused Plaintiff to experience extreme pain and suffering in her lower back and kidneys. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

244.     Plaintiff Jacqueline E. Williams is and was at all relevant times a citizen of the State of Georgia and domiciled in Collins, Georgia. Plaintiff Jacqueline E. Williams purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread starting in 2001, followed by Truvada until 2015 and Complera beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer severe bone demineralization, which resulted in fractures of the hip, shoulder, ankle and toe. Plaintiff's severe bone demineralization and related fractures of the hip, shoulder, ankle and toe have caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed, including visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition, and therefore Plaintiff has to refrain from engaging in many of life's activities. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain,

1    suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost

2    earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

3          245.    Plaintiff Jamal Metoyer is and was at all relevant times a citizen of the State of

4    Louisiana and domiciled in Monroe, Louisiana. Plaintiff Jamal Metoyer purchased and ingested the

5    following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2010, followed

6    by Truvada from 2010 to 2013. As a result of Gilead's wrongful conduct with respect to the

7    defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

8    ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in renal

9    failure and being placed on dialysis at the young age of twenty-nine. Plaintiff's renal failure, kidney

10   damage and related dialysis have caused Plaintiff extreme pain and suffering and required

11   hospitalization for three months. Plaintiff's condition is so limiting that he can no longer participate

12   in activities he once enjoyed and he has very restrictive dietary requirements. In addition, Plaintiff's

13   activities and quality of life are diminished based on his requirement to take kidney medication for

14   the rest of his life due to his condition. Plaintiff Jamal Metoyer must do a trial for any medication he

15   takes to see if it adversely affects his kidneys due to the injuries caused by Gilead's defective TDF

16   Drugs. Plaintiff's injuries have also had a negative impact on his career in that his injuries have

17   caused him to require time off from work resulting in lost wages. Plaintiff required and incurred, and

18   will continue to require and incur, expenses in connection with medical treatment as a result of these

19   injuries, including hospitalization and dialysis. Plaintiff has endured, and will continue to endure,

20   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered

21   lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

22         246.    Plaintiff James M. Criswell is and was at all relevant times a citizen of the State of

23   Tennessee and domiciled in Antioch, Tennessee. Plaintiff James M. Criswell purchased and ingested

24   the following TDF Drug for an FDA-approved use of the drug: Truvada from 2013 to 2016. As a

25   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

26   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

27   suffer damage to his kidneys, which resulted in a diagnosis of Stage 3 chronic kidney disease.

28   Plaintiff's Stage 3 chronic kidney disease and related kidney damage have caused Plaintiff extreme

pain and suffering and constant fatigue. Plaintiff's condition is so limiting that he can no longer participate in activities he once enjoyed, including going to movies and other activities that do not allow him immediate access to a restroom. In addition, Plaintiff's activities and quality of life are diminished based on his fear of diminished kidney function in the future due to his condition. Plaintiff James M. Criswell must urinate frequently due to the injuries caused by Gilead's defective TDF Drug.. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

247.     Plaintiff James McKnight is and was at all relevant times a citizen of the State of Tennessee and domiciled in Murfreesboro, Tennessee. Plaintiff James McKnight purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2006 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as well as the inability to have full use of his right hand. Plaintiff's condition is so painful and limiting that he can no longer participate in activities he once enjoyed, including walking long distances, riding a bicycle and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and therefore he is forced to refrain from engaging in many of life's activities. Plaintiff James McKnight must use his left hand for most things including writing due to the injuries caused by Gilead's defective TDF Drug, and has extreme difficulty climbing stairs or standing in one place for an extended period of time. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

1    his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

2    damages to be proven at trial.

3        248.    Plaintiff James William Moon, Jr. is and was at all relevant times a citizen of the State

4    of Tennessee and domiciled in Hollow Rock, Tennessee. Plaintiff James William Moon, Jr.

5    purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada

6    and Atripla from 2008 to 2012. As a result of Gilead's wrongful conduct with respect to the defective

7    TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

8    the TDF Drugs caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of bone

9    demineralization at the young age of thirty-seven. Plaintiff's bone demineralization and related

10   deteriorations have caused Plaintiff excruciating pain and suffering in his neck, back, spine, legs and

11   knees, and he has endured a fractured thumb and herniated spinal disc. Plaintiff required and

12   incurred, and will continue to require and incur, expenses in connection with medical treatment as a

13   result of these injuries, including monitoring bone density. Plaintiff has endured, and will continue to

14   endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has

15   suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

16   at trial.

17       249.    Plaintiff Jeffrey K. Spreen is and was at all relevant times a citizen of the State of

18   Wisconsin and domiciled in Kenosha, Wisconsin. Plaintiff Jeffrey K. Spreen purchased and ingested

19   the following TDF Drug for an FDA-approved use of the drug: Stribild beginning in 2016. As a

20   result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

21   was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

22   suffer severe bone density loss, which resulted in a diagnosis of osteoporosis and put him at a high

23   risk for bone fractures at the young age of twenty-seven. Plaintiff's osteoporosis and related

24   deteriorations have occurred in his arms, elbows, shoulders, spine, ribs, hips, pelvis, ankles and legs,

25   causing him extreme pain and suffering and multiple fractures to his left elbow, spinal vertebrae, ribs

26   and left shoulder, followed by excruciatingly painful and expensive physical therapy. Plaintiff's

27   constant pain throughout his entire body is so debilitating that he can no longer participate in

28   activities he once enjoyed, including getting out of the bed or bath tub or shower without assistance,

1    walking or standing or sitting for an extended period of time, lifting more than ten pounds, jogging

2    and exercising. Plaintiff refrains from engaging in many of life's activities due to the injuries caused

3    by Gilead's defective TDF Drug, and has extreme suicidal depression with constant crying and

4    debilitating difficulty with everyday routine activities such as socializing with family and friends,

5    going up and down stairs and doing housework. Plaintiff's quality of life is completely ruined at the

6    young age of twenty-seven. Plaintiff required and incurred, and will continue to require and incur,

7    expenses in connection with medical treatment as a result of these injuries, including surgeries and

8    hospitalization. Plaintiff Jeffrey K. Spreen has endured, and will continue to endure, pain, suffering,

9    mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings

10   and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

11           250.    Plaintiff Jeffrey May is and was at all relevant times a citizen of the State of Louisiana

12   and domiciled in Baton Rouge, Louisiana. Plaintiff Jeffrey May purchased and ingested the

13   following TDF Drugs for an FDA-approved use of the drugs: Atripla beginning in 2007, followed by

14   Truvada until 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF

15   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

16   TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of Stage 3

17   chronic kidney disease at the young age of forty-nine. Plaintiff's Stage 3 chronic kidney disease and

18   related kidney damage have caused Plaintiff pain and suffering as well as mental anguish. Plaintiff's

19   condition is so limiting that he can no longer participate in activities he once enjoyed that do not

20   allow him to be near a restroom. In addition, Plaintiff's activities and quality of life are diminished

21   based on his fear of diminishing kidney function due to his condition, and therefore Plaintiff is

22   forced to refrain from engaging in many of life's activities due to the injuries caused by Gilead's

23   defective TDF Drugs. Plaintiff's injuries have also had a negative impact on his career as an

24   electrical engineer in that his injuries do not allow him to continue working. Plaintiff required and

25   incurred, and will continue to require and incur, expenses in connection with medical treatment as a

26   result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental

27   anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a

28   loss of earning capacity, and other injuries and damages to be proven at trial.

251.    Plaintiff Jerome Armstead is and was at all relevant times a citizen of the State of Louisiana and domiciled in Lafayette, Louisiana. Plaintiff Jerome Armstead purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney injury, which resulted in the diagnoses of Stage 3 chronic kidney disease and nearly end stage renal failure. Plaintiff's severe kidney function loss of thirty-percent (30%) and related injury have caused Plaintiff extreme pain and suffering as well as constant worry of his kidney function levels quickly diminishing which will require future dialysis treatments. Plaintiff's injuries have required Plaintiff to endure extreme mental anguish after undergoing significant changes in his lifestyle, including losing his job and obtaining disability benefits. Plaintiff may require expensive and painful kidney dialysis followed by kidney transplantation with anti-rejection medications for the rest of his life. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

252.    Plaintiff John Black is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff John Black purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla, followed by Truvada from 2010 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of bone density loss. Plaintiff's bone density loss and related bone deterioration have caused Plaintiff extreme mental anguish and suffering. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff John Black is very worried about diminished bone density in the future due to the injuries caused by Gilead's defective TDF Drugs, and has been

told by his doctor he is borderline osteoporosis. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

253.    Plaintiff John Messer is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana Plaintiff John Messer purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2014 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization and damage to his kidneys, which resulted in a diagnosis of osteopenia with a risk for bone fractures and kidney failure associated with high creatinine levels at the young age of thirty-eight. Plaintiff's risk for bone fractures and related deterioration has caused Plaintiff mental anguish. Plaintiff's kidney failure and related kidney damage have caused Plaintiff extreme pain and suffering, and require Plaintiff to follow a strict food diet, be restricted from taking anti-inflammatory drugs and to closely monitor his kidney functions. Plaintiff's condition is so debilitating that he is no longer able to run and has difficulty standing for extended periods of time or walking long distances. Plaintiff cannot participate in activities he once enjoyed, including exercising, jogging, eating his favorite foods and other activities that require movement and physical exertion. In addition, Plaintiff cannot work on a regular basis at the young age of thirty-eight. Plaintiff's condition has required hospitalization and he has endured kidney failure due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including hospitalization. Plaintiff John Messer has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

254.    Plaintiff Jonathan Cole is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Jonathan Cole purchased and ingested

the following TDF Drugs for an FDA-approved use of the drugs: Viread and Atripla beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and kidney issues, which resulted in the diagnoses of osteopenia and borderline Stage 4 chronic kidney disease, respectively. Plaintiff's osteopenia, severe chronic kidney disease, and related injuries have caused Plaintiff extreme pain and suffering in his back, kidneys, hips, legs and feet as well as a fractured toe. Plaintiff's physical activities and quality of life have been severely diminished, such as requiring dialysis in the near future and daily difficulties with most physical activities, all due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries. Plaintiff has also suffered lost earnings and/or a loss of earning capacity, as well as other injuries and damages to be proven at trial.

255.    Plaintiff Joseph A. Gallow is and was at all relevant times a citizen of the State of Louisiana and domiciled in Mamou, Louisiana. Plaintiff Joseph A. Gallow purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2014 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis at the young age of thirty-five. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as well as continual numbness throughout his body. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including working out, playing basketball, visiting with family and friends and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition. Plaintiff Joseph A. Gallow must endure pain in his legs, feet, arms and back due to the injuries caused by Gilead's defective TDF Drug, and has extreme difficulty lifting heavier objects. Plaintiff required and incurred, and will continue to require and incur,

1    expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and

2    will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

3    his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

4    damages to be proven at trial.

5         256.    Plaintiff Joy Taylor is and was at all relevant times a citizen of the State of Louisiana

6    and domiciled in Alexandria, Louisiana. Plaintiff Joy Taylor purchased and ingested the following

7    TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2017. As a result of Gilead's

8    wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the

9    foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone

10   demineralization, which resulted in a diagnosis of osteoporosis at the young age of fifty-three.

11   Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as

12   well as a broken bone in her back. Plaintiff's condition is so painful that she can no longer participate

13   in activities she once enjoyed, including household chores, driving distances, visiting with family

14   and friends and other activities that require movement and physical exertion. In addition, Plaintiff's

15   activities and quality of life are diminished based on her fear of breaking a bone or injuring herself

16   due to her condition. Plaintiff Joy Taylor must often use a cane or walker for mobility and has

17   extreme difficulty getting in the bath tub and climbing stairs due to the injuries caused by Gilead's

18   defective TDF Drug. Plaintiff's injuries have also had a negative impact on her career as a cashier in

19   that her injuries will not allow her to stand for extended periods of time and Plaintiff is no longer

20   able to work. Plaintiff required and incurred, and will continue to require and incur, expenses in

21   connection with medical treatment as a result of these injuries. Plaintiff has endured, and will

22   continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

23   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

24   to be proven at trial.

25        257.    Plaintiff Kabrodrick Brantley is and was at all relevant times a citizen of the State of

26   Louisiana and domiciled in Springhill, Louisiana. Plaintiff Kabrodrick Brantley purchased and

27   ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from June of 2013

28   to June of 2015, Complera from June of 2015 to 2016 and Truvada from 2017 to 2018. As a result of

Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer severe damage to his kidneys, which resulted in a diagnosis of kidney failure at the young age of twenty-eight. Plaintiff's severe kidney failure and related kidney damage have caused Plaintiff extreme pain and suffering and required Plaintiff to be hospitalized for two weeks for kidney treatments. Plaintiff's condition is so debilitating that he missed work while in the hospital for his kidney treatments and was required to withdraw from college courses due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff Kabrodrick Brantley has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

258.    Plaintiff Kenneth L. Casey is and was at all relevant times a citizen of the State of Louisiana and domiciled in Metairie, Louisiana. Plaintiff Kenneth L. Casey purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss and kidney dysfunction, which resulted in the diagnoses of low bone density and proteinuria, respectively. Plaintiff's severe bone density loss and kidney disease along with related deteriorations have caused Plaintiff to experience extreme pain and suffering in his jaws, shoulders, back, spine, kidneys, hips, and legs as well as weakness, fatigue and a fractured leg. Plaintiff's injuries, fatigue and dizziness have required him to give up his life's passion/career of owning a professional dog grooming business for forty years while now relying on disability benefits. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant bone and kidney monitoring. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

259.     Plaintiff Kent Monroe is and was at all relevant times a citizen of the State of Oklahoma and domiciled in Tulsa, Oklahoma. Plaintiff Kent Monroe purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Complera beginning in 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteopenia at the young age of thirty-two. Plaintiff's osteopenia and related deterioration have caused Plaintiff extreme pain and suffering as well as caused Plaintiff to fracture his ankle, fingers and toes. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed including snowboarding, riding bikes, skateboarding, walking and any other activity that requires movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition. Plaintiff Kent Monroe must purchase two different size shoes, severely limit his physical activities, has extreme difficulty using stairs and must shower sitting down due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

260.     Plaintiff Keri Brady is and was at all relevant times a citizen of the State of Tennessee and domiciled in Pigeon Forge, Tennessee. Plaintiff Keri Brady purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2006 to 2011, followed by Truvada from 2011 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of renal failure and forced him to be placed on dialysis at the young age of forty-seven. Plaintiff's renal failure and related kidney damage have caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful and limiting that he can no longer participate in activities he once enjoyed, including socializing and other activities that require

movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his dependence on dialysis and extreme difficulty with fatigue due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

261.    Plaintiff Keri Hicks is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Keri Hicks purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2011 and Complera from to 2011 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of Stage 2 chronic kidney disease at the young age of thirty-seven. Plaintiff's chronic kidney disease and related deteriorations have caused extreme pain and suffering as well as daily kidney dysfunctions. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

262.    Plaintiff Lance Bartholomew is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Lance Bartholomew purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Complera beginning in 2006. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunctions, which resulted in a diagnosis of Stage 3 chronic kidney disease at the young age of thirty-two. Plaintiff's chronic kidney disease and related deteriorations have caused him extreme pain, suffering and urination issues. Plaintiff's injuries have

had a negative impact on his quality of life in that his injuries have caused him to quit working and require Plaintiff to receive SSI disability at the young age of thirty-two. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring his kidney functions and possibly needing kidney dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

263.    Plaintiff Lashawn Victor is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Lashawn Victor purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, followed by Truvada from 2013 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to her kidneys, which resulted in a diagnosis of acute renal failure at the young age of forty. Plaintiff's acute renal failure and related kidney damage have caused Plaintiff extreme pain and suffering as well as being placed on dialysis four hours a day, three times a week. Plaintiff's condition is so limiting that she can no longer participate in activities she once enjoyed, including taking care of her son full time, visiting with family and friends and other activities that require movement and physical exertion. Plaintiff Lashawn Victor is awaiting a kidney transplant due to the injuries caused by Gilead's defective TDF Drugs and will be required to take anti-rejection drugs for the rest of her life thereafter if she is fortunate enough to receive a kidney transplant. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including surgery and dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

264.    Plaintiff Lawrence Owens is and was at all relevant times a citizen of the State of Tennessee and domiciled in Clarksville, Tennessee. Plaintiff Lawrence Owens purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, then Truvada from

2008 to 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney damage, which resulted in a diagnosis of renal failure and forced him to be placed on dialysis at the young age of thirty-three. Plaintiff's condition is so painful and limiting that he can no longer participate in activities he once enjoyed, including visiting with family and friends and other activities that require movement and physical exertion. Plaintiff Lawrence Owens has physically deteriorated quite substantially due to the injuries caused by Gilead's defective TDF Drugs and has extreme difficulty with depression. Plaintiff's injuries have also had a negative impact on his career as a small business owner, as his injuries have forced him to require time off from work, and he ultimately lost his business. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

265. Plaintiff Leander Patrick is and was at all relevant times a citizen of the State of Louisiana and domiciled in Shreveport, Louisiana. Plaintiff Leander Patrick purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Truvada beginning in 2001. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and related deteriorations have caused Plaintiff extreme pain and suffering in his back, legs and knees as well as a fractured leg. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed that require movement and physical exertion. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

266.     Plaintiff Levoice Weary, Jr. is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Levoice Weary, Jr. purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2006 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney problems, which resulted in a diagnosis of kidney dysfunction at the age of forty-seven. Plaintiff's kidney dysfunction and related deteriorations have caused excruciating pain and suffering in his kidneys and lower back as well as requiring him to miss multiple days at work and amass additional medical bills. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring kidney functions. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

267.     Plaintiff Lisa Renee Devereux is and was at all relevant times a citizen of the State of Tennessee and domiciled in Knoxville, Tennessee. Plaintiff Lisa Renee Devereux purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2002 to 2004 and Truvada from 2004 to 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis at the young age of forty-three. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as well as fractured ankles, wrists and toes. Plaintiff's ingestion of the TDF Drugs further caused Plaintiff to suffer damage to her kidneys, which resulted in a diagnosis of Stage 4 kidney disease at the young age of forty-five. Plaintiff's Stage 4 chronic kidney disease and related kidney damage have caused Plaintiff pain and suffering and have required hospitalization and being sent to a nursing home. Plaintiff's condition is so painful and limiting that she can no longer participate in activities she once enjoyed that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition. Plaintiff Lisa Renee Devereux

must adhere to a restrictive diet and has extreme difficulty with fear of her kidneys further deteriorating due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including hospitalization. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

268.    Plaintiff Lloyd H. Peoples is and was at all relevant times a citizen of the State of New York and domiciled in New York, New York. Plaintiff Lloyd H. Peoples purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada and Stribild beginning in 2008. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage renal failure. Plaintiff's severe kidney failure and related injuries and dysfunction have caused Plaintiff excruciating pain and suffering as well as requiring him to receive painful and expensive kidney dialysis treatments three times per week while waiting for kidney transplantations. Plaintiff's condition has caused him to constantly worry about his possibility of obtaining a successful kidney transplantation and monitoring of kidney functions and possibly taking lifetime anti-rejection transplant medications to prevent any kidney transplant rejection. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

269.    Plaintiff Lois A. Goetz is and was at all relevant times a citizen of the State of Pennsylvania and domiciled in Harrisburg, Pennsylvania. Plaintiff Lois A. Goetz purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to 2012 and Stribild from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a

1   diagnosis of osteoporosis and a fracture of her left leg with an unsuccessful bone graft surgery and

2   the fracture of five ribs just from coughing. Plaintiff's osteoporosis and related deteriorations have

3   occurred in her back, hips, ribs, arms and legs, all of which have caused Plaintiff extreme pain and

4   suffering. Plaintiff's condition is such an intensively painful daily experience that she can no longer

5   participate in activities she once enjoyed, including playing with her grandson, housework, standing,

6   walking and sitting for an extended period of time, as well as being able to work and other physical

7   activities. In addition, Plaintiff is required to rely on the use of a cane or walker for mobility, and has

8   to rely on disability benefits instead of working at the age of forty-nine. Plaintiff required and

9   incurred, and will continue to require and incur, expenses in connection with medical treatment as a

10  result of these injuries. Plaintiff Lois A. Goetz has endured, and will continue to endure, pain,

11  suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost

12  earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

13         270.    Plaintiff Louverne Boddie is and was at all relevant times a citizen of the State of

14  Tennessee and domiciled in Memphis, Tennessee. Plaintiff Louverne Boddie purchased and ingested

15  the following TDF Drug for an FDA-approved use of the drug: Viread from 2010 to 2013. As a

16  result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

17  was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

18  suffer kidney failure and severe damage to her kidneys, which resulted in a diagnosis of end stage

19  renal failure while requiring dialysis treatments three times per week since the age of forty-four.

20  Plaintiff's kidney failure and related kidney damage have caused Plaintiff extreme pain, suffering

21  and fatigue. Plaintiff's condition is so painful and debilitating that she can no longer participate in

22  activities she once enjoyed, including eating her favorite foods, traveling, walking for a long

23  distances, exercising and other activities that require movement and physical exertion. In addition,

24  Plaintiff's activities and quality of life are diminished based on her fear of the future condition of her

25  kidneys and possibly requiring a future kidney transplantation surgery. Plaintiff must be very careful

26  not to take many over the counter medications due to the injuries caused by Gilead's defective TDF

27  Drug. Plaintiff required and incurred, and will continue to require and incur, expenses in connection

28  with medical treatment as a result of these injuries. Plaintiff Louverne Boddie has endured, and will

continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

to be proven at trial.

271.     Plaintiff Marcus Cole is and was at all relevant times a citizen of the Commonwealth

of Kentucky and domiciled in Hillsboro, Kentucky. Plaintiff Marcus Cole purchased and ingested the

following TDF Drug for an FDA-approved use of the drug: Stribild from 2012 to 2016. As a result of

Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

bone density loss, which resulted in a diagnosis of weakening of the bones at the young age of

twenty-six. Plaintiff's weak bones and related deteriorations have caused Plaintiff extreme pain and

suffering as well as multiple fractures in his spine and left shoulder followed by painful and

expensive physical therapy. Plaintiff's condition is so painful that he can no longer work nor perform

other activities that require movement and physical exertion. Plaintiff required and incurred, and will

continue to require and incur, expenses in connection with medical treatment as a result of these

injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss

of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning

capacity, and other injuries and damages to be proven at trial.

272.     Plaintiff Margaret Spencer is and was at all relevant times a citizen of the

Commonwealth of Kentucky and domiciled in Jackson, Kentucky. Plaintiff Margaret Spencer

purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Viread for

ten months in 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF

Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF

Drug caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteoporosis and a

high risk for bone fractures. Plaintiff's osteoporosis and related injury have occurred in her arms,

elbows, spine, ribs, hips, knees and legs which have caused Plaintiff extreme pain and suffering as

well as multiple fractured spinal vertebrae and ribs followed by wearing a very uncomfortable back

brace. Plaintiff's condition is such an intensively painful daily experience that she can no longer

participate in activities she once enjoyed without difficulty, including gardening, cooking, playing

1   with her seventeen grandchildren, grocery shopping, walking, standing or sitting for extended

2   periods of time, standing up from a sitting position, and performing housework and other daily

3   physical activities. Plaintiff required and incurred, and will continue to require and incur, expenses in

4   connection with medical treatment as a result of these injuries, including multiple emergency room

5   (ER) hospitalizations for fractured ribs from coughing. Plaintiff Margaret Spencer has endured, and

6   will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

7   her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and

8   damages to be proven at trial.

9        273.    Plaintiff Margaret Turner-Davis is and was at all relevant times a citizen of the State

10   of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Margaret Turner-Davis purchased

11   and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to

12   2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff

13   ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused

14   Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage renal failure at the

15   age of forty-eight. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff

16   extreme pain and suffering as well as dialysis treatments while waiting for kidney transplantations.

17   Plaintiff requires expensive and painful kidney dialysis followed by kidney transplantation with anti-

18   rejection medications for the rest of her life. Plaintiff required and incurred, and will continue to

19   require and incur, expenses in connection with medical treatment as a result of these injuries,

20   including constant kidney monitoring and medications. Plaintiff has endured, and will continue to

21   endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has

22   suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven

23   at trial.

24        274.    Plaintiff Mark Hicks is and was at all relevant times a citizen of the Commonwealth

25   of Kentucky and domiciled in Pimbrook, Kentucky. Plaintiff Mark Hicks purchased and ingested the

26   following TDF Drug for an FDA-approved use of the drug: Truvada from 2010 to 2014. As a result

27   of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

28   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

1   damage to his kidneys, which resulted in his being placed on dialysis. Plaintiff's kidney damage and

2   related dialysis have caused Plaintiff extreme pain and suffering as well as mental anguish.

3   Plaintiff's condition is so limiting that he can no longer participate in activities he once enjoyed that

4   do not allow him to be near a restroom. In addition, Plaintiff's activities and quality of life are

5   diminished based on his fear of the future deterioration of his kidneys due to his condition, and

6   therefore he is forced to refrain from engaging in many of life's activities. Plaintiff Mark Hicks was

7   hospitalized and put on dialysis due to the injuries caused by Gilead's defective TDF Drug and has

8   extreme difficulty with frequent urination. Plaintiff required and incurred, and will continue to

9   require and incur, expenses in connection with medical treatment as a result of these injuries,

10  including dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish,

11  and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of

12  earning capacity, and other injuries and damages to be proven at trial.

13          275.    Plaintiff Mary Rebecca Souslin is and was at all relevant times a citizen of the State of

14  Texas and domiciled in Conroe, Texas. Plaintiff Mary Rebecca Souslin purchased and ingested the

15  following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla, and Complera

16  beginning in 2005. As a result of Gilead's wrongful conduct with respect to the defective TDF

17  Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

18  TDF Drugs caused Plaintiff to suffer weakening of the bones, which resulted in a diagnosis of

19  osteoporosis. Plaintiff's osteoporosis and related injuries have caused Plaintiff to have extreme pain

20  and suffering in her back, hips, knees and legs, and caused her to experience fractures to both hips

21  (followed by hip replacement surgery) as well as back surgery. Plaintiff required and incurred, and

22  will continue to require and incur, expenses in connection with medical treatment as a result of these

23  injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss

24  of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning

25  capacity, and other injuries and damages to be proven at trial.

26          276.    Plaintiff Mary Wilson McCullen, individually and as personal representative for the

27  Estate of Rodney Leon Fitzgerald McCullen, is and was at all relevant times a citizen of the State of

28  Louisiana and domiciled in Franklinton, Louisiana. Plaintiff Mary Wilson McCullen is the mother of

Rodney Leon Fitzgerald McCullen, deceased. Decedent Rodney Leon Fitzgerald McCullen purchased and ingested the following TDF Drug for an FDA-approved use of the drug: from 2001 until 2018 Viread and Stribild. As a result of Decedent Rodney Leon Fitzgerald McCullen's use of the foregoing TDF Drugs, and his resulting death, Plaintiff must endure the pain, suffering and mental anguish of knowing her son, Rodney Leon Fitzgerald McCullen, suffered from kidney failure and required hospitalization for two weeks prior to his death due to the severity of his kidney failure. Rodney Leon Fitzgerald McCullen was made to endure the pain, suffering and mental anguish of his conditions and subsequent death. As a result of the injuries caused to Plaintiff's son, Rodney Leon Fitzgerald McCullen, by Defendant Gilead's products, Rodney Leon Fitzgerald McCullen sought medical treatment, including but not limited to doctor appointments, hospitalization, testing, and medications. Gilead's wrongful conduct proximately caused the death of Rodney Leon Fitzgerald McCullen, and additional damages to the Decedent and his estate: Conscious pain and suffering, loss of society and companionship; pain, suffering, emotional distress; past, present and future, humiliation, mortification, fright; past, present and future, medical expenses; lost wages, compensation, and earning capacity, past present and future; emotional and mental suffering, past, present and future; loss of enjoyment of life, past, present and future; and any and all other injuries and damages found to be appropriate by the trier of fact.

277.    Plaintiff Matthew Jones is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Matthew Jones purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Atripla beginning in 2006. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage kidney failure at the age of fifty-two. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff to experience extreme pain and suffering and to be placed on kidney dialysis three times per week. Plaintiff will require expensive and painful kidney transplantation followed by anti-rejection medications for his entire life. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant kidney

monitoring and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

278.     Plaintiff Maurice Lee is and was at all relevant times a citizen of the State of Tennessee and domiciled in Spring Hill, Tennessee. Plaintiff Maurice Lee purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada beginning in 2011. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in diagnoses of osteoporosis and complete renal failure. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering and mental anguish as well as requiring Plaintiff to be placed on dialysis. Plaintiff's condition is so painful and limiting that he can no longer participate in activities he once enjoyed, including working around the house, working in the yard, working on cars, playing pool and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his anxiety about the future of his kidneys and being on dialysis due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff Maurice Lee must go through dialysis three times a week and adhere to a restrictive diet due to the injuries caused by Gilead's defective TDF Drug, and has extreme difficulty with fatigue and the reality that this is his life now. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including dialysis. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

279.     Plaintiff Mia J. Abbott is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla for the year of 2015 and Complera beginning in 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

TDF Drugs caused Plaintiff to suffer kidney problems, which resulted in the diagnosis of kidney dysfunction at the age of thirty-one. Plaintiff's kidney dysfunction has caused her excruciating pain and suffering. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

280.    Plaintiff Milton L. Mosley is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Milton L. Mosley purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada starting in 2008 and Stribild thereafter until 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis at the young age of thirty-six. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including cooking, working and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his physical limitations and anxiety due to his condition, and therefore he is now forced to refrain from engaging in many of life's activities. Plaintiff Milton L. Mosley must often use a cane for mobility due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty standing for extended periods of time. Plaintiff's injuries have also had a negative impact on his career, as he is no longer able to work. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

281.    Plaintiff Myron Rogers is and was at all relevant times a citizen of the State of Louisiana and domiciled in Westwego, Louisiana. Plaintiff Myron Rogers purchased and ingested

1    the following TDF Drug for an FDA-approved use of the drug: Truvada from 2008 to 2015. As a

2    result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and

3    was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

4    suffer bone demineralization, which resulted in a diagnosis of osteoporosis at the young age of fifty.

5    Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering as

6    well as fracturing his forearm. Plaintiff's condition is so painful that he can no longer participate in

7    activities he once enjoyed, including bowling, fishing, playing basketball, visiting with family and

8    friends and other activities that require movement and physical exertion. In addition, Plaintiff's

9    activities and quality of life are diminished based on his fear of breaking a bone or injuring himself

10   due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's

11   activities. Plaintiff required and incurred, and will continue to require and incur, expenses in

12   connection with medical treatment as a result of these injuries. Plaintiff has endured, and will

13   continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

14   injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages

15   to be proven at trial.

16          282.   Plaintiff Nigel Luster is and was at all relevant times a citizen of the State of

17   Tennessee and domiciled in Memphis, Tennessee. Plaintiff Nigel Luster purchased and ingested the

18   following TDF Drug for an FDA-approved use of the drug: Atripla from 2009 to 2015. As a result of

19   Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

20   injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

21   kidney dysfunction, which resulted in a diagnosis of Stage 3 chronic kidney disease at the age of

22   forty. Plaintiff's severe kidney disease and related deteriorations have caused Plaintiff extreme pain

23   and suffering as well as almost complete kidney failure followed with dialysis treatments. Plaintiff

24   will require expensive and painful kidney dialysis followed by kidney transplantations with anti-

25   rejection medications, in the event his kidney conditions diminish any further. Plaintiff required and

26   incurred, and will continue to require and incur, expenses in connection with medical treatment as a

27   result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured,

28   and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result

1    of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other

2    injuries and damages to be proven at trial.

3         283.    Plaintiff Oris Anderson is and was at all relevant times a citizen of the State of

4    Louisiana and domiciled in Gonzales, Louisiana. Plaintiff Oris Anderson purchased and ingested the

5    following TDF Drug for an FDA-approved use of the drug: Atripla from 2011 to 2018. As a result of

6    Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

7    injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

8    bone demineralization, which resulted in a diagnosis of bone density loss. Plaintiff's bone density

9    loss and related deterioration have caused Plaintiff extreme pain and suffering as well as a burning

10   sensation in her legs. Plaintiff's condition is so painful that she can no longer participate in activities

11   she once enjoyed, including walking in the park and other activities that require movement and

12   physical exertion. Plaintiff required and incurred, and will continue to require and incur, expenses in

13   connection with medical treatment as a result of these injuries. Plaintiff has endured, and will

14   continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her

15   injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and

16   damages to be proven at trial.

17        284.    Plaintiff Patricia A. Williams is and was at all relevant times a citizen of the State of

18   Louisiana and domiciled in Maringouin, Louisiana. Plaintiff Patricia A. Williams purchased and

19   ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2006 to 2017.

20   As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested

21   and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

22   suffer bone density loss, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis and

23   related deteriorations have caused Plaintiff extreme pain and suffering in her back, legs and knees, as

24   well as right knee surgery affecting her job at Iberville Parish School. Plaintiff required and incurred,

25   and will continue to require and incur, expenses in connection with medical treatment as a result of

26   these injuries, including monitoring bone density. Plaintiff has endured, and will continue to endure,

27   pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has

28

1    suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be

2    proven at trial.

3         285.    Plaintiff Patricia Denise Kinnard is and was at all relevant times a citizen of the State

4    of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Patricia Denise Kinnard purchased

5    and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001to

6    2006 and Truvada beginning in 2008. As a result of Gilead's wrongful conduct with respect to the

7    defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

8    ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a

9    diagnosis of osteoporosis at the young age of forty-seven. Plaintiff's osteoporosis and related

10   deterioration have caused Plaintiff extreme pain and suffering. Plaintiff's condition is so painful that

11   she can no longer participate in activities she once enjoyed, including working for wages and other

12   activities that require movement and physical exertion. In addition, Plaintiff's activities and quality

13   of life are diminished based on her fear of breaking a bone or injuring herself due to her condition,

14   and therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff Patricia

15   Denise Kinnard must often use a cane or walker for mobility due to the injuries caused by Gilead's

16   defective TDF Drugs, and has extreme difficulty climbing stairs and getting in or out of the bathtub.

17   Plaintiff's injuries have also had a negative impact on her career as a laborer and housekeeper in that

18   she can no longer work. Plaintiff required and incurred, and will continue to require and incur,

19   expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and

20   will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

21   her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries

22   and damages to be proven at trial.

23        286.    Plaintiff Patricia Malone is and was at all relevant times a citizen of the State of

24   Tennessee and domiciled in Memphis, Tennessee. Plaintiff Patricia Malone purchased and ingested

25   the following TDF Drugs for an FDA-approved use of the drugs: Atripla for 2007 and Truvada

26   beginning in 2008. As a result of Gilead's wrongful conduct with respect to the defective TDF

27   Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the

28   TDF Drugs caused Plaintiff to suffer bone demineralization, for which she was diagnosed with

osteopenia. Her injuries were severe and forced her to have to obtain disability benefits. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

287. Plaintiff Patrick Dennis is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Cub Run, Kentucky. Plaintiff Patrick Dennis purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla and Stribild beginning in 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney problems, which resulted in a diagnosis of severe Stage 3 chronic kidney disease at the young age of thirty-eight. Plaintiff's chronic kidney disease and related deteriorations have caused Plaintiff extreme pain and suffering. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

288. Plaintiff Patrick Heinze is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Patrick Heinze purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2006 to 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney dysfunction and bone density loss, which resulted in the diagnoses of Fanconi's Syndrome and osteopenia, respectively, at the young age of thirty-four. Plaintiff's severe kidney failure and severe bone density loss along with related injuries have caused Plaintiff excruciating pain and suffering and required him to be hospitalized for seven days for the risk of requiring dialysis treatments and a fractured left foot. Plaintiff's injuries have required Plaintiff to undergo significant changes in his lifestyle, including having to leave his job and rely on disability

1    benefits. Plaintiff required and incurred, and will continue to require and incur, expenses in

2    connection with medical treatment as a result of these injuries, including constant kidney monitoring

3    and medications. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish,

4    and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of

5    earning capacity as well as other injuries and damages to be proven at trial.

6        289.    Plaintiff Pedro A. Benitez is and was at all relevant times a citizen of the State of New

7    York and domiciled in Rochester, New York. Plaintiff Pedro A. Benitez purchased and ingested the

8    following TDF Drugs for an FDA-approved use of the drugs: Truvada, Atripla and Stribild from

9    2006 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs,

10   Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF

11   Drugs caused Plaintiff to suffer severe kidney dysfunction and extensive damage to his kidneys,

12   which resulted in a diagnosis of kidney failure requiring dialysis treatments at the age of thirty-four.

13   Plaintiff's severe kidney failure and related deterioration have caused Plaintiff extreme fatigue, pain

14   and suffering and require him to endure expensive and painful dialysis treatments and expensive

15   hospitalization. Plaintiff's condition is so painful and debilitating that he can no longer participate in

16   activities he once enjoyed, including working full-time as a professional speaker, eating his favorite

17   foods and other activities that require movement and physical exertion. In addition, Plaintiff's

18   activities and quality of life are diminished based on his constant worry regarding the future

19   condition of his kidneys which may require kidney transplantation surgery. Plaintiff must be very

20   careful not to take many over the counter medications and is required to follow a very strict food diet

21   and fluid intake monitoring due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff

22   required and incurred, and will continue to require and incur, expenses in connection with medical

23   treatment as a result of these injuries, including future kidney transplantation surgery followed by

24   anti-rejection medications for the remainder of his life. Plaintiff Pedro A. Benitez has endured, and

25   will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of

26   his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries

27   and damages to be proven at trial.

28

290.     Plaintiff Phillip Haggan is and was at all relevant times a citizen of the State of Louisiana and domiciled in Maringouin, Louisiana. Plaintiff Phillip Haggan purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2006 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss, which resulted in a diagnosis of osteopenia at the age of forty-three. Plaintiff's severe bone density loss and related deteriorations have caused Plaintiff excruciating pain and suffering in his neck, back, spine and legs as well as a fractured hand. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring bone density. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

291.     Plaintiff Prentice Page is and was at all relevant times a citizen of the State of Louisiana and domiciled in Westwego, Louisiana. Plaintiff Prentice Page purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, for which Plaintiff was diagnosed with weakening of the bones and caused the deteriorations of Plaintiff's bones at the young age of twenty-eight. Plaintiff has difficulty walking because he has extreme pain and suffering in his legs, knees and ankles, and has endured fractures to his knees and ankles. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

292.     Plaintiff Prentice Williams is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Prentice Williams

purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada beginning in 2011. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer kidney problems, which resulted in a diagnosis of kidney dysfunction. Plaintiff's kidney dysfunction and related deteriorations have caused excruciating pain and suffering in her kidneys and lower back. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring kidney functions. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

293.    Plaintiff Renetta C. Tornes is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Renetta C. Tornes purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla 2009 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of weakening of the bones at the young age of thirty-seven. Plaintiff's weakening of the bones and related deterioration have caused Plaintiff extreme pain and suffering as well as continual pain in her ankle, leg, hip and back. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed, including running, visiting with family and friends and other activities that require movement and physical exertion. Plaintiff Renetta C. Tornes cannot stand for extended periods of time due to the injuries caused by Gilead's defective TDF Drug, and has extreme difficulty climbing stairs or hills. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

294.     Plaintiff Robert Patmon is and was at all relevant times a citizen of the State of Georgia and domiciled in Clarkston, Georgia. Plaintiff Robert Patmon purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Stribild beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage renal failure requiring dialysis treatments while waiting for kidney transplantation. Plaintiff's severe kidney failure and related injuries have caused Plaintiff excruciating pain and suffering. Plaintiff's condition of requiring kidney dialysis treatments and transplant is so painful and frequent that Plaintiff was required to quit working at the age of fifty-four. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

295.     Plaintiff Robert Welles is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Robert Welles purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2004, followed by Truvada from 2004 to 2015. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney damage, which resulted in a diagnosis of renal failure, hospitalization and dialysis at the young age of fifty-two. Plaintiff's renal failure, dialysis and related kidney damage have caused Plaintiff extreme pain and suffering as well as mental anguish. Plaintiff's condition is so limiting that he can no longer participate in activities he once enjoyed, including socializing with friends and other activities that cannot meet his strict dietary requirements. In addition, Plaintiff's activities and quality of life are diminished based on his fear of further diminished kidney function in the future due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these

1   injuries, including hospitalization and dialysis. Plaintiff has endured, and will continue to endure,

2   pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has

3   suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be

4   proven at trial.

5       296.    Plaintiff Ronald Eric King is and was at all relevant times a citizen of the

6   Commonwealth of Kentucky and domiciled in Radcliff, Kentucky. Plaintiff Ronald Eric King

7   purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from

8   2013 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,

9   Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug

10  caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of proteinuria (excess

11  protein in the urine) at the young age of forty-nine. Plaintiff's proteinuria and related kidney damage

12  have caused Plaintiff suffering as well as urinary issues. Plaintiff's condition is so limiting that he

13  can no longer participate in activities he once enjoyed, including visiting with family and friends and

14  other activities that do always not allow him to be near a restroom. In addition, Plaintiff's activities

15  and quality of life are diminished based on his fear of his kidneys further deteriorating due to his

16  condition, and thus Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff

17  required and incurred, and will continue to require and incur, expenses in connection with medical

18  treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain,

19  suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered

20  lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at

21  trial.

22      297.    Plaintiff Ronnette Archelle is and was at all relevant times a citizen of the State of

23  Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Ronnette Archelle purchased and

24  ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2009 to

25  2011 and Complera beginning in 2011. As a result of Gilead's wrongful conduct with respect to the

26  defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

27  ingestion of the TDF Drugs caused Plaintiff to suffer loss of kidney function, which resulted in a

28  diagnosis of kidney failure at the young age of twenty-nine and has caused Plaintiff extreme pain and

suffering. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including monitoring her kidney functions. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

298.    Plaintiff Roy L. Robinson is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Salvisa, Kentucky. Plaintiff Roy L. Robinson purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2006 to 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of osteoporosis at the age of forty-eight. Plaintiff's severe bone density loss and related deteriorations have caused Plaintiff extreme pain and suffering in his back, arms and feet as well as fractures to his arm and foot. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself due to his condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff's limited mobility due to the injuries caused by Gilead's defective TDF Drug has negatively affected his ability to work as a healthcare professional at Bluegrass Care and Rehabilitation Center. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured, and will continue to endure, pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

299.    Plaintiff Sam E. Thompson is and was at all relevant times a citizen of the State of Louisiana and domiciled in Baton Rouge, Louisiana. Plaintiff Sam E. Thompson purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2003 to 2010 and Atripla from 2013 to 2017. As a result of Gilead's wrongful conduct with respect to the

defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in the diagnosis of bone density loss. Plaintiff's severe bone density loss and related deteriorations have caused Plaintiff to experience excruciating pain and suffering in his back, arms, hands, fingers and legs as well as a compound leg fracture. Plaintiff's ingestion of the TDF Drugs also caused him to suffer weakness in his legs leading him to fall and fracture a hand and three fingers while trying to stop his fall. Plaintiff required and incurred, and will continue to require and incur, expenses in connection with medical treatment as a result of these injuries, including constant bone density monitoring. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

300.    Plaintiff Sarah Dugas is and was at all relevant times a citizen of the State of Louisiana and domiciled in Carencro, Louisiana. Plaintiff Sarah Dugas purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2006 to 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone density loss, which resulted in the diagnoses of osteopenia of the lumbar spine and femurs and osteoporosis of the left knee with a high risk for bone fractures. Plaintiff's risk for fractures and related deteriorations have occurred in her shoulders, back, arms, legs and knees, which have caused Plaintiff extreme pain and suffering. Plaintiff's condition is such an intensively painful daily experience that she can no longer participate in activities she once enjoyed, including working for Walmart, walking or standing or sitting for extended periods of time, bicycling, yard work and performing her housework without difficulty, as well as other daily physical activities. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff Sarah Dugas has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

301.     Plaintiff Shardra Smith is and was at all relevant times a citizen of the State of Louisiana and domiciled in Westwego, Louisiana. Plaintiff Shardra Smith purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2007 to 2010 and Atripla in 2010. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer severe kidney dysfunction and extensive damages to her kidneys, which resulted in a diagnosis of acute kidney failure requiring dialysis treatments at the young age of thirty-five. Plaintiff's severe kidney failure and related deterioration have caused Plaintiff extreme fatigue, pain and suffering as well as requiring her to endure expensive and painful dialysis treatments while requiring future kidney transplantation surgery. Plaintiff's condition is so painful and debilitating that she can no longer participate in activities she once enjoyed, including eating her favorite foods, drinking her favorite beverages, traveling, walking and standing for an extended period of time and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her constant worry and severe depression regarding the future condition of her kidneys while waiting for a kidney transplantation surgery at the young age of thirty-five. Plaintiff must be very careful not to take many over the counter medications and is required to follow a very strict food diet and fluid intake monitoring due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including future kidney transplantation surgery followed by anti-rejection medications for the remainder of her young life. Plaintiff Shardra Smith has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

302.     Plaintiff Shelia Ford is and was at all relevant times a citizen of the Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Shelia Ford purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2010 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was

1    injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer

2    bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's severe bone density

3    loss and related deteriorations have caused Plaintiff extreme pain and suffering in her back, hips,

4    legs, feet and toes as well as two fractured toes and excruciating hip pains. Plaintiff required and

5    incurred and will continue to require and incur expenses in connection with medical treatment as a

6    result of these injuries, including monitoring bone density. Plaintiff has endured and will continue to

7    endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and

8    has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to

9    be proven at trial.

10          303.    Plaintiff Shirley Brents is and was at all relevant times a citizen of the Commonwealth

11   of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Shirley Brents purchased and ingested

12   the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2008 to 2015 and

13   Viread beginning in 2015. As a result of Gilead's wrongful conduct with respect to the defective

14   TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of

15   the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end

16   stage kidney failure at the age of forty-two. Plaintiff's severe kidney failure and related

17   deteriorations have caused Plaintiff to experience extreme pain and suffering as well as undergo

18   kidney dialysis three times per week until kidney transplantations on April 30, 2018. Plaintiff

19   endured expensive and painful kidney transplantations followed by anti-rejection medications which

20   she will have to take for the remainder of her life. Plaintiff's injuries have caused a negative impact

21   on her life in that she was required to quit her job and hire help to perform everyday tasks. Plaintiff

22   required and incurred and will continue to require and incur expenses in connection with medical

23   treatment as a result of these injuries, including constant kidney monitoring and transplant anti-

24   rejection medications. Plaintiff has endured and will continue to endure pain, suffering, mental

25   anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or

26   a loss of earning capacity as well as other injuries and damages to be proven at trial.

27          304.    Plaintiff Stephen Riggs is and was at all relevant times a citizen of the

28   Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Stephen Riggs

FIRST AMENDED CONSOLIDATED COMPLAINT – 140
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2012 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer severe kidney dysfunction and extensive damage to his kidneys, which resulted in a diagnosis of Stage 3 chronic kidney disease with high creatinine levels at the age of fifty-four. Plaintiff's severe kidney failure and related deterioration have caused Plaintiff extreme fatigue, pain and suffering and require him to undergo near-daily dialysis treatments. Plaintiff's condition is so painful and debilitating that he can no longer participate in activities he once enjoyed without difficulty, including sitting or walking for an extended period of time, standing for an extended period of time while teaching high school students for thirty-years and other activities that require movement and physical exertion. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including possibly requiring future dialysis treatments. Plaintiff Stephen Riggs has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

305.     Plaintiff Stephen Terrell Gaines is and was at all relevant times a citizen of the State of Missouri and domiciled in Shubuta, Missouri. Plaintiff Stephen Terrell Gaines purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Atripla from 2013 to 2014, Truvada from 2014 to 2015 and Stribild from 2015 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of kidney disease at the young age of twenty-nine and a diagnosis of end-stage renal failure at the young age of thirty-one. Plaintiff's end-stage renal failure and related kidney damage have caused Plaintiff pain and suffering and fatigue as well as requiring him to be placed on dialysis. Plaintiff's condition is so limiting that he can no longer participate in activities he once enjoyed, including extended travel and other activities that require movement and physical exertion. Plaintiff Stephen Terrell Gaines must attend dialysis three times a week for four hours each

1   time due to the injuries caused by Gilead's defective TDF Drugs, and he has extreme difficulty with

2   sleep disturbance and being required to adhere to a strict diet. Plaintiff's injuries have also had a

3   negative impact on his career, as he has become unable to work. Plaintiff required and incurred and

4   will continue to require and incur expenses in connection with medical treatment as a result of these

5   injuries, including dialysis. Plaintiff has endured and will continue to endure pain, suffering, mental

6   anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or

7   a loss of earning capacity as well as other injuries and damages to be proven at trial.

8          306.    Plaintiff Steven J. Spradlin is and was at all relevant times a citizen of the State of

9   California and domiciled in Berry Creek, California. Plaintiff Steven J. Spradlin purchased and

10  ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread, Truvada, Atripla

11  and Complera from 2001 to December of 2018. As a result of Gilead's wrongful conduct with

12  respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs.

13  Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer severe bone demineralization and

14  damage to his kidneys, which resulted in diagnoses of osteoporosis and kidney failure at the young

15  age thirty-four. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain

16  and suffering as well as constant pain in his spine, ribs, ankles and legs. He has experienced multiple

17  fractures of his spine, three ribs and left ankle. Plaintiff's kidney failure and related kidney damage

18  have caused him extreme pain and suffering and required hospitalization for kidney treatments, and

19  have forced him to follow a strict food diet, closely monitor his fluid intake, and be restricted from

20  taking anti-inflammatory drugs. Plaintiff's condition is so painful that he no longer participates in

21  activities he once enjoyed such as running, walking for long distances, standing or sitting for an

22  extended period of time, and other activities that require movement and physical exertion. In

23  addition, Plaintiff's activities and quality of life are diminished based on his immobility due to his

24  condition, and therefore Plaintiff is now forced to refrain from engaging in many of life's daily

25  activities. Plaintiff Steven J. Spradlin must endure debilitating and constant pain and high anxiety

26  due to the injuries caused by Gilead's defective TDF Drugs, and has extreme difficulty going

27  outdoors without the fear of fracturing more bones. Plaintiff required and incurred and will continue

28  to require and incur expenses in connection with medical treatment as a result of these injuries,

FIRST AMENDED CONSOLIDATED COMPLAINT – 142
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

1    including hospitalization. Plaintiff has endured and will continue to endure pain, suffering, mental

2    anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or

3    a loss of earning capacity as well as other injuries and damages to be proven at trial.

4         307.    Plaintiff Terry W. Garrett is and was at all relevant times a citizen of the

5    Commonwealth of Kentucky and domiciled in Louisville, Kentucky. Plaintiff Terry W. Garrett

6    purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from

7    2006 to 2017. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,

8    Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug

9    caused Plaintiff to suffer damage to his kidneys, which resulted in a diagnosis of Stage 3 chronic

10   kidney disease. Plaintiff's Stage 3 chronic kidney disease and related kidney damage have caused

11   Plaintiff pain and suffering and depression. Plaintiff's ingestion of the TDF Drug caused Plaintiff to

12   suffer bone demineralization, which resulted in a diagnosis of osteoporosis. Plaintiff's osteoporosis

13   and related deterioration have occurred in his hips and left shoulder, which have caused Plaintiff

14   extreme pain and suffering as well as the inability to raise his left arm properly. Plaintiff's condition

15   is so painful and limiting that he can no longer participate in activities he once enjoyed, including

16   exercising, walking long distances, picking up his nieces, traveling long distances, eating well-

17   seasoned foods and other activities that require movement and physical exertion or cannot meet his

18   strict dietary requirements. In addition, Plaintiff's activities and quality of life are diminished based

19   on his fear of breaking a bone and/or injuring himself, or his kidneys further deteriorating due to his

20   condition; thus, Plaintiff is now forced to refrain from engaging in many of life's activities. Plaintiff

21   Terry W. Garrett must adhere to a very bland and restrictive diet due to the injuries caused by

22   Gilead's defective TDF Drug and has extreme difficulty with constant pain in his hips, back and left

23   shoulder. Plaintiff suffers from sleep deprivation due to the constant pain he experiences. Plaintiff's

24   injuries have also had a negative impact on his career as an assistant manager for Walgreens in that

25   his injuries have caused him to barely continue working and require Plaintiff to take frequent breaks.

26   Plaintiff required and incurred and will continue to require and incur expenses in connection with

27   medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain,

28   suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered

1    lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at

2    trial.

3          308.    Plaintiff Tiarrence Grayson is and was at all relevant times a citizen of the

4    Commonwealth of Kentucky and domiciled in Oak Grove, Kentucky. Plaintiff Tiarrence Grayson

5    purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from

6    2010 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug,

7    Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug

8    caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of acute kidney failure at

9    the young age of twenty-four. Plaintiff's severe kidney failure and related deteriorations have caused

10   Plaintiff excruciating pain and suffering and required him to be hospitalized for four days; further, he

11   is at a risk of requiring dialysis treatments. Plaintiff's injuries have required Plaintiff to undergo

12   significant changes in his lifestyle, including difficulties working as a restaurant professional for

13   Taco Bell GFE Inc. Plaintiff required and incurred and will continue to require and incur expenses in

14   connection with medical treatment as a result of these injuries, including constant kidney monitoring

15   and medications. Plaintiff has endured and will continue to endure pain, suffering, mental anguish,

16   and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of

17   earning capacity as well as other injuries and damages to be proven at trial.

18         309.    Plaintiff Timothy Allen Hickle is and was at all relevant times a citizen of the State of

19   Tennessee and domiciled in Memphis, Tennessee. Plaintiff Timothy Allen Hickle purchased and

20   ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2003

21   and Truvada from 2004 to 2016. As a result of Gilead's wrongful conduct with respect to the

22   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

23   ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization and damage to his

24   kidneys, which resulted in diagnoses of bone density loss, hypercreatininemia, and Stage 3 chronic

25   kidney disease. Plaintiff's bone density loss and related deterioration have caused Plaintiff extreme

26   pain and suffering in his back, hips, knees and legs, and have required him to be restricted in his food

27   diet and intake of fluids. Plaintiff's condition is so debilitating that he endures excruciating kidney

28   and bone pain while attempting to perform his daily activities. Plaintiff cannot participate in

activities he once enjoyed, such as working in the landscape business he once owned, playing golf, walking without the use of a cane or walker and other activities that require movement and physical exertion. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff Timothy Allen Hickle has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

310.    Plaintiff Timothy Whaley is and was at all relevant times a citizen of the State of Tennessee and domiciled in Nashville, Tennessee. Plaintiff Timothy Whaley purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Truvada from 2004 to 2014. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer bone demineralization and kidney problems, which resulted in the diagnoses of osteoporosis and kidney failure, respectively. Plaintiff's severe bone density loss, kidney failure, and related deteriorations have caused Plaintiff extreme pain and suffering in his neck, back, kidneys, legs and ankles, including a fracture to his ankle. Plaintiff has difficulty walking and has a permanent left leg limp due to the injuries caused by Gilead's defective TDF Drug. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

311.    Plaintiff Tommy Kinner is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff Tommy Kinner purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2010 to 2018. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer damage to his kidneys and bone demineralization, which resulted in the diagnoses of Stage 4 chronic kidney disease and osteoporosis, respectively, at the young age of forty-two. Plaintiff's Stage

4 chronic kidney disease and related kidney damage have caused Plaintiff pain and suffering as well as constant fatigue. Plaintiff's osteoporosis and related deterioration have caused Plaintiff extreme pain and suffering. Plaintiff's condition is so painful that he can no longer participate in activities he once enjoyed, including cutting the grass, walking and other activities that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on his fear of breaking a bone or injuring himself, and the fear of his kidneys further deteriorating and having to be placed on dialysis due to his condition; thus, Plaintiff is now forced to refrain from engaging in many of life's activities. Plaintiff Tommy Kinner endures extreme fatigue and loss of appetite due to the injuries caused by Gilead's defective TDF Drug, and has extreme difficulty standing for extended periods of time. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

312.    Plaintiff Trina Sutton is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Trina Sutton purchased and ingested the following TDF Drug for an FDA-approved use of the drug: Atripla from 2005 to 2012. As a result of Gilead's wrongful conduct with respect to the defective TDF Drug, Plaintiff ingested and was injured by the foregoing TDF Drug. Plaintiff's ingestion of the TDF Drug caused Plaintiff to suffer loss of kidney function, which resulted in a diagnosis of Stage 2 chronic kidney disease at the age of forty. Plaintiff's chronic kidney disease and related injuries have caused Plaintiff mental anguish, pain and suffering, and have caused her intense worry over the condition of her kidneys. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including monitoring her kidney functions. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

313.    Plaintiff Valorie Denton is and was at all relevant times a citizen of the State of Louisiana and domiciled in Lake Charles, Louisiana. Plaintiff Valorie Denton purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread from 2001 to 2005, Truvada from 2005 to 2011, and Atripla from 2011 to 2016. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a diagnosis of bone density loss. Plaintiff's bone density loss and related deterioration have caused Plaintiff extreme pain and suffering as well as continual aching. Plaintiff's condition is so painful that she can no longer participate in activities she once enjoyed that require movement and physical exertion. In addition, Plaintiff's activities and quality of life are diminished based on her fear of breaking a bone or injuring herself due to her condition, and therefore Plaintiff is forced to refrain from engaging in many of life's activities. In addition, Plaintiff Valorie Denton must refrain from attempting heavy lifting and has extreme difficulty with pain in her legs and feet due to the injuries caused by Gilead's defective TDF Drugs. Plaintiff's injuries have also had a negative impact on her career as a caregiver in that her injuries will not allow her to lift anything heavy and restrict Plaintiff to only take clients that need minimal care. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

314.    Plaintiff Walter M. Henry is and was at all relevant times a citizen of the State of Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Walter M. Henry purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Viread and Atripla beginning in 2002. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of end stage renal failure at the age of forty-five. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff extreme pain and suffering as well as requiring dialysis treatments three times per

1   week. Plaintiff requires expensive and painful kidney dialysis while waiting for kidney

2   transplantations with anti-rejection medications for the rest of his life. Plaintiff required and incurred

3   and will continue to require and incur expenses in connection with medical treatment as a result of

4   these injuries, including constant kidney monitoring and medications. Plaintiff has endured and will

5   continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his

6   injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and

7   damages to be proven at trial.

8       315.    Plaintiff Wilfredo Morales is and was at all relevant times a citizen of the State of

9   Louisiana and domiciled in New Orleans, Louisiana. Plaintiff Wilfredo Morales purchased and

10   ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada from 2004 to

11   2008 and Atripla from 2008 to 2016. As a result of Gilead's wrongful conduct with respect to the

12   defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's

13   ingestion of the TDF Drugs caused Plaintiff to suffer bone demineralization, which resulted in a

14   diagnosis of osteoporosis at the young age of fifty-one. Plaintiff's osteoporosis and related

15   deterioration have caused Plaintiff extreme pain and suffering. Plaintiff's condition is so painful and

16   limiting that he can no longer participate in activities he once enjoyed, including riding a bicycle,

17   walking the dog, cooking, doing laundry, visiting with friends and family and other activities that

18   require movement and physical exertion. In addition, Plaintiff's activities and quality of life are

19   diminished based on his fear of breaking a bone or injuring himself due to his condition, and

20   therefore Plaintiff is forced to refrain from engaging in many of life's activities. Plaintiff Wilfredo

21   Morales dreads doing anything due to the injuries caused by Gilead's defective TDF Drugs and has

22   extreme difficulty with constant pain. Plaintiff's injuries have also had a negative impact on his

23   career as a server at a 4-star dining restaurant in that his injuries have rendered him unable to

24   continue working as a server. Plaintiff required and incurred and will continue to require and incur

25   expenses in connection with medical treatment as a result of these injuries. Plaintiff has endured and

26   will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of

27   his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries

28   and damages to be proven at trial.

FIRST AMENDED CONSOLIDATED COMPLAINT – 148
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

316.     Plaintiff William Parker is and was at all relevant times a citizen of the State of Tennessee and domiciled in Memphis, Tennessee. Plaintiff William Parker purchased and ingested the following TDF Drugs for an FDA-approved use of the drugs: Truvada and Atripla beginning in 2004. As a result of Gilead's wrongful conduct with respect to the defective TDF Drugs, Plaintiff ingested and was injured by the foregoing TDF Drugs. Plaintiff's ingestion of the TDF Drugs caused Plaintiff to suffer kidney dysfunction, which resulted in a diagnosis of Stage 4 chronic kidney disease at the young age of forty. Plaintiff's severe kidney failure and related deteriorations have caused Plaintiff extreme pain and suffering as well as requiring dialysis treatments. Plaintiff's injuries have required Plaintiff to undergo significant changes in his lifestyle, including losing his home after losing his job and being forced to obtain disability benefits. Plaintiff requires expensive and painful kidney dialysis while waiting for kidney transplantations which will be followed by anti-rejection medications for the remainder of his life. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, including constant kidney monitoring and medications. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, and has suffered lost earnings and/or a loss of earning capacity as well as other injuries and damages to be proven at trial.

317.     Defendant Gilead Sciences, Inc. is a Delaware corporation with its principle place of business at 333 Lakeside Drive, Foster City, California. Gilead is a biopharmaceutical company that develops, manufactures, markets, and sells prescription medicine, including but not limited to Viread, Truvada, Atripla, Complera, Stribild, Genvoya, Odefsey, and Descovy. Gilead reported revenue of $26.1 billion dollars in 2017 and has operations worldwide.

## V.     FACTUAL ALLEGATIONS

318.     Gilead's "Company Overview" states: "With each new discovery and investigational new drug candidate, we seek to improve the care of patients living with life-threatening diseases

1    around the world."[3] It would more accurately state: We seek to improve the care of patients living

2    with life-threatening diseases *only if and when it suits the company's financial needs*.

3    **A.      Background**

4            **1.       Laws and regulations governing the approval and labeling of prescription drugs.**

5            319.    The Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") requires

6    manufacturers that develop a new drug product to file a New Drug Application ("NDA") in order to

7    obtain approval from the Food and Drug Administration ("FDA") before selling the drug in interstate

8    commerce. 21 U.S.C. § 355.

9            320.    The NDA must include, among other things, data regarding the safety and

10   effectiveness of the drug, information on any patents that purportedly cover the drug or a method of

11   using the drug, and the labeling proposed to be used for the drug. 21 U.S.C. § 355(b).

12           321.    Manufacturers with an approved NDA must review all adverse drug experience

13   information obtained by or otherwise received by them from any source, including but not limited to

14   postmarketing experience, reports in the scientific literature, and unpublished scientific papers. 21

15   C.F.R. § 314.80(b).

16           322.    After FDA approval, manufacturers may only promote drugs in a manner consistent

17   with the contents of the drug's FDA-approved label. 21 C.F.R. § 202.1. The FDA's Division of Drug

18   Marketing, Advertising, and Communications monitors manufacturers' promotional activities and

19   enforces the FDCA and its implementing regulations to ensure compliance.

20           323.    Under what is known as the Changes Being Effected ("CBE") regulation, a

21   manufacturer with an approved NDA can make certain changes to its label without prior FDA

22   approval by simply sending the FDA a "supplemental submission." 21 C.F.R. § 314.70(c)(6)(iii).

23           324.    Changes to the labeling a manufacturer can make pursuant to CBE without prior FDA

24   approval include those to "add or strengthen a contraindication, warning, precaution, or adverse

25   reactions for which the evidence of causal association satisfies the standard for inclusion in the

26

27   _____

            [3] *See, e.g.*, Gilead Sciences Company Overview, available at
28   http://www.gilead.com/~/media/Files/pdfs/other/US%20Corporate%20Overview%20%20111014.pdf.

labeling under § 201.57(c) of this chapter" and "to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. § 314.70(c)(6)(iii)(A) and (C).

325.    A manufacturer must revise its label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitively established." 21 C.F.R. § 201.57(c)(6).

326.    The warnings section of the label "must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy." *Id*. § 201.57(c)(6)(iii). According to an FDA Guidance for Industry on the warnings and precautions section of the labeling, "[i]nformation about the frequency of testing and expected ranges of normal and abnormal values should also be provided if available."[4]

327.    Adverse reactions must be added to the label where there "is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id*. § 201.57(c)(7).

328.    An August 22, 2008 amendment to these regulations provides that a CBE supplement to amend the labeling for an approved product must reflect "newly acquired information." 73 Fed. Reg. 49609. "Newly acquired information" is not limited to new data but also includes "new analysis of previously submitted data." "[I]f a sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id*. at 49607.

329.    Under the 1984 Hatch-Waxman Amendments to the Act, Congress sought to expedite the entry of less expensive generic versions of brand name drugs by simplifying the generic approval

---

[4] https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM075096.pdf.

process. A generic manufacturer seeking to sell a generic version of a brand name drug may file an Abbreviated New Drug Application ("ANDA"), which relies on the brand manufacturer's safety and efficacy data. The ANDA filer must demonstrate that its proposed generic product is therapeutically equivalent to the brand name drug, meaning that it: (a) contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug; and (b) is bioequivalent to the brand drug (i.e., the drugs exhibit the same rate and extent of absorption).

330.   As a counter-balance to the abbreviated process for the approval of generic drugs, Hatch-Waxman may grant brand manufacturers a period of market exclusivity upon approval of the NDA. For example, Hatch-Waxman grants a five-year period of exclusivity (regardless of any patent protection) to products containing chemical entities not previously approved by the FDA. Under this five-year exclusivity, the FDA cannot even accept an ANDA to make a generic version of the drug for four or five years from NDA approval (depending upon whether the generic asserted that the brand's patents were invalid or not infringed).

331.   Hatch-Waxman also streamlined the process for brand manufacturers to attempt to enforce their patents against potential infringement by generic manufacturers. If an ANDA contains a certification that the patents the brand has listed in its NDA are invalid or will not be infringed by the ANDA generic product (a "Paragraph IV certification"), the brand manufacturer can automatically delay FDA approval of the generic drug by suing the generic manufacturer for patent infringement. If the brand manufacturer brings a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of two and a half years, or (b) the issuance of a court decision that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii).

332.   Generic drugs that are therapeutically equivalent to the brand name drug may be automatically substituted for the brand at the pharmacy counter. Due to state automatic substitution laws that permit or require generic substitution, once a generic version of a brand-name drug enters the market, the generic quickly captures the vast majority of the brand's sales, often obtaining 80%

or more of unit sales within the first six months. On average, generics capture 90% of brand unit sales within the first year of generic entry.

**2.      Tenofovir and Gilead's TDF- and TAF- containing drug products indicated for use in treating HIV.**

333.    Tenofovir (chemical name, 9-(2-Phosphonomethoxypropyl)adenine ("PMPA")) is a type of medicine called a nucleotide analog reverse transcriptase and HBV polymerase inhibitor ("NRTI").

334.    In order for HIV to infect a healthy human cell, the virus must convert its ribonucleic acid ("RNA") based genome into a strand of complementary deoxyribonucleic acid ("DNA"). This process of converting the virus's RNA into DNA is reverse transcription, and is performed by an enzyme named reverse transcriptase. Reverse transcription occurs inside the human cell that the virus is infecting.

335.    NRTIs prevent the reverse transcriptase from converting its RNA into DNA, preventing the infection of the cell and spread of HIV. In order for NRTIs to stop HIV from infecting a cell, the drug must be absorbed into the cell and "activated" by the cell's biological machinery. The "activated" form of tenofovir is known as tenofovir-diphosphate ("TFV-DP").

336.    When used to treat HIV infection, tenofovir must be administered in combination with other anti-HIV drugs, a practice known as "combination antiretroviral therapy" or "cART." By using a combination of different classes of medications, physicians can customize treatment based on factors including how much virus is in the patient's blood, the particular strain of the virus, and disease symptoms. The aim of cART is to reduce the viral load—i.e., the amount of virus per unit of blood or plasma, of patients to levels where commercial viral load tests cannot detect the presence of the virus (generally a concentration of lower than 50 HIV-1 RNA copies per mL of plasma). A cART treatment regimen can incorporate multiple standalone pills or a single pill coformulated with all drugs necessary for the regimen.

337.    Gilead did not discover tenofovir. Tenofovir was discovered in the mid-1980s by the collaborative research efforts of scientists in Prague and Belguim. Although the anti-HIV properties

1    of tenofovir were promising, it had a significant downside. When tenofovir is administered by

2    mouth, very little of it is absorbed into the body.

3         338.    Because an intravenous formulation had little sales potential, Gilead developed a

4    prodrug form of tenofovir that can be taken orally. Prodrugs are pharmacologically inactive

5    compounds that can be more efficiently absorbed into the bloodstream and then converted into the

6    active form of the drug within the body.

7         339.    One prodrug of tenofovir is tenofovir disoproxil (chemical name,

8    bis(isopropyloxycarbonyloxymethyl)-PMPA or bis-POC PMPA). The fumaric salt of tenofovir

9    disoproxil is tenofovir disoproxil fumarate, commonly known as TDF.

10        340.    While TDF is able to be taken by mouth, the proportion of tenofovir that enters the

11   cells is relatively low. In order to have the desired therapeutic effect, a high dose of TDF must be

12   administered. The standard dose of TDF for HIV treatment and prevention in adults is relatively

13   large—300 mg taken once a day. A general principle of toxicology is that the "dose makes the

14   poison"—i.e., larger doses are generally associated with higher rates of toxicity and adverse events.

15   Tenovofir is no different.

16        341.    Gilead has received FDA approval for five TDF-based drugs for the treatment of HIV.

17        342.    On October 26, 2001, the FDA approved Gilead's NDA 21356 for Viread (300 mg

18   TDF) tablets for use in combination with other antiretroviral agents for the treatment of HIV-1

19   infection. Gilead submitted limited clinical data supporting approval of the drug. Gilead had not

20   completed Phase III clinical studies. Gilead excluded from its clinical trials people who had serious

21   preexisting kidney dysfunction. And Gilead only studied Viread in treatment-experienced patients

22   (those who had previously been treated for HIV). In 2008, the FDA approved an additional Viread

23   indication for the treatment of Chronic Hepatitis B.

24        343.    On August 2, 2004, the FDA approved Gilead's NDA 21752 for Truvada tablets,

25   which is a combination product containing 300 mg TDF (i.e., Viread) and 200 mg emtricitabine, for

26   use in combination with other antiretroviral agents for the treatment of HIV-1 infection in adults.

27   Neither of the active ingredients in Truvada was new. The FDA approved the Truvada application

28   based primarily on data showing the fixed-dose combination drug was bioequivalent to its separate

components. On July 16, 2012, the FDA approved an additional indication for the use of Truvada in combination with safer sex practices for pre-exposure prophylaxis (PrEP) to reduce the risk of sexually acquired HIV-1 in adults at high risk.

344.    On July 12, 2006, the FDA approved Gilead's NDA 21937 for Atripla tablets, which is a combination product containing 300 mg TDF, 200 mg emtricitabine, and 600 mg efavirenz, for use alone as a complete regimen or in combination with other retroviral agents for the treatment of HIV-1 infection in adults. Gilead submitted no clinical data in support of NDA 21937. None of the active ingredients in Atripla were new. Approval was based on a demonstration of bioequivalence between the individual components and the fixed-dose combination.

345.    On August 10, 2011, the FDA approved Gilead's NDA 202123 for Complera tablets, which is a fixed dose combination product containing 300 mg TDF, 200 mg emtricitabine, and 25 mg rilpivirine, for use as a complete regimen for the treatment of HIV-1 infection in treatment-naïve adults (i.e., adults who had not been previously treated for HIV). None of the active ingredients in Complera were new. Gilead submitted no new clinical safety or efficacy trials in connection with NDA 20123. Approval was based on the results of bioequivalence studies comparing the combination product to the individual component drugs. In addition, the primary focus of the FDA's safety and medical review of the Complera NDA was on rilpivirine, since that drug was the most recently approved component of the fixed dose combination Complera tablet.

346.    On August 27, 2012, the FDA approved Gilead's NDA 203100 for Stribild, which is a fixed dose combination product containing 300 mg TDF, 200 mg emtricitabine, 150 mg elvitegravir, and 150 mg cobicistat, for use as a complete regimen for the treatment of HIV-1 infection in treatment-naïve adults. Although elvitegravir and cobicistat had not been previously approved by the FDA, the FDA gave Gilead's Stribild NDA a 10-month standard review because there were already multiple regimens available for treatment naïve patients including one pill, once-a-day regimens.

347.    Before the FDA approved Viread in 2001, Gilead had discovered another prodrug version of tenofovir, which it originally called GS-7340 and which is now known as tenofovir alafenamide fumarate ("TAF"). TDF and TAF are two prodrug versions of the same parent drug,

1    tenofovir, though TAF requires a dose more than ten times smaller than TDF to achieve the same

2    therapeutic effect.

3         348.    TAF differs from TDF in its penetration into target cells. Unlike TDF, which is

4    converted into the parent drug tenofovir in the gastrointestinal tract, liver, and blood, TAF is not

5    converted into tenofovir until it has been absorbed by the cell. This allows TAF to be more

6    efficiently absorbed by "target cells"—i.e., cells that HIV infects or "targets"—compared to TDF.

7    This more efficient absorption allows TAF to achieve far greater intracellular concentrations of the

8    activated drug (tenofovir-diphosphate) in target cells than even a dramatically larger dose of TDF.

9    This enhanced efficiency in absorption leads to plasma concentrations of tenofovir that are 90%

10   lower than TDF, while still maintaining intracellular concentrations of activated drug in target cells

11   that is the same or higher than TDF. The lowered plasma concentrations of tenofovir found with

12   TAF result in reduced toxicity compared to TDF, making TAF safer to use than TDF.

13        349.    On November 5, 2015, the FDA approved Gilead's first TAF-based design—NDA

14   207561 for Genvoya tablets, a fixed dose combination product which contains 10 mg TAF, 200 mg

15   emtricitabine, 150 mg elvitegravir, and 150 mg cobicistat. Genvoya is indicated for the treatment of

16   HIV-1 infection in adults and pediatric patients 12 years of age or older who have no antiretroviral

17   treatment history or to replace the current antiretroviral regimen in those who are virologically

18   suppressed (HIV-1 RNA less than 50 copies per mL) on a stable antiretroviral regimen for at least

19   six months with no history of treatment failure and no known substitutions associated with resistance

20   to the individual components of Genvoya. The TDF-based counterpart to Genvoya is Stribild.

21   Genvoya is identical to Stribild except for the substitution of TAF for TDF.

22        350.    On March 1, 2016, the FDA approved Gilead's NDA 208351 for Odefsey tablets,

23   which is a combination product containing 25 mg TAF, 200 mg emtricitabine, and 25 mg rilpivirine,

24   for use as a complete regimen for the treatment of HIV-1 infection in patients 12 years of age and

25   older as initial therapy in those with no antiretroviral treatment history with HIV-1 RNA less than or

26   equal to 100,000 copies per mL; or to replace a stable antiretroviral regimen in those who are

27   virologically-suppressed (HIV-1 RNA less than 50 copies per mL of blood or plasma) for at least six

28   months with no history of treatment failure and no known substitutions associated with resistance to

the individual components of Odefsey. The TDF-based counterpart to Odefsey is Complera. Odefsey is identical to Complera except for the substitution of TAF for TDF.

351.     On April 4, 2016, the FDA approved Gilead's NDA 208215 for Descovy tablets, which is a fixed dose combination product containing 25 mg TAF and 200 mg emtricitabine, for use in combination with other antiretroviral agents, for treatment of HIV-1 infection in adults and pediatric patients 12 years of age or older. The TDF-based counterpart to Descovy is Truvada. Descovy is identical to Truvada except for the substitution of TAF for TDF.

352.     Upon information and belief, Gilead has not sought FDA approval of a standalone TAF drug product for the treatment of HIV. Viread, therefore, has no TAF-based counterpart for the treatment of HIV infection. Although the FDA approved Gilead's NDA 208464 for Vemlidy (300 mg TAF) tablets on November 10, 2016, Gilead only sought approval to market Vemlidy for the treatment of Hepatitis B infection in adults with compensated liver disease and thus cannot be marketed for the treatment of HIV.

**B.     Gilead knew before Viread was approved that TDF posed a significant safety risk.**

353.     Before Gilead's first TDF product, Viread, received FDA approval in 2001, Gilead knew that two of its other antiviral drugs that are structurally similar to tenofovir caused significant kidney damage.

354.     Tenofovir is a member of a class of molecules known as "acyclic nucleoside phosphonates." Two of Gilead's other antiviral drugs—cidofovir and adefovir[5]—are also acyclic nucleoside phosphonates.

355.     Cidofovir injection, marketed as Vistide, was Gilead's first commercial product. When the FDA approved Vistide in 1996, it carried a black box warning stating that renal impairment is the drug's major toxicity and renal failure resulting in dialysis or contributing to death have occurred with as few as one or two doses of Vistide.

---

[5] Like tenofovir, only a prodrug of adefovir—adefovir dipivoxil—can be effectively administered orally.

356.     In December 1999, Gilead abandoned development of NRTI prodrug adefovir dipovoxil for the treatment of HIV after it proved so toxic to patients' kidneys in the later stages of Phase III clinical trials. In Gilead's clinical trial GS-408, 59% of patients demonstrated severe kidney toxicity after 72 weeks. One patient in the trial died due to multiorgan failure subsequent to kidney failure. Based on this experience, Gilead knew that adefovir dipivoxil was associated with delayed nephrotoxicity—meaning that its toxic effects might not be felt for some time after continued use. Gilead would later develop and market adefovir dipivoxil as Hepsera for treatment of hepatitis B virus infection. Critically, Gilead recognized that if it reduced the dose of adefovir dipivoxil from 120 mg—as used in trial GS-408 for the treatment of HIV—to 10 mg (the dose in Hepsera), an effective dose for hepatitis B virus treatment, the risk of nephrotoxicity is dramatically reduced.

357.     Tenofovir has a nearly identical structure to adefovir, varying only by the presence of a methyl group (i.e., a carbon atom bound to three hydrogen atoms) in tenofovir, which replaces a hydrogen atom in adefovir. As Gilead recognized in its 10-K for the year ending December 31, 2000, due to its experiences with nephrotoxicity in Phase III clinical trials of adefovir dipivoxil, delayed toxicity issues similar to those experienced with adefovir dipivoxil could arise with TDF.

358.     Gilead also knew that while prodrugs allow the drug to be efficiently absorbed into the bloodstream and then converted into an active form within the body, the conversion of the TDF prodrug into free tenofovir outside the cell, and the presence of high levels of free tenofovir in the blood, endangers the kidneys.

359.     The primary purpose of the kidney is to filter out toxins and waste products from the blood, as well as help maintain the delicate balance of water, salts and other compounds in a person's blood. The functional unit of the kidney is the nephron, a microscopic structure that consists of two primary components: a renal "corsipucle" and a renal "tubule." On average, each kidney contains hundreds of thousands to millions of nephrons.

360.     The renal corsipucle is the component of the nephron that directly filters the blood. Blood flows through a network of capillaries (small blood vessels) known as the glomerulus. The walls of these capillaries work as a filter, allowing certain compounds, as well as water, to pass through. The fluid that is filtered through the capillary walls in the glomerulus, known as the filtrate,

is collected by a structure known as Bowman's capsule. One of the ways kidney function is measured is by the rate of blood that is filtered by the glomeruli. This is known as the glomerular filtration rate or "GFR."[6]

361.    In Bowman's capsule, the filtrate is collected and drains into the other primary component of the nephron, the tubule. Glomerular filtration is highly effective at removing many toxins, but it also filters out many compounds, like water and electrolytes, that a person needs. In the tubule, the cells lining the tubule put these crucial, non-toxic compounds back into the blood, as well as filter out remaining toxins that glomerular filtration did not remove. After the filtrate exits the tubule, it drains into the bladder. This processed filtrate is urine.

362.    This system of filtering the blood is extremely important and delicate. TDF primarily damages the nephron tubule, due to hyper-concentration of free tenofovir within the tubule cells of the nephron, which results in cell death or dysfunction. If the tubule cells are dysfunctional or dead, they are unable or less able to perform the vital function of filtering waste and/or toxins and reabsorbing beneficial compounds. Tubular injury can occur without a decline in a patient's glomerular filtration rate. Physicians must monitor other markers of kidney function—those that assess tubule function specifically, like serum phosphorus or urine glucose, to assess a patient's true kidney health.

363.    Because tenofovir is renally eliminated, through glomerular filtration and proximal tubular secretion, patients are exposed to an increased concentration of tenofovir as the kidneys become damaged. Because exposure to an increased concentration of tenofovir increases toxicity, patients' kidney function must be monitored to ensure that their kidneys remain healthy enough to receive tenofovir.

---

[6] GFR is not measured directly. Physicians typically estimate a patient's GFR by testing for serum creatinine or by calculating creatinine clearance. Creatinine is a waste product that is produced by the breakdown of muscle tissue and created at a relatively constant rate by the body. The kidneys filter creatinine from the blood into the urine, and reabsorb almost none of it. If the kidney is damaged, the ability of the body to remove creatinine from the blood can be reduced, resulting in high levels of creatinine in the blood. Serum creatinine is the amount of creatinine in the blood. Creatinine clearance is the rate at which the kidneys clear creatinine from the blood and is measured using the amount of creatinine present in urine over 24 hours. As renal function goes down, creatinine clearance also goes down.

364.    Since scientists first synthesized TDF, studies have consistently shown that it could cause significant kidney and bone damage. For example, an animal study published in 1999 showed that high doses of tenofovir were associated with significant bone toxicity in both simian immunodeficiency virus (SIV, the non-human primate version of HIV) infected and uninfected rhesus macaques, with a quarter of the treated animals experiencing significant bone toxicity.

365.    Gilead's preclinical studies of TDF showed that it could be toxic to kidneys and bones. Preclinical animal studies of TDF showed evidence of renal toxicity and that TDF exposure caused bone toxicity in the form of softening of the bones (osteomalacia) and reduced bone mineral density. Nephrotoxicity in animal models was related to dose as well as to duration of therapy.

366.    Gilead also knew that the relatively high dose of TDF needed to achieve the desired therapeutic effect created a greater risk of toxic effects, and that bone and kidney toxicities were even more likely with the long-term use of TDF which was needed to combat a disease with no known cure.

**C.    Gilead's knowledge of TDF toxicity grew as patients' kidneys and bones were damaged by the TDF Drugs.**

367.    As soon as Gilead began marketing Viread, patients started experiencing the nephrotoxic effects of TDF.

368.    In November 2001, less than one month after Viread entered the market, the first published case of TDF-associated acute renal failure occurred. Thereafter, additional reports of TDF-associated kidney damage, including but not limited to Fanconi syndrome, renal failure, renal tubular dysfunction, and nephrogenic diabetes insipidus, began to appear in the medical literature. Many of those adverse events occurred in patients without preexisting kidney dysfunction.

369.    Gilead was also seeing renal adverse events in its postmarketing safety data. In fact, the most common serious adverse events reported to Gilead were renal events, including renal failure,[7] Fanconi syndrome,[8] and serum creatinine increase.

370.    In the first two years Viread was on the market, 40% of Viread adverse events reports received by Gilead were related to the renal/urinary system. This included 49 cases of increased creatinine, 16 cases of hypophosphatemia,[9] 42 cases of renal insufficiency, 51 cases of acute renal failure, 6 cases of chronic renal failure, and 32 cases of Fanconi syndrome. These numbers are far less than the true incidence of kidney damage experienced by Viread patients during this timeframe because postmarketing adverse events are underreported.

371.    Gilead had to update its Viread labeling at least four times to describe the kidney damage patients experienced when taking TDF:

    a.    On December 2, 2002, Gilead added that patients had suffered renal impairment, including increased creatinine, renal insufficiency, kidney failure, and Fanconi syndrome, with Viread use;

    b.    On October 14, 2003, Gilead added more kidney disorders, including acute renal failure, proximal tubulopathy,[10] and acute tubular necrosis;[11]

    c.    On May 12, 2005, Gilead added nephrogenic diabetes insipidus;[12] and

---

[7] When the kidney cannot filter the blood normally, a patient is usually diagnosed with "renal failure."

[8] If damage to the tubule prevents the reabsorption of beneficial molecules from filtrate, the levels of these beneficial compounds can become dangerously low in the blood. This is known as Fanconi syndrome.

[9] Hypophosphatemia is a low level of phosphorus in the blood, which can indicate that the ability of the nephron tubule to reabsorb phosphorus from the filtrate is damaged.

[10] Proximal tubulopathy refers to damage or dysfunction to the portion of the nephron tubule that is closest to Bowman's capsule.

[11] Acute tubular necrosis refers to the death of the cells that line the nephron tubule. This is associated with loss of kidney function.

[12] Nephrogenic diabetes insipidus refers to a condition characterized by the production of a large amount of dilute urine as a result of kidney dysfunction. It is thought to be related to damage to the nephron tubule.

FIRST AMENDED CONSOLIDATED COMPLAINT – 161
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

        d.       On March 8, 2006, Gilead added polyuria[13] and nephritis[14] to the list of renal and urinary disorders that patients had experienced while on TDF.

As Gilead knew, injuries were not limited to patients with a history of renal dysfunction or other risk factors.

372.    Gilead's long-term clinical data also demonstrated that TDF was damaging patients' bones. 48-week data showed greater decreases from baseline in bone mineral density at the lumbar spine and hip in patients taking Viread compared to those receiving other HIV drugs. At 144 weeks, there was a significantly greater decrease from baseline in bone mineral density at the lumbar spine in patients taking Viread compared to those receiving other HIV drugs, as well as significant increases in biochemical markers of bone turnover in patients taking Viread. And once Gilead began conducting clinical trials with Viread in adolescent and pediatric patients, the effects of TDF on adolescent and pediatric patients' bones were similar to the effects seen with adult patients.

373.    After Gilead brought Truvada to market, the medical literature continued to identify cases of TDF-associated kidney damage, including in patients without preexisting renal dysfunction or co-administration with another nephrotoxic drug.

374.    Several new studies presented at the February 2006 Conference on Retroviruses and Opportunistic Infections ("CROI") highlighted the frequency of nephrotoxicity in TDF-treated patients. In one study, CDC investigators analyzed longitudinal data from 11,362 HIV-infected patients, all of whom had GFR > 90mL/min at baseline, and found that treatment with TDF was significantly associated with mild and moderate renal insufficiency. In another, observational study of 497 patients initiating TDF treatment, 17.5% developed renal dysfunction. The most severe declines in renal function were associated with TDF treatment as part of a boosted regimen.

375.    In 2007, Gilead scientists published an article discussing the company's knowledge of TDF safety issues over the first four years of TDF treatment. Gilead reported that 0.5% of patients enrolled in a global expanded access program experienced a serious renal adverse event, including

---

[13] Polyuria refers to the excessive production of urine.

[14] Nephritis refers to the inflammation of the kidneys.

acute and chronic renal failure and Fanconi syndrome. A "serious" adverse event meant one resulting in hospitalization or prolongation of hospitalization, death, disability, or requiring medical intervention to prevent permanent impairment. Gilead also reported that through April 2005 the most common serious adverse events reported to Gilead's postmarketing safety database were renal events, including renal failure, Fanconi syndrome, and serum creatinine increase.

376.    Although this Gilead article demonstrates the company's clear and early knowledge of serious TDF toxicity in a significant number of patients, it downplayed the incidence of TDF-associated renal toxicity. In its Medical Review of the Stribild NDA in 2012, the FDA noted the limitations of Gilead's data, including the short duration of treatment, the voluntary nature of adverse event reporting in some countries, and the fact that Gilead only assessed serious adverse events, and not renal events leading to drug discontinuation or non-serious renal adverse events. According to the FDA, any of these factors may have led to an underestimation of the true incidence of renal events of interest. The FDA similarly questioned Gilead's data on the incidence of renal adverse events based on its postmarketing safety database given the voluntary nature of reporting.

377.    Moreover, even if Gilead's data accurately captured the percentage of patients experiencing serious renal adverse events (which it did not), it would still represent a very large number of patients who experienced significant health problems due to TDF toxicity. For example, in late 2015, according to data from Symphony Health Solutions, nearly 500,000 people in the U.S. were ingesting TDF daily. Using Gilead's numbers, approximately 2,500 of those patients would likely experience severe kidney damage. Now that TDF has been on the market for nearly two decades, many thousands of patients have likely experienced severe TDF-induced kidney damage.

378.    In May 2007, Gilead had to update its labeling to recognize that TDF-associated renal damage also caused osteomalacia (softening of the bones) in patients. In November 2008, Gilead modified the labeling to state that patients taking TDF had experienced osteomalacia due to proximal renal tubulopathy as bone pain, and that it might contribute to fractures.

379.    In August 2008, Gilead had to update its labeling to recognize finally that TDF caused both "new onset" and "worsening" renal impairment—meaning, as Gilead knew years prior, that TDF was injuring patients' kidneys even though they had no preexisting renal dysfunction.

380.     During 2009–2011, studies continued to show that TDF caused a significant loss of renal function in HIV-infected patients.

381.     Multiple articles described how the incidence of TDF-induced nephrotoxicity was underreported because studies often excluded patients who were most likely to exhibit nephrotoxic effects, including patients who combined TDF in a ritonavir-boosted regimen or with another nephrotoxic drug, older patients or those with advanced HIV disease, or those with mild baseline renal dysfunction. Notwithstanding selection bias that tended to hide TDF-associated kidney dysfunction, the evidence was clear that TDF caused renal tubular dysfunction in a significant percentage of HIV-infected patients.

382.     In April 2012, researchers at the San Francisco Veterans' Administration Medical Center and the University of California, San Francisco published their analysis of the medical records of more than 10,000 HIV-positive veterans in the national VA healthcare system, which is the largest provider of HIV care in the United States. The study authors found that for each year of tenofovir exposure, risk of protein in urine—a marker of kidney damage—rose 34%, risk of rapid decline in kidney function rose 11%, and risk of developing chronic kidney disease rose 33%. The risks remained after the researchers controlled for other kidney disease risk factors such as age, race, diabetes, hypertension, smoking, and HIV-related factors.

383.     By the time it reviewed the Stribild NDA, the FDA stated that the safety profile of TDF was, by that point, "well-characterized in multiple previous clinical trials and is notable for TDF-associated renal toxicity related to proximal renal tubule dysfunction and bone toxicity related to loss of bone mineral density and evidence of increased bone turnover."[15]

384.     With each passing year and each successive TDF product, Gilead learned even more about TDF's toxicity. Despite this knowledge, Gilead repeatedly designed the TDF Drugs to contain TDF as the tenofovir delivery mechanism rather than safer TAF.

---

[15] FDA Center for Drug Evaluation and Research Summary Review for NDA 203100 at 10, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000SumR.pdf.

**D.    Before Gilead developed Stribild, it knew that renal adverse events were more likely when patients took TDF as part of a boosted regimen.**

385.    Before Gilead first started marketing Viread, it knew that patients' exposure to tenofovir increases significantly when tenofovir is co-administered with a ritonavir-boosted protease inhibitor: the maximum concentration of tenofovir increased 31%; the minimum concentration of tenofovir increased 29%; and the area under the curve (the actual body exposure to the drug after dose administration) increased 34%.

386.    In the first few years TDF was on the market, many reported cases of tenofovir-related renal damage involved patients taking TDF with a ritonavir-boosted protease inhibitor—leading authors to conclude that the risk of TDF-associated renal toxicity increased for patients on a boosted regimen. This is consistent with other patient populations at increased risk for renal toxicity, including those with low body weight and those taking another nephrotoxic drug; each is associated with higher levels of tenofovir exposure.

387.    As Gilead recognized in the Precautions section of the July 1, 2004 Viread label: "[h]igher tenofovir concentrations could potentiate Viread-associated adverse events, including renal disorders."[16]

388.    Gilead further stated: "Atazanavir [another protease inhibitor] and lopinavir/ritonavir have been shown to increase tenofovir concentrations. The mechanism of this interaction is unknown. Patients receiving atazanavir and lopinavir/ritonavir and Viread should be closely monitored for Viread-associated adverse events. Viread should be discontinued in patients who develop Viread-associated adverse events."[17]

389.    Case study authors similarly called for careful monitoring of patients taking TDF in a boosted regimen, given the frequency of renal damage in such patients.

390.    A 2008 Journal of Infectious Diseases article reported that the odds of developing significant renal function reduction were 3.7 times higher for patients receiving a regimen containing

---

[16] Viread (tenofovir disoproxil fumarate) Tablets label at 17, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2004/21356slr010_viread_lbl.pdf.

[17] Id.

FIRST AMENDED CONSOLIDATED COMPLAINT – 165
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

tenofovir plus ritonavir-boosted protease inhibitor than for those receiving tenofovir plus nonnucleoside reverse transcriptase inhibitor-based therapy, even after adjusting for viral load.

**E.      Before Gilead developed each of the TDF Drugs, it knew that TAF was less toxic to kidneys and bones than TDF.**

391.    Before the FDA approved Viread, Gilead had already discovered a different design for an orally available version of tenofovir that is more potent than TDF, meaning that it can be administered at a significantly lower dose with fewer side effects than TDF.

392.    Unlike TDF, TAF is not converted into tenofovir until it has been absorbed by the cell. As a result, TAF is more efficiently absorbed by the cells HIV targets compared to TDF. This more efficient absorption allows TAF to achieve far greater intracellular concentrations of the activated drug (tenofovir-diphosphate) in target cells than even a dramatically larger dose of TDF, while achieving plasma concentrations of tenofovir that are 90% lower than TDF. The lowered plasma concentrations of tenofovir found with TAF result in reduced toxicity compared to TDF, making TAF safer to use than TDF.

393.    On July 21, 2000, Gilead filed a provisional patent application which described TAF (then called GS-7340) as 2–3 times more potent than TDF while providing 10 times the intracellular concentration of tenofovir than TDF. Gilead also demonstrated that dosing with TAF resulted in dramatically higher concentrations of drug in all organs except the kidneys and the liver, compared with TDF. This suggested that TAF is uniquely able to target cells that HIV infects, while not concentrating in the kidney.

394.    In a 2001 paper, Gilead scientists described the remarkable results achieved when studying the metabolism of TAF in blood. The paper, "Metabolism of GS-7430, A Novel Phenyl Monophosphoramidate Intracellular Prodrug of PMPA, In Blood," compared the distribution of the active drug tenofovir in blood cells and plasma after exposure to either GS-7430 or tenofovir disoproxil (which was still in clinical development at the time of the study). What Gilead found was that one need only ***one thousandth of the dose*** of GS-7340 compared to tenofovir to achieve the same level of inhibition of HIV replication in vitro. Gilead also found that one need to use only one tenth the dose of GS-7340 compared to TDF to reach the same levels of active tenofovir inside cells.

395.     Gilead researchers presented the results of its GS-7340 study at a February 2002 Conference on Retroviruses. John Milligan, then Gilead's Vice President of Corporate Development and currently its President and Chief Executive Officer, said that Gilead's goal with GS-7340 was to deliver a more potent version of tenofovir that can be taken in lower doses, resulting in better antiviral activity and fewer side effects. Milligan said that "there's a great need to improve therapy for HIV patients."[18]

396.     Gilead's preclinical studies of TAF also indicated that TAF is less likely to accumulate in renal proximal tubules than TDF, supporting the potential for an improved renal safety profile.

397.     Gilead's 2001 10-K highlighted the benefits of GS-7340 over Viread: "Both GS 7340 and Viread are processed in the body to yield the same active chemical, tenofovir, within cells. However, the chemical composition of GS 7340 may allow it to cross cell membranes more easily than Viread, so that with GS 7340, tenofovir may be present at much higher levels within cells. As a result, GS 7340 may have greater potency than Viread and may inhibit low-level HIV replication in cells that are otherwise difficult to reach with reverse transcriptase inhibitors."[19]

398.     At the end of the first quarter of 2002, Gilead told investors that it had initiated Phase I/II testing of GS-7340. In an earnings call, Gilead stated that it had initiated a dose escalation study for GS-7340 through which Gilead intended to prove that GS-7340 was more potent than Viread, meaning that it could be administered at a safer, lower dose.

399.     In an October 28, 2003 earnings call, Gilead told analysts that data from the ongoing Phase I/II study of GS-7340 "look[ed] promising."[20]

400.     In December 2003, Mark Perry, then Gilead's Executive Vice President of Operations, told investors that Gilead was "excited" about GS-7340. Gilead expected GS-7340 to

---

[18] Special Coverage: 9th Conference on Retroviruses – New drugs, new data hold promise for next decade of HIV treatment, AIDS Alert, May 1, 2002.

[19] Gilead Sciences, Inc. Form 10-K for the fiscal year ended December 31, 2001, at 13, available at https://www.sec.gov/Archives/edgar/data/882095/000091205702011690/a2073842z10-k.htm.

[20] Event Brief of Q3 2003 Gilead Sciences Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 28, 2003.

achieve "more potency at lower doses and increase the therapeutic index for" tenofovir.[21] The "therapeutic index" is a comparison of the amount of a therapeutic agent that causes the therapeutic effect compared to the amount that causes toxicity.

401.    In January 2004, Gilead repeatedly referred to the positive results from clinical studies of GS-7340 in calls with analysts and disclosures to the investment industry. On a January 29, 2004 earnings call, Gilead stated that, based on these positive results, it was designing a Phase II program for GS-7340 to determine the safety and efficacy of the compound in treatment naïve patients and in highly treatment experienced patients.

402.    At a May 2004 Deutsche Bank Securities Healthcare Conference, Gilead said that it knew GS-7340 could be dosed at a fraction of the Viread dose and give a greater antiviral response.

403.    However, on October 21, 2004, shortly after the FDA approved Truvada, Gilead abruptly announced that it would abandon its GS-7340 design. It stated:

> Earlier this year as a result of positive data from a small phase I/II study of GS 7340, we began designing a phase II program to determine the safety and efficacy of the compound in treatment-naive patients and in highly treatment experienced patients. Since that time we have witnessed the increasing use of Viread across all HIV patient populations, and we have also received approval for and launched Truvada.
>
> Based on our internal business review and ongoing review of the scientific data for GS 7340, we came to the conclusion that it would be unlikely that GS 7340 would emerge as a product that could be highly differentiated from Viread.[22]

404.    Prior to its October 2004 announcement, Gilead never indicated that there might be an issue with differentiating GS-7340 from Viread or expressed any other negative view of the prospects of GS-7340. To the contrary, Gilead repeatedly touted the positive results of preclinical and clinical studies of GS-7340 and the benefits of GS-7340 over Viread.

405.    Gilead's "internal business review" was the real driver of its decision to abandon a design it knew to be safer than Viread.

---

[21] Gilead Sciences at Harris Nesbitt Gerard Healthcare Conference 2003 – Final, FD (Fair Disclosure) Wire, Dec. 11, 2003.

[22] https://www.gilead.com/news/press-releases/2004/10/gilead-discontinues-development-of-gs-9005-and-gs-7340-company-continues-commitment-to-research-efforts-in-hiv.

406.     In May 2005, despite Gilead's misrepresentation that GS-7340 was not worth

pursuing, Gilead scientists reported the favorable results they achieved with GS-7340, including its

benefits over Viread, in an issue of Antimicrobial Agents and Chemotherapy. Reuters Health News

covered the article:

> After oral administration of GS 7340 to dogs, tenofovir concentrations
> were 5- to 15-fold higher in lymph nodes than after tenofovir DF
> administration, the researchers note. Except for kidney and liver, tissue
> concentrations of tenofovir were generally higher after GS 7340 than
> after tenofovir DF administration.
>
> "The high concentrations of tenofovir observed in lymphatic tissues
> after oral administration of GS 7340 are expected to result in increased
> clinical potency relative to tenofovir DF and could have a profound
> effect on the low-level virus replication that occurs in tissues with
> suboptimal drug exposure during HAART," the authors conclude.
>
> "With GS 7340," the researchers add, "it should be possible to reduce
> the total dose of tenofovir, thereby minimizing systemic exposure,
> while at the same time increasing antiviral activity."[23]

407.     Moreover, even though Gilead purportedly abandoned TAF, Gilead filed

seven applications for patents on TAF between 2004 and 2005.

408.     Despite recognizing the safety benefits of TAF, Gilead kept its GS-7340

design on the shelf for years—knowingly exposing patients taking its TDF-containing drug

products to greater risks of kidney and bone toxicity.

409.     It was not until approximately October 2010—*six years* after Gilead shelved

its safer tenofovir prodrug and after Gilead designed combination products Truvada and

Atripla to contain TDF rather than safer TAF—that Gilead renewed development of the safer

TAF design.

410.     Once Gilead renewed development of its TAF design, it again touted the

benefits of TAF over TDF—as if it had never falsely claimed that TAF could not be "highly

differentiated" from TDF.

---

[23] Novel tenofovir prodrug preferentially targets lymphatic tissue, Reuters Health Medical News, June 1, 2005.

FIRST AMENDED CONSOLIDATED COMPLAINT – 169
Case No.: 3:18-cv-06972-JST
010759-11/1129954 V8

411.    Despite having discovered the benefits of TAF before 2001, Gilead repeatedly misrepresented TAF as "new." The benefits of TAF that Gilead described in 2010 and beyond were known to Gilead years earlier. And the clinical results Gilead achieved with TAF would have been achieved years earlier but for Gilead's decision to slow-walk and withhold the safer TAF design purely for financial gain.

412.    In an October 19, 2010 earnings call, Gilead's Chief Scientific Officer Norbert Bischofberger explained to investors how GS-7340's safety profile was superior to Viread, particularly with respect to kidney and bone toxicity:

> 7340 is a prodrug that actually delivers more active antivirally active components into the compartment in the body where it's really needed which means lymphocytes mostly. What that means is you can take a lower dose, and actually our clinical study would indicate 1/6th to 1/10th the Viread dose and you would actually get higher efficacy with less exposure. So we're looking at this to be used in sub population where people have a concern with Viread, and the one with renal impairment, elderly people that have reduced renal function, and the other population will be adults that have preexisting or suspicion of bone disease, osteoporosis, and that's where we are initially going to position the compound.[24]

413.    Giving a statement at the Capital Markets Healthcare Conference on March 2, 2011, John Milligan, then Gilead's President and Chief Operating Officer, told investors the real reason Gilead previously refused to design its products to contain safer GS-7340—it did not want to hurt TDF sales by stepping on its TDF marketing message:

> One of the reasons why we were concerned about developing 7340 was we were trying to launch Truvada versus Epzicom[25] at that time. And to have our own study suggesting that Viread wasn't the safest thing on the market, which it certainly was at the time. . . . It didn't seem like the best. It seemed like we would have a mix[ed] message. And in fact that Viread story is split out to be a fairly safe product over the years. There are some concerns still on kidney toxicity and there are some concerns about bone toxicity.[26]

---

[24] Q3 2010 Gilead Sciences Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 19, 2010.

[25] Epzicom is a combination medication, containing abacavir and lamuvidine, indicated to treat HIV sold by Gilead's competitor GlaxoSmithKline, now Viiv Healthcare, Ltd. The FDA approved both Epzicom and Truvada in August 2004.

[26] Gilead Sciences at RBC Capital Markets Healthcare Conference – Final, FD (Fair Disclosure) Wire, Mar. 2, 2011.

414.    Milligan called GS-7340 a "kinder, gentler version of Viread."[27]

415.    At the March 14, 2011 Roth Capital Partners Growth Stock Conference, Gilead stated that the ability to dose GS-7340—the "kinder, gentler" version of Viread—lower than Viread was important because GS-7340 is safer, particularly as patients take the medication for the long term.[28]

416.    At the NASDAQ OMS 26th Investor Program in June 2011, Gilead described GS-7340 as a "very exciting product" which was then in dosing studies to determine just how low GS-7340 could be dosed. Gilead explained the benefit of lower dosing to aging patients and those who have been on the medication for a long time:

> And we had recently this year had presented 14-day monotherapy results from a study we had done at 50 and 100 mg of 7340 versus the 300 mg of Viread today. And what we have shown was viral load reductions were greater in the lower doses of 7340 and the plasma tenofovir levels were actually much reduced from what we see with Viread.
>
> We're currently now in a Phase Ib looking at even lower doses. We are studying 8 mg, 25 and 40 mg of GS-7340. This is important because as the age of the AIDS population continues to increase, as the median age is now just about 50 years old, you get issues with aging such as renal function and bone mineral density that can become bigger issues for these patients and we think that it's a currently unmet medical need to address those concerns of the aging population in HIV.[29]

Yet, Gilead knew well before 2010–2011 that people with HIV were living longer lives. Since the introduction of effective combination antiretroviral therapy in late 1995 and early 1996, many people with HIV have lived a normal lifespan.

417.    On January 24, 2012, Gilead announced that it had begun Phase II clinical trials of GS-7340 and identified a dose that is ten times lower than Viread while providing greater antiviral efficacy.

418.    On October 31, 2012, Gilead announced that a Phase II clinical trial evaluating TAF met its primary objective. The study compared a once-daily single tablet regimen containing TAF 10

---

[27] *Id.*

[28] Gilead Sciences at Roth Capital Partners OC Growth Stock Conference – Final, FD (Fair Disclosure) Wire, Mar. 14, 2011.

[29] Gilead Sciences Inc. at NASDAQ OMS 26th Investor Program – Final, FD (Fair Disclosure) Wire, June 21, 2011.

mg/elvitegravir 150 mg/cobicistat 150 mg/emtricitabine 200 mg with Stribild (TDF 300

mg/elvitegravir 150 mg/cobicistat 150 mg/emtricitabine 200 mg) among treatment-naïve adults.

Compared to Stribild, the TAF-containing regimen demonstrated better markers of bone and kidney

effects that were statistically significant. The study showed that TAF is effective at a fraction of the

dose of Viread and provides safety advantages.

419.    In January 2013, Gilead began Phase III clinical development of TAF. Announcing

the beginning of Phase III development, then-CEO Martin mischaracterized TAF as "new."[30]

420.    Gilead finally submitted an application to market its first TAF-containing product,

Genvoya, to the FDA on November 5, 2014 (though it could have done so years earlier had it not

shelved the safer design to make more money).

421.    When the FDA approved Genvoya on November 5, 2015, John C. Martin, then

Chairman and CEO of Gilead, announced that "there is still a need for new treatment options that

may help improve the health of people as they grow older with the disease."[31] Martin misrepresented

that TAF was "new" and concealed that Gilead had known about this safer version of tenofovir for

over a decade but purposefully withheld it from the market solely to protect its monopoly profits and

extend Gilead's ability to profit on TAF regimens for the next decade or more.

**F.    Gilead withheld its safer TAF design to protect its TDF sales and extend profits on its HIV franchise.**

422.    Gilead first developed and sought FDA approval for its TDF line of products even

though it knew TAF was safer.

423.    Then Gilead shelved its TAF design in 2004 because it did not want to hurt TDF sales

by admitting that TDF is unreasonably and unnecessarily unsafe.

424.    Gilead continued to withhold its TAF design for the next decade. Gilead knew that by

withholding the safer TAF design, it could extend the longevity of its HIV drug franchise and make

---

[30] Gilead Sciences at JPMorgan Global Healthcare Conference – Final, FD (Fair Disclosure) Wire, Jan. 7, 2013.

[31] US FDA approvals Gilead's Single Table Regiment Genvoya for Treatment of HIV-1 Infection, Business Wire, Nov. 5, 2015.

billions two times over: first, with TDF medications until TDF patent expiration, which would begin by no later than 2018, and second, with TAF medications until TAF patent expiration as late as 2032.

425.    But Gilead also knew that timing was key. While it wanted to delay the TAF-designed products to maximize profits on its TDF Drugs, it also knew that it had to get its TAF-based products on the market sufficiently in advance of TDF patent expiration. Gilead knew that once doctors switched their patients from TDF to TAF, doctors would be highly unlikely to switch their patients back to TDF-based regimens once generic TDF became available. By converting TDF prescriptions to TAF prescriptions (which cannot be automatically substituted at the pharmacy counter with a generic TDF product), Gilead could save a substantial percentage of sales from going generic.

426.    Only once Gilead had realized billions in sales through most of the TDF patent life—having built Viread sales up to $1.1 billion and the TDF portfolio up to $11 billion in sales in 2015—did Gilead create TAF-based versions of its prior TDF Drugs and work to convert its TDF Drug sales to TAF drug sales.

427.    Once TAF entered the market, Gilead successfully convinced a large percentage of doctors to switch from TDF-based to TAF-based regimens by highlighting TAF's improved safety profile with respect to bone and kidney toxicity—the very benefits that Gilead could have and should have incorporated into its product design from the beginning but withheld from patients with each successive TDF Drug for over a decade.

428.    In addition, by delaying the filing of an NDA for its first TAF product, for which it received five-year regulatory exclusivity, Gilead knew that it was also delaying the entry of any generic manufacturer who could successfully challenge Gilead's TAF patents as invalid or not infringed. Due to its regulatory exclusivity, no generic manufacturer can even file an ANDA with a Paragraph IV certification seeking to market a generic version of Genvoya until November 2019 and then, upon Gilead's suit against the generic, Gilead can automatically delay generic entry by up to an additional 30 months.

429.    Gilead boasted about TAF's potential to extend its HIV franchise, which has been the core of its business.

430.     Milligan told investment analysts in 2010 that the safer TAF-designed products could replace the whole TDF franchise which would provide a "great deal of longevity. . . ."[32] Milligan similarly told investors at a Deutsche Bank Securities Inc. Healthcare Conference in May 2011 that TAF was a "new" drug that "could potentially bring quite a bit of longevity to the Gilead portfolio."[33]

431.     As Milligan told analysts at a Goldman Sachs Global Healthcare Conference in June 2011, Gilead would be "offering a product called 7340, which we believe is a lower dose, better safety profile, more potent, differentiated drug relative to Viread. And so, our ability to develop and get that onto the market prior to [TDF] patent expiration will be key to us, to maintain the longevity."[34]

432.     Gilead withheld its safer TAF design until it suited Gilead's bottom line at the expense of patients' health.

**G.     Gilead knowingly designed its TDF drugs to be unreasonably dangerous and unsafe to patients' kidneys and bones.**

433.     Despite knowing that TDF causes kidney and bone damage and that TAF is safer for patients' kidneys and bones, Gilead designed the TDF Drugs to contain TDF rather than safer TAF as the orally available version of tenofovir.

434.     In addition to withholding the safer TAF design of Stribild, Gilead made Stribild even more dangerous to patients when it formulated the drug to include 300 mg TDF with cobicistat.

435.     Stribild is a fixed dose combination containing 300 mg TDF, emtricitabine, elvitegravir, and cobicistat. Elvitegravir is an integrase strand transfer inhibitor (INSTI). Cobicistat has no antiretroviral effect; it is a pharmacoenhancer that increases the plasma concentrations of

[32] Gilead Sciences at 22nd Annual Piper Jaffray Healthcare Conference – Final, FD (Fair Disclosure) Wire, Nov. 30, 2010.

[33] Gilead Sciences Inc. at Deutsche Bank Securities Inc. Health Care Conference – Final, FD (Fair Disclosure) Wire, May 3, 2011.

[34] Gilead Sciences Inc. at Goldman Sachs Global Healthcare Conference – Final, FD (Fair Disclosure) Wire, June 7, 2011.

elvitegravir. Regimens that include a pharmacoenhancer like cobicistat are called "boosted" regimens.

436.    Gilead's early development of elvitegravir used ritonavir as the boosting agent. Gilead knew before Viread entered the market in 2001 that coadministration of TDF with ritonavir-boosted lopinavir significantly increased tenofovir concentrations. By 2004, the Viread label warned doctors to carefully monitor patients taking both TDF and ritonavir/lopinavir. And scientific literature published years before Gilead developed Stribild indicated that renal toxicity associated with TDF was more frequent in patients receiving TDF in combination with boosted protease inhibitors.

437.    Although Gilead ultimately replaced ritonavir with cobicistat as the boosting agent in Stribild, the two boosters are structurally similar. Gilead learned during development of Stribild that tenofovir levels in patients receiving Stribild (TDF with cobicistat) were similar to the tenofovir levels experienced in patients who took TDF in combination with a ritonavir-boosted protease inhibitor. Gilead knew that tenofovir levels are 25–35% higher when combining TDF in a boosted regimen.

438.    Despite knowing that combining TDF with cobicistat would significantly increase tenofovir levels in patients' blood, Gilead did not reduce the dose of TDF when it formulated Stribild. Gilead's Stribild clinical trials showed an increased rate of serious renal adverse events that led to treatment discontinuation. Stribild is even more toxic to patients' kidneys and bones than unboosted TDF.

439.    When Gilead formulated its first TAF-based drug, Genvoya—which was Stribild with TAF in place of TDF—Gilead reduced the dose of TAF to account for the fact that cobicistat increases tenofovir concentrations. A Phase I TAF dosing trial showed that TAF 25 mg was the optimal dose to achieve activity similar to a 300 mg dose of TDF. When formulating Genvoya, however, Gilead further reduced the TAF dose to 10 mg because, when given with cobicistat, TAF 10 mg achieves exposure similar to TAF 25 mg when given without cobicistat.

440.    Gilead knew to reduce the dose of TAF to 10 mg when given with cobicistat before Gilead sought FDA approval for Stribild. Pursuant to Gilead's Phase I study GS-US-311-0101, conducted between June 6, 2011 and August 31, 2011, Gilead determined that co-administration of

TAF with cobicistat significantly increased the body's exposure to TAF and active tenofovir. It found that the body's drug exposure across time (known as the "area under the curve" in pharmacokinetic parlance) increased 2.7-fold with respect to TAF and 3.3-fold with respect to tenofovir when given with cobicistat. Gilead addressed this drug interaction by reducing the dose of TAF from 25 mg to 10 mg in the Genvoya tablet. When Gilead began its study GS-US-292-0103 on October 5, 2011, it used a TAF dose of 10 mg in the Genvoya combination because "the TAF dose is 10 mg when combined with COBI in the [fixed dose combination] versus 25 mg when not combined with COBI."[35]

441.    Critically, Gilead reduced the TAF dose when formulating Genvoya even though patients' plasma exposure to tenofovir when taking TAF is already significantly less than their tenofovir exposure when taking TDF due to TAF's enhanced entry and absorption into target cells.

442.    Moreover, in July 2011, months before Gilead submitted its Stribild NDA to the FDA, Gilead sought FDA approval of reduced doses of TDF (Viread) in 150 mg, 200 mg, and 250 mg strengths for the treatment of HIV-1 infection in pediatric patients ages 2-12. That same month, Gilead also sought approval of Viread 40 mg oral powder for the treatment of HIV-1 infection in pediatric patients 2 years and older.[36] The FDA approved the lower dosage strength TDF tablets and oral powder in early January 2012—over six months before the FDA approved the Stribild NDA. There was no reason Gilead could not have similarly reduced the dose of TDF in Stribild—when it knew that failing to reduce the dose would increase the drug's toxicity.

443.    As a direct result of Gilead's decision not to use a safer design, Stribild proved to be toxic to patients' kidneys and bones.

444.    In the clinical trials of Stribild over 48 weeks, eight patients in the Stribild group compared to one in the comparator groups discontinued the drug study due to renal adverse events, including kidney failure and Fanconi Syndrome. Four of these patients developed laboratory findings

---

[35] FDA Center for Drug Evaluation and Research, Genvoya NDA 207561 Clinical Pharmacology and Biopharmaceutics Review(s) at 32, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000ClinPharmR.pdf.

[36] In the EU, Gilead recommends that adults with creatinine clearance below 50 mL/min take Viread oral powder to reduce their doses of TDF.

consistent with proximal renal tubular dysfunction. The laboratory findings in these four subjects improved but did not completely resolve upon discontinuation of Stribild. The signature toxicity of the Stribild group was proximal renal tubular dysfunction.

445.   The FDA's Medical Review described the notable adverse events that led to study discontinuation more frequently in the Stribild group as a "constellation of renal [Adverse Events] (e.g. renal failure, Fanconi syndrome, and increased blood creatinine)."[37]

446.   According to the FDA, the "most important safety risks of Stribild use are associated with two key toxicities: renal adverse events (particularly proximal renal tubular dysfunction) and bone toxicity. Both of these events have previously been associated with use of TDF . . . ."[38]

447.   The FDA noted that "published literature suggests that the renal toxicity associated with TDF may be more frequent in patients receiving TDF in combination with PIs, including ritonavir,"[39] and the "review team remains concerned that COBI may exacerbate the known renal toxicity associated with TDF."[40] In its Summary Review of the Stribild NDA, the FDA concluded: "it appears that the combination of COBI with TDF may have more renal toxicity than TDF alone as highlighted in the clinical reviews and the renal consult."[41] The FDA expressed concern that the data reviewed for the Stribild NDA represented an increased hazard signal even compared to regimens containing TDF combined with another boosting agent.

448.   Due to Stribild's renal toxicity, Stribild use is restricted in patients with impaired renal function. Stribild's label states that doctors should not initiate Stribild in patients with estimated creatinine clearance below 70 mL per minute, and Stribild should be discontinued if estimated creatinine clearance declines below 50 mL per minute as dose interval adjustment cannot

---

[37] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Medical Review at 9, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000MedR.pdf.

[38] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Cross Discipline Team Member Review at 17, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000CrossR.pdf.

[39] *Id*. at 18.

[40] *Id*.

[41] FDA Center for Drug Evaluation and Research Stribild NDA 203100 Summary Review at 16, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/203100Orig1s000SumR.pdf.

be achieved. Moreover, in the EU—though not in the U.S. —Gilead warns doctors that Stribild should not be initiated in patients with creatinine clearance below 90 mL per minute unless, after review of all available treatment options, it is considered that Stribild is the preferred treatment for the individual patient.

449.    Gilead's post-approval Stribild data continued to show renal adverse effects. In the clinical trials of Stribild over 96 weeks, two additional Stribild patients discontinued the study due to a renal adverse reaction. In the clinical trials of Stribild over 144 weeks, three additional Stribild patients discontinued the study due to a renal adverse reaction. In addition, one patient who received ritonavir-boosted atazanavir plus Truvada (i.e., a boosted TDF regimen) in the comparator group developed laboratory findings consistent with proximal renal tubular dysfunction leading to drug discontinuation after week 96.

**H.    Gilead obtained FDA approval for its TAF-based products by relying on studies demonstrating TAF's superiority over TDF.**

450.    In seeking FDA approval of its first TAF-based antiviral drug product, Genvoya, Gilead told the FDA that TAF has better entry and concentration in HIV-target cells than TDF, thereby allowing the administration of smaller doses and reducing systemic tenofovir exposure, renal toxicity and bone effects, without sacrificing efficacy.

451.    Gilead established during Phase I clinical development of TAF that doses as low as 8 to 25 mg of TAF had antiviral activity comparable to the approved dose of TDF 300 mg. Gilead selected the 25 mg TAF dose as the optimal dose for Phase 2 and 3 studies based on its antiviral activity. Gilead included TAF 10 mg in Genvoya because it provides similar exposures to TAF 25 mg when coadministered with cobicistat.

452.    Gilead supported the safety and efficacy of Genvoya with two clinical trials that compared Genvoya to its TDF-containing counterpart, Stribild. In those studies, a 10 mg oral dose of TAF in Genvoya resulted in greater than 90% lower concentrations of active tenofovir in plasma as compared to a 300 mg oral dose of TDF in Stribild. Due to these lower plasma concentrations, Gilead expected that the kidney and bone toxicities associated with TDF would occur at a lower rate

with TAF. And, as expected, the trials showed that rates of biomarkers for tenofovir-induced renal

and bone toxicities were less with Genvoya than Stribild.

453.    In seeking FDA approval of Genvoya in 2014, Gilead relied on TAF data obtained by

Gilead more than a decade earlier—before the company abruptly shelved its TAF design in pursuit

of more money. Gilead submitted in its Genvoya NDA data from: (a) early clinical development

showing that TAF provided greater intracellular distribution of tenofovir yielding lower plasma

tenofovir levels than TDF; (b) preclinical studies that indicated TAF is less likely to accumulate in

renal proximal tubules, supporting the potential for an improved renal safety profile; and (c) Phase I

dosing studies supporting doses of TAF far lower than the standard 300 mg dose of TDF.

454.    Reviewing these studies, the FDA stated that: "Based on the design of the pivotal

clinical trials, safety can be directly compared between TAF (Genvoya) and TDF (as Stribild) in

subjects initiating treatment."[42] According to the FDA, the studies showed that "the rates of signature

TFV [tenofovir] toxicities related to bone mineral density and renal laboratory parameters were

lower [than TDF], likely due to the fact that the TAF prodrug yields lower plasma concentrations of

TFV."[43]

455.    As a result of its improved renal safety profile over TDF, Gilead's TAF-containing

products are better tolerated by patients with renal impairment.

456.    For example, Genvoya requires no dosage adjustment for patients with creatinine

clearance greater than or equal to 30 mL per minute, whereas its TDF-containing counterpart Stribild

is not recommended for patients with creatinine clearance below 70 mL per minute and Stribild

should be discontinued if creatinine clearance falls below 50 mL per minute as dose interval

adjustment cannot be achieved. Due to its superior safety profile, Genvoya has an expanded

indication for renally impaired individuals with creatinine clearance greater than or equal to 30 mL

per minute.

---

[42] FDA Center for Drug Evaluation and Research Genvoya NDA 207561 Summary Review at 10, available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207561Orig1s000SumR.pdf.

[43] Id. at 15.

457.    As a result of its improved bone toxicity safety profile over TDF, the labels for Gilead's TAF-containing products no longer include bone effects in the Warnings and Precautions sections of those labels.

458.    The FDA agreed that bone effects need only be displayed in the Adverse Events section of TAF drug labeling because "[w]ith respect to bone toxicity, TAF appears to have substantially less of an adverse effect on bone mineral density (BMD) than TDF."[44]

459.    Gilead removed bone toxicity from the Warnings and Precautions sections of the Genvoya label in December 2016 and from the Odefsey and Descovy labels in 2017. Bone toxicity remains in the Warnings and Precautions sections of the labels of Gilead's TDF Drugs to this day.

**I.      Gilead markets TAF as superior to TDF.**

460.    Gilead's TAF-based product websites, including the Genvoya site, market the TAF-based drugs as superior to Gilead's TDF-containing products with respect to kidney health. Gilead recognizes that: "Kidneys play a key role in keeping you healthy, working around the clock to remove waste from your blood. That's why it's so important to take care of them, especially if you have HIV-1."[45] Gilead states that the TAF-based products have "less impact on kidney lab tests" than other approved HIV-1 treatments, including Stribild, Atripla, and Truvada. The website also highlights that unlike its TDF products, the TAF-based products are "FDA-approved for people with mild-to-moderate kidney problems and can be used in some people with lowered kidney function without changing the dose."[46]

461.    Gilead's TAF-based product websites, including the Genvoya site, market the TAF-based drugs as superior to Gilead's TDF-containing products with respect to bone health. Gilead recognizes that: "Because HIV-1 medicines may impact your bones, it's important to protect your bone health. If you're under 30 years of age, you're still developing bone mass. If you're over 30,

---

[44] FDA Center for Drug Evaluation and Research Vemlidy NDA 208464 Summary Review at 5, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208464Orig1s000SumR.pdf.

[45] *See* https://www.genvoya.com/hiv-kidney-bone-health.

[46] *Id.*

your bones have fully developed and it's important to try to maintain them."[47] The site touts clinical studies which demonstrate that the TAF-containing products "had less impact on hip and lower spine bone mineral density than the other approved HIV-1 treatments," including Stribild, Atripla, and Truvada.[48]

462.    Gilead also touts TAF as safer than TDF to scientists, clinical investigators, and doctors attending the annual Conference on Retroviruses and Opportunistic Infections ("CROI").

463.    In 2015, Gilead scientists presented to CROI attendees data evaluating the safety and efficacy of Genvoya in patients with mild to moderate renal impairment. Gilead stated that "TDF has been associated with clinically significant renal and bone toxicity," and "[r]elative to TDF 300 mg, TAF at an equivalent dose of 25 mg has 90% lower circulating plasma TFV, while maintaining high antiviral activity."[49] This first study of a single-tablet antiviral regimen without dose adjustment in patients with mild to moderate renal impairment demonstrated the efficacy and renal and bone safety of Genvoya in this patient population.

464.    In 2016, Gilead scientists presented to CROI attendees data evaluating the renal safety of TAF in patients with a high risk of kidney disease. Gilead stated that TDF "has been associated with an increased risk of [chronic kidney disease] . . . ." and "[d]ue to a 91% lower plasma tenofovir level, tenofovir alafenamide (TAF) relative to TDF has demonstrated a significantly better renal safety profile and no discontinuations due to renal adverse events through 2 years in 2 randomized, double-blind studies . . . comparing TAF to TDF . . . ."[50] With respect to high risk renal patients, Gilead concluded that "[a]ntiretroviral-naïve adults with both high and low risk for [chronic kidney disease] treated with TAF had more favorable renal outcomes compared to those treated with TDF."[51]

---

[47] *Id.*

[48] *Id.*

[49] http://www.croiconference.org/sites/default/files/posters-2015/795.pdf.

[50] http://www.croiconference.org/sites/default/files/posters-2016/681.pdf.

[51] *Id.*

465.     Gilead also presented at the 2016 CROI data demonstrating that TAF is safer to kidneys than TDF in the longer-term. Showing data through 96 weeks, Gilead concluded that "[c]linically significant renal events were less frequent in patients receiving" TAF vs. TDF and these "data provide further support for the improved renal safety profile of TAF compared with TDF."[52]

466.     In 2017, Gilead scientists presented to CROI attendees data showing that switching patients with low bone mineral density from a TDF-based to a TAF-based regimen results in increased BMD and a reversion from osteoporosis, leading Gilead to conclude that "[s]witching from TDF to TAF may be an important treatment strategy to increase bone mineral density in those at the highest fracture risk."[53]

467.     Also in 2017, Gilead scientists presented to CROI attendees 144-week data establishing the superiority of TAF over TDF with respect to efficacy as well as kidney and bone safety. At week 144, TAF: was "superior to [TDF] on virologic efficacy," had "significantly less impact than [TDF] on renal biomarkers," and had "significantly less impact than [TDF] on BMD."[54]

468.     In 2018, Gilead scientists presented to CROI attendees 96-week data that showed that switching to a TAF-based regimen resulted in "significant increases in bone mineral density at hip and spine" and "improved biomarkers of renal tubular function."[55]

469.     Gilead's sales force has used data showing the superior safety profile of TAF over TDF to convince doctors to switch patients from TDF-based to TAF-based products.

470.     Gilead President and COO Milligan told analysts during a November 10, 2015 Credit Suisse Healthcare Conference that he expected Gilead's sales representatives to be successful in switching the market from TDF to Genvoya based on favorable data showing the benefits of TAF over TDF. Milligan viewed switching patients from Stribild to Genvoya as "the most likely thing to happen very commonly, because it's very seamless for the patient. You're not really changing much;

---

[52] http://www.croiconference.org/sites/default/files/posters-2016/682.pdf.

[53] http://www.croiconference.org/sites/default/files/posters-2017/683_Brown.pdf.

[54] http://www.croiconference.org/sites/default/files/posters-2017/453_Arribas.pdf.

[55] http://www.croiconference.org/sites/default/files/posters-2018/1430_Mills_504.pdf.

you're just getting a better version of Stribild."[56] Milligan also touted the benefit of switching Atripla patients, who, at that point, had a decade of TDF toxicity buildup, to Genvoya, which, he said, gives patients the benefits of TDF with a better safety profile.

471.    In order to prevent or combat the cumulative buildup of kidney and bone toxicity associated with TDF (which Gilead itself caused by withholding the safer TAF design), Gilead's message was: "if you're a new patient, start with a TAF-based single-tablet regimen, because that's going to be highly efficacious and very safe and very tolerable for long-term usage. And if you're on a Viread-based regimen, it's a great idea to convert, switch, upgrade to a TAF-based regimen as soon as possible."[57]

472.    According to Milligan, Genvoya was the most successful launch ever for an HIV therapy. After six months on the market, Genvoya was the most prescribed regimen for treatment-naïve and switch patients.

473.    Gilead's conversion strategy continued with FDA approval of Gilead's subsequent TAF-based products. As Milligan stated in March 2016, the marketplace was moving to TAF because patients need the safest possible medication:

> [A]s I look at TAF right now there's a very strong medical rationale for TAF versus Viread. And so what we're seeing in the marketplace with the launch of Genvoya and then with the recent approval of Odefsey is the desire to move patients from a TDF containing regimen to a TAF containing regimen. . . . it's very interesting that the field wants to move to the safest medication, I think should move to the safest medication because it's a great opportunity for patients to stay on care for another 10 to 20 years which is really where we're at with most of these patients. They're going to need decades more care and so you need the gentlest, safest option for patients. . . .[58]

---

[56] Gilead Sciences Inc. at Credit Suisse Healthcare Conference – Final, FD (Fair Disclosure) Wire, Nov. 10, 2015.

[57] Gilead Sciences Inc. at Piper Jaffray Healthcare Conference – Final, FD (Fair Disclosure) Wire, Dec. 1, 2015.

[58] Gilead Sciences Inc. at Barclays Global Healthcare Conference – Final, FD (Fair Disclosure_ Wire, Mar. 15, 2016.

474.     Gilead's 2017 Annual Report attributes strong growth in its HIV business to "widespread physician acceptance and uptake" of the TAF-based regimens.[59]

475.     In January 2018, Milligan stated that "physicians and patients prefer TAF dramatically over our TDF-containing backbones," noting that its TAF-based products had achieved more than 56% of the market share of its TDF-containing regimen.[60] TAF-based products now make up at least 74% of Gilead's TDF- and TAF-based drug products for HIV treatment.

476.     Gilead could have and should have incorporated the benefits of TAF, which doctors and patients "prefer dramatically" over TDF, into its products years earlier.

477.     Gilead funded a 2018 study, Baumgardner, J., *et al.*, "Modeling the impacts of restrictive formularies on patients with HIV," that highlights the damage Gilead did by withholding TAF products from the market. The authors found that a restrictive drug formulary design,[61] which restricts access to TAF or TDF-sparing regimens (other antiviral drugs, abacavir, lamuvidine, and douletegravir), forcing more people to use TDF-containing regimens, would cause 171,500 more cumulative bone and renal events and 16,500 more deaths by 2025 compared to an open formulary design which permitted patients to start on TAF. Gilead itself prevented patients from taking TAF for more than a decade—longer than the period covered by the 2018 study. Gilead likely caused even more deaths and injuries as a result of its callous decision to withhold the safer TAF drugs.

**J.     Gilead failed to adequately warn about the risks of TDF.**

478.     In addition to withholding a safer TAF-based design despite knowing the risk its TDF Drugs posed to patients' kidneys and bones, Gilead failed to adequately warn physicians and patients about the risks and safe use of TDF.

---

[59] Gilead Sciences 2017 Year in Review at 7, available at https://www.gilead.com/-/media/ files/pdfs/yir-2017-pdfs/final-year-in-review-426.pdf?la=en&hash=E86C6471302682C56A548CC 42342AFC4.

[60] Gilead Sciences Inc. at JPMorgan Healthcare Conference – Final, FD (Fair Disclosure) Wire, Jan. 8, 2018.

[61] A drug formulary is a list of an insurer's covered drugs and is designed to save money.

1        **1.       Gilead failed to adequately warn doctors about the risks of TDF.**

2        479.    Because tenofovir is primarily cleared out of the body by the kidneys, a patient

3   experiences even greater exposure to tenofovir as the kidneys become impaired—causing even

4   greater harm. As a result, early detection is key to preventing serious, potentially irreversible renal

5   injury. Frequent monitoring for TDF-induced toxicity is also critical because patients are typically

6   asymptomatic in the early stages. Gilead, however, downplayed the risks of TDF and the need to

7   carefully monitor all patients in order to inflate sales.

8        480.    During the first years Viread was on the market, Gilead relied on Viread sales for a

9   significant portion of its operating income. For 2002, Viread's first full year on the market, Viread

10  sales comprised 53% of Gilead's total product sales. In 2003, Viread accounted for 68% of Gilead's

11  total product sales.

12       481.    Gilead stated in its 2002 10-K that its operations would suffer if Viread did not

13  maintain or increase its market acceptance. Gilead also stated that if additional safety issues were

14  reported for Viread, this could "significantly reduce or limit our sales and adversely affect our results

15  of operations."[62] Gilead made similar statements in its 2003 and 2004 10-K filings.

16       482.    To make sure that safety issues did not depress or slow the growth of Viread sales,

17  which were crucial to Gilead's operations, Gilead dramatically increased its sales force and

18  marketing budget, and trained its sales representatives to misrepresent Viread's safety profile. At the

19  direction of Gilead's senior management, Gilead representatives told doctors that Viread was a

20  "miracle drug," "extremely safe," and "extremely well-tolerated" with "no toxicities." Gilead's sales

21  representatives did not tell doctors the facts: that Viread posed significant risks to patients' kidneys

22  and bones.

23       483.    According to a 2009 shareholder lawsuit filed against Viread, Viread's then-Chief

24  Executive Officer John C. Martin frequently referred to Viread as a "miracle drug" at sales force

25  meetings. According to a former employee, Gilead was trying to overcome the perception in the

26

27  ─────────────────
    [62] Gilead Sciences, Inc. Form 10-K for the fiscal year ended Dec. 31, 2002 at 24 available at

28  https://www.sec.gov/Archives/edgar/data/882095/000104746903008695/a2105292z10-k.htm.

medical community that Viread was like Gilead's previous HIV drugs and would likely cause kidney damage.

484.     On March 14, 2002, FDA sent Gilead a Warning Letter admonishing Gilead for engaging in promotional activities that contained false and misleading statements in violation of the Federal Food, Drug and Cosmetic Act. The FDA stated that Gilead unlawfully minimized Viread's risks, including with respect to kidney toxicity, and overstated its efficacy.

485.     Despite this warning, Gilead continued to unlawfully promote Viread by minimizing its safety risks. During a June 2003 sales force training, Gilead instructed sales representatives to respond to anticipated physician concerns about Viread's nephrotoxicity by downplaying that many patients taking Viread had experienced the adverse effects of kidney toxicity—some of them severe —including but not limited to renal failure, acute renal failure, Fanconi syndrome, proximal tubulopathy, increased creatinine, and acute tubular necrosis. Gilead's sales representatives omitted this material information from their sales presentations in order to drive sales.

486.     The FDA issued another Warning Letter to Viread on July 29, 2003, stating that Gilead's sales representatives had repeatedly omitted or minimized material facts regarding the safety profile of Viread. Among other things, the FDA required Gilead to retrain its sales force to ensure that Gilead's promotional activities complied with the Federal Food, Drug and Cosmetic Act and accompanying regulations. But Gilead had achieved its goal: rapidly increased Viread sales.

487.     In subsequent years, Gilead continued to downplay the risks of TDF-induced toxicity when promoting its TDF Drugs to doctors by withholding information about the frequency and severity of adverse kidney and bone events; dismissing case reports of acute renal failure and other TDF-associated adverse events as purportedly unavoidable side effects of tenofovir in an otherwise "safe" drug; and failing to tell doctors to monitor patients for drug-induced toxicity using more sensitive markers of kidney function.

488.     In addition to omitting crucial facts about the safety profile of TDF when promoting TDF to doctors, Gilead also downplayed the importance of patient monitoring in its TDF Drug labeling despite the importance of early detection of TDF-induced toxicity. The dangerous

inadequacies in Gilead's drug labeling were compounded by the misleading marketing messages it gave to doctors.

489.    From Viread's product approval on October 26, 2001, through May 20, 2007, Gilead's TDF labeling failed to warn doctors that all patients needed to be monitored for adverse kidney effects. During this time, Gilead only recommended monitoring patients taking TDF Drugs for renal adverse effects if patients were at risk for, or had a history of, renal impairment or if they were taking another nephrotoxic drug. This monitoring recommendation was woefully inadequate because, as Gilead was well aware, TDF-associated renal toxicity had harmed patients who were not at risk for, or did not have a history of, renal impairment.

490.    Gilead failed to include any warning about the need to monitor bone effects until October 14, 2003, and that warning was limited to patients with certain risk factors. Since then, Gilead has only suggested that doctors monitor, and only informs patients that monitoring may be necessary, for patients with certain risk factors for bone adverse effects. Gilead's inadequate kidney monitoring warnings also prevented doctors from detecting early signs of kidney damage that can lead to bone density loss.

491.    Gilead failed to warn about the need for universal monitoring even though it knew that all patients taking TDF are at risk for renal and bone adverse effects.

492.    Gilead failed to warn about the need for universal monitoring even after patients without preexisting risk factors experienced kidney and bone effects.

493.    Gilead failed to warn about the need for universal renal monitoring even though patients with a certain level of renal impairment should not take its TDF products or, if TDF products are to be administered to certain renally impaired patients, the dosing interval must be adjusted. The Viread and Truvada labels require a dosing interval adjustment for patients with creatinine clearance of 30–49 mL per minute, and Atripla and Complera cannot be taken by patients with a creatinine clearance of less than 50 mL per minute. Frequent monitoring of all patients' kidney function is necessary to ensure that patients' kidneys are healthy enough to continue treatment or patients receive a needed dose interval adjustment.

494.    Presented with signs of nephrotoxicity, physicians could have weighed further treatment options, such as increased monitoring, less frequent dosing, or drug discontinuation, before the damage manifested, worsened, or became irreversible. By failing to warn doctors to monitor all patients for TDF-associated toxicity, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing injuries that would have been prevented or lessened through early detection.

495.    On May 21, 2007, Gilead added to the Viread label a recommendation that doctors calculate creatinine clearance (one measure of kidney function) in all patients before initiating treatment with a TDF-based product and as clinically appropriate during therapy. Gilead recommended monitoring of creatinine clearance and serum phosphorus only for patients at risk for renal impairment.[63]

496.    The "all patients" monitoring recommendation for Viread, Truvada, Atripla, and Complera remained inadequate because it instructed doctors to assess just one, insufficiently sensitive marker of kidney function.[64] Without using sufficiently sensitive markers of kidney function, substantial kidney injury can occur before it is measurable. As a result, the detection of TDF-induced nephrotoxicity often comes too late, resulting in kidney injury that may be irreversible. Gilead should have warned doctors to test all patients for additional markers of kidney function, such as serum phosphorus and/or urine glucose, which are more sensitive to changes in the nephron tubule, the main site of TDF damage.[65]

---

[63] Gilead did not add similar warnings to the Truvada and Atripla labels until 2008. Complera's label included such a warning at the time of FDA approval in 2011. And when Gilead began marketing Stribild in 2012, it warned doctors to assess some measures of kidney function in all patients but failed to warn doctors to monitor all patients for serum phosphorus. These warnings remained inadequate.

[64] It was not until 2018 that Gilead strengthened the Truvada, Atripla, and Complera labels to recommend that all patients receive monitoring for serum creatinine, estimated creatinine clearance, urine glucose, and urine protein. Gilead did not make this change to the Viread label until December 2018, after Plaintiffs filed suit.

[65] The "all patients" monitoring recommendation for Stribild upon approval was inadequate because it failed to warn doctors to measure serum phosphorus. On August 30, 2017, Gilead strengthened the Stribild label to recommend that all patients be monitored for serum creatinine, serum phosphorus, estimated creatinine clearance, urine glucose, and urine protein. But, on August 8, 2018, Gilead again weakened the Stribild label to warn doctors to monitor serum phosphorus only in patients with chronic kidney disease.

497.    Phosphorus is a mineral that plays an important role in many physiologic systems, including keeping bones healthy and strong. Normal working kidneys maintain balanced levels of phosphorus in the blood. Low levels of phosphorus in the blood may be indicative of impaired kidney function. Moreover, low serum phosphate is itself dangerous; low levels of phosphorus in the blood can cause a range of health problems, including serious bone and heart damage.

498.    Serum phosphorus is a more sensitive marker of nephron tubule function than creatinine clearance. The nephron tubule is responsible for reabsorbing phosphorus from the glomerular filtrate. When the nephron tubule is damaged, it cannot reabsorb enough phosphorus, allowing the phosphorus to be excreted via urine. TDF nephrotoxicity is generally characterized by tubular dysfunction that precedes a decline in glomerular filtration. Thus, by monitoring patients' serum phosphorus, doctors are able to pick up more subtle changes in kidney function that would otherwise go undetected. Moreover, TDF-induced bone injuries are related to the wasting of minerals through the urine. This is due to dysfunction in the nephron tubule, which prevents reabsorption of minerals from the glomerular filtrate. If physicians knew earlier that their patients' kidneys were dysfunctional, subsequent bone injuries could be avoided.

499.    Presented with early signs of nephrotoxicity, physicians could have weighed further treatment options, such as increased monitoring or drug discontinuation, before the damage manifested, worsened, or became irreversible. By failing to warn doctors to monitor additional, more sensitive markers of all patients' kidney function, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing patients' injuries that would have been prevented or lessened through early detection.

500.    Gilead's "all patients" monitoring recommendation for its TDF Drugs also remains inadequate because it fails to instruct doctors how frequently doctors should assess patients' kidney function. By the time a doctor assesses a patient's kidney function when "clinically appropriate," the patient is likely to have already experienced adverse toxic effects, some of which might be irreversible. Regularly scheduled, frequent monitoring of kidney function is necessary to catch early signs of TDF-induced toxicity and prevent injury because patients are generally asymptomatic during the early stages.

501.     Moreover, after May 21, 2007, the TDF labels do not disclose that adverse kidney and bone events occurred in patients without preexisting risk factors—which, combined with the warning to only routinely monitor patients at risk—gives the false impression that TDF is only harmful to people otherwise at risk for kidney and bone injuries. By failing to warn doctors as to the frequency of monitoring, Gilead delayed the diagnosis of TDF-associated harm, causing or enhancing injuries that could have been prevented or lessened through early detection.

502.     Gilead's monitoring instructions for at risk patients taking Viread, Truvada, Atripla, and Complera, and patients taking Stribild are also inadequate because they fail to recommend a specific, frequent monitoring schedule for doctors to assess patients' kidney function.

503.     Gilead's warnings about the need to monitor patients for the renal effects of TDF in the U.S. are far weaker than those given by Gilead to physicians and patients in the European Union. From the approval of the first TDF product in the EU, Gilead's European labeling (known there as the Summary of Product Characteristics or "SmPC") has recommended that doctors in the EU routinely monitor, on a specific schedule, all patients taking TDF Drugs for adverse renal effects. In addition, Gilead's "all patient" monitoring instruction in the EU is not limited to testing only for creatinine clearance. In its EU labeling, Gilead recommends that doctors also monitor all TDF Drug patients' serum phosphorus levels on the specified, frequent schedule.

504.     Gilead's renal monitoring instructions for Viread upon approval in the U.S. and the EU looked like this—with Gilead warning EU physicians to monitor all patients' serum creatinine and serum phosphate at baseline and every four weeks, while it told U.S. doctors to consider monitoring only patients at risk, with no recommended frequency:

| Viread U.S. Label 10/26/01 | Viread EU Label 02/07/2002 |
| --- | --- |
| Although tenofovir-associated renal toxicity has not be observed in pooled clinical studies for up to one year, long term renal effects are unknown. **Consideration should be given to monitoring for changes in serum creatinine** | Although no significant nephrotoxicity has been observed in clinical trials . . . the monitoring of renal function is recommended since nephrotoxicity of tenofovir cannot be strictly excluded. **The monitoring of renal function** |

| Viread U.S. Label 10/26/01 | Viread EU Label 02/07/2002 |
|---|---|
| **and serum phosphorus in patients at risk or with a history of renal dysfunction**. | **(serum creatinine and serum phosphate) is recommended at baseline before taking tenofovir disoproxil fumarate and at routine intervals during therapy every four weeks**. |

505.   Gilead's EU label also instructed physicians when to increase monitoring and consider treatment interruption in light of the results of frequent monitoring. Gilead's U.S. label contained no such warning:

| Viread U.S. Label 10/26/01 | Viread EU Label 02/07/2002 |
|---|---|
| | If serum phosphate is < 1.5 mg/dl (0.48 mmol/l) or serum creatinine is > 1.7 mg/dl (150 µmol/l), renal function should be re-evaluated within one week. Consideration should be given to interrupting treatment with tenofovir disoproxil fumarate in patients with increases in serum creatinine to > 2.0 mg/dl (177 µmol/l) or decreases in serum phosphate to < 1.0 mg/dl (0.32 mmol/l). |

506.   On December 8, 2004, Gilead updated Viread's EU labeling to change the recommended renal monitoring schedule and recommend that doctors monitor creatinine clearance, which gives a more accurate picture of kidney function, rather than serum creatinine.[66] Gilead continued to instruct doctors in the EU to monitor TDF patients more carefully than it instructed doctors in the U.S.:

---

[66] Gilead did not recommend that doctors monitor creatinine clearance in the U.S. until 2007.

| Viread's U.S. Labeling 12/8/2004 | Viread's EU Labeling 12/8/2004 |
|---|---|
| **Patients at risk** for, or with a history of, renal dysfunction and patients receiving concomitant nephrotoxic agents **should be carefully monitored for changes in serum creatinine and phosphorus.** | **Monitoring of renal function (creatinine clearance and serum phosphate) is recommended before taking tenofovir disoproxil fumarate, every four weeks during the first year, and then every three months.** **In patients at risk** for, or with a history of, renal dysfunction, and patients with renal insufficiency, **consideration should be given to more frequent monitoring of renal function**. |

507.    Like the initial EU label, the 2004 EU label also instructed physicians when to increase monitoring and consider treatment interruption in light of the results of frequent monitoring. Although Gilead instructed U.S. doctors to adjust the dose interval for patients with creatinine clearance <50 mL/min, it did not tell doctors to monitor for creatinine clearance (only serum creatinine for some patients) and only instructed doctors to monitor patients' serum creatinine if they were at risk for, or had a history of, renal impairment:

| Viread's U.S. Labeling 12/8/2004 | Viread's EU Labeling 12/8/2004 |
|---|---|
| Dosing interval adjustment is recommended in all patients with creatinine clearance <50 mL/min. | If serum phosphate is < 1.5 mg/dl (0.48 mmol/l) or creatinine clearance is decreased to < 50 ml/min, renal function should be re-evaluated within one week and the dose interval of Viread adjusted (see 4.2). Consideration should also be given to interrupting treatment with tenofovir disoproxil fumarate in patients with creatinine clearance decreased to < 50 ml/min or decreases |

| Viread's U.S. Labeling 12/8/2004 | Viread's EU Labeling 12/8/2004 |
|---|---|
|  | in serum phosphate to < 1.0 mg/dl (0.32 mmol/l). |

508.    After Gilead began recommending in its U.S. labeling that doctors calculate creatinine clearance in all patients prior to initiating therapy and as clinically appropriate during therapy, Gilead still gave stronger warnings in the EU—recommending that EU doctors monitor all patients' creatinine clearance and serum phosphate every four weeks during the first year, then every three months:

| Viread's U.S. Labeling 05/21/2007 | Viread's EU Labeling 05/21/2007 |
|---|---|
| It is recommended that creatinine clearance be calculated in all patients prior to initiating therapy and as clinically appropriate during therapy with VIREAD. **Routine monitoring of calculated creatinine clearance and serum phosphorus should be performed in patients at risk for renal impairment.** | It is recommended that creatinine clearance is calculated in all patients prior to initiating therapy with tenofovir disoproxil fumarate and **renal function (creatinine clearance and serum phosphate) is also monitored every four weeks during the first year, and then every three months. In patients at risk** for renal impairment, **consideration should be given to more frequent monitoring of renal function.** |

509.    Gilead instructs in Viread's most recent EU labeling "that renal function (creatinine clearance and serum phosphate) [should be] assessed in all patients prior to initiating therapy with tenofovir disoproxil fumarate and . . . also monitored after two to four weeks of treatment, after three months of treatment, and every three to six months thereafter in patients without renal risk factors." For patients at risk for renal impairment, Gilead states that more frequent monitoring of renal function is "required."

510.    Gilead has updated its Viread EU labeling multiple times every year since 2002. Each time, Gilead determined that it should instruct doctors in the EU that they should monitor all patients' kidneys on a frequent, specific schedule using multiple markers of kidney function, including serum phosphorus.

511.    On February 24, 2005, Truvada received approval to be marketed in the EU. As with Viread, Gilead's Truvada EU labeling contained stronger monitoring warnings than its U.S. labeling at the time of approval:

| Truvada's U.S. Labeling 08/02/2004 | Truvada's EU Labeling 02/24/2005 |
|---|---|
| **Patients at risk** for, or with a history of, renal dysfunction and patients receiving concomitant nephrotoxic agents **should be carefully monitored for changes in serum creatinine and phosphorus**. | **Careful monitoring of renal function (serum creatinine and serum phosphate) is recommended before taking Truvada, every four weeks during the first year, and then every three months.** In patients with a history of renal dysfunction or **in patients who are at risk for renal dysfunction, consideration should be given to more frequent monitoring of renal function.** |

512.    Like its Viread EU labeling, Gilead's Truvada EU labeling also instructed physicians to increase monitoring and consider treatment interruption if the results of frequent monitoring showed that a patient's serum phosphate or creatinine clearance fell below a specified level. Gilead's U.S. labeling recommended only that patients with creatinine clearance < 50 mL/min receive a dose adjustment—though Gilead did not recommend that doctors monitor patients' creatinine clearance (and would not do so for almost three years) and only instructed doctors to monitor patients' serum creatinine if they were at risk for, or had a history of, renal impairment.

513.    In Truvada's most recent SmPC, Gilead continues to instruct doctors as to frequent, routine monitoring of renal function (creatinine clearance and serum phosphate) for patients without preexisting risk factors for renal disease: at treatment initiation and then "after two to four weeks of

use, after three months of use and every three to six months thereafter." For patients at risk for renal disease, Gilead warns that more frequent monitoring of renal function is "required."

514.    Gilead has updated its Truvada EU labeling multiple times every year since 2005. Each time, Gilead determined that it should instruct doctors in the EU to monitor all patients' kidneys on a frequent, specific schedule using multiple markers of kidney function, including serum phosphorus.

515.    In 2006, Gilead issued a "Dear Doctor" letter to physicians in the EU about the importance of frequent, routine monitoring of all TDF patients' renal function. Gilead issued no such letter to doctors in the U.S., though the risk to patients' kidneys was the same.

516.    On December 18, 2007, Atripla received approval to be marketed in the EU. As with Viread and Truvada, Gilead's Atripla EU labeling contained stronger monitoring warnings than its U.S. labeling at the time of approval:

| Atripla's U.S. Labeling 07/12/2006 | Atripla's EU Labeling 12/18/2007 |
|---|---|
| **Patients at risk** for, or with a history of, renal dysfunction and patients receiving concomitant nephrotoxic agents **should be carefully monitored for changes in serum creatinine and phosphorus**. | **It is recommended that creatinine clearance is calculated in all patients prior to initiating therapy with Atripla and renal function (creatinine clearance and serum phosphate) is also monitored every four weeks during the first year and then every three months**. In patients with a history of renal dysfunction or in **patients who are at risk** for renal dysfunction, **consideration must be given to more frequent monitoring of renal function.** |

517.    Like its Viread EU and Truvada EU labeling, Gilead's Atripla EU labeling also instructed physicians to increase monitoring and consider treatment interruption if the results of frequent monitoring showed that a patient's serum phosphate or creatinine clearance fell below a specified level. Gilead's U.S. labeling stated only that patients with creatinine clearance < 50

mL/min should not receive Atripla—though Gilead did not recommend that doctors monitor patients' creatinine clearance (and would not do so for approximately another year) and only instructed doctors to monitor patients' serum creatinine if they were at risk for, or had a history of, renal impairment:

| Atripla's U.S. Labeling 07/12/2006 | Atripla's EU Labeling 12/18/2007 |
| --- | --- |
| Since ATRIPLA is a combination product and the dose of the individual components cannot be altered, patients with creatinine clearance <50 mL/min should not receive ATRIPLA. | If serum phosphate is < 1.5 mg/dl (0.48 mmol/l) or creatinine clearance is decreased to < 50 ml/min in any patient receiving Atripla, renal function must be re-evaluated within one week, including measurements of blood glucose, blood potassium and urine glucose concentrations (see section 4.8, proximal tubulopathy). Since Atripla is a combination product and the dosing interval of the individual components cannot be altered, treatment with Atripla must be interrupted in patients with confirmed creatinine clearance < 50 ml/min or decreases in serum phosphate to < 1.0 mg/dl (0.32 mmol/l). |

518.    In Atripla's most recent SmPC, Gilead instructs doctors that creatinine clearance should be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored after two to four weeks of use, after three months of treatment and every three to six months thereafter in patients without renal risk factors. For patients at risk, Gilead states that more frequent monitoring is "required."

519.    Gilead has updated its Atripla EU labeling multiple times every year since 2007. Each time, Gilead determined that it should instruct doctors in the EU to monitor all patients' kidneys on a frequent, specific schedule using multiple markers of kidney function, including serum phosphorus.

520.    On November 30, 2011, Complera (under the trade name Eviplera) received approval to be marketed in the EU. As with Viread, Truvada, and Atripla, Gilead's Complera EU labeling contained stronger monitoring warnings than its U.S. labeling at the time of approval:

| Complera's U.S. Labeling 08/10/2011 | Complera's EU Labeling 11/30/11 |
| --- | --- |
| It is recommended that creatinine clearance be calculated in all patients prior to initiating therapy and as clinically appropriate during therapy with COMPLERA. **Routine monitoring of calculated creatinine clearance and serum phosphorus should be performed in patients at risk** for renal impairment, including patients who have previously experienced renal events while receiving HEPSERA. | It is recommended that creatinine clearance is calculated in all patients prior to initiating therapy with Eviplera and **renal function (creatinine clearance and serum phosphate) is also monitored every four weeks during the first year and then every three months. In patients at risk** for renal impairment, including patients who have previously experienced renal events while receiving adefovir dipivoxil **consideration should be given to more frequent monitoring of renal function**. |

521.    Like its Viread EU, Truvada EU, and Atripla EU labeling, Gilead's Complera EU labeling also instructed physicians to increase monitoring and consider treatment interruption if the results of frequent monitoring showed that a patient's serum phosphate or creatinine clearance fell below a specified level. Gilead's U.S. labeling stated only that patients with creatinine clearance < 50 mL/min should not receive Complera:

| Complera's U.S. Labeling 08/10/2011 | Complera's EU Labeling 11/30/11 |
| --- | --- |
| Since COMPLERA is a combination product and the dose of the individual components cannot be altered, patients with creatinine | If serum phosphate is < 1.5 mg/dl (0.48 mmol/l) or creatinine clearance is decreased to < 50 ml/min in any patient receiving Eviplera, renal function should be re-evaluated within one |

| Complera's U.S. Labeling 08/10/2011 | Complera's EU Labeling 11/30/11 |
| --- | --- |
| clearance below 50 mL per minute should not receive COMPLERA. | week, including measurements of blood glucose, blood potassium and urine glucose concentrations (see section 4.8, proximal tubulopathy). Since Eviplera is a combination product and the dosing interval of the individual components cannot be altered, treatment with Eviplera must be interrupted in patients with confirmed creatinine clearance decreased to < 50 ml/min or decreases in serum phosphate to < 1.0 mg/dl (0.32 mmol/l). |

522.    In Complera's/Eviplera's most recent SmPC, Gilead instructs that creatinine clearance should be calculated in all patients prior to initiating therapy and renal function (creatinine clearance and serum phosphate) be monitored after two to four weeks of use, after three months of treatment and every three to six months thereafter in patients without renal risk factors. For patients at risk, Gilead states that more frequent monitoring is "required."

523.    Gilead has updated its Complera EU labeling multiple times every year since 2011. Each time, Gilead determined that it should instruct doctors in the EU to monitor all patients' kidneys on a frequent, specific schedule using multiple markers of kidney function, including serum phosphorus.

524.    On May 27, 2013, Stribild received approval to be marketed in the EU. As with Viread, Truvada, Atripla, and Complera, Gilead included in its Stribild EU labeling stronger monitoring warnings than its U.S. labeling at the time of approval:

| Stribild U.S. Labeling 08/27/2012 | Stribild's EU Labeling 05/27/2013 |
| --- | --- |
| Estimated creatinine clearance, urine glucose and urine protein should be documented in all | Creatinine clearance should be calculated and urine glucose and urine protein should be |

| Stribild U.S. Labeling 08/27/2012 | Stribild's EU Labeling 05/27/2013 |
|---|---|
| patients prior to initiating therapy. . . . **Routine monitoring of estimated creatinine clearance, urine glucose, and urine protein should be performed during STRIBILD therapy in all patients. Additionally, serum phosphorus should be measured in patients at risk for renal impairment**. | determined in all patients . . . **Creatinine clearance, serum phosphate, urine glucose and urine protein should be monitored every four weeks during the first year and then every three months during Stribild therapy**. **In patients at risk** for renal impairment **consideration should be given to more frequent monitoring of renal function**. |

525.    Gilead also included in its Stribild EU labeling a stronger warning about initiating the drug in patients with mild renal impairment:

| Stribild U.S. Labeling 08/27/2012 | Stribild's EU Labeling 05/27/2013 |
|---|---|
| STRIBILD should not be initiated in patients with estimated creatinine clearance below 70 mL per min. | Stribild should not be initiated in patients with creatinine clearance < 70 mL/min. **It is recommended that Stribild is not initiated in patients with creatinine clearance < 90 mL/min unless, after review of the available treatment options, it is considered that Stribild is the preferred treatment for the individual patient**. |

526.    In Stribild's most recent SmPC, Gilead states that for patients at risk, physician monitoring of creatinine clearance, serum phosphate, urine glucose, and urine protein more frequently than every four weeks during the first year of treatment and then every three months during Stribild therapy is "required."

527.    Gilead has updated its Stribild EU labeling multiple times every year since 2013. Each time, Gilead determined that it should instruct doctors in the EU to monitor all patients'

1   kidneys on a frequent, specific schedule using multiple markers of kidney function, including serum

2   phosphorus.

3       528.    Unlike Gilead's U.S. labeling, Gilead's EU labeling for Viread and Truvada also

4   discloses that a higher risk of renal impairment has been reported in patients receiving TDF as part of

5   a ritonavir or cobicistat-boosted regimen (like Stribild), and doctors should carefully evaluate

6   whether it is appropriate to prescribe TDF as part of a boosted regimen in patients with renal risk

7   factors.

8       529.    There is no medical, clinical, or scientific basis for the differences between the

9   warnings contained in Gilead's labeling for its TDF-based products in the U.S. and its labeling for

10  the same products in the EU. Gilead knew that it should instruct doctors to monitor all patients for

11  multiple markers of kidney function on a frequent schedule but did not do so in the U.S.

12      530.    Gilead was more concerned with increasing or maintaining TDF Drug sales in the

13  U.S. by downplaying the safety risk and the need for careful, frequent monitoring of all patients than

14  it was in safeguarding patients from the known risks of TDF toxicity.

15      531.    In addition, until 2018, Gilead's U.S. warnings about the need to monitor patients for

16  renal effects of Viread, Truvada, Atripla, and Complera were also far weaker than the warnings it

17  gives to monitor patients for renal effects of TAF, even though TAF is far less toxic to kidneys than

18  TDF. Gilead has consistently warned doctors to monitor all patients taking TAF-based drugs for

19  multiple markers of renal function, including urine glucose and urine protein, not just estimated

20  creatinine clearance.

21      532.    For example, when the FDA approved Odefsey—the TAF version of Complera—on

22  March 1, 2016, Gilead gave stronger monitoring warnings for safer Odefsey than it did for

23  Complera, telling doctors that they should monitor all Odefsey patients, not just those at risk, for

24  multiple markers of kidney function:

| Complera's U.S. Label 03/01/2016 | Odefsey's Labeling 03/01/2016 |
|---|---|
| **It is recommended that estimated creatinine clearance be assessed in all patients prior to** | **Estimated creatinine clearance, urine glucose and urine protein should be assessed before** |

| Complera's U.S. Label 03/01/2016 | Odefsey's Labeling 03/01/2016 |
|---|---|
| **initiating therapy and as clinically appropriate during therapy** with COMPLERA. In patients at risk of renal dysfunction, including patients who have previously experienced renal events while receiving HEPSERA®, it is recommended that estimated creatinine clearance, serum phosphorus, urine glucose, and urine protein be assessed prior to initiation of COMPLERA and periodically during COMPLERA therapy. | **initiating ODEFSEY therapy and should be monitored during therapy in all patients.** Serum phosphorus should be monitored in patients with chronic kidney disease because these patients are at greater risk of developing Fanconi syndrome on tenofovir prodrugs. Discontinue ODEFSEY in patients who develop clinically significant decreases in renal function or evidence of Fanconi syndrome.[67] |

533.    When the FDA approved Descovy—the TAF version of Truvada—on April 4, 2016, Gilead gave stronger monitoring warnings for safer Descovy than it did for Truvada, telling doctors that they should monitor all Descovy patients, not just those at risk, for multiple markers of kidney function:

| Truvada U.S. Labeling 04/04/2016 | Descovy U.S. Labeling 04/04/2016 |
|---|---|
| It is recommended that **estimated creatinine clearance be assessed in all individuals prior to initiating therapy and as clinically appropriate during therapy** with TRUVADA. In patients at risk of renal dysfunction, including patients who have previously experienced renal events while receiving HEPSERA®, it is recommended that estimated creatinine clearance, serum phosphorus, urine | **Estimated creatinine clearance, urine glucose, and urine protein should be assessed before initiating DESCOVY therapy and should be monitored during therapy in all patients.** Serum phosphorus should be monitored in patients with chronic kidney disease because these patients are at greater risk of developing Fanconi syndrome on tenofovir prodrugs. Discontinue DESCOVY in patients |

---

[67] On August 17, 2017, Gilead updated its Odefsey label to tell doctors to all monitor all patients, not just those with chronic kidney disease, for serum phosphorus.

| Truvada U.S. Labeling 04/04/2016 | Descovy U.S. Labeling 04/04/2016 |
|---|---|
| glucose, and urine protein be assessed prior to initiation of TRUVADA, and periodically during TRUVADA therapy. | who develop clinically significant decreases in renal function or evidence of Fanconi syndrome. |

534.    Gilead determined that it should give stronger monitoring warnings for its safer TAF-based drugs, yet failed to strengthen its TDF Drug warnings for years.

**2.    Gilead failed to adequately warn patients about the risks of TDF.**

535.    Gilead failed to adequately warn patients about the risks of TDF, and the need to routinely monitor all patients taking TDF, in direct-to-consumer advertising and in patient labeling.

536.    Gilead promoted its TDF Drugs directly to patients through direct-to-consumer advertising, including print and online media. Like its sales force's promotion to doctors, Gilead's consumer advertising downplayed the risks of TDF toxicity by, among other things, hiding risk information relative to the benefits of the drugs, and suggesting that kidney and bone adverse events only occurred in, and monitoring was only necessary for, patients with risk factors for such injuries.

537.    For example, a print advertisement for Truvada that appeared in the November 2004 edition of *The Advocate*, the oldest and largest lesbian, gay, bisexual, and transgender magazine in the U.S., stated under the heading "Important Safety Information" that: "If you have had kidney problems or take other medicines that can cause kidney problems, your medical professional should do regular blood tests to check your kidneys." Yet Gilead knew by this time that adverse kidney events were not limited to at risk patients, and thus should have warned doctors and patients about the need for frequent monitoring of all patients.

538.    On March 26, 2010, the FDA issued another Warning Letter to Gilead, this time in connection with Gilead's direct-to-consumer print advertising for Truvada. The FDA stated that Gilead's Truvada advertisement was false and misleading because it overstated the efficacy of Truvada and minimized the risks associated with the drug, in violation of the Federal Food, Drug, and Cosmetic Act and FDA implementing regulations. The FDA noted that Truvada is associated with "serious risks" like new onset or worsening renal impairment, including cases of acute renal

failure and Fanconi syndrome (renal tubular injury with severe hypophosphatemia), and decreases in bone mineral density, including cases of osteomalacia (associated with proximal renal tubulopathy and which may contribute to fractures). The agency stated that Gilead's Truvada advertising was false or misleading because it failed to present the risks associated with Truvada with a prominence and readability comparable to the statements regarding the drug's benefits.

539.    In addition to the reasons set forth in the Warning Letter, the Truvada advertising was also false and misleading because, like the earlier Truvada advertising, it continued to suggest that kidney problems only occurred in, and monitoring was also necessary for, patients that had had kidney problems in the past or took other medications that can cause kidney problems.

540.    Upon information and belief, Gilead's other direct-to-consumer advertising for Viread, Truvada, Atripla, and Complera similarly failed to adequately warn patients about the true risk of TDF and the need to routinely monitor all patients for TDF-associated kidney and bone effects.

541.    Gilead's patient package inserts for Viread, Truvada, Atripla, and Complera also failed to warn about all patients' need to be routinely monitored by their doctors for adverse kidney and bone effects. The patient package inserts said nothing for years about monitoring anyone other those who were already at risk for kidney and bone problems despite Gilead's knowledge that TDF was injuring patients without identified risk factors for such injuries.

542.    Gilead's patient package inserts for Viread, Truvada, Atripla, and Complera failed to adequately warn patients even after Gilead had inadequately updated the warnings in its prescriber labeling.

543.    For example, Gilead did not disclose to patients that Viread may cause "new or worse kidney problems" until more than two years after Gilead added that warning to the Viread prescriber labeling. And Gilead waited many more years before it added the "new or worse kidney problems" disclosure to the patient package inserts for other TDF products; it did not appear in the Truvada patient package insert until June 17, 2013 and did not appear in the Atripla patient package insert until July 25, 2018—nearly five and ten years respectively after Gilead first warned doctors that TDF may cause "new onset or worsening renal impairment."

544.    Gilead similarly delayed disclosing to patients in the patient package inserts about doctors' need to assess all plaintiffs' kidney function prior to initiating treatment with TDF. Although Gilead added that warning to the Viread prescriber labeling in May 2007, it did not tell patients that "[y]our healthcare provider should do blood tests to check your kidneys before you start treatment" with TDF until August 16, 2012, for Viread, May 15, 2018, for Truvada, July 25, 2018, for Atripla, and January 25, 2013, for Complera. At a minimum, Gilead was grossly negligent in failing to ensure that its warnings to patients were consistent with those it gave to doctors and the patient warnings it gave were consistent among its various TDF Drugs.

### 3.    Gilead could have unilaterally strengthened its TDF drug labels.

545.    Gilead could have strengthened the Warnings, Precautions, and Adverse Events sections of the labels for its TDF Drugs unilaterally without prior FDA approval.

#### a.    Gilead could have unilaterally strengthened its warnings before FDA approval.

546.    Each time Gilead sought FDA approval for a new TDF Drug, it could have strengthened its label before the drug obtained FDA approval. Gilead bears primary responsibility for its drug labeling at all times, and was responsible for crafting adequate labels before the drugs were FDA approved. No federal law prevented Gilead from submitting a stronger warning label to the FDA prior to the initial approval of the TDF Drugs. And the FDA would not have prevented Gilead from strengthening its monitoring warnings in advance of FDA approval.

547.    Gilead's initial EU label for its first TDF Drug, Viread, included stronger monitoring warnings. As it did in the EU, Gilead could have included stronger warnings in its initial Viread label in the U.S.—had Gilead been concerned with patient safety rather than U.S. sales.

548.    Moreover, before Gilead submitted Truvada, Atripla, Complera, and Stribild for FDA approval in the U.S., it knew that it gave stronger monitoring warnings for its TDF Drugs in the EU. Gilead knew, as evidenced by its EU labels, that stronger warnings were warranted. It could have and should have used this knowledge to strengthen its U.S. labels.

549.    In addition, once TDF was on the market, each time Gilead submitted a new TDF Drug for FDA approval, it did so with years of cumulative knowledge as to the adverse toxic effects

of TDF. Faced with accumulating information about adverse kidney and bone toxicity, including in patients without preexisting risk factors, Gilead could have strengthened its monitoring warnings before submitting the drugs for FDA approval.

550.    The FDA would not have rejected Gilead's stronger warnings. The FDA has, in fact, approved labels including stronger monitoring warnings for the TDF Drugs, as well as the safer TAF drugs.

### b.    Gilead could have unilaterally strengthened its warnings after FDA approval.

#### (1)    Before August 22, 2008

551.    Prior to August 22, 2008, Gilead could have strengthened its Viread, Truvada, and Atripla labels via CBE without prior FDA approval. Under the CBE regulation in effect during that time, Gilead could have simply submitted a supplemental submission strengthening the labels' warnings and/or its instructions about the safe administration of the drugs. 21 C.F.R. § 314.70(c)(6)(iii).

552.    Among other things, Gilead could have strengthened the labels' warnings by providing additional information about laboratory tests helpful in following the patient's response or identifying possible adverse reactions, including such factors as the range of normal and abnormal values and the recommended frequency with which tests should be performed before, during, and after therapy. 21 C.F.R. § 201.57(c)(6).

553.    Prior to August 22, 2008, Gilead could have strengthened its labels via CBE without regard to whether it possessed information that it did not previously provide to the FDA.

554.    The FDA would not have rejected Gilead's supplemental submission to strengthen the TDF labels. The FDA has, in fact, approved labels including stronger monitoring warnings for the TDF Drugs, as well as the safer TAF drugs.

#### (2)    On and after August 22, 2008

555.    On and after August 22, 2008, when the CBE regulation was amended, Gilead could have unilaterally strengthened its TDF Drug labels post-FDA approval based on "newly acquired information," *i.e.*, information that was not previously presented to the FDA.

556.     Gilead could have strengthened the Warnings, Precautions, and Adverse Events sections of its labels unilaterally, without requiring prior FDA approval, based on, among other things: increasing post-approval evidence that patients with and without preexisting risk factors were experiencing kidney and bone adverse effects with a frequency greater than reported in Gilead's clinical trials; expanding post-approval evidence that all patients are at risk for TDF-induced nephrotoxicity, meaning that doctors should monitor all patients for multiple indicators of renal function, including tubular dysfunction; and Gilead's own post-approval determinations to give stronger warnings regarding the exact same TDF Drugs in the EU.

557.     Except for Stribild, Gilead's clinical trials of the TDF Drugs, upon which FDA approval was based, did not show significant nephrotoxicity of TDF, despite preclinical evidence demonstrating that TDF could be highly toxic to kidneys and bones. However, once Gilead started marketing TDF, patients quickly began experiencing TDF's nephrotoxic effects, some severe and irreversible. Although the FDA became aware, after the clinical trials through adverse event reporting, that TDF was injuring patients' kidneys and bones, it did not know the true frequency or severity of adverse events, injury, or risk associated with TDF.

558.     On May 21, 2007, Gilead changed its Viread label to instruct doctors to calculate creatinine clearance in all patients before initiating treatment with TDF and as clinically appropriate during therapy. Gilead recommended the monitoring of creatinine clearance and serum phosphorus only for patients at risk of renal impairment.

559.     This warning remained inadequate because it failed to instruct doctors to frequently monitor all patients for sufficiently sensitive markers of kidney function that could detect early signs of nephrotoxicity and thus prevent or lessen the harm of TDF. As Gilead had known since at least 2002, TDF was injuring patients with no preexisting risk factors for kidney impairment. Gilead's May 21, 2007 label change perpetuated the false distinction between patients "at risk" for TDF-induced nephrotoxicity and everyone else. But as subsequent studies would make clear, while there may be certain factors that increase a patient's risk of TDF-induced renal damage, *all TDF patients are at risk*—making frequent, careful monitoring of all patients essential for safe use of the drug.

1   560.    As clinicians' experience with TDF grew, the medical literature recognized that even

2   if TDF may not frequently impair kidneys' *glomerular function*—as measured by serum creatinine or

3   creatinine clearance—in the absence of established risk factors, TDF-induced damage to kidneys'

4   *tubular function* is much more common and cannot be adequately predicted by traditional risk factors

5   for kidney impairment or detected by monitoring for glomerular function. These new studies

6   demonstrated a heightened risk to all patients, leading study authors to conclude that all patients must

7   be frequently monitored for markers of tubular function—e.g., serum phosphorus, in addition to

8   creatinine clearance.

9   561.    For example, the 2009 paper, Labarga P., *et al.*, "Kidney tubular abnormalities in the

10   absence of impaired glomerular function in HIV patients treated with tenofovir," described the study

11   of glomerular and tubular function in 284 patients, 154 of whom took TDF, 49 of whom took another

12   HIV regimen, and 81 of whom took no antiretroviral drugs. The authors found that glomerular

13   function, as measured by plasma creatinine levels or creatinine clearance or both, was within normal

14   limits and comparable among all study groups. Tubular dysfunction, on the other hand, was far more

15   frequent in the TDF group (22%), as compared to those never treated with TDF (6%) or never

16   exposed to antiretrovirals (12%). The authors also identified three TDF patients with complete

17   Fanconi syndrome (the signature TDF toxicity), even though each patient's creatinine clearance was

18   within the normal range. After follow-up, the data showed that the TDF patients had a significantly

19   greater risk for tubular damage than patients never treated with TDF: an estimated 25% rate of

20   tubular dysfunction at 4 years for TDF patients compared to null for the rest.

21   562.    The Labarga study also found that no risk factor other than TDF use and old age was

22   predictive of tubular dysfunction. And because estimates of glomerular function like creatinine

23   clearance were not predictive of tubular function, the authors explained that unless tubular

24   parameters like urine glucose and/or phosphorus are routinely monitored, tubular abnormalities may

25   go undiagnosed. And if tubular damage persists unnoticed, patients may progress to more severe

26   kidney damage and experience a chronic loss of phosphorus, leading to bone mineral density loss

27   and premature osteoporosis. The authors recommended that all TDF patients be monitored for signs

28

1   of tubular damage so that a switch in therapy could be considered in the event of progressive

2   deterioration.

3          563.    A 2011 article, Hall AM *et al*., "Tenofovir-associated kidney toxicity in HIV-infected

4   patients: a review of the evidence," conducted a literature review and further addressed the

5   disconnect between results of studies examining markers of glomerular function with the

6   nephrotoxicity seen in practice. The authors noted that prior studies tended to establish that TDF was

7   not often significantly toxic to the glomerulus—which contrasted with the authors' clinical

8   experience in treating TDF patients for nephrotoxicity. In practice, TDF-associated nephrotoxicity

9   was the authors' most common reason for referral of HIV patients to specialist renal services. The

10  authors explained that the main site of TDF toxicity was the proximal renal tubule (not the

11  glomerulus) and that proximal tubule dysfunction may not be detected by measuring glomerular

12  filtration.

13         564.    Because (a) TDF-associated nephrotoxicity can occur in patients without obvious

14  risks factors and at highly variable times after the initiation of therapy, and (b) standard tests of

15  glomerular function are insufficiently sensitive to detect early or mild cases of nephrotoxicity, the

16  authors concluded that all patients on TDF should be carefully and routinely monitored (every 3

17  months during the first year then twice yearly) for signs of both glomerular and tubular dysfunction

18  so that long-term effects on kidney and bone health can be assessed.

19         565.    A 2012 paper, Scherzer, R., *et al.*, "Association of Tenofovir Exposure with Kidney

20  Disease Risk in HIV Infection," discussed the authors' study of 10,841 HIV-infected patients from

21  the Veterans Health Administration to assess the associations of tenofovir with kidney disease

22  outcomes. The authors found that each year of tenofovir exposure was associated with a 34%

23  increased risk of proteinuria, 11% increased risk of rapid decline in kidney function, and 33%

24  increased risk of chronic kidney disease. The results provided "strong evidence that tenofovir may

25  cause clinically significant toxicity to the kidney that is not reversible." The study also demonstrated

26  that traditional risk factors did not worsen the effects of tenofovir. The authors concluded that "while

27

28

traditional risk factors such as hypertension, older age, and diabetes may increase the risk for kidney disease, tenofovir is associated with elevated risk even in patients without preexisting risk factors."[68]

566.    The authors explained the strength of their results in light of the study's large patient population and inclusion of patients who are often excluded from clinical trials or do not qualify or volunteer for cohort studies. The authors contrasted their study with the design of previous studies which made them less able to detect statistically significant associations between tenofovir use and kidney disease.

567.    A 2013 paper, Reynes, J., *et al.*, "Tubular and glomerular proteinuria in HIV-infected adults with estimated glomerular filtration rate ≥60 ml/min per 1.73," recommended that all TDF patients be systematically monitored for markers of tubular injury in light of the authors' finding that nearly 20% of 1200 patients had proteinuria even though they had a normal creatinine-based estimated glomerlular filtration rate.

568.    And a 2014 paper, Bonjoch, A., *et al.*, "High prevalence of signs of renal damage despite normal renal function in a cohort of HIV-infected patients: evaluation of associated factors," also found that signs of renal damage were "highly frequent" even in patients with a normal estimated glomerlular filtration rate. The authors concluded that the data demonstrated the need for early detection of renal injury, even in patients with normal renal function.

569.    These papers, and others in this timeframe that demonstrated a high percentage of TDF patients with proximal renal tubular dysfunction, stand in stark contrast to Gilead's Viread clinical trials and subsequent attempts to maintain that only some TDF patients are at risk. Unlike the Viread clinical trials, these papers showed significant nephrotoxicity of TDF—with toxicity occurring at a high frequency and high risks of kidney disease outcomes looming even in patients with normal glomerular function and without traditional risk factors.

---

[68] The FDA cited the Scherzer study in connection with its medical review of the Stribild NDA in July 2012. At most, this demonstrates the FDA's knowledge of this study as of July 2012— approximately 4 years after the CBE regulation requiring "newly acquired information" became effective.

570.     The clinical trials reported that the frequency of renal events leading to drug discontinuation was low (0.4%). Despite these results, Gilead knew that the potential for TDF to be toxic was high, particularly in real world settings over the long-term. And, indeed, multiple retrospective studies have demonstrated that the rate of renal adverse events leading to drug discontinuation was many times higher than what was reported in clinical trials. For example, the 2011 paper, "Tenofovir-induced renal toxicity in 324 HIV-infected antiretroviral-naïve patients," found that drug discontinuation due to decline in GFR or tubular dysfunction was 9.2%.

571.     Postmarketing adverse event reports did not put the FDA on notice of the frequency or severity of the risk. Adverse event reports underreport the true incidence of adverse events because they are based on voluntary reporting. And they do not reflect the damage TDF inflicts on kidneys and bones before renal function declines, the risk of future adverse kidney or bone outcomes, nor the benefits of frequent, careful monitoring of all patients for early signs of nephrotoxicity as demonstrated by these new studies.

572.     Further, there is no evidence that Gilead submitted to the FDA analyses demonstrating that TDF patients have a high frequency of renal damage or the true extent of the risk nephrotoxicity poses to all TDF patients even if they have normal glomerular function or do not have preexisting risk factors.

573.     Gilead did not submit analyses to the FDA establishing the full extent of the frequency or severity of risk that TDF poses to all patients, nor did it tell the FDA that the one marker of kidney function Gilead was warning doctors to monitor in all patients after May 21, 2007 could not adequately detect the type of kidney injury that was frequently occurring in all TDF patients (and, which left unchecked, would cause more severe kidney injury and also harm patients' bones). Gilead could have analyzed the accumulating data demonstrating the higher frequency and severity of the risk to all TDF patients and strengthened its warnings, but did not.

574.     Until the FDA's review of the Stribild NDA in 2012, there is no evidence that the agency reviewed any medical literature regarding TDF or other analyses describing how post-approval renal and bone injury and/or adverse events were occurring at a frequency or severity much greater than that reported in the registrational clinical trials. The FDA based its approval of Viread

on the preclinical data and clinical trials Gilead submitted in its Viread NDA. After Viread was approved, the FDA based its approvals of the Truvada, Atripla, and Complera NDAs on Gilead's data showing the bioequivalence of those combination drugs to their individual components. The FDA's approvals of Truvada, Atripla, and Complera were not based on any new clinical studies or other analyses regarding safety of TDF. When the FDA conducted a more searching review in connection with the Stribild NDA, Gilead proposed and the FDA approved stronger monitoring warnings for Stribild, which included recommending the monitoring of all patients for glomerular and tubular injury.

575.    Unlike in the U.S., Gilead did warn—since 2002—physicians in the EU to frequently monitor all patients for both glomerular (creatinine clearance) and tubular (serum phosphorus) injury. In fact, after Gilead received FDA approval to market each of the TDF Drugs, it repeatedly determined to give stronger monitoring warnings for the exact same TDF Drugs in the EU. Upon information and belief, Gilead did not disclose to the FDA that it gave stronger monitoring warnings in the EU for the exact same products nor did it disclose its scientific or medical reasons for doing so.

576.    In addition, once Gilead finally launched the safer TAF-based drugs (after approval of the TDF Drugs) it also gave stronger monitoring warnings for the safer TAF drugs than it gave in the TDF Drugs' labels, including recommending that doctors monitor all patients for both glomerular and tubular injury.

577.    The FDA would not have rejected a label change strengthening monitoring recommendations to protect all patients from risks of TDF-induced kidney and bone adverse effects. In 2018, the FDA did, in fact, approve labels including stronger monitoring warnings for Viread, Truvada, Atripla, and Complera, like it did for the safer TAF drugs years earlier.

### VI.    TOLLING OF THE STATUTE OF LIMITATIONS

578.    Gilead misrepresented that TAF was "new" despite knowing that it had discovered the benefits of TAF even before Viread was approved in 2001.

579.    Gilead misrepresented the reasons that it shelved TAF in 2004, asserting that TAF could not be differentiated from TDF when it knew that TAF was, in fact, highly differentiated from TDF.

580.    Gilead concealed that it shelved TAF in 2004 in order to extend the lifecycle of its HIV product portfolio while patients were injured by TDF-induced kidney and bone toxicity.

581.    Gilead misrepresented that it renewed development of TAF because of the needs of an aging HIV population. Gilead knew by 2004 when it halted TAF development that, as a result of cART, many HIV patients had a normal life expectancy.

582.    For years, Gilead has publicized the pretext for its decision to halt and then renew TAF development in order to conceal the existence of Plaintiffs' claims.

583.    Gilead concealed that it did not reduce the dose of TDF in Stribild even though it knew to reduce the tenofovir prodrug dose when combined with cobicistat.

584.    Gilead concealed the true risk of kidney and bone injuries TDF posed to patients who did not have preexisting risk factors for such injuries and concealed from U.S. doctors and patients what it knew about the need to monitor all patients for TDF associated toxicity.

585.    Because of Gilead's misrepresentations and omissions, plaintiffs did not know and had no reason to suspect that Gilead's wrongdoing was the cause of their injuries and could not have discovered their claims.

586.    No reasonable person taking TDF-based drugs and experiencing kidney and bone toxicities would have suspected that Gilead purposefully withheld a safer design that would have ameliorated those very side effects.

587.    No reasonable person without prior risk factors for renal or bone harm taking TDF-based drugs and experiencing kidney and bone toxicities would have suspected that Gilead failed to adequately warn them because the label misleadingly suggests that only patients with preexisting risk factors were in danger.

588.    No reasonable person would have suspected that Gilead provided stronger warnings to patients and doctors in the EU than it did in the U.S. for the exact same TDF products.

589.     Gilead's misrepresentations and omissions would lead a reasonable person to believe that he or she did not have a claim for relief.

590.     Because of Gilead's misrepresentations and omissions, neither Plaintiffs nor any reasonable person would have had reason to conduct an investigation. Once Plaintiffs suspected that Gilead's wrongdoing was the cause of their injuries, they were diligent in trying to uncover the facts.

591.     Gilead's misrepresentations and omissions regarding its refusal to earlier market TAF-designed products and the true risks of TDF constitute continuing wrongs that continue to this day.

## VII.    CLAIMS FOR RELIEF[69]

### COUNT I

**STRICT PRODUCTS LIABILITY – DESIGN DEFECT
UNDER THE LAWS OF THE STATES OF ALABAMA,[70] ARIZONA, ARKANSAS,
COLORADO, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND,
MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, OKLAHOMA,
OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND
WISCONSIN**

592.     Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

593.     Gilead is the manufacturer and seller of the TDF Drugs.

594.     The TDF Drugs reached Plaintiffs without substantial change to the condition in which they were sold.

595.     The TDF Drugs are unreasonably dangerous and unsafe for their intended purpose because they include TDF, which causes kidney and bone toxicity, as the design for delivering tenofovir to the body. The design defect existed in these products at the time they left Gilead's possession.

---

[69] Plaintiffs assert claims under the laws of the states in which they reside and ingested the relevant TDF Drugs.

[70] The Alabama Plaintiffs assert their claims under the judicially-created Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").

596.     Stribild is also unreasonably dangerous and unsafe for its intended purpose because it combines 300 mg TDF with cobicistat, which enhances TDF toxicity. The design defects existed in Stribild at the time it left Gilead's possession.

597.     The TDF Drugs are not as safe as current technology could make them, nor were they as safe as then-current technology could make them when Gilead first manufactured and distributed each of the TDF Drugs.

598.     The TDF Drugs were not incapable of being made safe at the time of manufacture and distribution. Gilead knew, before it manufactured and distributed each of the TDF Drugs, that TAF was more potent than TDF and reduced the risk of kidney and bone toxicity compared to TDF. Gilead also knew that it could reduce the dose of TDF in Stribild and achieve the same antiviral response with less kidney and bone toxicity. The TDF Drugs are therefore not unavoidably unsafe.

599.     The risks of patient harm associated with TDF-induced kidney and bone toxicity were both known to and foreseeable to Gilead.

600.     Gilead could have reduced or prevented the foreseeable risks of harm associated with TDF by adopting a reasonable and feasible alternative design. Gilead could have incorporated the safer TAF design, which it knew reduces the risks of kidney and bone toxicity and is safer than TDF, into the TDF Drugs before they were approved by the FDA. Gilead did utilize the TAF design instead of TDF in other FDA-approved products that are identical to the TDF Drugs except for the substitution of TAF for TDF. Gilead markets its TAF-designed products as safer than the TDF Drugs and advocates that doctors switch their patients from a TAF-designed to a TDF-designed product because of TAF's superior safety profile with respect to kidney and bone toxicity.

601.     A drug product containing TAF could have and would have been FDA approved and on the market years earlier if Gilead had not purposefully shelved the TAF design for approximately six years in order to make more money.

602.     Gilead could have reduced or prevented the foreseeable risks of harm associated with Stribild by adopting another reasonable and feasible alternative design. Gilead could have reduced the dose of TDF in Stribild before it was approved by the FDA because, as it knew for years, tenofovir concentrations rise significantly when tenofovir is combined with a boosting agent like

cobicistat. The reasonableness and feasibility of this alternative design is demonstrated by, *inter alia*, the fact that Gilead reduced the dose of the tenofovir prodrug TAF in Genvoya, which is identical to Stribild except for the substitution of TAF for TDF.

603.    The likelihood and severity of the kidney and bone injuries suffered by patients like Plaintiffs far outweighed Gilead's burden in taking safety measures to reduce or avoid the harm. Given the sheer number of people taking the TDF Drugs, including over the long-term, there was a high likelihood that TDF would injure a very large number of patients, and that a significant number of those injuries would be irreversible. Gilead's burden was small. Gilead had already discovered the safer TAF method of introducing tenofovir into the body before it sought FDA approval for each of the TDF Drugs and using the TAF design would have no adverse impact on the utility of the products.

604.    TAF-based alternative designs, and a reduced TDF dose design of Stribild, would have accomplished the product's purpose at lesser risk. This is how Gilead markets its TAF-designed products today—a as equally or more effective than the TDF Drugs with a reduced risk of kidney and bone toxicity.

605.    Gilead knew that ordinary patients would use the TDF Drugs without knowledge of the hazards involved in such use. The TDF Drugs failed to perform as an ordinary consumer would expect.

606.    Gilead knowingly designed its TDF Drugs with TDF rather than safer TAF to maximize profits on its portfolio of TDF profits and extend the lifecycle of its HIV franchise, which formed the backbone of Gilead's operations. Gilead withheld its safer TAF design to make more money at the expense of patients' health.

607.    The benefit in promoting enhanced accountability through strict products liability outweighs the benefit of a product that Gilead should have and could have made safer years earlier.

608.    Plaintiffs ingested one or more of the TDF Drugs for an approved purpose and experienced bone and/or kidney injuries while taking TDF.

609.    Plaintiffs' bone and kidney toxicity-related injuries were directly and proximately caused by TDF while Plaintiffs used the TDF Drugs in a reasonably foreseeable manner.

**COUNT II**

**STRICT PRODUCTS LIABILITY – FAILURE TO WARN
UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS,
CALIFORNIA, COLORADO, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS,
MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK,
OKLAHOMA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, AND
WISCONSIN**

610.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

611.    Gilead is the manufacturer and seller of the TDF Drugs.

612.    Gilead was aware of the risks TDF posed to patients' kidneys at bones, and the risks TDF posed to patients' kidneys and bones were knowable, at the time Gilead manufactured, sold, or distributed the TDF Drugs.

613.    The risks TDF posed to patients' kidneys and bones were known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution.

614.    The need to frequently monitor all TDF patients for kidney toxicity using more than one insufficient marker of kidney function to ensure the safe use of TDF was known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution of the TDF Drugs.

615.    TDF posed a substantial danger to patients' kidneys and bones.

616.    Ordinary consumers and physicians would not have recognized the potential risks TDF posed to patients' kidneys and bones.

617.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the risks TDF posed to patients' kidneys and bones, and the proper and safe use of the TDF Drugs.

618.    The inadequate warnings and instructions Gilead did provide were minimized, eroded, and nullified by Gilead's improper promotion of the TDF Drugs to doctors.

619.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians that all TDF patients needed to be monitored frequently, on a specific schedule, for TDF-associated toxicity.

620.     Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians that all TDF patients' kidney function needs to be monitored by measuring more than one insufficient marker of kidney function.

621.     Plaintiffs were injured by using TDF in a reasonably foreseeable way.

622.     The lack of adequate warnings and instructions was a substantial factor in causing Plaintiffs' injuries.

623.     Had Gilead adequately warned and instructed Plaintiffs, Plaintiffs would have taken the TDF Drugs in a safer way.

624.     Had Gilead adequately warned and instructed Plaintiffs' doctors, Plaintiffs' doctors would have read and heeded such adequate warnings and instructions.

625.     Plaintiffs' properly warned physicians would have monitored Plaintiffs differently—by frequently monitoring Plaintiffs using sufficiently sensitive markers of kidney function that would have alerted doctors to early signs of nephrotoxicity, including tubular damage that leads to more severe renal adverse events and bone mineral density loss. Once they recognized the signs of nephrotoxicity, Plaintiffs' physicians would have taken further action after weighing their treatment options, such as increased monitoring, less frequent dosing, or drug discontinuation, before the damage manifested, worsened, or became irreversible. Plaintiffs' properly warned physicians would have detected TDF toxicity earlier, thus preventing or lessening Plaintiffs' injuries.

626.     Plaintiffs' bone and kidney toxicity-related injuries were directly and proximately caused by Gilead's inadequate warnings.

## COUNT III

### INDIANA PRODUCTS LIABILITY ACT, BURNS IND. CODE ANN. §§ 34-20-1-1 *ET SEQ.*

627.     Indiana Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

628.     Gilead sold or otherwise put the TDF Drugs into the stream of commerce in a defective condition unreasonably dangerous to users and consumers like Plaintiffs.

629.     The TDF Drugs are defective in design and because Gilead failed to adequately warn about the dangers and proper use of the products.

630.     Indiana Plaintiffs are in the class of persons that Gilead should reasonably foresee as being subject to the harm caused by the TDF Drugs' defective condition.

631.     Gilead is in the business of selling pharmaceuticals like the TDF Drugs.

632.     The TDF Drugs were expected to and did reach users and consumers like Plaintiffs without substantial alteration in the condition in which Gilead sold them.

633.     At the time Gilead conveyed the TDF Drugs to another party, the TDF Drugs were in a defective condition not contemplated by reasonable persons among those considered expected users or consumers of the products and that will be unreasonably dangerous to the expected user or consumer when used in reasonably expected ways of handling or consumption.

634.     The TDF Drugs are defective because Gilead failed to properly and adequately label the products to give reasonable warnings of the danger about the products or give reasonably complete instructions on proper use of the products. By exercising reasonable diligence, Gilead could have made adequate warnings and instructions available to users like Plaintiffs.

635.     Gilead failed to exercise reasonable care under the circumstances in designing the TDF Drugs and in providing warnings or instructions regarding the TDF Drugs.

636.     The TDF Drugs were not incapable of being made safe for their reasonably expectable use.

637.     Indiana Plaintiffs suffered physical injuries to their kidneys and/or bones which were proximately caused by the TDF Drugs.

## COUNT IV

### LOUISIANA PRODUCTS LIABILITY ACT, LA. R.S. §§ 9:2800.51 *ET SEQ.*

638.     Louisiana Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

639.     The TDF Drugs are unreasonably dangerous in design because, at the time they left Gilead's control, there existed an alternative design for the products that were capable of preventing

Plaintiffs' injuries, and the likelihood that the products' design would cause Plaintiffs' damage and the gravity of that damage outweighed Gilead's burden in adopting the alternative design. There is no adverse effect of using the alternative design on the utility of the product.

640.    At the time the TDF Drugs left Gilead's control, Gilead knew and in light of then-existing reasonably available scientific and technical knowledge should have known of the design characteristic that caused the damage or the danger of such characteristic.

641.    At the time the TDF Drugs left Gilead's control, Gilead knew and in light of then-existing reasonably available scientific and technical knowledge should have known of the alternative design.

642.    The TDF Drugs are unreasonably dangerous due to the lack of an adequate warning. At the time the TDF Drugs left Gilead's control, and after the TDF Drugs left Gilead's control, the TDF Drugs possessed a characteristic that may cause damage and Gilead failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users of the products. The TDF Drugs are dangerous to an extent beyond which would be contemplated by the ordinary user, with ordinary knowledge common to the community as to the product's characteristics.

643.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Louisiana Plaintiffs' injuries and damages for which recovery is sought.

**COUNT V**

**MISSISSIPPI PRODUCTS LIABILITY ACT, MISS. CODE ANN. §§ 11-1-63**

644.    Mississippi Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

645.    Gilead designed the TDF Drugs in a defective manner.

646.    The TDF Drugs failed to function as expected and there existed a feasible design alternative that would have, to a reasonable probability, prevented the harm without impairing the utility, usefulness, practicality or desirability of the products to users or consumers.

647.    The TDF Drugs are also defective because Gilead failed to provide adequate warnings or instructions as to the safe use of the products.

648.    At the time the TDF Drugs left Gilead's control, Gilead knew, or in light of reasonably available knowledge should have known, about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize the dangerous condition of the TDF Drugs.

649.    The TDF Drug warnings that Gilead provided did not sufficiently warn of the dangers or the safe use of the products.

650.    The defective condition of the TDF Drugs rendered the products unreasonably dangerous to users and consumers like Mississippi Plaintiffs.

651.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Plaintiffs' injuries and damages for which recovery is sought.

**COUNT VI**

**NEW JERSEY PRODUCTS LIABILITY ACT, N.J. STAT. §§ 2A:58C-1 *ET SEQ.***

652.    New Jersey Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

653.    The TDF Drugs are not reasonably fit, suitable or safe for their intended purpose because Gilead designed them in a defective manner and failed to give adequate warnings or instructions at the time the TDF Drugs left Gilead's control and thereafter.

654.    At the time the TDF Drugs left Gilead's control, there was a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the products.

655.    The TDF Drugs are not unavoidably unsafe and the harm was not caused by an unavoidably unsafe aspect of the products.

656.    The TDF Drug warnings that Gilead provided did not sufficiently warn of the dangers or safe use of the products.

657.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused New Jersey Plaintiffs' injuries and damages for which recovery is sought.

1

2

## COUNT VII

## OHIO PRODUCT LIABILITY ACT, ORC ANN. §§ 2307.71 *ET SEQ.*

3  658.   Ohio Plaintiffs reallege and incorporate the allegations made above as if fully set forth

4  below, including but not limited to the allegations specifically contained in the paragraphs

5  corresponding to Counts I and II above.

6  659.   At the time the TDF Drugs left Gilead's control, the foreseeable risks associated with

7  the design exceeded the benefits of the design.

8  660.   At the time the TDF Drugs left Gilead's control, there existed a practical and

9  technically feasible alternative design or formulation that would have prevented the harm for which

10  Plaintiffs seek to recover compensatory damages without substantially impairing the usefulness or

11  intended purpose of the product.

12  661.   The TDF Drugs were and are not unavoidably unsafe. Based on the state of technical,

13  scientific and medical knowledge at the time the TDF Drugs left Gilead's control, Gilead could have

14  made the TDF Drugs safe by utilizing the TAF design.

15  662.   At the time the TDF Drugs left Gilead's control, Gilead knew, or in the exercise of

16  reasonable care, should have known about the risk of TDF-induced kidney and bone toxicity and

17  Gilead failed to provide the warning or instruction that a manufacturer exercising reasonable care

18  would have provided regarding that risks, in light of the likelihood that the product would cause

19  harm to patients' kidneys and bones and the severity of that harm.

20  663.   At the relevant time after the TDF Drugs left Gilead's control, Gilead knew, or in the

21  exercise of reasonable care, should have known about the risk of TDF-induced kidney and bone

22  toxicity and Gilead failed to provide the post-marketing warning or instruction that a manufacturer

23  exercising reasonable care would have provided regarding the risks, in light of the likelihood that the

24  product would cause harm to patients' kidneys and bones and the severity of that harm.

25  664.   At the time the TDF Drugs left Gilead's control, they did not conform to Gilead's

26  representations regarding the safety of the drugs.

27  665.   The defective condition of the TDF Drugs proximately caused Ohio Plaintiffs'

28  injuries and damages for which recovery is sought.

**COUNT VIII**

**WASHINGTON PRODUCTS LIABILITY ACT, REV. CODE WASH. §§ 7.72-010 *ET SEQ.***

666.    Washington Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including but not limited to the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

667.    The TDF Drugs are not reasonably safe as designed and not reasonably safe because adequate warnings or instructions were not provided.

668.    At the time of manufacture, the likelihood that the TDF Drugs would cause Plaintiffs' harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

669.    At the time of manufacture, the likelihood that the TDF Drugs would cause Plaintiffs' harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions inadequate and Gilead could have provided adequate warnings or instructions.

670.    After the time of manufacturer, Gilead learned or a reasonably prudent manufacturer should have learned about a danger connected with the TDF Drugs. Gilead's failure to exercise reasonable care to inform consumers about the dangers after it learned about them rendered the warnings or instructions inadequate.

671.    The defective and unreasonably dangerous condition of the TDF Drugs proximately caused Washington Plaintiffs' injuries and damages for which recovery is sought.

**COUNT IX**

**NEGLIGENCE AND GROSS NEGLIGENCE**
**UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, AND WISCONSIN**

672.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

673.     Gilead has a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including the TDF Drugs.

674.     Gilead has a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that its pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

675.     Gilead has a duty to monitor the adverse effects associated with its pharmaceutical products, including the TDF Drugs.

676.     Gilead has a continuing duty to warn of the adverse effects associated with its pharmaceutical products, including the TDF Drugs, to avoid reasonably foreseeable risks.

677.     Gilead has a duty to identify any laboratory tests helpful in identifying adverse reactions and the recommended frequency with which such tests should be performed.

678.     Gilead has a duty to exercise reasonable care when it undertakes affirmative acts for the protection of others.

679.     Gilead owes these duties to Plaintiffs because it was foreseeable to Gilead that patients like Plaintiffs would ingest and consequently be endangered by its TDF Drugs.

680.     Gilead knew that the TDF design it incorporated into the TDF Drugs was associated with risks of kidney and bone toxicity and caused injuries that resulted from kidney and bone toxicity – including in patients not otherwise at risk for such injuries. Gilead's knowledge that TDF harmed patients' kidneys and bones only grew with each year TDF was on the market. By the time Stribild entered the market, Gilead had more than a decade's worth of knowledge that TDF was toxic to kidneys and bones.

681.     Gilead knew that combining 300 mg of TDF with cobicistat resulted in even greater toxicity, and that it could reduce the tenofovir prodrug dose when combined with cobicistat and achieve the same therapeutic effects. Despite this knowledge, Gilead did not reduce the TDF dose in Stribild.

682.     Gilead knew, before its first TDF Drug and every subsequent TDF Drug was approved by the FDA, that TAF is safer than TDF in that it reduces the risks of kidney and bone toxicities associated with TDF. Despite knowing that TAF would reduce foreseeable harm to

1    patients' kidneys and bones, Gilead repeatedly incorporated the TDF design into the TDF Drugs

2    prior to FDA approval and prevented patients from taking a safer TAF-based product so Gilead

3    could make more money.

4         683.    Based, *inter alia*, on its duty to monitor the adverse effects associated with Viread,

5    Truvada, Atripla, Complera, and Stribild, Gilead knew that the likelihood and severity of the harm

6    associated with TDF was great. Thousands of patients experienced damage to their kidneys and

7    bones as a result of TDF exposure—some of it severe and irreversible. The likelihood and severity of

8    the kidney and bone injuries suffered by patients like Plaintiffs far outweighed Gilead's burden in

9    taking safety measures to reduce or avoid the harm. Gilead had already designed the safer TAF

10   method of introducing tenofovir into the body before it sought FDA approval for the TDF Drugs.

11   Gilead had also reduced the TAF dose when combined with cobicistat in Genvoya, when it was

12   developing Stribild.

13        684.    Gilead failed to exercise ordinary care in the design, manufacture, and sale of the TDF

14   Drugs.

15        685.    Gilead failed to use the amount of care in designing the TDF Drugs that a reasonably

16   careful manufacturer would have used to avoid exposing patients to foreseeable risks of harm.

17        686.    Gilead undertook to develop and market a safer TAF-designed product to sell to

18   wholesalers and other direct purchasers of pharmaceuticals. Gilead recognized that its development

19   and marketing of safer TAF-designed products was for the protection of patients like Plaintiffs. By

20   shelving the safer TAF design purely for monetary gain and misrepresenting why it was abandoning

21   the safer TAF design, Gilead failed to exercise reasonable care in the performance of this

22   undertaking that increased the risk of harm to patients like Plaintiffs. Gilead's failure to exercise

23   reasonable care resulted in physical harm to Plaintiffs.

24        687.    Gilead failed to use the amount of care in warning about the risks and safe use of the

25   TDF Drugs that a reasonably careful manufacturer would have used to avoid exposing patients to

26   foreseeable risks of harm.

27        688.    Gilead knew or reasonably should have known that the TDF Drugs were dangerous or

28   likely to be dangerous when used in a reasonably foreseeable manner.

689.    Gilead knew or reasonably should have known that Plaintiffs and Plaintiffs' physicians would not realize the danger posed by inadequate monitoring of patients taking TDF Drugs.

690.    Gilead failed to adequately warn Plaintiffs and Plaintiffs' physicians about the need to monitor all patients taking the TDF Drugs. For years, Gilead failed to recommend that doctors monitor anyone other than patients "at risk" for TDF-induced kidney and/or bone injuries. When Gilead finally added a weak instruction regarding the monitoring of all patients for kidney damage, it only warned doctors to monitor patients for one insufficient marker of kidney dysfunction that was incapable of detecting many dangerous changes in kidney dysfunction, and failed to warn doctors to monitor TDF patients on a frequent schedule. Gilead's monitoring warnings with respect to "at risk" Viread, Truvada, Atripla, and Complera users and Stribild users were also inadequate because they failed to warn doctors to monitor patients on a specific, frequent schedule.

691.    A reasonable manufacturer and seller under the same or similar circumstances would have instructed Plaintiffs and Plaintiffs' physicians on the safe use of the TDF Drugs, i.e., use where doctors frequently monitored all TDF patients for TDF-associated toxicity, including monitoring for kidney damage using more than one inadequate test. Gilead knew to warn doctors to frequently monitor all patients for kidney damage using more than one inadequate test because it did so in the European Union.

692.    Gilead's failure to adequately warn Plaintiffs and Plaintiffs' doctors about the need to monitor TDF Drug patients was compounded by Gilead's omissions to doctors during sales detailing and other promotional activities. Gilead's misleading promotion of the TDF Drugs undermined the efficacy of its existing (inadequate) warnings.

693.    Plaintiffs were injured by using TDF in a reasonably foreseeable way.

694.    The lack of adequate warnings was a substantial factor in causing Plaintiffs' injuries.

695.    Had Gilead adequately warned Plaintiffs' doctors, Plaintiffs' doctors would have read and heeded such adequate warnings.

696.    Plaintiffs' properly warned physicians would have monitored Plaintiffs differently— by frequently monitoring Plaintiffs using sufficiently sensitive markers of kidney function that would

have alerted doctors to early signs of nephrotoxicity, including tubular damage that leads to more severe renal adverse events and bone mineral density loss. Once they recognized the signs of nephrotoxicity, Plaintiffs' physicians would have taken further action after weighing their treatment options, such as increased monitoring, less frequent dosing, or drug discontinuation, before the damage manifested, worsened, or became irreversible. Plaintiffs' properly warned physicians would have detected TDF toxicity earlier, thus preventing or lessening Plaintiffs' injuries.

697.    Plaintiffs were injured as a direct and proximate result of Gilead's negligence.

698.    Gilead's conduct constitutes gross negligence and willful misconduct.

699.    By designing the TDF Drugs to contain TDF when it knew TDF harmed patients' kidneys and bones, and intentionally withholding the safer TAF design from patients, while failing to adequately warn of the known risks and safe use of TDF, Gilead acted in reckless disregard of, or with a lack of substantial concern for, the rights of others. By designing Stribild to contain 300 mg TDF when it knew to reduce the tenofovir prodrug dose with combined with cobicistat, Gilead acted in reckless disregard of, or with a lack of substantial concern for, the rights of others.

700.    Gilead intentionally designed the TDF Drugs to contain 300 mg TDF and withheld the safer designs from patients while in disregard of the known risk of TDF-induced kidney and/or bone toxicity, making it highly probable that harm would result.

701.    Gilead knew that its conduct would harm patients like Plaintiffs but Gilead withheld its safer designs to make more money.

**COUNT X**

**FRAUD BY OMISSION**
**UNDER THE LAWS OF THE STATES OF ALABAMA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, KENTUCKY, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, AND WISCONSIN**

702.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

703.    Gilead has a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including the TDF Drugs.

704.    Gilead has a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that its pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

705.    Gilead has a duty to monitor the adverse effects associated with pharmaceutical products, including Stribild.

706.    Gilead has a duty to exercise reasonable care when it undertakes affirmative acts for the protection of others.

707.    Gilead owes these duties to Plaintiffs because it was foreseeable to Gilead that patients like Plaintiffs would ingest and consequently be endangered by the TDF Drugs.

708.    Gilead also owed a duty to speak because it was in possession of information about TDF and TAF that was not readily available to Plaintiffs and Plaintiffs' physicians, made partial representations about TDF and TAF to Plaintiffs and Plaintiffs' physicians while suppressing material facts, and actively concealed material information about TDF and TAF from Plaintiffs and Plaintiffs' physicians, including that: (a) Gilead knew about the safer TAF design for delivering tenofovir into the body prior to seeking and receiving FDA approval for the TDF Drugs but designed the TDF Drugs to include TDF anyway, even though it knew that TDF posed a significant and increased safety risk to patients' kidneys and bones; (b) the toxicity associated with tenofovir was not unavoidable; (c) the real reason Gilead abandoned its TAF design in 2004 was not because TAF could not be sufficiently differentiated from TDF; (d) Gilead had already determined that it should reduce the dose of tenofovir prodrug when combining it with cobicistat at the time it was developing Stribild but Gilead did not reduce the TDF dose in Stribild as it did with Genvoya; (e) Gilead purposefully withheld the TAF design, which it knew was safer than TDF, solely to make more money; and (f) Gilead knew to warn doctors to frequently monitor all patients for the adverse effects of TDF toxicity using more than one insufficient marker of kidney function even though it did not do so in its warnings to doctors in the U.S.

709.    Gilead knew that this information was not readily available to Plaintiffs and their doctors, and Plaintiffs and their doctors did not have an equal opportunity to discover the truth.

Plaintiffs and their doctors had no practicable way of discovering the true state and timing of Gilead's knowledge.

710.    Gilead intentionally omitted from its prescriber and patient labeling an adequate warning regarding the need for doctors to monitor all TDF patients, on a frequent, specific schedule, for the adverse effects of TDF-associated bone and kidney toxicity. Gilead intentionally omitted an adequate monitoring warning in order to conceal the true risk of its TDF-based antiviral products, and to inflate sales by inducing doctors to prescribe, and patients like Plaintiffs to consume, its TDF Drugs. By providing inadequate warnings that were contrary to those it gave with respect to the exact same drugs in the EU, Gilead partially disclosed material facts. Gilead had a duty of complete disclosure once it began to speak.

711.    Plaintiffs and their doctors justifiably relied on Gilead's product labeling and other representations.

712.    Had Gilead not omitted this information about the safe use of its drugs from the prescriber and patient labeling, doctors would have performed, and patients would have insisted upon, frequent and adequate monitoring for the kidney and bone problems that have injured Plaintiffs. But for Gilead's omissions, Plaintiffs would have consumed the TDF Drugs in a safer way.

713.    If Plaintiffs had been adequately monitored for kidney and bone problems while taking TDF, they would not have been injured or their injuries would have been less severe.

714.    Gilead intentionally concealed from Plaintiffs and their doctors the fact that Gilead had already developed the safer TAF mechanism but designed the TDF Drugs to contain TDF instead of the safer TAF design in order to maximize profits on its TDF-based products and extend its ability to profit on its HIV franchise for years to come. Gilead actively concealed these material facts by, *inter alia*, misrepresenting: (a) that any tenofovir-induced toxicity was rare and unavoidable; (b) why Gilead had purportedly abandoned development of TAF in 2004; and (c) that TAF was "new" once Gilead finally introduced the safer TAF design over a decade later.

715.     Gilead also intentionally concealed from Plaintiffs and their doctors that Gilead knew that the tenofovir prodrug dose should be reduced when combined in a fixed dose combination pill with cobicistat, but did not reduce the TDF dose in Stribild as it did with Genvoya.

716.     By concealing that Gilead was aware of but had withheld the safer designs, Gilead intended to and did induce Plaintiffs' doctors to prescribe, and Plaintiffs to ingest, one or more of the TDF Drugs, thereby causing Plaintiffs' injuries.

717.     Plaintiffs and their doctors justifiably relied on Gilead's omissions regarding TAF.

718.     Had Gilead disclosed that it was aware of, but intentionally withheld, the safer TAF mechanism for delivering tenofovir into the body, Plaintiffs would have ingested TDF in a safer manner.

719.     Plaintiffs' doctors would have ensured that Plaintiffs ingested TDF in a safer manner through increased and/or more careful monitoring for TDF-induced kidney and bone toxicity, or by prescribing TDF without coadministration with cobicistat.

720.     Plaintiffs were injured as a direct and proximate result of Gilead's material omissions.

## COUNT XI

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE LAWS OF THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, COLORADO, DELAWARE, ILLINOIS, MARYLAND, MINNESOTA, MISSOURI, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, SOUTH CAROLINA, TENNESSEE, TEXAS, AND VIRGINIA**

721.     Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

722.     Gilead is the manufacturer and seller of the TDF Drugs.

723.     An implied warranty of fitness for human consumption runs from Gilead to consumers like Plaintiffs.

724.     Gilead impliedly warranted to Plaintiffs and their doctors that the TDF Drugs were of merchantable quality, and fit and safe for the use for which they were intended.

725.     Plaintiffs ingested the TDF Drugs for the treatment of HIV, Hepatitis B, or PrEP, which is the purpose for which the drugs were manufactured, sold, and prescribed.

726.    Plaintiffs relied on Gilead's skill or judgment to provide a product suitable for this purpose. Gilead is in the business of designing, manufacturing, selling, and marketing prescription drugs and specializes in drugs for the treatment or prevention of HIV, and treatment of Hepatitis B.

727.    Gilead had reason to know that Plaintiffs and their doctors would rely on Gilead's skill or judgment.

728.    The TDF Drugs are unfit for the purpose for which they were purchased because they are toxic to patients' kidneys and bones when put to their intended and ordinary use, causing injuries to Plaintiffs.

729.    The dangers the TDF Drugs posed to Plaintiffs' kidneys and bones were known and knowable to Gilead at the time of manufacture and sale. Yet Gilead marketed the TDF Drugs without adequate warnings about the risks or safe use of TDF of which it knew or should have known.

730.    Plaintiffs suffered kidney and/or bone injuries as a result of ingesting the TDF Drugs.

731.    In addition to the common law, the conduct alleged herein constitutes a breach of the implied warranty of merchantability under the Uniform Commercial Code as codified by the following statutes:

      a.      Alabama, Code of Alabama § 7-2-314

      b.      Arkansas, A.C.A. § 4-2-314

      c.      California, U Com Code § 2314

      d.      Colorado, Colorado R.S. 4-2-314

      e.      Delaware, 6 Del. C. § 2-314

      f.      Illinois, 810 ILCS 5/2-314

      g.      Maryland, Md. Comm. Law Code Ann. § 2-314

      h.      Minnesota, Minn. Stat. Ann. § 336.2-314

      i.      Missouri, Mo. Ann. Stat. § 400.2-314

      j.      Nevada, Nev. Rev. Stat. § 104.2314

      k.      New Mexico, N.M. Stat. Ann. § 55-2-314

      l.      New York, N.Y. U.C.C. § 2-314

      m.      North Carolina, N.C. Gen. Stat. Ann. § 25-2-314

1        n.      Oregon, Or. Rev. Stat. § 72.3140

2        o.      Rhode Island, R.I. Gen. Laws § 6A-2-314

3        p.      South Carolina, S.C. Code Ann. § 36-2-314

4        q.      Tennessee, Tenn. Code Ann. § 47-2-314

5        r.      Texas, Tex. Bus. & Com. Code § 2314

6        s.      Virginia, Va. Code Ann. § 8.2-314

7        732.    On November 9, 2018, the *Holley* Plaintiffs sent a letter to Gilead via certified mail giving official notice of Gilead's breach of the implied warranty of merchantability under the laws of Alabama, Arkansas, California, Colorado, Delaware, Illinois, Maryland, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Carolina, Tennessee, Texas, and Virginia. On January 25, 2019, the *Dowdy* Plaintiffs sent a letter to Gilead via certified mail giving official notice of Gilead's breach of the implied warranty of merchantability under the laws of Alabama, Colorado, Illinois, Maryland, Minnesota, New York, and Tennessee. On May 9, 2019, the *Lyons* Plaintiffs sent a letter to Gilead via certified mail giving official notice of Gilead's breach of the implied warranty of merchantability under the laws of California, New York, North Carolina, Tennessee, and Texas. Plaintiffs' notice letters are attached as Exhibit A.

## COUNT XII

### VIOLATION OF STATE CONSUMER PROTECTION LAWS

733.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

734.    Plaintiffs are consumers within the meaning of the following states' consumer protection laws because they are natural persons who purchased one or more of the TDF Drugs for personal, family, or household use.

735.    The TDF Drugs are goods and merchandise within the meaning of the following states' consumer protection laws.

736.    Gilead manufactured, sold, and marketed its TDF Drugs in trade or commerce, including within each of the 50 U.S. States.

737.   Gilead engaged in unconscionable, unfair, false, fraudulent, misleading, and deceptive acts and practices in connection trade or commerce involving its TDF Drugs.

738.   Gilead engaged in unfair and/or unconscionable conduct by knowingly designing its TDF Drugs to be unreasonably dangerous and withholding the safer designs to make more money.

739.   Gilead also intentionally suppressed, concealed, and omitted material facts in its promotional, marketing, and/or labeling communications about the risks and benefits of the TDF Drugs to Plaintiffs and Plaintiffs' doctors, including but not limited to, that: 1) all TDF patients should be carefully and frequently monitored for adverse kidney and bone effects on a frequent schedule; 2) Gilead had already developed the safer TAF design for delivering tenofovir into the body but nevertheless designed the TDF Drugs to contain TDF, and withheld the safer SAF design, in order to maximize profits on its TDF-based products and extend its ability to profit on its HIV franchise for years to come; and 3) Gilead knew that the tenofovir prodrug dose should be reduced when combined in a fixed dose combination pill with cobicistat, but did not reduce the TDF dose in Stribild.

740.   Gilead had a duty to disclose the omitted material facts about TDF and TAF because it: (a) was in possession of information about TDF and TAF that was not readily available to Plaintiffs and Plaintiffs' physicians; (b) made partial representations about TDF and TAF to Plaintiffs and Plaintiffs' physicians while suppressing material facts; and (c) actively concealed material information about TDF and TAF from Plaintiffs and Plaintiffs' physicians.

741.   Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Hundreds of thousands of consumers in the U.S. have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

742.   Gilead's conduct was likely to mislead and did mislead reasonable consumers and members of the public.

743.    Gilead's omissions were material and affected Plaintiffs' and Plaintiffs' doctors' conduct.

744.    Gilead intended that others rely on its deceptive and misleading omissions regarding its TDF Drugs.

745.    Plaintiffs and their doctors reasonably relied on Gilead's deceptive and misleading omissions regarding its TDF Drugs.

746.    Plaintiffs' doctors prescribed, and Plaintiffs ingested, one or more of the TDF Drugs in reliance on Gilead's unconscionable, false, misleading and/or deceptive acts and omissions.

747.    Plaintiffs were directly and proximately injured as a result of Gilead's deceptive conduct. But for Gilead's unfair and/or unconscionable conduct, Plaintiffs would have ingested a safer tenofovir-prodrug product, thus preventing or reducing Plaintiffs' injuries and monetary expenses in connection with taking TDF. But for Gilead's omissions, Plaintiffs would have ingested the TDF Drugs in a safer way—through more careful, frequent monitoring and/or by not taking Stribild (TDF in combination with cobicistat)—thus preventing or reducing Plaintiffs' injuries and monetary expenses in connection therewith.

748.    Plaintiffs suffered ascertainable losses as a result of Gilead's violations of the state consumer protection statutes alleged herein. Plaintiffs will prove the full extent and amount of their damages at trial.

749.    The conduct alleged herein violates the state consumer protection statutes as further alleged below.

        a.    **Alabama, Ala. Code §§ 8-19-1** *et seq*.

750.    Gilead committed unconscionable, false, misleading and/or deceptive acts and practices in the conduct of trade or commerce in violation of Ala. Code § 8-19-5(27), and violated Ala. Code § 8-19-5(5) and (7) by representing that the TDF Drugs have characteristics, benefits, and qualities they do not have, and are of a particular standard and quality when they are another.

751.    On November 9, 2018, the *Holley* Alabama Plaintiffs made a written demand for relief in satisfaction of the Act. On January 24, 2019, the *Dowdy* Alabama Plaintiffs made a written demand for relief in satisfaction of the Act. Plaintiffs' notice letters are attached as Exhibit A.

752. Alabama Plaintiffs suffered money damages as a result of Gilead's violations.

753. Alabama Plaintiffs seek their actual damages, punitive damages, attorneys' fees.

**b.    Arizona, Ariz. Rev. Stat. Ann. §§ 44-1521 *et seq*.**

754. Gilead committed false, deceptive, and unfair acts or practices and concealed, suppressed or omitted material facts with the intention that others rely on such concealment, suppression or omission in connection with the sale of the TDF Drugs in violation of Ariz. Rev. Stat. Ann. § 44-1522(A).

755. Arizona Plaintiffs suffered monetary damages as a proximate result of Gilead's violation of the Arizona Consumer Fraud Act.

756. Arizona Plaintiffs seek their actual and punitive damages.

**c.    Arkansas, Ark. Code Ann. §§ 4-88-101 *et seq*.**

757. Gilead committed unconscionable, false, misleading and/or deceptive acts and practices in the conduct of trade or commerce in violation of Ark. Code Ann. §§ 4-88-107(a)(1), (10) and § 4-88-108(1)-(2).

758. Arkansas Plaintiffs suffered actual financial losses as a proximate result of their reliance on Gilead's unlawful practices, including but not limited to the cost of the TDF Drugs that injured them and medical expenses.

759. Arkansas Plaintiffs seek their actual damages, attorneys' fees, and any additional damages permitted by statute.

**d.    California, California Civil Code §§ 1750 *et seq*., Cal. Bus. & Prof. Code §§ 17200 *et seq*. and § 17500**

760. Gilead violated California Civil Code §§ 1750 et. seq. (the "Consumer Legal Remedies Act" or "CLRA") by intentionally: 1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of CLRA § 1770(a)(5); 2) representing that goods or services are of a particular standard, quality, or grade if they are another in violation of CLRA § 1770(a)(7); and 3) advertising goods or services with intent not to sell them as advertised in violation of CLRA § 1770(a)(9).

761.    Gilead's conduct violates the Cal. Bus. & Prof. Code §§ 17200 *et seq.* (the "California Unfair Competition Law" or "UCL") prohibition against unfair, unlawful, or fraudulent business acts or practices. Gilead's conduct is unfair because Gilead's decisions to intentionally withhold the safer designs, and Gilead's omissions with respect to the safer designs and warnings it knew it should have given, lacked utility and do not outweigh the substantial harm Plaintiffs suffered as a result of the toxic TDF Drugs. Gilead's conduct is also unfair because it is tethered to Plaintiffs' CLRA omission claims.

762.    Gilead's conduct violates the Cal. Bus. & Prof. Code § 17500 (the "False Advertising Law" or "FAL") prohibition against untrue and misleading advertising. By omitting material facts, Gilead disseminated false and misleading marketing and promotional materials and advertisements that Gilead knew or should have known were untrue or misleading.

763.    California Plaintiffs suffered damages, including lost money or property, as a proximate result of Gilead's unlawful practices.

764.    On November 9, 2018, the *Holley* California Plaintiffs made a written demand for relief in satisfaction of the CLRA. On May 9, 2019, the *Lyons* California Plaintiffs made a written demand for relief in satisfaction of the CLRA. Plaintiffs' notice letters are attached as Exhibit A.

765.    California Plaintiffs seek restitution and restitutionary disgorgement arising from Gilead's violations of the UCL and FAL.

766.    California Plaintiffs seek their actual and punitive damages arising from Gilead's violations of the CLRA as well as attorneys' fees.

**e.      Colorado, Colo. Rev. Stat. §§ 6-1-101 *et seq.***

767.    Gilead violated Colo. Rev. Stat. §§ 6-1-101 *et seq.* (the "Colorado Consumer Protection Act") by: 1) knowingly making a false representation as to the characteristics or benefits of the TDF Drugs in violation of Colo. Rev. Stat. § 6-1-105(1)(e); 2) representing that TDF Drugs are of a particular standard or quality when Gilead knew or should have known they are of another in violation of Colo. Rev. Stat. § 6-1-105(1)(g); and 3) failing to disclose material information concerning goods, services, or property which information was known at the time of an

1    advertisement or sale when such failure to disclose such information was intended to induce the

2    consumer to enter into a transaction in violation of Colo. Rev. Stat. § 6-1-105(1)(u).

3        768.    Gilead's conduct significantly impacted the public as actual or potential consumers of

4    Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead

5    has directed its misleading marketing and promotional messages to the market generally. Consumers

6    like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead.

7    Gilead's conduct has impacted other consumers and has significant potential to do so in the future.

8        769.    Colorado Plaintiffs were injured as a result of Gilead's violations of the Colorado

9    Consumer Protection Act.

10       770.    Colorado Plaintiffs seek actual damages, costs, attorneys' fees, and treble damages

11   arising from Gilead's bad faith (fraudulent, willful, knowing, or intentional) conduct as alleged

12   herein.

13                    **f.      Delaware, 6 Del. C. § 2511 *et seq*.**

14       771.    Gilead has violated 6 Del. C. § 2513 which prohibits the use of any deception, fraud,

15   or the concealment, suppression, or omission of any material fact with the intent that others rely upon

16   such concealment, suppression, or omission in connection with the sale of any merchandise.

17       772.    Gilead's unfair and unlawful practices occurred in part within Delaware. Gilead sold,

18   promoted, and advertised its TDF Drugs, and distributed its TDF Drugs with misleading and

19   deceptive labeling, within Delaware and Plaintiffs residing in Delaware ingested Gilead's TDF

20   Drugs in Delaware.

21       773.    Delaware Plaintiffs seek their actual damages and punitive damages arising from

22   Gilead's violations of the Delaware Consumer Fraud Act.

23                    **g.      Illinois, 815 ILCS 505/1 *et seq*. and 815 ILCS 510 *et seq*.**

24       774.    Gilead has engaged in the following conduct in violation of the Illinois Consumer

25   Fraud and Deceptive Business Practices Act and Illinois Uniform Deceptive Trade Practices Act:

26   1) engaging in unfair methods of competition or deceptive acts or practices, including the use of any

27   deception, fraud, false pretense, false promise, concealment, suppression or omission of any material

28   fact, with the intent that others rely upon the concealment, suppression or omission of such material

1  fact in the conduct of trade or commerce in violation of 815 ILCS 505/2; 2) representing that the

2  TDF Drugs have characteristics or benefits that they do not have in violation of 815 ILCS

3  510/2(a)(5); and 3) representing that the TDF Drugs are of a particular standard, quality or grade

4  when they are of another in violation of 815 ILCS 510/2(a)(7).

5      775.    Gilead concealed material facts with the intent that others rely on the concealment of

6  material facts.

7      776.    Illinois Plaintiffs suffered actual pecuniary losses proximately caused by Gilead's

8  violations of the Illinois Acts.

9      777.    Illinois Plaintiffs seeks actual damages, punitive damages, reasonable attorneys' fees,

10  and costs.

11          **h.    Indiana, Ind. Code § 24-5-0.5-1 *et seq.***

12      778.    Gilead has engaged in the following conduct in violation of Ind. Code § 24-5-0.5-1

13  *et seq.*: 1) committing unfair or deceptive acts, omissions, or practices in connection with a consumer

14  transaction in violation of Ind. Code § 24-5-0.5-3(a); 2) representing that the TDF Drugs has

15  performance, characteristics, or benefits it does not have which the supplier knows or reasonably

16  knows it does not have in violation of Ind. Code § 24-5-0.5-3(b)(1); and 3) representing that the TDF

17  Drugs is of a particular standard or quality that it is not and if the supplier knows or should

18  reasonably know that it is not in violation of Ind. Code § 24-5-0.5-3(b)(2).

19      779.    Plaintiffs suffered damages, including lost money or property, as a proximate result of

20  Gilead's violations of Ind. Code § 24-5-0.5-1 *et seq.*

21      780.    On November 9, 2018, the *Holley* Indiana Plaintiffs made a written demand for relief

22  in satisfaction of the Act. Plaintiffs' notice letters are attached as Exhibit A.

23      781.    Indiana Plaintiffs seek their actual damages, treble damages, and attorneys' fees as a

24  result of Gilead's violations.

25          **i.    Kentucky, Ky. Rev. Stat. Ann. §§ 367.110 *et seq.***

26      782.    Gilead has engaged in unfair, false, misleading, or deceptive acts or practices in the

27  conduct of trade or commerce in violation of Ky. Rev. Stat. Ann. § 367.170.

28

783.   Kentucky Plaintiffs have suffered ascertainable losses in the form of lost money or property as a result of Gilead's violations of Ky. Rev. Stat. Ann. §§ 367.110 *et seq.*

784.   Kentucky Plaintiffs seek actual damages, punitive damages, attorneys' fees, and costs.

**j.**     **Maryland, Md. Com. Law Code Ann. § 13-101 *et seq.***

785.   Gilead committed the following violations of Md. Com. Law Code Ann. § 13-101 *et seq.*: 1) false and misleading oral or written statements or other representations of any kind which have the capacity, tendency, or effect of deceiving or misleading consumers in violation of Md. Com. Law Code Ann. § 13-301(1); 2) representations that the TDF Drugs have a characteristic or benefit which they do not have in violation of Md. Com. Law Code Ann. § 13-301(2)(i); 3) representations that the TDF Drugs are of a particular standard or quality which they are not in violation of Md. Com. Law Code Ann. § 13-301(2)(iv); 4) failure to state a material fact if the failure deceives or tends to deceive in violation of Md. Com. Law Code Ann. § 13-301(3); and 5) deception, fraud, false pretense, false premise, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the sale of consumer goods in violation of Md. Com. Law Code Ann. § 13-301(9).

786.   Maryland Plaintiffs suffered injuries and losses as a result of Gilead's violations of Md. Com. Law Code Ann. § 13-101 *et seq.*

787.   Maryland Plaintiffs seek actual damages and reasonable attorneys' fees.

**k.**     **Minnesota, Minn. Stat. §§ 325F.68 *et seq.*, §§ 325D.44 *et seq.***

788.   Gilead's conduct constitutes fraud, false pretense, false promise, misrepresentation by omission, misleading statements, or deceptive practices with the intent that others rely thereon in violation of Minn. Stat. §§ 325F.69(1).

789.   Gilead's conduct constitutes 1) representing that goods have characteristics or benefits they do not have in violation of Minn. Stat. §§ 325D.44(2)(5); and 2) representing that goods are of a particular standard or quality when they are another in violation of Minn. Stat. §§ 325D.44(2)(7).

790.   Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers

1   like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead.

2   Gilead's conduct has previously impacted other consumers and has significant potential to do so in

3   the future.

4       791.    Minnesota Plaintiffs were injured by Gilead's violations of Minn. Stat. §§ 325F.68 *et*

5   *seq.*, §§ 325D.44 *et seq.*

6       792.    Minnesota Plaintiffs seek damages, costs of investigation, and reasonable attorneys'

7   fees.

8           **l.**    **Missouri, Mo. Rev. Stat. §§ 407.010 *et seq.***

9       793.    Gilead's conduct constitutes deception, fraud, false pretense, false promise, unfair

10   practice, and the concealment, suppression, or omission of any material fact in trade or commerce in

11   violation of Mo. Rev. Stat. §§ 407.020(1).

12       794.    Missouri Plaintiffs suffered damages including an ascertainable loss as a result of

13   Gilead's violation of Mo. Rev. Stat. §§ 407.010 *et seq.*

14       795.    Missouri Plaintiffs seek damages, punitive damages, attorneys' fees, and costs.

15           **m.**    **Nevada, Nev. Rev. Stat. §§ 598.0903 *et seq.***

16       796.    Gilead committed a deceptive trade practice within the meaning of Nev. Rev. Stat.

17   §§ 598.0903 *et seq.* by: 1) knowingly making a false representation as to the characteristics and

18   benefits of the TDF Drugs in violation of Nev. Rev. Stat. §§ 598.0915(5); 2) representing that the

19   TDF Drugs are of a particular standard or quality when it knew they are of another standard or

20   quality in violation of Nev. Rev. Stat. §§ 598.0915(7); and 3) knowingly failing to disclose a material

21   fact in connection with the sale of the TDF Drugs in violation of Nev. Rev. Stat. §§ 598.0923(2).

22       797.    Nevada Plaintiffs were damaged as a result of Gilead's violations of Nev. Rev. Stat.

23   §§ 598.0903 *et seq.*

24       798.    Nevada Plaintiffs seek actual damages, costs of suit, and reasonable attorneys' fees.

25           **n.**    **New Jersey, N.J. Stat. Ann. §§ 56:8-1 *et seq.***

26       799.    Gilead's conduct constitutes an unconscionable commercial practice, deception,

27   fraud, false pretense, false promise, and the knowing, concealment, suppression, or omission of any

28

1    material fact with intent that others rely upon such concealment, suppression or omission in

2    connection with the sale or advertisement of merchandise in violation of N.J. Stat. Ann. §56:8-2.

3          800.    The TDF Drugs are merchandise within the meaning of N.J. Stat. Ann. §56:8-2

4    because they are objects, goods, or anything offered, directly or indirectly, to the public for sale.

5          801.    New Jersey Plaintiffs suffered an ascertainable loss of moneys or property as a result

6    of Gilead's violations of N.J. Stat. Ann. §56:8-2.

7          802.    New Jersey Plaintiffs seek damages, treble damages, and reasonable attorneys' fees

8    and costs of suit.

9          **o.    New Mexico, N.M. Stat. Ann. §§ 57-12-1 *et seq*.**

10         803.    Gilead's conduct constitutes unfair, unconscionable, or deceptive trade practices in

11    the conduct of trade or commerce in violation of N.M. Stat. Ann. § 57-12-3.

12         804.    The conduct by Gilead that Plaintiffs challenge herein occurred in the regular course

13    of Gilead's trade or commerce.

14         805.    New Mexico Plaintiffs suffered a loss of money or property as a result of Gilead's

15    violations of N.M. Stat. Ann. § 57-12-3.

16         806.    New Mexico Plaintiffs seek actual damages, up to three times Plaintiffs' actual

17    damages in light of Gilead's willful violations, attorneys' fees, and costs.

18         **p.    New York, N.Y. Gen. Bus. Law § 349**

19         807.    Gilead's conduct constitutes deceptive acts or practices in the conduct of any

20    business, trade or commerce in violation of N.Y. Gen. Bus. Law § 349.

21         808.    Gilead's conduct was directed at consumers.

22         809.    Gilead's conduct significantly impacted the public as actual or potential consumers of

23    Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead

24    has directed its misleading marketing and promotional messages to the market generally. Consumers

25    like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead.

26    Gilead's conduct has previously impacted other consumers and has significant potential to do so in

27    the future.

28

810.   New York Plaintiffs were injured by reason of Gilead's violations of N.Y. Gen. Bus. Law § 349.

811.   New York Plaintiffs seek actual damages, three times actual damages in an amount not to exceed $1,000 in light of Gilead's willful or knowing violations, and reasonable attorneys' fees.

**q.   North Carolina, N.C. Gen. Stat. §§ 75-1.1** *et seq.*

812.   Gilead's conduct constitutes unfair methods of competition and unfair or deceptive acts or practices in or affected commerce in violation of N.C. Gen. Stat. §§ 75-1.1.

813.   Plaintiffs could not discover the truth by exercise of reasonable diligence and they were induced to forego any investigation by Gilead's misrepresentations.

814.   Gilead's violations of N.C. Gen. Stat. §§ 75-1.1 proximately caused North Carolina Plaintiffs' injuries.

815.   North Carolina Plaintiffs seek actual damages, treble damages, and attorneys' fees in light of Gilead's willful violations.

**r.   Ohio, Ohio Rev. Code §§ 1345.01** *et seq.*

816.   Gilead's conduct constitutes unfair or deceptive acts or practices in connection with a consumer transaction in violation of Ohio Rev. Code § 1345.02.

817.   Gilead represented that the TDF Drugs have characteristics or benefits that it does not have in violation of Ohio Rev. Code § 1345.02(B)(1).

818.   Gilead represented that the TDF Drugs are of a particular standard or quality that they are not in violation of Ohio Rev. Code § 1345.02(B)(2).

819.   Ohio Plaintiffs suffered damages as a result of Gilead's violations of Ohio Rev. Code § 1345.02.

820.   Ohio Plaintiffs seek their actual damages plus an amount not exceeding $5,000 in noneconomic damages, and reasonable attorneys' fees in light of Gilead's knowing violations.

**s.   Oklahoma, 15 Okla. Stat. §§ 751** *et seq.*

821.   Gilead made false or misleading representations, knowingly or with reason to know, as to the characteristics and benefits of the TDF Drugs in violation of 15 Okla. Stat. § 753(5).

822.    Gilead made false or misleading representations, knowingly or with reason to know, that the TDF Drugs were of a particular standard when they of another in violation of 15 Okla. Stat. § 753(7).

823.    Gilead's conduct constitutes unfair and deceptive practices in violation of 15 Okla. Stat. §§ 752, 753(20). Gilead committed omissions, or other practices that deceived or could reasonably be expected to deceive or mislead a person to their detriment. Gilead's conduct offends the established public policy of encouraging the marketing of safer drugs and adequately warning consumers about the risks of existing drugs. Gilead's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

824.    Oklahoma Plaintiffs suffered actual injury and damages as a result of Gilead's violations of 15 Okla. Stat. § 751 *et seq.*

825.    Oklahoma Plaintiffs seek actual damages, costs of suit, reasonable attorneys' fees, and civil penalties are permitted under 15 Okla. Stat. § 761.1.

**t.     Oregon, Or. Rev. Stat. Ann. §§ 646.605 *et seq.***

826.    Gilead represented that the TDF Drugs have characteristics or benefits that they do not have in violation of Or. Rev. Stat. Ann. § 646.608(1)(e).

827.    Gilead represented that the TDF Drugs are of a particular standard or quality when they are of another in violation of Or. Rev. Stat. Ann. § 646.608(1)(g).

828.    Gilead engaged in unfair or deceptive conduct in violation of Or. Rev. Stat. Ann. § 646.608(1)(u).

829.    Oregon Plaintiffs suffered injuries and damages in the form of an ascertainable loss of money or property as a result of Gilead's violations of Or. Rev. Stat. Ann. § 646.608.

830.    Oregon Plaintiffs seek the greater of actual damages or $200, punitive damages, reasonable attorneys' fees, and costs.

**u.     Rhode Island, R.I. Gen. Laws §§ 6-13.1 *et seq.***

831.    Gilead represented that the TDF Drugs have characteristics or benefits that they do not have in violation of R.I. Gen. Laws § 6-13.1-1(6)(v).

832.     Gilead represented that the TDF Drugs are of a particular standard or quality when they are of another in violation of R.I. Gen. Laws § 6-13.1-1(6)(vii).

833.     Gilead's conduct constituted methods, acts, or practices that misled or deceived the members of the public in a material respect in violation of R.I. Gen. Laws § 6-13.1-1(6)(xiv).

834.     Gilead's conduct offends the established public policy of encouraging the marketing of safer drugs and adequately warning consumers about the risks of existing drugs. Gilead's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

835.     Rhode Island Plaintiffs suffered an ascertainable loss of money or property as a result of Gilead's violations of R.I. Gen. Laws § 6-13.1-1.

836.     Rhode Island Plaintiffs seek the greater of actual damages or $200, punitive damages, costs of suit, and reasonable attorneys' fees.

### v.     South Carolina, S.C. Code Ann. §§ 39-5-10 *et seq.*

837.     Gilead's conduct constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of S.C. Code Ann. § 39-5-20(a).

838.     Gilead's conduct significantly impacted the public as actual or potential consumers of Gilead's TDF Drugs. Millions of consumers have ingested one or more of the TDF Drugs and Gilead has directed its misleading marketing and promotional messages to the market generally. Consumers like Plaintiffs are at an informational disadvantage and lack bargaining power relative to Gilead. Gilead's conduct has previously impacted other consumers and has significant potential to do so in the future.

839.     South Carolina Plaintiffs suffered an ascertainable loss of money or property as a result of Gilead's violations of S.C. Code Ann. § 39-5-20(a).

840.     South Carolina Plaintiffs seek factual damages, three times Plaintiffs' actual damages as a result of Gilead's willful or knowing violations, reasonable attorneys' fees, and costs.

### w.     Texas, Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.*

841.     Gilead's conduct constitutes false, misleading, or deceptive acts or practices in the conduct of trade or commerce in violation of Tex. Bus. & Com. Code Ann. § 17.46(a).

842.   Gilead represented the TDF Drugs as having characteristics or benefits that they do not in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(5).

843.   Gilead represented that the TDF Drugs are of a particular standard or quality that they are not in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(7).

844.   Gilead represented that a warranty conferred or involved rights which it does have or involve in violation of Tex. Bus. & Com. Code Ann. § 17.46(20).

845.   Gilead failed to disclose information concerning the TDF Drugs which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(24).

846.   Gilead knowingly and intentionally violated the Texas Deceptive Trade Practices-Consumer Protection Act.

847.   Texas Plaintiffs suffered economic damages as a result of Gilead's violations of Tex. Bus. & Com. Code Ann. § 17.46.

848.   Texas Plaintiffs seek economic damages, three times Plaintiffs' economic damages and mental anguish damages in light of Gilead's knowing and intentional violations, and reasonable and necessary attorneys' fees and court costs.

849.   On November 9, 2018, the *Holley* Texas Plaintiffs made a written demand for relief in satisfaction of the Texas Deceptive Trade Practices-Consumer Protection Act.

850.   On May 9, 2019, the *Lyons* Texas Plaintiffs made a written demand for relief in satisfaction of the Texas Deceptive Trade Practices-Consumer Protection Act. Plaintiffs' notice letters are attached as Exhibit A.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court enter an order or judgment against Gilead and in favor of Plaintiff, and grant the following relief:

A.   Declare, adjudge, and decree the conduct of Gilead as alleged herein to be unlawful, unfair, and/or deceptive and otherwise in violation of the law;

1         B.     Award Plaintiffs actual, compensatory, and/or statutory damages in an amount to be

2    proven at trial;

3         C.     Award Plaintiffs punitive and exemplary damages as permitted by law and the statutes

4    cited herein in an amount to be proven at trial;

5         D.     Award Plaintiffs restitution and restitutionary disgorgement to restore ill-gotten gains

6    received by Gilead as a result of the unfair, wrongful, and deceptive conduct alleged herein;

7         E.     Award Plaintiffs the costs of bringing this suit, including reasonable attorneys' fees;

8    and

9         F.     Award Plaintiffs such other and further relief as to which Plaintiffs may be entitled in

10   law or equity.

11   **JURY DEMAND**

12   Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury on all

13   matters so triable.

14   DATED: May 31, 2019               Respectfully submitted,

15

16                                HAGENS BERMAN SOBOL SHAPIRO LLP

17                                By: */s/ Steve W. Berman*

18                                Steve W. Berman (*pro hac vice*)
                                  Anne F. Johnson (*pro hac vice*)

19                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                  1301 Second Avenue, Suite 2000

20                                Seattle, WA 98101
                                  Telephone: (206) 623-7292

21                                Facsimile: (206) 623-0594
                                  Email: steve@hbsslaw.com

22                                Email: annej@hbsslaw.com

23                                Robert C. Hilliard (*pro hac vice*)
                                  Katrina R. Ashley (*pro hac vice*)

24                                HILLIARD MARTINEZ GONZALES LLP
                                  719 S. Shoreline Blvd.

25                                Corpus Christi, TX 78401
                                  Telephone: (361) 882-1612

26                                Facsimile: (361) 882-3015
                                  Email: bobh@hmglawfirm.com

27                                Email: kashley@hmglawfirm.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: shanas@hbsslaw.com

*Attorneys for Plaintiffs*