1    Steve W. Berman (*pro hac vice*)
     Anne F. Johnson (*pro hac vice*)
2    HAGENS BERMAN SOBOL SHAPIRO LLP
     1301 Second Avenue, Suite 2000
3    Seattle, WA 98101
     Telephone: (206) 623-7292
4    Facsimile: (206) 623-0594
     Email: steve@hbsslaw.com
5    Email: annej@hbsslaw.com

6    Robert C. Hilliard (*pro hac vice*)
     Katrina R. Ashley (*pro hac vice*)
7    HILLIARD MARTINEZ GONZALES LLP
     719 S. Shoreline Blvd.
8    Corpus Christi, TX 78401
     Telephone: (361) 882-1612
9    Facsimile: (361) 882-3015
     Email: bobh@hmglawfirm.com
10   Email: kashley@hmglawfirm.com

11   *Attorneys for Plaintiffs*
     [Additional counsel on signature page]

12

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15   ADRIAN HOLLEY, *et al.*,              Case No. 3:18-cv-06972-JST

16                          *Plaintiffs*,  **PLAINTIFFS' MEMORANDUM IN
                                           OPPOSITION TO MOTION TO
17        v.                               DISMISS FIRST AMENDED
                                           CONSOLIDATED COMPLAINT
18   GILEAD SCIENCES, INC.,                PURSUANT TO FED. R. CIV. P. 8(a),
                                           9(b), AND 12(b)(6)**
19                          *Defendant.*
                                           Judge: Hon. Jon S. Tigar
20                                         Hearing Date: September 25, 2019
                                           Hearing Time: 2:00 p.m.
21                                         Location: Courtroom 6

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ..................................................................................................................1

II.     BACKGROUND ...................................................................................................................2

III.    RELEVANT FACTUAL ALLEGATIONS .........................................................................3

      A.      Gilead could have unilaterally strengthened its warnings based on "newly
           acquired information." ................................................................................................3

           1.      Careful monitoring of TDF patients' kidneys is essential for safe use of
                 the drug. ...........................................................................................................3

           2.      Post-approval information demonstrated risks of a different frequency
                 and severity than information previously presented to the FDA. ....................4

                 a.      New data demonstrated risks of a different frequency or
                      severity. ...............................................................................................5

                 b.      The FDA did not know the true frequency or severity of the
                      risks associated with TDF. ...................................................................8

                 c.      The FDA would not have rejected stronger monitoring
                      warnings. ...............................................................................................9

      B.      Gilead omitted adequate warnings about the risks and safe use of TDF and that
           Gilead was withholding safer designs of the TAF Drugs from its promotional,
           marketing, and/or labeling communications regarding TDF. ....................................9

IV.     LEGAL STANDARD .........................................................................................................11

V.      ARGUMENT ......................................................................................................................11

      A.      Plaintiffs' post-approval, post-2008 failure to warn allegations are not
           preempted. ...............................................................................................................11

      B.      Plaintiffs assert omissions-based claims that the Court upheld as properly
           pleaded. ...................................................................................................................16

VI.     CONCLUSION ...................................................................................................................18

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GILEAD'S
FED. R. CIV. P. 8(a), 9(b), AND 12(b)(6) MOTION TO DISMISS – i
010759-11/1154242 V6
                  Case No. 3:18-cv-06972-JST

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.,*
   779 F.3d 34 (1st Cir. 2015) .................................................................................................. 14

5

6

*Curtis Lumber Co., Inc., v. La. Pac. Corp.,*
   618 F.3d 762 (8th Cir. 2010) ................................................................................................ 17

7

*Gibbons v. Bristol-Myers Squibb Co.,*
   919 F.3d 699 (2d Cir. 2019) ................................................................................................. 15

8

9

*MacDonald v. Ford Motor Co.,*
   37 F. Supp. 3d 1087 (N.D. Cal. 2014) ................................................................................. 11

10

11

*Newman v. McNeil Consumer Healthcare,*
   2012 U.S. Dist. LEXIS 2153 (N.D. Ill. Jan. 9, 2012) ......................................................... 13

12

*In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.,*
   880 F. Supp. 2d 801 (S.D. Ohio 2012) ................................................................................ 17

13

14

*State ex rel. Rosenblum v. Johnson & Johnson,*
   362 P.3d 1197 (Or. Ct. App. 2015) ...................................................................................... 17

15

16

*Temple v. Fleetwood Enters.,*
   133 F. App'x 254 (6th Cir. 2005) ......................................................................................... 17

17

*Utts v. Bristol-Myers Squibb Co.,*
   226 F. Supp. 3d 166 (S.D.N.Y. 2016) ............................................................................ 12, 14

18

19

*Utts v. Bristol-Myers Squibb Co.,*
   251 F. Supp. 3d 644 (S.D.N.Y. 2017) ............................................................................ 14, 15

20

21

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ........................................................................................................ 11, 13

22

23

*In re Xarelto Rivaroxaban Prods. Liab. Litig.,*
   2017 U.S. Dist. LEXIS 114338 (E.D. La. July 21, 2017) .................................................... 13

24

25

26

27

28

## I.    INTRODUCTION

Gilead's motion to dismiss Plaintiffs' First Amended Consolidated Complaint[1] raises two narrow issues: (1) whether Plaintiffs plausibly alleged "newly acquired information" that would have allowed Gilead to unilaterally strengthen its TDF Drug labels after FDA approval; and (2) whether Plaintiffs' purported affirmative misrepresentation claims meet the requirements of Rule 9(b).

Regarding Plaintiffs' failure to warn claims, Plaintiffs have remedied the shortcomings the Court identified in its prior Order by alleging post-approval information that demonstrated risks of a different frequency and/or severity than information previously presented to the FDA. *See* ¶¶ 17, 555–576. Specifically, Plaintiffs allege new data and analysis establishing that TDF patients suffer kidney damage at a much higher frequency than previously reported to the FDA—with high risks of serious kidney disease outcomes looming even in patients with seemingly normal kidney function and without traditional risk factors. *Id*. Presented with this new information about the frequency and severity of the risk of TDF-induced nephrotoxicity in all patients, Gilead could have strengthened its post-approval warnings for Viread, Truvada, Atripla, and Complera to recommend that all patients be frequently monitored for sensitive markers of kidney function that would have enabled doctors to detect kidney and associated bone damage before it was too late to prevent lasting harm.[2]

Regarding Gilead's Rule 9(b) argument, dismissal is not warranted because Plaintiffs' FAC does not assert affirmative misrepresentations claims. Unlike Plaintiffs' prior complaints, the FAC alleges violations of state consumer protection laws based only on Gilead's omissions and other non-fraudulent conduct. *See* ¶¶ 737–739. The Court has already ruled that these allegations are sufficiently pleaded,[3] and Gilead does not argue otherwise. With respect to Plaintiffs' fraud by omission claim, Gilead points to one errant sentence in a complaint containing more than 800

---

[1] Plaintiffs' First Amended Consolidated Complaint, ECF No. 84 ("FAC"). All references to "¶" herein are to paragraphs in the FAC, unless otherwise noted.

[2] Plaintiffs do not dispute Gilead's motion to the extent it seeks dismissal of Plaintiffs' post-approval failure to warn claims for Stribild only. Plaintiffs request that any dismissal be without prejudice to a motion to amend if warranted by evidence found in discovery.

[3] *See* Order Granting in Part and Denying in Part Motion to Dismiss, ECF No. 75 ("Order"), at 27–30.

paragraphs. If the Court deems it necessary, Plaintiffs do not oppose dismissal of their fraud and consumer protection claims to the extent the Court finds them based on misrepresentations and not omissions.

## II.     BACKGROUND

On May 10, 2019, the Court largely denied Gilead's motion to dismiss Plaintiffs' complaint. The Court denied Gilead's motion to dismiss Plaintiffs' design defect claims. *See* Order at 6–8, 12–17. The Court denied Gilead's motion to dismiss Plaintiffs' pre-approval failure to warn claims and post-approval failure to warn claims that are based on Gilead's conduct prior to the 2008 change to the "Changes Being Effected" ("CBE") regulation. *See id.* at 18–22, 24. The Court denied Gilead's motion to dismiss Plaintiffs' failure to warn claims on causation grounds. *See id.* at 24–27. The Court denied Gilead's motion to dismiss Plaintiffs' consumer protection claims that are not based on fraudulent activity. *See id.* at 27–28. And the Court denied Gilead's motion to dismiss Plaintiffs' omissions-based fraud and consumer protection claims, ruling that such claims were sufficiently pleaded under Rule 9(b). *See id.* at 29–30. The Court held that Plaintiffs adequately alleged that:

> "The 'who' is Gilead, the 'what' is an adequate warning about the risks and safe use of TDF and the fact that Gilead was withholding safer designs of the TDF Drugs, the 'when' is prior to Plaintiffs' doctors' prescribing and monitoring decisions, and the 'where' is in Gilead's drug labeling, marketing, and promotional materials."

*See id.* at 29 (quoting ECF No. 54 at 31).

The Court dismissed without prejudice two types of claims. First, the Court dismissed the post-approval failure to warn claims that were based on Gilead's conduct after the 2008 CBE regulation change. *See id.* at 22–24. The 2008 CBE regulation permits a drug manufacturer to amend its drug labeling without prior FDA approval based on "newly acquired information," which is "data, analyses, or other information not previously submitted to the [FDA]." *Id*. at 24 (quoting 21 C.F.R. § 314.4(b)). Given Plaintiffs' allegations regarding Gilead's knowledge of TDF's risks, the Court ruled that the "problem with Plaintiffs' allegations [was] that it [was] not possible to discern from the complaint whether – and, if so, when – any such information was provided to the FDA." *Id*. at 23. Thus, "[w]ithout more," the Court could not conclude that Plaintiffs plausibly alleged the existence

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GILEAD'S
FED. R. CIV. P. 8(a), 9(b), AND 12(b)(6) MOTION TO DISMISS – 2
010759-11/1154242 V6

Case No. 3:18-cv-06972-JST

of "newly acquired information." *Id*. at 24. Second, the Court dismissed Plaintiffs' fraud and

consumer protection claims to the extent they were based on affirmative misrepresentations, rather

than omissions. *See id.* at 29. The Court distinguished the affirmative misrepresentation claims from

the omissions-based claims, which were "specific enough" to satisfy Rule 9(b). *Id*. at 30 (quoting

*Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

### III.   RELEVANT FACTUAL ALLEGATIONS

**A.   Gilead could have unilaterally strengthened its warnings based on "newly acquired information."**

**1.   Careful monitoring of TDF patients' kidneys is essential for safe use of the drug.**

TDF is a prodrug form of tenofovir. ¶¶ 3 & n.2, 338. Prodrugs are pharmacologically inactive

compounds that can be more efficiently absorbed into the bloodstream and then converted into the

active form of the drug within the body. *Id*. TDF is converted into tenofovir in the gastrointestinal

tract, liver, and blood. ¶ 348. Although the prodrug form allows the drug to be taken by mouth, the

conversion of TDF into tenofovir outside the cells HIV targets, and the presence of high levels of

free tenofovir in the blood, endangers the kidneys. ¶ 358.

The primary purpose of the kidney is to filter out toxins and waste products from the blood,

and maintain the delicate balance of water, salts, and other compounds in a person's blood. ¶ 359.

The functional unit of the kidney is the nephron, a microscopic structure that consists of two primary

components: a renal "corpuscle" and a renal "tubule." *Id*. The renal corpuscle is the component of

the nephron that directly filters the blood. ¶ 360. Blood flows through a network of capillaries (small

blood vessels) known as the glomerulus. *Id*. Glomerular filtration is highly effective at removing

many toxins, but it also filters out many compounds that a person needs. ¶ 361. In the tubule, the

cells lining the tubule put these crucial, non-toxic compounds back into the blood, as well as filter

out remaining toxins that glomerular filtration did not remove. *Id*.

TDF primarily damages the nephron tubule, due to hyper-concentration of free tenofovir

within the tubule cells of the nephron, which results in cell death or dysfunction. ¶ 362. If the tubule

cells are dysfunctional or dead, they are unable or less able to perform the vital function of filtering

waste and/or toxins and reabsorbing beneficial compounds. *Id*.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GILEAD'S
FED. R. CIV. P. 8(a), 9(b), AND 12(b)(6) MOTION TO DISMISS – 3
010759-11/1154242 V6

Case No. 3:18-cv-06972-JST

Because tenofovir is renally eliminated, patients are exposed to more tenofovir as the kidneys become damaged. ¶ 363. Increased exposure to tenofovir increases damaging toxicity, making it crucial for doctors to monitor patients' kidney function so that they can detect early signs of nephrotoxicity, and prevent or lessen kidney damage before it becomes irreversible. *Id.*

One way that kidney function is measured is by the rate of blood that is filtered by the glomeruli. This is known as the glomerular filtration rate or "GFR." ¶ 360. GFR is not measured directly. ¶ 360 n.6. Physicians estimate a patient's GFR by calculating creatinine clearance. *Id*. Creatinine is a waste product that is produced by the breakdown of muscle tissue and created at a relatively constant rate by the body. *Id*. The kidneys filter creatinine from the blood into the urine, and reabsorb almost none of it. *Id*. Creatinine clearance is the rate at which the kidneys clear creatinine from the blood. *Id*.

However, TDF nephrotoxicity is generally characterized by tubular dysfunction that precedes a decline in glomerular filtration, and occurs before patients are symptomatic. ¶¶ 479, 498. Physicians must therefore monitor more sensitive markers of kidney function—those that assess tubule function, like serum phosphorus or urine glucose—to assess a patient's true kidney health. ¶¶ 362, 498. When the nephron tubule is damaged, it cannot reabsorb enough phosphorus, allowing the phosphorus to be excreted via urine. ¶ 498. By monitoring patients' serum phosphorus, doctors are able to pick up more subtle changes in kidney function that would otherwise go undetected. *Id*. Moreover, TDF-induced bone injuries are related to the wasting of minerals through the urine. *Id*. This is due to dysfunction in the nephron tubule, which prevents reabsorption of minerals from the glomerular filtrate. *Id*. If physicians knew earlier that their patients' kidneys were dysfunctional, subsequent bone injuries could also be avoided. *Id*.

### 2. Post-approval information demonstrated risks of a different frequency and severity than information previously presented to the FDA.

After August 2008, Gilead could have unilaterally strengthened the warnings contained in its TDF Drug labels, without prior FDA approval, based on "newly acquired information." ¶¶ 17, 328, 555–577. The "newly acquired information" Gilead could have used to strengthen its TDF warnings included: increasing evidence that TDF patients with and without preexisting risk factors were

1    experiencing kidney damage with a frequency and severity greater than previously reported to the

2    FDA; expanding evidence that all TDF patents are at risk for serious TDF-induced nephrotoxicity

3    that cannot be adequately detected by the one biomarker Gilead recommended doctors monitor in all

4    patients; and Gilead's repeated, post-approval determinations to give stronger warnings regarding the

5    exact same TDF Drugs in the European Union. ¶¶ 17, 328, 555–577. This post-approval information

6    demonstrated risks of a different frequency and severity than information previously presented to the

7    FDA. *Id.*

8            **a.    New data demonstrated risks of a different frequency or severity.**

9          Except for Stribild, Gilead's clinical trials of the TDF Drugs, upon which FDA approval was

10   based, did not show significant nephrotoxicity of TDF, despite preclinical evidence demonstrating

11   that TDF could be highly toxic to kidneys and bones. ¶¶ 365, 557, 569–570.[4] Once Gilead started

12   marketing TDF, patients quickly began experiencing TDF's nephrotoxic effects, some severe and

13   irreversible. ¶¶ 367–384, 557.

14         Prior to May 21, 2007, Gilead did not recommend that doctors conduct any kidney

15   monitoring for patients not deemed "at risk." ¶¶ 489, 491–494. On May 21, 2007, however, Gilead

16   amended its Viread label to recommend that doctors calculate creatinine clearance in all patients

17   before initiating treatment with TDF and as clinically appropriate during therapy. ¶¶ 495, 558.[5]

18   Gilead recommended the monitoring of creatinine clearance and serum phosphorus only for patients

19   at risk of renal impairment. *Id.*

20         This warning remained inadequate because it failed to instruct doctors to frequently monitor

21   all patients for sufficiently sensitive markers of kidney function that could detect early signs of

22   nephrotoxicity and thus prevent or lessen the harm of TDF. ¶¶ 496–502, 559; *see also* ¶¶ 503–529

23    

---

24       [4] The Stribild clinical trials demonstrated that Stribild is even more toxic to patients' kidneys and
     bones than the other TDF drugs—with multiple patients forced to discontinue the study due to a

25   "constellation of renal [Adverse Events] (e.g., renal failure, Fanconi syndrome, and increased blood
     creatinine." ¶ 445; *see also* ¶¶ 444, 446–449.

26       [5] Gilead did not add similar warnings to the Truvada and Atripla labels until 2008. ¶ 495 n.63.

27   Complera's label included such a warning at the time of FDA approval in 2011. *Id.* And when Gilead
     began marketing Stribild in 2012, it warned doctors to assess some measures of kidney function in

28   all patients but failed to warn doctors to monitor all patients' serum phosphorus. *Id.*

(Gilead gave stronger monitoring warnings in the European Union—with respect to the tests conducted and the frequency of monitoring—for the exact same TDF Drugs than it did in the U.S.). As Gilead had known since at least 2002, TDF was injuring patients with no preexisting risk factors for kidney impairment. ¶¶ 368, 559. Gilead's May 21, 2007 label change perpetuated the false distinction between patients "at risk" for TDF-induced nephrotoxicity and everyone else. ¶ 559.[6]

As clinicians' experience with TDF grew, so did the evidence of TDF's toxicity. Data published after August 2008 showed that TDF patients were suffering kidney damage at a much higher frequency than previously reported to the FDA. The medical literature recognized that even if TDF may not frequently impair kidneys' *glomerular function*—as measured by serum creatinine or creatinine clearance—in the absence of established risk factors, TDF-induced damage to kidneys' *tubular function* is much more frequent and cannot be adequately predicted by traditional risk factors for kidney impairment or detected by monitoring patients' glomerular function. ¶ 560. These post-August 2008 studies included, e.g., the following:

- 2009 paper, which reported that (a) 22% of TDF patients studied had tubular dysfunction—including three patients with complete Fanconi syndrome (the signature TDF toxicity)—even though their glomerular function, as measured by plasma creatinine levels or creatinine clearance or both, was within normal limits; (b) TDF patients had a significantly greater risk for tubular damage than patients never treated with TDF: an estimated 25% rate of tubular dysfunction at 4 years for TDF patients compared to null for the rest; and (c) no risk factor other than TDF use and old age was predictive of tubular dysfunction (*see* ¶¶ 561–562);

- 2011 paper, which conducted a literature review and drew a distinction between prior studies that tended to establish that TDF was not often significantly toxic to the glomerulus and the authors' experience frequently treating TDF patients for proximal tubule dysfunction, which may not be detected by measuring glomerular filtration (*see* ¶¶ 563–564);

- 2011 paper, which found that drug discontinuation due to decline in GFR or tubular dysfunction was 9.2%—much higher than the discontinuation rate found in the Viread clinical trials (0.4%) (*see* ¶ 570);

---

[6] While Gilead's May 21, 2007 label change added the recommendation that doctors monitor all patients' creatinine clearance, it deleted language that appeared in prior versions of the label that disclosed that adverse kidney and bone events occurred in patients without preexisting risk factors—reinforcing the false impression that TDF is only harmful to people otherwise at risk for kidney and bone injuries. ¶ 501.

- 2012 paper regarding the study of 10,841 HIV-infected patients, which found that: (a) each year of tenofovir exposure was associated with a 34% increased risk of proteinuria, 11% increased risk of rapid decline in kidney function, and 33% increased risk of chronic kidney disease; and (b) TDF is associated with elevated risk of kidney damage even in patients without preexisting risk factors (*see* ¶¶ 565–566);[7]

- 2013 paper, which recommended that all TDF patients be systematically monitored for tubular injury in light of the authors' findings that 20% of patients studied evidenced tubular injury despite normal estimated glomerular filtration rate (*see* ¶ 567); and

- 2014 paper, which found signs of renal damage to be "highly frequent" even in patients with normal estimated glomerular filtration rate, leading the authors to highlight the importance of early detection of renal injury (*see* ¶ 568).

Unlike the Viread clinical trials (and subsequent studies upon which FDA approval of Truvada, Atripla, and Complera were based), these papers showed significant nephrotoxicity of TDF—with toxicity occurring at a high frequency and high risks of kidney disease outcomes looming even in patients with normal glomerular function and without traditional risk factors. ¶¶ 557, 569–570. This heightened risk of kidney damage that TDF posed to all patients caused study authors to conclude that all TDF patients must be frequently monitored for markers of tubular function, e.g., serum phosphorus, in addition to creatinine clearance. *See* ¶ 562 (recommending that all TDF patients be monitored for signs of tubular damage so that a switch in therapy could be considered in order to avoid progressive deterioration of the kidneys and a chronic loss of phosphorus, leading to bone mineral density loss and premature osteoporosis); ¶ 564 (recommending that all patients on TDF be carefully and routinely monitored (every 3 months during the first year, then twice yearly) for signs of both glomerular and tubular dysfunction so that long-term effects on kidney and bone health can be assessed).

Gilead could have analyzed the accumulating data demonstrating the higher frequency and severity of the risk to all TDF patients and strengthened its warnings to recommend frequent monitoring of both glomerular and tubular function in all TDF patients. ¶¶ 572–573. After all, Gilead is required to review all adverse drug experience information about TDF obtained from any source,

---

[7] Plaintiffs allege that the FDA reviewed this study in connection with its July 2012 review of the Stribild NDA which "[a]t most, … demonstrates the FDA's knowledge" of this information "4 years after the CBE regulation requiring 'newly acquired information' became effective." ¶ 565 n.68.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GILEAD'S
FED. R. CIV. P. 8(a), 9(b), AND 12(b)(6) MOTION TO DISMISS – 7
010759-11/1154242 V6

Case No. 3:18-cv-06972-JST

including, but not limited to, reports in the scientific literature, and unpublished scientific papers. ¶ 321. But Gilead did not. ¶¶ 572–573. At least, it did not do so in the crucial U.S. market. Since 2002, after each of its TDF Drugs was approved in the U.S., Gilead warned physicians in the European Union to frequently monitor all TDF patients for both glomerular (creatinine clearance) and tubular (serum phosphorus) injury. ¶¶ 503–529, 575.[8] But rather than use its accumulating knowledge of TDF's risks to make U.S. patients safer, Gilead refused to give an adequate monitoring warning in order to conceal the true risk of its TDF Drugs and inflate U.S. sales. ¶ 530.

### b.   The FDA did not know the true frequency or severity of the risks associated with TDF.

Although the FDA became aware, through adverse event reporting, that TDF was injuring patients' kidneys and bones, it did not know the true frequency or severity of adverse events, injury, or risk associated with TDF. ¶¶ 557, 571. Adverse event reports underreport the true incidence of adverse events because they are based on voluntary reporting. ¶¶ 376, 381, 571. And they do not reflect the damage TDF inflicts on kidneys and bones before renal function declines, the risk of future adverse kidney or bone outcomes, nor the benefits of frequent, careful monitoring of all patients for early signs of nephrotoxicity as demonstrated by these new studies. ¶ 571. Gilead could have submitted analyses to the FDA establishing the true frequency or severity of risk that TDF poses to all patients, but did not. ¶¶ 572–573. Nor did Gilead tell the FDA that the one marker of kidney function Gilead was warning doctors to monitor in all patients after May 21, 2007— creatinine clearance—was insufficient to detect the type of kidney injury that was frequently occurring in all TDF patients (and, if left unchecked, would cause more severe kidney injury and harm patients' bones). ¶ 573.

Until the FDA's review of the Stribild NDA in 2012, the agency did not consider medical literature describing how renal and bone injury were occurring at a frequency or severity much greater than that reported in the registrational clinical trials. ¶ 574. The FDA based its approval of

---

[8] Upon information and belief, Gilead did not disclose to the FDA that it gave stronger monitoring warnings in the European Union for the exact same products, nor did it disclose its scientific or medical reasons for doing so. ¶ 575.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GILEAD'S
FED. R. CIV. P. 8(a), 9(b), AND 12(b)(6) MOTION TO DISMISS – 8
010759-11/1154242 V6

Case No. 3:18-cv-06972-JST

Viread on the preclinical data and clinical trials Gilead submitted in its Viread NDA. *Id*. After Viread was approved, the FDA based its approvals of the Truvada, Atripla, and Complera NDAs on Gilead's data showing the bioequivalence of those combination drugs to their individual components. *Id*. The FDA's approvals of Truvada, Atripla, and Complera were not based on any new clinical studies or other analyses regarding safety of TDF. *Id*. When the FDA conducted a more searching review in connection with the Stribild NDA, Gilead proposed and the FDA approved stronger monitoring warnings for Stribild, which included recommending the monitoring of all patients for glomerular and tubular injury. *Id*.[9]

### c.     The FDA would not have rejected stronger monitoring warnings.

The FDA would not have rejected a label change strengthening monitoring recommendations to protect all patients from risks of TDF-induced kidney and bone adverse effects. ¶ 577. Once Gilead finally launched the safer TAF-based drugs (after approval of the TDF Drugs), Gilead gave stronger, FDA-approved monitoring warnings for the safer TAF drugs than it did for the TDF Drugs, including recommending that doctors monitor all patients for both glomerular and tubular injury. ¶¶ 531–534, 532 n.67, 576. And in 2018, the FDA also approved labels containing stronger monitoring warnings for Viread, Truvada, Atripla, and Complera, like it did for the safer TAF drugs years earlier. ¶¶ 496 n.64, 577.

**B.     Gilead omitted adequate warnings about the risks and safe use of TDF and that Gilead was withholding safer designs of the TAF Drugs from its promotional, marketing, and/or labeling communications regarding TDF.**

During the first years Viread was on the market, it represented a huge percentage—up to 68%—of Gilead's product sales. ¶ 480. To make sure that safety issues did not depress or slow the growth of Viread sales, Gilead dramatically increased its sales force and marketing budget, and trained its sales representatives to omit from their presentations to doctors material information about

---

[9] Although the Stribild monitoring warnings are stronger than the warnings for the other TDF Drugs, they are still inadequate because they failed to recommend that doctors monitor patients' serum phosphorus at approval (¶ 496 n.65), and failed to recommend that doctors monitor Stribild patients on a specific, frequent schedule like Gilead warned in the European Union (¶¶ 15–16, 500, 502, 524–527). As discussed herein, Plaintiffs limit their failure to warn Stribild claims to a pre-approval theory.

the risks that TDF posed to patients' kidneys and bones. ¶ 482 (Gilead's sales representatives'

statements that Viread was a "miracle drug" with "no toxicities" omitted that Viread posed

significant risks to kidneys and bones); ¶ 485 (Gilead's sales force training materials omitted the fact

that many patients taking Viread had experienced kidney adverse effects); ¶ 487 (through the years,

Gilead's sales representatives have minimized the risks of TDF-induced toxicity by withholding

information about the frequency and severity of adverse kidney and bone events and failing to tell

doctors to adequately monitor TDF patients for drug-induced toxicity).

The FDA hit Gilead with at least two warning letters in which the agency admonished Gilead

for promoting Viread to doctors in ways that omitted material facts about Viread's safety profile.

¶¶ 484, 486. Despite receiving these warnings from the FDA, Gilead has continued to misleadingly

promote its TDF Drugs to doctors. ¶¶ 485–487.

Gilead's direct-to-consumer advertising, including print and online media, similarly

downplayed the risks of TDF toxicity by hiding risk information and omitting the need for frequent

monitoring of all TDF patients. ¶¶ 535–540. In 2010, the FDA issued another warning letter to

Gilead, this time in connection with Gilead's print advertising for Truvada, for minimizing the risks

associated with the drug. ¶ 538.

In addition to omitting crucial facts about the safety profile of TDF when promoting and

advertising TDF to doctors and consumers, Gilead omitted from its prescriber and patient labeling

adequate warnings regarding the need for doctors to sufficiently monitor all TDF patients, on a

frequent, specific schedule, for the adverse effects of TDF-induced bone and kidney toxicity. ¶¶ 488–

534, 541–544. The dangerous inadequacies in Gilead's drug labeling were compounded by the

misleading marketing messages it gave to doctors. ¶ 488.

Gilead also concealed from Plaintiffs and their doctors that Gilead intentionally withheld

other tenofovir prodrug designs that Gilead knew to be safer than the TDF-designed drugs in order to

maximize profits on its TDF Drugs and extend its ability to profit on its HIV franchise for years to

come. ¶¶ 424–432, 714–715, 739.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GILEAD'S
FED. R. CIV. P. 8(a), 9(b), AND 12(b)(6) MOTION TO DISMISS – 10
010759-11/1154242 V6

Case No. 3:18-cv-06972-JST

1    In addition to their products liability and negligence claims based on Gilead's failure to warn,

2    Plaintiffs assert two types of omissions-based claims: (1) Count X, Fraud by Omission (¶¶ 702–720);

3    and (2) Count XII, violation of state consumer protection laws (¶¶ 733–850).

### IV.    LEGAL STANDARD

5    The Court must accept the facts alleged in Plaintiffs' complaint, together with reasonable

6    inferences to be drawn from those facts, as true. *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d

7    1087, 1091 (N.D. Cal. 2014) (Tigar, J.). Plaintiffs need only plead enough facts to state a plausible

8    claim for relief—meaning that the facts alleged allow the Court to draw the reasonable inference that

9    Gilead is liable for the misconduct alleged. *Id*. at 1091–92. Although fraud claims must state with

10   particularity the circumstances constituting the fraud (*see* Fed. R. Civ. P. 9(b)), claims based on an

11   omission can succeed without the same level of specificity. *MacDonald*, 37 F. Supp. 3d at 1096; *see*

12   *also* Order at 29 (ruling that Plaintiffs' omissions-based allegations were sufficiently specific under

13   Rule 9(b)).

### V.    ARGUMENT

**A.    Plaintiffs' post-approval, post-2008 failure to warn allegations are not preempted.**

16   Consistent with *Wyeth v. Levine*, 555 U.S. 555, 568–72 (2009), Plaintiffs plausibly allege the

17   existence of "newly acquired information" that would have allowed Gilead to unilaterally strengthen

18   the warnings contained in its Viread, Truvada, Atripla, and Complera labels after FDA approval.

19   Because "newly acquired information" is the sole basis upon which Gilead seeks to dismiss

20   Plaintiffs' post-approval, post-2008 warning claims, Gilead's motion as to these drugs must be

21   denied.

22   "Newly acquired information" is "data, analyses, or other information not previously

23   submitted to the [FDA]." Order at 24 (citing 21 C.F.R. § 314.3(b)). It "may include (but is not

24   limited to) data derived from new clinical studies, reports of adverse events, or new analyses of

25   previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a

26   different type or greater severity or frequency than previously included in submissions to the FDA."

27   *Id*. at 20. "The rule accounts for the fact that risk information accumulates over time and that the

28   same data may take on a different meaning in light of subsequent developments." *Levine*, 555 U.S. at

569. "Information previously known to the manufacturer, but not submitted to the FDA, may constitute 'newly acquired information,' provided that the information meets the other CBE requirements." *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 178 (S.D.N.Y. 2016) (citing Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49603, 49606 (2008)).

Plaintiffs allege that data published after August 2008 constituted "newly acquired information" because it showed that TDF patients were suffering kidney damage at a higher frequency, and the risks posed to all TDF patients are more severe, than previously reported to the FDA. Unlike the studies upon which Viread, Truvada, Atripla, and Complera FDA approval were based, the post-August 2008 studies of TDF patients demonstrated high rates of tubular kidney dysfunction and high risks of future kidney injury. *See* ¶ 561 (22% of TDF patients studied had tubular dysfunction, with authors estimating that 25% of TDF patients would have tubular dysfunction at the 4-year mark); ¶ 563 (authors' experience demonstrated far greater frequency of nephrotoxicity than earlier studies included in the authors' literature review); ¶ 565 (each year of tenofovir exposure is associated with a 34% increased risk of proteinuria, 11% increased risk of rapid decline in kidney function, and 33% increased risk of chronic kidney disease); ¶ 567 (20% of patients studied evidenced tubular injury despite normal estimated glomerular filtration rate); ¶ 568 (signs of renal damage were "highly frequent" even in patients with normal estimated glomerular filtration rate); *see also* ¶ 570 (a retrospective study from 2011 demonstrated far higher rates of TDF discontinuation due to kidney dysfunction than reported in the clinical trials). The post-2008 medical literature reported a high frequency of tubular injury that could not be predicted by traditional risk factors for kidney impairment or detected by monitoring patients' glomerular function (creatinine clearance). *See* ¶¶ 561–569. As a result, the study authors recommended that doctors frequently monitor all TDF patients—not just those deemed "at risk"—for markers of both glomerular and tubular dysfunction. *See* ¶¶ 562, 564, 567–568.

Plaintiffs have plausibly alleged that, at least between August 2008 and July 2012, the FDA did not know the true extent of the frequency or severity of the risk of TDF. The post-2008 data demonstrated higher risks than reported to the FDA in the clinical trials and other data upon which

1   TDF Drug approval was based. *See* ¶¶ 557, 570, 574. Adverse event reports submitted to the FDA

2   did not inform the agency about the true incidence of adverse events or the risk of harm, or the

3   inability of creatinine clearance to detect tubular injury. *See* ¶¶ 376, 381, 571. Although Gilead is

4   required to review all adverse drug experience information about TDF obtained from any source (*see*

5   ¶ 321), Gilead did not submit analyses to the FDA demonstrating the true extent of the risk

6   nephrotoxicity poses to all TDF patients. *See* ¶¶ 572–573. Nor did Gilead tell the FDA that the one

7   marker of kidney function Gilead warned doctors to assess in all patients could not adequately detect

8   the type of kidney injury that was frequently occurring in TDF patients without regard to traditional

9   risk factors. *See* ¶ 572. These facts give rise to the reasonable inference that the post-2008 data

10   revealed risks of a greater severity or frequency than previously included in submissions to the FDA.

11         Thus, like the manufacturer in *Levine*, Gilead could have unilaterally added, via CBE, a

12   stronger warning about the proper administration of Viread, Truvada, Atripla, and Complera based

13   on accumulating evidence of injuries, even though the label already included some information about

14   the risk. *See Levine*, 555 U.S. at 569–70 ("After the first such incident came to Wyeth's attention in

15   1967, it notified the FDA and worked with the agency to change Phenergan's label. In later years, as

16   amputations continued to occur, Wyeth could have analyzed the accumulating data and added a

17   stronger warning about IV-push administration of the drug."); *see also In re Xarelto Rivaroxaban*

18   *Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 114338, at *14–15 (E.D. La. July 21, 2017) (holding that

19   manufacturer could have updated its label with "newly-acquired information" based on additional

20   adverse event information); *Newman v. McNeil Consumer Healthcare*, 2012 U.S. Dist. LEXIS 2153,

21   at *31–32 (N.D. Ill. Jan. 9, 2012) (same).

22         Gilead's arguments are logically and legally flawed. First, Gilead mischaracterizes Plaintiffs'

23   "newly acquired information" allegations as merely revealing the "relationship" between TDF and

24   tubular injury. *See* Mot. at 5–7. From there, Gilead argues that because it warned doctors to monitor

25   patients *at risk* for renal impairment for markers of both glomerular and tubular dysfunction, the

26   post-2008 data does not constitute "newly acquired information." *See id.* at 7–8. This argument

27   ignores that: (a) until 2018, Gilead's label did not include a warning to monitor *all patients* for

28   tubular injury; and (b) the post-2008 data revealed not just a relationship between TDF and tubular

1   injury, but that risks of tubular injury were frequent and severe enough in all TDF patients to require

2   the monitoring of *all patients* for tubular injury. It makes no sense to argue that the FDA was aware

3   of the risk based on a warning Gilead did not give.

4        Gilead tries to sidestep this problem by pointing to Plaintiffs' allegations regarding what

5   Gilead knew about TDF injuring patients without preexisting risk factors for kidney injury. *See id.* at

6   8 (citing Plaintiffs' allegations about Gilead's knowledge and arguing that Plaintiffs purportedly

7   failed to identify information "different than that already in Gilead's possession"). But the relevant

8   inquiry here is what the FDA, not Gilead, knew. The *Utts* cases upon which Gilead relies make clear

9   that information previously known to the manufacturer, but not submitted to the FDA, may constitute

10  "newly acquired information." *See Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 659

11  (S.D.N.Y. 2017); *Utts*, 226 F. Supp. 3d at 178.[10] Moreover, although the FDA may have been aware

12  that TDF could cause "new onset" renal impairment (*see* Mot. at 8), Plaintiffs have plausibly alleged

13  that the agency did not know the true frequency with which TDF was injuring patients' kidneys. The

14  fact that "new onset" renal impairment had occurred with TDF use does not indicate the frequency

15  with which TDF was damaging patients' kidneys in the absence of preexisting kidney damage or

16  other risk factors.

17       Gilead's attack on Plaintiffs' post-2008 data because it purportedly consists of mere

18  recommendations or opinion pieces (*see* Mot. at 9) also fails. The study authors' recommendations

19  were based on hard data and reports of adverse events that demonstrated risks of greater frequency or

20  severity than had been reported to the FDA—the very definition of "newly acquired information." *In*

21  *re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 42 (1st Cir. 2015), cited by Gilead,

22  is distinguishable. The "opinion piece" at issue in *Celexa* did not constitute "newly acquired

23  information" because it was based on "the same information that the FDA had in approving Lexapro.

24  It simply argu[ed] that the FDA should not have approved Lexapro on the basis of that information."

25

26       [10] Because Gilead's knowledge is not determinative, the fact that the European Union labels
    prove that Gilead knew to give stronger monitoring warnings does not undermine Plaintiffs' claim to

27  "newly acquired information." Instead, it is additional post-approval evidence that stronger warnings
    were needed. *See* ¶¶ 503–529, 575.

28

1   Here, by contrast, Plaintiffs allege new information that the FDA did not have at the time of

2   approval.

3       Gilead's other cases are also distinguishable, and only serve to highlight the sufficiency of

4   Plaintiffs' claims. *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) affirmed

5   dismissal of failure to warn claims where plaintiffs alleged that subsequent studies "confirm[ed]" the

6   adverse events associated with the drug at issue, and provided no basis from which the court could

7   conclude that the studies presented risks of a different type, severity, or frequency. The data and

8   analyses on which Plaintiffs here rely did not just "confirm" what the FDA already knew. *See supra*

9   at 4–9, 12–13. Similarly, the description of the insufficient allegations in *Utts v. Bristol-Myers*

10  *Squibb Co.*, 251 F. Supp. 3d at 665, highlights how Plaintiffs here have plausibly alleged "newly

11  acquired information." The data cited by the *Utts* plaintiffs did "not suggest—nor d[id] the plaintiffs

12  allege that the real world signal data for [the drug] show[ed] a greater severity or frequency of

13  bleeding events or deaths than previously disclosed in [the company's] submissions to the FDA." *Id.*

14  But that is exactly what Plaintiffs allege here—new data and analyses of adverse event information

15  that showed kidney toxicity at a greater frequency and severity than previously disclosed in Gilead's

16  submissions to the FDA, which could not be adequately detected by the one biomarker Gilead

17  included in its label for the monitoring of all patients. *Utts* also found plaintiffs' allegations to be

18  lacking because the existing drug label reported a higher risk of adverse events than the study

19  plaintiffs pointed to as purportedly new information. *See id.* at 665. The new information Plaintiffs

20  allege here reports a far higher frequency of nephrotoxicity than the Viread, Truvada, Atripla, and

21  Complera labels. *Compare* ¶¶ 561–568 (reporting that more than 20% of TDF patients studied had

22  kidney damage and/or risked future kidney damage) *with* Gilead's Request for Judicial Notice, Ex. A

23  (Viread label) at 5 (stating that renal impairment "has been reported"); *id.* at 16 (listing renal events

24  that "have been identified" without disclosing the frequency of events or severity of the risk).[11]

25

26

27

28
        [11] *See also* Request for Judicial Notice (ECF No. 93), Ex. B (Truvada label) at 5, 10; *id.* at Ex. C
        (Atripla label) at 7, 15; *id.* at Ex. D (Complera label) at 5, 13.

Finally, Gilead incorrectly asserts that Plaintiffs' FAC contains no new allegations of "newly acquired information" regarding bone risks associated with TDF. Plaintiffs allege that monitoring patients for kidney tubule injury is necessary because, *inter alia*, tubule dysfunction prevents reabsorption of minerals critical to bone health. *See* ¶ 498. If physicians knew earlier that patients' kidneys were dysfunctional, subsequent bone injuries could be avoided. *Id.* The new data and analyses regarding the frequency of TDF-induced tubule injury and the risk of such injury in all patients caused study authors to conclude that all TDF patients must be monitored for tubular function to, *inter alia*, prevent a chronic loss of phosphorus that leads to bone mineral density loss and premature osteoporosis. ¶ 562. Better kidney monitoring means better bone monitoring. The Court should therefore not dismiss Plaintiffs' post-approval, post-2008 claims with respect to bone risks.

**B.      Plaintiffs assert omissions-based claims that the Court upheld as properly pleaded.**

Plaintiffs' fraud and consumer protection claims should not be dismissed based on Gilead's mistaken argument that Plaintiffs continue to assert claims based on affirmative misrepresentations.

After the Court's Order dismissing Plaintiffs' misrepresentation-based claims, Plaintiffs amended their complaint to exclude claims based on affirmative misrepresentations. *Compare, e.g.*, *Holley* Complaint, ECF No. 1, Count XII Violation of State Consumer Protection Laws, ¶ 536 (alleging that Gilead intentionally misrepresented material facts in its promotional, marketing, and labeling communications), *with* FAC, Count XII, Violation of State Consumer Protection Laws, ¶ 739 (alleging only that Gilead intentionally suppressed, concealed, and omitted material facts in its promotional, marketing, and/or labeling communications); *see also* FAC, Count X, Fraud By Omission. Plaintiffs' omissions-based claims are sufficiently pleaded (*see* Order at 29–30) and Gilead does not argue otherwise.

Instead, Gilead directs the Court to the FAC paragraphs that list the state consumer protection law provisions that Plaintiffs allege Gilead violated, and asserts that Plaintiffs' citations to laws that prohibit deceptive "representations"—as opposed Plaintiffs' factual allegations regarding Gilead's conduct—must mean that Plaintiffs are trying to maintain claims based on affirmative misrepresentations. The problem with Gilead's motion is that it assumes, without citing any case law

1    or other authority, that the FAC's citation to the state laws' prohibitions against deceptive

2    representations cannot include prohibitions against omissions. *See* Mot. at 12. But that is not the

3    case. Omissions can render representations deceptive. *See, e.g.*, *Curtis Lumber Co., Inc., v. La. Pac.*

4    *Corp.*, 618 F.3d 762, 776–80 (8th Cir. 2010) (reversing summary judgment against plaintiff alleging

5    an omission under Arkansas Code § 4-88-107(a)(1), which prohibits knowingly making a false

6    representation as to the characteristics of a product); *Temple v. Fleetwood Enters.*, 133 F. App'x 254,

7    265 (6th Cir. 2005) (explaining that to establish a prima facie claim under the Ohio Consumer Sales

8    Practices Act provisions that prohibit deceptive representations, plaintiffs can allege a deceptive

9    omission); *In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp.

10   2d 801, 826 (S.D. Ohio 2012) (stating that omissions are actionable under the California Consumer

11   Legal Remedies Act provisions that prohibit deceptive representations); *State ex rel. Rosenblum v.*

12   *Johnson & Johnson*, 362 P.3d 1197, 1203 (Or. Ct. App. 2015) (ruling that omissions are actionable

13   under the Oregon Unlawful Trade Practices Act provisions that prohibit deceptive representations).

14   Gilead has failed to argue or cite any cases supporting the argument that omissions are not

15   cognizable under any of the state laws asserted, and should be precluded from making the argument

16   for the first time in its reply brief. *See* Order at 30 (arguments raised for the first time on reply are

17   generally deemed waived and need not be considered).

18        In addition, with respect to Plaintiffs' Fraud by Omission claims, Gilead cites just one

19   paragraph out of more than 800 in support of its argument that Plaintiffs are purportedly attempting

20   to proceed on an affirmative misrepresentation-based theory. *See* Mot. at 5, 11 (citing ¶ 714). The

21   first sentence of ¶ 714 refers only to Gilead's concealment: "Gilead intentionally concealed from

22   Plaintiffs and their doctors the fact that Gilead had already developed the safer TAF mechanism but

23   designed the TDF Drugs to contain TDF instead of the safer TAF design in order to maximize profits

24   on its TDF-based products and extend its ability to profit on its HIV franchise for years to come." It

25   is the second sentence of ¶ 714 which Gilead apparently finds problematic. Plaintiffs' inclusion of

26   this one sentence referencing misrepresentations was in error.

27        Plaintiffs did not intend their FAC to include claims based on affirmative misrepresentations

28   and do not believe the FAC states such claims. To the extent the Court disagrees, Plaintiffs do not

oppose dismissal of any fraud or consumer protection claims to the extent they are based on misrepresentations and not omissions. However, Plaintiffs oppose dismissal of any specific statutory claims because Gilead has not argued that omissions are not cognizable violations under any specific state law.

**VI.    CONCLUSION**

As discussed above, Plaintiffs do not dispute Gilead's motion to the extent it seeks dismissal of: (a) Plaintiffs' post-approval failure to warn claims as to Stribild only; and (b) any affirmative misrepresentation-based fraud or consumer protection claims (to the extent the Court finds that they exist). Any dismissals, however, should be without prejudice to a motion to amend if warranted by evidence found in discovery. For the foregoing reasons, Gilead's motion should be denied in all other respects.

Dated: August 12, 2019                            Respectfully submitted,

                                 By:    /s/ Steve W. Berman
                                        Steve W. Berman (*pro hac vice*)
                                        Anne F. Johnson (*pro hac vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        Telephone: (206) 623-7292
                                        Facsimile: (206) 623-0594
                                        Email: steve@hbsslaw.com
                                        Email: annej@hbsslaw.com

                                        Shana E. Scarlett (SBN 217895)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        715 Hearst Avenue, Suite 202
                                        Berkeley, CA 94710
                                        Telephone: (510) 725-3000
                                        Facsimile: (510) 725-3001
                                        Email: shanas@hbsslaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robert C. Hilliard (*pro hac vice*)
Katrina Ashley (*pro hac vice*)
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
Email: bobh@hmglawfirm.com
Email: kashley@hmglawfirm.com

*Attorneys for Plaintiffs*