# EXHIBIT C

Darius N. Lakdawalla, Ph.D.

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   ADRIAN HOLLEY, et al.,          )
                                     )
 5            Plaintiffs,            )
                                     )
 6       vs.                         )
                                     ) CASE NO.
 7   GILEAD SCIENCES, INC.,          ) 4:18-cv-06972-JST
                                     )
 8            Defendants.            )
     _____)
 9                                   )
     This Notice Relates to all      )
10   Holley Plaintiffs originally    )
     filed in Holley, et al. and     )
11   all other consolidated cases.   )
                                     )
12   _____)

13

14

15               REMOTE VIDEO-RECORDED

16        DEPOSITION OF DARIUS N. LAKDAWALLA, Ph.D.

17               Tuesday, August 23, 2022

18               8:55 a.m.- 3:33 p.m.

19

20

21

     REPORTED BY:  SHARI BOLTON, CSR 9291
22

23

24

25
```

```
 1    REMOTE APPEARANCES:
 2

          For Plaintiffs:
 3
                HILLIARD MARTINEZ GONZALES LLP
 4              BY:  BENJAMIN R. O'CONNOR, ESQ.
                719 S. Shoreline Boulevard
 5              Corpus Christi, Texas 78401
                (361) 882-1612
 6              boconnor@hmglawfirm.com
 7
          For Defendants:
 8
                PROSKAUER ROSE LLP
 9              BY:  KYLE A. CASAZZA, ESQ.
                2029 Century Park East, Suite 2400
10              Los Angeles, California 90067-3010
                (310) 284-5677
11              kcasazza@proskauer.com
12              PROSKAUER ROSE LLP
                BY:  GOURDIN W. SIRLES, ESQ.
13              One International Place
                Boston, Massachusetts 02110-2600
14              (617) 526-9482
                Gsirles@proskauer.com
15
16        Videographer:
17              JEFF FLEMING
18
          Trial Technician:
19
                EVAN WOLFE
20
21
22
23
24
25
```

```
 1                   INDEX TO EXAMINATION

 2

 3    WITNESS:   DARIUS N. LAKDAWALLA, Ph.D.

 4                                              PAGE

 5   Examination By Mr. O'Connor                   7

 6   Examination By Mr. Casazza                  210

 7

 8

 9

10

11

     INSTRUCTION NOT TO ANSWER           PAGE      LINE
12
                                          56        18
13                                        97         4
                                          97        12
14                                       102         8
                                         111        16
15                                       128         7
                                         129         8
16                                       129        25
                                         130         7
17                                       144        22
                                         152        24
18                                       158        10

19

20

21

22

23

24

25
```

```
 1                    INDEX TO EXHIBITS
 2
 3
 4    MARKED              DESCRIPTION              PAGE
 5    Exhibit 1    Common-Issue Rebuttal Expert      26
                   Report of Darius N. Lakdawalla,
 6                 PhD July 13, 2022
 7    Exhibit 2    Letter dated July 8, 2021 to      58
                   Darius N. Lakdawalla from
 8                 Joshua E. Anderson
 9    Exhibit 3    Article entitled "How COVID Can   74
                   Help Us Refocus On The How And
10                 Why Of Value Assessment," dated
                   October 21, 2021
11
      Exhibit 4    Updated Lakdawalla Materials      93
12                 Considered List
13    Exhibit 5    Darius N. Lakdawalla deposition   98
                   transcript dated March 14, 2022
14
      Exhibit 6    Materials Considered by          101
15                 Professor Darius Lakdawalla
16    Exhibit 7    Omnibus Order Re: Sargon         113
                   Motions
17
      Exhibit 8    Reporter's Transcript of         119
18                 Proceedings July21, 2022
19    Exhibit 9    Henry G. Grabowski Cornerstone   147
                   Research profile page
20
      Exhibit 10   Excel spreadsheet                157
21
      Exhibit 11   Spreadsheet titled "Other        157
22                 Report Calculations"
23    Exhibit 12   E-mail dated 4/17/2003 to Bill   161
                   Lee from Bruno Delagneau with
24                 attachments
25
```

```
 1                INDEX TO EXHIBITS (Continued)

 2

 3    MARKED                    DESCRIPTION            PAGE

 4    Exhibit 13    Article entitled "Application     169
                    of real options analysis for
 5                  pharmaceutical R&D project
                    valuation - Empirical results
 6                  from a survey"

 7    Exhibit 14    E-mail chain                       192
                    Bates Nos. GILTDF111601879276 -
 8                  111601879278.0001 -
                    111601879278.0017
 9
      Exhibit 15    Invoice Number 99665 dated June   196
10                  29, 2022

11    Exhibit 16    Invoice Number 99638 dated        200
                    August 23, 2022
12
      Exhibit 17    Invoice Number 99771 dated        205
13                  August 23, 2022

14

15

16

17

18

19

20

21

22

23

24

25
```

Darius N. Lakdawalla, Ph.D.

```
1              TUESDAY, AUGUST 23, 2022, 8:55 A.M.

2

3              THE VIDEOGRAPHER:  We are now on the record.

4              My name is Jeff Fleming.  I'm a videographer

5    for Golkow Litigation Services.

6              Today's date is August 23rd, 2022.

7              Time is 8:55 a.m.

8              This remote video deposition is being held in

9    the matter of Adrian Holley, et al., versus Gilead

10   Sciences, Inc., et al.

11             The deponent is Dr. Darius Lakdawalla.

12             All parties to this deposition have agreed to

13   the witness being sworn in remotely.

14             Due to the nature of remote reporting, please

15   pause briefly before speaking to ensure all parties

16   are heard completely.

17             Will counsel please state their appearances

18   after which the court reporter, Shari Bolton, will

19   swear in the witness.

20             MR. O'CONNOR:  Yes.  Benjamin O'Connor from

21   Hilliard Martinez Gonzales on behalf of the federal

22   plaintiffs.

23             MR. CASAZZA:  Kyle Casazza from Proskauer

24   Rose for Gilead Sciences.  And my colleague Gordon

25   Sirles is joining us remotely.
```

```
 1

 2                  DARIUS N. LAKDAWALLA, Ph.D.,

 3       having been first duly sworn, was examined and

 4                    testified as follows:

 5

 6                         EXAMINATION

 7   BY MR. O'CONNOR:

 8       Q   Good morning, Doctor.  Would you please state

 9   your name and spell it for the record, please.

10       A   Sure.  It's Darius Noshir Lakdawalla.  D, as

11   in dog, a-r-i-u-s, as in Sam.  N, as in Nancy, o-s, as

12   in Sam, h-i-r, as in Robert.  L-a-k-d, as in dog,

13   a-w-a-l-l-a.

14       Q   And do you understand that you are providing

15   deposition testimony today in connection with

16   litigation between Gilead on one hand and thousands of

17   plaintiffs who have claimed to have sustained personal

18   injury on the other, correct?

19       A   I do.

20       Q   Okay.  You understand everything being said

21   today is being recorded both stenographically and by

22   video?

23       A   I do.

24       Q   Okay.  And you understand that you have taken

25   an oath to tell the truth and are providing testimony
```

Darius N. Lakdawalla, Ph.D.

```
 1   subject to the penalties of perjury?

 2       A    I do.

 3       Q    You've been deposed before, correct, sir?

 4       A    Yes, I have.

 5       Q    Five times before today; is that a correct

 6   number?

 7       A    I think it's actually seven because a couple

 8   of the entries on my prior testimony list involve two

 9   depositions.

10       Q    Got it.  We will walk through all that stuff.

11   Appreciate it.

12            Just a reminder, you're familiar with what to

13   do, but just some things that will be helpful for me;

14   if my question is unclear, please ask me to clarify it

15   and I will.

16            Can we agree to that?

17       A    Sure.

18       Q    Can we agree, though, that if you have not

19   asked me to clarify my question and that you answer my

20   question that you've understood my question.

21            Can we agree to that?

22       A    Yes.

23       Q    Okay.  Outside of any question that elicits a

24   response from Mr. Casazza or an objection related to

25   privilege, you are expected to provide an answer to my
```

```
 1   question even if Mr. Casazza accepts.  Does that make

 2   sense?  Objects.  Excuse me.

 3       A   Yes.

 4       Q   Okay.  Sorry about that question.

 5           We'll take breaks from time to time.  Just

 6   let me know when you need a break.  But I only ask

 7   that you provide an answer to any pending question

 8   before we go on a break; is that fair?

 9       A   Yes, of course.

10       Q   Okay.  We are conducting this via Zoom,

11   correct, sir?

12       A   Yes.

13       Q   Where are you physically located at the

14   moment?

15       A   I'm in Los Angeles in the law offices of

16   Proskauer Rose.

17       Q   Okay.  And who is present with you in the

18   room?

19       A   Mr. Casazza is here.

20       Q   Anyone else?

21       A   No.

22       Q   If anyone else does walk into the room, could

23   you please let me know?

24       A   Yes.

25       Q   What other electronic devices are in the room
```

1   by which you could communicate with other people?

2        A   I have my cell phone in my pocket, which is

3   set to do not disturb.  And I have an iPad in my bag

4   that's also set to do not disturb.

5        Q   If for whatever reason you need to make a

6   cell phone call or something comes up where you need

7   to address something on your cell phone, please let me

8   know; otherwise, I ask that you please keep it on do

9   not disturb during the pendency of questions.  Is that

10  fair?

11       A   Yes.

12       Q   Okay.  Do you have any documents in the room

13  with you?

14       A   No, I don't.

15       Q   Okay.  And I think you mentioned before, but

16  you have an additional screen for viewing documents;

17  is that fair?

18       A   That's correct.

19       Q   Do you have any windows open on that screen

20  besides that which you are using to view documents?

21       A   I have the Zoom control window open, I think.

22       Q   Okay.

23       A   And -- and then the browser window open

24  and -- just let me check.  I'm sorry, just give me a

25  moment to make sure.

```
 1              Yes, so those are the only windows open on
 2    the other monitor.
 3         Q    Okay.  Thank you.
 4              You are presenting yourself in this
 5    litigation as an expert in health economics; is that
 6    fair?
 7         A    Yes, that's fair.
 8              I guess I would also say there are areas of
 9    expertise; so in the economics of the pharmaceutical
10    industry, health insurance, the valuation of medical
11    technology and other related subfields that I focused
12    on within health economics.
13         Q    Thank you for that clarification.
14              Would it be fair, then, still to say that the
15    broad purview of your expertise would be classified as
16    health economics?
17         A    I think that would be fair.
18         Q    How would you define health economics?
19         A    I would start with the economics part.  So
20    economics is considered to be the study of how human
21    behavior is influenced by and responds to incentives.
22              And health economics is the application of
23    that -- those economic principles to the study of a
24    number of topics related to human health, such as the
25    organization and functioning of the healthcare system,
```

Darius N. Lakdawalla, Ph.D.

1    decisions that people -- that individuals make about

2    their health, the behavior of healthcare providers and

3    other participants in the healthcare system.

4         Q   Have you ever performed the role of health

5    economics as an employee or contractor for a

6    pharmaceutical company?

7              MR. CASAZZA:  Objection; form.

8              THE WITNESS:  I have done consulting projects

9    for pharmaceutical companies, but I'm not exactly sure

10   if that would qualify as -- as performing work as a

11   contractor.  I've certainly never been an employee.

12             I'm not quite sure how to answer the

13   contractor part given the consulting work that I've

14   done.

15   BY MR. O'CONNOR:

16        Q   Maybe that would be a helpful point to break

17   down, and we'll get into detail on that.

18             You've never been an employee for a

19   pharmaceutical company, correct?

20        A   That's right.

21        Q   And is it fair to say that the consulting

22   work that you've done for pharmaceutical companies was

23   in the context of your work for Precision Health

24   Economics?

25        A   Not entirely.  Since I left Precision I have

Darius N. Lakdawalla, Ph.D.

```
 1   done a handful of consulting projects for

 2   pharmaceutical companies, but I would say the bulk of

 3   it was through Precision.

 4       Q   Got it.

 5           Are you holding yourself out to be an expert

 6   in any other field besides health economics in this

 7   litigation?

 8           MR. CASAZZA:  Objection; form.

 9           THE WITNESS:  I guess with the clarification

10   that health economics has a fairly broad purview, and

11   we talked about some of the breadth and some of the

12   work that I've done within health economics.  But

13   based on my understanding of health economics, I would

14   say that it -- it covers the expertise that I'm

15   offering.

16   BY MR. O'CONNOR:

17       Q   And I guess my point is, based on your

18   understanding of what health economics is and the

19   definition that you've provided, the examples that you

20   provided, is that the only field of expertise in which

21   you are holding yourself out to be an expert in this

22   litigation?

23           MR. CASAZZA:  Objection; form.

24           THE WITNESS:  Yes, subject to the

25   qualification that I don't claim to have provided an
```

Darius N. Lakdawalla, Ph.D.

```
 1   exhaustive list of example subfields within health
 2   economics.  But as -- as an umbrella term, I agree
 3   with your statement that I'm -- I'm holding myself out
 4   as a health economist subject to my understanding of
 5   what that term means and what the discipline means.
 6   BY MR. O'CONNOR:
 7       Q   Okay.  Have you provided to the fullest
 8   extent your understanding of what health economics is?
 9           MR. CASAZZA:  Objection; form.
10           THE WITNESS:  So the definition I gave to
11   you -- maybe for clarity, I'll attempt to restate it.
12   BY MR. O'CONNOR:
13       Q   Sure.
14       A   It may be duplicative, on which case I
15   apologize, but I'll just attempt to reiterate it.
16       Q   It's my problem, not yours, Doctor.  Don't
17   worry about it.
18       A   So again, economics is the -- the study of
19   how human behavior responds to incentives.  I'll also
20   emphasize incentives don't have to be cash incentives.
21   There are incentives of all kinds, and it can include
22   nonfinancial incentives.
23           And health economics is the application of
24   those conceptual tools to the study of how healthcare
25   is delivered, how individuals decide to invest in or
```

1    in some cases detract from their own health, how they

2    make decisions about risky health behavior, how firms

3    in the healthcare industry make decisions about how to

4    behave with respect to pricing, the development of

5    medical technology, competition, marketing, a whole

6    host of other non-price forms of competition.

7              As I sit here, that's the best I can do to

8    explain the breadth of it.  And I think that's --

9    that's reasonably complete, although I don't claim to

10   have covered every bit of ground that would reasonably

11   be called health economics.

12       Q   But as you sit here today, it's your best

13   understanding and as complete an answer as you can

14   provide as to the definition in your mind of health

15   economics, correct?

16       A   I would say so.

17       Q   Okay.  Thank you.

18             You're not holding yourself out to be an

19   expert in drug safety, are you, sir?

20       A   No.  But I would qualify that as an -- as a

21   health economist, I am qualified in the process of

22   using information about drug safety as an input into

23   analyses of, for instance, the value of pharmaceutical

24   assets.

25             But the distinction here is I'm not claiming

1   that I myself know how to evaluate the safety of a

2   drug.  Rather, data on drug safety, I'm trained to

3   look at it as an input and use it fruitfully in the

4   analysis of valuation or other firm decision-making.

5        Q   You're not holding yourself out to be an

6   expert in the evaluation of drug efficacy, are you?

7        A   I'm not, with the -- subject to the same

8   qualification that I am trained in -- in how to use

9   data on efficacy as an input into the study of the

10  value of drugs, cost-effectiveness of drugs, and other

11  aspects of how firms market or compete with each other

12  in the pharmaceutical industry.

13       Q   So it's fair to say that you are not holding

14  yourself -- you are holding yourself out to have some

15  degree of expertise in the use of drug efficacy data

16  but not in the evaluation of drug efficacy data; is

17  that fair?

18            MR. CASAZZA:  Objection; form.

19            THE WITNESS:  I think -- I'm not sure that

20  would be the distinction I would make.  I think I

21  would say that I'm not trained in determining what the

22  efficacy of a drug is.  Usually efficacy is a relative

23  concept.  So I'm not trained in understanding -- in

24  determining the efficacy of one drug versus another.

25            I am trained in evaluating statistical data

Darius N. Lakdawalla, Ph.D.

```
 1    on efficacy.  And I'm also trained in taking those

 2    data and using them to draw inferences about economic

 3    questions like the value of drugs, the way that firms

 4    decide to develop, market and price drugs.

 5          So I guess I wouldn't use the use versus

 6    evaluate distinction.  It's more that I'm not an

 7    expert in how to design studies to evaluate safety and

 8    efficacy.  I'm not an expert in the basic science that

 9    underlies safety and efficacy, but I am -- I do have

10    expertise in the statistical analysis of safety and

11    efficacy and also the use of those data in economic

12    evaluations and analyses.

13    BY MR. O'CONNOR:

14        Q   Are you holding yourself out to be an

15    expert -- excuse me.

16          You're not holding yourself out to be an

17    expert in drug research and development generally, are

18    you?

19          MR. CASAZZA:  Objection; form.

20          THE WITNESS:  So I -- I guess that's a little

21    bit broad, but I -- I guess -- let me -- let me try to

22    narrow it down in a way that would make sense to me.

23          I'm not -- I -- I do have expertise in how

24    pharmaceutical companies make economic decisions

25    related to drug development and drug research.  I've
```

Darius N. Lakdawalla, Ph.D.

1    published on that question.  I don't profess to have

2    expertise in the question of, say, how to

3    commercialize a drug or how to -- how to conduct a

4    development program for a drug and bring it to market.

5    I view those as two separate kinds of activities.

6            But certainly in my academic research I have

7    written about firms' research and development behavior

8    and the determinants of that behavior, how competition

9    influences it, how data about safety and efficacy of

10   drugs influences it, how the design of clinical trials

11   influences it, those kinds of things.

12           And hopefully that distinction is clear.  I

13   think I just wouldn't quite make the distinction in

14   the way that you initially posed it.

15   BY MR. O'CONNOR:

16       Q   I understand.

17           Are you holding yourself out to be an expert

18   in drug company decision-making?

19           MR. CASAZZA:  Objection; form.

20           THE WITNESS:  I think -- I think, yes, to the

21   extent that I explained it earlier; that the economic

22   analysis of how firms in healthcare make decisions is

23   within the purview of health economics.

24   BY MR. O'CONNOR:

25       Q   Is it fair to say that you are holding

1    yourself out to be an expert in the economic

2    implications of, in this example, Gilead's drug

3    decision-making in this litigation?

4        A    I would say I'm holding myself out as an

5    expert in the economic determinants of Gilead's

6    decision-making, as well as the -- as well as its

7    implications.

8            I think the same would go potentially for

9    other stakeholders in the ecosystem that are either

10   competing with Gilead or deciding to prescribe drugs

11   or otherwise participating in the supply chain.

12       Q    Two phrases would be helpful to clarify from

13   my standpoint.

14           When you are using the phrase "determinants,"

15   what do you mean?

16       A    It's -- it's a reference to causes.  So, for

17   example, if I were to say what are the determinants of

18   a drug company's decisions, economists often refer to

19   the -- a term of art called "exogenous causal

20   factors," so there might be external causes that are

21   beyond the control of an actor like Gilead and those

22   causes might influence its decision-making.

23           Just to give you one example that's not an

24   exhaustive list, but just to give you one example, one

25   determinant of a drug company's decision-making would

1    be the underlying clinical characteristics of a drug

2    and once the drug is discovered, it -- those

3    underlying clinical characteristics are fixed.  They

4    are not necessarily known.  There's -- there's

5    typically uncertainty around the precise clinical

6    characteristics.  But the clinical characteristics

7    themselves are beyond the control of really anyone.

8    They just exist and are inherent to the drug and they

9    may influence a firm's decision-making.

10        That would be an example of a type of

11   determinant of decisions or a set of determinants of

12   decisions.

13        Q    Thank you.

14        And you used the phrase "other stakeholders"

15   within the context of decision-making.  What types of

16   entities are you referring to when you use that term?

17        A    Typically in the pharmaceutical market we

18   think about of course pharmaceutical companies.  Then

19   there are wholesalers that are in the supply chain.

20   There are insurance companies.  There are pharmacy

21   benefit managers.

22        There are prescribers, and that can be a

23   broad set.  It could be specialists, physicians,

24   general physicians, nurse practitioners, other --

25   other types -- in some states even pharmacists can

1    prescribe.

2              And speaking of, then there are pharmacies.

3    There are different kinds of pharmacies.

4              And then of course there are ultimately

5    patients.  And in addition to patients, there are

6    consumers who are paying health insurance premia but

7    may not themselves be sick with the condition of

8    interest, yet they're paying insurance premia that are

9    indirectly at least financing the purchases of the

10   drug in question.

11             I think that is -- I -- I suppose the

12   government is the stakeholder as well in some sense

13   through public health insurance and other sorts of

14   programs.

15             I think that's -- that's a reasonably

16   complete list.

17   Q   And this is me characterizing this, so

18   correct me if I'm wrong, you understand when you use

19   the term "stakeholders," you are referring to any

20   entity that might have a stake in the drug or drugs at

21   issue; is that a fair definition?

22   A   Well, I think in some cases I was using the

23   term generally, not specific to this matter.  But

24   yeah, if I were to say stakeholders within the context

25   of this matter, it would be one or -- or more of the

Darius N. Lakdawalla, Ph.D.

```
 1    types of entities I described that would have a stake
 2    in the -- to be specific, the tenofovir franchises
 3    that are -- that are at issue.
 4          There may be other related drugs like
 5    competitors' drugs, like GSK's Epzicom and others.
 6    But I think that -- subject to those qualifications, I
 7    think that's -- what you stated is -- is accurate.
 8      Q    You said this before, you have no background
 9    as an employee in a commercial strategy department at
10    a drug company, correct?
11      A    That's correct.
12      Q    And you have no background as an employee of
13    marketing in a drug company, correct?
14      A    Correct.
15      Q    And you have no background as an employee in
16    finance or financial planning at a drug company,
17    correct?
18      A    Correct.  To the extent -- and again, I think
19    you know this, but just for clarity, Mr. O'Connor, so
20    the -- this -- the employee part is important.  Some
21    of those questions, I have performed consulting in but
22    certainly not as an employee of the drug company.
23      Q    I recognize there's a legal distinction
24    there.  We will kind of go through all those things.
25    Thank you for the clarification.
```

```
 1              You are -- Dr. Lakdawalla, but you -- you are
 2     a doctor because you have your Ph.D., correct?
 3        A    That's correct.
 4        Q    You're not a medical doctor, correct?
 5        A    Correct, I'm not a medical doctor.
 6        Q    You're not a lawyer of any kind, correct?
 7        A    No, I'm not a lawyer.
 8        Q    God bless you.
 9              You're not a patent lawyer, right?
10        A    I'm not a patent lawyer.  I have conducted
11     quite a bit of economic research on the economics of
12     intellectual property protection in the pharmaceutical
13     industry and the medical technology industry, which I
14     understand that wasn't your question, but just to
15     clarify some of the context.
16              I'm not a patent lawyer, though.
17        Q    Thank you very much.
18              You are not holding yourself out to be an
19     expert -- strike that.
20              You're not holding yourself out to be a
21     regulatory expert, are you?
22              MR. CASAZZA:  Objection; form.
23              THE WITNESS:  I certainly have conducted
24     economic research on regulation.  And, in fact, my
25     endowed chair at USC is about -- or part of it is
```

Darius N. Lakdawalla, Ph.D.

1    about regulatory innovation.  So I guess I would --

2    I'm not quite sure how to answer the question in the

3    sense of how you specifically intended it.  But I -- I

4    would say I do have expertise in the economic analysis

5    of regulation as it relates to healthcare and medical

6    technology.

7    BY MR. O'CONNOR:

8        Q    Outside of that distinction in which you

9    noted your expertise in regulatory as it applies to

10   economic decision-making, are you holding yourself out

11   to be a regulatory expert in any other way?

12            MR. CASAZZA:  Objection to form.

13            THE WITNESS:  Let me -- maybe the best way to

14   handle this is just to reiterate and then make a

15   distinction about where my expertise ends.

16            I -- I have conducted economic analysis of

17   the effects of regulation and the design of optimal

18   regulation as it relates to healthcare and in the

19   healthcare -- sorry -- in the medical technology

20   fields.

21            I have not ever, for instance, served in a

22   regulatory body, and I don't claim to have experience

23   serving in a regulatory body.  So from that

24   perspective, that that's one -- I think that's an

25   important point at which my expertise extends and

1    ends.

2          But I have experience in evaluating the

3    behavior regulators as an economist.

4    BY MR. O'CONNOR:

5    Q    Put it this way:  Any other examples of your

6    expertise in the regulatory field as you understand it

7    besides those you have mentioned?

8    A    Not as I sit here today.

9    Q    Thank you.

10         Have you ever served on a cross-functional

11   team involved in drug development decision-making?

12         MR. CASAZZA:  Objection; form.

13         THE WITNESS:  In my capacity at Precision

14   Health Economics, we, in some cases, worked with

15   cross-functional teams, so I guess the "served with"

16   is a little ambiguous in my mind.  And in some cases

17   we've participated in cross-functional meetings

18   relating to the development of new assets or the

19   marketing or pricing of new assets.

20         I -- perhaps it would be just clearer to

21   harken back to the earlier testimony that I've never

22   been an employee of a pharmaceutical company.  So I've

23   never served on a cross-functional team as an

24   employee, but I believe that, in my view, I have

25   served on cross-functional teams in my capacity as a

Darius N. Lakdawalla, Ph.D.

1    consultant when I was a partner at Precision Health

2    Economics and the chief scientific officer of

3    Precision Medicine Group.

4    BY MR. O'CONNOR:

5        Q    Thank you.

6             Have you ever served on a board of directors

7    at a pharmaceutical company?

8        A    No, I have not.

9             MR. O'CONNOR:  Evan, would you please pull up

10   my internal document number 2.

11            And I'll mark this as Exhibit 1 to your

12   deposition, Dr. Lakdawalla.

13            Be throwing a lot of numbers around, so just

14   let me know if there's any points of confusion.

15            THE WITNESS:  Sure.

16            (Exhibit 1 marked.)

17   BY MR. O'CONNOR:

18       Q    Dr. Lakdawalla, please flip through this, but

19   I believe this is, and could you please confirm, that

20   this is your report in this case?

21            MR. CASAZZA:  And, Dr. Lakdawalla, are you

22   able to download the report and see it somewhere

23   that's easy enough to flip through?

24            THE WITNESS:  Let me take a shot at that.

25            Mr. O'Connor, would it be okay with you if I

Darius N. Lakdawalla, Ph.D.

```
 1    flipped through a hard -- a clean hard copy of my

 2    report?  I don't know if Kyle has one.

 3             MR. CASAZZA:  Would you like me to get you a

 4    hard copy?

 5             THE WITNESS:  Is that okay with you,

 6    Mr. O'Connor?

 7             MR. O'CONNOR:  Oh, my gosh, if that would

 8    make things easier, that's fine, yes.

 9             MR. CASAZZA:  Can we go off the record for --

10    for a very -- very short period of time.

11             THE VIDEOGRAPHER:  Off record; 9:22 a.m.

12             (Recess.)

13             THE VIDEOGRAPHER:  On record; 9:23 a.m.

14             MR. O'CONNOR:  Dr. Lakdawalla, we went off

15    the record and now we're back on.

16             And, Evan, would you please pull up what I've

17    marked as Exhibit Number 1.

18        Q    Doctor, you have a hard copy in front of you.

19             Is this your report in this litigation?

20        A    Yes.  Certainly the title page matches.

21        Q    Would you please flip through it and let me

22    know if anything about this is not your report in this

23    case.

24        A    Sure.  If you just give me one minute to just

25    scroll all the way through the version up on the
```

Darius N. Lakdawalla, Ph.D.

```
 1    exhibit share, I can -- I'm happy to do that.

 2         Q   No problem.

 3             MR. CASAZZA:  Looks like the numbers on the

 4    exhibit shows 82 pages.

 5             MR. O'CONNOR:  Correct.

 6             THE WITNESS:  Yes, Mr. O'Connor, this is my

 7    report.

 8    BY MR. O'CONNOR:

 9         Q   And your report is titled "Common-Issue

10    Rebuttal Expert Report of Darius N. Lakdawalla, PhD,"

11    and it's dated July 13th, 2022, correct, sir?

12         A   Yes.

13         Q   Okay.  Are all of your opinions and

14    conclusions for this litigation set forth in this

15    report, sir?

16         A   Yes.  With the qualifier that since I've

17    written the report, I've had the opportunity to review

18    the depositions by Professor Rosenthal and

19    Ms. Fontein.  And while the opinions set forth in this

20    report are not substantively different, I do have

21    opinions regarding some of their testimony.  But it

22    doesn't substantively change the opinions I set forth

23    in this report.

24         Q   Why don't we take care of that right now.

25             What are the opinions that you have for --
```

Darius N. Lakdawalla, Ph.D.

```
 1   sorry -- strike that.
 2          What opinions do you have regarding the
 3   testimony of Dr. Rosenthal?
 4      A   I -- well, I'll do my best to enumerate them.
 5   I'm not sure I'm going to get all of them in -- in
 6   terms of my responses to her testimony regarding my
 7   report, but I'll start with one of her points relating
 8   to a criticism of my empirical analysis.
 9          And in particular, she argued that my
10   empirical analysis suffered from the problem that the
11   forecasts I used from Gilead estimated growth in TDF
12   revenues that proved to be less than the actual growth
13   in TDF revenues.  I believe that her analysis is
14   incorrect.
15          And the opinions in particular are, first of
16   all, as I note in my report, the relevant issue is
17   what Gilead believed to be the case in 2004, not what
18   actually happened relating to TDF revenue.  And
19   Professor Rosenthal doesn't provide any reason to
20   doubt that the forecasts I relied upon from the
21   2003/2004 time frame reflected Gilead's beliefs
22   regarding TDF's future revenue growth at that time.
23          Second of all, even setting that aside, I
24   believe Professor Rosenthal is getting the economic
25   logic wrong.  Even if TDF revenue did grow faster than
```

Darius N. Lakdawalla, Ph.D.

1    the Gilead forecasts predicted, it would only

2    strengthen the case for launching TAF earlier because

3    to the extent that TDF grew faster, it would mean that

4    launching TAF earlier would be more valuable in the

5    sense that it would switch over a larger number of

6    patients from TDF to TAF before generic entry of TDF

7    molecules.

8         So what she herself identifies as the

9    protection, quote/unquote, that one gets from

10   launching a new product in order to protect an

11   incumbent, that protection value goes up when TDF

12   grows more rapidly.

13        And second of all, to the extent that TDF

14   grew more rapidly than predicted, it's likely that

15   incremental revenues of TAF, meaning that the

16   additional market share Gilead would have gained for

17   its franchise as a result of TAF's launch also would

18   have been higher than predicted leading, again, to a

19   stronger case for launching earlier.

20        And indeed, that is the case when you look at

21   the actual financials.  That the incremental revenue

22   from TAF, the launch of Genvoya, the actual TAF drug

23   that launched in I guess late 2015, was approximately

24   a billion dollars over a one-year period, which was

25   actually faster or larger than was predicted in

Darius N. Lakdawalla, Ph.D.

```
1    Gilead's forecasts.  And when incremental revenue is

2    higher, it actually leads to the conclusion that an

3    earlier launch is more valuable than a later launch.

4         So that -- that's one opinion of hers that I

5    believe is incorrect that she expressed in -- in her

6    deposition.

7    Q    Before you go on, can I ask one clarifying

8    question?

9    A    Sure.

10   Q    When you use the phrase "protection value,"

11   what are -- what are you referring to?  What does that

12   mean?

13   A    So she used the term "protection," and I

14   think in my report I use it in quotes as a reference

15   to what she says.

16        The idea that she's advancing is that to the

17   extent TAF is launched before the expiration of the

18   TDF patent, it would switch some patients from using

19   TDF to using TAF instead and those switched patients

20   would be protected -- again, these are -- this is the

21   word that she uses -- from market stealing by the

22   entry of a TDF generic.

23        So when I talk about protection value, I'm

24   referring to the value to Gilead of launching TAF

25   prior to -- anytime prior to the expiration of the TDF
```

1    patent, being able to switch some patients from TDF to

2    TAF and thus protecting those switched patients from

3    competition by the entry of TDF generics eventually.

4        Q   Very good.

5            You were going to go on to another

6    opinions -- or other opinions that you disagreed with

7    that you'd like to share about Dr. Rosenthal's report.

8    Please go ahead.

9        A   Sure.  Thank you.

10           I think -- she also noted that -- she noted

11    one point which -- which I think is relevant, and I

12    believe she's agreeing with one of the criticisms I

13    made in my report.

14           In my report I noted that it was not the case

15    that Gilead believed launching TAF earlier would

16    actually extend its exclusivity period for the HIV

17    franchise and, rather, that the market exclusivity

18    that is sometimes referred to in Gilead documents, as

19    I note in my report, is specifically referring to the

20    fact that TAF patent expires four years later than the

21    TDF patent.

22           Or just for clarity, those are the patent

23    expiration timings at the time of the 2004 decision to

24    stop TAF development.  My understanding is that the

25    patent expiration dates may have changed since then.

1   But as of that 2004 period, there was a four-year gap

2   between the TDF patent expiration date and the TAF

3   patent expiration date.  And I pointed out that that

4   was actually the source of the market exclusivity in

5   the documents that Professor Rosenthal was citing.

6         And in her deposition testimony she appears

7   to agree with that conclusion.  She specifically says

8   that Hatch-Waxman exclusivity is not part of her

9   opinion as it relates to market exclusivity.  And as

10  such, since it's about the difference in patent

11  expiration dates, the extension and market exclusivity

12  would happen if TAF is launched as long as it's

13  launched before the TDF patent expiration date, then

14  the HIV franchise exclusivity period gets extended.

15  The timing of the TAF launch actually doesn't bear,

16  then, on the length of the HIV franchise exclusivity

17  because the timing of the launch doesn't affect TAF's

18  patent expiration date.

19        I'm think -- I -- I do recall, Mr. O'Connor,

20  I feel like there were one or two other points in her

21  deposition.  I can't recall them from memory as I sit

22  here.  I'm happy to go through sort of the back part

23  of her deposition to enumerate them, if you'd like.

24  But those are -- those are the two that I recall off

25  the top of my head, though, as I sit here.

Darius N. Lakdawalla, Ph.D.

1       Q   As you sit here.  Okay.

2           And you say there might have been more, but

3    you can't recall what your other opinions or issues

4    that you may have had with Professor Rosenthal's

5    opinion, as you sit here right now?

6           MR. CASAZZA:  Objection; form.

7    Mischaracterizes prior testimony.

8           THE WITNESS:  So I think what I'm saying is I

9    just don't remember off the top of my head all of her

10   criticisms.  As soon as I see her criticisms -- I know

11   what my opinions are in response to those criticisms.

12   And if I -- if I see her deposition testimony, I'm

13   more than happy to tell you exactly what my opinions

14   are with respect to the criticisms she advances in the

15   deposition.

16   BY MR. O'CONNOR:

17      Q   Okay.  Outside of those that you're referring

18   to, what are your opinions, additional and outside

19   that which you have set forth in your report,

20   regarding the opinions of Saskia Fontein?

21      A   So my understanding of Ms. Fontein's

22   testimony is that she continues to note that an

23   earlier launch of TAF could have increased market

24   share for the HIV franchise at Gilead.

25           I guess I think it's fair to say that that is

Darius N. Lakdawalla, Ph.D.

```
 1    I think consistent with what I -- with the opinions

 2    that I expressed in my report.

 3           So in my report what I noted was that she had

 4    advanced several claims that supported the notion that

 5    launching TAF earlier would be more profitable for

 6    Gilead than delaying TAF.  And I believe in her

 7    testimony she noted that launching TAF earlier could

 8    have increased market share for the Gilead HIV

 9    franchise, which I think is supportive of the points

10    that I made in my report and also contradicts

11    Professor Rosenthal's view that Gilead had an economic

12    incentive to delay.

13           Which actually reminds me, another point that

14    Professor Rosenthal raised in her deposition, I

15    apologize for switching back to that, but I just

16    remembered another issue there.

17           That Professor Rosenthal appears in the

18    deposition to offer the opinion that it's possible in

19    some conceptual sense for Gilead to have profited from

20    delay, but she does not go so far as to say that the

21    evidence makes it more likely, in any way that I saw,

22    that Gilead would have profited from delay.  Rather,

23    she just advances the conceptual possibility.

24           In my analysis, what I do is I conduct

25    empirical analysis that leads me to the inference that
```

Darius N. Lakdawalla, Ph.D.

```
 1   it's not likely that Gilead would have, in fact,
 2   profited from a delay strategy.
 3          And, in fact, the point that in principle
 4   there are multiple competing economic incentives makes
 5   it important to conduct empirical analysis to
 6   determine what the net effect of those incentives are
 7   on Gilead's profitability.  And my empirical analysis
 8   indicates that Gilead would have profited from an
 9   earlier launch of TAF.
10          But returning to the question you had just
11   asked me regarding Ms. Fontein's deposition, as I sit
12   here, I don't recall any other points from her
13   deposition from memory.  Again, I'm happy to flip
14   through it to ascertain if I'm missing anything from
15   her deposition that I have responses to.
16      Q   But as you sit here today, without flipping
17   through the deposition testimony again, do you have
18   any other opinions other than those you've already
19   stated regarding the deposition testimony of
20   Dr. Rosenthal and Ms. Fontein?
21      A   Not as I sit here, and to the extent that I
22   can recall from memory their opinions, but not -- not
23   as I sit here.
24      Q   Would you, based on the testimony of
25   Dr. Rosenthal and Ms. Fontein, make any edits to your
```

Darius N. Lakdawalla, Ph.D.

```
 1    expert report that we see in front of us as Exhibit 1?
 2           MR. CASAZZA:  Objection; form.
 3           And, Ben, maybe I can help move this along.
 4    Are you asking whether he would change anything that's
 5    in there or are you trying to ask whether there are
 6    things he would add?
 7           MR. O'CONNOR:  Either/or.
 8      Q    Would you -- I'll ask it this way, Doctor.
 9           Having reviewed those deposition testimonies
10    of Dr. Rosenthal and Ms. Fontein, would you change
11    anything about your expert report?
12           MR. CASAZZA:  Objection; form.
13           THE WITNESS:  I don't believe that -- well,
14    let me say this.
15           I don't believe anything in the expert
16    report -- I haven't changed my mind about the accuracy
17    or validity of anything I write in the expert report.
18           It is true, as I testified, that I have
19    responses to some of the criticisms that were made and
20    those criticisms were not known to me at the time that
21    I filed the report so they're not contained in it.
22           I don't know that -- if you're asking me if I
23    plan to file a supplemental report, that's a different
24    question, potentially.  But I -- I don't see any
25    changes to the report that I would make because I
```

Darius N. Lakdawalla, Ph.D.

```
 1    think the opinions that I've offered continue to -- to
 2    be valid.
 3    BY MR. O'CONNOR:
 4        Q   Let me ask it this way, then.
 5            Would you change anything about your
 6    substantive opinions or conclusions in your report
 7    based on your review of Dr. Rosenthal's and
 8    Ms. Fontein's deposition?
 9        A   Thank you for the clarification.
10            No, I don't believe that I would change any
11    of my substantive opinions or conclusions in response
12    to the deposition testimony.
13        Q   Have you formed any opinions or conclusions
14    in this litigation that are not set forth either in
15    this report or in what you described in response to
16    the deposition testimony of Dr. Rosenthal and
17    Ms. Fontein?
18        A   Well, I'd want to qualify just by saying the
19    earlier testimony regarding my responses to their
20    deposition was purely from memory.  So I don't -- I
21    don't claim to have enumerated all of the responses
22    they advanced to the analysis that I conducted.
23            But setting aside any deposition testimony
24    that they may have given as criticism of my work that
25    I haven't recalled, the answer is, this is -- that the
```

1    report plus my earlier testimony is complete, but I

2    would reserve the right to offer additional opinions

3    to the extent that I remember more deposition

4    testimony from Ms. Fontein or Professor Rosenthal or

5    if I -- or if you'd like me to go through the

6    deposition text, that would be fine, too.

7           But just subject to that qualifier, I would

8    agree to your statement subject to that qualifier

9    about my recall of the depositions.

10      Q   And the only additional opinions or

11   conclusions that you would be potentially discussing

12   would be in response to the deposition testimonies of

13   Dr. Rosenthal and Ms. Fontein, correct?

14      A   Yes, I agree with that statement.

15      Q   Are you currently doing any additional work

16   on this litigation?

17      A   Well, I prepared for this deposition today.

18   I'm not sure what your question was about exactly.

19   But I have been doing that.

20      Q   Outside of testimony in this case and

21   preparation of the reports, do you have any plans to

22   do any additional work in this litigation?

23      A   Not at this time.  But as I note in my

24   report, I reserve the right if new information that I

25   feel is material comes to light.  But at this time

Darius N. Lakdawalla, Ph.D.

 1    I'm -- I'm not planning to offer additional opinions

 2    in a different report.

 3         Q   Are you aware of any inaccuracies or

 4    corrections to your report that need to be made, as we

 5    sit here today?

 6         A   Nothing substantive.  I noticed a couple of

 7    typos in reviewing it.  There was one in paragraph 79

 8    where I forgot to add the word "cannibalizing" in the

 9    second sentence, but I think it was reasonably clear

10    from the context.

11             And I believe there was a verb agreement

12    problem I noted in the earlier part of my report.  I

13    just don't remember where that was.  But I wouldn't

14    characterize those as substantive issues that require

15    revision.  They're just typographical.

16         Q   I understand.  Thank you, Doctor.

17             Could we jump ahead in Dr. Lakdawalla's

18    report to Appendix A.

19             And I believe that is -- Dr. Lakdawalla,

20    you've attached as Appendix A to your expert report

21    your curriculum vitae, correct?

22         A   That's right.

23         Q   Is the curriculum vitae attached as

24    Appendix A to your expert report your current

25    curriculum vitae, or CV?

Darius N. Lakdawalla, Ph.D.

```
 1        A    It is.  I would just add the qualifier I
 2   don't always update the publication list in real time.
 3   So I don't -- there may be one or two minor additions
 4   to my publication list if something that's forthcoming
 5   maybe recently got released online or if another paper
 6   got accepted.  But I wouldn't consider those to be
 7   substantive changes.
 8             And this was current at the time I filed it.
 9   I'm just not a hundred percent sure if the publication
10   list is accurate up to the minute.
11        Q    I understand.
12             When you say it was current as of the time
13   you filed it, that means it was current as of July 13,
14   2022, correct?
15        A    To the best of my knowledge.  Although, I
16   will note that sometimes there might be a breaking
17   publication acceptance that slips my notice for a few
18   days.  But it was as close as I can get it on
19   July 13th.
20        Q    Attached as Appendix B to your report is a
21   list of prior testimony that you've provided, correct,
22   sir?
23        A    That's correct.
24        Q    And we'll talk about each of these.
25             Attached as Appendix C is a list --
```

```
 1        A    I'm sorry, Mr. O'Connor, may I add something
 2   about Appendix B first?
 3        Q    Sure.
 4        A    Since I filed the report I was deposed in one
 5   other matter, and so there's one more that I would add
 6   to the list.
 7             It is Scilex versus Virpax in Delaware
 8   Chancery Court.  And I was deposed on that matter -- I
 9   believe it was a few weeks ago, if I'm not mistaken.
10        Q    Okay.  So Scilex versus Virpax, correct?
11        A    Yeah, it's -- the spelling is S-c-i-l-e-x and
12   V-i-r-p-a-x.
13             And I believe there were some other
14   defendants.  Anthony Mack, M-a-c-k, was a defendant.
15   I might be missing some others, but that's the -- I
16   think those are the principal parties involved.
17        Q    Okay.  We'll get into detail on those.  Thank
18   you for the clarification.
19             Appendix C is a document entitled "Materials
20   Considered List," correct?
21        A    Correct.
22        Q    And these three appendices plus your
23   substantive report constitute the entirety of the
24   report that you produced on July 13, 2022, correct?
25        A    Yes, that's correct.
```

Darius N. Lakdawalla, Ph.D.

```
 1            MR. O'CONNOR:  If we could please turn back
 2   and go back to the prior testimony, that would be
 3   Appendix B, please, Evan.
 4       Q   You mentioned, Doctor, your deposition
 5   recently in Scilex versus Virpax, Inc., and you said
 6   this testimony was a few weeks ago.  Was that in
 7   August or July, if you recall?
 8       A   I'm not quite sure.  I believe it was in -- I
 9   believe it was in late July, but to be honest, I'm not
10   a hundred percent sure whether it was late July or
11   early August.
12       Q   And that was in Delaware Chancery Court was
13   where the proceedings taking place, correct?
14       A   Right.  Of course I was deposed here in
15   Los Angeles.  But yes, the case is -- is within the
16   Delaware Chancery Court system, as I understand it.
17       Q   Besides that which you just referenced, are
18   there any other testimonies, depositions or otherwise,
19   that you would list on this document?
20       A   No.
21       Q   Have you ever testified on behalf of a
22   natural person?
23            MR. CASAZZA:  Objection; form.
24            THE WITNESS:  You mean have I testified for a
25   plaintiff or defendant where one of the plaintiffs or
```

1    defendants was a person as opposed to a corporate

2    entity; is that the question?

3    BY MR. O'CONNOR:

4        Q    Correct.

5        A    I actually am not sure -- in -- in the Scilex

6    versus Virpax matter, I was -- I was an expert for the

7    plaintiff, and I don't remember if there were any

8    individual plaintiffs on that case.  So I just don't

9    remember that one.

10           As far as I understand, the participants in

11   these other litigations, I don't think any of the

12   other litigations involve natural people,

13   quote/unquote.  I guess I don't -- I shouldn't use

14   that term since I don't exactly know what it means.

15           But it's -- I'm not representing individuals

16   on any of these.  There may have been someone -- some

17   individual plaintiff involved in the Scilex matter.  I

18   just don't remember.

19       Q    In the first entry it reads, "In re JUUL

20   Labs, Inc. Marketing, Sales Practices, and Products

21   Liability Litigation," correct?

22       A    That's correct.

23       Q    Looks like you were deposed twice in that

24   litigation, correct?

25       A    That's right.

Darius N. Lakdawalla, Ph.D.

```
1        Q    Who -- who did you testify on behalf of in

2    that case?

3        A    It was for Juul Labs.

4        Q    What was the nature of that litigation?

5        A    That litigation was -- concerned the claim

6    that Juul's marketing practices had created harms to

7    plaintiffs by inappropriately exposing youth to

8    vaping.  And so I believe it was -- these were

9    bellwether cases, as I understand it, although I don't

10   profess to be an expert on what that exactly means,

11   but I think it means as opposed to a class action in

12   some fashion.

13            And they were -- so this was about litigation

14   connected to the allegation that Juul's behavior and

15   marketing practices increased youth vaping rates and

16   that led to harms for the plaintiffs.

17       Q    The next entry is, "Victor G. Karraa et al.

18   versus Gilead Sciences, Inc."

19            Did you testify on behalf of Gilead Sciences

20   in that matter?

21       A    Yes.

22       Q    And it's noted that this is the Judicial

23   Council Coordination Proceeding, or JCCP, based out of

24   San Francisco County and California, correct?

25       A    Yes, that's what it says.
```

Darius N. Lakdawalla, Ph.D.

```
 1      Q   And is it fair, if we can agree, that this --
 2  that this litigation is the state court -- state court
 3  corollary to what we're engaging in in this
 4  deposition; is that a fair understanding?
 5      A   So I -- I would be a little careful just
 6  because I don't know all of the legal distinctions and
 7  issues.  But just from my perspective as -- as an
 8  expert witness, it is the case that the issues are
 9  quite similar.  There are some differences to the
10  extent that plaintiff experts in these two matters are
11  making somewhat different arguments.  So from my
12  perspective the substance is a little bit different.
13          I don't know officially whether there is a
14  legal relationship that would make these cases
15  parallel in some fashion, but I believe that they're
16  related and the substance appears to be at least
17  somewhat overlapping.
18      Q   Can we agree that when I'm referring to the
19  JCCP, I'm referring to Victor G. Karraa, et al., v.
20  Gilead Sciences, Inc. for the sake of this deposition?
21      A   Sure.  And I'll try to remember that
22  nomenclature.
23      Q   If you need clarification, please let me
24  know.
25      A   Sure.
```

```
 1        Q   You noted, also, third on this list is
 2   Perrigo Securities Litigation, correct?
 3        A   Correct.
 4        Q   It appears that you were deposed twice in
 5   that case, correct?
 6        A   Correct.
 7        Q   On whose behalf were you deposed in that
 8   case?
 9        A   Perrigo.
10        Q   What is Perrigo?
11        A   Perrigo -- pardon me.  Perrigo used to be a
12   generic drug company.  I believe that they sold their
13   generic drug divisions.  But the litigation is
14   connected to a period during which Perrigo was
15   manufacturing generic drugs.
16        Q   And then finally, you list in Appendix B,
17   "In re Mylan N.V. Securities Litigation," correct?
18        A   That's correct.
19        Q   And who did you testify on behalf of in that
20   litigation?
21        A   Mylan.
22        Q   What is Mylan?
23        A   Among others things, Mylan manufactures
24   generic drugs.  I believe that they are involved in
25   other industries as well.  But that was the relevant
```

1   issue for that case.

2        Q   And it appears that you were deposed once in

3   that litigation, correct?

4        A   That's right.

5        Q   You mentioned also your testimony in Scilex

6   versus Virpax, et al.  You were deposed within the

7   past few weeks, correct, sir?

8        A   Yes, it might have been as far back as a

9   month ago.  I just -- one thing I'm certain of is it

10  happened after the filing date.  I think it was

11  something on the order of two to three weeks after

12  that, but I just don't, for whatever reason, happen to

13  remember the date.  But roughly speaking, that's when

14  it was.

15       Q   And you said you were deposed on behalf of

16  Scilex and the other plaintiffs in that case, correct?

17       A   That's correct.  I don't -- I don't actually

18  remember if there were other plaintiffs, but I'm just

19  opening the possibility because I don't remember how

20  many plaintiffs there were.  But Scilex -- I was

21  retained by Scilex.

22       Q   Exactly what I was going to ask you.  Thank

23  you for that clarification.

24           What was the nature -- well, first off, what

25  is Scilex?

Darius N. Lakdawalla, Ph.D.

```
1       A    Scilex is a drug company.  They produce pain
2   medication drugs.
3       Q    And what is the nature of that litigation?
4       A    It is a breach of contract, breach of
5   fiduciary duty and misappropriation of trade secrets
6   case that was brought by Scilex against its former
7   CEO, Anthony Mack, and the company that he founded,
8   Virpax.
9       Q    And you said you are testifying in the Scilex
10  matter on behalf of the plaintiffs, correct, sir?
11      A    That's right.
12      Q    Have you ever testified on behalf of
13  plaintiffs in any of the other litigations?
14      A    Not the ones listed here.
15      Q    Are there any -- are there any types of
16  litigation that are not listed here that we haven't
17  discussed in which you testified as -- on behalf of
18  plaintiffs?
19      A    Oh, not in which I've testified, but I have
20  been retained by plaintiffs in at least one matter
21  that I can think of that ended up settling before it
22  got to the point of a report being filed and testimony
23  being taken.
24      Q    What was that case?
25           MR. CASAZZA:  I just want to caution the
```

Darius N. Lakdawalla, Ph.D.

```
1    witness, I wasn't involved in the matter, but to the
2    extent your involvement was privileged and remained
3    confidential, please don't disclose that.  If your
4    involvement in the case had been disclosed to the
5    other side in the litigation, then -- then you're --
6    you're free to disclose it.
7              MR. O'CONNOR:  Well, I'll note on the record,
8    too, that this deposition can be protected for
9    confidentiality sake.  I'm not asking whether or
10   not --
11      Q   I'm not asking for you to get into privileged
12   discussions, Dr. Lakdawalla, but to the extent it's
13   confidential, I think it's fair for you to discuss and
14   for it to be marked as -- as such.  So my -- let me
15   rephrase.
16             The matter in which you said you were hired
17   as a consultant but on behalf of plaintiff and the
18   report -- and never reached the point of a report, who
19   hired you?
20             MR. CASAZZA:  And, Dr. Lakdawalla, to the
21   extent your involvement in that case was never
22   disclosed to your client's litigation adversaries in
23   that case, I'd instruct you not to answer.
24             THE WITNESS:  So my -- my participation was
25   not disclosed.  At a very high level, it was a
```

Darius N. Lakdawalla, Ph.D.

```
1    hospital pricing dispute that I was involved in.

2    BY MR. O'CONNOR:

3        Q    That's fine.

4             Any other matters in which you have been

5    retained as an expert that are not either listed here

6    or that we've discussed today?

7             MR. CASAZZA:  And same caveat,

8    Dr. Lakdawalla.  To the extent your participation in

9    any matter wasn't disclosed to your client's

10   litigation adversary, I'll instruct you not to answer.

11            THE WITNESS:  So there's one other matter in

12   which I wasn't disclosed.  At a high level, it was

13   a -- it was a securities class action case in the

14   pharmaceutical industry.

15   BY MR. O'CONNOR:

16       Q    In the two cases that you've mentioned which

17   you were retained as an expert, what type of entity

18   were your clients?  You don't have to name them.

19       A    Could you be more specific?

20       Q    How would you characterize --

21       A    The legal entity?

22       Q    Yeah.  How would you characterize your

23   clients?

24       A    I believe that they were -- in one -- that

25   they were corporate entities.  I don't remember -- one
```

Darius N. Lakdawalla, Ph.D.

```
 1    of them might have been nonprofit.  I just don't
 2    remember.
 3        Q   In the case in which you mentioned it was a
 4    hospital dispute, were you testifying on behalf of a
 5    hospital or health system?
 6            MR. CASAZZA:  Objection; form,
 7    mischaracterizes prior testimony.
 8            MR. O'CONNOR:  I'll -- I'll rephrase.
 9        Q   In the case in which you -- which you said
10    was -- involved a hospital dispute, were you retained
11    by either a hospital or a healthcare system?
12            MR. CASAZZA:  Objection; form.
13            THE WITNESS:  I was retained by an entity
14    that I believe owned hospitals.  So I think that -- I
15    think that's the best way to characterize it, although
16    I don't profess to know if they own other kinds of
17    organizations.  But they -- they did own hospitals.
18    BY MR. O'CONNOR:
19        Q   And the other matter in which you were
20    retained which you said involved some form of a
21    pharmaceutical dispute, was the client that retained
22    you a pharmaceutical company?
23        A   Yes.
24        Q   Was it a pharmaceutical company that worked
25    in branded or generic drugs?
```

```
 1       A    Branded drugs.  I don't know if they were

 2   also producing generics, but they were in the branded

 3   drug space.

 4       Q    Thank you.

 5            Besides the deposition testimony listed in

 6   Appendix B, as well as your deposition testimony in

 7   the Scilex versus Virpax matter, have you ever

 8   provided any other testimony under oath?

 9       A    Yes.

10       Q    What were the -- those circumstances?

11       A    I provided testimony under oath at a hearing

12   in July connected to the JCCP case.  I hope I'm using

13   the acronym correctly.

14       Q    You are.

15            And when -- just so we're clear going

16   forward, when we're referring to the JCCP case, you're

17   referring to the Gilead tenofovir cases based in

18   San Francisco state court; is that fair?

19       A    That's my understanding, yes.

20       Q    What did you testify about at that hearing?

21       A    I'm sorry, you said when or what?  I just

22   didn't hear you.

23       Q    Well, we'll do that.

24            When did you testify at -- in the JCCP

25   hearing?
```

1       A   I believe it was approximately the middle of

2   July.

3       Q   And what did you testify about?

4       A   There was a Sargon motion, and I was asked to

5   testify in a hearing about the Sargon motion.

6       Q   What is a Sargon motion, as far as you know?

7       A   I'm sure I won't describe it accurately from

8   a legal standpoint.  But my understanding is that

9   there was a motion to exclude my testimony at trial.

10      Q   Besides the testimony that you mentioned at

11  the JCC -- JCCP hearing and the deposition testimony

12  that we've discussed already, are there any other

13  instances in which you have testified under oath?

14      A   Not that I can think of.

15          There were -- there was one employment action

16  at USC where I think I was interviewed by USC's

17  attorneys.  I'm fairly certain that was not under oath

18  or it never got to the point where I was testifying

19  under oath, but I just don't precisely recall.  So

20  just for completeness, I'll mention that in case that

21  at some point I testified under oath.  But in that

22  case I was a fact witness.

23      Q   Okay.  Dr. Lakdawalla, how did you prepare --

24  well -- strike that.

25          How much time have you spent preparing for

1    this deposition?

2        A   I don't know exactly because I haven't put

3    that together yet, but I suspect it was something in

4    the ballpark of about 20 to 25 hours.

5            MR. O'CONNOR:  And while we're doing that,

6    I'd like to note, Counsel, we have not received

7    Dr. Lakdawalla's retainer agreement and related

8    invoices related to his work on this case, and I'd

9    request on the record those be provided prior to the

10   end of this deposition or we can continue any closure

11   of this deposition.

12           MR. CASAZZA:  My understanding is those were

13   provided this morning.

14           MR. O'CONNOR:  Okay.

15           MR. CASAZZA:  Also, we've been going about an

16   hour ten, maybe we should take a break, go off the

17   record, we can sort that out at this point.

18           MR. O'CONNOR:  Perfect.  Thank you.

19           Let's go off the record.

20           THE VIDEOGRAPHER:  Off record; 10:04 a.m.

21           (Recess.)

22           THE VIDEOGRAPHER:  On record; 10:17 a.m.

23   BY MR. O'CONNOR:

24       Q   Dr. Lakdawalla, how did you prepare for

25   today's deposition?

```
 1      A   I reviewed the deposition testimonies of

 2   Ms. Fontein and Professor Rosenthal.  Of course I went

 3   over my report and their report and associated

 4   materials.  I met with my research assistants at

 5   Cornerstone, and I met with counsel.

 6      Q   These meetings with Cornerstone and counsel,

 7   were these separate meetings?

 8      A   There were meetings with Cornerstone and then

 9   there were meetings with Cornerstone and counsel.

10      Q   The meetings with Cornerstone alone, with

11   whom did you meet at Cornerstone?

12      A   I met with Dr. Penka Kovacheva, Danny Harley,

13   Helen Lan and Tiffany Shih.

14      Q   And what did you discuss at this meeting?

15          MR. CASAZZA:  I'm going to instruct the

16   witness not to answer pursuant to paragraph 5C of the

17   order regarding expert discovery in Holley.

18          (Instruction not to answer.)

19          MR. O'CONNOR:  That's fine.

20      Q   When you met with counsel, which counsel did

21   you meet with?

22      A   Mr. Casazza and Mr. Sirles.

23      Q   About how many times did you meet with

24   personnel from Cornerstone alone?

25      A   I believe it was twice.
```

Darius N. Lakdawalla, Ph.D.

```
 1        Q    And did you have any meetings with counsel

 2   alone without Cornerstone?

 3        A    No.

 4        Q    Okay.  How many times did you meet with

 5   counsel and Cornerstone together?

 6        A    Twice.

 7             I apologize, but there's quite a bit of

 8   background noise.  I'm not sure, Mr. O'Connor, it's

 9   from your audio or something else.

10             MR. O'CONNOR:  Is it?

11             Let's go off the record.

12             THE VIDEOGRAPHER:  Off record; 10:19 a.m.

13             (Recess.)

14             THE VIDEOGRAPHER:  On record; 10:25 a.m.

15   BY MR. O'CONNOR:

16        Q    Dr. Lakdawalla, who has retained you to serve

17   as an expert in this case?

18             MR. CASAZZA:  Objection; form.

19             THE WITNESS:  I believe that it was Sidley

20   Austin, although I will confess I don't exactly

21   remember the form of the engagement letter.

22             MR. O'CONNOR:  Well, you know, let's pull it

23   up.

24             Evan, do you have the documents that I just

25   sent you?
```

Darius N. Lakdawalla, Ph.D.

```
 1              TRIAL TECHNICIAN:  Yes, I do.
 2              MR. O'CONNOR:  Would you please pull up
 3    Lakdawalla_Darius_retention AGMT.
 4         Q   And, Doctor, I apologize, I know it's Darius.
 5    I believe --
 6         A   Darius, actually.
 7         Q   Yes, I'm sorry.  I will keep making that
 8    mistake.  I'll do my best not to do it.
 9         A   Okay.  No problem at all.
10         Q   Doctor, I'll represent this document was
11    produced to me just before your deposition began.
12    Could you please look through it.
13              Is this the retention agreement that you have
14    regarding this litigation?
15         A   Yes, I believe so.
16         Q   And I'll be marking this, I believe we are on
17    Exhibit 2 to your deposition.
18              (Exhibit 2 marked.)
19              MR. O'CONNOR:  And could we please flip
20    through it.
21         Q   It appears at the very end that it was signed
22    by you and Joshua Anderson, correct?
23         A   Right.  Is that a signature by Mr. Anderson?
24    But yes, I -- maybe it's a legal signature.  I'm not
25    sure.
```

Darius N. Lakdawalla, Ph.D.

```
 1            But yes, to the extent that that's a legal

 2   signature, it's signed by both of us.

 3       Q   I'll make it easier for you.

 4            Does it read "Sincerely," backslash S

 5   backslash, "Joshua E. Anderson"?

 6       A   Yes.  I apologize for my lack of knowledge

 7   about how the signatures work.  But yes, that's

 8   correct.

 9       Q   And the letterhead on this agreement reads

10   "Sidley Austin," correct, sir?

11       A   That's right.

12       Q   And at the very first paragraph --

13            If we could zoom in on that, please.

14            -- it says, "Dear Darius:  After consultation

15   with our client, Gilead Sciences, Inc., this letter

16   formalizes Quantitative Health Group, LLC's agreement

17   with Sidley Austin LLP to provide your expert services

18   in connection with litigation involving prescription

19   medications containing tenofovir disoproxil fumarate

20   ('TDF') (the 'TDF Litigation')."  Correct?

21       A   Yes, that's correct.

22       Q   And what is Quantitative Health Group, LLC?

23       A   It's the LLC that I use to run my litigation

24   consulting through.  It has -- the members are me and

25   then another person that basically handles the
```

1    finances for me.

2        Q    Okay.  Does Quantitative Health Group have

3    any other employees besides you and this person who

4    you mentioned who runs the finances?

5        A    We employ a person to help with scheduling

6    and documents and those sorts of administrative tasks.

7        Q    I understand.

8            Besides those three people, are there any

9    other employees of Quantitative Health Group, LLC?

10       A    I don't think so.  I believe there have been

11   a few projects that have since been concluded where we

12   brought on some staff to assist with the research.

13   Those were not litigation consulting projects.  They

14   were other economic consulting projects.

15           And I think some of the California-based

16   staff were technically classified as employees.  But I

17   think -- I believe those agreements have been

18   terminated and there are no additional employees.

19       Q    Thank you.

20           Could you pull off the callout, please, Evan.

21           The bottom third to one-half of the first

22   page is blacked out in what I've presented to you,

23   correct, sir?

24       A    Yes.

25           MR. O'CONNOR:  If we turn the page, please.

```
 1       Q   Besides the heading, the entire page of

 2   page 2 is blacked out, correct?

 3       A   Yes.

 4           MR. O'CONNOR:  Could you please turn the

 5   page.

 6       Q   It appears that the -- at the top and the

 7   bottom there are also portions of page 3 that are

 8   blacked out, correct, sir?

 9       A   Yes.

10       Q   And then the portion that's not blacked out

11   is entitled "Fees" correct?

12       A   Correct.

13       Q   And it appears that you -- you are being paid

14   or Quantitative Health -- strike that.

15           It appears that Quantitative Health will bill

16   for your services at a customary rate of $900 per

17   hour, correct?

18       A   Correct.

19       Q   Do you distinguish, sir, your hourly time

20   between time spent preparing your expert report and

21   time spent testifying?

22       A   I'm sorry.  Distinguish in what way?  I mean,

23   clearly they are different.

24       Q   Yes.  Do you -- do you charge differently or

25   a different rate for testifying versus preparation of
```

Darius N. Lakdawalla, Ph.D.

```
 1   a report?
 2        A   No, I don't.
 3        Q   Do you charge differently for testimony in
 4   deposition versus testimony at a hearing or in court?
 5        A   No, I don't.
 6        Q   And it says this is your usual or customary
 7   rate.  But just to confirm, are any of the rates
 8   discussed in this letter, that is $900 per hour,
 9   different from your typical rates for you to serve as
10   an expert?
11        A   No.
12        Q   Have you ever received any payment or other
13   financial benefit from Gilead outside of your work on
14   this litigation?
15        A   No, I -- but just to clarify, Gilead, along
16   with other types of healthcare companies, has provided
17   support to the Schaeffer Center where I work at USC,
18   the Schaeffer Center for Health Policy & Economics.
19   But that's not -- I think the answer to your question
20   would remain no because they don't support me or my
21   research directly.  They -- it's just donations to the
22   center.
23            And they were at some point clients at
24   Precision Health Economics, probably about nine years
25   ago or something like that.  So they would have paid
```

Darius N. Lakdawalla, Ph.D.

```
 1    fees, I imagine, to Precision Health Economics.

 2              But outside those two categories, the answer

 3    would be no.

 4         Q    Okay.  If you turn back to your report,

 5    please.

 6              Evan, would you turn that -- would you turn

 7    to paragraph 8, please.

 8              Paragraph 8.  You mention and you write, "I

 9    am being compensated at my standard billing rate of

10    $900 per hour in this matter.  I have been assisted in

11    this matter by staff at Cornerstone Research, who

12    worked under my direction."

13              Did I read that correctly?

14         A    Yes.

15         Q    You then write, "I receive compensation from

16    Cornerstone Research based on its collected staff

17    billings for its support in this matter."

18              Did I read that correctly?

19         A    Yes.

20         Q    May have been clear before, but just so it's

21    clear for the record, what is Cornerstone Research?

22         A    Cornerstone Research is a firm that provides

23    research assistants to expert witnesses in litigation

24    consulting matters.

25         Q    To the best of your knowledge, who hired
```

1    Cornerstone Research to work on this litigation?

2         A    I actually don't know specifically how

3    Cornerstone's contracting worked in this litigation.

4         Q    Let me put it this way.

5              How, then, did you come to work together with

6    Cornerstone Research on this litigation?

7         A    I believe that Cornerstone contacted me in

8    the summer of 2021, it may have been slightly before

9    that, I don't recall the exact timing, and mentioned

10   that there was litigation that involved a drug for

11   Gilead and they asked if I was interested in it

12   because they thought it might match some of my areas

13   of research.

14             And based on their description, I thought it

15   sounded interesting and aligned with the work that I

16   had done and then I -- I at that point met with some

17   set of attorneys, I don't remember exactly who, and

18   that's how I came to be involved with it.

19        Q    Just a point of clarification from before.

20             Are you being paid for your services in this

21   case by Sidley Austin?

22        A    So mechanically, just for convenience, I

23   typically submit my invoices to Cornerstone and then

24   Cornerstone pays them and then ultimately Cornerstone

25   issues a bill.  And I'm not exactly sure how they do

```
 1    their billing.  It is my understanding that -- that if

 2    they don't ultimately get paid that I -- I could

 3    potentially have some of that payment clawed back,

 4    which hasn't happened, but I think it's -- the point

 5    is that it's ultimately passed through.  I'm just not

 6    a hundred percent sure who they bill or how they pass

 7    it through.

 8        Q    So -- just so mechanics are clear.

 9             You submit a bill to Cornerstone Research for

10    your work in this litigation, correct?

11        A    That's right.

12        Q    And then Cornerstone Research submits an

13    invoice to Sidley Austin, to the best of your

14    knowledge?

15        A    I'm actually not sure where they submit their

16    invoice.  What I see is that I submit the invoice to

17    Cornerstone and presumably they submit, my

18    understanding, let me put it that way, my

19    understanding is that they submit my time to the

20    eventual client, whether that's Sidley or one of the

21    other firms involved or -- or someone else, I'm

22    honestly not sure where they submit their invoices.

23        Q    And so when you receive payment does that

24    payment come from Cornerstone Research or someone

25    else?
```

Darius N. Lakdawalla, Ph.D.

```
 1        A    It comes from Cornerstone Research.

 2        Q    Thank you.

 3             So when you were first contacted by

 4   Cornerstone Research to work on this litigation, to

 5   the best of your knowledge, they were already retained

 6   to work on this litigation; is that fair?

 7        A    I actually am not sure.  I think what -- what

 8   I know is that they would have been contacted about it

 9   in some fashion before they contacted me.  Whether or

10   not they were already working on it in some capacity,

11   I'm actually not sure.  I mean, clearly, they knew

12   about it before I did, but I just don't know if their

13   knowing about it was in connection with them speaking

14   about the potential opportunity or already working on

15   it.  I just don't know the timing of that.

16        Q    And you may have said this, but so it's

17   clear, is this litigation the first time in which

18   you've worked with Cornerstone Research?

19        A    No.

20        Q    And what other projects or litigation have

21   you worked with Cornerstone Research?

22        A    All of the other matters that we discussed

23   earlier were with Cornerstone Research.

24        Q    And when you say the other matters discussed,

25   you're talking about the litigation or cases that we
```

Darius N. Lakdawalla, Ph.D.

```
 1    described and that are listed in Exhibit B, "Prior
 2    Testimony," in your report, correct?
 3         A    Right.  And I'm also referring to the
 4    questions you asked me concerning matters that were
 5    not listed on the prior testimony.  Those were also
 6    with Cornerstone.
 7         Q    So all the issues in which you've worked with
 8    Cornerstone Research were litigation matters; is that
 9    fair?
10         A    Yes.
11         Q    Okay.  You write, "I receive compensation
12    from Cornerstone Research based on its collective
13    [sic] staff billings for its support in this matter."
14              What does that mean?
15         A    Sure.  Just -- I want to clarify one thing,
16    Mr. O'Connor.  I heard you say "collective."  It may
17    have been my audio, but it's "collected."
18         Q    Thank you for clarifying, please, yeah.
19              What does that phrase mean?
20         A    Well, it means that -- that Cornerstone's
21    billing for the research assistants that support me on
22    this matter, I get a percentage of those billings when
23    Cornerstone ultimately gets paid.  It's not immediate.
24    There's some annual frequency or some timing.  But
25    that's what it means.
```

Darius N. Lakdawalla, Ph.D.

```
 1        Q    Is this agreement laying out the percentage

 2   of staff billings that you may receive reduced into

 3   some form of writing or document?

 4        A    I believe that there is an agreement that I

 5   have with Cornerstone that lays it out in -- in -- I

 6   believe that it's laid out in the agreement that I

 7   have with Cornerstone, yes.

 8             MR. O'CONNOR:  Counsel, we ask that that

 9   agreement with Cornerstone, between Cornerstone and

10   Dr. Lakdawalla be produced.

11             MR. CASAZZA:  We can take that up on a break.

12             MR. O'CONNOR:  Thank you.

13        Q    Do you have any equity in Cornerstone?

14        A    No.

15        Q    Okay.

16        A    And I guess, Mr. O'Connor, I just wanted to

17   point to the next sentence in my report also, that

18   none of that compensation is contingent on the content

19   of my opinion or outcomes.  Just so we're clear.

20        Q    Thank you, Doctor.

21             Move to strike as nonresponsive.  There

22   wasn't a question pending.

23             I appreciate that clarification.

24             If we could please pull that back, please,

25   and go to Dr. Lakdawalla's CV, which is Exhibit A to
```

1    his deposition.  Sorry.  It's Exhibit A to his --

2    Appendix A to his report.

3         Dr. Lakdawalla, we discussed this before and

4    you mentioned that, if anything, the only thing that's

5    not -- that may not be current in your CV is potential

6    publications that may have been published between

7    July 13th, 2022, and today; is that fair?

8    A    Yes.

9    Q    We've discussed this a few times.  I'd like

10   to spend some time.

11        Would you please, Evan, blow up the portion

12   that says, "Professional Experience."

13        Dr. Lakdawalla, we've discussed Precision

14   Health Economics a variety of times.  Let's spend some

15   time with it.

16        It appears that Precision Health Economics --

17   or at least you began working with Precision Health

18   Economics in 2006, correct?

19   A    Well, I would clarify I was one of the

20   founders so it didn't exist before my participation.

21   So I guess I wouldn't say I began working with them at

22   that time.  But I was one of the three founders of it

23   in 2006.

24   Q    Okay.  The company -- you said that the

25   company sold to Precision medical group in April 2015,

Darius N. Lakdawalla, Ph.D.

```
1    correct?

2        A    Precision Medicine Group.  That's correct.

3        Q    And how much money did you receive in that

4    sale?

5        A    I don't recall the exact amount.

6        Q    What would be your estimate as to the amount

7    of money that you received or otherwise earned from

8    the sale of Precision Health Economics, LLC, to

9    Precision Medicine Group in April of 2015?

10       A    I don't remember and I don't want to

11   speculate.

12       Q    Was it in the millions of dollars?

13       A    It may have been, yes.

14       Q    Was it $5 million?

15       A    I don't recall.

16       Q    Was it a cash payment?

17       A    There was cash and there was equity.

18       Q    Okay.  What was the equity that you received

19   as a result of the sale of Precision Health Economics

20   to Precision Medicine Group in April of 2015?

21       A    It was equity in Precision Medicine Group.  I

22   don't recall the exact amount.  But it was equity in

23   the parent company that was acquiring PHE.

24       Q    Do you still --

25       A    Precision Health Economics.  Sorry.
```

Darius N. Lakdawalla, Ph.D.

```
 1        Q   Oh, no, please.  What was that?  I missed
 2   that last bit.
 3        A   I just -- I just wanted to clarify that PHE
 4   means Precision Health Economics.
 5        Q   Fair enough.
 6            If we're -- can we agree that for this
 7   deposition when we refer to PHE, we're referring to
 8   Precision Health Economics?
 9        A   That would be great, yes.
10        Q   Okay.  I'll do my best to do that, but I hope
11   you understand when I make that mistake.
12            Do you still maintain that equity that you
13   received as a result of the sale of PHE to Precision
14   Medicine Group in April 2015 to this day?
15        A   Yes.
16        Q   Has that equity changed at all since April of
17   2015?
18        A   I'm not sure what you mean about the equity
19   changing.
20        Q   Has the amount -- has the percentage of
21   equity that you have in Precision Medicine Group that
22   you obtained as a result of the sale of Precision
23   Health Economics to Precision Medical Group changed at
24   all from April 2015 until today?
25        A   Oh, I see.  I'm not sure what the percentages
```

Darius N. Lakdawalla, Ph.D.

```
 1    are.  I'm not sure I was ever -- I ever knew what the

 2    percentages were.  I suspect that it's gone down over

 3    time because they've taken money in.  But I don't know

 4    the details.

 5         Q   Is the equity and sale agreement which

 6    details the amount of cash you would have received or

 7    the amount of equity that you would have received as a

 8    result of the sale of Precision Health Economics to

 9    Precision Medicine Group reduced to writing or a

10    document of some kind?

11         A   Yes, I believe there were -- there was a

12    sales agreement.

13              MR. O'CONNOR:  Counsel, we request that sale

14    agreement be produced.

15              MR. CASAZZA:  We will take that up

16    separately.

17    BY MR. O'CONNOR:

18         Q   After 2015, can you please describe to me,

19    and it's in your CV, but I'd like for you to just kind

20    of provide me a narrative of your involvement with

21    Precision, be it the medicine group or Precision

22    Health Economics, after the sale in April in 2015?

23         A   Sure.

24              I worked as a consultant to Precision

25    Medicine Group after the sale in April 2015 until the
```

Darius N. Lakdawalla, Ph.D.

```
 1    summer of 2016.  And after -- or in the summer of
 2    2016, I took a sabbatical or I guess technically it
 3    was a one-year leave of absence from USC.  And during
 4    that period of time I served as the chief scientific
 5    officer of -- it may have been for -- for what was
 6    called the Precision Health Economics division.
 7    Actually, I'm not -- and given that's what's on my CV,
 8    it's probably accurate.  I don't remember all of the
 9    nomenclature.
10            After 2017, which would have been the summer
11    of 2017, I returned to my academic job, and I did
12    serve as a consultant to the company from time to
13    time.  In I think it was May of 2020 I stepped down
14    from that consulting role.  And I'm no longer involved
15    in a consulting role or any kind of direct involvement
16    since that time.
17    Q    How much money would you say you have
18    received or otherwise earned from Precision Health
19    Economics?
20    A    I'm not sure.
21    Q    Would you say it is more than $10 million?
22    A    I don't know the answer to that.
23    Q    As you sit here today, can you definitively
24    state that it is not more than $10 million?
25            MR. CASAZZA:  Objection; asked and answered.
```

```
 1              THE WITNESS:  I just don't know and I don't
 2   want to speculate.
 3   BY MR. O'CONNOR:
 4       Q   Was it -- have you earned more than
 5   $20 million?
 6              MR. CASAZZA:  Same objection.
 7              THE WITNESS:  I mean, as I said, I just don't
 8   know the number and I don't want to guess.
 9   BY MR. O'CONNOR:
10       Q   Would you say that you earned a hundred
11   million dollars during your time at Precision Health
12   Economics?
13              MR. CASAZZA:  Same objection.
14              THE WITNESS:  Yeah, I would give the same
15   answer.  I just don't know the number and I don't want
16   to speculate or guess about it.
17   BY MR. O'CONNOR:
18       Q   Okay.
19              And please -- thank you.  You can put that
20   one down.
21              Evan, would you please pull up my internal
22   document number 10.
23              And I believe we're on Exhibit 3, correct?
24              THE REPORTER:  Yes.
25              (Exhibit 3 marked.)
```

Darius N. Lakdawalla, Ph.D.

```
 1            MR. O'CONNOR:  Thank you, Madam Court

 2   Reporter.  I see you smiling at me.  I appreciate it.

 3       Q   Dr. Lakdawalla, you can take a second and

 4   look through this.  It's a short article.  I'll

 5   represent that it was taken from the Internet.

 6            Would you please take a second to look

 7   through this and just let me know when you're

 8   generally familiar with it.

 9       A   Sure.  Just -- just give me a minute, if you

10   don't mind.

11       Q   Of course.

12       A   Okay.  I'm done.

13       Q   Thanks, Doctor.

14            This is an article you appear to have

15   authored that's dated October 21st, 2021, correct?

16       A   That's right.

17       Q   And the title of the article is, "How COVID

18   Can Help Us Refocus On The How And Why Of Value

19   Assessment," correct?

20       A   That's correct.

21       Q   And it looks like it's being published in the

22   journal Health Affairs; is that correct?

23       A   No, it's actually not the journal.  This is

24   the blog.  It used to be called Health Affairs Blog, I

25   think, but now they call it Health Affairs Forefront.
```

Darius N. Lakdawalla, Ph.D.

```
 1    I don't think it's a peer-reviewed journal.

 2        Q   I understand.

 3            And I guess -- so this is something that you

 4    wrote, and it says -- strike that.

 5            If you go down a little bit, please, Evan.

 6            Just as a point of verification, Doctor.

 7            "This post" -- it reads, "This post is part

 8    of the Health Affairs Blog short series, 'Value

 9    Assessment: Where Do We Go post-COVID?'"

10            So is that what you were referring to when

11    you say the Health Affairs Blog?

12        A   Yes, exactly.  But they call their blog

13    Health Affairs Forefront, and I'm just making a

14    distinction -- I was just reacting to the use of the

15    word "journal" because typically I would think of that

16    as a peer-reviewed outlet, and this isn't a

17    peer-reviewed journal.  It's a blog that is maintained

18    by a peer-reviewed journal, which is Health Affairs.

19        Q   Thank you.  You're saving me time, actually,

20    saying that better than I can ask the question.

21            Could we go to the very end.  There's a

22    section entitled "Authors' Note."  It cuts across a

23    couple pages.

24            Can you see that, Doctor?

25        A   Yes.
```

Darius N. Lakdawalla, Ph.D.

```
 1       Q   It reads, under Authors' Note, "In the past
 2   three years, Dr. Lakdawalla has received research
 3   support, speakers fees, travel assistance, or
 4   consulting income from the following sources," and
 5   then there's a variety of entities listed.
 6           Did I read that correctly?
 7       A   That's correct.
 8       Q   Okay.  And Gilead is one of the entities
 9   listed as a source of either research support,
10   speakers fees, travel assistance, or consulting income
11   for you in the past three years; is that a fair
12   assessment?
13       A   Yes.
14       Q   When you say you've received research
15   support, speakers fees, travel assistance, and
16   consulting income, which of those did you receive from
17   Gilead in the past three years prior to October 21st,
18   2021?
19       A   Right.  I think I was actually being somewhat
20   expansive to err on the side of overinclusiveness.
21           But I'm referring to Gilead's donations to
22   the Schaeffer Center and I'm characterizing that as
23   research support, although as I explained earlier,
24   it's not direct research support for me.  It's -- it's
25   a donation to the Schaeffer Center where I maintain a
```

1    faculty appointment.  So that's -- that's the -- the

2    reference.

3        Q   How long have you been associated with the

4    Schaeffer Center?

5        A   Since I came to USC.  So 2009.

6        Q   And just so the record's clear, when I and

7    you are referring to the Schaeffer Center, we're

8    referring to the Leonard D. Schaeffer Center for

9    Health Policy & Economics at the University of

10   Southern California, correct?

11       A   That's right.

12       Q   Okay.  And as far as you know, how long has

13   Gilead provided donations to the Schaeffer Center?

14       A   You know, I'm not exactly sure.  I don't

15   directly interact with them or their contributions or

16   giving.  I can tell you that certainly at the time of

17   this article they -- they would have been donating.

18   I'm just not quite sure when that started.

19       Q   Are you aware of the amount of money that

20   Gilead has donated to the Schaeffer Center?

21       A   No, I'm not.

22       Q   As you sit here today, do you have any reason

23   to doubt that Gilead was providing donations to the

24   Schaeffer Center since you joined it in 2009?

25       A   I think I do have a reason to doubt that it

1    went back that far.  Although I -- I confess I'm not

2    sure, but I don't believe that the faculty at the

3    Schaeffer Center knew anybody at Gilead at that time,

4    as -- as far as I can recall.

5             I just don't exactly remember when this

6    might -- their donations might have started or even

7    when the structure for donations would have been put

8    in place.  It certainly wasn't on day one because

9    we -- we founded the Schaeffer Center in 2009.  So it

10   evolved over the course of many years.

11   Q   As you sit here today, what's your best

12   estimate as to the time at -- of when Gilead started

13   donating to the Schaeffer Center?

14   A   I would say it's very likely to be at some

15   point after 2014 or '13, but I -- I don't know how

16   many years after that.

17   Q   And you mentioned that you didn't think it --

18   the donations went back to 2009 because no one at the

19   Schaeffer Center knew anyone at Gilead; is that a fair

20   characterization of what you were saying before?

21   A   Well, maybe -- maybe that's not as precise a

22   way to say it.  I just don't remember any interactions

23   with Gilead in a research or other capacity that

24   predate 2013, to the best of my recollection.

25   Q   Do you recall --

```
 1        A    Just to be clear -- I'm sorry, Mr. O'Connor.

 2        Q    No, no, please, please, please go ahead.

 3        A    I'm not testifying, by the way, that the

 4    donations definitively started in 2013.  I just think

 5    that that is -- as far as I can remember, that's the

 6    earliest date on which there was some interaction

 7    between Gilead and members of the faculty at the

 8    Schaeffer Center.

 9        Q    Do you recall who the people were at Gilead

10    with whom personnel at the Schaeffer Center

11    interacted?

12        A    Back then, I'm afraid I don't remember the

13    names of who we interacted with in 2013.

14        Q    Do you have any understanding or estimation

15    as to how much funding or money PHE has received from

16    Gilead since PHE's inception in 2006?

17        A    No.  I guess I would clarify, though, PHE, to

18    my knowledge, doesn't exist any longer.  It was

19    absorbed into Precision Medicine Group and at some

20    point the name went away and the division went away.

21    I don't remember exactly when.  It was several years

22    ago so it -- I just want to clarify, it doesn't exist

23    anymore so there's some termination date.  I don't

24    remember what it was.

25             But I don't -- in answer to your question, I
```

Darius N. Lakdawalla, Ph.D.

```
 1   don't know how much was received from the time of its
 2   inception to the time of its ending.
 3       Q   So when you say in your deposition -- or --
 4   sorry -- in your CV that from 2017 to 2020 you were a
 5   scientific advisor at Precision Health Economics, are
 6   you referring to Precision Medicine Group?
 7       A   It was a little hazy to me, to be honest, how
 8   the naming was working.  At some point there was --
 9   there was a branding change from Precision Health
10   Economics to I think PRECISIONheor.  And just for --
11   to avoid confusion in my CV, I didn't add that as a
12   separate line.  So it may well have been that during
13   that period of time the name had changed.  But just
14   for clarity, I maintained it as a single line.
15       Q   Can we agree that when we're talking about
16   Precision Health Economics for the purpose of this
17   deposition, understanding the nuances, that we're
18   referring to the entity that existed between 2006 and
19   April of 2015, as well as the entity as it existed and
20   exists to this day; is that a fair...
21       A   If I -- if I may make a request, I think
22   it's -- in my mind it's very clear to think about it
23   from 2006 to 2015.  And then in my mind it's clear to
24   think about Precision Medicine Group and the
25   activities that occurred within Precision Medicine
```

1    Group from 2015 onwards just because there -- there

2    was a lot of evolution of the structure after the

3    acquisition.  So in my head it's just easier to

4    organize it that way, if it's okay with you.

5         Q    Sure.  And please clarify at any point.

6              So let me rephrase my earlier question.

7              How much money and how much funding did

8    Precision Health Economics receive from Gilead between

9    2006 to 2015, to the best of your knowledge?

10        A    I don't know the answer to that.

11        Q    How many projects would you say Precision

12   Health Economics worked on on behalf of Gilead from

13   2006 to 2015?

14        A    I can remember two, off -- off -- as I sit

15   here today.

16        Q    Okay.  How much funding did Precision

17   Medicine Group, to the best of your knowledge, receive

18   from Gilead after April of 2015 until today?

19        A    I don't know the answer to that.

20        Q    Do you recall how many projects Precision

21   Medicine Group worked on on behalf of Gilead or was

22   hired by Gilead to perform from April 2015 until

23   today?

24        A    At my prior deposition I learned of one such

25   project, which is the first time I had seen it, but

1  apart from that I'm not sure what other projects

2  Gilead might have performed for Precision Medicine

3  Group.

4      Q   What was that project to which you are

5  referring?

6      A   I don't remember the details anymore.  It

7  was -- there was ultimately a paper by Dr. Jim

8  Baumgardner as the lead author.  But I don't -- I

9  confess I don't remember the details of that project,

10  as I sit here.  And I wasn't involved in it during my

11  time as a consultant at Precision Medicine Group.

12     Q   If your name was on any documents related to

13  that project -- let's put it this way.

14         Why would your name be on any documents

15  relating to that project if you were not involved?

16         MR. CASAZZA:  Objection; form.

17         THE WITNESS:  I'm not sure.  I would have to

18  look at the document and try to understand.  I wasn't

19  on the project team.  I don't remember what other

20  interactions I might have had about the project and I

21  didn't really remember it.

22  BY MR. O'CONNOR:

23     Q   Okay.  Let's go back to your CV, please.

24     A   Sure.

25

Darius N. Lakdawalla, Ph.D.

```
 1              MR. O'CONNOR:  We can zoom back, Evan.
 2         Q   You list a variety of publications in your
 3   CV, correct, sir?
 4         A   Yes.
 5         Q   How many of these publications were either
 6   sponsored by or received funding to support the
 7   research from pharmaceutical companies?
 8         A   I don't know that off the top of my head.
 9         Q   Would you estimate that all of these
10   publications either received some form of financial
11   support or funding from pharmaceutical companies?
12              MR. CASAZZA:  Objection to form.
13              THE WITNESS:  No.
14   BY MR. O'CONNOR:
15         Q   What percentage of these, to the best of your
16   knowledge, as you sit here today, received funding
17   from or were otherwise sponsored financially by
18   pharmaceutical companies?
19              MR. CASAZZA:  Objection; form, asked and
20   answered.
21              THE WITNESS:  I don't know the share of it,
22   as I sit here.
23   BY MR. O'CONNOR:
24         Q   How can you say definitively that none of
25   these -- sorry -- that -- let me strike that.
```

```
 1              How are you confident enough to say
 2    definitively that not all of these were either
 3    sponsored by or received funding in some way, shape,
 4    or form from pharmaceutical companies?
 5              MR. CASAZZA:  Objection; form.
 6              THE WITNESS:  Because I can remember, as I
 7    sit here, projects that were not funded by a
 8    pharmaceutical company.  So that rules out the
 9    estimate of a hundred percent.  But that doesn't mean
10    that it rules in a specific estimate of the share
11    funded by pharmaceutical companies.
12    BY MR. O'CONNOR:
13       Q   Which one of these publications were not
14    funded by pharmaceutical companies?
15       A   Well, for instance, the very first one wasn't
16    funded by pharmaceutical companies.  I'm happy to go
17    through the rest, but there are numerous that were not
18    funded by pharmaceutical companies.
19       Q   When you say "numerous," so is your
20    estimation would be that over 50 percent of them were
21    not funded by pharmaceutical companies?
22              MR. CASAZZA:  Objection; form, asked and
23    answered.
24              THE WITNESS:  I don't know the exact number
25    and I don't want to speculate.  I'm happy to go
```

1    through and make tick marks and give you the number,

2    if you'd like me to do that.

3    BY MR. O'CONNOR:

4        Q    That would be great.

5             THE WITNESS:  Do you mind handing me a pen?

6             MR. CASAZZA:  Professor Lakdawalla, it might

7    be easier if, rather than writing on the document in

8    front of you, if you want to read aloud the number as

9    you go through them so it's present on the transcript.

10            THE WITNESS:  Okay.  Shall I do that?

11            MR. O'CONNOR:  I agree.  No problem.  Sounds

12   great.

13            THE WITNESS:  All right.

14            1, 2, 4, 6, 7, 8, 9, 10.

15            And just -- I'm sorry.  Just to clarify,

16   these are papers that are not funded by pharmaceutical

17   companies, just for clarity.

18   BY MR. O'CONNOR:

19       Q    Sounds good.

20       A    12, 13, 15, 16, 17, 19, 20, 23, 31, 36, 39,

21   40, 41, 42, 47, 61, 64, 69, 71, 73, 78, 81, 82, 89,

22   91, 92, 94, 95, 96, 99, 100, 102, 104, 106, 107, 108,

23   110, 113, 114, 116, 117, 118, 119, 120, 121, 122, 123,

24   124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134.

25       Q    Okay.  How about for the published conference

1    abstracts, which of -- which ones of these were, as

2    you sit here today, not sponsored by or otherwise

3    funded by pharmaceutical companies?

4         A    1, 2, 3, 4, 6, 7, 23, 25.

5              Okay.  That's it.

6         Q    All the other published conference abstracts

7    that you did not reference or did not point out as

8    having not been sponsored by pharmaceutical companies

9    otherwise funded, these were funded by pharmaceutical

10   companies?

11             MR. CASAZZA:  Objection; form.

12             THE WITNESS:  The ones that I did not mention

13   in both cases had received or had, I think -- the way

14   I would put it most precisely is that there was

15   pharmaceutical funding disclosed that was part of the

16   project.

17   BY MR. O'CONNOR:

18        Q    For your other lists you have "Other

19   Publications."  Which of these listed -- for which of

20   these was pharmaceutical funding disclosed?

21        A    Actually, if you wouldn't mind, can we flip

22   it because that's how I was doing it before.

23        Q    Whatever you want to do, yes, sure.

24             Just so the record's clear, for -- under the

25   list of Other Publications, can you please identify

Darius N. Lakdawalla, Ph.D.

```
1    which of these other publications were not funded by

2    pharmaceutical companies?

3         A    Sure.

4              1, 2, 4.

5              I think 3 was not directly funded by a

6    pharmaceutical company.

7              Number 5.  6, 7, 8, 9, 10, 11, 12, 13, 15,

8    16, 18, 19, 21, 23, 24, 26, 27, 28, 29, 30, 32, 33,

9    34, 35.

10             I don't remember what 36 was about so I'm not

11   sure either way.

12             Same for 37.  I just don't remember that one.

13             38, 39, 41.  4- -- I don't remember what 42

14   was about.

15             44, 45, 46, 47.  Sorry.  47 shouldn't be in

16   this category.  It's actually a peer-reviewed

17   publication.  I apologize.  That should be elsewhere.

18   But in any event, it was not funded by a

19   pharmaceutical company.

20             48, 49, 51, 52, 54, 55, 56, 57, 58, 59, 60,

21   61, 62, 63, 64.

22             I'm just taking a quick look at the early

23   parts just to make sure my memory is clear.

24             Okay.  I think that's it.

25             I do want to clarify, Mr. O'Connor, that, as
```

1    I mentioned earlier, at the Schaeffer Center there are

2    gifts and contributions given by health insurers,

3    pharmaceutical companies, hospital systems and the

4    like.  And from time to time we would disclose those

5    gifts in articles, even if there was no direct support

6    given, just as a matter of overinclusiveness, but they

7    are not generally supporting -- they're not directly

8    supporting projects that we perform at USC.  Those are

9    just gifts to the center writ large.

10        Q    Thank you.

11             I object to and move to strike the last

12   portion as nonresponsive.

13             So, Doctor, in the Other Publications

14   section, all the documents that you did not reference

15   explicitly, those would have received funding or money

16   otherwise provided for by pharmaceutical companies?

17        A    To the best of my recollection.  And I just

18   want to emphasize, I'm doing this as I sit here and

19   doing my best to recall, and some of these

20   publications were quite old.  But to the best of my

21   recollection, as I sit here, that's accurate.

22        Q    Okay.  Thank you.  Couple more things and we

23   can take a break or keep going.

24             But the four current working papers listed in

25   your CV, are any of those, as you sit here today,

```
 1    funded by pharmaceutical companies?

 2        A   No.

 3        Q   Okay.  And then you list 14 grants of --

 4    under your CV.  As you sit here today, are any of

 5    these funded or otherwise sponsored by pharmaceutical

 6    companies?

 7        A   Well, the first one is a gift from Biogen.

 8            And the rest of them, no, were not sponsored

 9    by pharmaceutical companies.

10        Q   Okay.

11            And then if we go to page 24 of the appendix,

12    please.

13            You list a variety of speaking engagements

14    and presentations, correct, sir?

15        A   Yes.

16        Q   Are any of these -- and maybe the easiest way

17    to do this is to do it by date because they're

18    bullet-pointed.  Are any of these or were any of

19    these -- strike that.

20            In any of these circumstances were you paid

21    or otherwise provided funding in some way, shape, or

22    form for making these presentations?

23        A   May I quickly look through these?

24        Q   Please, yes.  And please mention the ones

25    that, you know, you're comfortable responding to.
```

Darius N. Lakdawalla, Ph.D.

```
 1        A   Well, just to be clear, Mr. O'Connor, I've
 2   forgotten now which I'm responding to.  So I'm going
 3   to tell you -- in this case I'm going to tell you
 4   which, if any, I was -- I received funding to -- from
 5   pharmaceutical companies to perform; is that --
 6        Q   That's fine.  Thank you very much.
 7        A   Okay.
 8        Q   And again, you're more than welcome to read
 9   all of the -- all of it off, but if you want to
10   mention just certain distinguishing features of it for
11   the record, that's fine, too.
12        A   Okay.  I understand.  Thank you.
13            Just give me one moment to review.
14            I think the November 2018 presentation to
15   Otsuka was funded.  That's called "The New Economics
16   of Value in Healthcare."
17            So the May 2016 "Ending Hepatitis C."
18   Although that was not a U.S. congressional hearing.
19   That's a mistake in the bullet.
20            The July 2013 "Promoting Clinical Trials for
21   Cancer."
22            May 2013, "Council for Advancing Diabetes
23   Care."
24            I believe that's it.
25        Q   As a point of clarity, you mentioned the May
```

Darius N. Lakdawalla, Ph.D.

```
1    of 2016 presentation in Washington, D.C., you said it
2    was not a U.S. congressional hearing.
3             Do you recall to whom or where you presented
4    this?
5         A    Yeah, it was sponsored by the National Viral
6    Hepatitis Roundtable.  And we gave -- it was a public
7    event that was in a -- I think a government building.
8    It may have been some congressional office building.
9    But it was -- it was not a congressional hearing as
10   such.  I'm not sure what I was thinking when I wrote
11   that down.  But it was -- it's a -- it was an event in
12   a congressional building that -- Mr. Cleary was from
13   the National Viral Hepatitis Roundtable.
14            MR. O'CONNOR:  I know we've been going for a
15   little while.  I don't know if you want to take break.
16   I'm certainly happy to keep going.  Let me know.
17            MR. CASAZZA:  Yeah, I was going to say why
18   don't we take -- want to take five now, go back on the
19   record around 11:30, then shoot to take a lunch break
20   at 12:30 and then go back on around 1:00?
21            MR. O'CONNOR:  Apologies.  That sounds fine
22   to me.
23            We can go off the record.
24            MR. CASAZZA:  Okay.  Perfect.
25            THE VIDEOGRAPHER:  Off record; 11:26 a.m.
```

```
1                (Recess.)

2                THE VIDEOGRAPHER:  On record; 11:38 a.m.

3                MR. O'CONNOR:  Evan, would you please pull up

4      in the documents I just presented to you or sent to

5      you recently, the "Updated Lakdawalla Materials

6      Considered List."

7                And, I am sorry, I think we're on Exhibit

8      Number 4.

9                (Exhibit 4 marked.)

10               MR. O'CONNOR:  Okay.  Great.

11       Q   Dr. Lakdawalla, I'll represent that this was

12     produced to me shortly before your deposition.  This

13     is a document entitled "Updated Lakdawalla Materials

14     Considered List," correct?

15       A   Looks like it, yes.

16       Q   I've done a review of this and it appears

17     the -- what has been added to this list compared to

18     the version that is attached as Appendix C to your

19     report are references to the deposition of Saskia

20     Fontein and Meredith Rosenthal; is that correct?

21       A   Yes, that's correct.

22       Q   Is there anything else that I'm missing that

23     has been added to this Updated Lakdawalla Materials

24     Considered List that was not on the earlier version

25     attached to your expert report?
```

Darius N. Lakdawalla, Ph.D.

```
 1      A   Not so far as I recall.  I'll just do one
 2  check to make sure.
 3      Q   Please.
 4      A   Yes, that's my understanding, Mr. O'Connor.
 5      Q   Thank you, Doctor.
 6          You first list -- I shouldn't say first list.
 7          You list on the first page a variety of
 8  depositions that you reviewed, correct, sir?
 9      A   Yes.
10      Q   Among them were depositions of Michael James
11  Martin Hitchcock, William Lee, John Milligan, Norbert
12  Bischofberger and Peter Virsik, in addition to
13  Ms. Fontein and Dr. Rosenthal, correct?
14      A   That's correct.
15      Q   And the depositions of the first -- I guess
16  it's five individuals, six depositions, that was in
17  your initial Materials Considered List attached to
18  your expert report, correct, sir?
19      A   Correct.
20      Q   Now, it's fair to say that you reviewed those
21  depositions prior to serving your report and filing
22  your report, correct?
23      A   Correct.
24      Q   What was your process for determining which
25  depositions in this litigation to review?
```

```
 1              MR. CASAZZA:  And I'm just going to caution
 2    the witness that -- that you shouldn't answer to the
 3    extent it's calling for communications between you and
 4    counsel or communications between you and anyone at
 5    Cornerstone.  So I believe he's asking with respect to
 6    internal thought process.
 7    BY MR. O'CONNOR:
 8         Q   I am indeed.  And, you know, so, Doctor, with
 9    counsel's caution, what is your response?
10         A   Sure.
11              I was interested in -- I guess it's easiest
12    for me to answer this in the context of my general
13    approach to identifying documents and since to me
14    deposition testimony is one, is a subset of the
15    documents.
16              I -- first of all, I reviewed the reports by
17    Professor Rosenthal and Ms. Fontein to understand the
18    nature of their opinions.  And based on that review, I
19    decided that I wanted to understand material connected
20    to Gilead's financial forecasts related to TAF,
21    Gilead's decision-making regarding the launch of TAF,
22    particularly as it related to issues of timing or
23    issues of launching at all and issues connected to the
24    length of their market exclusivity.  And so, you know,
25    I identified those categories of documents as being
```

Darius N. Lakdawalla, Ph.D.

1    relevant to those requirements, is probably the best

2    way to put it, for evidence.

3             And in addition, I wanted to see documents

4    that Ms. Fontein and Professor Rosenthal cited to and

5    in at least some of these deposition cases or some of

6    the cases of these depositions they were cited to in

7    those reports as well.  So I think those are the main

8    categories that I internally decided would be relevant

9    as a first pass.

10       Q   And you list that you reviewed two expert

11   reports; namely, the expert report of Saskia Fontein

12   and the expert report of Meredith Rosenthal, correct?

13       A   Yes, that's correct.

14       Q   You did not review the expert report of

15   Robert Dow, did you?

16       A   That's correct, I did not.

17       Q   Did you know that Robert Dow had written an

18   expert report in this case?

19       A   I don't remember.  I do remember knowing he

20   wrote a report in the JCCP case.  I don't -- I

21   honestly just don't remember if I specifically knew he

22   was writing another report in this matter or not.  But

23   either way, I didn't look at -- I didn't see the

24   report he filed if he, in fact, filed one.

25       Q   Did you ask to review any report by Robert

1    Dow in preparation for your expert report?

2          MR. CASAZZA:  I'll instruct the witness not

3    to answer.

4          (Instruction not to answer.)

5          MR. O'CONNOR:  I'm asking if he asked to do

6    something, not whether or not he -- what the response

7    was from that.  I just simply asked if he -- so I'll

8    ask again.

9     Q    Doctor, did you ask to review any report from

10   Robert Dow in this litigation?

11         MR. CASAZZA:  And same instruction.

12         (Instruction not to answer.)

13         MR. CASAZZA:  Ben, I'm not trying to be

14   difficult, but 5C blocks any -- any oral or written

15   communication between and among the expert and a whole

16   litany of people.

17   BY MR. O'CONNOR:

18    Q    Are you taking your counsel's advice and not

19   responding to that question, Doctor?

20    A    Yes, I'm going to take my counsel's advice.

21    Q    Okay.  You reviewed the testimony of Robert

22   Dow in the JCCP proceedings, correct?

23    A    I believe I did, yes.

24         MR. O'CONNOR:  Could we please pull up

25   document number 11, please.

Darius N. Lakdawalla, Ph.D.

```
 1              And I'm going to mark this as Exhibit 5.

 2              (Exhibit 5 marked.)

 3    BY MR. O'CONNOR:

 4        Q   Dr. Lakdawalla, this -- if you wouldn't mind

 5    confirming, this is your deposition testimony or I --

 6    should I say a transcript of your deposition testimony

 7    from March 14th, 2022, in the JCCP, is it not?

 8        A   Yes, it looks like it.

 9              MR. CASAZZA:  And, Mr. O'Connor, I just want

10    to clarify whether or not it includes errata.

11              MR. O'CONNOR:  Fair enough.  Thank you,

12    Counsel.  I believe this is the most -- most recent

13    one, but subject to any concerns from you, your

14    objection's on the record.

15              If you could please turn to page 53 of this

16    deposition, please, Evan.

17        Q   It says at the very bottom, Doctor, that you

18    looked at the Virsik deposition and exhibits and the

19    Dow depositions and exhibits, correct?

20        A   Correct.

21        Q   Do you recall that testimony?

22        A   I do.

23        Q   Okay.  And -- and by Dow, you're referring to

24    Robert Dow deposition and exhibits, correct?

25              Correct, Doctor?  I'm sorry if you gave a
```

Darius N. Lakdawalla, Ph.D.

 1   response.  Oh, maybe I cut off.

 2          Doctor, I'm sorry, it must have been

 3   something on my end.

 4          What was your response to that?

 5      A   I'm sorry, I thought I responded and then

 6   something cut off.  Would you mind repeating the

 7   question that you think I didn't respond to.

 8      Q   No, of course.  I don't think you didn't

 9   respond to it.  I think there was a glitch.

10          It says "the Dow" --

11          THE REPORTER:  I didn't hear it either.

12          MR. O'CONNOR:  Okay.

13      Q   It says "the Dow depositions and exhibits."

14   You're referring to the Robert Dow depositions and

15   exhibits in the JCCP, correct?

16      A   Yes.  So to be clear, I -- this is my

17   deposition testimony for the JCCP, and I'm referring

18   to the deposition that Dr. Dow gave in the JCCP matter

19   and that I looked at that deposition and exhibits.

20      Q   You did not provide an expert report in the

21   JCCP, correct?

22      A   That's correct.

23      Q   What was your assignment in the JCCP?

24      A   I was -- my assignment was to review

25   Professor Kesselheim's opinion insofar as it was laid

Darius N. Lakdawalla, Ph.D.

1    out in his deposition testimony, evaluate it and offer

2    my opinions on it.

3           I also was asked to evaluate Mr. Johnson's

4    opinions concerning the damages that accrued to, I

5    believe, Mr. Karraa, if I'm not mistaken.  And so

6    those were the two pieces of my assignment in that

7    matter.

8       Q    Thank you.

9           Could you please jump ahead, Evan, to

10   page 90.

11          Dr. Lakdawalla, at the very bottom it says,

12   you -- you testified, "Yes, as I noted, I wanted to

13   review Professor Kesselheim's deposition and Dr. Dow's

14   deposition first.  And I also wanted to review the

15   exhibits to the depositions first."

16          Did I read that correctly?

17      A    Yes.

18      Q    So Dr. Dow's and Professor Kesselheim's

19   deposition and exhibits were the first documents or

20   testimony that you reviewed in the JCCP?

21      A    Right.  And the exhibits.  I don't remember

22   the precise timing regarding, you know, which

23   deposition plus exhibits I reviewed first.  But

24   basically that first set of documents, that was the

25   first set of documents I reviewed.

Darius N. Lakdawalla, Ph.D.

```
 1            MR. O'CONNOR:  Evan, would you please pull up
 2    my internal document number 12.
 3            I want to mark as Exhibit 6.
 4            (Exhibit 6 marked.)
 5    BY MR. O'CONNOR:
 6       Q    Doctor, I will represent that this is listed
 7    as Exhibit Number 3 from your deposition in the JCCP
 8    proceedings as a document entitled "Materials
 9    Considered by Professor Darius Lakdawalla"; is that
10    correct?
11       A    Yes.
12       Q    And you list under depositions reviewed the
13    deposition of Robert Dow with exhibits February 9th,
14    2022, correct?
15       A    Yes.
16       Q    And this appears to be the materials
17    considered by you in the JCCP proceedings, correct?
18       A    Well, not just that highlighted piece, but
19    yeah, if you're referring to the whole document, yes.
20       Q    Yes, I'm just authenticating.  This is, in
21    fact, the materials considered that you provided in
22    that litigation; is that a fair characterization, sir?
23       A    Yes.  I mean, I -- I -- of course I don't
24    remember photographically all the documents, but it
25    looks to be that list and I have no reason to doubt
```

Darius N. Lakdawalla, Ph.D.

```
 1   that it isn't the updated list.

 2          MR. O'CONNOR:  Would you take the callouts

 3   off, please, Evan.

 4     Q    Did you create this document, Dr. Lakdawalla?

 5          MR. CASAZZA:  Objection.

 6          I'll ask the witness not to answer consistent

 7   with the approved governing acts of discovery.

 8          (Instruction not to answer.)

 9          MR. O'CONNOR:  I'm not trying to be difficult

10   on this one.

11     Q    Do you recall if this document was produced

12   to opposing counsel in the JCCP proceedings?

13     A    I believe that it was, but I don't recall

14   specifically.

15     Q    Was it your decision not to review the expert

16   report of Dr. Robert Dow in preparing your report?

17     A    You're speaking of the report in the federal

18   matter now, correct, Mr. O'Connor?

19     Q    Yes, unless there's a -- strike that.

20          There's no other report that you provided

21   with -- with respect to Gilead or on behalf of Gilead,

22   correct?

23     A    That's a fair point, yes.

24          No, I did not ask to review the report of

25   Dr. Dow for the report in the federal matter.
```

Darius N. Lakdawalla, Ph.D.

```
 1        Q   Okay.  I guess my question was a little
 2   different.
 3            Was it your decision not to review the expert
 4   report of Dr. Dow in preparing your report for the
 5   federal matter?
 6        A   Oh, yes.  Yes, it was my decision not to --
 7   sorry, I got a little confused about what exactly --
 8   it was my decision not to ask for -- or my decision
 9   not to review the report by Dr. Dow.
10            MR. O'CONNOR:  Would you please go back now,
11   Evan, to the updated materials list.  I believe it's
12   Exhibit 5.  I'm sorry.  It's Exhibit 4.
13        Q   Doctor, when you use the phrase "materials
14   considered," what are you referring to?
15            MR. CASAZZA:  Objection; form.
16            MR. O'CONNOR:  I'll rephrase it.
17        Q   Doctor, what do you mean when you say
18   "materials considered"?
19            MR. CASAZZA:  Same objection.
20            THE WITNESS:  Well, my understanding is that
21   it is a -- it's legal terminology, so I'll share with
22   you my understanding as given my capacity -- in my
23   capacity as a nonlawyer.  But my understanding is that
24   it means documents or materials that I considered when
25   forming my opinions.
```

1    BY MR. O'CONNOR:

2        Q    And in your understanding and recognizing

3    there is a legal aspect to this, how do you understand

4    the term "materials considered" to be different, if at

5    all, from the phrase "materials relied upon"?

6        A    To be frank, that's always struck me as a

7    technical legal distinction that is difficult for me

8    to parse.

9            But as I understand materials considered, I

10   think of it as documents that I considered in forming

11   my conclusions.  My generalized and very qualitative

12   understanding is that relied upon is a little stronger

13   than considered.  But I don't know that I can give you

14   a clean definition that would survive scrutiny at a

15   law journal.  I'm -- I'm just not sure I understand it

16   to that extent.

17       Q    Is this list that we find in this exhibit the

18   entirety of documents that you considered in creating

19   your report, sir?

20       A    Yes.

21       Q    Okay.

22       A    Although, I'm sorry, just to clarify, the --

23   the two depositions that we discussed earlier were not

24   considered obviously in creating my report, the

25   Ms. Fontein and Dr. Rosenthal, because they didn't

Darius N. Lakdawalla, Ph.D.

```
 1    exist when I filed my report.
 2           But subject to that qualification, yes, it's
 3    the -- these are all materials I considered in -- in
 4    producing my report.
 5       Q   Okay.
 6           Can we go to the last, literally the last
 7    sentence of this, please, Evan.
 8           Doctor, you write, the very last sentence of
 9    this materials considered list, "In addition to the
10    documents on this list, I considered any other
11    documents cited in my report and my exhibits to form
12    my opinions."
13           What do you mean by that?
14       A   I -- this -- this is added for completeness.
15    As far as I know, everything I cited in my report and
16    my exhibits appears on this list but just in case
17    there were some omissions, I wanted to make clear that
18    if I cited something in my report or exhibits it also
19    is -- is a document that I considered.
20       Q   Okay.
21           You can put that aside.
22           There is an aspect of this, which I'm -- I'm
23    not trying to infringe upon any communications that
24    you've had with counsel or relatedly so take it for
25    what it's worth.
```

Darius N. Lakdawalla, Ph.D.

```
 1              But I would like for you to describe, if you
 2   will, your process from receiving the assignment from
 3   Gilead to drafting your -- to finalizing and serving
 4   your report.  How is it that you went from your
 5   assignment and made your determinations to -- and your
 6   conclusions in this matter?
 7              MR. CASAZZA:  And I'd just like to instruct
 8   the witness to not answer to the extent it's calling
 9   for any questions about draft writings done in
10   connection with the report, you know, by -- and any
11   communications between you and any counsel or any
12   communications between you and anyone at Cornerstone.
13              And, just generally speaking, ask you to
14   proceed with caution given the breadth of the question
15   and the scope of the order regarding expert discovery.
16              THE WITNESS:  Okay.
17              So I -- the first thing I did on my own was
18   to review the two reports, Ms. Fontein and
19   Dr. Rosenthal, and determine the facts that I wanted
20   to better understand and the points that I wanted to
21   evaluate.  And so that was how I started it.
22              And past that point, I'll take my counsel's
23   guidance regarding the balance of the process.
24              MR. O'CONNOR:  Actually, let's go back to the
25   materials considered list for a second.
```

Darius N. Lakdawalla, Ph.D.

```
1        Q   You list a variety of Bates-stamped documents

2   in your materials considered list, Doctor?

3        A   Correct.

4        Q   Did you review each of these documents?

5        A   Everything that's cited in my report I

6   personally reviewed.  The balance of the documents in

7   my materials considered that are not cited, either I

8   personally reviewed or I had my research assistants

9   review at my direction.

10       Q   How did you make the determination as to

11  which documents you personally reviewed and which

12  documents you had your research assistants at

13  Cornerstone review at your direction?

14       A   I -- I think the process could best be

15  described as I wanted to understand documents from the

16  categories that I mentioned earlier; that is,

17  financial forecasts of TAF, discussions of launch

18  timing, discussions regarding the likely commercial

19  prospects of TAF and -- and the TDF from the 2003/'04

20  time -- time frame, for example.

21           And I had reviewed -- I reviewed all the

22  financial forecasts from '03/'04 because I was

23  particularly interested in those.

24           And I reviewed a number of documents from the

25  other categories, but at some point they began to fall
```

Darius N. Lakdawalla, Ph.D.

```
1    into very, I would call repeating patterns and
2    appeared relatively similar.  And in those cases I
3    might direct my research assistants to review other
4    documents just to confirm and identify whether there
5    was any new or distinct information in them.
6         Q   When did you first review the reports of
7    Dr. Rosenthal and Ms. Fontein?
8         A   I don't recall the date.  It was -- it was in
9    June at some point, I believe.
10        Q   When did you review the documents listed
11   under Bates-stamped documents on page 4 of your
12   materials considered list?
13        A   I'm not going to be able to recall all of
14   them, but I did review -- I did review some internal
15   Gilead documents, which I believe would have been
16   Bates stamped, in June.  I reviewed some of them in
17   July.  So it was over time.  I don't think -- usually
18   when I'm working, I -- I would review documents kind
19   of over time.  I don't know that it's always in a
20   discrete bundle.
21        Q   Did you review any of these documents prior
22   to your review of -- sorry.
23            Did you review any of these Bates-stamped
24   documents listed in the materials considered list
25   prior to your review of Dr. Rosenthal and
```

```
 1   Ms. Fontein's reports?

 2           MR. CASAZZA:  Objection; form.

 3           THE WITNESS:  To the best of my recollection,

 4   the first thing I did was to review the reports from

 5   Dr. Rosenthal and Ms. Fontein.

 6           However, I think the answer to your question,

 7   though, is a little bit complicated because some of

 8   these documents I had reviewed in the context of the

 9   JCCP litigation.  So some of the documents I had

10   reviewed previously and under the guise of that

11   matter.  But insofar as we're talking about the work

12   that I initiated for this federal case, the first

13   thing I did was look at those two reports.

14   BY MR. O'CONNOR:

15       Q   What would you estimate is the percentage of

16   documents listed under Bates-stamped documents on --

17   in your materials considered list, which percentage of

18   those did you personally review?

19       A   I don't know.  I can tell you certain

20   categories.  As I mentioned, I definitely reviewed all

21   of the '03/'04 financial forecasts and everything

22   that's cited to in my report.  But as I sit here, I

23   don't -- I'm not able to give you a percentage

24   estimate.

25       Q   And as you sit here today, you're unable to
```

1   identify which of these documents that are listed

2   under the Bates stamp documents in the materials

3   considered list you reviewed personally?

4           MR. CASAZZA:  Objection; form,

5   mischaracterizes prior testimony.

6           THE WITNESS:  Well, I don't know that I can

7   recall, identify any document just based on the

8   number.  I don't internalize the numbers in my memory.

9           But I -- I do note in -- in my report

10  citations to them and those I've reviewed and other --

11  like the forecasts, I definitely reviewed.  I just

12  don't know how to relate the numbers to the content

13  off the top of my head.

14  BY MR. O'CONNOR:

15      Q   Is it fair to say that the documents that you

16  list and cite in your report itself are documents that

17  you personally reviewed?

18      A   The documents I list and cite in my report

19  are documents I personally reviewed, but I want to

20  clarify they're not the sum total of the documents I

21  personally reviewed.  So being cited in my report is a

22  sufficient but not necessary condition for me having

23  personally reviewed them.

24      Q   Did you have access to the entire database of

25  documents that Gilead produced in this litigation?

Darius N. Lakdawalla, Ph.D.

```
 1        A    Well, "access" I'm trying to parse, but I

 2   mean, I -- I was able to request categories of

 3   documents.  And so in that sense I -- I had access to

 4   documents that I requested.

 5        Q    When you say "requested," to whom did you

 6   request documents?

 7        A    Typically I would set forth documents,

 8   categories of documents that I wanted to see and I

 9   would set forth those requests to Cornerstone.

10        Q    Okay.  Do you recall if you or Cornerstone

11   ran any search terms across the Gilead database --

12   sorry -- the database of Gilead-produced documents?

13             MR. CASAZZA:  Objection.

14             I'm going to ask the witness not to answer

15   consistent with paragraph 5.

16             (Instruction not to answer.)

17             THE WITNESS:  I'll follow my counsel's

18   instruction.

19   BY MR. O'CONNOR:

20        Q    Okay.  Did you personally create any search

21   terms to run across the Gilead database?

22        A    I formulated my request for certain

23   categories of documents, and if I understand your

24   question correctly, I believe that that is identifying

25   the kinds of documents that I was asking be searched
```

Darius N. Lakdawalla, Ph.D.

1   for.  I did not personally type words into a database

2   to recover the documents, though.  That's -- that I

3   did not do.  But I formulated the search conceptually

4   and directed my research assistants at Cornerstone to

5   identify those documents, the categories of documents

6   that I was interested in.

7       Q   You noted earlier that you testified in the

8   JCCP proceedings in a hearing before the Court,

9   correct?

10      A   Yes, that's correct.

11      Q   Okay.  And you said that this was in -- this

12  testimony was in response to a Sargon motion that was

13  filed, correct?

14      A   Yes.

15      Q   Okay.  Do you recall the Court's order on the

16  Sargon motion as it relates to you?

17          MR. CASAZZA:  Just object to the form.

18          You're referring to the tentative order,

19  Mr. O'Connor?

20          MR. O'CONNOR:  I'm referring to the -- I'm

21  referring to the -- I'm just asking, yes, generally if

22  he refers to any order -- let's put it this way.

23      Q   Do you recall the order that the Court

24  ultimately entered prior to -- regarding your Sargon

25  motion prior to your testimony before the Court in the

1    JCCP proceedings, Dr. Lakdawalla?

2            MR. CASAZZA:  Same objection on form.

3    BY MR. O'CONNOR:

4        Q    Go ahead.

5        A    So my recollection is that there was a

6    tentative order, that's how I understood it to be

7    characterized before the hearing, and yes, I remember

8    that tentative order.

9        Q    Okay.

10           Evan, would you please pull up my internal

11   document number 13.

12           I'll be marking this as Exhibit 7 to your

13   deposition.

14           (Exhibit 7 marked.)

15   BY MR. O'CONNOR:

16       Q    You can flip through this, if you'd like,

17   Doctor, but does this appear to be the June 29, 2022

18   order regarding Sargon motions in the JCCP

19   proceedings?

20       A    Yes, it does.

21       Q    Okay.

22           Could we jump ahead to page 11 of this, Evan.

23           The Court writes -- first off, there's a

24   heading hearing near the top that says number 2,

25   "Darius N. Lakdawalla, Ph.D.," correct?

Darius N. Lakdawalla, Ph.D.

```
 1      A    That's right.

 2      Q    Then the second paragraph underneath that

 3   reads, "The Court agrees, as a threshold matter, that

 4   Dr. Lakdawalla's primary conclusion on the topic of

 5   deliberate delay is not adequately supported and

 6   simply constitutes an ordinary matter for

 7   cross-examination to be conducted by counsel.

 8   Dr. Lakdawalla's primarily conclusion is not based on

 9   any assertion as to the proper methodology to be

10   employed, the type of financial analysis to be used,

11   or a critique rooted in Dr. Lakdawalla's experience

12   [sic] as an economist.  It is unclear what

13   Dr. Lakdawalla was looking for and what standards he

14   employed to evaluate this particular point.

15   Dr. Lakdawalla's primary critique on this topic of

16   deliberate delay is not proper expert testimony based

17   on the current records."

18           Did I read that correctly?

19      A    I think you said "experience" instead of

20   "expertise" in the third-to-the-last sentence, but

21   other than that, yes, you read it correctly.

22      Q    Thank you.

23           The next paragraph reads, "Dr. Lakdawalla did

24   not review all of the documents relied upon by

25   Dr. Kesselheim and outsourced document review to
```

1    research associates even though such document

2    assessment is at the heart of Dr. Lakdawalla's

3    principal opinion."

4         Did I read that correctly?

5    A    Yes.

6    Q    Were the research associates at issue

7    Cornerstone?

8    A    Yes.

9         MR. O'CONNOR:  Next page, please.

10        The first full paragraph reads, "Under

11   California law, an expert must have personal knowledge

12   of, have perceived, or be made aware of the facts upon

13   which the expert is relying."

14   Q    Did I read that correctly?

15   A    Yes.

16   Q    It then reads, "As reflected in the Law

17   Revision Commission Comments to Evidence Code

18   section 801, it expected that an expert may rely on

19   facts or reports provided by others; it is not the

20   case that the expert must be a percipient witness to

21   all of the facts upon which he or she relies.  Here,

22   the issue is that Dr. Lakdawalla appears to not simply

23   rely on facts provided by others, but rather to have

24   outsourced the analysis itself.  In other words, it is

25   possible that an expert could permissibly outsource

```
 1    data collection or certain rote calculations that will

 2    be used as inputs for the expert's analysis.  But

 3    reliance on inputs or facts provided by others is

 4    fundamentally different than reliance on others to

 5    conduct the analysis.  Given Dr. Lakdawalla is opining

 6    as to whether Dr. Kesselheim's opinion was supported

 7    by evidence, the Court finds the outsourcing of this

 8    fundamental analysis to be problematic for this

 9    particular opinion on this record.  This is an

10    additional reason that the Court excludes

11    Dr. Lakdawalla's opinion on profitability of

12    deliberate delay."

13            Did I read that correctly?

14        A   Yes.

15        Q   Next paragraph reads, "Finally, there is an

16    issue with Dr. Lakdawalla's critique due to his

17    admitted lack of qualification to testify about

18    certain topics that are necessarily related to

19    Dr. Kesselheim's opinions [sic] and Dr. Lakdawalla's

20    evaluation of the same.  Significantly, Dr. Lakdawalla

21    appears to dispute whether TAF was safer than TDF or

22    whether Gilead had a 'belief' that TAF was safer than

23    TDF for the purpose of making an assumption in his

24    critique on the topic of the profitability of

25    delay" -- "profitability of deliberate delay."
```

Darius N. Lakdawalla, Ph.D.

```
 1              Did I read that correctly?

 2       A   Yes.

 3       Q   It then continues, "Based on Dr. Lakdawalla's

 4   statements, including his disclaimer of expertise on

 5   the topic of the clinical science of drug development,

 6   the Court finds his seeming disputation problematic

 7   particularly in the absence of a clear basis for

 8   making a particular assumption about safety."

 9              Did I read that correctly?

10       A   Yes.

11       Q   What was your disclaimer of expertise on the

12   topic of clinical science of drug development in that

13   case?

14              MR. CASAZZA:  Objection; form, foundation.

15              THE WITNESS:  Sorry, could you repeat the

16   question?  I'm not quite following.

17   BY MR. O'CONNOR:

18       Q   What is your understanding of what the Court

19   is referring to when the Court says "his disclaimer of

20   expertise on the topic of the clinical science of drug

21   development"?

22              MR. CASAZZA:  You can answer if you know what

23   the Court was referring to.

24              THE WITNESS:  I believe they're referring to

25   the fact that I am not a bench scientist.  And I think
```

Darius N. Lakdawalla, Ph.D.

1    that's what is meant by clinical science of drug

2    development is the bench science of drug development

3    as opposed to the economics of drug development.

4    BY MR. O'CONNOR:

5        Q    The Court then continues, "It is not apparent

6    that Dr. Lakdawalla properly evaluated or was capable

7    of evaluating any clinical data as relevant to making

8    a determination about this assumption.  Ultimately,

9    because Dr. Lakdawalla's explanation is lacking, and

10   the issue of safety appears - in his mind - to be

11   intertwined with the analysis of the profitability of

12   deliberate delay, the Court finds his conclusion on

13   that topic to be problematic under Sargon on this

14   additional basis."

15            Did I read that correctly?

16       A    Yes.

17       Q    You then, after this order, testified before

18   the Court in the hearing, as you discussed, correct?

19       A    That's right.

20            MR. O'CONNOR:  Could you please pull up my

21   internal document number 14, Evan.

22            And I'll mark this as Exhibit 7 to your

23   deposition.

24            MR. CASAZZA:  I think it's Exhibit 8.

25            MR. O'CONNOR:  Thank you, Counsel.

Darius N. Lakdawalla, Ph.D.

```
 1              Exhibit 8 to the deposition.
 2              (Exhibit 8 marked.)
 3   BY MR. O'CONNOR:
 4       Q   Dr. Lakdawalla, this appears to be, and
 5   please confirm, that this is the transcript from your
 6   testimony before the JCCP Court on July 21st of 2022,
 7   correct?
 8       A   It seems to be, although I don't know that
 9   I've actually seen this before.  But yes, it seems to
10   be the transcript.
11       Q   Please review it and please let me know when
12   you're comfortable answering questions on it.
13       A   All right.  Thank you.
14           Okay, Mr. O'Connor, thank you.
15       Q   Does this appear, Dr. Lakdawalla, to be a
16   transcript of your testimony before the JCCP Court at
17   a July 21st, 2022 hearing?
18       A   It does, yes.
19       Q   Okay.  If you could please turn to page 14.
20   And apologize if it's a little small.  This is our way
21   in which lawyers try to save a little bit of paper by
22   putting four on -- on a page.
23           If you go to the very bottom of page 14, a
24   question was asked you, "Have you done additional work
25   to ensure that the process that was utilized to
```

Darius N. Lakdawalla, Ph.D.

```
 1   identify the documents was comprehensive and
 2   accurate?"
 3          And your response was, "Yes, since I became
 4   aware of the Court's concern regarding my methods, I
 5   went through the -- went to Professor Kesselheim's
 6   reliance list and the documents on it myself.  I
 7   reviewed the documents on that reliance list myself
 8   and essentially replicated the search that I asked to
 9   be -- my research assistant at Cornerstone to
10   perform."
11          Did I read that correctly?
12      A   Yes.
13      Q   So again, this is referring to work that you
14   did after your initial deposition in the JCCP
15   proceedings, correct?
16      A   Correct.
17      Q   Okay.
18          If you could turn now to page 25, starting at
19   page -- sorry -- line 16, you were asked,
20   "Dr. Lakdawalla, at your deposition you testified that
21   one of your opinions was that there was no evidence
22   that Gilead investigated a deliberate delay strategy
23   as being profitable; correct?"
24          You respond, "I believe that's right, yes."
25          Question, "And you also testified in order to
```

Darius N. Lakdawalla, Ph.D.

```
 1   make that conclusion you need to -- in order to

 2   test -- in order to testify that there's an absence of

 3   evidence, you needed to look at every document; isn't

 4   that true?"

 5          "Yes, I testified to that, that's right."

 6          Then it continues, "And you did not

 7   personally look at every document in accordance with

 8   that methodology prior to your deposition; correct?"

 9          And you respond, "That's correct."

10          Did I read that correctly?

11     A    Yes.

12     Q    Then if we go to page 29, please.

13          The question was asked, "Now, you testified

14   that you used Cornerstone as your research assistant

15   in this project; correct?

16          "Right, or research support, they are

17   synonyms but yeah, that's true."

18          That was your response.

19          Question, "And you used them to help you

20   review documents on Dr. Kesselheim's reliance list;

21   correct?"

22          Answer, "I think I said I used to search for

23   documents and identify documents that I -- based on my

24   criteria."

25          Question, "Right.  But they looked at
```

Darius N. Lakdawalla, Ph.D.

```
 1    documents that you did not look at; correct?"
 2           Answer, "At that time, but now I have
 3    reviewed all of them."
 4           Question, "When you say 'now', you mean after
 5    your deposition was concluded; right?"
 6           Answer, "Right.  So just to be clear, what I
 7    said was that the -- when I became aware of the
 8    Court's concern, I went through the documents on
 9    Professor Kesselheim's reliance list myself to verify
10    that the search was conducted correctly.  So that's
11    what I'm referring to, as I explained earlier."
12           Question, "So you did this work after the
13    Court's order on this case May 29th; correct?"
14           Answer, "If by," quote, "'the work,'"
15    unquote, "you're referring to this -- the search of
16    the documents to verify that the documents necessary
17    were delivered to me, yes, that's true."
18           Did I read that correctly?
19       A   Yes.
20       Q   Did you personally review all the documents
21    referenced in Dr. Rosenthal's expert report?
22       A   I'm not sure.  As I said before, I've
23    personally reviewed everything cited in my report.
24    Some of those documents were cited to in Professor
25    Rosenthal's report.  I've personally reviewed what --
```

Darius N. Lakdawalla, Ph.D.

```
1    how Ms. -- how -- I apologize -- Professor Rosenthal

2    characterized those documents.  I personally reviewed

3    her explanation of those documents.  And I've

4    personally reviewed other documents outside that set.

5           So in my view, I've personally reviewed the

6    documents as Professor Rosenthal presented them and

7    formed her opinions on the basis of them.

8       Q   I guess my question was a little different.

9           As you sit here today, do you recall or have

10   you personally reviewed all the documents referenced

11   in Dr. Rosenthal's report?

12          MR. CASAZZA:  Objection; form.

13          THE WITNESS:  I don't know the answer to that

14   question.  I've -- the way I've answered it was to the

15   best of my recollection, I've named the sets of

16   documents that I have reviewed.  I'm just not sure

17   what the overlap is between that -- those sets and

18   Professor Rosenthal's documents, as I sit here.

19   BY MR. O'CONNOR:

20      Q   As you sit here today, you can't definitively

21   state that you've personally reviewed all of the

22   documents referenced in Dr. Rosenthal's report, can

23   you?

24          MR. CASAZZA:  Objection; form, asked and

25   answered.
```

```
 1              THE WITNESS:  I -- I've said I can't recall,
 2   but I've also said that Professor Rosenthal -- or
 3   Professor Rosenthal's presentation of the documents I
 4   have reviewed personally and so I do have personal
 5   insight into whether she points to certain categories
 6   of documents.  So I think that that is a relevant
 7   issue in understanding the evidence that she presented
 8   in my personal review of them.
 9              But I also would indicate -- I would also
10   explain that in the process of reviewing documents I
11   personally reviewed many of them, but even the ones
12   that I didn't personally review were reviewed at my
13   direction.
14              And as I noted in the hearing, my conclusion
15   was that my methodology for managing my research
16   assistants delivered the desired result, which is that
17   the searches were performed accurately and the
18   information I needed was provided to me, as I expected
19   it would be.
20              MR. O'CONNOR:  I would move to strike
21   everything after "and I would also explain."  I object
22   to it as nonresponsive.
23        Q    Did you, Doctor, personally review all the
24   documents referenced in Ms. Fontein's report?
25              MR. CASAZZA:  Objection to form; vague.
```

Darius N. Lakdawalla, Ph.D.

```
 1              But by "referenced in Ms. Fontein's report,"
 2    are you referring to the body of the report or the
 3    report and the reliance list, Mr. O'Connor?
 4              MR. O'CONNOR:  That's a great point.
 5         Q   Dr. Rosenthal -- or -- sorry.
 6              Dr. Lakdawalla, did you personally review all
 7    the documents referenced in the body of or any
 8    appendices to or exhibits to Ms. Fontein's report?
 9              MR. CASAZZA:  Same -- same objections insofar
10    as the appendices and exhibits include the reliance
11    list.
12              THE WITNESS:  I don't know, as I sit here,
13    whether I reviewed all of those documents or not.
14    BY MR. O'CONNOR:
15         Q   Do you recall, as you sit here today, whether
16    you personally reviewed all of the documents in the
17    body of Ms. Fontein's expert report?
18         A   I certainly recall reviewing many of them,
19    but I just don't remember if I reviewed all of them or
20    not.
21         Q   After you testified at this hearing, the
22    Court ruled that you could testify as an expert in the
23    JCCP proceedings, correct?
24         A   Yes, that's my understanding.
25         Q   Okay.  Perhaps -- we've already discussed it
```

Darius N. Lakdawalla, Ph.D.

1    to a degree but just as a matter of clarity, what was

2    the methodology that you used in preparing your

3    report?

4              MR. CASAZZA:  Objection; form, vague.

5              THE WITNESS:  Yeah, I'm not sure I understand

6    the question.  I'm sorry, Mr. O'Connor.  Would you

7    mind rephrasing it?

8    BY MR. O'CONNOR:

9         Q   Of course.

10             What is the scientific or academic

11   methodology that you used to prepare your report in

12   this case?

13             MR. CASAZZA:  Same objection.

14             THE WITNESS:  In preparing my report I'm

15   relying on my expertise and training as a health

16   economist and I'm using the conceptual tools of

17   economic analysis and econometrics to evaluate the

18   opinions offered by Professor Rosenthal and

19   Ms. Fontein and also to offer my own empirical

20   analysis of the profitability or lack of profitability

21   associated with an alleged strategy that deliberately

22   delayed the launch of TAF.

23   BY MR. O'CONNOR:

24        Q   Is there a rate of error attributed to this

25   methodology that you're describing?

Darius N. Lakdawalla, Ph.D.

```
 1              MR. CASAZZA:  Objection; form, vague.
 2              THE WITNESS:  I'm afraid I don't really know
 3    what that means.  I mean, that's not really a
 4    well-defined concept in economic theory as such.
 5    BY MR. O'CONNOR:
 6         Q   Do you have any understanding as to --
 7    sorry -- strike that.
 8              You referenced earlier a methodology and how
 9    you deployed, for lack of a better term, Cornerstone
10    in the JCCP proceedings.
11              Do you recall discussing that?
12         A   You're saying the -- the way in which I
13    directed the Cornerstone team?  I'm just trying to
14    understand to make sure I --
15         Q   Yeah, I think you used -- I didn't mean to
16    cut you off.  Sorry, Doctor.
17              I believe you used the phrase "methodology"
18    in -- in the context of your discussion of the hearing
19    in the JCCP proceedings.
20              Do you recall that?
21         A   Yes.  Thank you for clarifying.  Yes, I
22    understand what you're referring to.
23         Q   Did the methodology, for lack of a better
24    term, in this context change in any way; that is, did
25    your methodology in deploying Cornerstone in the
```

Darius N. Lakdawalla, Ph.D.

```
 1    preparation of this report differ in any way from the

 2    methodology that you used in the JCCP proceedings?

 3              MR. CASAZZA:  Objection; form.

 4              And I'm going to instruct the witness not to

 5    answer to the extent it's calling for any

 6    communications between him and Cornerstone.

 7              (Instruction not to answer.)

 8              THE WITNESS:  Well, I think what I can say

 9    about this is that, and as I explained at the hearing,

10    the methodology here is not something that I created

11    in an idiosyncratic way for the JCCP matter.  It's

12    based on my experience as an academic principal

13    investigator directing research teams.  So that

14    methodology as a general matter is what I relied upon.

15              There are always specifics of every research

16    project that might vary.  But as a general matter, I

17    explained in the hearing that I routinely direct teams

18    of research assistants as an academic principal

19    investigator, and I drew on that experience and

20    expertise to direct my research assistants at

21    Cornerstone in both of these matters.

22    BY MR. O'CONNOR:

23         Q   Put it this way, was there anything different

24    about the process or methodology or means by which you

25    deployed or used Cornerstone in this litigation that
```

Darius N. Lakdawalla, Ph.D.

```
 1    was different from the way in which you used them

 2    prior to and in preparation for your deposition in the

 3    JCCP matter?

 4              MR. CASAZZA:  Objection; form.

 5              And same instruction to the witness not to

 6    answer insofar as it's asking for communications

 7    between the witness and Cornerstone.

 8              (Instruction not to answer.)

 9              THE WITNESS:  I'm going to follow my

10    counsel's instruction on that.

11    BY MR. O'CONNOR:

12       Q    No aspect of that question can you answer

13    without infringing upon communications with either

14    counsel or Cornerstone; is that correct?

15       A    Well, as I'm evaluating the question, it

16    seems to me that it -- it intrinsically relates to the

17    way in which I communicated with the team at

18    Cornerstone and directed them.

19       Q    And I would say did any of this aspect in

20    which I'm asking about involve the drafting of your

21    report?

22              MR. CASAZZA:  I'll instruct the witness not

23    to answer consistent with paragraph 5 of the order

24    regarding expert discovery.

25              (Instruction not to answer.)
```

Darius N. Lakdawalla, Ph.D.

```
 1   BY MR. O'CONNOR:

 2       Q   Put it this way:  Is there any aspect of the

 3   communications with Cornerstone not involved in the

 4   drafting of your report?

 5           MR. CASAZZA:  Same.  Same objection and

 6   instruction.

 7           (Instruction not to answer.)

 8           THE WITNESS:  I'm going to follow my

 9   counsel's instruction.

10           MR. O'CONNOR:  Okay.  Let's go off the

11   record.

12           THE VIDEOGRAPHER:  Off record; 12:35 p.m.

13           (Lunch recess.)

14           THE VIDEOGRAPHER:  On record; 1:10 p.m.

15           MR. O'CONNOR:  Could we go off record for one

16   second.  Never mind, never mind.  I was going to make

17   one note, but we're all set.

18           Can we please pull up, Evan, Dr. Lakdawalla's

19   report, which is Exhibit 1.

20       Q   And Dr. Lakdawalla, you have a hard copy in

21   front of you?

22       A   I do, yes.

23       Q   I'll be -- I'll be jumping around through

24   various parts of it, so obviously let me know if you

25   have any -- you need me to slow down or look at
```

```
 1    something, let me know.

 2             Could you please, let's go to paragraph 48.

 3             Dr. Lakdawalla, you write in paragraph 48

 4    that an earlier launch of TAF-containing drugs would

 5    also lead consumers to switch -- sorry -- strike that.

 6             Go back up, Evan.  It's the first sentence.

 7             You -- Dr. Lakdawalla, you write in

 8    paragraph 48 "that an earlier launch of TAF-containing

 9    drugs would also lead consumers to switch from

10    TDF-containing drugs to TAF-containing drugs prior to

11    the entry of generic versions of TDF," correct?

12        A    Yes.

13        Q    Do you agree with that statement?

14        A    I would say I think the main issue is that

15    they failed to recognize the implications of that.

16    They may note it in some factual capacity, but it's

17    the implications that matter.

18        Q    I guess I'm asking more specifically, do you,

19    Dr. Lakdawalla, agree with the portion that's

20    highlighted; namely, "an earlier launch of

21    TAF-containing drugs would also lead consumers to

22    switch from TDF-containing drugs to TAF-containing

23    drugs prior to the entry of generic versions of TDF"?

24        A    Oh, I apologize.

25             Yes, I agree that that's what's written.
```

Darius N. Lakdawalla, Ph.D.

```
1       Q   And do you agree with that sentiment in that
2   statement?
3       A   Yes, I do.
4       Q   Okay.
5           Sorry, just so everything's clear.  We talked
6   about it earlier.  But can we agree when we're
7   referring to TDF, we are referring to the drug
8   tenofovir disoproxil fumarate?
9       A   Yes.
10      Q   And when we're referring to TAF, we're
11  referring to tenofovir alafenamide?
12          Can we agree to that?
13      A   Yes, and I will almost certainly use TDF or
14  TAF instead of the chemical names.
15      Q   Join the club.
16          Another name for TAF is GS-7340, correct?
17      A   Correct.
18      Q   And another one, another version of that is
19  7340, correct?
20      A   Sure, that's right.
21      Q   So if I'm referring to either TAF, GS-7340 or
22  7340, can we agree that I'm referring to the drug
23  tenofovir alafenamide for the purposes of this
24  deposition?
25      A   Yes.
```

Darius N. Lakdawalla, Ph.D.

1      Q   Thank you.

2          Can we now jump up to paragraph 80.

3          THE REPORTER:  Counsel, I'm having a hard

4   time hearing you.

5          MR. O'CONNOR:  How is this?

6          THE REPORTER:  That's better.

7          MR. O'CONNOR:  Okay.  Thank you.  I'll move

8   closer.

9          THE REPORTER:  Thank you.

10  BY MR. O'CONNOR:

11     Q   You write in paragraph 80, "This" -- I'll

12  read the whole sentence.

13          "This effect is magnified even further under

14  Ms. Fontein's assertion that Gilead's 'expected [cost

15  of goods sold] for TAF 75mg [was] less than half of

16  that of TDF, with room to further reduce costs

17  long-term."

18          Did I read that correctly with exception of a

19  few brackets thrown in there?

20     A   Yes.

21     Q   Do you agree with the statement "that

22  Gilead's 'expected [cost of goods] sold for TAF 75mg

23  [was] less than half of that of TDF, with room to

24  further reduce costs long-term"?

25          MR. CASAZZA:  Objection; form.

Darius N. Lakdawalla, Ph.D.

1          THE WITNESS:  I'm not offering an opinion on

2     that.  Here, I'm just noting that her assertion, if

3     correct, would strengthen my conclusions regarding the

4     profitability of launching TAF earlier.

5     BY MR. O'CONNOR:

6          Q    Okay.

7               Let's go back now to paragraph 11.

8               If you could blow that one up, please, Evan.

9               Dr. Lakdawalla, you discuss the term "product

10    switch" in this paragraph, correct?

11         A    Right.  Although, to be clear, I'm -- I'm

12    citing to how Dr. Rosenthal uses the expression.

13         Q    What is your understanding of what a product

14    switch is?

15         A    Based on my reading of the literature, and

16    even the literature that is cited in Dr. Rosenthal's

17    report, a product switch strategy is a strategy in

18    which a new reformulation of an incumbent drug is

19    launched in order to protect some portion of the

20    incumbent's market share against generic entry of

21    the -- of the -- just to be clear, against entry of

22    generics for the incumbent product.

23         Q    For the purposes of this deposition, your

24    report, your understanding of Dr. Rosenthal's report,

25    can we agree that in this context the new product at

Darius N. Lakdawalla, Ph.D.

```
 1    issue would have been TAF and the incumbent product

 2    would have been TDF; is that a fair characterization?

 3              MR. CASAZZA:  Objection; form,

 4    mischaracterizes prior testimony.

 5              THE WITNESS:  So whenever I am referring --

 6    well, actually, Mr. O'Connor, to be honest, I -- I

 7    generally don't use the new versus old in the context

 8    of the specific matter.

 9              But certainly in the event that I talk about

10    an incumbent product and a new product within the

11    context of this matter rather than in general, yes,

12    it's true that I'm referring to TAF-containing

13    compounds as the new product with the understanding

14    that it's potentially more than one drug.

15              And similarly, for the incumbent product it's

16    potentially more than one drug.  It's the

17    TDF-containing compounds.

18              And if I might, I'm sorry, Mr. O'Connor, but

19    I was having a little trouble hearing you just in the

20    last set of questions.  I apologize.

21    BY MR. O'CONNOR:

22        Q    No problem.

23              THE VIDEOGRAPHER:  Yeah, Mr. O'Connor, just

24    check to make sure you don't have any paper on top of

25    the laptop keyboard area that might be covering the
```

Darius N. Lakdawalla, Ph.D.

```
 1   microphone or something.

 2              MR. O'CONNOR:  No, it's -- does everyone hear

 3   me now or is there still trouble?

 4              THE WITNESS:  It's better for me.

 5              MR. O'CONNOR:  Okay.  I assume it might be a

 6   function of me fussing with the report a little bit so

 7   I have a very sensitive mic so just please let me know

 8   if it continues to be an issue.

 9              THE WITNESS:  Sure.

10              MR. O'CONNOR:  Thank you.

11       Q   Dr. Lakdawalla, have you ever been qualified

12   by a court as an expert in product switches?

13              MR. CASAZZA:  Objection; form.

14              THE WITNESS:  I'm not exactly sure what that

15   means, Mr. O'Connor.

16   BY MR. O'CONNOR:

17       Q   Have you ever provided an expert opinion

18   in -- at -- sorry.

19              Have you ever provided an expert opinion

20   outside this one on the issue of product switches?

21       A   Yes, because it came up in the context of the

22   JCCP litigation as well.

23       Q   Outside of the context of the JCCP litigation

24   and this litigation, have you ever provided an expert

25   opinion on product switches?
```

Darius N. Lakdawalla, Ph.D.

1     A   Well, I have -- I've taught the concept so

2   I've provided expert opinions as an academic.  But if

3   the intent of your question is specific to litigation,

4   then what you said is correct, that it's those two

5   matters in which I have offered opinions on product

6   switch in a litigation context.

7     Q   And let's go back, actually -- or we're going

8   to actually go forward in the report.

9         Can we go to your CV, please.

10        Dr. Lakdawalla, could you please identify any

11  articles, publications, presentations, all the things

12  that you list in your CV that relate to product

13  switches?

14    A   Sure.  Well, actually, two that come to

15  mind -- I can go through all of them.  There are two

16  that come to mind, but I'm happy to go through all of

17  them.

18    Q   We'll make it easy.  What are the two that

19  come to mind?

20    A   So one of them is my paper on the "Economics

21  of the Pharmaceutical Industry" where I talk about

22  strategies for extending intellectual property

23  protection.  And that's -- that's the publication in

24  the Journal of Economic Literature, I believe.

25        And I believe -- my recollection is that

```
 1   there was some discussion in there about extensions of

 2   exclusivity.  Sometimes it's called evergreening.

 3   There are different terms that are used in the

 4   literature for this.

 5            And I believe in my paper with Tomas

 6   Philipson in the Journal of Law and Economics on

 7   intellectual property and marketing, I believe we

 8   looked in the data there and we -- we -- the data we

 9   had distinguished between extension candidates and new

10   molecular entities.  Those are two that occur to me

11   off the top of my head.

12            I will say that the concept of reformulations

13   and the economic incentives around reformulations,

14   which is really what this refers to, is present in a

15   number of ways in economic analysis in the

16   pharmaceutical industry.  So I'm not sure I'm -- I

17   don't claim to be able to enumerate every way in which

18   that concept plays a role.  But those two I remember

19   having thought about this issue in the analysis that I

20   conducted in particular.

21        Q   I appreciate that clarification.

22            For the record and just so things are easier,

23   can you identify in your CV those two documents and

24   any other articles or publications that you believe

25   would deal with, relate to or otherwise involve
```

Darius N. Lakdawalla, Ph.D.

```
 1    discussion of product switches?

 2        A   Sure.  Although, I do want to clarify,

 3    Mr. O'Connor, that -- as I think I mentioned this

 4    earlier, but there are a lot of different terms that

 5    economists use for this behavior.  "Product switch" is

 6    one of them.  But there are terms like "exclusivity

 7    extension."  Sometimes people say "patent extension."

 8    Sometimes people say "evergreening."

 9            So I think -- the way I'm answering your

10    question is I'm referring to papers that tackle this

11    concept which to me is -- has different names.  But

12    with that qualification, give me a moment to just flip

13    through and I'll identify those papers.

14        Q   And I'll note for the record that's exactly

15    what I want you to be looking for.  So thank you,

16    Doctor.

17        A   So I believe it -- it shows up in number 36.

18    That was one of the papers.

19        Q   Under your list of "Peer-Reviewed

20    Publications," correct, sir?

21        A   Correct.

22            This -- the title of the paper is "The

23    Economics of the Pharmaceutical Industry" in the

24    Journal of Economic Literature.

25            Sorry, I think the other one is older.  It's
```

Darius N. Lakdawalla, Ph.D.

```
 1   just taking me a minute to find it.

 2            Oh, it's number 95, "Does Intellectual

 3   Property Restrict Output?"

 4            Let me just take a quick look to make sure

 5   I'm not forgetting anything else.

 6            Okay.  To the best of my knowledge, that

 7   issue of patent extension or evergreening, et cetera,

 8   comes up in those two papers.  And I -- as I sit here,

 9   I don't remember whether it comes up in any others,

10   but that's -- that's to the best of my recollection.

11       Q   And just so everything's clear, any other --

12   are there any other documents or presentations

13   referenced in your CV that involve this concept of

14   product switching via product switching or market

15   exclusivity, patent extension, evergreening, the terms

16   that you referred to earlier?

17       A   Right.  If you don't mind, just give me one

18   minute.  I didn't look at those sections.

19       Q   Yeah, of course, please.  Anything in your

20   CV.  I'd just like to know what they are.

21            MR. CASAZZA:  Please don't rush.

22   BY MR. O'CONNOR:

23       Q   Yeah, don't rush.  Don't worry about it.  I'd

24   like -- just want it to be complete.

25       A   Actually, I think it might have come up in
```

Darius N. Lakdawalla, Ph.D.

1    the paper on "Market Exclusivity for Drugs," either in

2    the reply, which is number 24 under conference

3    abstracts, or the original paper, which was number 101

4    in Peer-Reviewed Publications.  It may have been an

5    issue in that research.

6           I think it may have also been an issue under

7    Other Publications for number 5, this "First-in-Class

8    Drug Approvals on Future In-Class Innovation."  I

9    don't remember exactly.  But that was related to the

10   issue of incremental novelty or extension.  But I

11   don't remember that one exactly.

12          Maybe 37 under Other Publications because

13   it's about the narrowing of markets and narrowing of

14   incremental value for new drugs.  That's this web --

15   that's the Health Affairs Blog post called "The End of

16   the Blockbuster?"

17          Oh, possibly also on 45 and 46, which is the

18   "Intellectual Property" handbook chapter on the

19   "Incentives to Innovate" handbook chapter.  Yeah, the

20   ones that are highlighted.

21          Okay.  To the best of my recollection, that's

22   the set, although I'll just note some of these papers

23   were written a long time ago so I'm just doing the

24   best I can to recall the content.

25          Q    Thank you.

```
 1              Can we go back to your report.  We were
 2    looking at paragraph 11.
 3              Dr. Lakdawalla, the last sentence of that
 4    paragraph reads, "But that," quote, "'product
 5    switch,'" unquote, "opinion ignores the fact that she
 6    and Ms. Fontein are both alleging that Gilead knew all
 7    along that TAF was notably clinical" -- "clinically
 8    superior to TDF."
 9              Did I read that correctly?
10        A    Yes.
11        Q    Are you going to opine as to the clinical
12    superiority of TAF to TDF in this litigation?
13        A    I'm not going to opine on whether it was
14    clinically superior but I have opined in my report the
15    economic implications of clinical superiority to the
16    extent that it is clinically superior.
17              This relates to the earlier distinction I
18    made from this morning when I talked about how it's
19    within the purview of an economist to use clinical
20    data as an input into economic analysis even though an
21    economist wouldn't necessarily produce the clinical
22    data as such or opine on the likelihood of one set of
23    clinical characteristics or another.
24        Q    So any -- any opinion that you would make
25    involving the, quote, clinical superiority of TAF over
```

```
 1    TDF would be as to the economic implications of such

 2    superiority; is that fair?

 3            MR. CASAZZA:  Objection; form.

 4            THE WITNESS:  I think it would be fair.  But

 5    I want to emphasize people -- a non-economist might

 6    interpret that phrase "economic implications"

 7    differently than I would as an economist.  But I -- I

 8    view that as a fairly broad set of issues connected to

 9    the decisions made by Gilead, decisions made by

10    competitors, other, you know, countervailing

11    incentives.

12            But as long as we are saying that these are

13    the economic implications as I understand the purview

14    of health economic analysis, then yes, I think

15    that's -- that's a fair statement subject to that

16    clarification.

17    BY MR. O'CONNOR:

18       Q   And I want to just be clear.

19            You're not going to get up before the jury at

20    trial and say, "Based on my expert opinion, TAF is

21    clinically superior to TDF," are you?

22       A   I can't think of any circumstance in which I

23    would do that.

24       Q   Okay.

25       A   At this time at least.
```

Darius N. Lakdawalla, Ph.D.

```
 1      Q   Okay.

 2          Please go to just Section 4 of your report.

 3  It begins at paragraph 18 and it goes -- looks like

 4  two paragraphs and then you have a chart.  It

 5  stretches from page 8 to 10 -- strike that.

 6          It stretches from page 6 to 10, correct, sir?

 7      A   I'm sorry, you're saying that Section 4

 8  stretches from page 6 to 10 and that's the -- that's

 9  the question?

10      Q   Yeah.  Correct.  I just want to make sure

11  we're looking at the same thing.

12      A   Yes, that's correct.  Section 4 stretches

13  from page 6 to page 10.

14      Q   Did you write this section, sir?

15      A   Yes.

16      Q   Okay.  Did anyone help you in writing this

17  section?

18          MR. CASAZZA:  Objection.

19          I'll ask the witness not to answer consistent

20  with paragraph 5 of the order governing expert

21  discovery.

22          (Instruction not to answer.)

23  BY MR. O'CONNOR:

24      Q   Are you going to take your counsel's advice

25  on that one, Dr. Lakdawalla?
```

Darius N. Lakdawalla, Ph.D.

```
 1        A    Yes, I will.

 2        Q    Okay.  Go to paragraph 19.

 3             In the second paragraph -- sorry -- the

 4   second sentence of that paragraph you write, "There

 5   are substantial risks and uncertainty involved in the

 6   drug development process," correct?

 7        A    Correct.

 8        Q    If anything, you're only opining in this

 9   circumstance as to the financial risks and uncertainty

10   of the drug development process; is that fair?

11        A    I would call it the economic risks and

12   uncertainty, which might lie beyond the scope of the

13   word "financial."  But -- for example, I would say

14   that it -- just as an example, the footnote cites to a

15   Journal of Health Economics paper which discusses

16   things like the risks to the -- the risk of drug, of

17   failure to approve, you know, the -- the -- the market

18   uptake of the drug may be below what is expected,

19   above what is expected.  There may in principle be

20   risks beyond financial risks that still affect the

21   decision-making of the firm or affect patients from

22   a -- from a social welfare standpoint.

23             Those would all I -- I view as economic in

24   nature because we can consider things like the effects

25   on patient health.  There's a certain social value
```

```
 1   that economists would discuss related to patient

 2   health effects.  I wouldn't call those financial.  But

 3   I think that that's connected and it's within the

 4   purview of health economics, just as one example of a

 5   nonfinancial aspect.

 6       Q   So you are only opining and will only be

 7   opining as to the economic risks and uncertainty

 8   involved in the drug development process; is that

 9   fair?

10       A   Right.  Subject to the stipulation I keep

11   making about the way that I understand the breadth of

12   the word "economic."  But yes, as long as we are in

13   agreement on that, that's correct.

14           MR. CASAZZA:  Objection; form on the

15   question.

16   BY MR. O'CONNOR:

17       Q   The Journal of Health Economics article that

18   you cite is listed in footnote 23, it's written by

19   Joseph DiMasi, Henry Grabowski and Ronald Hansen,

20   correct?

21       A   Right.

22       Q   Henry Grabowski works for Cornerstone

23   Research, correct?

24       A   I don't know, actually.  He may.  That may be

25   true.  I'm not sure.
```

Darius N. Lakdawalla, Ph.D.

```
 1              MR. O'CONNOR:  Would you please pull up --

 2              THE WITNESS:  Actually, I'm sorry, that -- so

 3    just to be clear, he's a professor.  If what you're

 4    saying is that he has a consulting relationship to

 5    Cornerstone, that -- that may well be true.  I'm not a

 6    hundred percent sure if that's the case right now or

 7    not.

 8    BY MR. O'CONNOR:

 9        Q   Okay.

10            Could you please pull up my internal document

11    number 18, Jeff -- Jeff -- Evan.

12            I'm marking this as Exhibit 9 to your

13    deposition.

14            (Exhibit 9 marked.)

15            MR. O'CONNOR:  This appears to be Henry G.

16    Grabowski at -- his profile page at Cornerstone

17    Research.

18        Q   Does that appear to be what this is, sir?

19        A   Yes, it does.

20        Q   Okay.  And I'll represent that this was

21    downloaded within the last two weeks.

22            Do you have any reason to dispute that

23    Mr. Grabowski works for Cornerstone Research?

24        A   Well, I do want to just clarify "works for

25    Cornerstone" has a lot of different meanings and I
```

1    don't dispute that he -- he may have a relationship

2    but it may be that he works for multiple firms that

3    provide litigation consulting support, maybe only for

4    Cornerstone, maybe he has worked on cases recently or

5    not.  I actually just don't know any of those facts.

6    I don't -- I know Dr. Grabowski, but I've never spoken

7    to him about these issues before.

8            But certainly I agree that there's likely

9    some relationship.  I just don't know exactly what

10   that relationship is in terms of its specifics.

11       Q   I guess you're not disputing that he is

12   listed on Cornerstone Research's page website and has

13   his own profile page on Cornerstone Research's

14   website, are you?

15       A   No, you're absolutely right, I'm not

16   disputing that he shows up as an expert on the

17   Cornerstone website.

18       Q   Okay.  Thank you.

19           You can take that down.

20           Now, the phrase is used in your report and

21   other reports, "cannibalization," Dr. Lakdawalla.

22           What is your understanding of what

23   cannibalization is in the economic context of the

24   pharmaceutical industry to be precise?

25           MR. CASAZZA:  Objection; form, vague.

Darius N. Lakdawalla, Ph.D.

1          THE WITNESS:  So my understanding about how

2    it's used -- maybe it's easiest for me to talk about

3    how it's used in this particular matter just to

4    provide some concreteness.

5    BY MR. O'CONNOR:

6          Q    Please.

7          A    And so the way I understand cannibalization

8    as used by Professor Rosenthal, Ms. Fontein and -- and

9    me, I think there's agreement on the general meaning

10   of the concept, which is that there's a new drug, in

11   this case it would be TAF or a TAF-containing compound

12   or some set of TAF-containing compounds, and if there

13   are some patients currently on incumbent Gilead drugs

14   containing TDF that elect to switch from using the

15   TDF-containing compound to the TAF-containing

16   compound, that would be an instance of

17   cannibalization.

18          So the rate at which this occurs might

19   sometimes be called the cannibalization rate

20   associated with the launch of the new product, which

21   in this case would be the TAF-containing product.

22          MR. O'CONNOR:  If you could turn back to

23   Dr. Lakdawalla' report, paragraph 34.

24          Q    You write in this paragraph, "For example, a

25   March 23, 2004 'Special DC Meeting Executive Report'

1    indicates that Gilead's Development Committee

2    considered proceeding with TAF development

3    'immediately' while also noting that Gilead," quote,

4    "'plan[ned] for GS-7340 to cannibalize Viread.'"

5            Did I read that correctly?

6        A    Yes.

7        Q    So internal documents dating back to at least

8    2004 showed that Gilead personnel understood that and

9    planned for GS-7340, that is TAF, to cannibalize

10   Viread, that is TDF, correct?

11           MR. CASAZZA:  Objection; form.

12           THE WITNESS:  Well, I don't think it's

13   correct to say GS-7340 is the sum total of all TAF

14   compounds in -- in this matter or that Viread is the

15   sum total of TDF compounds.

16           But instead I would say this does -- this

17   sentence says that in at least as far back as

18   March 23, 2004, Gilead had planned for a

19   TAF-containing compound to cannibalize a

20   TDF-containing compound.  And you're right, that it's

21   GS-7340 is the TAF-containing compound and Viread is

22   the TDF-containing compound.

23   BY MR. O'CONNOR:

24       Q    And based on your understanding of this case,

25   Viread is the single agent version of TDF; is that

```
1    correct?

2         A    That's my -- that's my understanding, yes.

3              MR. O'CONNOR:  Could we jump ahead, please,

4    to paragraph 40.

5              Blow that up, please.

6         Q    You reviewed the deposition of William Lee in

7    this case, correct?

8         A    That's right.

9         Q    And he was -- Mr. Lee -- excuse me.

10             Dr. Lee was the former executive vice

11   president of research for Gilead, correct?

12        A    That's right.

13        Q    And you write that "Dr. Lee testified, for an

14   innovative drug company, cannibalizing older products

15   is a normal part of its business, which is focused on

16   developing and launching better products," correct?

17        A    Yes.

18        Q    So is it fair to say that Gilead had

19   knowledge of and was comfortable with the concept --

20   strike that.

21             You can pull that one down, not the whole

22   document, the callout.

23             Can you please, Doctor, there is a section

24   that begins with paragraph 52, I believe, if I get

25   this right, it is Section...
```

Darius N. Lakdawalla, Ph.D.

```
1       A    4?

2       Q    Maybe -- yeah, not exactly.

3       A    Oh, yeah.

4       Q    Roman numeral V, capital D -- sorry --

5  capital C, Section 4, correct?

6       A    It's on page 24.  Maybe that's simpler.

7       Q    Exactly.

8       A    Section that starts at the bottom of page 24.

9       Q    Right.

10           And it reads, "Dr. Rosenthal and Ms. Fontein

11  Ignore Evidence That as Late as September 2004, Gilead

12  Was Still Considering," quote, "'full,'" unquote,

13  "Development of TAF-Containing Drugs," correct?

14      A    Correct.

15      Q    And this section goes from paragraphs 52

16  through 58 of your report; is that correct?

17      A    Correct.

18      Q    Did you write this section of your report?

19      A    Yes.

20      Q    Did anyone help you in drafting this section

21  of your report?

22           MR. CASAZZA:  Objection.

23           I'll instruct him not to answer.

24           (Instruction not to answer.)

25
```

```
 1    BY MR. O'CONNOR:

 2        Q   Are you taking your counsel's advice in not

 3    answering this question, Dr. Lakdawalla?

 4        A   Yes.

 5        Q   Okay.

 6            MR. CASAZZA:   To be clear for the record, I

 7    was instructing him not to answer on the basis of

 8    paragraph 5 of the order governing expert discovery in

 9    this case.

10            MR. O'CONNOR:   Thank you, Counsel.

11            Could we jump ahead to paragraph 60, please.

12        Q   You write that, and please tell me if I

13    mischaracterizing it, "Dr. Rosenthal notes that

14    Genvoya earned 4.6 billion in global dollar sales in

15    2018," correct?

16        A   Yes.

17        Q   Do you dispute those numbers?

18        A   I don't dispute that Genvoya earned

19    $4.6 billion in global dollar sales in 2018, no.

20        Q   Then would you turn, please, to section -- I

21    should say page 35 of your report.

22            Dr. Lakdawalla, just a point of

23    clarification, you performed an "Economic Analysis of

24    Net Present Value of a 2007 Launch of TAF-Containing

25    Drugs Forecasted by Gilead versus a 2015
```

1    Strategically," quote, "'Delayed,'" unquote, "Launch

2    of TAF-Containing Drugs Per Plaintiffs' Experts'

3    Theory" in this matter, correct?

4        A    Yes.  I think you're referring to the

5    empirical analysis that I present at the end of my

6    report.  And if that's the case, then, yes, I think

7    that's correct.

8             MR. O'CONNOR:  Can we jump to Exhibit 2 at

9    the end.

10            I'm sorry, not Exhibit 2.

11            It's Exhibit 2 so it's literally going to be

12   right after page 41, Evan.

13            MR. CASAZZA:  I think it's page 44 of the

14   PDF.

15            MR. O'CONNOR:  Thank you, Counsel.

16       Q    Doctor, is this the economic analysis that I

17   was just questioning about that you were just

18   referencing?

19       A    I wouldn't characterize the table as the

20   economic analysis.  These -- this table summarizes

21   some of the results of the economic analysis.  Shows

22   the results.

23       Q    Yes, you were helping me out because what I

24   want to clarify is, you discussed the economic

25   analysis from paragraph 71 through 83 of your report,

```
 1   correct?

 2       A    That's correct.

 3       Q    Then, as you say it, you summarize your

 4   analysis in Exhibit 2 of your report, correct?

 5       A    Well, I would say I summarize it in Exhibit 2

 6   and the accompanying text in -- that you just referred

 7   to, which is from paragraphs 71 to 83.

 8       Q    Okay.  Outside of paragraph 71 through 83 and

 9   what is found in Exhibit 2, is there anywhere else in

10   your report, just as a matter of completeness, where

11   you discuss the economic analysis that you performed

12   in this case?

13       A    There may have been backup that was separate.

14   I just don't recall.  But apart -- that would be the

15   only qualifier.  Other than that, this would be the --

16   the -- the full set of my summary of the economic

17   analysis.

18       Q    Okay.  That's helpful.

19            Actually, I'll -- let's do this.

20            Evan, if you could please pull up within the

21   documents that I sent you earlier today, there's a

22   spreadsheet entitled Exhibit 2 and footnote 143.

23            And I'll represent that this information

24   was -- this is exactly what was presented to produce

25   to me ten minutes before your deposition.  And you can
```

1  flip through it if need be.  I don't know if there's a

2  way to kind of add it to the exhibit list.

3        But, Dr. Lakdawalla, is -- I want to ask this

4  question.  What is this document?

5    A   This document was the underlying Excel

6  spreadsheet to create Exhibit 2.

7        MR. O'CONNOR:  I'll note on the record that

8  this document was requested weeks ago and was just

9  presented/produced ten minutes prior to your

10  deposition.

11    Q   Dr. Lakdawalla, when did you create this

12  document?

13    A   I don't remember specifically.  It was

14  probably maybe in the week or so, maybe it was earlier

15  than that, I don't remember exactly when I created it.

16  I mean, it was obviously prior to the filing date.  I

17  don't remember very specifically beyond that.

18    Q   Okay.  And it contains a variety of tabs in

19  it.  What are these separate tabs in this spreadsheet?

20    A   The tabs give the inputs into the exhibit

21  spreadsheet.  And the analytical steps are kind of

22  walked through in the section of my report where I

23  talk about the steps that are undertaken for the

24  analysis.  And the tabs give sort of the inputs for

25  those steps.

Darius N. Lakdawalla, Ph.D.

1       Q    Thank you.

2            What exhibit number are we on?

3            TRIAL TECHNICIAN:  That would be 10, the

4   Excel sheet.

5            (Exhibit 10 marked.)

6            MR. O'CONNOR:  Okay.

7            Evan, could you please pull up what was

8   produced to me ten minutes prior to our -- to

9   Dr. Lakdawalla's deposition, spreadsheet entitled

10  "Other Report Calculations."

11           I'll mark this Exhibit 11 to your deposition,

12  Dr. Lakdawalla.

13           (Exhibit 11 marked.)

14  BY MR. O'CONNOR:

15       Q  Dr. Lakdawalla, what is this document?

16       A  This shows the backup for calculations of

17  numbers that I present in the report.  They're

18  typically pretty straightforward calculations, as you

19  can see.  They're just sort of the backup to -- if I

20  have a number that was not literally pulled from an

21  underlying document, then I just explain how it's

22  calculated in this spreadsheet.

23       Q  When did you create this document?

24       A  I -- I don't remember the day.  It's the

25  same -- obviously it was before the filing deadline.

1    I don't remember when it -- when exactly I put it

2    together.

3        Q   Did anyone help you in creating this document

4    or the prior spreadsheet that we marked as Exhibit 10

5    to your deposition?

6            MR. CASAZZA:  I'll instruct the witness not

7    to answer based on paragraph 5 of the order governing

8    the expert discovery.  He already testified that he

9    prepared both of them.

10           (Instruction not to answer.)

11           THE WITNESS:  I'll follow my counsel's

12   instruction.

13           MR. O'CONNOR:  Thank you.

14           Let's go back to your report, please.

15           Evan, could you turn to page 36.

16       Q   Dr. Lakdawalla, you write in paragraph 36,

17   "In order to adopt Gilead's perspective, my economic

18   analysis utilizes the April 2003 Gilead forecasts

19   noted above," correct?

20       A   Yes, you read that correctly.

21       Q   And you footnote to a set of documents,

22   "Email from Bruno Delagneau to William Lee, 'GS7340

23   financial analysis,' April 17, 2003," and then you

24   provide the Bates number, correct?

25       A   Right.  That's -- that's the document that is

Darius N. Lakdawalla, Ph.D.

1    referred to in the sentence.  In other words, what's

2    referred to as the April 2003 Gilead forecast, that

3    footnote, the Bates number in that footnote

4    corresponds to those particular forecasts.

5         Q    Okay.  Thank you.

6              And if we go actually to your Exhibit 2, the

7    table, for lack of a better term.

8              Your table provides -- or describes two

9    scenarios.

10             The first scenario is, "2007 Launch of

11   TAF-Containing Drugs (Gilead's Forecast)."

12             And then, "Scenario 2:  2015 'Delayed' Launch

13   of TAF-Containing Drugs," correct?

14        A    Correct.

15        Q    And you reference in Scenario 1, Gilead's

16   forecast.  At the bottom you write, "Source: Email

17   from Bruno Delagneau to William Lee, 'GS-7340

18   financial analysis,' April 17, 2003," correct?

19        A    That's correct.  That's what I write there in

20   the source.

21        Q    So the forecast that you use based on --

22   sorry.

23             This -- strike that.

24             The source of this document is the same as

25   the source referenced in paragraph 142 of your report,

1    correct?

2         A    Well, I just want to be clear that the

3    source -- it's that the source cited in footnote 142

4    and also referred to as the April 2003 Gilead

5    financial forecast is the source that's the basis of

6    Scenario 1, which is described as Gilead's forecast of

7    the 2007 launch of TAF-containing drugs.

8              For Scenario 2, those numbers don't appear in

9    whole cloth within those forecasts, and that's the

10   nature of the analysis here, is the construction of

11   Scenario 2.

12        Q    Thank you for the clarification.

13             I just wanted to -- when you're referring to

14   your report --

15             If we go back to paragraph 71, page 36.

16             When you're referring to April 2003 Gilead

17   forecasts, are these the forecasts that you reference

18   in this citation where you say e-mail from Bruno

19   Delagneau to William Lee?

20        A    Yes.  I just want to be clear, though, there

21   are -- there is another April 2003 Gilead forecast so

22   I'm not claiming that every time there's a reference

23   to an April 2003 Gilead forecast it's the same one.

24             But I believe your question -- so I just want

25   to make sure there's no confusion on that.

Darius N. Lakdawalla, Ph.D.

1           But with respect to your specific question,

2    yes, that is the forecast referred to in footnote 142,

3    referred to in the sentence that precedes footnote 142

4    and summarized in Exhibit 2 Scenario 1.

5        Q   Okay.

6           Would you please, Evan, pull my internal

7    document 25.

8           And I'll mark this as Exhibit 12 to your

9    deposition, Dr. Lakdawalla.

10          (Exhibit 12 marked.)

11   BY MR. O'CONNOR:

12       Q   Dr. Lakdawalla, this is a cover e-mail and

13   then a PDF printout of related spreadsheets.

14          Is this the e-mail from Bruno Delagneau to

15   William Lee that you reference in footnote 142 and in

16   Exhibit 2?

17       A   Yes, I believe that it is.

18       Q   Okay.  And this is an e-mail from Bruno

19   Delagneau to Bill Lee, and it appears that he attaches

20   two spreadsheets, correct?

21       A   Correct.

22       Q   And those are the spreadsheets you relied

23   upon in -- in describing Scenario 1, for lack of a

24   better term, of your economic analysis; is that a fair

25   characterization?

Darius N. Lakdawalla, Ph.D.

```
1        A    Well, I think I would make it a little more
2    specific because Scenario 1 is the price parity
3    scenario, which I think is just one of the two
4    spreadsheets, as I recall.  The other one is the price
5    premium scenario that I don't include in Exhibit 2.
6        Q    Okay.  Thank you.
7             Do you know who Bruno Delagneau was at
8    Gilead?
9        A    I have a -- I have a rough sense of what
10   Mr. -- I think it's "Delagneau," is the way I've heard
11   the name pronounced.
12            I don't know that I could tell you his exact
13   job title, but he -- he -- my understanding is that he
14   was on the finance side.  He wasn't the chief
15   financial officer, but he was -- he was on the finance
16   side and he's -- this e-mail is directed to Mr. Lee,
17   who's on the R&D side.
18       Q    What is the source of your knowledge as to
19   the job title of Bruno Delagneau?
20       A    I don't remember how I know that.  I mean,
21   one -- one source may be -- I mean, I've read
22   documents authored by him that appear to be related to
23   financial analyses, and I think I may have at some
24   point looked up his history.  I -- but I don't
25   remember exactly what the sources are for that.
```

Darius N. Lakdawalla, Ph.D.

1        Q    Have you seen any evidence in your review of

2    Gilead documents that anyone at Gilead besides Bruno

3    Delagneau and Bill Lee saw or reviewed these attached

4    forecasts?

5              MR. CASAZZA:  Objection; form.

6              THE WITNESS:  Well, these forecasts end up

7    being very similar to the July 2004 forecasts that

8    were seen by a different set of people, as I recall.

9    And the July 2004 forecasts were, I mean, virtually

10   identical.  They were like 4 percent higher on

11   incremental revenue for TAF.  And they considered the

12   early TAF launch scenario.

13             But as I sit here, I don't recall how this

14   financial forecast circulated.

15             I think it's notable that this is

16   correspondence between -- or to Mr. Lee -- or Dr. Lee,

17   rather, on the R&D side, that's informing him about

18   the financial analysis.  And it seems consistent with

19   a forecast in the subsequent year that studies an

20   early launch.  That's what I can remember, as I sit

21   here.

22             MR. O'CONNOR:  I object to everything after

23   "I think it's notable" to the end as nonresponsive and

24   move to strike.

25        Q    Doctor, just to be clear, based on your

Darius N. Lakdawalla, Ph.D.

```
 1   review of relevant documents, do you have any evidence
 2   that anyone besides these two individuals, Bruno
 3   Delagneau and Bill Lee, reviewed these specific
 4   forecasts that are attached to this specific e-mail?
 5       A   I don't know --
 6           MR. CASAZZA:  Objection; form, asked and
 7   answered.
 8           THE WITNESS:  I -- I don't know who reviewed
 9   the e-mail or where it got forwarded or who would have
10   reviewed the forecasts.  But I also don't have any
11   reason to doubt that this reflected Gilead's beliefs
12   about financial forecasting.
13   BY MR. O'CONNOR:
14       Q   I don't think you answered my question.
15           I really just want to know, do you have any
16   evidence, as you sit here today, of any other people
17   at Gilead besides Bruno Delagneau and Bill Lee
18   reviewing these specific forecasts that are attached
19   to this specific e-mail?
20       A   As I sit here, I can't point to any evidence
21   about who else might have reviewed this set of
22   spreadsheets.
23       Q   Okay.  Do you recall Bill Lee ever
24   referencing these forecasts attached to this e-mail in
25   his deposition?
```

Darius N. Lakdawalla, Ph.D.

```
 1              MR. CASAZZA:  Objection; form.

 2              THE WITNESS:  I don't recall.

 3    BY MR. O'CONNOR:

 4         Q   Do you recall Norbert Bischofberger

 5    referencing these documents in his deposition?

 6              MR. CASAZZA:  Same objection.

 7              THE WITNESS:  I don't recall.  I don't

 8    recall, no.

 9    BY MR. O'CONNOR:

10         Q   Do you recall John Milligan reviewing -- do

11    you recall in the deposition of John Milligan him ever

12    referencing reviewing these documents?

13              MR. CASAZZA:  Same objection.

14              THE WITNESS:  I don't recall one way or the

15    other.

16    BY MR. O'CONNOR:

17         Q   Do you recall if Michael Hitchcock, or Mitch

18    Hitchcock -- Mick Hitchcock -- referenced reviewing

19    these documents in his deposition?

20         A   I don't recall one way or the other.

21         Q   Do you have any --

22              MR. CASAZZA:  And same objection on that

23    question.

24    BY MR. O'CONNOR:

25         Q   In your review of -- of the documents, were
```

Darius N. Lakdawalla, Ph.D.

```
 1   you able to determine if Norbert Bischofberger ever
 2   reviewed these forecasts attached to this specific
 3   e-mail?
 4            MR. CASAZZA:  Objection; form.
 5            THE WITNESS:  My recollection is that there
 6   were development committee memos that referred to
 7   financial projections associated with earlier launches
 8   of TAF.  I don't recall whether they would have
 9   alluded to specific e-mails or specific forecasts.
10   But the notion of forecasts of early TAF launch and
11   their financial implications, that does come up in
12   other documents.
13            And in footnote 143 I list out what I believe
14   to be all of the financial forecasts of TAF revenues
15   in 2003 and 2004.  So it would stand to reason that
16   that's the base of information upon which those
17   discussions are taking place.
18   BY MR. O'CONNOR:
19      Q   But as you sit here today, based on your
20   review of the relevant documents in this case, you
21   can't determine whether or not Norbert Bischofberger
22   ever reviewed these specific forecasts that you're
23   referencing or that are being referenced in this
24   exhibit, correct?
25            MR. CASAZZA:  Objection; form,
```

Darius N. Lakdawalla, Ph.D.

1    mischaracterizes prior testimony.

2            THE WITNESS:  I think I'm saying that the

3    discussions in the development committee memos

4    indicate that there is some -- that there are

5    allusions to financial projection analysis.  And I --

6    I have no reason to doubt that therefore they're based

7    on reviews of financial forecasts.

8            And my understanding is that there are really

9    two such forecasts that look at the early TAF launch.

10   There's the April 2003 and there's a July 2004.  And

11   as I note in footnote 143, they're substantially

12   similar.  So for all practical purposes, it's

13   essentially the same forecast.  So I don't -- to the

14   extent that there's discussion of profitability, I

15   have no reason to doubt that it's based on analyses

16   that Gilead would have conducted of profitability of

17   early launches.

18   BY MR. O'CONNOR:

19       Q   But as you sit here today, there's no -- you

20   don't have any memory of Robert Bischofberger or the

21   development committee looking at this specific

22   forecast as attached to this specific e-mail, correct?

23           MR. CASAZZA:  Objection; form, asked and

24   answered.

25           THE WITNESS:  I don't have a specific memory

1    of Dr. Bischofberger looking at this specific

2    forecast.  But I've noted that there's only two such

3    forecasts and there's discussion of financial

4    implications.  So I think it's plausible to believe

5    that one or the other or both sets of forecasts were

6    evaluated.

7            But your -- your -- the answer to your

8    question is, I don't have any specific knowledge that

9    this particular e-mail was looked at.

10           MR. O'CONNOR:  I move to strike everything

11   before "the answer to your specific question" as

12   nonresponsive and object to it accordingly.

13      Q   Let's go back to your report, Doctor.  Let's

14   go to paragraph 72.

15           You write in the first sentence of

16   paragraph 72, "To determine the profit impact of

17   delaying the TAF" -- strike that.

18           You write, "To determine the profit impact of

19   delaying the launch of TAF-containing drugs, I use a

20   standard approach to measure the expected

21   profitability of a drug over its life cycle," correct?

22      A   Correct.

23      Q   And then you cite paragraph -- sorry -- to

24   footnote 144.  Then you cite to two documents within

25   that footnote, correct?

Darius N. Lakdawalla, Ph.D.

```
 1        A    Correct.

 2        Q    Are there any other -- is this particular

 3   methodology that you say is "a standard approach to

 4   measure the expected profitability of a drug over its

 5   life cycle," has it ever been published anywhere

 6   besides these two documents?

 7        A    Yes, in numerous places.

 8        Q    Okay.

 9             Can we please pull up my internal document

10   number 15.

11             (Exhibit 13 marked.)

12             MR. O'CONNOR:

13        Q    Dr. Lakdawalla, is this the document that you

14   referred to in paragraph 144, Marcus Hartmann and Ali

15   Hassan, 2006, "Application of real options analysis

16   for pharmaceutical R&D project valuation - Empirical

17   results from a survey"?

18        A    Yes.

19        Q    Could you please point to and identify -- I

20   guess a better way of putting it is, could you please

21   identify for me where in this document the methodology

22   that you are using in your report is being described?

23        A    Sure.

24             There's a table in this paper, you're going

25   to have to scroll a ways, and it's going to report the
```

Darius N. Lakdawalla, Ph.D.

```
 1    frequency of use of different -- this one right here.
 2           So you can see that the "Valuation methods"
 3    on the left-hand side in the left-hand column, it says
 4    "NPV," which means net present value, "ENPV," which
 5    means expected net present value, or "DCF," which
 6    means discounted cash flows.
 7           Those are all essentially permutations of the
 8    same net present value method.  And you can see that
 9    those are found to be the predominant method used in
10    this survey for valuation based on the numbers in the
11    table.
12       Q   Where in this document does it detail how the
13    methodology works?
14       A   You're asking me where it defines net present
15    value?
16       Q   No.  I'm asking, you say it's a standard --
17    you're saying I'm using "a standard approach to
18    measure the expected profitability of a drug over its
19    life cycle," correct?
20       A   Correct.
21       Q   Where is that approach described outside of
22    this table?
23       A   I guess I'm not sure --
24           MR. CASAZZA:  Objection; form.
25           THE WITNESS:  I believe that question is
```

Darius N. Lakdawalla, Ph.D.

```
 1    answered.  I mean, in this table they mention net
 2    present value.  And that's the framework I'm using.  I
 3    think they may have described it, but it's a very
 4    basic and widely known and understood concept.  I
 5    don't know that in a peer-reviewed journal you would
 6    define it.  It's -- any economist is going to know
 7    what it is.
 8            But there may be a definition earlier.  They
 9    do note they -- I mean, you can see the definition --
10    the definitions in the top of the table that it's net
11    present value, expected net present value and
12    discounted cash flow.
13            But I mean, that's like asking does an
14    economics -- a peer-reviewed economics paper always
15    define what supply and demand are.  I don't know that
16    it will.  But it's using the terms and they're well
17    understood terms.
18    BY MR. O'CONNOR:
19        Q   So for a person who is non-economist, can you
20    please describe the net present value approach that is
21    so standard that it needs no definition?  Could you
22    please describe it for me?
23        A   Sure.
24            MR. CASAZZA:  Objection; form, argumentative.
25            THE WITNESS:  I'd be happy to.
```

Darius N. Lakdawalla, Ph.D.

```
 1              And net present value is designed to
 2    construct what's known as the present value, meaning
 3    the value in current period dollars, of a stream of
 4    future cash flows.
 5              So in the context of a drug valuation
 6    exercise, you may have a stream of cash flows of what
 7    the drug is expected to earn in years one, two, three,
 8    four, five, six, seven, et cetera.  And what you want
 9    to do is you want to express that stream of cash flows
10    in terms of a single number that is expressed in terms
11    of dollars at a particular point in time.
12              So for instance -- I'll just make -- I'll
13    just make some numbers up just for the sake of
14    providing some concreteness.
15              Suppose that there's a string of cash flows
16    that we say is a million dollars in year one,
17    $2 million in year two, 3 million in year 3,
18    et cetera.  What you want to know is what's the value
19    of that stream of cash flows in year zero.
20              And the way it works is that you take that
21    stream of cash flows, you do what's called discounting
22    it according to a discount factor and that is designed
23    to account for the fact that money in the future is in
24    some sense cheaper than money today.  And the reason
25    for that, from an economic standpoint, is that "if I
```

Darius N. Lakdawalla, Ph.D.

```
 1   use a dollar today, it costs me a dollar today," sort
 2   of tautologically.  But if I use a dollar next year, I
 3   could have financed that with less than a dollar today
 4   because my dollar grows as a result of -- you know,
 5   let's say it's in a savings account, to keep things
 6   very simple.  So if the interest rate is 10 percent,
 7   it may be that my cost of a dollar today -- oh,
 8   sorry -- of a dollar next year is really 91 cents
 9   today.  And that's -- in that -- in that exercise,
10   what I did was I discounted the dollar next period
11   into current period value terms.
12          And net present value does that calculation,
13   that discounting approach in every year of the stream
14   of cash flows.  And then you sum them all together
15   after they're appropriately discounted and you come up
16   with a net present value number that is in year zero.
17          So that's how I would ordinarily explain it,
18   you know, in the context of a class or something like
19   that.  But it can become more complicated depending on
20   whether you want to introduce probabilities and so on.
21   But that's the -- the nuts and bolts of net present
22   value is about discounting future cash flow so that
23   they're expressed in current period dollars.
24   BY MR. O'CONNOR:
25       Q   Okay.
```

Darius N. Lakdawalla, Ph.D.

```
 1              Could we turn, please, to paragraph 81 of

 2    Dr. Lakdawalla's report.

 3              Actually -- strike that.

 4              Let's --

 5              Dr. Lakdawalla, does your model or your

 6    economic analysis account for negative impact on TDF

 7    sales from the years 2003 to 2006?

 8         A    Well, as a -- as a general proposition, I'm

 9    not -- I'm not offering an opinion about whether there

10    was such a negative impact.

11              To the extent that Gilead believed there

12    would be a negative impact on TDF sales of developing

13    TAF, then I see no reason to doubt that those would be

14    internal to the forecast as there -- there's no reason

15    I can see that has been given that suggests that the

16    forecasts don't reflect Gilead's best attempts to

17    write down or to internalize its beliefs about future

18    TDF forecasting.

19              So I think -- first of all, I don't -- I

20    don't know that it's been established, as far as I can

21    see, that there was an expectation that TDF sales

22    would fall while TAF was being developed.

23              But second of all, even if that were true,

24    then I think it's reasonable to believe that that

25    would be internal to the forecast that I'm using in
```

Darius N. Lakdawalla, Ph.D.

1   constructing my analysis.

2      Q   How would this, in your words, be internal to

3   your analysis?

4      A   Well, the forecast gives the effect of

5   developing TAF early on TDF revenues.  So to the

6   extent that it was believed that early -- earlier

7   development of TAF would have reduced TDF revenues,

8   that's a salient consideration in forecasting TDF

9   revenues.  And a forecasting exercise attempts to

10  incorporate all of the beliefs that a company has

11  about what determines future revenues.

12         So I don't -- I -- I think it's plausible to

13  believe that that -- if it were, in fact, a prevalent

14  belief or belief held by the company at the time in

15  2004 or 2003, that it would have been internal to the

16  forecast itself.

17         I think the other point that I would make is

18  that I've looked at the forecasts where TAF is

19  launched earlier versus later and there's not a lot of

20  difference in -- as far as I can tell, in the

21  protections of TDF revenue.  So one would expect to

22  see such differences if it were the case that Gilead

23  believed TAF's development was going to reduce TDF

24  revenues.  But even if that belief were true, it would

25  be internal to the forecast.

Darius N. Lakdawalla, Ph.D.

```
 1              MR. O'CONNOR:  We've been going for a little
 2     while.  I can keep going, but if you'd like to take a
 3     break, Dr. Lakdawalla.
 4              MR. CASAZZA:  Yeah, why don't we take a
 5     break.
 6              THE WITNESS:  That would be great, yeah.
 7              MR. O'CONNOR:  Go off the record, please.
 8              THE VIDEOGRAPHER:  Off the record; 2:17 p.m.
 9              (Recess.)
10              THE VIDEOGRAPHER:  On record; 2:28 p.m.
11              MR. O'CONNOR:  Evan, can we please pull up
12     Dr. Lakdawalla's report, specifically that table
13     that's listed as Exhibit 2.
14              I believe you said it was page 44 of the PDF,
15     right, Kyle?
16              MR. CASAZZA:  Yes.
17     BY MR. O'CONNOR:
18       Q   Just so the record's clear, in Exhibit 2 of
19     your report, Dr. Lakdawalla, you compare the net
20     present value, or NPV, of two scenarios, Scenario 1,
21     where Gilead enters the market for TAF products in
22     2007, and Scenario 2, where the market -- sorry --
23     entry into the market for TAF products happens in
24     2015; is that a fair characterization?
25       A   Yes.
```

Darius N. Lakdawalla, Ph.D.

1    Q   Gilead did, in fact, enter the market for TDF

2   in 2015, correct?

3           MR. CASAZZA:  Objection; form.  I think you

4   misspoke.

5           THE WITNESS:  I think you meant TAF.

6           MR. O'CONNOR:  Sorry.  I'll restate that.

7    Q   Gilead did -- I'll say it again.

8           Gilead did, in fact, delay entry of TAF into

9   the marketplace until 2015, correct?

10          MR. CASAZZA:  Objection; form and --

11   objection; form.

12          MR. O'CONNOR:  Okay.

13          THE WITNESS:  No, that's -- that's not

14   correct.  What Gilead -- first of all, it's true that

15   Gilead stopped development in 2004 of -- at the time

16   it was looking at a single-agent TAF product and TAF

17   plus emtricitabine, or FTC.

18          What it ended up doing was launching Genvoya,

19   which was a different combination, in 2015.  And I

20   don't agree with the premise that it delayed.  That

21   attributes a certain causal pathway from the decision

22   to stop to the decision to restart.

23          I agree that the decision was made to stop

24   the TAF program in 2004.  That program was eventually

25   restarted and it resulted in the launch of Genvoya,

1    which was not contemplated as a launch candidate in

2    2004, at the time that the stop decision was made.

3    BY MR. O'CONNOR:

4        Q    So you're not going to testify at trial that

5    Gilead did not stop -- you're not going to testify at

6    trial that Gilead did not stop development of TAF in

7    2004, are you?

8              MR. CASAZZA:  Objection; form.

9              THE WITNESS:  I guess I don't quite know what

10   that means.  I'll tell you what my understanding of

11   the facts are and maybe I think that's responsive to

12   the question.

13             In -- in 2004, Gilead decided to stop its

14   program of developing single-agent TAF and TAF plus

15   emtricitabine.  And my understanding is that that

16   program was stopped in 2004 and it was restarted -- I

17   forget the exact year in which TAF development was

18   restarted.

19             But when it was restarted, the -- eventually

20   it ended up resulting in the launch of Genvoya rather

21   than the original two drugs, which were single-agent

22   TAF and TAF plus emtricitabine.  I'm not testifying

23   that Gilead was continuing to develop single-agent TAF

24   plus TAF plus FTC past 2004, and I don't plan to

25   testify to that.

Darius N. Lakdawalla, Ph.D.

```
 1            But I think that's the -- those are the facts
 2    that are clear to me from the record, like relating to
 3    the stopping of TAF's development.
 4    BY MR. O'CONNOR:
 5       Q   In note number 1 in your table --
 6            If you blow that up, Evan, that'd be great.
 7            -- you write, "Gilead's 2003 'price parity'
 8    forecast that considers an early launch of a single
 9    agent TAF drug in 2007 and a launch of a TAF/FTC
10    combination drug in 2010.  In Gilead's forecast,
11    Branded TDF-Based Revenue is denoted as," quote,
12    "'Viread revenues (includes combo),'" unquote,
13    correct?
14       A   Correct.
15       Q   So in -- going back to --
16            You can pull that down for a second, Evan.
17            Going back to your Exhibit 2, when you're
18    referring to "Branded TDF-Based Revenue" in
19    Scenario 1, are you referring to revenues from Viread
20    and the Viread combo drug, which is Truvada?
21       A   Yes, that's the way it's laid out in the
22    Gilead spreadsheet.
23       Q   You are not incorporating any revenue from
24    the drug Atripla, are you?
25       A   I'd have to look at the backup -- or I'd have
```

1   to look at the original spreadsheet.

2          But as I sit here, I don't believe that

3   Atripla was included in that forecast, to the best of

4   my knowledge.  I -- I just don't -- I don't remember

5   exactly.  But I believe that this would have been

6   Viread and Truvada at the time the forecast was

7   constructed.

8      Q   So -- and then in Scenario 2 when you're

9   referring to "Branded TDF-Based Revenue," you'd be

10  referring to the same things; that is, Viread plus the

11  Viread combo that is Truvada, correct?

12     A   Well, I think maybe the best way to put this

13  is that I'm referring to the way Gilead is -- is

14  defining the term in the spreadsheet.

15         So just to be clear, my understanding of it

16  is it's Viread plus Truvada in the Gilead spreadsheet.

17  But if that is not correct and that it's Gilead plus

18  Truvada plus, let's say, Atripla, then that's what I'm

19  looking at.

20         So basically the bottom line here is I'm

21  using Gilead's forecast and I'm employing their

22  definitions.  I believe that to be Viread and Truvada.

23  But even if it isn't, then I'm looking at what -- at

24  the definition in an apples to apples way that's

25  consistent with the way Gilead is looking at it.

Darius N. Lakdawalla, Ph.D.

```
 1        Q   But as you sit here today, you believe that
 2   references to branded TDF-based revenue in Gilead's
 3   forecast that you referred to is Viread plus Truvada,
 4   correct?
 5           MR. CASAZZA:  Objection; form.
 6           THE WITNESS:  I think so.  But it really
 7   doesn't matter for my analysis.  What really matters
 8   is that I'm matching the way Gilead defines the term.
 9           But if you're asking me to give you my best
10   assessment of what's included in that, I believe it's
11   Viread plus Truvada, but it doesn't really matter for
12   my conclusions.
13   BY MR. O'CONNOR:
14        Q   Okay.  And you assume that TDF-based revenue
15   from sales, as I read your exhibit, would peak in 2009
16   at about $1.025 billion and remain constant from that
17   point until 2016 in both scenarios; is that a fair
18   reading?
19        A   No, it's not that I assume that.  It's that
20   that's what Gilead's forecast says.  But it's a fair
21   reading that Gilead's forecast says that TDF --
22   branded TDF-based revenue as they define it reaches a
23   peak in '09, it persists at that peak until 2016 and
24   then it begins to decline after -- that's presumably
25   because generic entry begins in '17.
```

Darius N. Lakdawalla, Ph.D.

1      Q   And you accepted that and input those numbers

2   from Gilead into this analysis that you performed and

3   as demonstrated and summarized in Exhibit 2, correct?

4      A   I wouldn't put it that way because as I

5   explained the framework here is I'm interested in what

6   Gilead's beliefs were.  So their forecast serves as

7   data for me regarding their beliefs.  So I'm using it

8   not as an assumption but as data regarding what they

9   believed to be a forecast of TDF-based revenue.

10      Q   So you're -- you will be testifying at trial

11   as to the subjective beliefs of Gilead and Gilead

12   personnel; is that fair?

13           MR. CASAZZA:  Objection; form,

14   mischaracterizes prior testimony.  And objection to

15   the extent "subjective" calls for a legal conclusion.

16           THE WITNESS:  No, I'm saying that Gilead's

17   financial forecast reveals that they are offering this

18   analysis as an aid for decision-making, and they are

19   revealing that in evaluating their decisions they are

20   using a trend in TDF -- in branded TDF-based revenue

21   that peaks in '09 and declines after '16.

22           It's not about the subjective beliefs of

23   individual Gilead personnel, which I -- I don't claim

24   to have knowledge of.  It's about the company's

25   broader expectations about future revenue that are

Darius N. Lakdawalla, Ph.D.

```
 1   revealed in its forecast that are conducted in the

 2   ordinary course of business.

 3   BY MR. O'CONNOR:

 4       Q   Do you think it's reasonable to assume that

 5   in a world absent TAF products that Gilead would take

 6   steps to increase it's TDF-based revenue from 2009 to

 7   2016?

 8       A   I'm -- I'm not expressing --

 9           MR. CASAZZA:  Objection; form.

10           THE WITNESS:  I'm not expressing an opinion

11   on whether that makes sense.

12           And I also don't agree with Dr. Rosenthal's

13   assertion that the forecast itself implies that they

14   weren't planning to take such steps.  There's a

15   difference between trying to increase revenue or

16   taking steps to increase revenue and actually

17   realizing an increase in revenue.  So that logical

18   inference is incorrect.

19           But I'm not offering an opinion as to whether

20   they -- what their strategy was in -- in very specific

21   detail or whether they were attempting to grow revenue

22   after '09 or not in the TDF portfolio.

23   BY MR. O'CONNOR:

24       Q   So you're -- do you have any explanation as

25   to why TDF revenues stay constant across both -- both
```

1    of the scenarios that are detailed in your analysis?

2        A    I am not offering a specific opinion on that,

3    but I will note the fact that if you look at the

4    forecasts from this time period they appear to show

5    that the antiretroviral market is fairly flat in total

6    after the 2009/'10 time period.  So that was the

7    expectation -- and that shows up in various forecasts,

8    not just the earlier TAF launch forecast.

9            So I think mechanically that would be a

10   possible explanation of why revenues are not rising

11   after 2009.  It -- one possible explanation is that

12   Gilead may have been using the assumption that the

13   antiretroviral market was not growing past 2009 and

14   offering a conclusion -- or offering an opinion about

15   whether growth or stability in the total market were

16   better assumptions I think veers into a clinical

17   discussion about beliefs regarding the longevity of

18   HIV patients on antiretroviral therapy, which is a key

19   input into market size, as well as beliefs about the

20   epidemiology of HIV incidence, neither of which I'm

21   expressing an opinion on.

22           But the mechanics to me are consistent with

23   the explanation that Gilead was using an assumption of

24   flat ARV market size after anywhere from 2008 to 2010.

25       Q    You referenced in your last answer various

1    forecasts from that time.  Are you referring not only

2    to the forecasts that you include from April 2003 that

3    is the source of this analysis but also the other

4    forecasts that you list in paragraph -- sorry --

5    footnote 143 of your report?

6        A    Yes, there are other forecasts.  I believe

7    one of the later -- later TAF launch forecasts

8    outlines expectations regarding the size of the total

9    ARV market -- sorry -- antiretroviral marketplace.  If

10   it's okay, I'll call that ARV.  But they -- it

11   outlines that the size of the ARV market, it was

12   expected to grow till, anywhere from 2008 to 2010.  It

13   varies a little bit from forecast to forecast.  But it

14   appears more than once that there's an assumption that

15   the ARV market doesn't continue to grow indefinitely.

16   And as such, that's going to be just mathematically a

17   limit to the growth of forecasted revenue.

18          And to be clear, I'm not offering the opinion

19   that that's exactly why, that's the reason why the

20   forecasts here are flat.  I'm just saying that could

21   explain why the forecasts are flat.  It's consistent

22   with the flat forecasts after a certain point in time.

23          And evaluating growth and market size, as I

24   noted, is -- it bears on clinical issues that I'm not

25   offering an opinion on concerning the incidence of HIV

Darius N. Lakdawalla, Ph.D.

 1    and the longevity of patients being treated by ARVs.

 2        Q   None of the forecasts that you reference in

 3    paragraph 143 are inputs to this economic analysis

 4    that you provide in this case, correct?

 5        A   I'm -- I wouldn't call -- I wouldn't put it

 6    that way because I'm cross-checking against those

 7    forecasts.  For instance, the July 2004 business unit

 8    review which was, in fact, viewed, you know, widely

 9    within the company is consistent with the April 2003

10    forecast, and if you compare the two for the years in

11    which they overlap, the incremental revenues projected

12    in the July 2004 business unit review for TAF's

13    launch, an early TAF launch, are actually about

14    4 percent higher in the 2004 business unit review.

15            So as part of this exercise it's important to

16    look at all the sources of data and understand that

17    the data are painting a fairly consistent picture

18    about how Gilead was forecasting.  So the two late

19    launch scenarios roughly agree.

20            And related to my answer about the flat

21    revenues after 2010, even the patent extension,

22    quote/unquote, or the late TAF launch scenarios are

23    consistent with that concept, which is notable because

24    it says that even in a world where TAF was being

25    developed late, the expectation was the total ARV

Darius N. Lakdawalla, Ph.D.

1    market was going to peak in size actually even earlier

2    than is in the forecast shown in Exhibit 2.  And that

3    is not consistent with the view that TDF revenue would

4    grow substantially more quickly in a world where TAF

5    was delayed.

6           So the data don't support that idea.  And as

7    I noted at almost the very beginning of this -- of our

8    discussion today, even if TDF revenue grows faster

9    than what's shown in these forecasts, it just

10   strengthens my conclusions.

11          So in that sense the analysis here is not

12   strictly contingent on the forecasts themselves.  One

13   can change the TDF forecast.  In fact, if -- if one

14   increases the growth in TDF revenue, you'll come to

15   even stronger conclusions that it's more profitable to

16   launch TAF earlier.

17          So it's incorrect to say that the validity of

18   this analysis hangs entirely on the April '03 forecast

19   because of a cross-validation against other forecasts

20   and the mathematics and economics which says that

21   higher TDF growth rates only strengthen and reinforce

22   the conclusions, not to mention the lower COGS

23   assertion that Ms. Fontein makes about the cost of

24   producing TAF.

25          MR. O'CONNOR:  Madam Court Reporter, could

Darius N. Lakdawalla, Ph.D.

```
1    you please read back my question to me.
2            (Record read.)
3            MR. O'CONNOR:  Move to strike everything that
4    Dr. Lakdawalla's answer after the phrase "As I noted
5    at the beginning of our discussion."
6       Q   Doctor, you do not list any of the forecasts
7    that you identify in footnote 143 as a source at the
8    bottom of Exhibit 2, do you?
9       A   That's true.  But it's -- actually
10   misrepresents the nature of this analysis.  Because as
11   I said earlier, it's incorrect to say that this
12   Exhibit 2 is the sum total of my analysis.
13           The section that I wrote also represents my
14   analysis and I discuss all of the other forecasts
15   there and how they relate to my choice of parameters
16   and the conclusions that I've drawn.
17      Q   Thank you, Doctor.
18           I move to strike everything after "that's
19   true" as nonresponsive and object to that on the same
20   basis.
21           Where in paragraphs 71 of 83 of your report,
22   outside of footnote 143, do you discuss the
23   footnote -- the forecasts detailed in footnote 143?
24           MR. CASAZZA:  Objection to form.
25           You're asking other than where he discusses
```

Darius N. Lakdawalla, Ph.D.

```
1    it, where -- where does he discuss it?
2            MR. O'CONNOR:  That's not what I'm asking,
3    Counsel.  I'm asking where in paragraphs 71 through
4    paragraph 83 does Dr. Lakdawalla discuss any of the
5    forecasts referenced in footnote 143 outside of the
6    discussion that he engages in in footnote 183 -- 143.
7    Excuse me.
8            MR. CASAZZA:  Objection to form.
9            THE WITNESS:  Footnote 143 and 151 discuss
10   other forecasts.
11   BY MR. O'CONNOR:
12       Q   Outside of footnotes 143 and 151, anywhere
13   else in paragraphs 71 through 83 do you discuss other
14   forecasts?
15           MR. CASAZZA:  Same objection.
16           THE WITNESS:  That's it.  That summarizes
17   what I've told you about the two forecasts for the
18   early TAF launch.
19   BY MR. O'CONNOR:
20       Q   In footnote 143 --
21           Oh, thank you.  You pulled it up.
22           You write, "One of these forecasts, from
23   September 2003, is based on the premise that
24   TAF-containing drugs would have minimal clinical
25   differentiation from TDF-containing drugs, which
```

1    contradicts Plaintiffs' experts' premise that TAF was

2    meaningfully clinically differentiated and Gilead was

3    aware of that as early as 2003."

4         I stumbled a bit, but did I read that

5    correctly, sir?

6    A    Yes.

7    Q    Okay.  When you're referring to plaintiffs'

8    experts in this sense, are you referring to

9    Ms. Fontein and Dr. Rosenthal?

10   A    That's correct.

11   Q    Any other plaintiffs' expert?

12   A    No.

13   Q    Okay.  What do you mean when you say "minimal

14   clinical differentiation" in that sentence?

15   A    Well, from an economic standpoint, I'm

16   referring to the fact that in those forecasts TAF is

17   assumed not to be able to generate any incremental

18   market share or any incremental price premium and

19   that -- essentially what that means is that when it's

20   sold at the same price it is generating the same

21   market share, which would be a way, from an economic

22   theory or framework of health economics, to infer that

23   the underlying clinical data support minimal clinical

24   differentiation.

25        Q    And similarly, later in the sentence when you

Darius N. Lakdawalla, Ph.D.

```
 1   say "that TAF was meaningfully clinically

 2   differentiated," what do you mean there by

 3   "meaningfully clinically differentiated"?

 4      A   Along the same lines.  Meaningful clinical

 5   differentiation is viewed from an economic

 6   perspective, and it means that at least one of the two

 7   of the following two things is true.  Either TAF, when

 8   sold at price parity, would gain incremental market

 9   share for the HIV franchise or TAF, when sold at a

10   price premium, would gain incremental revenue for the

11   HIV franchise.

12           So clinical differentiation here is -- is

13   inferred from an economic standpoint as a property of

14   its ability to gain market share and/or support a

15   price premium, one or the other or both of those.

16      Q   After that sentence you write, "Another

17   forecast from April 2003 also assumes that

18   TAF-containing drugs would only cannibalize TDF

19   revenue, which indicates this forecast also assumed

20   that TAF was not meaningfully clinically

21   differentiated from TDF."

22           Did I read that correctly?

23      A   Yes, you did.

24      Q   Okay.

25           Evan, could you please pull up my internal
```

```
 1   document number 27.

 2            And then we will mark this as Exhibit 14 to

 3   your deposition.

 4            Is that correct, Madam Court Reporter, 14?

 5            THE REPORTER:  I'll defer to Evan.

 6            MR. O'CONNOR:  Sounds good.

 7            TRIAL TECHNICIAN:  Yeah, that's what I got.

 8            MR. O'CONNOR:  Okay.

 9            (Exhibit 14 marked.)

10   BY MR. O'CONNOR:

11       Q   If you notice at the bottom, Dr. Lakdawalla,

12   the Bates stamp Gilead TDF111601879276, the cover

13   e-mail, and then there's an analysis that follows

14   that.

15            Is this the April 2003 forecast that you're

16   referring to in your footnote 143?

17       A   There are two April 2003 forecasts.  You're

18   talking about the April 2003 late -- later launch or

19   extension forecast, correct?

20            MR. O'CONNOR:  You know what, could you pull

21   up just so -- for point of reference, Evan, could you

22   pull up, please, footnote 143, just side by side.

23   I think we can do this.  Yeah, there we go.

24       Q   That -- that second highlighted sentence that

25   we discussed earlier, that I read to you,
```

Darius N. Lakdawalla, Ph.D.

```
1    Dr. Lakdawalla, it then references -- that -- it

2    reads, "Another forecast from April 2003," and then it

3    references "See 'NPV Analysis of GS 7340 as a Patent

4    Extension to Viread,' GILTDF111601879278 (Attachment

5    from Email" -- to -- "(Attachment to Email from Jung

6    Choi to Peter Virsik," correct?

7        A    I did, yes.

8        Q    Is this, which I've attached and which we

9    have entered as Exhibit 14, the forecast that you are

10   referring to in that sentence that we just discussed?

11       A    Yes, the Bates number matches and I

12   recognize, in form at least, the -- the exhibit, so I

13   believe so.

14       Q    Okay.

15            Could we please go to, Evan --

16            And, Doctor, let me know if you have

17   difficulty reviewing it.

18            -- the Bates number that ends 278.0008.

19            Doctor, do you see in this, it appears to be

20   a printout of a spreadsheet, that it says,

21   "Incremental US Single Revenue," and then,

22   "Incremental US Combo Revenue"?

23       A    I do.

24       Q    And then -- I apologize, it might be the way

25   it prints out, and we can flip through the document as
```

Darius N. Lakdawalla, PH.D.

```
1   needed, there appears to be an entire row with inputs

2   in this Excel that -- that details -- it appears to

3   detail "Incremental US Single Revenue" and "US Combo

4   Revenue."

5            If you flip to the next page, Evan.

6            Is that correct, Doctor?

7       A   Yes, those rows, as I understand what you're

8   highlighting, refer to the projections of TAF single

9   and combo revenue in a delay -- in -- in a -- an

10  extension scenario.  So 2015 launch.

11      Q   You write in your sentence describing this

12  forecast "that TAF was not mainly clinically

13  differentiated from TDF," then why would there be, in

14  your mind, based on your experience, a row in this

15  model for GS-7340 incremental revenue?

16      A   Because there's incremental revenue from

17  protecting -- from cannibalization, which protects TDF

18  patients from generic entry.

19           If you go to the first part of the

20  spreadsheet that you flashed up a minute ago, it's

21  pretty explicit about the clinical assumptions.  I

22  think you had it -- maybe it was up just before this.

23           MR. O'CONNOR:  Yeah, go back to where -- I

24  think it might be -- maybe not the second page or

25  the -- go back a few pages, please, Evan.
```

Darius N. Lakdawalla, Ph.D.

```
 1            THE WITNESS:  I think it should be the first
 2   part of the file.  Yeah, here we go.
 3            "GS-7340 will only penetrate the Viread
 4   single agent share of the total TDF market," which
 5   basically means there's only cannibalization for the
 6   TAF product.
 7   BY MR. O'CONNOR:
 8       Q   So that -- and is this what we're looking at
 9   right before us, and is this -- this is the beginning
10   of it -- doesn't that read in the -- under sales and
11   marketing assumptions on number 4 the secondary
12   positioning would be as active against K65R and 4TAM
13   mutant virus, correct?
14       A   It does say that, right.  And it's -- it's --
15   it's a clinical question.  I don't -- I don't profess
16   to have a specific opinion about what any of that
17   means.  But you're accurately reading the highlighted
18   text.
19       Q   Got it.
20            And you say in your footnote and in the
21   sentence describing this forecast, that "this forecast
22   also assumed that TAF was not meaningfully clinically
23   differentiated from TDF," correct?
24       A   Right.  And that's consistent with what
25   you're showing.
```

Darius N. Lakdawalla, Ph.D.

1              MR. O'CONNOR:  Could we go back to

2    footnote 143, Evan.

3              Actually, we can take that down.

4              And, Evan, if you could please pull up what

5    was produced to us just before Dr. Lakdawalla's

6    deposition, the file entitled 99665.

7              I'll mark this as Exhibit 16.

8              MR. CASAZZA:  This will be 15?

9              MR. O'CONNOR:  Sorry, you were ahead of me.

10   Thank you.

11             This is Exhibit 15 to your deposition,

12   Dr. Lakdawalla.

13             (Exhibit 15 marked.)

14   BY MR. O'CONNOR:

15       Q    This is what appears to be an invoice from

16   Cornerstone Research related to your work on this

17   case; is that correct?

18       A    I don't know.  I haven't seen it before but

19   it looks -- that looks to be true.

20       Q    Okay.  Would you -- could you please review

21   this document and let me know when you're ready for

22   questions.

23       A    Sure.  This -- this is Exhibit 15, is it?

24       Q    It is.  I'll represent that this appears

25   was -- sorry.

Darius N. Lakdawalla, Ph.D.

1          This was produced, I believe, in response to

2    our deposition notice for your deposition.

3        A    Okay.

4        Q    All right.  Dr. Lakdawalla, it appears that

5    this document is sent to Joshua E. Anderson of Sidley

6    Austin.

7          And it reads, "Dear Josh:  Attached is our

8    invoice number 99665 for professional fees and

9    expenses incurred through May 2022 in connection with

10   the above matter."  And it reads in the "Re" line,

11   "Holley et al. v. Gilead Sciences Inc.," correct?

12       A    Yes.

13       Q    And then it says, "Time details are included

14   for the individuals involved," correct?

15       A    Yes.

16       Q    Then if we flip through this it appears that

17   this is a summary of work done by four individuals:

18   Penka Kovacheva, Tiffany Shih, Yun Feng, and Daniel

19   Harley.  Outside of mispronouncing their names, is

20   that correct, sir?

21       A    Yes.

22       Q    So is it fair to say that you did not perform

23   any work related to this litigation during May of

24   2022?

25       A    Nothing that I billed for, no.

Darius N. Lakdawalla, Ph.D.

1      Q   As you sit here today, can you recall any

2  work that you performed on this litigation during May

3  of 2022?

4      A   In -- in May of 2022, I -- I did briefly flip

5  through the plaintiff expert reports, but I haven't

6  yet -- I -- I turned back to them in June, but I

7  didn't bill for the amount of time I spent in May.

8      Q   And it appears that the total professional

9  fees incurred during May of 2022 related to your --

10  your involvement with this case was $5,715.50,

11  correct?

12     A   Sorry, you're saying my involvement in the

13  case?  I'm not quite sure what you mean.

14     Q   No, no, no.

15         It appears that the total professional fees

16  related to work on, in some way, shape, or form

17  your -- your expert report or expert opinions in this

18  matter amounted to $5,715.50?

19         MR. CASAZZA:  Objection; form.

20         THE WITNESS:  So I guess I would put it at

21  that the research team that I was assisted by spent

22  this amount of time and billed this amount in May.

23         MR. O'CONNOR:  If you turn to the next page.

24     Q   It details the --

25         THE REPORTER:  I'm sorry, Counsel, you cut

```
 1    out.
 2              MR. O'CONNOR:  I'll start over.
 3         Q    This page that is page 4 of this document
 4    appears to detail the activities of Penka Kovacheva on
 5    "Re: Holley et al. v. Gilead Sciences Inc.," during
 6    May of 2022, correct?
 7         A    Right.  It's "Kovacheva."  But yes, that's
 8    correct.
 9         Q    Thank you very much.
10              And it includes, "Reviewed summary of
11    Plaintiffs' common issue expert reports," correct?
12         A    Correct.
13         Q    And it includes, "Reviewed work plan for
14    Lakdawalla rebuttal report in Holley case," correct?
15         A    Correct.
16         Q    Okay.  And then you also -- and the next page
17    details the work of Tiffany Shih, correct?
18         A    Yes, it looks that way.
19         Q    And that was during May of 2022, correct?
20         A    Right.
21         Q    And the next page details the work done by
22    Yun Feng during May of 2022, correct?
23         A    Right.
24         Q    And the last page details the work done by
25    Daniel Harley in May of 2022, correct?
```

Darius N. Lakdawalla, Ph.D.

```
 1       A    Yes.

 2       Q    Okay.  Thank you.

 3            Do you recall if this invoice was -- or do

 4   you know if this invoice was ever paid?

 5       A    I don't know.  As I mentioned, this is the

 6   first time I'm seeing the actual invoice.

 7       Q    Okay.

 8            Could you please pull up, Evan, my

 9   internal -- sorry, not my internal document, but the

10   document that I sent to you titled 99638, which again,

11   I will represent was produced ten minutes prior to

12   Dr. Lakdawalla's deposition.

13            (Exhibit 16 marked.)

14   BY MR. O'CONNOR:

15       Q    Dr. Lakdawalla, have you seen this document

16   before?

17       A    No, I have not.

18       Q    Would you please flip through it and

19   familiarize yourself through it and let me know when

20   you're ready for questions on it.

21       A    Sure.

22            Okay.

23       Q    Dr. Lakdawalla, this document dated

24   August 23rd, 2022, is today, reads, "Dear Josh:

25   Attached is our invoice number 99638 for professional
```

Darius N. Lakdawalla, Ph.D.

```
 1    fees and expenses incurred through June 2022 in

 2    connection with the above matter.  Time details are

 3    included for the individuals involved," correct?

 4         A    Correct.

 5         Q    And, apologies, the Josh referenced is

 6    Joshua E. Anderson, Sidley Austin LLP, correct?

 7         A    Right.

 8         Q    And the last two pages of this document

 9    actually include your time log, for lack of a better

10    term, as it relates to this matter during June of

11    2022, correct?

12         A    Correct.

13              MR. O'CONNOR:  Could we go to that last -- or

14    the second-to-last page, please, Evan.

15         Q    And I know you discussed this earlier.  Is

16    this essentially -- would you have provided

17    Cornerstone with essentially these last two pages and

18    then they would have submitted it all at once; is that

19    your understanding of how this was done mechanically,

20    Dr. Lakdawalla?

21         A    Well, I guess my knowledge of the mechanics

22    is confined to what I see and do.  And the last two

23    pages are the pages of this document that I've seen

24    before and I would have prepared these pages,

25    submitted them to Cornerstone and, you know, evidently
```

Darius N. Lakdawalla, Ph.D.

```
 1    they put them together with other staff billings and
 2    prepared this package of invoices.
 3        Q   Dr. Lakdawalla, it appears that during the
 4    month of June you billed 20 hours and 40 minutes of
 5    work to this matter, correct?
 6        A   Right.
 7        Q   And that amounted to $18,600 of -- for
 8    payment, correct?
 9        A   Correct.
10        Q   And on the --
11            If you go, actually, to the next page, Josh
12    [sic].
13            You describe your activities on each of
14    the -- in each of the relevant time entries, correct?
15        A   Right.
16        Q   And it appears that during -- strike that.
17            And then if we go back to the third page of
18    this document, it appears there's a "Summary of
19    Professional Fees" from Cornerstone Research; is that
20    correct?
21        A   Well, if you're asking me does it say
22    "Summary of Professional Fees," that's correct.  I
23    don't -- I don't profess to know whether the document
24    is in itself correct just because I don't know.  But
25    that's -- the -- the reading is correct, yes.
```

Darius N. Lakdawalla, Ph.D.

```
 1        Q   Underneath that, it reads June 2022, and then
 2   it provides the name of -- the names of eight
 3   individuals, their hours, their rates and their total
 4   fees, correct?
 5        A   Correct.
 6        Q   And you can flip through it, if you'd like,
 7   but the following pages of this document --
 8            Evan, you don't have to go through them
 9   unless the doctor needs you to.
10            -- detail each individual's, that's listed
11   here, their activities and time logs over the month of
12   June; is that a fair characterization?
13        A   Yes, I think so.
14        Q   Leaving this side up, so it appears that the
15   persons from Cornerstone Research incurred fees of
16   $412,714.50 as it relates to work related to your
17   expert report or expert testimony during the month of
18   June of 2022, correct?
19        A   Sorry, could you repeat that.  I think I -- I
20   missed one part of it.
21        Q   No problem.
22            The total fees that are listed underneath
23   Summary of Professional Fees for the eight individuals
24   listed is $412,714 -- sorry -- $412,714.50, correct?
25        A   Correct.
```

Darius N. Lakdawalla, Ph.D.

```
1      Q   And my math could be wrong but all of the
2   hours that are added up, if you add each of them up
3   for each person, amounts to 725.6 hours.
4          Do you have any reason to dispute that, as
5   you sit here?  Please feel free to check my math.
6      A   Well, I can -- I can add it, if you just give
7   me a minute.
8      Q   Yeah.  Of course.
9      A   Sorry, what did you say the number was?
10      Q   I said that the total amount of hours worked
11   by these individuals amounted to, according to my
12   math, 725.6 hours.
13      A   Yeah, that's -- that's -- I got something
14   slightly different but roughly that seems correct.
15      Q   Okay.  And there's a "Summary of Expenses"
16   beneath that and your outside expert fees of $18,600
17   are referenced there, correct?
18      A   Yes.
19      Q   And there are additional expenses, Data and
20   Document Management, Data Acquisition - Information
21   Specialists, and Data Acquisition.
22          Are you familiar with what those expenses are
23   referring to?
24      A   I don't recall, as I sit here.  I do remember
25   some discussion of this, but I just don't recall, as I
```

Darius N. Lakdawalla, Ph.D.

```
 1   sit here, what that was for.
 2       Q   So during the month of June you worked on
 3   this matter for 20 hours and 40 minutes and
 4   Cornerstone personnel worked on them for over
 5   700 hours; is that correct?
 6       A   Yes.
 7           MR. O'CONNOR:  Let's please, Evan, pull up
 8   the document sent to you, 99771.
 9           Dr. Lakdawalla, I will mark this as
10   Exhibit 17 to your deposition.  It appears to be
11   another invoice, this one also dated August 23rd,
12   2022.  That is today's date.
13           (Exhibit 17 marked.)
14   BY MR. O'CONNOR:
15       Q   Could you please review it and let me know
16   when you are ready for questions on it.
17       A   Sure.
18           Okay.
19       Q   Dr. Lakdawalla, similar to our last exhibit,
20   this document includes -- it appears to include your
21   invoice and time log for your work during July 2022 on
22   this matter, as well as the work of individuals at
23   Cornerstone Research on this matter in July of 2022;
24   is that correct?
25       A   That's correct.
```

Darius N. Lakdawalla, Ph.D.

```
 1        Q    If we go actually to your specific portion.

 2             That would be the second-to-last page,

 3   please, Evan.

 4             This is, the next page, again, Doctor, as we

 5   discussed before, would have been what you or your

 6   Quantitative Health Group would have provided to

 7   Cornerstone, correct?

 8        A    Correct.

 9        Q    And it appears that during the month of July

10   you worked for 17 hours and 20 minutes on this matter;

11   is that correct?

12        A    I billed 17 hours and 20 minutes, that's

13   correct.

14        Q    Okay.  Very good.

15             You billed 17 hours and 20 minutes and that

16   amounts to $15,600 in fees, correct?

17        A    Right.

18        Q    Okay.

19             And then on the next page you detail your

20   activities in a time log on this matter, correct?

21        A    Right.

22             MR. O'CONNOR:  And then if we go back to the

23   third page.

24        Q    The top of it reads, "Summary of Professional

25   Fees," correct?
```

```
 1       A    Yes.

 2       Q    Then there's nine individuals listed, their

 3  hours, their rate and their fees for the month of July

 4  of 2022; is that a fair assessment?

 5       A    Yes, that's what it lists.  Again, I don't --

 6  I haven't seen this invoice before so I don't claim to

 7  know exactly how everything was generated.  But yeah,

 8  that's -- that appears what the list is.

 9       Q    It appears that Cornerstone personnel,

10  according to my math, and please check it, worked for

11  a total of 308 hours, 308.2 hours on this matter

12  during July of 2022, correct?

13       A    Yeah, that looks approximately correct.

14       Q    And then underneath that there's a "Summary

15  of Expenses" and your expert fees are detailed below,

16  correct?

17       A    Right, on the last two pages that we saw

18  earlier.

19       Q    And then on the pages that follow this there

20  appears to be an itemization of individual Cornerstone

21  employees' activity or time log during the month of

22  July; is that a fair characterization?

23       A    Yes -- well, actually, I'm not sure where we

24  are on the document, whether it's before or after, but

25  within this document there are time logs for each
```

Darius N. Lakdawalla, Ph.D.

1    Cornerstone employee.

2         Q   Okay.

3             If we could go real quickly under the page

4    for Tiffany Shih, I believe it's -- yep, right there.

5             There's a reference to a -- July 12, 2022 --

6    "Reviewed draft Lakdawalla MCL."

7             Do you have any idea what MCL stands for?

8         A   Yeah, materials considered list.

9         Q   Got it.  Thank you.

10            Doctor, so it appears that during the month

11   of July you worked for a total of 17 hours and

12   20 minutes on this case and personnel from Cornerstone

13   worked for over 300 hours on this case, correct?

14        A   Right.  In terms of billable time, that's

15   correct.

16        Q   Okay.  And both this invoice and the invoice

17   listed in Exhibit 16 are dated today so I'm assuming,

18   at least in your mind -- sorry, at least to you, that

19   these have not been paid; is that correct?

20        A   I don't know, but I assume that Cornerstone

21   hasn't been paid.

22        Q   Have you been paid for your work on this --

23   on this matter yet, sir?

24            MR. CASAZZA:  Objection; form.

25            THE WITNESS:  I am quite reasonably certain I

1   have been paid for July.  I just don't -- I'm just not

2   sure if I've been paid for June.  It's conceivable,

3   but it's not totally obvious.

4   BY MR. O'CONNOR:

5       Q   As you sit here today, what is your

6   assessment for the amount of hours that you have spent

7   working on this matter during the month of August?

8       A   I think I would ballpark it at around 25,

9   30 hours, I guess.  I'm not sure.  It's -- I haven't

10  put it together so it -- I want to make clear that

11  it's very rough, but I would say in that neighborhood.

12      Q   And would this all be work that was done in

13  preparation for today's deposition; is that fair?

14      A   Yes.

15      Q   Anything beside -- any work that you would

16  have done on this matter in August, that is this

17  month, outside of preparing for this deposition?

18      A   Well, I guess I'm not quite sure how to

19  respond to that because, I mean, I reviewed -- well,

20  let me put it this way.  For -- just as an example, I

21  reviewed the depositions of Ms. Fontein and

22  Dr. Rosenthal.  I suppose in the event that there's

23  another filing, that review would be relevant.

24          But insofar as there's not -- I'm not -- that

25  I'm currently not planning a supplemental report, but

Darius N. Lakdawalla, Ph.D.

1    reserve the right to file one, then everything was for

2    the preparation of -- my preparation for this

3    deposition.

4           MR. O'CONNOR:  Doctor, having received what

5    we've marked as Exhibits 10 and 11 just prior to your

6    deposition, we reserve the right to question you on

7    those documents subject to further analysis.

8           But as it stands here today, I have no

9    further questions for you.  Thank you.

10          THE WITNESS:  Thank you.

11          MR. CASAZZA:  Dr. Lakdawalla, I have just a

12   few questions.

13                      EXAMINATION

14   BY MR. CASAZZA:

15      Q   Earlier today, do you remember plaintiffs'

16   counsel asking you to distinguish between academic

17   works in which you had disclosed the identity of a

18   pharmaceutical company and works in which you had not

19   disclosed the identity of a pharmaceutical company?

20      A   I do, yes.

21      Q   In preparing academic papers, why might you

22   disclose the identity of a pharmaceutical company in

23   connection with your by line?

24      A   Well, typically in an academic publication

25   one wants to be overinclusive.

Darius N. Lakdawalla, PH.D.

1          So if, for example, there's a gift made by a

2    pharmaceutical company to the Schaeffer Center along

3    the lines that I explained earlier, that might be

4    disclosed on a particular publication even though

5    there was no funding that was directed towards or

6    specifically supporting that publication.  So it might

7    just disclose a general donation that was not directed

8    towards the project.  So in that respect, funding

9    might be disclosed even if it -- even if it wasn't

10   specifically supporting that research project.

11       Q   So does the disclosure of a pharmaceutical

12   company on a particular paper of yours mean that

13   pharmaceutical company sponsored that particular

14   paper?

15           MR. O'CONNOR:  Objection; form.

16           THE WITNESS:  No, not necessarily.  And

17   generally pharmaceutical companies do not sponsor

18   particular papers that are conducted at -- in my

19   academic home of USC at the Schaeffer Center.

20   BY MR. CASAZZA:

21       Q   So would it be fair to say that the majority

22   of peer-reviewed papers listed on your CV were not

23   sponsored by a pharmaceutical company?

24           MR. O'CONNOR:  Objection; form, leading.

25           THE WITNESS:  There were some papers that I

Darius N. Lakdawalla, Ph.D.

```
 1    listed as sponsored by pharmaceutical companies in an
 2    overinclusive way that were -- that may have just been
 3    connected to a gift that was not specifically directed
 4    to the project.
 5    BY MR. CASAZZA:
 6        Q   Dr. Lakdawalla, has -- have donations by
 7    Gilead or any other pharmaceutical company to USC
 8    influenced the outcome of any of your research in any
 9    way?
10        A   No.
11        Q   Earlier today, do you recall plaintiffs'
12    counsel moving to strike testimony you had offered
13    regarding the projections for TDF-based revenue on
14    Exhibit 2 of your report?
15        A   Yes, I think I do.
16        Q   If you could please turn to Exhibit 2 of your
17    report.
18        A   Okay.
19            MR. O'CONNOR:  Evan, could you pull it up,
20    please, for the screen, too.
21    BY MR. CASAZZA:
22        Q   Dr. Lakdawalla, beneath the tables on
23    Exhibit 2 there's a line that reads, "Source: Email
24    from Bruce Delagneau to William Lee."
25            Do you see that?
```

Darius N. Lakdawalla, Ph.D.

```
 1          MR. O'CONNOR:  Objection insofar as it
 2  misstates the document.  The names are on it, but...
 3          THE WITNESS:  Yeah, and apart from the fact
 4  that it's Bruno Delagneau, that's true, what you said
 5  is --
 6          MR. CASAZZA:  Oh, it's all -- you know what,
 7  I'll just do it again.
 8      Q   Dr. Lakdawalla, do you see beneath the table
 9  in Exhibit 2 where it says, "Source: Email from Bruno
10  Delagneau to William Lee, 'GS7340 financial analysis,'
11  April 17, 2003," then it goes on to provide a Bates
12  number and a file name?
13      A   I do, yes.
14      Q   Dr. Lakdawalla, is that source, the
15  April 2003 e-mail from Dr. Delagneau to Bill Lee,
16  attaching a pair of financial forecasts for TAF?
17          MR. O'CONNOR:  Objection; misstates the
18  document.
19          Sorry, Doctor.  Go ahead.
20          THE WITNESS:  That e-mail has a pair of
21  forecasts.  One of them is a price parity forecast
22  that appears in Scenario 1, and the other is the
23  priced premium forecast that I discuss in the last
24  section of my report.
25
```

Darius N. Lakdawalla, Ph.D.

```
1    BY MR. CASAZZA:
2        Q   Dr. Lakdawalla, are those the only forecasts
3    you considered in connection with your economic
4    analysis summarized in Exhibit 2 of your report?
5        A   No.  I considered other forecasts that were
6    discussed in footnote 143, and I considered what the
7    other forecasts would imply regarding the appropriate
8    way to identify parameters for my analysis in
9    Exhibit 2.
10       Q   Dr. Lakdawalla, had Gilead's projections from
11   the 2003 time period for future sales of TDF-based
12   medications been higher than reflected in Exhibit 2 to
13   your report, how would that have affected your
14   opinions?
15       A   If that were the case it would have
16   strengthened my opinions because, first of all, it
17   would have meant that there's more TDF revenue to,
18   quote/unquote, protect as TAF converts TDF patients
19   away and protects them from generic entry of TDF in
20   2017.  And if TDF revenues were higher, it would
21   become more likely that the incremental revenues
22   accruing to TAF would also be higher.
23           And that hypothesis, in fact, is borne out
24   when one looks at the actual financials data which
25   shows that the actual incremental revenue from
```

Darius N. Lakdawalla, Ph.D.

1   launching TAF in late 2015 was substantially higher

2   than the incremental revenue that's projected in this

3   forecast.  And therefore, if one were to use the

4   actuals instead of the forecasts, the conclusion would

5   be strengthened.

6          I would note that, as I note in my report,

7   the appropriate thing to do is to use the numbers that

8   appear to reflect Gilead's decision parameters in

9   2004.  But even if Gilead, in fact, understood TDF

10  revenues to be higher than what was in this forecast,

11  it would have only strengthened the conclusion that

12  launching TAF earlier was more profitable than

13  launching it later.

14     Q   Dr. Lakdawalla, earlier today in connection

15  with your discussion of Gilead's TAF forecast you

16  mentioned the July 2004 business review.

17         Do you recall that?

18     A   I do, yes.

19     Q   Why did you mention the Gilead's July 2004

20  business review in connection with your discussion of

21  Gilead's financial forecasts for TAF?

22     A   I think there are two reasons.  One, it

23  serves as a cross-validation check for the April 2003

24  financial analysis; and two, it shows that there was a

25  document that would have been circulated at Gilead

Darius N. Lakdawalla, Ph.D.

```
 1    that reflects these numbers.

 2            And as I noted in the earlier testimony,

 3    although I'm not sure if that got struck or not, the

 4    2004 business unit review presents estimates or

 5    forecasts of incremental revenue from TAF's launch.

 6    And for the years that overlap between the 2004

 7    forecast and the April 2003 forecast, it's evident

 8    that in 2004 the forecast was that incremental revenue

 9    from TAF was actually projected to be 4 percent higher

10    than was projected in April 2003.

11            And again, if one uses the 2004 forecast,

12    then it would only strengthen the conclusion that an

13    earlier launch of TAF is more profitable because

14    incremental revenues are higher.  So there's

15    consistency across two forecasts.  If anything, the

16    one I use results in a conservative assumption.

17            And the business unit review would have been

18    a document that was reviewed by a group at Gilead

19    suggesting that these numbers were understood by more

20    than just Mr. Delagneau and Dr. Lee -- or

21    Dr. Delagneau, I apologize, and Dr. Lee.

22            MR. CASAZZA:  Thank you, Dr. Lakdawalla.

23    Subject to questioning from plaintiffs' counsel, I

24    have no further questions today.

25            MR. O'CONNOR:  I have no further questions.
```

Darius N. Lakdawalla, Ph.D.

```
 1    Thank you.  Subject to my reservation of rights

 2    discussed earlier.

 3              THE VIDEOGRAPHER:  Off record; 3:33 p.m.

 4              (Deposition concluded at 3:33 p.m.)

 5    /

 6    /

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Darius N. Lakdawalla, Ph.D.

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, SHARI BOLTON, CSR No. 9291, hereby

 4      certify:

 5            That the foregoing proceedings were taken

 6      before me at the time and place therein set forth, at

 7      which time the witness was put under oath by me, that

 8      the testimony of the witness, the questions

 9      propounded, and all objections and statements made at

10      the time of the examination were recorded

11      stenographically by me and were thereafter

12      transcribed;

13            That a review of the transcript was not

14      requested; that the foregoing is a true and correct

15      transcript of my shorthand notes so taken.

16            I further certify that I am not a relative or

17      employee of any attorney of the parties; nor

18      financially interested in the action.  I declare under

19      penalty of perjury under the laws of California, that

20      the foregoing is true and correct.

21

22        Dated:

23

24        _____

25        SHARI BOLTON, CSR No. 9291
```