# EXHIBIT D

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ADRIAN HOLLEY, *et al.*,

          *Plaintiffs,*

    vs.

GILEAD SCIENCES, INC.,

          *Defendant.*

Case No.:    4:18-cv-06972-JST
              (and consolidated cases)

Honorable Jon S. Tigar

# <u>EXPERT REPORT OF SASKIA FONTEIN</u>

# TABLE OF CONTENTS

Page

I. EXECUTIVE SUMMARY ........................................................................ 1

II. QUALIFICATIONS AND BACKGROUND ........................................ 5

III. THE FOUR CORE ELEMENTS OF DRUG DEVELOPMENT
DECISION-MAKING ........................................................................ 10

    A. Unmet Patient Need ................................................................ 10

        1. Quantitative Assessment .............................................. 10

        2. Qualitative Assessment ................................................ 12

    B. Return on Investment ............................................................. 14

    C. Risk and the Probability of Success ....................................... 15

    D. Portfolio Fit ............................................................................ 16

IV. FACTUAL BACKGROUND ............................................................... 18

V. GILEAD DIVERGED FROM THE ANALYSIS A REASONABLE
PHARMACEUTICAL MANUFACTURER WOULD HAVE APPLIED
IN DELAYING TAF DEVELOPMENT UNTIL 2010 ........................ 31

    A. Gilead failed to conduct a thorough unmet patient need analysis. ... 31

        1. Quantitative analysis would have revealed a need for
medications safe for long-term use. .............................. 32

        2. Qualitative analysis would have revealed stakeholders
concerned about TDF toxicity. ..................................... 36

        3. Gilead did not adequately consider the renal and bone
toxicity impact on patients taking TDF in real life settings. ... 41

        4. Gilead treated renal and bone toxicity as a "perceived"
issue not a real one. ...................................................... 44

    B. Gilead's flawed ROI analysis drove TAF decision-making as its
primary concern was that TAF not hurt TDF sales. ...................... 48

        1. Costs would not have been prohibitive. .......................... 48

        2. Gilead analyzed ROI without thoroughly assessing unmet
patient need. ................................................................ 50

    C. Risk Assessment .................................................................... 55

    D. Portfolio Fit ............................................................................ 59

VI. CONCLUSIONS ................................................................................ 64

## I. EXECUTIVE SUMMARY

1.     My name is Saskia Fontein. I am a pharmaceutical industry consultant with approximately twenty-five years of experience in commercial and launch strategy for prescription pharmaceuticals. For sixteen of those years, I worked exclusively on pharmaceuticals in the HIV therapeutic area, which required me to evaluate and make decisions based on the various business considerations that are involved in the development and commercialization of antiretroviral medications to treat and prevent HIV.

2.     I understand that plaintiffs in this case allege that: (a) before Gilead began marketing Viread, its first prescription drug containing tenofovir disoproxil fumarate ("TDF"), it had started development of a safer tenofovir prodrug design, tenofovir alafenamide fumarate (TAF), that was less toxic to kidneys and bones; (b) before Gilead announced that it was stopping TAF development on October 21, 2004, it knew that TAF was likely to have an improved safety profile but it delayed TAF development to avoid risk to TDF sales and saved it for later use as a lifecycle extension strategy for its HIV portfolio; (c) while Gilead was delaying development of safer TAF, it was minimizing reports of the toxicity of TDF to kidneys and bones; and (d) plaintiffs experienced kidney and/or bone adverse events from taking one or more of Gilead's TDF-containing drugs that would have been prevented or lessened had they taken a medication containing TAF instead of TDF.[1]

3.     I have been retained by plaintiffs' counsel to evaluate Gilead's decision-making regarding the development of TAF in light of my expertise and experience in developing and commercializing pharmaceuticals for HIV. More specifically, plaintiffs' counsel asked me to address: (a) whether, in deciding to stop TAF development in 2004, Gilead diverged from the analysis that pharmaceutical companies typically apply when

---

[1] *See, e.g.*, First Amended Consolidated Complaint for Damages, *Adrian Holley, et al. v. Gilead Sciences, Inc.*, United Stated District Court for the Northern District of California, No. 4:18-cv-06972-JST, ¶¶ 1-18, 403, 455, 485, 494.

making drug development decisions in the HIV therapeutic area; (b) whether a reasonable pharmaceutical company in Gilead's position would have considered, in its TAF decision-making, information regarding: (i) post-marketing adverse event reports regarding renal and bone adverse events in patients taking TDF-based drugs; and/or (ii) scientific conclusions Gilead reached regarding the safety of TDF to kidneys and bones that were codified in its Company Core Safety Information and led to changes in country-specific labeling and prescribing information for TDF; and (c) the risks involved in developing TAF in 2004.

4.      I have reached the opinions expressed in this report and summarized below, based on the Gilead documents and testimony I reviewed, as well as my 25 years of experience in the pharmaceutical industry:

a.      Pharmaceutical companies generally consider four core elements when making drug development decisions: (1) unmet patient need; (2) return on investment ("ROI"); (3) risk; and (4) portfolio fit.

b.      When making drug development decisions in HIV, a company must consider the unmet patient need that exists in the market, and the opportunity they have in addressing this unmet need with their new product. This is the primary purpose of pharmaceutical companies, and in an area such as HIV in the early 2000s, there was considerable unmet need. To quantify unmet need, the company must fully evaluate the experience that physicians and patients are having with currently available treatments. Then it must determine how to best develop their product to achieve better patient outcomes by addressing that unmet need.

c.      Before Gilead decided to stop TAF development in October 2004, it failed to conduct a thorough unmet need analysis. It ignored the renal and bone toxicities that TDF patients were experiencing in real-world settings, even though Gilead had frequent interactions with regulators about the renal and bone toxicities of TDF, made regular updates

- 2 -

to its core company position on TDF safety and product labels regarding the renal adverse events that TDF patients suffered in post-marketing experience, and heard from HIV physicians at conferences and in interactions with Gilead Medical Affairs personnel about the physicians' concerns regarding the renal toxicity of TDF. Rather than trying to understand and mitigate the renal and bone toxicity of TDF, Gilead tried to minimize it, dismissing renal and bone toxicity as merely a competitive issue with "perceived" toxicity rather than a real patient safety issue. A reasonable pharmaceutical manufacturer would not have ignored its own post-marketing safety data and CCSI and labeling changes in making the decision to stop TAF development in October 2004. By failing to conduct a thorough unmet need analysis that considered the risks of its own product, TDF, Gilead diverged from the analysis a reasonable pharmaceutical manufacturer would have applied. And a reasonable pharmaceutical manufacturer would not have continued to ignore the growing evidence of TDF renal and bone adverse events in the years after October 2004.

        d.    Gilead's assessment of ROI was also unreasonably flawed. Stated simply, ROI is the ratio of the investment costs versus the revenue that the company expects the product to generate. Having failed to conduct a thorough unmet need analysis and refusing to acknowledge the renal and bone toxicity of TDF, Gilead assessed that TAF would generate little incremental revenue. But Gilead's decision-making was driven by the notion that TAF, no matter what its safety and efficacy profile, not be permitted to cannibalize TDF sales (i.e., take sales from TDF) or limit TDF uptake (i.e., impair TDF sales growth). In 2003-2004, Gilead was laser focused on establishing TDF as the foundation of antiretroviral therapy for all patients and developing TDF in combination with other HIV medications. Because of this, as well as Gilead's refusal to acknowledge there was anything wrong with TDF, Gilead did not or would not see the need for TAF in the short-term, as TAF would raise awareness of the renal and bone toxicity of TDF and threatened Viread and the anticipated

TDF fixed dose combination ("FDC") products, Truvada and Atripla. While TAF was a risk to Gilead's TDF revenue in the short-term, in the longer-term, Gilead only saw TAF as an opportunity to extend the lifecycle of its tenofovir portfolio following the loss of patent exclusivity for TDF in 2017. Because Gilead was so singularly focused on TDF revenues, it failed to properly consider the impact of its decisions on the lives of people living with HIV who were taking their medicines.

        e.        With respect to the risks of TAF development, both internal and external risks would have been relatively low given that TAF belonged to a precedented class of medicine, was a prodrug of tenofovir like another medication that was already FDA-approved and on the market, and was being developed for a therapeutic area, HIV, that was very well known to Gilead. I understand that Gilead has in this litigation argued that two particular risks justified discontinuing TAF development. In my view neither of those risks would have caused a reasonable pharmaceutical manufacturer to stop TAF development. The 9-month beagle toxicity study may have warranted further investigation of the high-dose toxicity finding, but TAF had a better safety margin than TDF and Gilead later cited the study as reason to continue, not discontinue, clinical development of TAF. And regarding the Costs of Goods Sold (CoGS) for TAF, those costs were already lower for TAF than TDF before Gilead improved its process for synthesizing TAF at commercial scale. To the extent a reasonable pharmaceutical company wanted to further reduce costs, it simply could have initiated a project to solve this issue, just as Gilead planned to do before it stopped TAF development in 2004 and did do in later years.

        f.        Finally, regarding portfolio fit, a reasonable pharmaceutical company in Gilead's position would have prioritized patient need over the risk that TAF would cannibalize or impair TDF sales. Deciding to prioritize TAF and TAF-based FDCs over TDF

- 4 -

would have supported Gilead's stated mission[2] and would have been the right thing to do for a pharmaceutical company in their position.

> g. By ignoring TDF toxicity in its assessment of unmet patient need, minimizing TDF toxicity both internally and externally, and focusing only on the short-term risk TAF posed to TDF revenue in its ROI and portfolio analysis, Gilead diverged from the analysis a reasonable pharmaceutical manufacturer would have applied in TAF development decision-making.

5. I hold all of the opinions expressed in this report to a reasonable degree of professional certainty and in good faith.

6. My work in this matter is ongoing, and I reserve the right to supplement and modify my report as additional information and data becomes available.

7. My opinion proceeds as follows: Section II describes my qualifications and other background matters; Section III summarizes the four core elements of drug development decision-making, Section IV contains facts relevant to my opinions, and Section V describes how a reasonable pharmaceutical manufacturer would have viewed each of those elements when considering whether to develop TAF and how Gilead diverged from reasonable analysis in deciding to stop TAF development in 2004 and through 2010.

## II. QUALIFICATIONS AND BACKGROUND

8. I have direct and first-hand knowledge of the considerations that are involved in the development of antiretroviral medications to treat and prevent HIV. This knowledge comes from the approximately 25 years I have spent in the pharmaceutical industry, including as a pharmaceutical executive responsible for leading commercial and launch strategy for multi-national pharmaceutical companies. For 16 of those years, I worked exclusively on

---

[2] Oct. 21, 2004 Gilead Press Release, GILTDF112102364378 ("Gilead Sciences is a biopharmaceutical company that discovers, develops and commercializes therapeutics to advance the care of patients suffering from life-threatening diseases worldwide.").

pharmaceutical compounds in the HIV therapy area, evaluating the commercial potential of different products in development, creating the commercial strategies for products at all stages of the product lifecycle, and making decisions about portfolio strategy and investment regarding different assets in development.

9.      I started my career in a global market research agency based in London, gathering and analyzing data about the needs of HIV physicians and patients, tracking treatment trends and market dynamics, and understanding physician prescribing behaviors.

10.      From there, I started the first of many roles related to the commercial development of HIV medications. While Gilead was first marketing Viread and assessing the commercial potential of TAF, I was working at a pharmaceutical company in La Jolla, CA (Agouron, a Pfizer Company) in a role in New Product Development in HIV and anti-infectives (2001-2003). In this role, I was involved in the development of several early-stage products for HIV, including protease inhibitors (PIs), non-nucleoside reverse transcriptase inhibitors (NNRTIs) and CCR5 antagonists. My role was to evaluate the commercial potential of the different products, identify important considerations for the clinical development program of each product to maximize commercial potential, and provide input into portfolio decisions around the prioritization of the different products. After this role, I moved into Worldwide Commercial Development at Pfizer in New York, where my role was focused on the commercial launch of the CCR5 antagonist Celsentri/Selzentry (2003-2007).

11.      Subsequently, after working in other therapeutic areas for about two years, I returned to HIV when ViiV Healthcare was formed. ViiV Healthcare was founded in 2009 as a joint venture between Pfizer and GlaxoSmithKline (GSK); a carve out of their respective HIV portfolios, ViiV Healthcare was a new company solely dedicated to HIV.

12.      At ViiV Healthcare I was a member of the founding Executive Team as Vice President, Head of Global Commercial Strategy (2009-2014), located in London. In this role,

I was responsible for setting the commercial strategy for the entire HIV portfolio, which included products across the whole lifecycle, from mature products like AZT that had been on the market for years and were facing patent expiration to products in Phase 1 of clinical development.

13. At the time of the formation of ViiV Healthcare, the priority products were Epzicom/Kivexa and Celsentri/Selzentry. For these and other products that were on the market, my team and I were responsible for product positioning, which means identifying the target patients for each product, clarifying the key benefits of the product, developing the communications platform and materials to be used, and setting the direction for all the country teams who were actively commercializing the products.

14. My team and I also led the cross-functional Global Product Teams for each marketed product and product in development. We shared leadership with a Global Medical Lead or a Clinical Development Lead, depending on each product's stage in the product lifecycle. The purpose of the cross-functional product team was to bring together all the different functional teams involved in the product at that stage in the lifecycle. These teams typically included representatives from the Clinical team who were responsible for the clinical trials and generating evidence, the Medical teams responsible for interpreting data and interacting with the HIV treating physicians to support physicians' use of the medicines, the Regulatory team responsible for interactions with regulators, and the Market Access team responsible for ensuring patients could access the medicines through the different access and reimbursement channels in each country.

15. Additionally, although not regular members of the Global Product Team, other important functions were part of sub-teams that reported into the Global Product Team; these functions were represented by a related function at the Global Product Team. For example, the Product Safety Team was a sub-team that met regularly to review and discuss adverse

010759-11/1897384 V1

events and clinical monitoring reports from clinical trials, post-marketing studies, and pharmacovigilance. The Clinical or Medical Lead shared a summary of the discussions from the Product Safety Team at Global Product Team meetings, to ensure all team members were aware of these safety reports so we could consider them when developing materials communicating about the product and planning activities that involved the product.

16.     Together with the Chief Scientific and Medical Officer, I was responsible for developing the portfolio strategy for the company and making recommendations for the prioritization and investment of the different assets in development, as well as the Business Development strategy where we evaluated opportunities for collaborations with other pharmaceutical companies. We presented our strategies and recommendations to the rest of the Executive Team for their input and endorsement, and then to the Board of Directors for their approval.

17.     In 2014, I moved to other roles at GSK, first as Vice President for Commercialization in Vaccines based in Belgium, and then as General Manager for GSK in Denmark. In the latter role, I once again had responsibility for HIV, as one of the three core therapy areas for GSK at that time. Both of these roles were cross-functional leadership roles. In the Vaccines role, I was the single point of accountability for Pneumococcal Vaccines, with Clinical, Medical, Manufacturing, Commercial, and Regulatory Leads all reporting to me. My job was to ensure cross-functional collaboration and consideration to make the best decisions for the vaccines, including investment and collaboration decisions. As General Manager in Denmark, my focus was on the commercialization of products already on the market, leading the Sales and Marketing efforts as well as overseeing supply chain, pharmacovigilance, regulatory, and quality processes.

18.     I left GSK in 2018 to return to the United Kingdom. Since then, I have been working as an independent consultant with several biotech and pharmaceutical companies. As

a consultant, I work with smaller biotech and medium and large pharmaceutical companies

on commercialization projects across the product lifecycle from discovery through launch.

Examples of projects I have worked on include conducting commercial assessments of early-

stage product concepts, developing a portfolio strategy and investment prioritization,

supporting organizations preparing to launch new medicines in a region of the world where

they have not previously operated and recommending the necessary organizational structure,

and supporting the accelerated commercialization of medicines to treat patients with COVID-

19.

19.     My CV is attached as Exhibit A.

20.     I have never previously testified as an expert at trial or by deposition in any

litigation.

21.     Acumen Biopharma is being compensated at a rate of $800 per hour for my

time spent on deposition or trial and a rate of $700 per hour for other time spent on this case.

No part of my compensation is contingent upon the substance of my opinions or the outcome

of this litigation.

22.     To prepare this report, and reach the opinions contained in it, I reviewed many

types of Gilead documents including, among other things, commercial plans, strategic plans,

development plans, Product Safety Update Reports, Core Company Safety Information

reports, meeting documentation from Development Committee meetings, Core Team

meetings, Project Team meetings, Development Plan Review meetings, Product Safety

Committee meetings and Core Safety Review Committee meetings, Advisory Board

meetings as well as interactions between Gilead and the FDA, and internal emails between

and among Gilead employees. I had access to all documents Gilead produced during

discovery. I have also read the depositions and reviewed the associated exhibits from Jay

Toole, John Milligan, Bill Guyer, Jim Meyers, Bill Lee, Norbert Bischofberger, Grushenka

Wolfgang, and Michael "Mick" Hitchcock. A list of the documents I relied on in forming my opinions is attached as Exhibit B.

23.     I also drew on my experience of developing portfolio and product strategies at both Pfizer and ViiV Healthcare and approached the development decisions as I would have done in my role as Head of Commercial Strategy at ViiV Healthcare.

## III.     THE FOUR CORE ELEMENTS OF DRUG DEVELOPMENT DECISION-MAKING

24.     Making the right decisions regarding which assets to develop and prioritize, and what level of investment is appropriate for each asset, is critically important for all pharmaceutical companies. Many companies invest heavily into making these decisions by hiring consultants and establishing elaborate processes supported by entire departments in their attempts to get this right. The challenge is comparing the potential value of different medicines in early-stage development that will treat different types of patients, across different diseases and at different timepoints. Therefore, companies need to find a way to value them in an "apples to apples" comparison to enable good investment decision making. While the precise process differs across companies, in my experience, there are always four core elements that go into the evaluation that leads to drug development decisions in a pharmaceutical company: (1) unmet patient need; (2) return on investment; (3) risk and the probability of success; and (4) portfolio fit. I discuss each of these elements below.

### A.     Unmet Patient Need

25.     It is fundamental to establish the unmet patient need that the medicine addresses when evaluating its value to support a development decision. There is a quantitative and a qualitative aspect to this evaluation.

#### 1.     Quantitative Assessment

26.     To quantify unmet need, pharmaceutical companies start with the **epidemiology**, i.e., the prevalence (how many people have it), the incidence (how many new

people get infected every year), and the death rate among people with the disease. Epidemiology informs what the market size is at the time of the analysis and what it will be over the course of the lifecycle of the product in development. This information is typically gathered from secondary data sources, reports and publications and provides the foundation of the commercial model.

27.     Next, companies apply **market dynamics**, as these will drive market evolution during the time the medicine is in clinical development, while it is on the market, and throughout the product lifecycle. Because companies need to determine the value of the medicine for the entire product lifecycle, they typically look at a 20-year time horizon and need to consider what changes will happen in the disease area or market that will impact the value of the medicine that is being developed. Examples of market dynamics include (a) switching rates, i.e. how many patients switch treatments due to side effects or toxicity, (b) treatment failure, i.e. how many patients discontinue or change treatment due to it not working, and (c) how long patients stay on the treatments.

28.     Another important market dynamic to review is the frequency and severity of adverse events that patients are experiencing but that do not result in a switch or a discontinuation of treatment due to a lack of better treatment options. In a well-developed market with lots of treatment options this will be lower, but in a market such as HIV in the 1990s and early 2000s there were not many treatment options, so patients often continued on regimens that caused or were capable of causing adverse events, and physicians tried their best to manage these.

29.     Since the assessment needs to span a 20-year horizon, market dynamics can change significantly over this time period, with the emergence of new data and the availability of new products. To predict how the market may evolve, companies obtain retrospective data from market tracking studies or patient diary studies and then apply the

- 11 -

dynamics to build future market scenarios. This information is a key input into developing the forecast regarding how many patients will receive the medicine over the course of its lifecycle and for what duration.

30.     Finally, companies need to define the **target population** for the drug in development. Since there are usually still unknowns about the product profile at this stage, companies often develop multiple scenarios. For example, possible scenarios might include (a) patients with risk factors for a certain toxicity and/or patients who have developed side effects while taking currently available medicines, (b) all patients as first line treatment, and/or (c) patients for whom the current treatment is not effective. From these inputs, companies can calculate the number of patients who would be eligible for the new product.

### 2.     Qualitative Assessment

31.     In addition to the quantitative assessment, companies need to assess the qualitative element by obtaining an external perspective of unmet patient need, i.e., how satisfied the different external stakeholders are with the currently available medicines and to what extent they see a need for a new, improved medicine. This will determine the speed of adoption of a new medicine by **physicians** when it hits the market. If physicians are satisfied with current medicines or have concerns about a new medicine, they will likely only try the new medicine in a few patients who have no other options first. At the other end of the spectrum, if physicians are unhappy with currently available options and view the new medicine as a significant improvement, they may proactively switch patients who are stable onto the new medicine as well as start a high proportion of their new patients on it straightaway. Another important aspect is the "pull" or acceptance from **patients** to take a new medicine. Is this something that patients will be reluctant to take? Or will patients perceive it as being better, talk about it with friends and create buzz in the community, so that

- 12 -

patients proactively ask their physicians to prescribe this new medicine? This impacts speed of adoption (and therefore sales uptake) as well as shareholder value.

32.     It is also critical to be clear about the unmet need that a medicine in development can potentially address from a regulatory and payer perspective. For example, **payers** will be interested in the cost implications of introducing a new medicine and the medicine's cost-effectiveness. Relevant cost factors include not just medication costs but the cost of monitoring for toxicities and managing and treating them when they arise. This aspect of unmet need is determined by gathering insights from all these different stakeholders through market research and advisory meetings, as well as through secondary sources such as reports and publications.

33.     With all this information in hand, to evaluate the commercial potential of an early-stage product and allow for comparisons across a portfolio, companies typically develop a MACP, a Minimally Acceptable Commercializable Profile, or a TPP, a Target Product Profile, (or a variation thereof). This describes the minimum criteria that the product must achieve to be commercially viable and reach the forecasted revenues. This will include attributes such as patient outcomes in terms of viral load suppression, the number of patients experiencing side effects (at all grades), the dosing frequency, and number of pills. The MACP/TPP development is typically the responsibility of commercial strategy. It is the responsibility of the R&D team to develop a product that has a high likelihood of achieving this product profile, demonstrating these attributes through clinical trials, and assessing the likelihood that the profile will be achieved (see section on Risk later).

34.     When making portfolio investment and trade-off decisions, the unmet need is a very important foundation of the assessment. This is not only a key input into valuing the commercial potential of the assets, but it is also key in determining how the potential medicine helps the company achieve its mission, which holds significant shareholder value.

**B.     Return on Investment**

35.     Return on investment (ROI) is the next core element of a development decision. To put it simply, it is the ratio of the investment costs versus the revenue that the product is expected to generate. It is often referred to colloquially as the "bang for the buck" and it is usually measured through an NPV (Net Present Value) analysis.

36.     The first part of the ROI calculation is **the costs**. This is made of up several components, the key ones being R&D (clinical trials, toxicity studies etc.), manufacturing costs, and commercial costs. Costs to develop a medicine from Phase 1 can vary significantly, depending on the number of unknowns about the medicine or disease, the size of the population needed for clinical trials, and the duration of the trials. Manufacturing costs also vary depending on complexity. Biologics are highly complex, while small molecule oral tablets and capsules tend to be simpler and therefore less costly. The same spectrum applies to Cost of Goods (CoGs), which is the cost of manufacturing the medicine in its commercial form (not the form that is manufactured in small batches at a higher cost for use during clinical development). CoGs is an ongoing cost throughout the product lifecycle, and many companies will continue investments to reduce these costs through manufacturing efficiencies throughout the product lifecycle. Commercial costs also vary, depending on whether there is already a commercial structure in place to promote the product, or whether establishing this structure would be an additional cost. Primary care diseases that high numbers of general practitioners treat are significantly more expensive to commercialize due to the high numbers of sales representatives required to reach all treating physicians and larger Direct to Consumer (DTC) advertising costs, e.g., television advertising. In specialty diseases like HIV, commercial costs are typically much lower because the number of treating physicians is limited, and DTC advertising is usually only worthwhile in the treatment press (that is, the specialty publications that focus on the disease) or within the disease area community groups.

- 14 -

37.     To calculate the second part of the ROI equation: **the revenue**, you start by quantifying the unmet need as described above, from which you can calculate the number of patients likely to receive the new product, known as the market share, which includes those patients starting treatment on the medicine as their first line of treatment and those who switch from other medicines. From there, it is fairly simple to calculate the revenues by applying the price of the medicine, the average length of therapy, the compliance rate, the uptake curve, and the timing of when the medicine will be on the market.

**C.     Risk and the Probability of Success**

38.     The third core element of a development decision is risk, which includes internal and external risk.

39.     **Internal** risks are those associated with the medicine in development and include, e.g., the risk of an unexpected adverse event emerging, the risk that the medicine fails to meet efficacy targets, or the risk associated with being able to scale up manufacturing and maintain the required quality standards. These risks, often considered the Probability of Technical Success, are higher for a medicine in the early phases of development and decrease as each stage gate (that is, each development phase) is passed. The risks will vary significantly depending on, e.g., the class of medicines, whether this is a first in class medication or there are already similar products that have reached full development, the complexity of the disease, and the type of administration. Development decision-makers also consider the Probability of Regulatory Success, which includes all these technical aspects, plus the likelihood that the medicine will receive approval from regulators to market the product, whether it qualifies for accelerated approval (where applicable), and whether the desired product label is achieved. The label becomes the framework for promotion and therefore impacts the uptake and forecasted sales of the product.

- 15 -

40.     Taken together these factors are typically grouped and considered together as the "Probability of Success" (PoS). In some cases, the PoS assessment which companies use to compare the risks of different medicines in development across a portfolio also includes the likelihood of achieving the target product profile, which is expected to deliver the forecasted revenues. Industry benchmarks for PoS, as noted by Gilead, are as follows: Phase 1 to launch: 40%; Phase 2 to launch: 50%; Phase 3 to launch: 76%.[3]

41.     **External** risks are those that impact the market for the medicine, including competitive risks. For example, if you are expecting to be first to market but a competitor gets there ahead of you, or has a more compelling product profile, then this will impact your revenue potential. Also, if a similar product already on the market takes a big price cut, this could devalue your medicine in development. In addition to competitor activities, other examples of external risk factors include unexpected epidemiological shifts, changes in reimbursement practices or political systems, or changes in the understanding of the disease. Drug development is an inherently risky business, so it is important to clarify the risk profile of each product in development, so that decisions about investment and prioritization include this risk, and a company can balance this risk across a portfolio.

42.     Building a thorough understanding of the risk profile of a medicine in development is complex, but ultimately it leads to a discount factor that is applied to the ROI calculation so that assets in development can be compared.

**D.     Portfolio Fit**

43.     The last core element has less to do with the individual medicine in development but rather concerns how the medicine fits into the portfolio of the organization, including the medicines already on the market and other products in development. The

---

[3] Gilead Portfolio Review Appendix 15 September 2011: Cross Franchise Overview: Revenue and Expense Forecast, GILTDF110200948294 at 299.

direction for this comes from the company's vision and mission statements, the corporate strategy and portfolio strategy, and commitments made to the investor and patient community. These sources should specify whether the organization is looking to diversify across different therapy areas or focus on one or two therapy areas where they have a meaningful competitive advantage.

44.     When developing several drugs within the same therapeutic area, it is also important to consider how the different medicines fit within that portfolio: what is the incremental value that each new product brings to the portfolio? Will the new product cannibalize any existing products, or does it target different patients or is it used in combination? Cannibalization is acceptable if it enables a company to be more competitive versus products from other companies. From the commercial perspective, it is better to lose share of your existing product to your new product than it is to lose share to a competitor. In addition, if the new product has better efficacy, or is better tolerated or has less toxicity, you can expect patients to stay on it longer, which benefits the company.

45.      In addition to following the corporate strategy, development decision-makers will also consider the balance of costs, revenues, and risks, so they may invest in a small number of high risk-high reward development programs, and balance this out with smaller opportunities that are lower in risk. They will also look at the timelines for incurring the high costs of the development program, and the revenue stream, to ensure continued growth of the organization.

46.     Pharmaceutical companies are typically driven by the need to meet investors' expectations of continued growth and, as a consequence, can be inclined to focus predominantly on the ROI and risk elements. The more ethical organizations will not lose sight of their vision and mission, which typically concern helping patients and combating

disease, and will instead maintain this objective as the foundation of their strategies and decisions.

## IV.    FACTUAL BACKGROUND

47.    By 1999, before Gilead filed its New Drug Application seeking FDA approval to market its first TDF-containing drug (Viread), Gilead had begun developing a back-up to TDF due to concerns about potential nephrotoxicity with TDF.[4]

48.    Gilead selected intracellular tenofovir prodrug GS-7340 for further development because it reduced "systemic/kidney" exposure to tenofovir while increasing the amount of tenofovir within the cells HIV targets.[5] Gilead planned to file an Investigational New Drug Application to begin clinical development of GS-7340 in humans as early as March 2000.[6]

49.    In Spring 2000, Gilead considered the rationale for TAF development, stating that its early concerns about potential nephrotoxicity with TDF had diminished based on the TDF clinical trial data that was known at that time.[7] Discussing whether the attributes of GS-7340 warranted clinical development independent of its role as TDF back-up, the team concluded that they might expect significant commercial upside with TAF over TDF due to its expected increased potency which could enable it to overcome HIV treatment resistance and might enable 2-drug regimens (instead of 3 drug regimens which was the standard of care

---

[4] Aug. 31, 1999 PMPA Prodrug Back-Up, GILTDF107400223383, at 385; Feb. 7, 2000 Potential IND Selection for GS-7340, GILTDF105500123184, at 198 ("Early in the development of tenofovir DF (GS 4331) concerns over potential nephrotoxicity led us to initiate a back-up prodrug program with the goal of maximizing intracellular concentration of tenofovir (GS 1278) while minimizing systemic concentration.").

[5] *See id.* at 398.

[6] Sept. 22, 1999 Back-up candidate for Tenofovir DF; status of amidate prodrug, GILTDF110601045264, at 264, 267.

[7] Apr. 26, 2000, Potential IND Selection for GS-7340-02, GILTDF105500123184, at 185.

at that time).[8] Gilead also expected that TAF's lower systemic exposure to tenofovir could reduce the risk of toxicity.[9]

50.     In June 2000, Gilead's Development Committee considered TAF for IND submission based on its increased sales potential versus TDF.[10] The Committee considered a proposal to compare 300 mg TDF to 25 mg and 75 mg TAF in a short clinical trial to determine if TAF was a promising product,[11] while recognizing that a "potential downside to moving forward" with TAF development was its impact on the development program for TDF. The memo to the Development Committee stated: "The [TAF development] effort should not be allowed to cannibalize the TDF program."[12]

51.     Around that time, in June 2000, Gilead was planning to file its IND for TAF by September 1, 2000, though the team responsible for the filing noted that the "actual filing date [would] depend on several factors, including assuring that the program does not conflict with priorities on the tenofovir DF development program."[13] Gilead filed its IND for TAF on November 28, 2001,[14] shortly after it received FDA approval to market TDF on October 26, 2001.[15]

52.     Soon after Gilead began marketing TDF (Viread), Gilead made promotional statements about Viread that the FDA determined were false and misleading.[16] The FDA

---

[8] *See id.* at GILTDF105500123195-197.

[9] Apr. 26, 2000 Interoffice Memo re Potential Selection for GS 7340-2, GILTDF105500123184, at 196-197.

[10] June 23, 2000 PMPA Amidate Prodrug (GS 7340): Rationale for Development, GILTDF104300013010 and GILTDF104300013011, at 028.

[11] *Id*. at 014.

[12] June 27, 2000 GS 7340 Rationale for Development, GILTDF104300013011, at 029.

[13] June 2, 2000 Tenofovir Amidate Prodrug Project Team Meeting Summary, GILTDF108900280406.

[14] Nov. 28, 2001 IND Application for GS-7340, Vol. I, GILREG00684156.

[15] Oct. 26, 2001 FDA Approval Letter, GILREG00373984.

[16] March 14, 2002 letter from FDA to Gilead, GILTDF111601918927, at 927-927.003.

stated that Gilead had made false and misleading statements by describing Viread as

"extremely safe" with "no toxicities."[17]

53.    On May 6, 2002, the FDA told Gilead that it was "concerned with the number

of postmarketing and IND safety reports of cases of renal insufficiency/renal failure in

patients receiving tenofovir." The FDA asked Gilead to "prepare and submit an analysis of

your postmarketing and clinical trial databases and prepare a safety update about renal

adverse events in individuals exposed to tenofovir."[18]

54.    On July 1, 2002, Gilead submitted its first Periodic Safety Update Report

(PSUR) for Viread to the FDA. The PSUR included Gilead's response to the FDA's request

for information regarding renal events. Gilead disclosed 30 reports of renal failure and

numerous other renal adverse events.[19] That review prompted Gilead to update its CCSI, as

well as its product label, to include warnings about renal adverse events and to recommend

renal monitoring in patients with or at risk for renal dysfunction.[20]

55.    In August 2002, Gilead prepared a preliminary commercial recommendation

for TAF.[21] That document stated that "because it is likely to replace Viread, a product profile

that will support increased market share and premium pricing is critical."[22] Gilead recognized

a number of "potential benefits of GS-7340 for the treatment of HIV," including greater viral

---

[17] *Id*. at 927-927.001.

[18] May 6, 2002 FDA Request for Further Information about Renal Insufficiency/Renal Failure, GILREG00374891, at 8.

[19] June 28, 2002 Periodic Safety Update Report, GILREG01863600 at 615-617.

[20] *Id.* at 608-609.

[21] Aug. 19, 2002 GS-7340 Preliminary Commercial Recommendation, GILTDF106400201367.

[22] *Id.* at 369; *see also id*. at 371 ("GS 7340 with its expected greater potency compared to current agents, its safety profile and its once a day dosing convenience has the potential to become a new cornerstone of HIV treatment, however likely at the expense of Viread.") *id*. at 372 ("Because the active component of GS 7340 is tenofovir, it must be assumed that it will not be combined with Viread in clinical practice and will eventually cannibalize most of Viread sales. It is critical that GS 7340 be more than a mere replacement for Viread but also provide significant benefits that will make the product more competitive and will have broader usage than Viread.").

load reduction, decreased opportunity for resistant virus selection, and "reduced systemic exposure to tenofovir which may translate into a better side effect profile and less drug related toxicity."[23] Gilead set several "no go decision points," including if TAF's viral load reduction was less than 1 log more than viral load reduction achieved with Viread, or if TAF showed an increased toxicity profile compared to Viread.[24]

56.     In December 2002, Gilead submitted its second PSUR to the FDA covering Viread safety data from May 2002 through October 2002.[25] Gilead's review of its clinical and safety data caused it to update its CCSI to include renal dosing guidelines for patients with renal impairment, disclose that additional types of renal adverse events had been reported in post-marketing surveillance,[26] and add information on bone toxicity.[27] Gilead proposed similar changes to the Viread label, which the FDA approved in August 2003.[28]

57.     In March 2003, the European regulator, Committee for Proprietary Medicinal Products (CPMP), requested that Gilead perform a review of all renal disorders reported in patients treated with TDF.[29] In response to Gilead's submission, the Assessor concluded that "renal toxicity remains a concern with tenofovir and should be closely monitored."[30]

58.     At a Development Committee meeting on April 17, 2003, Gilead's head of R&D, Norbert Bischofberger, reported that during an April 3, 2003 Business Review Committee meeting, the Committee recommended that Gilead stop TAF development due to the likelihood that TAF "would ultimately cannibalize" TDF "regardless of its efficacy and

---

[23] Id. at 369.

[24] Id. at 374.

[25] Dec. 16, 2002 Periodic Safety Update Report and cover letter, GILREG01811247.

[26] Id. at 255-256.

[27] Id. at 321. These updates are included as late-breaking information and are also described in the third PSUR.

[28] July 15, 2003 FDA facsimile to Gilead, GILREG00375191, at 193; Aug. 15, 2003 FDA approval letter, GILREG00375236, at 237.

[29] May 19, 2003 Review and Analysis of Renal Disorders, GILTDF111001617672, at 675.

[30] July 2003 Preliminary Assessment Report, GILTDF114706424166, at 177.

010759-11/1897384 V1

safety profile."[31] But "[o]ne reason for continuing/restarting development would be to obtain patent extension."[32] Bischofberger stated that "if the patent extension proves worthwhile, development of GS-7340 might resume" and a decision would be revisited in Spring 2004.[33]

59.     Bischofberger tasked Gilead's Corporate Development team with exploring the potential of TAF as an "IP extension strategy for TDF."[34] Under this strategy, Gilead would launch TAF two years before the patent expiry of TDF in 2017 and replace TDF with TAF products that had four additional years of patent protection.[35]

60.     Importantly, the lone clinical trial of TAF prior to October 2004, GS-120-1101, demonstrated its efficacy at a reduced dose relative to TDF. The pharmacological results from the first cohort for the study state:

> Tenofovir is detectable within PBMC samples following a single 50 mg dose of GS-7340-02, appearing to result in higher drug concentrations within cells versus tenofovir DF 300 mg as evidenced by more detectable and quantifiable tenofovir concentrations within PBMC samples. These interim pharmacokinetic findings … support preclinical data that showed administration of GS-7340-02 results in circulation of GS-7340, a more stable prodrug of tenofovir, increasing systemic and cellular distribution of drug."[36]

Indeed, at a Development Committee meeting later that year, Chairman John Martin noted how these results from the first study "clearly demonstrated the proof of concept that this formulation design produces increased drug concentrations in lymphoid tissues."[37] When the study was complete, the GS-7340 project team noted that the results "indicate[d] that either

---

[31] Apr. 17, 2003 Development Committee Executive Report, GILTDF106400200094, at 095.

[32] *Id*.

[33] Id.

[34] Apr. 4, 2003 email from Jung Choi re Revenue forecasting, GILTDF111001201107.

[35] Apr. 13, 2003 J. Choi email and attachment to Peter Virsik and others re GS-7340 NPV analysis, GILTDF111601879276-278.

[36] GS-120-1101 Pharmacology Interim Results, GILTDF106600206837.

[37] *See* Development Committee Executive Report, October 25, 2002, GILTDF106400199858, at 860-861.

010759-11/1897384 V1

dose of GS-7340 [50mg and 150 mg] is more potent than Tenofovir 300 mg,"[38] This was a very successful study for TAF.

61.     In June 2003, Bill Lee discussed the results of the first TAF clinical study, GS-120-1101, with the investigators. Lee stated that TAF development was on hold pending full evaluation of chronic toxicology studies; TAF clinical development was being considered relative to other internal programs; and that both TAF doses (50mg and 150mg) were more potent than TDF but the difference was less than 1 log.[39] Lee also stated that Gilead would not be publishing the study results "to avoid generating frustration or false expectations."[40] The final study report for GS-120-1101 was dated September 5, 2003.[41]

62.     Meanwhile, in July 2003, the FDA raised concerns about Gilead Sales representatives minimizing safety risks with TDF and sent Gilead a warning letter stating "Gilead's sales representatives have repeatedly omitted or minimized material facts regarding the safety profile of Viread . . . " and required Gilead to retrain its sales force.[42]

63.     Also in July 2003, Gilead was required to distribute a "Dear Doctor" letter to physicians in Europe following changes in the label regarding renal risk.[43] A "Dear Doctor letter" or now called a ("Direct Healthcare Professional Communication" or DHPC) is used in extreme situations to rapidly inform HCPs about important new safety information and any actions they should take. Specifically, in this letter, Gilead informed physicians in Europe that Viread's Summary of Product Characteristics now "include[d] dosing recommendations for patients with moderate to severe renal impairment," that is, "creatinine clearance < 50

---

[38] GS-7340 Project Team Executive Report, June 2003, GILTDF106400201482.
[39] Id.
[40] Id.
[41] Sept. 5, 2003 Clinical Study Report, GS-120-1101, GILREG01508768.
[42] July 29, 2003 FDA Warning Letter to Gilead, GILREG00375200, at 204.
[43] Dec. 19, 2003 Periodic Safety Update Report, GILREG01831711, at 723.

ml/min."[44] Notably, the letter states that "[t]he safety and efficacy of Viread in patients with renal impairment have not been established" and that "[c]areful monitoring of viral load, serum creatinine and phosphate is required in patients with renal impairment receiving Viread."[45] The letter also reports that "post-marketing surveillance has shown that tenofovir can be responsible in rare cases of proximal tubulopathy (including Fanconi), renal failure/insufficiency, [and] increased creatinine."

64.     On August 15, 2003, in approving another label change regarding renal and bone risks, the FDA informed Gilead that "[t]here are sufficient data presented to suggest a significant effect of TDF on bone metabolism"[46] and recommended Gilead conduct several post-marketing commitments on bone and renal safety.[47]

65.     On September 18, 2003, Gilead's Corporate Development department presented to the Development Committee its financial analysis of GS7340 as a "tenofovir exclusivity extension." The financial analysis assumed that Gilead would "develop GS7340 to replace both Viread and the TDF/FTC combination product [Truvada] in order to extend the exclusivity of the tenofovir franchise by four years."[48] Other assumptions included that "development of GS7340 is timed such that it is launched in 2015 with a six-year path to commercial launch" and the "launch of GS7340 would not expand patient market share for the tenofovir franchise, but would only cannibalize existing patients."[49] The analysis emphasized that a positive financial return was dependent on getting the TAF launch timing right.

---

[44] *Id.* at GILREG01831794 (copy of Dear Doctor letter included in Periodic Safety Update Report).

[45] Id.

[46] July 15, 2003 FDA facsimile to Gilead, GILREG00375191 at 193.

[47] Aug. 19, 2003 FDA approval letter, GILREG00375236 at 237.

[48] Sept. 18, 2003 Memo to Development Committee re Financial Analysis of GS7340 as a Tenofovir Exclusivity Extension, GILTDF106400200181.

[49] *Id*. at 182-183.

66.     On December 23, 2003, Gilead submitted its fourth Viread PSUR to the FDA, which included a cumulative review of renal adverse events from approval to October 31, 2003. Gilead reported a total of 257 renal cases and that it had added two new types of renal adverse events to its CCSI.[50]

67.     In March 2004, Gilead updated their TAF strategy, exploring three options: 1) a "Viread patent extension strategy" which was the "base case"; 2) use in salvage patients with resistance and 3) use as part of a paradigm shifting 2-drug regimen in treatment naive patients.[51] Under the "base case" scenario, TAF development would be "delayed" in order to "maximize the lifecycles of Viread and FDC."[52]

68.     On May 16, 2004, Gilead announced that it was in discussions with Bristol-Myers Squibb Company and Merck & Co. to develop the first complete, once-daily, fixed dose combination of three patented anti-HIV drugs. This potential three-drug, fixed-dose combination would include two Gilead drugs, Viread and Emtriva (emtricitabine).[53]

69.     On June 30, 2004, Gilead submitted its fifth Viread PSUR to the FDA, reporting a total of 333 renal cases"[54] and stating that "[p]ost-marketing drug safety surveillance data has indicated that tenofovir DF may, in rare circumstances, cause renal adverse reactions. In particular, tenofovir DF may cause proximal tubulopathy, including Fanconi syndrome, and renal failure."[55]

70.     A June 4, 2004 GS-7340 Project Team document stated that if the planned clinical study in patients with resistance (GS-120-0103) did "not show enhanced activity of 7340 over TDF, Gilead would still develop GS-7340. We would have to think carefully about

---

[50] December 23, 2003 Periodic Safety Update Report, GILREG01831711, at 726.
[51] Mar. 1, 2004 email and slides re GS-7340 Development Assumptions, GILTDF111601879352, at 352-353.
[52] Mar. 4, 2004 HIV Franchise Strategy Team Memo, GILTDF108900271721, at 724.
[53] May 16, 2004 Gilead press release, GILTDF113103878514-518.
[54] June 25, 2004 Periodic Safety Update Report, GILREG02213209, at 252-253.
[55] June 25, 2004 Periodic Safety Update Report, GILREG02213209, at 251.

- 25 -

timing of major activities and alternative distinguishing features of GS-7340 versus

Viread."[56] It also stated that: "The completed chronic studies (6-month rat and 9-month dog)

support conduct of clinical studies beyond 48 weeks."[57]

71.     On July 15, 2004, Gilead stated that study GS-120-0103 was on hold because

data from the 9-month toxicity study in beagles indicated a "possibility of a hypothyroid

effect in the high dose group of dogs, but not in the 2 lower dose groups" and to give the

"opportunity to re-assess at the upcoming Business Review Meeting what incremental value

GS-7340-02 would add to Viread."[58]

72.     The July 22, 2004 Development Committee meeting notes state that

"[a]lthough no effects on thyroid function were observed in patients enrolled in GS-120-

1101, the decision was made to stop screening patients for enrolling in Study GS-120-

0103."[59] The Committee directed the TAF Project Team to review the toxicology issue and

develop a commercial assessment of GS-7340.[60]

73.     On August 2, 2004, the FDA approved Gilead's NDA for Truvada.[61]

74.     The Project Team's September 16, 2004 GS-7340 Development Plan Update

stated that "[g]eneral toxicology studies completed to date support chronic dosing of GS-

7340 in humans for up to 48 weeks" and described two development scenarios: 1) a "full

development scenario" for TAF in salvage patients with resistance mutations; and 2) a

"Viread extension/replacement scenario" which would be implemented if TAF did not

---

[56] June 3, 2004 Memo re Summary of the 17 May 04 GS-7340 Project Team Meeting,
GILTDF106400203413.

[57] Id. at 414.

[58] July 15, 2003 C. Moxham email re delayed enrollment of GS-120-0103,
GILTDF116206729057.

[59] July 22, 2004 Development Committee Executive Report, GILTDF106600206608, at
609.

[60] Id.

[61] Aug. 2, 2004 FDA NDA Approval Letter, GILREG01630344, at 344-350.

- 26 -

demonstrate additional antiviral activity in salvage patients with resistance.[62] Benefits of

development under the "extension/replacement scenario" included the use of a lower dose

that would permit greater flexibility in pursuing two- and three-drug FDCs and that could

translate into "reduced potential for real or perceived long-term toxicity (i.e., renal or bone

mineral density)."[63] The timeline for the development of TAF under the

"extension/replacement scenario" would be "delayed."[64]

      75.    Notes from the September 23, 2004 Development Committee meeting state:

> A number of DC members expressed the opinion, that in consideration of the
> emerging profile of GS-7340 that does not appear to be sufficiently differentiated
> from Viread, development should be stopped. The DC also noted that the distribution
> profile of the prodrug is different than for TDF making predictability of safety
> impossible. Points in favor of continuing development included 1) toxicity was
> observed in only the high-dose treatment group and . . . 3) the efficacy dose of GS-
> 7340 has not been substantiated – it might be lower than the level currently being
> studied and thus increase the safety margin. The DC referred the final decision to stop
> or continue development to a DC subcommittee to be led by Norbert.[65]

      76.    On October 21, 2004, Gilead announced that it was discontinuing TAF

development because "Gilead does not believe that GS 7340 has a profile that differentiates it

to an extent that supports its continued development."[66]

      77.    On December 17, 2004, Gilead and BMS signed a collaboration agreement to

develop Atripla, the first Single Tablet Regimen.[67]

      78.    On December 22, 2004, Gilead submitted its sixth Viread PSUR to the FDA,

covering the period May 1, 2004 through October 31, 2004. Gilead reported that 443 renal

adverse events had been reported since product approval.[68]

---

[62] Sept. 16, 2004 GS-7340 Development Plan Update, GILTDF116607970990, at 990, 996-999.

[63] *Id*. at 999.

[64] *Id*. at 004.

[65] Sept. 23, 2004 Development Committee Executive Report, GILTDF106600206626, at 627.

[66] Oct. 21, 2004 Gilead Press Release, GILTDF112102364378.

[67] Dec. 17, 2004 Collaboration Agreement, GILTDF109800680783.

[68] Dec. 21, 2004 Periodic Safety Update Report, GILREG02055030, at 106.

79.     On March 31, 2005, Gilead requested that the TAF IND be placed on inactive status, which the FDA considered inactive as of May 6, 2005.[69]

80.     Between 2005 and 2010, Gilead continued to report additional renal and bone events in its Viread PSURs. Gilead's July 2005 PSUR contained a comprehensive review of 563 renal cases for Viread and Truvada and also highlighted the "possible bone toxicity" following its TDF pediatric safety review.[70] Gilead's December 2005 PSUR included a cumulative review of 63 renal events with a fatal outcome and reported an additional 99 renal events during the six-month reporting period.[71] The December 2007 PSUR reported an additional 137 renal cases, 21 of which were considered "severe" (fatal, life-threatening, requiring dialysis), and 18 bone events.[72] Gilead also conducted a cumulative review of 127 bone events[73] and four cumulative reviews of events potentially associated with proximal renal tubulopathy.[74] By May 2010, Gilead's cumulative review included 1,582 renal adverse events.[75]

81.     Between 2005 and 2010, based on its review of the safety data, Gilead made several additional changes to its CCSI reflecting additional renal and bone events. The CCSI's Undesirable Effects section was updated in June 2005 to include two additional renal adverse events[76] and in January 2006 to include language on two bone adverse

---

[69] May 6, 2005 FDA letter re inactivation request, GILREG00684114.

[70] June 28, 2005 Periodic Safety Update Report, GILREG02456731 at 813-814, 833, 873.

[71] Dec. 16, 2005 Periodic Safety Update Report, GILREG01849671 at 776.

[72] Dec. 14, 2007 Periodic Safety Update Report, GILREG01859579 at 676-679, 716 (covering twelve-month period).

[73] Id. at 739-740 (including 66 bone fractures and 82 reports of osteoporosis, osteonecrosis and osteomalacia).

[74] Id. at 677.

[75] May 6, 2010 Periodic Safety Update Report, GILREG00893772 at 773, 859-861.

[76] Dec. 16, 2005 Periodic Safety Update Report, GILREG01849671 at 688 (adding "nephrogenic diabetes insipidis" and "nephritis" to Renal and Urinary Disorders).

events.[77] From May to September 2006, Gilead made three consecutive updates to its CCSI,

including the addition of renal monitoring recommendations in all TDF patients and

removing the statement that the majority of renal adverse events occurred in patients with

underlying renal disease or in combination with nephrotoxic agents.[78] In December 2007,

following Gilead's review of bone events, information regarding fractures and bone pain

was added.[79]

82.     Also during this time, Gilead's exchanges with the FDA and CHMP indicated

ongoing regulator concern over renal and bone safety. In May 2005, the FDA proposed

another post-marketing commitment for Gilead to "conduct a comprehensive review of the

spectrum of renal toxicity reported" with the use of TDF.[80] In April 2006, Gilead informed

the FDA that it could not fulfill a post-marketing commitment to study the safety of Viread

in patients with varying degrees of renal impairment due to low study enrollment because of

the "perceived risk associated with [TDF] use in subjects with renal impairment. . . ."[81] The

FDA responded that the limited data from this study in patients with mild renal impairment

"was not encouraging" as "2 of 5 subjects in this cohort prematurely discontinued study

because of increases in calculated creatinine clearance."[82] In May 2007, during the FDA's

consideration of updates to the Viread label, the FDA recommended that, in addition to

---

[77] June 20, 2006 Periodic Safety Update Report, GILREG02172070 at 091 (adding to new section titled "Musculoskeletal and Connective Tissue Disorders": "Myopathy, osteomalacia (all associated with proximal renal tubulopathy)."

[78] Dec. 13, 2006 Periodic Safety Update Report, GILREG01854823 at 845-847, 011-020. Additional updates included language for the dosing of renally impaired patients, and the renal event "nephritis" was updated to include "interstitial nephritis (including acute cases)." *Id.*

[79] June 20, 2008, Periodic Safety Update Report, GILREG02190485 at 519, 677-688 (adding to warnings that bone abnormalities could infrequently contribute to fractures, and adding to post-marketing section the description that osteomalacia may be manifested as bone pain and infrequently contributes to fractures).

[80] May 4, 2005 FDA facsimile to Gilead re post-marketing commitments, GILREG00376169, at 170.

[81] Apr. 17, 2006 Renal Impairment Data Summary, GILREG02062837, at 850.

[82] May 3, 2007 FDA Memorandum to Gilead, GILREG00377756, at 757.

osteomalacia, Gilead also include reports of osteopenia and osteoporosis in the precautions section; however, Gilead argued that those events were not related to taking Viread.[83]

83.     Gilead had similar communications with the European regulator. In November 2005, following review of a Viread safety update, the CHMP concluded that there was an increase in the number of renal adverse events and required Gilead to provide a thorough cumulative review of renal events.[84] It also required Gilead to develop a "Risk Management Plan" to deal with the concern related to renal toxicity[85] and distribute another "Dear HCP letter" to all physicians in Europe concerning renal safety.[86] Following review of the Third PSUR for Truvada in 2007, the CHMP requested a cumulative review of bone pain in response to post-marketing bone adverse event data.[87] In October 2009, the CHMP again took note of the increasing number of TDF renal adverse events and requested Gilead to provide a cumulative review of all renal events.[88] Also in October 2009, the CHMP expressed concern that a larger and larger population was being exposed to TDF's toxicity, stating: "Unfortunately, [TDF's] renal toxicity, which has been identified as the salient toxicity of the product since [Marketing Authorization], is a particular source of concern (risk of Fanconi, uncertainties on the long-term impact...)."[89]

---

[83] Apr. 25, 2007 Gilead Response to FDA Labeling Comments, GILREG01856356, at 363. *See also* May 21, 2007 FDA supplement approval letter, GILREG00377793, at 794, 808-810 (approving updates to the Viread label to include the warning that creatinine clearance should be calculated in all patients, as clinically appropriate, during therapy with Viread, and a precaution that osteomalacia has been reported with use of Viread).

[84] Feb. 24, 2006 Rapporteur's Preliminary Assessment Report of Gilead's Review and Analysis of Renal Disorders, GILTDF113604607459, at 460.

[85] Dec. 5, 2005 Truvada-Viread Project Team Meeting Minutes, GILTDF104500017647.

[86] June 20, 2006 Periodic Safety Update Report, GILREG02172070, at 090.

[87] Dec. 14, 2007 Periodic Safety Update Report, GILREG01859579, at 739.

[88] Oct. 8, 2009 EMEA fax to Gilead re PSUR, GILTDF115006636015, at 016. This cumulative review, which reported 1,582 renal adverse events, was detailed in the Viread PSUR dated May 6, 2010. *See* May 6, 2010 Periodic Safety Update Report, GILREG00893772 at 773, 859-861.

[89] Oct. 8, 2009 EMEA fax to Gilead re FUM 219, GILTDF115006636083, at 084.

84.     In April 2010, at a Portfolio Review Update with the Executive Committee, Gilead discussed whether TAF (an "improved Viread") should be developed.[90]

85.     On July 13, 2010, John Milligan and Norbert Bischofberger sent a memo to the Board of Directors stating that Gilead would develop TAF to replace TDF to protect against the loss of patent protection for the TDF products.[91] They stated: TAF's "more selective exposure to infected cells result[ed] in at least equivalent efficacy and no side effects on renal function or bone mineral density (approval in 2015)."[92]

86.     On September 9, 2010, Gilead emailed the FDA to enquire about the process for reactivating the TAF IND that was placed on inactive status in 2005. Gilead informed the FDA that "[t]here were no safety reasons for which Gilead decided to halt development of this molecule."[93]

## V.     GILEAD DIVERGED FROM THE ANALYSIS A REASONABLE PHARMACEUTICAL MANUFACTURER WOULD HAVE APPLIED IN DELAYING TAF DEVELOPMENT UNTIL 2010

**A.     Gilead failed to conduct a thorough unmet patient need analysis.**

87.     Any company involved in developing HIV drugs in the mid to late 1990s and early 2000s would reasonably have been aware of a high level of unmet need in the HIV therapy area. HIV had become a chronic disease, and the medicines were complex and associated with many adverse events and toxicities. There was also a very active patient advocacy community at that time, which had been instrumental in accelerating access to important new HIV medicines through regulatory and reimbursement channels. These advocacy organizations were driven and motivated by the injustices committed towards

---

[90] Apr. 12, 2010 Executive Committee Portfolio Review Update, GILTDF112102734912 at GILTDF112102734912.0002.
[91] July 13, 2010 Memo from J. Milligan and N. Bischofberger re Gilead Vision 2025, GILTDF109300326146, at 146-147.
[92] Id. at 147.
[93] Sept. 9, 2010 Gilead email to FDA re reactivating TAF IND, GILREG00684156.

people with HIV and AIDS in the early days of the epidemic (early 1980s) and very vocal

about the unmet need that still existed, even though by this time antiretroviral therapy was

much more effective, and death rates had plummeted in the US. No one working in the HIV

therapy area could have been deaf to the needs of the HIV community for less toxic

medicines. A reasonable pharmaceutical company engaged in the development and

commercialization of HIV drugs would have conducted a thorough evaluation of the need for

a medicine like TAF—that is, a drug that could effectively reduce viral load with less toxicity

for patients needing to take daily medication to treat a chronic disease—before making the

decision to discontinue development.

### 1. Quantitative analysis would have revealed a need for medications safe for long-term use.

88.    With respect to **epidemiological data** to determine trends and emerging

needs, a thorough evaluation would have shown that death rates in patients with HIV

declined steeply with the advent of Highly Active Antiretroviral Therapy (HAART) in

1995.[94] HAART regimen used to treat HIV involved the use of three or more different drugs

that inhibit viral replication by several mechanisms. The combination of drugs could stop the

virus replicating and prevent the virus from mutating into a drug-resistant variant that could

lead to treatment failure. The introduction and relative success of HAART meant that patients

---

[94] *E.g.*, Toole Ex. 14, CDC MMWR (Monthly Morbidity Mortality Weekly Report) dated Sept. 19, 1997 ("Provisional surveillance data about [AIDS] for the first 6 months of 1996 indicated a decrease in deaths among persons with AIDS, attributed primarily to the effect of antiretroviral therapies on the survival of persons infected with human immunodeficiency virus (HIV). This report describes a decline in AIDS incidence during 1996 compared with 1995 and the continued decline in AIDS deaths; the findings indicate that HIV therapies are having a widespread beneficial impact on the rate of HIV disease progression in the United States.") *id.* ("Deaths among persons reported with AIDS declined 23% in 1996 compared with 1995"); Toole Ex. 15, National Vital Statistics Report, July 24, 2000 (showing both rate of infection and death rate declining in 1998); Toole Ex. 16, New England Journal of Medicine, March 1998 (discussing "dramatic declines" in death and disease linked to HAART).

were living longer and therefore would need to receive antiretroviral therapy for longer time periods.

89.     Gilead included some epidemiological data in its early Global Marketing Plans, and recognized that the introduction of HAART in 1996 lead to delayed progression of disease, decline in AIDS cases and deaths, and improved survival.[95] In fact, as early as 2000, Gilead was characterizing HIV as a chronic, manageable disease[96] and recognizing the need for treatments that would be safe for long-term use.[97] But Gilead's main focus was on the increasing number of people living with HIV which meant a robust market.[98]

90.     A key **market dynamic** was the demand for more compact treatment regimens and a higher standard of tolerability for patients. In the late 1990s the "gold

---

[95] *E.g.*, 2001 Viread Global Marketing Plan, GILTDF110000700636, at 641.

[96] *See* Tenofovir Disoproxil Fumarate (GS-4331-05) June 2000 Development Plan for HIV, GILTDF105300091370, at 381 ("HIV disease has become a chronically managed disease, and careful planning is now required by physicians when starting treatment in a new patient, to ensure long-term efficacy and long-term safety, to minimize the life style impact of treatment and to preserve treatment options if the patient fails his/her first regimen."); Aug. 19, 2002 GS-7340 Preliminary Commercial Recommendation, GILTDF106400201367, at 370 ("HIV is treated as a chronic, manageable disease and patients and physicians are seeking durable, tolerable and convenient regimens that preserve future options.").

[97] *See* Tenofovir Disoproxil Fumarate (GS-4331-05) June 2000 Development Plan for HIV, GILTDF105300091370, at 381 (("Long-term management of HIV, as opposed to treatment of symptomatic disease or AIDS, has become a key issue for physicians and patients to address."); 2001 Viread Global Marketing Plan, GILTDF110000700636, at 643 ("Long-term management of HIV . . . has become a key issue for physicians and patients to address."); *id*. at 652 ("The medical need in the management of HIV disease is therapy that provides long-term efficacy and adherence while ensuring patient safety.").

[98] *See, e.g.*, 2001 Viread Global Marketing Plan, GILTDF110000700636, at 643 ("Long-term management of HIV . . . has become a key issue for physicians and patients to address."); *id*. at 652 ("The medical need in the management of HIV disease is therapy that provides long-term efficacy and adherence while ensuring patient safety."); Aug. 19, 2002 GS-7340 Preliminary Commercial Recommendation, GILTDF106400201367, at 370 ("HIV is treated as a chronic, manageable disease and patients and physicians are seeking durable, tolerable and convenient regimens that preserve future options."); October 2004 PowerPoint regarding market dynamics, GILTDF114004822700, at Slide 7 (slide entitled, "Increased life expectancy is also driving growth in the HIV market," states, "The introduction of HAART has led to a decrease in the numbers of HIV patients progressing to AIDS, associated opportunistic infections, and mortality," and quotes Italian key opinion leader stating, "Our HIV positive patients have a life expectancy not different from the general population, so we don't lose patients over time.").

standard" antiretroviral therapy regimen consisted of 6+ pills two or three times a day, and

patients were experiencing daily side effects, such as diarrhea, vomiting, fatigue, and longer-

term effects such as lipodystrophy (fat redistribution) and peripheral neuropathy. A high

proportion of patients were discontinuing or switching treatments due to side effects and

toxicities.[99]

91.     Gilead was focused on reducing pill burden, as well as improving side effects

and toxicities. For example, Gilead promoted TDF as an alternative to AZT, d4T and ddI

(Retrovir, Zerit and Videx), which caused a lot of immediate side effects, as well as longer

term toxicities. But as discussed further below, Gilead failed to recognize or act on the unmet

need driven by the toxicities caused by their own medicine TDF.[100] With a product already on

the market, Gilead had access to a lot of information on real-life use with TDF. This should

have been an invaluable source of information in assessing the frequency of TDF adverse

events, switching rates due to adverse events from TDF, and the extent to which TDF patients

---

[99] O'Brien ME, Clark RA, Besch CL, Myers L, Kissinger P. Patterns and correlates of discontinuation of the initial HAART regimen in an urban outpatient cohort. J. Acquir. Immune Defic. Syndr. 2003 Dec 1;34(4):407-14. doi: 10.1097/00126334-200312010-00008. PMID: 14615659.

[100] *See, e.g.*, Viread Global Marketing Plan, October 19, 2001, GILTDF110000700636, at 649 ("stavudine [i.e., Zerit or d4T]-related mitochondrial toxicity leading to a loss of mitochondrial DNA is an issue that has been exploited"); *id.* at 650 (adverse events from Videx include "liver peripheral neuropathy, pancreatitis and other liver toxicities"); HIV Strategic Development Plan, May 1, 2004, GILTDF117308591985, at 006 (Truvada "will enjoy advantages in tolerability and safety", such as "anemia/fatigue versus AZT …"); Draft 2004 HIV Franchise Strategic Marketing Plan (2003), GILTDF113504154426, at 430 ("Additional strategies and tactics will focus on Viread and Emtriva benefits over AZT, d4T and 3TC in the areas of tolerability, efficacy, resistance, and PK profiles."); *id.* at 438 ("The most frequently discontinued NRTIs were stavudine [d4t] (66% for lactic acidosis/LD/PN), ddI (13% for nausea, vomiting, PN), AZT (13% for anemia/leukopenia) …"); *id.* at 451 ("When compared to stavudine, Viread provides superior safety in terms of cholesterol, triglycerides, and nucleoside-related toxicities."); Global Positioning Strategy Plan, HIV Franchise 2004-05, March 31, 2004, GILTDF110200947653, at 659 ("Core to our HIV franchise strategy will be to implement programs that drive proactive switching from older, less convenient and more toxic regimens to Viread/Emtriva-based regimens in early lines of therapy."); 2006–07 HIV Franchise Commercial Plan, GILTDF110200949939, at 945 ("d4T is no longer promoted" by Bristol Meyers Squibb "due to toxicity concerns").

were experiencing or at heightened risk for renal or bone harms but did not switch or discontinue treatment due to a lack of better treatment options.

92.     In addition, regarding treatment duration, it was well known before October 2004 that stopping antiretroviral therapy was not recommended in HIV patients, since the virus would quickly rebound, and HIV disease would progress. That meant that once a patient started on antiretroviral therapy, they would be receiving it for the remainder of their life. Due to emerging resistance with most antiretrovirals, patients would need to switch components of their regimens over the course of their life, but TDF was considered to have a higher barrier to resistance than other medicines available at this time. With a higher barrier to resistance, it would take longer for the virus to develop resistance to TDF than other medicines. As such, TDF was expected to be a medicine that patients would stay on while they progressed through lines of therapy, meaning patients could potentially be taking TDF for long time periods.[101] Therefore, long term toxicity was an increasingly important consideration, and it would have been clear to a reasonable pharmaceutical manufacturer that there was an unmet need for less toxic agents suitable for long term use.

93.     Analysis of the **target patient population** should have determined whether TAF would have been likely to meet patients' needs better than existing options, including TDF. A thorough look at this would have identified how many patients could not or should not take TDF due to renal insufficiency or other risk factors for renal and bone toxicities and would have considered whether TAF was a better treatment option for all patients as a first line therapy. Joining these findings up with the epidemiological and market dynamics analysis, it should have been clear and would have been clear to a reasonable pharmaceutical

---

[101] 2001 Viread Global Marketing Plan, GILTDF110000700636, at 640 ("The superior resistance profile of Viread preserves future therapeutic options, due to minimal cross-resistance with the nucleoside reverse transcriptase inhibitor (NRTI) class. Viread's profile makes it a valuable option for both treatment-naive and treatment-experienced patients.").

manufacturer that there was a significant and increasing need for a less toxic NRTI, such as TAF had the potential to be.

94.     Indeed, Gilead started to acknowledge this in 2010 when they restarted the TAF development program, linking it to patients becoming older and therefore exposed to TDF for longer time periods,[102] but this was already evident before October 2004. For example, at a Global Clinical Review meeting that Gilead held in March 2002 with 12 faculty consisting of Key Opinion Leaders and 64 HIV clinicians, Gilead's Vice President of Clinical Research, Dr Jay Toole, recognized that in light of the company's experience with related nephrotoxic compound adefovir, "at some point a [TDF] patient is going to develop nephrotoxicity. . . . "[103]

### 2.     Qualitative analysis would have revealed stakeholders concerned about TDF toxicity.

95.     A reasonable company engaged in the development and commercialization of HIV drugs would have sought **insights from stakeholders** who play a role in the treatment of HIV patients, including at a minimum: physicians, patients and patient advocates, and potentially payers and regulators as well. For example, physicians who had experience treating HIV patients, both with TDF and other antiretrovirals, could have provided critical insights, through advisory board meetings, consultations, and market research. While Gilead employees in the Medical Affairs and Clinical departments may have been familiar with TDF data and trained as physicians, they were not regularly treating patients with TDF and other HIV drugs. As a result, it would have been very important to hear from those physicians who

---

[102] *See* slide titled "Key Takeaways and Action Items from the GS-7340 Development Plan Discussion," GILTDF111602075743 ("Renal and bone issues regarding TDF are likely to become more prominent over time as patients become older and are exposed to TDF for longer periods.").

[103] GILTDF110801149244, at 271; *see also* GILREG01788241 (reflecting 2002 changes to Gilead's CCSI and Warnings section of the product label pertaining to the risk of renal toxicity and need for monitoring of patients at risk for or with a history of renal dysfunction); *see also supra* footnotes 95, 99, and 101.

actually managed patients treated with TDF to get their perspectives and learn from them the "real-life" experience with TDF. A reasonable pharmaceutical company would have sought input from these physicians and incorporated their insights into its unmet needs analysis.

96.     Gilead received numerous reports of renal events in patients on TDF and continued concern about the renal profile of TDF from HIV physicians in connection with Advisory Board[104] and Regional Consultant Meetings (RCM),[105] and in interactions between HIV physicians and Medical Science Liaisons.[106] HIV expert physicians who advised Gilead through Advisory Board meetings raised concerns about renal and bone toxicity and expressed frustration that Gilead was not being proactive in investigating these issues and providing more reliable data.[107] Renal concerns were often the first concern that physicians raised about TDF,[108] indicating there was a high level of knowledge and concern among HIV physicians, which was shared with the Gilead team.

97.     For example, in August 2004, shortly before Gilead decided to stop developing TAF, Gilead convened its U.S. HIV Advisory Board and asked them "[w]hat are

---

[104] *E.g.*, August 13-15, 2004 US HIV Advisory Board Meeting Minutes, GILTDF108900250064, at 065; November 22, 2004 Email from Jennifer Watt, GILTDF110100713875, at 875-876 (summarizing from Gilead's EU Advisory Board); September 9, 2006 HIV Advisory Board Meeting Summary, GILTDF110501033418, at 424-425.

[105] *E.g.*, Gilead 2004 RCM Feedback Results, GILTDF116607876746, at 746-748.

[106] *See, e.g.*, Medical Science Liaison Weekly Activity Report by Bill Guyer, GILTDF114005766561, at 563 ("[Dr. Farthing] had a few questions about renal toxicity."); Weekly Activity Report by Bill Guyer, GILTDF112803804438, at 441 ("I met with Dr. Tsai to discuss the one patient who developed grade 3 hypophosphatemia while on TDF.").

[107] *E.g.*, US HIV Advisory Board Meeting Minutes dated August 13-15, 2004, GILTDF108900250064, at 067 (Advisory Board member stating, "People hear case reports, Gilead needs to counter with more reliable data" regarding renal toxicity); October 26, 2004 Jim Meyers email, GILTDF108900271864, at 864-65 (email about physician concerns with TDF used in combination with ritonavir stating "Many investigators are also troubled by what they perceive as arrogance on the part of Gilead on this issue…as if we don't want to believe there could be an issue. Even close friends of Gilead are telling us that they don't believe we are taking this issue seriously enough…").

[108] U.S. HIV Advisory Board August 13-15, 2004 Meeting Minutes, GILTDF108900250064, at 065; *see also* November 22, 2004 Email from Jennifer Watt, GILTDF110100713875 (summarizing from Gilead's EU Advisory Board).

the key topics in your mind important to Gilead?" Many of the answers concerned renal or bone toxicity, including: "[w]hat constitutes renal toxicity"; "address issue that TDF is toxic"; the "[t]rue incidence of renal and bone toxicity in non-preselected populations ("real world");" and "osteopenia."[109] Rather than ask whether there was a need for a less toxic tenofovir prodrug, Gilead asked the experts whether Gilead would "ever get out from under this renal toxicity issue"—to which the experts responded that "Gilead needs to counter [the case reports] with more reliable data."[110] I have not seen any indication that Gilead considered this input in its unmet needs analysis.

98.     In a meeting with Regional Consultants in September 2004, Gilead asked physicians whether there were "issues that we still need to address" with TDF.[111] The summary of the physicians' response states:

> Despite assurances that increased renal toxicity has not been seen with Viread in large clinical trials and retrospective cohort studies, the participants expressed frustration regarding this issue and remain concerned about the potential for nephrotoxicity. Participants recounted that they each had 1 or 2 patients with tenofovir-related nephrotoxicity and believed that it is a real issue in contrast to most of the study data. . . .[112]

The physicians asked "for guidance regarding which patients beginning therapy are at risk for nephrotoxicity on Viread and urged Gilead to conduct small-scale studies of Viread in patients at increased risk for nephrotoxicity," stating that the studies "should be prospective and should not use calculated creatinines."[113]

99.     At another RCM in November 2004, physicians told Gilead that "they want[ed] Gilead to do a better job of communicating the renal toxicity story and to be careful

---

[109] U.S. HIV Advisory Board August 13-15, 2004 Meeting Minutes, GILTDF108900250064, at 065.

[110] *Id.* at 067.

[111] Truvada Regional Consultant Workshop Summary, September 25, 2004, GILTDF112803804561, at 564.

[112] *Id.* (emphasis added).

[113] Id.

not to give the impression that renal toxicity was not an issue."[114] Asked whether renal toxicity with Viread was a factor in their prescribing decisions, many physicians expressed concern about renal toxicity, asked Gilead to do more to identify which patients are at risk for renal toxicity, and urged Gilead to do additional studies. At a similar meeting in Boston, several advisors cited renal toxicity as their key concern and the advisors recommended that Gilead encourage physicians to regularly monitor patients for renal toxicity by urinalysis and creatinine clearance.[115]

100.    At an EU Advisory Board at a similar time in November 2004, experts from ten countries raised renal toxicity as the top concern, and "strongly recommended" that Gilead be more "'transparent' with real-world data" and engage "in more proactive education about renal safety, risk factors, etc."[116]

101.    A document reflecting "2004 RCM Feedback" noted "general consistencies across programs," including that "[r]enal is still a top area of concern"; physicians were still "unsatisfied with Truvada" due to "concern around TDF-associated renal toxicity alone or with Kaletra (boosted PIs)"; and "[m]ost advisors were concerned about nephrotoxicity development while on TDF despite seeing data from long term studies and large data sets.".[117]

102.    Gilead continued to hear from physicians about their concern with TDF toxicity after October 2004. For example, in May 2006, at an advisory meeting in Las Vegas with 179 HIV clinicians, advisors were divided on whether they would avoid TDF in patients at risk for renal impairment, such as those with hypertension or diabetes, or whether they

---

[114] Truvada Regional Consultant Workshop Summary, November 5, 2004, GILTDF108900239696.

[115] Truvada Regional Consultant Workshop Summary, November 6, 2004, GILTDF109500361085, at 085-086.

[116] November 22, 2004 Email from Jennifer Watt, GILTDF110100713875 (summarizing from Gilead's EU Advisory Board).

[117] Gilead 2004 RCM Feedback Results, GILTDF116607876746, at 746-747.

would still treat but monitor carefully, implying that some advisors would avoid TDF with such patients.[118] At a conference debrief after CROI in 2007, where KOLs discussed the key takeaways from a renal session, one of the conclusions was that the accumulation of data on renal toxicity when TDF was combined with a protease inhibitor—a common combination— was worrisome, and one KOL even ventured to question "does this accumulation of data look like d4T and lipoatrophy?"[119] referring to a severe side effect that eventually led to the removal of stavudine/Zerit/d4T from regimens for HIV patients. Later that year, at a Regional Advisory Board, the advisors again raised concerns about the renal effects of TDF, felt that such effects were seen at a higher rate in their practices than was shown in the clinical studies, but welcomed what they viewed as an increased willingness on the part of Gilead to acknowledge the clinical importance of the renal issues.[120]

103.    A reasonable pharmaceutical company would have taken these reports and concerns seriously and factored them into their unmet need analysis. Yet Gilead regularly dismissed reports of TDF toxicity from HIV physicians, such as presentations on renal toxicity in TDF patients at the key HIV scientific conference, CROI, in 2003.[121] With TDF on the market, it was unacceptable for Gilead not to have considered in its unmet need analysis for TAF, the experience patients and physicians were having with TDF in real life settings. By ignoring physician feedback regarding TDF toxicity, Gilead diverged from the analysis a reasonably pharmaceutical manufacturer would have applied.

---

[118] Truvada Advisory Program "Insights into Nucleosides" May 20-21, 2006 Summary Report, GILTDF110200950076.

[119] CROI Key Opinion Leaders Debrief, March 1, 2007, GILTDF108900237026, at 031-032.

[120] HIV Advisory Board August 25, 2007 Meeting Executive Summary Report, GILTDF111602115009.

[121] *See, e.g.*, February 14, 2003 Bischofberger email, GILTDF110100814352 (dismissing case reports of TDF toxicity presented at CROI as "valid but (very) old news.").

104.    Moreover, as discussed above, payers are another category of stakeholders who will be interested in the implications of introducing a new medicine. I have seen no indication that Gilead considered these implications during its TAF decision-making. Payers would have been impacted, as shown in a Gilead-funded study in 2018. That study showed that restricting access to TAF through formulary management would result in thousands more deaths and bone and renal events than less restrictive formularies.[122] In other words, providing more access to TAF would yield better patient outcomes and reduce payer costs.

### 3.    Gilead did not adequately consider the renal and bone toxicity impact on patients taking TDF in real life settings.

105.    It is well documented that based on the pre-clinical studies for TDF and Gilead's previous experience with adefovir, there was a known risk of developing renal and bone toxicity with long term use of TDF.[123] Indeed, this was the reason Gilead initiated the pro-drug back up program that delivered TAF.[124] Therefore, a reasonable company would have made it a priority to track any renal and bone toxicity events through post-marketing surveillance and pharmacovigilance reporting, to understand how this toxicity was impacting patients, and should have actively engaged with physicians about any cases of renal and bone toxicity they experienced with their patients. Instead, Gilead tried to minimize the toxicities in their interactions with regulators and physicians and rarely took action on the requests for additional studies and more data analyses from experts and physicians.

---

[122] Baumgardner, J. et al., *Modeling the Impacts of Restrictive Formularies on Patients with HIV*, Am J Managed Care. 2018: 24 (Spec Issue No. 8); SP322-SP328.

[123] PMPA Core Team Meeting Minutes dated August 31, 1998, GILTDF105000045002 at 1 ("Preclinical and Preveon results would predict a high probability that 300 and 150 mg will show nephrotoxicity with long term treatment.").

[124] 7340-Amidate Project Review dated February 20, 2001, GILTDF107400223401 at 13 ("Distribution of PMPA in lymph nodes can be significantly increased while the kidney levels are reduced."); Memorandum titled "PMPA Prodrug Back-up" by Gene Eisenberg dated August 31, 1999, GILTDF107400223383, at 389 ("New PMPA Prodrug…Minimizes systemic/kidney exposure to PMPA.").

106. It is a regulatory obligation for companies to track and report adverse events in post-marketing experience, including analyzing and integrating the adverse events into their official company safety position (as stated in the CCSI, the Core Company Safety Information), reporting them to regulators on a regular basis (typically every six-months) in the form of a PSUR (Periodic Safety Update Report), and updating the package insert/product label where appropriate with respect to the risk of adverse events, frequently in the Warnings and Precautions section of the label.

107. Since this involves changes to the medicine's prescribing information, and surveillance data provides important insights into real-life experience with the drug that is often very different than in randomized clinical trials involving the healthiest patients, a reasonable pharmaceutical company would have shared this adverse event information on a regular basis with the cross-functional team and ensured that this information was integrated into any assessments of unmet need.

108. This is particularly true under these facts as a reasonable company in Gilead's position would have had considerable evidence that TDF patients were experiencing kidney and bone harm, which was cause for concern among regulators and physicians. *See* ¶¶ 62-63, 95-104.

109. Yet I have seen no evidence that Gilead considered, as part of its TAF development decision-making before October 2004, the (a) more than 400 renal adverse events that were reported in TDF patients by the end of October 2004[125] (acknowledging that real-life adverse events are massively under-reported, so a reasonable pharmaceutical manufacturer would have known that this number was significantly higher) or (b) the multiple changes Gilead made to the company's official safety position and country-specific

---

[125] Viread Sixth Periodic Safety Update Report, December 22, 2004, GILREG02055030, at 106.

product labels that warned of the risk of renal events in patients taking TDF and stated that

patients in TDF clinical trials had lost a statistically significant amount of bone mineral

density compared to another HIV medication.[126] Former Gilead employee and Development

Committee member Mick Hitchcock confirmed this, when he testified that Gilead did not

consider post-marketing adverse events in connection with the decision to stop TAF

development in October 2004.[127] Moreover, after Gilead stopped TAF development in 2004,

evidence of renal and bone toxicity in patients on TDF continued to grow. *See* ¶¶ 80, 83, 117.

A reasonable pharmaceutical manufacturer would have considered this evidence of TDF

toxicity when assessing unmet patient need.

110.    In addition to the case reports, Gilead had numerous interactions between

Gilead and the regulators, both the FDA and CPMP, in which the regulators expressed

concerns about renal and bone toxicity, and asked Gilead to provide more information and

update the product labeling. ¶¶ 57, 63-64, 82-83. In several instances, FDA tried to strengthen

the language of the warnings, precautions and adverse events included in the TDF labels, but

Gilead pushed back, reflecting very different approaches with respect to the seriousness of

these toxicities.[128]

111.    Finally, as discussed above, in documented meetings between Gilead and its

physician advisors, renal and bone toxicity was consistently mentioned. *See* ¶¶ 96-102.

---

[126] *See, e.g.*, Clinical Study Report For Study GS-99-903, August 2002, GILREG01789453 (48-week study results showing statistically significant bone mineral density loss for patients on TDF regimen than patients on non-TDF regimen); Clinical Study Report For Study GS-99-903, April 2004, GILREG01833666 (144-week study results showing statistically significant bone mineral density loss for patients on TDF regimen than patients on non-TDF regimen); Final Clinical Study Report For Study GS-99-903, March 2014, GILREG01418693 (final study results showing statistically significant bone mineral density loss for patients on TDF regimen than patients on non-TDF regimen).

[127] M. Hitchcock Dep. Tr. (September 30, 2020) at 57:16-22.

[128] September 17-19, 2008 Email Chain between Elizabeth Thompson (FDA), Dara Wambach, and others, GILREG00378640; July 2008 Email and Attachment from Elizabeth Thompson (FDA) to Nikki McMillan, GILREG00363955; Gilead Response To FDA Viread Labeling Comments, July 6, 2008, GILREG00364045, at 045-055.

- 43 -

Additional evidence of TDF toxicity also continued to emerge at major HIV conferences like CROI[129] and in the medical literature.[130]

112.    A reasonable pharmaceutical manufacturer could not have ignored this significant body of evidence regarding the renal and bone harms associated with TDF—including its own safety conclusions as documented in its CCSI—when assessing unmet patient need. By ignoring this safety information about TDF toxicity in "real world" patients, Gilead diverged from the analysis a reasonable pharmaceutical manufacture would have applied.

### 4.    Gilead treated renal and bone toxicity as a "perceived" issue not a real one.

113.    Rather than acknowledging that TDF was associated with the risk of renal and bone toxicity and proactively working to understand the need for a safer medication, Gilead worked to minimize the issue across multiple parts of the organization.

114.    For example, in March 2002, the FDA accused Gilead's sales representatives of minimizing important risk information and overstating the efficacy of Viread in promotional statements made within the first few months of launch.[131] More specifically, the FDA stated that Gilead made false and misleading statements by describing Viread as "extremely safe," with "no toxicities."[132] In July 2003, the FDA issued a warning letter to

---

[129] Truvada Project Team January 17, 2005 Meeting Minutes, GILTDF104500017464, at 465 (noting that Johns Hopkins, a major HIV treatment center, would be presenting a poster highlighting the results of a study showing a decline in kidney function in TDF patients).

[130] *See, e.g.*, November 3-4, 2005 email chain including James Rooney, Paul Klotman, and others, GILTDF109500423033, at 033-036 (discussing publication in *AIDS* scientific journal describing tubular toxicity observed in TDF patients); Kinai, Ei and Hideji Hanabusa, "Renal tubular toxicity associated with urine-beta 2 microglobulin, percentage of tubular reabsorption of phosphate and alkaline phosphatase levels," AIDS, Volume 19(17) (November 18, 2005), at 2031-33 (abstract of article described in email).

[131] *See* March 28, 2002 letter from FDA to Gilead, GILREG00374976 ("Gilead's representatives minimized important risk information for Viread and overstated its efficacy.").

[132] *Id.*

Gilead stating that "Gilead's sales representatives have repeatedly omitted or minimized

material facts regarding the safety profile of Viread . . . " and requiring Gilead to retrain its

sales force.[133] Other documents reflect that Gilead trained its sales representatives to

minimize renal toxicities through the use of "objection handlers."[134]

115.    Gilead was focused on its goal of becoming "the world-wide leader in

HIV,"[135] which meant positioning Viread and Emtriva as the "ideal backbone," maximizing

their market penetration to pave the way for the TDF/FTC FDC (later to be known as

Truvada), and then "encourag[ing] physicians to adopt a new treatment paradigm centered on

the ideal NRTI backbone."[136] As stated in the 2004 HIV Franchise Strategy, Gilead saw

significant opportunity there, as they held less than one-fifth of total NRTIs sales worldwide

in 2003, and the total NRTI market in just the key western markets was $3.2 billion.[137] They

did not see any significant competitive products in the pipeline that could challenge them,

though they considered GSK's ABC/3TC FDC tablet (Epzicom) to be the main competitive

threat.[138] The plan was for Viread and Emtriva to become the most prescribed molecules in

the global HIV market, and "leverage market position and co-formulation opportunities to

direct treatment paradigms."[139] In its 2005 franchise plan, Gilead's focus had shifted onto the

---

[133] FDA Warning Letter to Gilead, July 29, 2003, GILREG00375200, at 201-205.

[134] Objection Handler For Training Purposes, October 18, 2001, GILTDF108900271999, at 1999-2004; *see also* TAF Portfolio Payer Value Message Testing PowerPoint, dated December 9, 2014, GILTDF114306214114, at slide 2 (describing how objection handler provides "recommendations on how to overcome challenges").

[135] Global Positioning Strategy Plan, HIV Franchise 2004-2005, March 31, 2004, GILTDF110200947653, at 658.

[136] 2004 HIV Franchise Strategic Marketing Plan, September 2, 2003, GILTDF113103878372, at 395, 404.

[137] *See* Gilead Memorandum, HIV Business Review Recommendations, March 19, 2004, GILTDF108900271732, at 733.

[138] *See, e.g.*, Global Positioning Strategy Plan, HIV Franchise 2004-2005, March 31, 2004, GILTDF110200947653, at 665 ("GSK's ABC/3TC fixed dose tablet is the main competitive threat facing the Gilead HIV franchise in the near term.").

[139] Gilead Sciences Strategic Update, Presentation to Board of Directors, November 3, 2004, GILTDF113103878346, at slide 18.

recently launched Truvada, with the similar objective of it becoming "the most prescribed ARV brand."[140] TDF toxicity was a threat to Gilead's objective of market dominance.

116.    In marketing and strategic plans, Gilead identified long term safety as a risk for TDF, but did not develop a plan to better understand and communicate this risk.[141] Similarly, in other strategic plans, as well as Viread Project Team minutes, Gilead dismissed safety issues as competitive issues raised by GSK rather than real adverse events experienced by patients and reported by physicians.[142] Gilead addressed the "perception of renal toxicity" or the "perception of bone toxicity,"[143] focused on how to manage the "renal toxicity story."[144] Gilead "managed to handle" the renal competitive issue and in fact "*turned . . .* difficult [Key Opinion Leaders] in HIV who actually were experiencing substantive renal toxicity with their patients" by enlisting the help of internal and external "experts" who were employed by Gilead or at "arm's reach."[145]

117.    Gilead's treatment of TDF's risks merely as a messaging problem suggests a lack of integration between discussions about TDF safety that took place in Product Safety Committee and/or Core Safety Review Committee meetings and discussions about strategic

---

[140] HIV Franchise Commercial Plan 2006-2007, July 2005, GILTDF110200949939, at 943.

[141] *See* Viread 2003 Draft Market Plan, GILTDF113504154362, at 754, 76 (long-term safety identified as a "threat," and "key issue," respectively).

[142] *See* Draft 2004 HIV Franchise Strategic Marketing Plan, September 2003, GILTDF114004823840, at 860 (characterizing renal issues as merely a "competitive accusation" facing Viread).

[143] *See* June 30, 2006 HIV Franchise Commercial Plan, GILTDF103900005896, at 907 (weaknesses include "perception of risk of renal AE profile" and "perception of risk of bone mineral density declines"); July 2005 HIV Franchise Commercial Plan 2006-2007, GILTDF110200949939, at 949 (weaknesses and threats include "perceived" issues).

[144] *See* October 2005 Viread Project Team Executive Report, GILTDF106400200700 (addressing "Management of renal profile and misinformation"); Commercial Plan Kick-Off Meeting Minutes dated April 18, 2006, GILTDF111101649329, at 331 ("Renal concerns over TDF for certain patient types are not going away. We need to continue to proactively and carefully manage this internal risk."); *id.* at 332 ("One important issue when consolidating the Truvada success is carefully and proactively manage the renal profile of TDF. GSK is investing heavily on building up a renal toxicity story.").

[145] *See* October 30, 2008 Jim Meyers email, GILTDF112803278535 (emphasis added).

planning for TDF, even when these discussions and events happened in the same timeframe. For example, Gilead's May 1, 2004 HIV Strategy Development Plan contained no mention of any renal or bone toxicity with TDF[146] despite multiple prior CCSI and label changes and a May 7, 2004 CSRC meeting during which Gilead executives discussed potential renal and bone safety related changes to the CCSI.[147] Similarly, in April 2006, materials for an HIV Commercial Plan kick-off meeting implied that TDF renal issues were merely competitor-driven and the June 30, 2006 Commercial Plan referred to the "perception" of risk of renal toxicity and BMD declines, again implying that renal toxicity was not real. Yet, also on June 30, 2006, Gilead submitted another PSUR which informed the FDA that, on the basis of its review of safety signals arising from additional adverse event information, Gilead was adding more renal and bone adverse events associated with proximal renal tubulopathy to the TDF CCSI.[148]

118.    The fact that the frequent safety discussions of the PSC and CSRC were rarely referenced in the strategic, development, or marketing plans for TDF, which were typically reviewed at the Development Committee meetings, suggests a disregard for safety reporting especially since a number of Gilead executives participated in both sets of meetings.[149] There

---

[146] HIV Strategic Development Plan, May 1, 2004, GILTDF117308591985.

[147] PowerPoint, Core Safety Review Committee Meeting regarding Viread, May 7, 2004, GILTDF112303187205.

[148] *See* Viread PSUR dated June 30, 2006, GILREG02172070, at 078 ("As a result of this review, myopathy, associated with proximal renal tubulopathy, was added to the tenofovir DF CCSI," and "As a result of this review, osteomalacia, associated with proximal renal tubulopathy, was added to the tenofovir DF CCSI.").

[149] *See, e.g.*, Core Safety Review Committee April 16, 2003 Meeting Minutes, GILTDF114506395510 (Norbert Bischofberger, Mick Hitchcock, Jay Toole, Alan Taylor, and Gregg Alton all listed as CSRC members); Core Safety Review Committee August 9, 2006 Meeting Minutes, GILTDF114506394692 (same); Core Safety Review Committee April 11, 2006 Meeting Minutes, GILTDF114506395826 (same); *see also* Core Safety Review Committee June 20, 2003 Draft Meeting Minutes, GILTDF114506395508 (same); *see, e.g.*, Development Committee July 22, 2004 Meeting Executive Report, GILTDF106600206608 (Norbert Bischofberger, Mick Hitchcock, Jay Toole, Alan Taylor, and Gregg Alton all listed as Development Committee members); Development Committee September 23, 2004 Meeting Executive Report, GILTDF106600206626 (same).

appear to have been five Gilead executives who were, at some point at least, participants of both the Development Committee and the CSRC: Norbert Bischofberger, Alan Taylor, Greg Alton, Mick Hitchcock and Jay Toole. These people should have played a key role in ensuring the safety information was considered in the development of the plans for TDF and TAF.

119.    The safety and tolerability of a medicine is a key part of its product profile, and it is the duty of the pharmaceutical company to be transparent and proactive about the safety risks associated with their medicine. Had Gilead not minimized the risks of TDF, both internally and externally, a thorough evaluation of unmet need would have shown a clear need for a less toxic alternative to TDF, a need that TAF had the potential to address. A reasonable pharmaceutical manufacturer would have treated TDF toxicity as a real patient safety issue, incorporating all the evidence in its possession to fully understand unmet patient need. By minimizing the risks of TDF to serve its sales objectives, Gilead diverged from the analysis a reasonable pharmaceutical manufacturer would have applied.

**B.    Gilead's flawed ROI analysis drove TAF decision-making as its primary concern was that TAF not hurt TDF sales.**

120.    As previously stated, Return on Investment is a two-part equation: the costs on one side, and the revenues on the other.

**1.    Costs would not have been prohibitive.**

121.    The biggest element of costs in pharmaceutical development is clinical trials. However, a number of factors would have limited the cost of developing TAF. First, in HIV at the time of the development of TDF and TAF, the duration of clinical trials was relatively short, typically 24- or 48-weeks for regulatory approval (though they may have chosen to continue these trials for longer time period to gather long term data), since companies used surrogate markers to show efficacy. Such surrogate markers typically include the percent of patients achieving an undetectable viral load, and the increase in CD4 counts. The use of

surrogate markers rather than clinical endpoints (typically disease progression or death) meant that Gilead could have determined efficacy in a short timeframe, rather than in lengthy expensive trials. Second, HIV is a specialty disease area which requires much smaller sample sizes than medicines for general practice, such as lipid-lowering agents, that are used by high proportions of the population. Third, because TAF was a tenofovir prodrug like an approved medicine, TDF, much was already known about this type of medicine so the risk of unexpected findings and the need for additional unplanned studies was lower than it would have been for an entirely novel compound. In sum, clinical development costs for TAF would have been relatively predictable, and not prohibitively high.

122.    Other key components of costs are commercialization costs and manufacturing costs. Since TAF would enter the HIV market in which Gilead was already commercially active, commercial costs would have been relatively low since Gilead already had commercial infrastructure in place. In addition, because HIV is a specialty therapy area, it has a relatively low number of physicians that Gilead sales representatives and Medical Science Liaisons (MSLs) would already have been visiting.

123.    Regarding manufacturing costs, although Gilead wanted to optimize the synthesis of TAF for commercial scale up, the expected CoGS for TAF 75mg were less than half than that of TDF,[150] with room to further reduce costs long-term[151] which would have further improved the ROI for TAF versus TDF. Notably, Gilead executive William Lee

---

[150] March 19, 2004 HIV Business Review Recommendations GILTDF106400202035, at 036 ("Based on the current synthetic routes for GS-7340 and Viread, at a dose of 75 mg the cost of goods for GS-7340 at launch will be one-half that of Viread.").

[151] Draft 08-Apr-04 Development Plan GS-7340 Pre Proof of Concept (POC), GILTDF109700678861, at 870 ("Based on current synthesis of GS-7340-02 and anticipated improvements in process, the cost/kg at launch will be no more than twice that of Viread. At a dose of 75 mg, COGS for GS-7340 will be half that of Viread. There are likely to be more ways to optimize GS-7340-02 synthesis to reduce cost long-term than there are for tenofovir disoproxil fumarate.").

testified that TAF manufacturing issues were not a factor in Gilead's decision to stop TAF development in 2004.[152]

124.    In light of these considerations, it is highly unlikely that the costs for developing and commercializing TAF were prohibitive in 2004, and that this continued to be the case until 2010. In the decision making documents I have reviewed, I have not seen that the cost of the development of TAF was a driving factor in the decision to discontinue development.

### 2.    Gilead analyzed ROI without thoroughly assessing unmet patient need.

125.    As noted above, the other side of the ROI equation, expected revenues, is based in part on a company's assessment of unmet need. However, as discussed in Section V.A., Gilead ignored patient need for a safer tenofovir product. Gilead's unmet need, and by extension its ROI analysis, was clouded by its refusal to seriously consider any course of action that might cannibalize TDF sales or limit uptake of its new TDF-based FDCs.

126.    Early in the drug's development, Gilead recognized that TAF's "reduced systemic exposure to tenofovir when compared with Viread" could mean a "better safety profile" with "less drug related toxicity."[153] However, because Gilead expected that TAF would "eventually cannibalize most of Viread sales," it was "critical" that TAF had to be "more than a mere replacement for Viread."[154] As a result, Gilead determined that to proceed with TAF development, TAF had to deliver incremental sales over TDF by targeting a niche where TAF would not cannibalize TDF.

127.    In its August 2002 Preliminary Commercial Recommendation, Gilead determined that the key attribute TAF needed to demonstrate was increased potency, which it

---

[152] W. Lee Deposition Tr. at 463:6-15 (TAF manufacturing issue was not a factor in decision to discontinue TAF).

[153] Aug. 19, 2002, GS-7340 Preliminary Commercial Recommendation, GILTDF106400201367, at 369.

[154] *Id.*

arbitrarily defined as at least 1 log more than the viral reduction observed with TDF.[155] The results of study GS-120-1101 showed that TAF was equally if not more effective than TDF at lower doses, but TAF did not achieve the desired potency level.[156]

128.    Subsequently, Gilead continued to explore ways for TAF to generate revenue over and above TDF, including in salvage patients with treatment resistance.[157] However, even with this approach, Gilead remained concerned that TAF would cannibalize TDF and its TDF-based FDCs.[158]

129.    In April 2003, Gilead's Strategy Review Committee recommended that they stop TAF development due to the likelihood that TAF would ultimately cannibalize TDF

---

[155] *Id*. at 374.

[156] *See, e.g.*, GS-7340 Project Team Executive Report, June 2003, GILTDF106400201482 (regarding GS-120-1101 results, "Analysis of early decline in plasma HIV-RNA indicates that either dose of GS-7340 [50mg and 150 mg] is more potent than Tenofovir 300 mg," yet "[a]lthough a significant difference between GS-7340 and Viread arms was observed, the pre set target for the internal go decision, one log difference in viral load between Tenofovir and GS-7340, was not met."); *see also* GS-120-1101 Pharmacology Interim Results, September 27, 2003, GILTDF106600206837 ("Tenofovir is detectable within PBMC samples following a single 50 mg dose of GS-7340-02, appearing to result in higher drug concentrations within cells versus tenofovir DF 300 mg as evidenced by more detectable and quantifiable tenofovir concentrations within PBMC samples. These interim pharmacokinetic findings from the first 9 patients enrolled in this study support preclinical data that showed administration of GS-7340-02 results in circulation of GS-7340, a more stable prodrug of tenofovir, increasing systemic and cellular distribution of drug.").

[157] March 6, 2003 Email From Shay Weisbrich to Bill Lee and others, GILTDF110100841102 ("In a discussion with Bill on Monday regarding the high intra-cellular concentration achieved by 7340 (50 mg 7340 is 1/2 log more potent than 300 mg TDF) and the resultant favorable impact on resistance profile, we explored the possibility of positioning 7340 as a premium-priced, limited indication therapy developed for salvage only."); March 2004 PowerPoint entitled GS-7340 Development Assumptions, GILTDF111601879353 (discussing using TAF to treat salvage patients with treatment resistance); Memorandum, HIV Business Review Recommendations, March 19, 2004, GILTDF108900271732, at 732, 738 (addressing how GS-7340 could be developed as salvage product for treatment resistant patients).

[158] GS-7340 Development Assumptions, GILTDF111601879353, at slide 5 ("Investigators and patients will choose to use 7340 in treatment-naïve patients, thereby cannibalizing Viread and the combination formulation of TDF and FTC. This will be hard to prevent and we need to be prepared to proactively assess the implications/opportunities this presents.").

"regardless of its efficacy and safety profile."[159] Gilead's head of R&D, Norbert

Bischofberger, then tasked Gilead's Corporate Development team with exploring the

potential of TAF as "an IP extension strategy" for TDF.[160] If the "patent extension prove[d]

worthwhile, development of GS-7340 might resume."[161] Under this scenario, Gilead would

launch TAF two years before the patent expiry of TDF in 2017[162] and replace TDF with TAF

products that had four additional years of patent protection.[163] An initial commercial

assessment stated that TAF would generate significantly more revenue after the patent expiry

of TDF, whereas before 2017 it was assumed to only cannibalize TDF revenues.[164]

     130.    After Corporate Development transmitted its financial analysis of TAF as a

"tenofovir exclusivity extension" to the Development Committee (*see* ¶¶ 58-59, 65), that

scenario became the "base case" for TAF. (*See* ¶¶ 67, 85-86).

     131.    "Base case" is a term that is commonly used in drug development, and

represents the most likely scenario, or the expected outcome of the ongoing clinical trials, and

the product profile that will emerge from the expected results of those trials. Many companies

will produce a "base case," an "upside," and a "downside" and assign probabilities to the

achievement of each scenario. In all companies, the base case is the most likely scenario,

meaning it must have the highest probability of happening. The upside is achieved if the

study results are better than expected on at least one attribute, and downside is if the results

are not as good as expected on at least one attribute. In the case of TAF, it means that the

"Viread extension/replacement scenario" was the most likely scenario, with a higher

---

    [159] Development Committee April 17, 2003 Executive Report, GILTDF106400200094, at 095.

    [160] April 4, 2003 email from J. Choi to P. Virsik, GILTDF111001201107.

    [161] *Id.*

    [162] *Id.*

    [163] April 13, 2003 email and attachment from J. Choi to P. Virsik and others, GILTDF111601879276-78.

    [164] April 14, 2003 email from P. Virsik to J. Choi and others, GILTDF111601877971.

probability of being the outcome, and it implies that the other two strategic options were

upsides, so had a lower probability of being successful.[165]

132.    Armed with a calculation of the value of using TAF to extend Gilead's market

exclusivity over its tenofovir franchise, Gilead was now willing to consider TAF as a

replacement for Viread, but only if TAF development was "delayed" until the end of TDF's

life cycle to limit TAF's impact on TDF sales, including those of the TDF-based FDCs.[166]

133.    Earlier TAF development and launch would have jeopardized Gilead's

mission of establishing TDF as the foundation of all antiretroviral combinations. As stated

earlier, Gilead was very focused on launching Truvada and developing its first Single Tablet

Regimen (STR) with Atripla. If TAF development had continued at this time, its launch

would have reduced the ROI for Truvada and Atripla, as they would have had a shorter time

on the market before being cannibalized by TAF.

134.    Moreover, Gilead continuing to develop TAF would have raised awareness of

the toxicity issues with TDF,[167] which would have dampened the uptake of its TDF drugs and

given ammunition to its competitors at a time when Gilead was trying to establish Truvada as

---

[165] GS-7340 Development Assumptions, GILTDF111601879353, at slide 1 ("The base case represents development of GS-7340 as a strategy to extend the patent life of Viread by 4 years."); April 29, 2004 Development Committee Executive Report, GILTDF106400202091, at 092 (if TAF did not prove efficacious in treatment resistant patients, then TAF would "be developed but only to replace Viread and provide patent extension. The timing of development activities for this purpose, however, will require additional discussion.").

[166] GILTDF108900271721, at 724 (the "Base Case: Viread Patent Extension Strategy" assumed "there is still value to the company if GS-7340 development and launch can coincide with patent expiry of Viread, thus extending the life of our franchise. To maximize the life cycles of Viread and FDC the development of GS-7340 would be delayed until the end of the life cycle of TDF."); Sept. 16, 2004 GS-7340 Development Plan Update, GILTDF116607970990, at 997, 999, 004 (describing "delayed development" plan for "Viread extension/replacement scenario").

[167] Around this time Gilead was very careful about sharing any data on TAF through presentations to investigators and at scientific conferences. *See* Development Committee May 29, 2003 Executive Report, GILTDF106400201475, at 475-76; Development Committee December 18, 2003 Executive Report, GILTDF106600207044, at 046; GS-7340 Project Team Executive Report, June 2003, GILTDF106400201482.

- 53 -

the "ideal backbone" for all patients. Former Gilead CEO John Milligan confirmed this

during an analyst meeting in March 2011, stating: "One of the reasons we were concerned

about developing 7340 was that we were trying to launch Truvada versus Epzicom at that

time. And to have our own study suggesting that Viread wasn't the safest thing on the market,

which it certainly was at the time. It didn't seem like the best. It seemed like we would have a

mix message."[168]

135.    Gilead expressed the issue this way in a TAF development plan from 2010:

> "[T]he development of GS-7340 will highlight potential bone and renal issues
> with TDF. Gilead competitors in both HIV and HBV will use this information
> against all TDF-containing products while GS-7340 is being developed. This
> risk has decreased since TDF has become established in the market; however,
> the impact could be significant if GS-7340 were to fail."[169]

As this document indicates, the risk that TAF would negatively impact TDF ROI would have

been more acute in 2004, when Gilead was still trying to become the market leader.

136.    Of course, being a commercial company, Gilead needed to consider ROI and

explain their investment decisions to shareholders. But drug development decisions should be

and typically are made based on all the core factors, including unmet patient need, since

serving that need is the primary purpose of pharmaceutical companies.

137.    A reasonable pharmaceutical company would have developed a ROI analysis

based on a thorough assessment of unmet need, which would have considered the number of

patients who could not or should not take TDF due to concerns about renal and/or bone

toxicity; the fact that HIV was a chronic illness that required lifetime treatment; and the

likelihood that TDF risk would increase as patients aged while continuing long-term TDF

treatment.

---

[168] Gilead Sciences at RBC Capital Markets Healthcare Conference – Final, FD (Fair
Disclosure) Wire, Mar. 2, 2011.
[169] GS-7340 Development Plan, June 2010, GILTDF112102729574, at 579.

138.     Gilead, however, never did such an analysis as its conclusion was that TAF would hurt TDF sales "regardless of its safety and efficacy profile." Rather than conduct an analysis that would have to recognize some fault with TDF, Gilead chose to assume that TAF would add minimal incremental value beyond use as a patent extension strategy—even though its "delayed development" plan under the "Viread extension/replacement scenario" recognized that TAF's intracellular design had the potential to be less toxic to kidneys and bones.

139.     Moreover, Gilead failed to or refused to see how an improved renal and bone safety profile of TAF could have made TAF a stronger competitor against GSK's Epzicom, delivering additional market share (and therefore revenues) by eliminating the key downside to TDF, and consequently the entire Gilead HIV portfolio.

140.     By conducting a ROI analysis without a thorough assessment of unmet patient need, Gilead diverged from the analysis a reasonable pharmaceutical manufacturer would have applied.

**C.      Risk Assessment**

141.     In the case of TAF, both internal and external risks would have been on the lower end of the scale, since it was a precedented class of medicine, a tenofovir pro-drug related to another medicine that had already reached the market (TDF), and the HIV therapy area was very well known to Gilead.

142.     In terms of **internal** risks, the first one would be the risk of a safety finding that would cause the company to discontinue development. Based on my review of documents pertaining to the 9-month beagle toxicity study, these results warranted further investigation, but normally this would not have warranted a discontinuation of development. Indeed, in the July 2004 email stating that enrollment into GS-120-0103 had been delayed, Gilead stated that the significance of this high-dose finding was not clear, and it provided the

opportunity to re-assess the incremental value of TAF.[170] My opinion on this issue is supported by the fact that TAF had a better safety margin than TDF,[171] Gilead informed the FDA that it did not discontinue TAF development for safety reasons,[172] and Gilead cited the 9-month beagle toxicity study as being supportive of further clinical development.[173]

143.    However, as a general matter, regardless of the dog study, there is always some risk of an unexpected adverse event finding with any medicine, and this obviously reduces as the number of studies conducted and number of patients treated with the product increases. An alternative approach for a pharmaceutical company in the position would have been to conduct additional safety studies to reduce the risk of this happening, but ultimately the patient need for less toxic medicines should have overridden this (relatively low) risk.

144.    Regarding the risk of not achieving the desired CoGS due to the need for an improved synthesis process for TAF for the commercial scale up, a reasonable company, seeing the need and opportunity with TAF, would have initiated a project to solve this and bring the CoGS down to a reasonable level, as indeed Gilead planned to do before it stopped

---

[170] July 15, 2004 email, GILTDF116206729057.

[171] Development Committee January 22, 2004 Executive Report, GILTDF106400201924, at 925.

[172] Sept. 9, 2010 Gilead email to FDA re reactivating TAF IND, GILREG00684156.

[173] *E.g.*, Bischofberger Ex. 26, at 414 (on June 3, 2004: "The completed chronic studies (6-month rat and 9-month dog) support conduct of clinical studies beyond 48 weeks."); *id.* at 418 (draft report received, final targeted for July 2004); GILTDF103600005464, Lee's Jan. 12, 2008 email to CDC ("I should mention that we have all the chronic tox done in 2 species necessary to move this molecule rapidly back into clinical development."); GS-7340 Development Plan, June 2010, GILTDF112102729574, at 584-585 (noting findings from study in support of developing TAF); *see also* Sept. 9, 2010 Gilead email to FDA re reactivating TAF IND, GILREG00684156 (Gilead tells FDA "[t]here were no safety reasons for which Gilead decided to halt development of this molecule").

TAF development in 2004[174] and did do after it restarted TAF development in 2010.[175] In 2010, the daily API was down to less than half than that of TDF when comparing TAF 50mg (double the daily approved TAF dose) to TDF 300mg.[176] A reasonable company would not have discontinued development on this basis.[177]

145.    Given that TAF is a tenofovir pro-drug like the FDA-approved TDF, and the Phase I/II study GS-120-1101 successfully established "proof of concept"[178] and identified no new safety issues,[179] the probability of success would have been high, and risk of an unexpected event would have been low. When evaluating assets and making decisions around which products to develop and prioritize, it is typically the probability of success that significantly reduces the value of an investment. But that would not have been the case with TAF.

---

[174] *See, e.g.*, Draft Development Plan for GS-7340, Pre-Proof of Concept (POC), April 8, 2004, GILTDF109700678861, at 877 (in discussing development of TAF, document set forth a list of strategies that were under evaluation to achieve the process improvements that would reduce the COGs for TAF, including "[a]ttempts … to link the isomerization to selective crystallization of GS-7340. If successful, this dynamic kinetic resolution would eliminate the need for the costly chromatographic separation and most likely increase the overall yield.").

[175] *E.g.*, GS-7340 Development Plan, June 2010, GILTDF112102729574, at 587 ("Development of an improved and/or alternative synthetic process that is commercially viable can start as early as Jul[y] 2010 and continue in 2011. The targeted outcome is to simplify processing, obtain higher overall yield, and avoid the use of chromatography or identify means to recycle the incorrect diasteromer to provide reduced cost of goods.").

[176] PowerPoint, Comparison of 9131, 7340, and TDF, March 24, 2010, GILTDF112102375875, slide 4.

[177] W. Lee Tr. at 463:6-15 (TAF manufacturing issue was not a factor in decision to discontinue TAF).

[178] *See* Development Committee Executive Report, October 25, 2002, GILTDF106400199858, at 860-861 (John Martin noted how these results from the first study "clearly demonstrated the proof of concept that this formulation design produces increased drug concentrations in lymphoid tissues").

[179] *See, e.g.*, GS-7430 Project Team Executive Report, June 2003, GILTDF106400201482 (when discussing results from Phase I/II study, principal investigator notes that "[t]he safety profile of GS-7340 was clean, no grade III or IV AEs [adverse events] were observed, and most lab abnormalities were transient and mild to moderate in severity"); *see also* Development Committee Executive Report, January 22, 2004, GILTDF1064000201924, at 925 ("[t]he toxological profile for GS-7340 is similar to TDF").

146.     In terms of **external risks**, a reasonable company would have conducted a thorough competitor analysis to see what other drugs were likely being developed by other companies to meet the needs of HIV patients and physicians. Gilead did look regularly at the competitive landscape, both products on the market and those in development, as is demonstrated in their commercial plans.[180] The conclusion they drew was that there was no external threat to TDF on the horizon, so no risk to the revenues that TDF was forecasted to generate. As a result, Gilead may have felt no urgency to develop a product with an improved safety and efficacy profile. However, since there was not another product in development that could address the toxicity challenges with NRTIs, there would continue to be an unmet need and an opportunity for a less toxic NRTI, and therefore a good reason to develop TAF. Gilead should have made it a priority to develop TAF and TAF-based FDCs over developing further TDF-based FDCs, and ensure that patients had the opportunity to benefit from a safer medicine.

---

[180] *See, e.g.*, Viread Global Marketing Plan, October 19, 2001, GILTDF110000700636, at 649 ("stavudine [i.e., Zerit or d4T]-related mitochondrial toxicity leading to a loss of mitochondrial DNA is an issue that has been exploited"); *id.* at 650 (adverse events from Videx include "liver peripheral neuropathy, pancreatitis and other liver toxicities"); HIV Strategic Development Plan, May 1, 2004, GILTDF117308591985, at 006 (Truvada "will enjoy advantages in tolerability and safety", such as "anemia/fatigue versus AZT …"); Draft 2004 HIV Franchise Strategic Marketing Plan (2003), GILTDF113504154426, at 430 ("Additional strategies and tactics will focus on Viread and Emtriva benefits over AZT, d4T and 3TC in the areas of tolerability, efficacy, resistance, and PK profiles."); *id.* at 438 ("The most frequently discontinued NRTIs were stavudine [d4t] (66% for lactic acidosis/LD/PN), ddI (13% for nausea, vomiting, PN), AZT (13% for anemia/leukopenia) …"); *id.* at 451 ("When compared to stavudine, Viread provides superior safety in terms of cholesterol, triglycerides, and nucleoside-related toxicities."); Global Positioning Strategy Plan, HIV Franchise 2004-05, March 31, 2004, GILTDF110200947653, at 659 ("Core to our HIV franchise strategy will be to implement programs that drive proactive switching from older, less convenient and more toxic regimens to Viread/Emtriva-based regimens in early lines of therapy."); 2006–07 HIV Franchise Commercial Plan, GILTDF110200949939, at 945 ("d4T is no longer promoted" by Bristol Meyers Squibb "due to toxicity concerns").

**D.      Portfolio Fit**

147.      In 2003 and 2004, Gilead's stated mission was focused on advancing patient care through the development and commercialization of medicines.[181]

148.      Gilead recognized the need for treatments that would be safe for long-term use. It positioned Viread/Emtriva and Truvada as the antiretroviral (ARV) that simplified treatment and made combinations better and longer lasting, with better tolerability and safety versus alternatives such as d4T and AZT.

149.      Given the importance that Gilead placed on longer lasting ARVs, with better tolerability and safety, TAF would have been a good fit for the HIV portfolio in 2004, with the potential for lower risk of renal and bone toxicity, since TAF had a 5-10 fold better safety margin than TDF.[182] And given the infrastructure, experience, and relationships that Gilead already had in the market, it could have been a great addition to the portfolio at this time. Indeed, Gilead themselves did conclude this as they restarted the TAF development program in 2010. A safer ARV was in line with Gilead's mission and would have reinforced Gilead's commitment to the welfare of HIV patients. This would have been a significant factor in the decision making of a reasonable pharmaceutical manufacturer.

150.      Continuing TAF development would have also benefitted the portfolio by enabling Gilead to compete more effectively with Epzicom and gain an even larger share of the NRTI market. At this time, physicians generally considered Truvada (TDF+FTC) and Epzicom (ABC+3TC) to be roughly equivalent, in terms of efficacy and safety. Efficacy was

---

[181] Oct. 21, 2004 Gilead Press Release, GILTDF112102364378 ("Gilead Sciences is a biopharmaceutical company that discovers, develops and commercializes therapeutics to advance the care of patients suffering from life-threatening diseases worldwide."); PowerPoint, Global Regulatory Affairs Meeting, September 2003, GILTDF114306154228, at slide 14 (Gilead mission was "[t]o discover, develop and commercialize therapeutics that advance patient care, while challenging employees to make a difference and building a thriving worldwide enterprise.").

[182] Development Committee January 22, 2004 Executive Report, GILTDF106400201924, at 925.

similar, though each was associated with different types of adverse events. While Truvada was associated with renal and bone toxicity from TDF, Epzicom was associated with the risk of a hypersensitivity reaction and possible cardiovascular events.

151.    With an improved renal and bone safety profile, TAF could have given Gilead a significant advantage over GSK. Gilead considered GSK, and specifically Epzicom (ABC+3TC) to be a high competitive threat, as stated in the 2004 HIV Franchise Strategic Marketing Plan.[183] Gilead was highly sensitive to the fact that GSK was raising awareness of TDF's renal toxicity with physicians: "GSK has maintained the noise level around the renal profile of Viread, suggesting that patients are at increased risk of developing renal problems the longer they remain on Viread."[184] A reasonable company would have seen the opportunity with TAF to provide patients and physicians with a potentially safer medicine, obtain a clear competitive advantage over their key competitor GSK, and eliminate the key threat their business. Gilead failed to see this as they were so focused on a potential short-term loss of TDF revenues they could not, or refused to, see the longer term advantage of accelerating TAF, and building their portfolio on a foundation that could be safer for patients.

152.    From reviewing franchise strategy documents from that time, it is not the case that Gilead needed to invest in other, more promising, HIV antiretrovirals at this time, which were selected over TAF. Another NRTI product Gilead had in development, DAPD, did not have a very attractive product profile, in light of BID (two times a day) dosing and an unclear toxicity profile and Gilead put this program on hold in October 2003.[185] While Gilead was keen to enter into the "third agent" market, which was made up of Protease Inhibitors (PIs) and Non-Nucleoside Reverse Transcriptase Inhibitors (NNRTIs) at this time, they recognized

---

[183] 2004 HIV Franchise Strategic Marketing Plan, September 12, 2003, GILTDF114004823813, at 833-834.
[184] *Id.* at 833.
[185] Development Committee October 23, 2003 Executive Report, GILTDF109000286741, at 742-743.

that this would take several years, and while GS-9005 was a protease inhibitor at a similar stage of development as TAF, it had very poor bioavailability and therefore did not progress.[186] So the focus was on TDF, FTC and the FDC (that would become Truvada) at this time.[187]

153. While Gilead was focused on a FDC strategy, TAF could have been part of this strategy. In fact, Gilead considered studying TAF in combination with FTC in 2003/2004,[188] though it would ultimately not seek FDA approval for TAF/FTC (Descovy) until 2015[189]and would not receive FDA approval until 2016[190]—many, many years after Gilead first recognized the potential safety benefits of TAF over TDF.

154. My opinion on this issue is rooted in my experience as an executive at ViiV Healthcare. When I was Head of Commercial Strategy, we used the mission statement as a framework to develop the portfolio strategy to deliver on this mission. The mission statement guided our decisions about investments, prioritization, and business development activities.

155. As an example, in a comparable situation to what Gilead faced with TAF and TDF, in 2010-2011, we had to make a decision about what to do with a backup drug to dolutegravir (now marketed as Tivicay), called cabotegravir. At the time, dolutegravir was in Phase 3 of clinical development, and the data to support the efficacy, safety, and tolerability looked very strong. As an executive team, we had lengthy discussions about what to do with

---

[186] October 21, 2004 John Martin email to Gilead employees re Third Quarter Results, GILTDF112102364375.

[187] *E.g.*, HIV Strategic Development Plan, May 1, 2004, GILTDF117308591985, at GILTDF117308591988 ("it is important that Gilead continue to develop the product profiles of its current franchise of therapies, namely that of Viread, Emtriva and the Fixed Dose Combination of Viread and Emtriva (FDC) [Truvada]").

[188] *See* Gilead Memorandum, HIV Business Review Recommendations, March 19, 2004, GILTDF108900271732, at 732, 734-735.

[189] *See* FDA Approval Letter for Descovy, April 4, 2016, GILREG1094179 (noting that Descovy NDA was dated April 6, 2015 and received April 7, 2015).

[190] *See id.* at 179, 213 (Descovy approved for HIV treatment on April 4, 2016; *see also* Gilead Press Release, April 4, 2016, GILTDF111401853206.

the backup compound cabotegravir. We decided to conduct an evaluation of unmet patient need through market research with both physicians and patients, secondary data analysis, and input from HIV experts and patient advocates.

156.    We discovered that there were many patients who did not like taking medicines every day because it was a daily reminder of their HIV, and they feared that taking medication daily might expose their HIV status. In addition, there was a clear need for HIV prevention that women could control (as opposed to condoms). Since cabotegravir had a longer half-life (meaning it can be dosed less frequently than daily), we tasked the R&D team with exploring ways of developing a long-acting antiretroviral regimen with cabotegravir and studying cabotegravir as pre-exposure prophylaxis.

157.    When we did the commercial evaluation, it was clear that these new products were unlikely to deliver very high ROI, since they would only be applicable to small segments of the HIV population and the development program would be extensive and complex. In addition, we assessed that there would be a proportion of cannibalization, as cabotegravir would take some market share from dolutegravir. However, we felt that continued development was in line with our mission statement to leave no person living with HIV behind, and therefore the right thing to do. We also sought partnerships and collaborations with other organizations whose mission it was to develop methods for the prevention of transmission of HIV, since this was not an area of expertise for ViiV Healthcare at the time. It was a long and challenging R&D journey, but the FDA approved Vocabria (cabotegravir for treatment of HIV), Cabenuva (cabotegravir + rilpivirine for the treatment of HIV), and Apretude (cabotegravir for pre-exposure prophylaxis, which means prevention that is taken before the risk occurs) in 2021. We had a saying in ViiV Healthcare that came from the CEO, which was "To do well by doing good" and this was lived in the company.

158.    Gilead, in this situation, focused much more on the ROI and the impact on revenues—but even those analyses were flawed—and not enough on the impact on people living with HIV, which is what led them to discontinue TAF, and focus on market domination with TDF, with little regard to the toxicities it was causing patients.

159.    A reasonable pharmaceutical company would have taken a broader view that incorporated patient outcomes into this evaluation. A reasonable pharmaceutical company would have conducted a scenario planning exercise and commercial evaluation, comparing the ROI and patient outcomes of different development scenarios, such as maintaining their planned TDF based portfolio strategy, versus accelerating TAF, developing FDCs with TAF instead and thereby establishing TAF as the foundation of antiretroviral therapy and the Gilead HIV strategy. This may have resulted in a trade-off between achieving early TDF market dominance and slightly later market dominance with a safer TAF that was able to treat more patients and achieve better patient outcomes.

160.    To summarize, through a thorough evaluation of unmet need, including regular reviews of post-marketing adverse event reporting from TDF and the feedback received from HIV physicians and advisors, a reasonable pharmaceutical manufacturer would have been aware of the shortcomings of TDF's safety profile and would have recognized that there was significant need for TAF, especially as patients were living longer and receiving treatment for longer time periods. A reasonable company in Gilead's position would have had a lively discussion about the ROI and the impact on TDF-based drugs. But a reasonable company would have ultimately seen that more patients would have been able to be treated for longer time periods with TAF rather than TDF, and without the renal and bone toxicity of TDF. In addition, they would have prioritized the greater good of the patients over the potential slowing down in uptake of the TDF products. This would have supported Gilead's

- 63 -

stated mission and would have been the right thing to do for a pharmaceutical company in their position.

## VI.    CONCLUSIONS

161.    Gilead's decision making regarding the discontinuation of the development of TAF in 2004 was flawed, and not in accordance with their mission and not as would be expected from a reasonable pharmaceutical company developing medicines for HIV at this time.

162.    There were several omissions in the unmet need analysis that Gilead conducted in preparation for the development decision for TAF. They failed to consider the renal and bone toxicities that were very evident with TDF. While these were frequently brought to Gilead's attention by both HIV physicians and regulators, Gilead failed to take these seriously, and dismissed them as "perceived" toxicities, and primarily an issue raised by competitors.

163.    Consequently, the Return on Investment (ROI) was inaccurate due to the understated prevalence of toxicities with TDF. Furthermore, Gilead was distracted by an early conclusion that TAF would merely cannibalize TDF sales, and not deliver any incremental value.

164.    Gilead was singularly focused on establishing TDF, and specifically TDF/FTC (Truvada) as the ideal backbone and achieving the growth targets that had been set, and that the investment community expected.

165.    TAF was a risk to this, as conducting a study where TAF went head-to-head with TDF would have provided more evidence of the toxicity issues with TDF, which would have negatively impacted the sales of TDF (both as single agent and the TDF-based FDCs).

166.    Gilead failed to see the opportunity that TAF, with the potential to be safer than, and at least as efficacious as TDF, could have enabled them to be more competitive

- 64 -

versus GSK, gain more market share from Epzicom and eliminate the key downside to TDF and by extension the entire Gilead HIV portfolio.

167.    Gilead, however, recognized the impact that the loss of exclusivity on TDF in 2017 would have on its revenues, and TAF offered an opportunity to address that problem in the long-term. So, consistent with its "base case" scenario, Gilead delayed TAF development until the end of the TDF lifecycle when TAF's threat to TDF would be reduced.

168.    Gilead was so focused on achieving its market share growth and revenue targets for TDF that it failed to properly consider the impact of its decisions on the lives of people living with HIV, taking their medicines, and failed to stay true to their mission "to advance the care of patients."

Dated this 27th day of May, 2022.

_____
Saskia Fontein

# EXHIBIT A

# Saskia Fontein

saskia@saskiafontein.com · +44 7725 043672 · LinkedIn: https://www.linkedin.com/in/saskia-fontein-96a6884/

An experienced Life Sciences executive with an established track record of driving growth for new and established medicines across a range of therapy areas including HIV, COVID-19, rare diseases and vaccines. Highly skilled at developing creative portfolio and product strategies, integrating insights from a broad range of stakeholders and working closely with a cross-functional team to build successful engagement plans. Demonstrated success of building and leading agile, high-performing teams able to deliver results within dynamic and competitive markets.

**KEY SKILLS/CAPABILITIES**

- Experienced in managing business portfolios, P&Ls and delivering commercial growth
- In-depth knowledge of and widely networked within the Pharmaceutical and Life Sciences sectors
- Ability to develop creative approaches for shaping new market opportunities
- Proven leader able to set targets, build capabilities and motivate teams to deliver results
- Skilled influencer and negotiator, excellent communicator and adept at working across diverse cultures and markets

**EMPLOYMENT HISTORY**

**SASKIA FONTEIN CONSULTING LTD**                                    **Feb 2019 to date**
**Managing Director**
Established Independent Consulting Business to work with Pharma/Biotech companies on maximizing commercialization opportunities throughout the product lifecycle from early clinical development through to launch. Examples of projects include

- Developing the launch strategy for International Markets in rare disease for a medium sized, US-based pharmaceutical company, and establishing the global-to-local business planning process
- Operationalising a first EU launch for a US-based Biotech in oncology
- Conducting an early commercial assessment of an infectious disease portfolio and developing the portfolio strategy for a small, start-up Biotech
- Preparing for accelerated commercialisation of medicines to treat COVID-19 and planning for global access in a large pharmaceutical company

**GSK (GlaxoSmithKline)**                                              **2014 - 2018**
**Vice President and General Manager, GSK Denmark**                     **2017 - 2018**
Appointed to lead a Nordic Country team responsible for running the Pharmaceutical Business in Denmark. Key achievements include:

- Led two product launches, collaborating closely with the teams to harness ideas and refine strategies, resulting in above target sales for new products within 6 months
- Identified key partners and stakeholders within the market to successfully implement a turnaround in sales within the stagnant HIV medicines market, growing market share by 50% within 6 months
- Developed an innovative country strategy enabling the business to build on brand loyalty, successfully retaining market share against aggressive competition from a generic entry
- Reshaped and re-focused the sales teams to achieve a significant improvement in selling ability resulting in an industry leading team (44% versus 9% in previous year in "seeking commitment" as measured by STEM)
- Identified and focused on key levers for new product launches, creating novel digital "go to market" approaches
- Worked closely with top leadership team for Europe to align and refine strategies with overall commercial goals

**Vice President, Vaccines Commercialization Lead, Pneumococcal Vaccines (Belgium)**        **2014 – 2017**
Appointed to lead a cross-functional team responsible for in-market and pipeline pneumococcal vaccines. Key achievements include:

- Repositioned a mature vaccine, clarifying the value proposition for tender markets and aligning the teams behind it, resulting in 20% growth in sales
- Identified "must-win" markets, focusing the team to beat a dominant competitor in these markets
- Improved forecast accuracy and partnered with manufacturing and supply chain to reduce product write-offs and increase profitability

- Conducted successful negotiations with supranational organizations such as Gavi and PAHO, and agreed tech transfers with local manufacturers to unlock new markets
- Strengthened the team through targeted talent development and hands-on performance management

**ViiV Healthcare , UK**                                                                                              **2009 – 2014**
**Vice President, Head of Global Commercial Strategy**
Joined the founding Executive Team to establish ViiV Healthcare out of Pfizer/GSK to lead Global Commercial Strategy. Achievements included:

- Executed the integration and carve out of HIV portfolios from Pfizer and GSK to form a new independent company focused on HIV
- Led the turnaround of declining mature brands, restoring products to growth through repositioning and building focused sales teams
- Developed creative portfolio strategy focused on addressing patient needs and maximizing return to shareholders
- Drove development of innovative launch strategies for flagship products, working with key partners to achieve first year sales 200% ahead of plan in all key markets, followed by sustained growth
- Sought senior stakeholder approval through presentations to the board on portfolio and launch strategies
- Led the Global Market Access team to deliver clear value propositions and engage stakeholders to ensure prompt and broad access for ViiV medicines
- Championed the shift to digital/multichannel marketing, integrated with traditional marketing channels to enhance product awareness and understanding and increase customer engagement
- Led a patient centered approach resulting in ViiV Healthcare being voted #1 five years running on "Corporate reputation from a patient perspective" by Patient View
- Initiated and drove a culture change across the organization to a "challenger" culture resulting in faster decision making and higher employee engagement

**Pfizer Inc., NY USA**                                                                                              **2001 – 2009**
**Director/Team Leader, Anxiety/Imagabalin & Lead for Customer Insights, Primary Care**        **2009**
Promoted to Team Leader to prepare for launch of new Anxiety product. Partnered with R&D team and led communications following failure in Phase 3. Simultaneously led Customer Insights initiative.

**Director, Cardiovascular, US Marketing**                                                                     **2008 – 2009**
Appointed to US marketing team to lead the Cardiologist strategy and refresh the positioning and messaging for top selling brands, Lipitor and Caduet, based on customer insights, and successfully reinvigorated growth.

**Senior Manager → Director, HIV/AIDS, Worldwide Commercial Development**                       **2003 - 2007**
Promoted to Senior Manager, then to Director. Led commercial development and global launch of a new class of medicines and partnered with a diagnostics company to integrate a new diagnostic into clinical practice. Collaborated with Local Country Organizations to establish infrastructure for launch. Undertook a secondment in South Africa supporting a healthcare NGO providing HIV treatment in rural communities

**Manager, Global Market Analytics, New Product Development**                                          **2001 - 2003**
Joined Agouron, a Pfizer company in La Jolla CA to conduct analyses to evaluate HIV and other anti-virals in the pipeline, collaborating with the R&D team to design development strategies. Moved to NY as part of Agouron integration in 2003.

**Isis Research (now IPSOS), London UK**                                                                    **1996 – 2001**
**Research Executive → Research Manager → Group Head, HIV**
Joined graduate program at Isis Research, a global market research agency, and then focused on HIV. Upon promotion to Group Head, drove the HIV business for Isis Research, achieving 35% year on year growth.

**EDUCATION**
BSc (Hons) Human Sciences, Loughborough University

**ADDITIONAL INFORMATION**
Languages: English, Dutch, French, German
Interests: Research Volunteer for Alzheimer's Society, rowing and basketball (as a table official)

# EXHIBIT B

| PRODBEG |
| --- |
| GILREG00000001 |
| GILREG00138477 |
| GILREG00363733 |
| GILREG00363792 |
| GILREG00363910 |
| GILREG00363954 |
| GILREG00363955 |
| GILREG00364045 |
| GILREG00364142 |
| GILREG00364185 |
| GILREG00365122 |
| GILREG00365126 |
| GILREG00365370 |
| GILREG00373984 |
| GILREG00374891 |
| GILREG00374911 |
| GILREG00374976 |
| GILREG00375033 |
| GILREG00375191 |
| GILREG00375200 |
| GILREG00375207 |
| GILREG00375212 |
| GILREG00375236 |
| GILREG00375440 |
| GILREG00375629 |
| GILREG00375639 |
| GILREG00375659 |
| GILREG00375925 |
| GILREG00375938 |
| GILREG00376137 |
| GILREG00376142 |
| GILREG00376169 |
| GILREG00377756 |
| GILREG00377760 |
| GILREG00377793 |
| GILREG00378131 |
| GILREG00378136 |
| GILREG00378233 |
| GILREG00378635 |
| GILREG00378640 |
| GILREG00378646 |
| GILREG00378663 |
| GILREG00684156 |
| GILREG00727752 |
| GILREG00727802 |
| GILREG00890331 |
| GILREG00893772 |

| |
|---|
| GILREG00893897 |
| GILREG00905194 |
| GILREG00905762 |
| GILREG00905851 |
| GILREG00907180 |
| GILREG00909192 |
| GILREG00910824 |
| GILREG00914995 |
| GILREG00915025 |
| GILREG00916030 |
| GILREG00967765 |
| GILREG00968355 |
| GILREG00969078 |
| GILREG00969084 |
| GILREG00969603 |
| GILREG00970011 |
| GILREG00970013 |
| GILREG00970203 |
| GILREG01094179 |
| GILREG01305423 |
| GILREG01305662 |
| GILREG01305790 |
| GILREG01418693 |
| GILREG01508768 |
| GILREG01560920 |
| GILREG01621480 |
| GILREG01621857 |
| GILREG01630344 |
| GILREG01788241 |
| GILREG01789453 |
| GILREG01811247 |
| GILREG01831711 |
| GILREG01833666 |
| GILREG01841961 |
| GILREG01849230 |
| GILREG01849671 |
| GILREG01854823 |
| GILREG01856356 |
| GILREG01859579 |
| GILREG01863600 |
| GILREG01864112 |
| GILREG01871786 |
| GILREG01876806 |
| GILREG01879049 |
| GILREG01892340 |
| GILREG01914452 |
| GILREG01937193 |
| GILREG02024812 |

| |
|---|
| GILREG02027409 |
| GILREG02044079 |
| GILREG02055030 |
| GILREG02062837 |
| GILREG02063082 |
| GILREG02135632 |
| GILREG02140110 |
| GILREG02170442 |
| GILREG02172070 |
| GILREG02190485 |
| GILREG02208850 |
| GILREG02213209 |
| GILREG02213625 |
| GILREG02218317 |
| GILREG02370286 |
| GILREG02393224 |
| GILREG02394869 |
| GILREG02401583 |
| GILREG02438490 |
| GILREG02456731 |
| GILREG02456731 |
| GILREG02482812 |
| GILREG02493140 |
| GILREG02494979 |
| GILREG02495864 |
| GILREG02498833 |
| GILREG02499377 |
| GILREG02507781 |
| GILREG02530906 |
| GILREG02531103 |
| GILREG02549434 |
| GILREG02549583 |
| GILREG02550362 |
| GILREG02550487 |
| GILREG02569379 |
| GILTDF00000912 |
| GILTDF102900001133 |
| GILTDF102900001134 |
| GILTDF102900001142 |
| GILTDF102900001150 |
| GILTDF102900001188 |
| GILTDF103600005464 |
| GILTDF103600005467 |
| GILTDF103600005495 |
| GILTDF103900005795 |
| GILTDF103900005857 |
| GILTDF103900005896 |
| GILTDF103900005942 |

| |
|---|
| GILTDF103900005982 |
| GILTDF103900006032 |
| GILTDF103900006076 |
| GILTDF104100006212 |
| GILTDF104100007021 |
| GILTDF104100007210 |
| GILTDF104100009573 |
| GILTDF104100009615 |
| GILTDF104100009960 |
| GILTDF104100009964 |
| GILTDF104100009984 |
| GILTDF104100010022 |
| GILTDF104100010025 |
| GILTDF104100010444 |
| GILTDF104100010483 |
| GILTDF104100010889 |
| GILTDF104100010905 |
| GILTDF104100010921 |
| GILTDF104100010999 |
| GILTDF104100011044 |
| GILTDF104100011070 |
| GILTDF104100011086 |
| GILTDF104100011093 |
| GILTDF104100011117 |
| GILTDF104100011120 |
| GILTDF104100011131 |
| GILTDF104100011137 |
| GILTDF104100011154 |
| GILTDF104100011171 |
| GILTDF104100011391 |
| GILTDF104100011394 |
| GILTDF104100011646 |
| GILTDF104100011649 |
| GILTDF104100011668 |
| GILTDF104100011713 |
| GILTDF104100011716 |
| GILTDF104100011775 |
| GILTDF104100011779 |
| GILTDF104100011783 |
| GILTDF104100011796 |
| GILTDF104300013010 |
| GILTDF104300013011 |
| GILTDF104300013030 |
| GILTDF104300013068 |
| GILTDF104300013069 |
| GILTDF104300013070 |
| GILTDF104300013071 |
| GILTDF104300013072 |

| |
|---|
| GILTDF104300013073 |
| GILTDF104300013074 |
| GILTDF104500015007 |
| GILTDF104500017397 |
| GILTDF104500017399 |
| GILTDF104500017402 |
| GILTDF104500017405 |
| GILTDF104500017407 |
| GILTDF104500017410 |
| GILTDF104500017413 |
| GILTDF104500017419 |
| GILTDF104500017421 |
| GILTDF104500017423 |
| GILTDF104500017426 |
| GILTDF104500017428 |
| GILTDF104500017431 |
| GILTDF104500017435 |
| GILTDF104500017440 |
| GILTDF104500017442 |
| GILTDF104500017461 |
| GILTDF104500017464 |
| GILTDF104500017470 |
| GILTDF104500017476 |
| GILTDF104500017647 |
| GILTDF104500017659 |
| GILTDF104700023260 |
| GILTDF105000045000 |
| GILTDF105000045002 |
| GILTDF105000045005 |
| GILTDF105000045114 |
| GILTDF105000045117 |
| GILTDF105000045166 |
| GILTDF105000045170 |
| GILTDF105000045332 |
| GILTDF105000045336 |
| GILTDF105000045424 |
| GILTDF105000045441 |
| GILTDF105000045624 |
| GILTDF105000045627 |
| GILTDF105000045812 |
| GILTDF105000045816 |
| GILTDF105000045820 |
| GILTDF105000045981 |
| GILTDF105000045986 |
| GILTDF105000046177 |
| GILTDF105000046181 |
| GILTDF105000046314 |
| GILTDF105000046317 |

| |
|---|
| GILTDF105000046712 |
| GILTDF105000046717 |
| GILTDF105000046980 |
| GILTDF105000046982 |
| GILTDF105000046984 |
| GILTDF105000047572 |
| GILTDF105000047758 |
| GILTDF105000047874 |
| GILTDF105000047931 |
| GILTDF105200060037 |
| GILTDF105200060907 |
| GILTDF105200060912 |
| GILTDF105200060920 |
| GILTDF105200060922 |
| GILTDF105200060924 |
| GILTDF105200060942 |
| GILTDF105200060943 |
| GILTDF105200060948 |
| GILTDF105200060950 |
| GILTDF105200060952 |
| GILTDF105200060953 |
| GILTDF105200060954 |
| GILTDF105200061139 |
| GILTDF105200062200 |
| GILTDF105200074085 |
| GILTDF105300085005 |
| GILTDF105300085009 |
| GILTDF105300090981 |
| GILTDF105300091370 |
| GILTDF105300092899 |
| GILTDF105300092900 |
| GILTDF105300092903 |
| GILTDF105400098614 |
| GILTDF105400099687 |
| GILTDF105400099754 |
| GILTDF105400100843 |
| GILTDF105400103085 |
| GILTDF105400104090 |
| GILTDF105400117115 |
| GILTDF105400117118 |
| GILTDF105400117138 |
| GILTDF105500123184 |
| GILTDF105500123212 |
| GILTDF105800124890 |
| GILTDF105800124960 |
| GILTDF105800125048 |
| GILTDF105800125134 |
| GILTDF105800125337 |

| |
|---|
| GILTDF105800125545 |
| GILTDF105800125619 |
| GILTDF105800125720 |
| GILTDF105800125823 |
| GILTDF105800125971 |
| GILTDF105800126053 |
| GILTDF105800126156 |
| GILTDF105800126288 |
| GILTDF105800126409 |
| GILTDF105800126527 |
| GILTDF105800126653 |
| GILTDF105800126778 |
| GILTDF105800126909 |
| GILTDF105800127175 |
| GILTDF105800127276 |
| GILTDF105800127478 |
| GILTDF105800127683 |
| GILTDF105800127784 |
| GILTDF105800127886 |
| GILTDF105800127989 |
| GILTDF105800128186 |
| GILTDF105800128384 |
| GILTDF105800128589 |
| GILTDF105800128789 |
| GILTDF105800128988 |
| GILTDF105800129185 |
| GILTDF105800129382 |
| GILTDF105800129581 |
| GILTDF105800129777 |
| GILTDF106200184160 |
| GILTDF106200185018 |
| GILTDF106400199139 |
| GILTDF106400199140 |
| GILTDF106400199141 |
| GILTDF106400199142 |
| GILTDF106400199246 |
| GILTDF106400199247 |
| GILTDF106400199262 |
| GILTDF106400199712 |
| GILTDF106400199726 |
| GILTDF106400199729 |
| GILTDF106400199740 |
| GILTDF106400199771 |
| GILTDF106400199784 |
| GILTDF106400199799 |
| GILTDF106400199815 |
| GILTDF106400199858 |
| GILTDF106400199879 |

| |
|---|
| GILTDF106400199885 |
| GILTDF106400199900 |
| GILTDF106400199907 |
| GILTDF106400199937 |
| GILTDF106400199949 |
| GILTDF106400199953 |
| GILTDF106400199959 |
| GILTDF106400199963 |
| GILTDF106400200010 |
| GILTDF106400200018 |
| GILTDF106400200042 |
| GILTDF106400200045 |
| GILTDF106400200077 |
| GILTDF106400200094 |
| GILTDF106400200129 |
| GILTDF106400200162 |
| GILTDF106400200167 |
| GILTDF106400200177 |
| GILTDF106400200181 |
| GILTDF106400200199 |
| GILTDF106400200203 |
| GILTDF106400200209 |
| GILTDF106400200233 |
| GILTDF106400200235 |
| GILTDF106400200261 |
| GILTDF106400200267 |
| GILTDF106400200273 |
| GILTDF106400200313 |
| GILTDF106400200318 |
| GILTDF106400200351 |
| GILTDF106400200363 |
| GILTDF106400200382 |
| GILTDF106400200399 |
| GILTDF106400200478 |
| GILTDF106400200499 |
| GILTDF106400200532 |
| GILTDF106400200557 |
| GILTDF106400200616 |
| GILTDF106400200652 |
| GILTDF106400200700 |
| GILTDF106400200703 |
| GILTDF106400200740 |
| GILTDF106400200793 |
| GILTDF106400200842 |
| GILTDF106400200845 |
| GILTDF106400201203 |
| GILTDF106400201219 |
| GILTDF106400201271 |

| |
|---|
| GILTDF106400201287 |
| GILTDF106400201292 |
| GILTDF106400201312 |
| GILTDF106400201317 |
| GILTDF106400201335 |
| GILTDF106400201338 |
| GILTDF106400201363 |
| GILTDF106400201367 |
| GILTDF106400201397 |
| GILTDF106400201404 |
| GILTDF106400201420 |
| GILTDF106400201424 |
| GILTDF106400201475 |
| GILTDF106400201482 |
| GILTDF106400201496 |
| GILTDF106400201498 |
| GILTDF106400201512 |
| GILTDF106400201517 |
| GILTDF106400201546 |
| GILTDF106400201549 |
| GILTDF106400201556 |
| GILTDF106400201563 |
| GILTDF106400201583 |
| GILTDF106400201585 |
| GILTDF106400201603 |
| GILTDF106400201605 |
| GILTDF106400201621 |
| GILTDF106400201623 |
| GILTDF106400201633 |
| GILTDF106400201634 |
| GILTDF106400201646 |
| GILTDF106400201663 |
| GILTDF106400201665 |
| GILTDF106400201711 |
| GILTDF106400201713 |
| GILTDF106400201725 |
| GILTDF106400201727 |
| GILTDF106400201746 |
| GILTDF106400201749 |
| GILTDF106400201808 |
| GILTDF106400201811 |
| GILTDF106400201863 |
| GILTDF106400201924 |
| GILTDF106400201927 |
| GILTDF106400201930 |
| GILTDF106400201949 |
| GILTDF106400201963 |
| GILTDF106400201965 |

| |
|---|
| GILTDF106400201998 |
| GILTDF106400202002 |
| GILTDF106400202031 |
| GILTDF106400202035 |
| GILTDF106400202044 |
| GILTDF106400202059 |
| GILTDF106400202091 |
| GILTDF106400202100 |
| GILTDF106400202134 |
| GILTDF106400202165 |
| GILTDF106400202303 |
| GILTDF106400202345 |
| GILTDF106400202445 |
| GILTDF106400202512 |
| GILTDF106400202552 |
| GILTDF106400202566 |
| GILTDF106400202579 |
| GILTDF106400202629 |
| GILTDF106400202632 |
| GILTDF106400202750 |
| GILTDF106400202757 |
| GILTDF106400202915 |
| GILTDF106400202965 |
| GILTDF106400203048 |
| GILTDF106400203067 |
| GILTDF106400203073 |
| GILTDF106400203413 |
| GILTDF106400203590 |
| GILTDF106400203711 |
| GILTDF106600206376 |
| GILTDF106600206416 |
| GILTDF106600206420 |
| GILTDF106600206426 |
| GILTDF106600206459 |
| GILTDF106600206532 |
| GILTDF106600206542 |
| GILTDF106600206573 |
| GILTDF106600206601 |
| GILTDF106600206603 |
| GILTDF106600206608 |
| GILTDF106600206614 |
| GILTDF106600206617 |
| GILTDF106600206620 |
| GILTDF106600206623 |
| GILTDF106600206626 |
| GILTDF106600206635 |
| GILTDF106600206640 |
| GILTDF106600206655 |

| |
|---|
| GILTDF106600206677 |
| GILTDF106600206686 |
| GILTDF106600206690 |
| GILTDF106600206706 |
| GILTDF106600206719 |
| GILTDF106600206743 |
| GILTDF106600206837 |
| GILTDF106600206848 |
| GILTDF106600206892 |
| GILTDF106600206906 |
| GILTDF106600206930 |
| GILTDF106600206933 |
| GILTDF106600206983 |
| GILTDF106600207016 |
| GILTDF106600207031 |
| GILTDF106600207035 |
| GILTDF106600207044 |
| GILTDF106600207057 |
| GILTDF106600207082 |
| GILTDF106600207086 |
| GILTDF106600207110 |
| GILTDF106600207143 |
| GILTDF106600207149 |
| GILTDF106600207194 |
| GILTDF106600207195 |
| GILTDF106600207213 |
| GILTDF106600207232 |
| GILTDF106600207250 |
| GILTDF106600207394 |
| GILTDF106600207422 |
| GILTDF106600207584 |
| GILTDF106600207588 |
| GILTDF106600207756 |
| GILTDF106600207917 |
| GILTDF106600207994 |
| GILTDF106600208123 |
| GILTDF106600208234 |
| GILTDF106600208301 |
| GILTDF106600208306 |
| GILTDF106600208497 |
| GILTDF106600208747 |
| GILTDF106600208781 |
| GILTDF106800210630 |
| GILTDF107300221716 |
| GILTDF107400223383 |
| GILTDF107400223401 |
| GILTDF108200232405 |
| GILTDF108900237025 |

| |
|---|
| GILTDF108900237026 |
| GILTDF108900239425 |
| GILTDF108900239427 |
| GILTDF108900239691 |
| GILTDF108900239694 |
| GILTDF108900239696 |
| GILTDF108900241101 |
| GILTDF108900241164 |
| GILTDF108900245856 |
| GILTDF108900245857 |
| GILTDF108900250063 |
| GILTDF108900250064 |
| GILTDF108900259191 |
| GILTDF108900271720 |
| GILTDF108900271721 |
| GILTDF108900271731 |
| GILTDF108900271732 |
| GILTDF108900271864 |
| GILTDF108900271998 |
| GILTDF108900271999 |
| GILTDF108900280406 |
| GILTDF108900280409 |
| GILTDF108900281658 |
| GILTDF109000286741 |
| GILTDF109000286749 |
| GILTDF109000286753 |
| GILTDF109000286770 |
| GILTDF109000286774 |
| GILTDF109000286779 |
| GILTDF109000286907 |
| GILTDF109000286933 |
| GILTDF109000286979 |
| GILTDF109000287646 |
| GILTDF109000288449 |
| GILTDF109100289057 |
| GILTDF109200302843 |
| GILTDF109200303283 |
| GILTDF109200303284 |
| GILTDF109200311443 |
| GILTDF109200311444 |
| GILTDF109200311881 |
| GILTDF109200311883 |
| GILTDF109200311890 |
| GILTDF109200321033 |
| GILTDF109300326146 |
| GILTDF109300326153 |
| GILTDF109300326190 |
| GILTDF109300334428 |

| |
|---|
| GILTDF109400334559 |
| GILTDF109400334669 |
| GILTDF109400334670 |
| GILTDF109400334671 |
| GILTDF109400334672 |
| GILTDF109400335523 |
| GILTDF109500344689 |
| GILTDF109500360386 |
| GILTDF109500360389 |
| GILTDF109500361083 |
| GILTDF109500361085 |
| GILTDF109500361537 |
| GILTDF109500394906 |
| GILTDF109500394909 |
| GILTDF109500394910 |
| GILTDF109500423033 |
| GILTDF109500424558 |
| GILTDF109500424884 |
| GILTDF109500424888 |
| GILTDF109500424889 |
| GILTDF109500494445 |
| GILTDF109500497843 |
| GILTDF109500497847 |
| GILTDF109500498451 |
| GILTDF109500498541 |
| GILTDF109700565993 |
| GILTDF109700568487 |
| GILTDF109700568488 |
| GILTDF109700568534 |
| GILTDF109700592881 |
| GILTDF109700592882 |
| GILTDF109700592883 |
| GILTDF109700602858 |
| GILTDF109700604126 |
| GILTDF109700641548 |
| GILTDF109700641549 |
| GILTDF109700649601 |
| GILTDF109700650350 |
| GILTDF109700655368 |
| GILTDF109700678858 |
| GILTDF109700678861 |
| GILTDF109800680783 |
| GILTDF110000700634 |
| GILTDF110000700636 |
| GILTDF110100713875 |
| GILTDF110100713944 |
| GILTDF110100713948 |
| GILTDF110100768817 |

| |
|---|
| GILTDF110100768818 |
| GILTDF110100768819 |
| GILTDF110100769593 |
| GILTDF110100769594 |
| GILTDF110100769902 |
| GILTDF110100770712 |
| GILTDF110100770714 |
| GILTDF110100771184 |
| GILTDF110100813966 |
| GILTDF110100814352 |
| GILTDF110100817570 |
| GILTDF110100817571 |
| GILTDF110100840630 |
| GILTDF110100840631 |
| GILTDF110100841102 |
| GILTDF110100842090 |
| GILTDF110100846769 |
| GILTDF110100846909 |
| GILTDF110100847358 |
| GILTDF110100847360 |
| GILTDF110100847601 |
| GILTDF110100891934 |
| GILTDF110100892049 |
| GILTDF110100892053 |
| GILTDF110100892736 |
| GILTDF110100892737 |
| GILTDF110100942156 |
| GILTDF110200947249 |
| GILTDF110200947653 |
| GILTDF110200948294 |
| GILTDF110200949937 |
| GILTDF110200949938 |
| GILTDF110200949939 |
| GILTDF110200949979 |
| GILTDF110200949980 |
| GILTDF110200949981 |
| GILTDF110200949982 |
| GILTDF110200949983 |
| GILTDF110200949984 |
| GILTDF110200949985 |
| GILTDF110200949986 |
| GILTDF110200949987 |
| GILTDF110200949988 |
| GILTDF110200949992 |
| GILTDF110200949993 |
| GILTDF110200950011 |
| GILTDF110200950030 |
| GILTDF110200950031 |

| |
|---|
| GILTDF110200950032 |
| GILTDF110200950033 |
| GILTDF110200950071 |
| GILTDF110200950073 |
| GILTDF110200950075 |
| GILTDF110200950076 |
| GILTDF110200950087 |
| GILTDF110200950088 |
| GILTDF110200950100 |
| GILTDF110200950101 |
| GILTDF110200950102 |
| GILTDF110200950103 |
| GILTDF110200950115 |
| GILTDF110200950116 |
| GILTDF110200950124 |
| GILTDF110200950125 |
| GILTDF110200950136 |
| GILTDF110200950137 |
| GILTDF110200950149 |
| GILTDF110200950150 |
| GILTDF110200950151 |
| GILTDF110200950152 |
| GILTDF110200950154 |
| GILTDF110200950155 |
| GILTDF110400956986 |
| GILTDF110500995347 |
| GILTDF110500995348 |
| GILTDF110500995350 |
| GILTDF110500995351 |
| GILTDF110501033133 |
| GILTDF110501033418 |
| GILTDF110501040617 |
| GILTDF110601045264 |
| GILTDF110601055147 |
| GILTDF110601059371 |
| GILTDF110601130075 |
| GILTDF110601130174 |
| GILTDF110601135475 |
| GILTDF110601135628 |
| GILTDF110801149241 |
| GILTDF110801149243 |
| GILTDF110801149244 |
| GILTDF110801149274 |
| GILTDF110801149275 |
| GILTDF110801149276 |
| GILTDF110801149278 |
| GILTDF110801149280 |
| GILTDF110801149281 |

| |
|---|
| GILTDF110801149283 |
| GILTDF110801149285 |
| GILTDF110801149287 |
| GILTDF110801149290 |
| GILTDF110801149292 |
| GILTDF110801149294 |
| GILTDF110801149295 |
| GILTDF110801149297 |
| GILTDF110801149299 |
| GILTDF110801149301 |
| GILTDF110801149303 |
| GILTDF110801149304 |
| GILTDF110801149306 |
| GILTDF110801149307 |
| GILTDF110801149308 |
| GILTDF110801149310 |
| GILTDF110801149311 |
| GILTDF110801149313 |
| GILTDF110801149315 |
| GILTDF110801149316 |
| GILTDF110801149318 |
| GILTDF110801149319 |
| GILTDF110801149320 |
| GILTDF110801149322 |
| GILTDF110801149324 |
| GILTDF110801149325 |
| GILTDF110801149327 |
| GILTDF110801149328 |
| GILTDF110801149330 |
| GILTDF110801149331 |
| GILTDF110801149333 |
| GILTDF110801149334 |
| GILTDF110801149336 |
| GILTDF110801149337 |
| GILTDF110801149339 |
| GILTDF110801149341 |
| GILTDF110801149342 |
| GILTDF110801149344 |
| GILTDF110801149345 |
| GILTDF110801149347 |
| GILTDF110801149349 |
| GILTDF110801149350 |
| GILTDF110801149351 |
| GILTDF110801149353 |
| GILTDF110801149355 |
| GILTDF110801149357 |
| GILTDF110801149359 |
| GILTDF110801149361 |

| |
|---|
| GILTDF110801149362 |
| GILTDF110801149364 |
| GILTDF110801149366 |
| GILTDF110801149368 |
| GILTDF110801149370 |
| GILTDF110801149372 |
| GILTDF110801149374 |
| GILTDF110801149375 |
| GILTDF110801149377 |
| GILTDF110801149378 |
| GILTDF110801149379 |
| GILTDF110801149380 |
| GILTDF110801149382 |
| GILTDF110801149383 |
| GILTDF110801149385 |
| GILTDF110801149386 |
| GILTDF110801149392 |
| GILTDF110801149393 |
| GILTDF110801149406 |
| GILTDF110801149407 |
| GILTDF110801149424 |
| GILTDF110801149425 |
| GILTDF110801149443 |
| GILTDF110801149444 |
| GILTDF110801149459 |
| GILTDF110801149460 |
| GILTDF111001201081 |
| GILTDF111001201082 |
| GILTDF111001201107 |
| GILTDF111001201109 |
| GILTDF111001248439 |
| GILTDF111001476300 |
| GILTDF111001494306 |
| GILTDF111001497356 |
| GILTDF111001497358 |
| GILTDF111001497854 |
| GILTDF111001497855 |
| GILTDF111001547250 |
| GILTDF111001566468 |
| GILTDF111001567239 |
| GILTDF111001617626 |
| GILTDF111001617672 |
| GILTDF111001619219 |
| GILTDF111101648650 |
| GILTDF111101649329 |
| GILTDF111101660484 |
| GILTDF111101660485 |
| GILTDF111101805599 |

| |
|---|
| GILTDF111101814427 |
| GILTDF111101836741 |
| GILTDF111401853206 |
| GILTDF111601877971 |
| GILTDF111601879276 |
| GILTDF111601879278 |
| GILTDF111601879352 |
| GILTDF111601879353 |
| GILTDF111601879354 |
| GILTDF111601879355 |
| GILTDF111601879356 |
| GILTDF111601879357 |
| GILTDF111601879358 |
| GILTDF111601879508 |
| GILTDF111601879509 |
| GILTDF111601918927 |
| GILTDF111601933236 |
| GILTDF111601933237 |
| GILTDF111602020236 |
| GILTDF111602068298 |
| GILTDF111602068299 |
| GILTDF111602068309 |
| GILTDF111602068310 |
| GILTDF111602073305 |
| GILTDF111602073306 |
| GILTDF111602075742 |
| GILTDF111602075743 |
| GILTDF111602115008 |
| GILTDF111602115009 |
| GILTDF111602264512 |
| GILTDF112102364375 |
| GILTDF112102364377 |
| GILTDF112102364378 |
| GILTDF112102373100 |
| GILTDF112102373101 |
| GILTDF112102375874 |
| GILTDF112102375875 |
| GILTDF112102377053 |
| GILTDF112102377055 |
| GILTDF112102416263 |
| GILTDF112102457585 |
| GILTDF112102472286 |
| GILTDF112102639803 |
| GILTDF112102639805 |
| GILTDF112102664019 |
| GILTDF112102720475 |
| GILTDF112102720476 |
| GILTDF112102729572 |

| |
|---|
| GILTDF112102729574 |
| GILTDF112102729594 |
| GILTDF112102733113 |
| GILTDF112102733115 |
| GILTDF112102733135 |
| GILTDF112102734911 |
| GILTDF112102734912 |
| GILTDF112102879857 |
| GILTDF112102879859 |
| GILTDF112103074483 |
| GILTDF112103147302 |
| GILTDF112103147303 |
| GILTDF112103149892 |
| GILTDF112103149893 |
| GILTDF112103149894 |
| GILTDF112103150252 |
| GILTDF112303166328 |
| GILTDF112303166329 |
| GILTDF112303166352 |
| GILTDF112303167099 |
| GILTDF112303167125 |
| GILTDF112303167623 |
| GILTDF112303168418 |
| GILTDF112303169035 |
| GILTDF112303169336 |
| GILTDF112303169411 |
| GILTDF112303169544 |
| GILTDF112303169647 |
| GILTDF112303185100 |
| GILTDF112303185241 |
| GILTDF112303187205 |
| GILTDF112603217068 |
| GILTDF112803244213 |
| GILTDF112803244241 |
| GILTDF112803244343 |
| GILTDF112803264727 |
| GILTDF112803264730 |
| GILTDF112803266501 |
| GILTDF112803266502 |
| GILTDF112803269656 |
| GILTDF112803269657 |
| GILTDF112803273353 |
| GILTDF112803278535 |
| GILTDF112803281106 |
| GILTDF112803384619 |
| GILTDF112803384620 |
| GILTDF112803384621 |
| GILTDF112803384622 |

| |
|---|
| GILTDF112803384623 |
| GILTDF112803384624 |
| GILTDF112803384625 |
| GILTDF112803530043 |
| GILTDF112803563942 |
| GILTDF112803750916 |
| GILTDF112803750917 |
| GILTDF112803750918 |
| GILTDF112803750919 |
| GILTDF112803750920 |
| GILTDF112803750921 |
| GILTDF112803750922 |
| GILTDF112803781841 |
| GILTDF112803781842 |
| GILTDF112803781843 |
| GILTDF112803781844 |
| GILTDF112803781845 |
| GILTDF112803781846 |
| GILTDF112803781847 |
| GILTDF112803781848 |
| GILTDF112803781849 |
| GILTDF112803781850 |
| GILTDF112803781851 |
| GILTDF112803781968 |
| GILTDF112803781969 |
| GILTDF112803781970 |
| GILTDF112803804317 |
| GILTDF112803804363 |
| GILTDF112803804380 |
| GILTDF112803804438 |
| GILTDF112803804447 |
| GILTDF112803804476 |
| GILTDF112803804494 |
| GILTDF112803804502 |
| GILTDF112803804507 |
| GILTDF112803804511 |
| GILTDF112803804526 |
| GILTDF112803804531 |
| GILTDF112803804553 |
| GILTDF112803804561 |
| GILTDF112803804567 |
| GILTDF112803807939 |
| GILTDF112803808183 |
| GILTDF112803811265 |
| GILTDF113103878346 |
| GILTDF113103878370 |
| GILTDF113103878372 |
| GILTDF113103878446 |

| |
|---|
| GILTDF113103878447 |
| GILTDF113103878448 |
| GILTDF113103878449 |
| GILTDF113103878450 |
| GILTDF113103878451 |
| GILTDF113103878452 |
| GILTDF113103878453 |
| GILTDF113103878514 |
| GILTDF113104018667 |
| GILTDF113104018668 |
| GILTDF113504154362 |
| GILTDF113504154363 |
| GILTDF113504154364 |
| GILTDF113504154365 |
| GILTDF113504154366 |
| GILTDF113504154367 |
| GILTDF113504154368 |
| GILTDF113504154369 |
| GILTDF113504154370 |
| GILTDF113504154371 |
| GILTDF113504154372 |
| GILTDF113504154373 |
| GILTDF113504154426 |
| GILTDF113604607459 |
| GILTDF113804782624 |
| GILTDF113804782625 |
| GILTDF113804782626 |
| GILTDF113804782627 |
| GILTDF113804782880 |
| GILTDF113804782882 |
| GILTDF113804782952 |
| GILTDF113804795068 |
| GILTDF113804795513 |
| GILTDF113804795541 |
| GILTDF114004822698 |
| GILTDF114004822700 |
| GILTDF114004822701 |
| GILTDF114004822702 |
| GILTDF114004822703 |
| GILTDF114004822704 |
| GILTDF114004823789 |
| GILTDF114004823790 |
| GILTDF114004823791 |
| GILTDF114004823792 |
| GILTDF114004823793 |
| GILTDF114004823794 |
| GILTDF114004823795 |
| GILTDF114004823796 |

| |
|---|
| GILTDF114004823797 |
| GILTDF114004823813 |
| GILTDF114004823838 |
| GILTDF114004823839 |
| GILTDF114004823840 |
| GILTDF114004823916 |
| GILTDF114004823917 |
| GILTDF114004823918 |
| GILTDF114004823919 |
| GILTDF114004823920 |
| GILTDF114004823921 |
| GILTDF114004823922 |
| GILTDF114004823923 |
| GILTDF114004826606 |
| GILTDF114004854242 |
| GILTDF114004854244 |
| GILTDF114005074637 |
| GILTDF114005074638 |
| GILTDF114005074673 |
| GILTDF114005146601 |
| GILTDF114005766548 |
| GILTDF114005766561 |
| GILTDF114005769216 |
| GILTDF114205887665 |
| GILTDF114205887926 |
| GILTDF114205889573 |
| GILTDF114305903202 |
| GILTDF114305903259 |
| GILTDF114305904419 |
| GILTDF114305920825 |
| GILTDF114305920827 |
| GILTDF114305920828 |
| GILTDF114305920831 |
| GILTDF114305931500 |
| GILTDF114305931502 |
| GILTDF114305931568 |
| GILTDF114305932852 |
| GILTDF114305941663 |
| GILTDF114305970551 |
| GILTDF114305970552 |
| GILTDF114305974437 |
| GILTDF114305974439 |
| GILTDF114305974440 |
| GILTDF114305974441 |
| GILTDF114305974442 |
| GILTDF114305974689 |
| GILTDF114305974691 |
| GILTDF114305974692 |

| |
|---|
| GILTDF114305974853 |
| GILTDF114305974855 |
| GILTDF114305974943 |
| GILTDF114305974944 |
| GILTDF114305974945 |
| GILTDF114305974946 |
| GILTDF114305974947 |
| GILTDF114306081772 |
| GILTDF114306081773 |
| GILTDF114306126682 |
| GILTDF114306126684 |
| GILTDF114306126685 |
| GILTDF114306154228 |
| GILTDF114306168065 |
| GILTDF114306168066 |
| GILTDF114306168082 |
| GILTDF114306214114 |
| GILTDF114306307989 |
| GILTDF114306307990 |
| GILTDF114506394692 |
| GILTDF114506394694 |
| GILTDF114506394789 |
| GILTDF114506394793 |
| GILTDF114506395508 |
| GILTDF114506395510 |
| GILTDF114506395826 |
| GILTDF114506395842 |
| GILTDF114706401852 |
| GILTDF114706405572 |
| GILTDF114706405573 |
| GILTDF114706407670 |
| GILTDF114706407671 |
| GILTDF114706407672 |
| GILTDF114706408065 |
| GILTDF114706408066 |
| GILTDF114706410959 |
| GILTDF114706411111 |
| GILTDF114706411113 |
| GILTDF114706422003 |
| GILTDF114706422004 |
| GILTDF114706424166 |
| GILTDF115006512077 |
| GILTDF115006517248 |
| GILTDF115006612727 |
| GILTDF115006636015 |
| GILTDF115006636083 |
| GILTDF116206729057 |
| GILTDF116206731490 |

| |
|---|
| GILTDF116206731497 |
| GILTDF116206731502 |
| GILTDF116206731505 |
| GILTDF116206731515 |
| GILTDF116206731520 |
| GILTDF116206731521 |
| GILTDF116206731525 |
| GILTDF116307102598 |
| GILTDF116307102599 |
| GILTDF116307102669 |
| GILTDF116307103150 |
| GILTDF116307103151 |
| GILTDF116307103182 |
| GILTDF116307131380 |
| GILTDF116307131382 |
| GILTDF116307131383 |
| GILTDF116307150834 |
| GILTDF116507191750 |
| GILTDF116507191751 |
| GILTDF116507302031 |
| GILTDF116507698036 |
| GILTDF116507752850 |
| GILTDF116507752868 |
| GILTDF116607876746 |
| GILTDF116607968302 |
| GILTDF116607968303 |
| GILTDF116607968309 |
| GILTDF116607968311 |
| GILTDF116607968312 |
| GILTDF116607968313 |
| GILTDF116607968314 |
| GILTDF116607970987 |
| GILTDF116607970988 |
| GILTDF116607970990 |
| GILTDF116607971005 |
| GILTDF116607971109 |
| GILTDF117008294224 |
| GILTDF117008294228 |
| GILTDF117308403965 |
| GILTDF117308591985 |
| GILTDF117408605615 |
| GILTDF117408605616 |
| GILTDF117408605706 |
| GILTDF117408605751 |
| GILTDF117408605752 |
| GILTDF117408605753 |
| GILTDF117408605792 |
| GILTDF117408605838 |

| |
|---|
| GILTDF117408605870 |
| GILTDF117408605871 |
| GILTDF118608763985 |
| GILTDF118608766597 |
| GILTDF123208826066 |
| GILTDF123208826263 |
| GILTDF123208826461 |
| GILTDF123208826629 |
| GILTDF123208826729 |
| GILTDF123208826830 |
| GILTDF123208826932 |
| GILTDF123208827129 |
| GILTDF123208827326 |
| GILTDF123208827520 |
| GILTDF123208827718 |
| GILTDF123208827915 |
| GILTDF123208828080 |
| GILTDF123208828204 |
| GILTDF123208828404 |
| GILTDF123208828604 |
| GILTDF123208828804 |
| GILTDF123208829002 |
| GILTDF123208829199 |
| GILTDF123208829396 |
| GILTDF123208829594 |
| GILTDF123208829791 |
| GILTDF123208829989 |
| GILTDF123208830186 |
| GILTDF123208830383 |
| GILTDF123208830580 |
| GILTDF123208830696 |
| GILTDF124008832193 |
| GILTDF222000094463 |
| GILTDF222000094470 |
| Gilead Sciences at RBC Capital Markets Healthcare Conference – Final, FD (Fair Disclosure) Wire, Mar. 2, 2011. |