# EXHIBIT E

Meredith B. Rosenthal, Ph.D.

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                   No. 4:18-cv-06972-JST

4    ***********************************

5    ADRIAN HOLLEY, et al,

6                   Plaintiffs,

7         v.

8    GILEAD SCIENCES, INC.,

9                   Defendant.

10

     THIS DOCUMENT RELATES TO:  All cases.

11

     ***********************************

12

13           Remote via Zoom Videotaped

14   Deposition of MEREDITH B. ROSENTHAL, Ph.D,

15   commencing at 10:02 a.m., on the 3rd of

16   August, 2022, before Maureen O'Connor

17   Pollard, Registered Diplomate Reporter,

18   Realtime Systems Administrator, Certified

19   Shorthand Reporter, Notary Public.

20

21                   – – –

22

            GOLKOW LITIGATION SERVICES

23                877.370.DEPS

               deps@golkow.com

24

25

```
 1   REMOTE APPEARANCES:
 2

     HILLIARD MARTINEZ GONZALES LLP
 3   BY:   BENJAMIN R. O'CONNOR, ESQ.
           719 S. Shoreline Blvd.
 4         Corpus Christi, Texas 78401
           361-520-4398
 5         boconnor@hmglawfirm.com
           Representing the Plaintiffs
 6

 7   PROSKAUER ROSE LLP
     BY:   KYLE A. CASAZZA, ESQ.
 8   BY:   SUSAN L. GUTIERREZ, ESQ.
           2029 Century Park East, Suite 2400
 9         Los Angeles, California 90067-3010
           310-284-5677
10         kcasazza@proskauer.com
           Representing the Defendant
11

12   PROSKAUER ROSE LLP
     BY:   GOURDIN W. SIRLES, ESQ.
13         One International Place
           Boston, Massachusetts 02110-2600
14         617-526-9482
           gsirles@proskauer.com
15         Representing the Defendant
16

17   Videographer: Danny Ortega
18

     Trial Technician: Derek Hehn, Immersion Legal
19

20

21

22

23

24

25
```

```
 1                    INDEX
 2   EXAMINATION                        PAGE
 3   MEREDITH B. ROSENTHAL, PHD
 4   BY MR. CASAZZA                        7
 5
 6
 7                 E X H I B I T S
 8   NO.          DESCRIPTION            PAGE
```

```
 9   1      Report of Meredith Rosenthal,
            Ph.D. In Support of Gilead
10          Personal Injury Litigation........  19
11   2      July 13, 2010 Memo, Bates
            GILTDF109300326146 through
12          109300326152....................   92
13   3      September 18, 2003 Memo, Re:
            Financial Analysis of GS-7340 as
14          a Tenofovir Exclusivity
            Extension, Bates
15          GILTDF106400200181 through
            106400200188....................  101
16
     4      4/17/2003 e-mail with
17          attachments, Bates
            GILTDF115006639141 through
18          115006639143....................  147
19   5      E-mail chain, Bates
            GILTDF111001201107 and
20          111001201108....................  169
21   6      Gilead GS-7340 Key Development
            Assumptions, R&D State Products,
22          2003 Business Review, Bates
            GILTDF106400201449 through
23          106400201463....................  170
24   7      E-mail chain, Bates
            GILTDF111601877971 and
25          111601877972....................  176
```

Meredith B. Rosenthal, Ph.D.

```
 1

    8      E-mail chain, Bates
 2             GILTDF111601879352................    181
 3   9      PowerPoint, GS-7340 Development
               Assumptions......................    183
 4
    10      March 4, 2004 Memo, Bates
 5             GILTDF108900271721 through
               108900271730.....................    193
 6
    11      March 19, 2004 Memo Re: HIV
 7             Business Review Recommendations,
               Bates GILTDF112803268474 through
 8             112803268482.....................    198
 9   12      Development Committee Executive
               Report, 17 April 2003, Bates
10             GILTDF1064002000094 through
               106400200096.....................    209
11
    13      GS-7340 Development Plan Update,
12             September 16, 2004, Bates
               GILTDF116607970990 through
13             116607971004.....................    219
14   14      Gilead Sciences, Inc., Form 10-K
               for the fiscal year ended
15             December 31, 2014................    276
16   15      Gilead Sciences, Inc. Form 10-K
               for the fiscal year ended
17             December 31, 2016................    298
18   16      Invoice from Greylock McKinnon
               Associates, Bates ROSENTHAL
19             000004 through 9.................    314
20   17      Darius N. Lakdawalla, PhD's July
               13, 2022 Expert Report...........    319
21

22

23

24

25
```

Meredith B. Rosenthal, Ph.D.

```
 1                    -   -   -

              DEPOSITION SUPPORT INDEX
 2                    -   -   -

 3

     Direction to Witness Not to Answer
 4   PAGE  LINE
     None.
 5

 6

 7

 8   Request for Production of Documents
     PAGE  LINE
 9   None.
10

11

     Stipulations
12   PAGE  LINE
     None.
13

14

15   Questions Marked Highly Confidential
     PAGE  LINE
16   None.
17

18

19

20

21

22

23

24

25
```

Meredith B. Rosenthal, Ph.D.

```
 1            P R O C E E D I N G S

 2

 3            THE VIDEOGRAPHER:  We are now

 4      on the record.  My name is Danny

 5      Ortega, and I'm the legal videographer

 6      for Golkow Litigation Services.

 7            Today's date is August 3rd,

 8      2022, and the time is 10:02 a.m.

 9            This video deposition is being

10      held in the matter of Gilead, TDF,

11      Adrian Holley, et al, versus Gilead

12      Sciences, Inc., et al, for the United

13      States District Court, Northern

14      District of California.

15            The deponent today is Meredith

16      Rosenthal PhD.

17            Counsel, please identify

18      yourselves for the record.

19            MR. CASAZZA:  Kyle Casazza from

20      Proskauer Rose for Gilead Sciences,

21      and my colleague, Gourdin Sirles, is

22      with us remotely.

23            MR. O'CONNOR:  Benjamin

24      O'Connor from Hilliard Martinez

25      Gonzalez on behalf of the federal
```

1    plaintiffs as well as the witness,

2    Dr. Meredith Rosenthal.

3         THE VIDEOGRAPHER:  The court

4    reporter today is Maureen Pollard, who

5    will now swear in the witness.

6              -    -    -

7      MEREDITH B. ROSENTHAL, PHD,

8  having been duly remotely identified and

9  sworn, was examined and testified as follows:

10             -    -    -

11             EXAMINATION

12  BY MR. CASAZZA:

13       Q.    Good morning, Dr. Rosenthal.

14  As I mentioned a moment ago, my name is Kyle

15  Casazza and I represent Gilead Sciences.

16             You've been deposed a number of

17  times before, correct?

18       A.    That's correct.

19       Q.    How many times would you

20  estimate you've been deposed?

21       A.    I would say 50 or 60.

22       Q.    And how many of those

23  depositions have been done remote via Zoom?

24       A.    A good question.  I think I've

25  probably done eight or ten remote

```
1     depositions.
2          Q.      So you understand that the
3     testimony you're giving today is given under
4     oath as if you were in a courtroom, right?
5          A.      Yes, I do.
6          Q.      If at any point today you
7     believe something you testified to needs to
8     be clarified, corrected, or otherwise
9     modified, will you let me know?
10         A.      I will.
11         Q.      And you understand that you'll
12    have a chance to review the transcript of
13    your testimony that you give today and make
14    changes that you want or believe that you
15    need to make, right?
16         A.      Yes, I do.
17         Q.      But understand that those
18    changes that you make are also under oath?
19         A.      Yes.
20         Q.      I could ask -- again, you've
21    done this before, but if you could please
22    give audible answers to my questions for the
23    court reporter's benefit, yeses and nos, as
24    opposed to, you know, head shakes or mm-hmms
25    or uh-huhs.  Is that all right?
```

Meredith B. Rosenthal, Ph.D.

```
 1            A.      Yes, I will.
 2            Q.      And if I could also please ask
 3     that you do your best to wait until I finish
 4     my question to start your answer, I'll do my
 5     best to wait until you finish your answer
 6     before I start my next question.  And because
 7     of the Zoom platform, I think we'll all need
 8     to give ourselves, you know, another little
 9     bit of time there so we're not talking over
10     each other.
11                   Is that all right?
12            A.      I shall try my best.
13            Q.      If you don't hear or don't
14     understand my question, please let me know
15     that as well, and I'll repeat it or do my
16     best to rephrase it.  But if you answer my
17     question, I'll assume that you understood it.
18     Is that okay?
19            A.      Yes.
20            Q.      And if you need to take a
21     break, please let me know.  I just ask that
22     you not do so when there's a question
23     pending.  Is that all right?
24            A.      Yes.
25            Q.      Now, do you have a hard stop
```

1    time today?

2         A.    I need to stop at 7.

3         Q.    At 7 Eastern?

4         A.    Yes.

5         Q.    Okay.  To the best of your

6    knowledge and ability, is there any reason

7    you are unable to give us your most accurate

8    and complete testimony today?

9         A.    No, there is not.

10         Q.    And if at any point that

11    changes, will you please let us know?

12         A.    Yes, I will.

13         Q.    Where are you physically

14    located right now?

15         A.    I am physically located at

16    23 Regent Circle in Brookline, Massachusetts.

17         Q.    Is anyone in the same room as

18    you?

19         A.    No.  There may be an orange cat

20    at some point, but...

21              (Cross-talking.)

22         Q.    And today for purposes of your

23    deposition you're being represented by

24    Mr. O'Connor?

25         A.    That is correct.

Meredith B. Rosenthal, Ph.D.

```
1          Q.     And you understand that
2    Mr. O'Connor represents a number of
3    plaintiffs in these cases against Gilead
4    Sciences?
5          A.     I do.
6          Q.     If at any point someone walks
7    in the room, would you mind just letting us
8    all know?
9          A.     I will.
10         Q.     Of course, not the cat.
11         A.     Yes, I hope that will not
12   happen but anything is possible, and I will
13   absolutely let you know.
14         Q.     Great.
15                Other than the Zoom application
16   for the deposition, is there anything else
17   open on the screen you're looking at?  You're
18   looking at your computer right now?
19         A.     I am.  And, you know, when I
20   went to get the Zoom link I went into
21   Outlook, so I'll shut that now.  And Chrome
22   is open because I clicked on Derek's link for
23   the documents.
24                So the Zoom and then that
25   place, the folder where I hope to look at
```

Meredith B. Rosenthal, Ph.D.

```
 1    documents.
 2         Q.    Okay.  And if I could just ask
 3    that you not bring anything else up on your
 4    computer screens.
 5              Are you looking at a desktop
 6    monitor, and just a single screen laptop and
 7    multiple screens?  I'll ask it better.
 8              Could you please just describe
 9    the setup in front of you this morning?
10         A.    I have a single laptop in front
11    of me and -- oh, and I meant to turn the
12    light on, although my lighting is pretty good
13    here -- and I have all notifications
14    silenced.  So I find sometimes I'm not the
15    techiest person and something comes through,
16    but I think that means that nothing will
17    disturb us.
18         Q.    Okay.  Great.
19              And is your cell phone off, or
20    on silent as well?
21         A.    It is off, and also
22    notifications are silenced.
23         Q.    Okay.  Do you have any physical
24    materials relating to the case with you
25    today?
```

Meredith B. Rosenthal, Ph.D.

```
1          A.      I do not.

2          Q.      Okay.  Dr. Rosenthal, you're

3    not a medical doctor, correct?

4          A.      I am not a medical doctor.

5          Q.      You are not an infectious

6    disease doctor?

7          A.      I am not an infectious disease

8    doctor.

9          Q.      You have never treated a

10   patient with HIV?

11         A.      I have never treated a patient

12   with HIV.

13         Q.      You have never prescribed a TDF

14   medication, correct?

15         A.      I have never prescribed a TDF

16   medication or any other medication.

17         Q.      And you have never prescribed a

18   TAF medication, right?

19         A.      Yes, that's correct.

20         Q.      Correct, you never have

21   prescribed a TAF medication?

22         A.      That is correct that I have

23   never prescribed a TAF medication.

24         Q.      You've never prescribed any

25   antiretroviral medication for any patient,
```

Meredith B. Rosenthal, Ph.D.

1    right?

2         A.      I have never prescribed any

3    antiretroviral medication for any patient.

4         Q.      So you've never made a

5    risk-benefit decision about the appropriate

6    treatment for any patient with HIV, have you?

7         A.      I have never done that, no.

8         Q.      You've never been involved in

9    any part of the decision about what

10   medication is appropriate for a patient with

11   HIV, have you?

12        A.      I have not been involved in any

13   clinical decisions, including for patients

14   with HIV.  I am not a clinician.

15        Q.      Have you ever published an

16   article related to HIV?

17        A.      I have not published an article

18   related to HIV.

19        Q.      So am I correct that you've

20   also never published an article related to

21   either TDF or TAF?

22        A.      I have not published an article

23   related to TDF or TAF.

24        Q.      And I'm using the acronyms

25   because you used them in your report.  I'm

1    assuming we're all familiar with them, but

2    today when I say "TDF," you understand that

3    I'm referring to the chemical compound

4    tenofovir disoproxil fumarate?

5         A.    I'm very impressed with your

6    pronunciation.  I'm not sure I could have

7    done as well.  But, yes, please let's use the

8    acronyms.

9         Q.    Well, I can do better with TAF.

10   We all stink with disoproxil, listening to

11   these cases.

12              So when I say "TAF," you'll

13   understand I'm talking about tenofovir

14   alafenamide?

15        A.    Yes.  And again, very

16   impressed.

17              MR. O'CONNOR:  Well, we both

18        have gotten good at it, right, Kyle?

19              MR. CASAZZA:  Yes, absolutely.

20   BY MR. CASAZZA:

21        Q.    Dr. Rosenthal, you're not an

22   expert in corporate ethics, are you?

23        A.    I am not an expert in corporate

24   ethics.

25        Q.    You've never published an

Meredith B. Rosenthal, Ph.D.

1   article on corporate ethics, right?

2            MR. O'CONNOR:  Objection.

3        Form.

4            THE WITNESS:  I have not

5        published an article on corporate

6        ethics.

7   BY MR. CASAZZA:

8        Q.     You are not a regulatory

9   expert, are you?

10       A.     I am not a regulatory expert.

11  Of course as a health economist I am familiar

12  with relevant regulations that have economic

13  implications, but that does not make me a

14  regulatory expert.

15       Q.     You have never worked at the

16  FDA?

17       A.     I have not worked at the FDA.

18       Q.     Have you ever served on an FDA

19  advisory committee?

20       A.     I have not served on an FDA

21  advisory committee.

22       Q.     Have you ever consulted for the

23  FDA?

24       A.     I have never consulted for the

25  FDA.

Meredith B. Rosenthal, Ph.D.

1       Q.     You've never been a clinical

2   researcher, have you?

3       A.     I have never been a clinical

4   researcher.

5       Q.     You are not a chemist, correct?

6       A.     I am not a chemist.

7       Q.     And you are not a statistician,

8   right?

9       A.     I am an applied economist, I

10  use statistics.  I am not a statistician.  I

11  have statistical expertise, however.

12      Q.     But you don't hold yourself out

13  as a statistician, correct?

14      A.     I do not.

15      Q.     You are not an expert in

16  patents, correct?

17      A.     I am not a patent expert.

18      Q.     And you're not trained in

19  patent law, correct?

20      A.     I am not trained in patent law.

21      Q.     You are not a named inventor on

22  any patents, are you?

23      A.     I am not a named inventor on

24  any patents.

25      Q.     You are not a lawyer of any

Meredith B. Rosenthal, Ph.D.

```
1    kind, correct?
2         A.     I am not a lawyer.
3         Q.     And I know we covered that you
4    are not a patent lawyer.  You are not an
5    expert in patent law, are you?
6         A.     I am not an expert --
7              MR. O'CONNOR:  Objection.
8              THE WITNESS:  -- in patent law.
9              MR. O'CONNOR:  Sorry.
10   BY MR. CASAZZA:
11        Q.     You are not an expert in
12   antitrust law, are you?
13        A.     I am not an expert in antitrust
14   law; although, I am familiar with antitrust
15   law and the intersection of antitrust law and
16   economics, and I have served as an expert in
17   numerous antitrust matters.
18        Q.     But you don't hold yourself out
19   as an expert in antitrust economics as a
20   discipline, correct?
21              MR. O'CONNOR:  Objection to
22        form.
23              THE WITNESS:  I do not
24        generally define that as my expertise.
25        I'm a health economist, and I use
```

1            health economics in antitrust context.

2       BY MR. CASAZZA:

3            Q.     Have you ever worked at a

4       pharmaceutical company?

5            A.     No, I have not.

6            Q.     Have you ever been involved in

7       the development of a drug in any capacity?

8            A.     No, I have not.

9            Q.     Have you ever been employed by

10      Gilead?

11           A.     No, I have not.

12           Q.     Have you ever consulted for

13      Gilead?

14           A.     No, I have not.

15           Q.     Is the most recent version of

16      your CV the one that's included with your

17      expert report that you served in this case at

18      the end of May?

19           A.     Yes, it is.

20           Q.     Okay.  Let's go ahead and mark

21      the entirety of your expert report, including

22      the exhibits to it, as Exhibit 1.

23                   -      -      -

24                   (Whereupon, Rosenthal Exhibit

25           Number 1 was marked for

Meredith B. Rosenthal, Ph.D.

```
 1            identification.)

 2                   -      -      -

 3            MR. CASAZZA:  And, Derek, if

 4       you could please bring up tab 1.

 5            And if we could please scroll

 6       forward in that document to

 7       Attachment A.  I believe it might be

 8       page 26 of the PDF.

 9            MR. O'CONNOR:  And while he's

10       doing that, Derek, you're putting this

11       in both the chat and the folder that

12       you provided?

13            TRIAL TECHNICIAN:  Sometimes it

14       takes a minute or two for it to

15       populate.

16            MR. O'CONNOR:  I got it.  Okay.

17       Thank you.

18            MR. CASAZZA:  Scroll forward

19       one more page.

20   BY MR. CASAZZA:

21       Q.    Dr. Rosenthal, this is the most

22   recent version of your CV that you've

23   prepared, correct?

24       A.    It is.

25       Q.    Is everything on here true and
```

1    accurate to the best of your knowledge?

2         A.    Yes, it is.

3         Q.    In 1996, before you obtained

4    your PhD, you began working as an academic

5    affiliate with Greylock McKinnon Associates,

6    is that right?

7         A.    Yes.  I was a PhD student at

8    the time.

9         Q.    Okay.  Is it okay if I refer to

10   Greylock McKinnon Associates as GMA, or would

11   you prefer Greylock, or is there some other

12   shorthand that's more common?

13        A.    GMA is fine.

14        Q.    Okay.  GMA is a consulting and

15   litigation support firm, right?

16        A.    That's correct.

17        Q.    What was your role at GMA when

18   you started in 1996?

19        A.    When I started in 1996, I was

20   supporting other experts by conducting mostly

21   data analysis.

22        Q.    Okay.  Now, among other things,

23   GMA consultants help companies make business

24   decisions, such as whether to undertake an

25   acquisition?

Meredith B. Rosenthal, Ph.D.

1        A.      They do.  I'm not as familiar

2   with the business consulting arm of GMA.  I

3   have only worked with them in the context of

4   litigation, so I could not tell you the

5   details of those engagements.

6        Q.      So all of your work for GMA

7   dating back to 1996 has been supporting GMA's

8   litigation activities, right?

9        A.      That's correct.

10       Q.      Such as developing economic

11  theories for a particular case?

12             MR. O'CONNOR:  Objection to

13        form.

14             THE WITNESS:  Yes, that's

15        correct, developing economic theories

16        and conducting economic analyses.

17  BY MR. CASAZZA:

18       Q.      You've served as an expert

19  witness before this case, right?

20       A.      I have.

21       Q.      In what year did you start

22  serving as an expert witness in litigation?

23       A.      I believe 2003.

24       Q.      By that point in time you had

25  received your PhD, right?

1          A.     That's right.

2          Q.     Approximately how many times

3     have you served as an expert witness?

4          A.     I believe I've been involved in

5     approximately 30 cases.  Not all of them have

6     resulted in testimony.

7          Q.     How many times have you

8     testified at a trial?

9          A.     I believe about a half a dozen,

10    five or six.

11         Q.     Do you recall which trials

12    those five or six were?

13         A.     Well, most recently I testified

14    in a trial related to Opana ER, and this was

15    an antitrust case.  And I testified in a

16    matter concerning the allegedly fraudulent

17    promotion of the drug Neurontin.  I testified

18    in a broader matter involving allegations

19    about the inflation of list prices, the

20    so-called AWP litigation.

21         Q.     Okay.

22         A.     And I testified in a similar

23    case in the Commonwealth of Massachusetts

24    related to list prices that were associated

25    with reimbursement from the Medicaid program.

Meredith B. Rosenthal, Ph.D.

1          Q.     From those, I count four.  Do

2    you recall --

3          A.     Yes.

4          Q.     -- what other trials at which

5    you testified?

6          A.     I'm -- there were actually two

7    trials in the Neurontin matter.

8          Q.     Okay.

9          A.     One was -- the plaintiff was

10   the Kaiser Foundation Health Plan entity, and

11   the other was related to the federal

12   government.

13              I'm sorry, I can't recall -- I

14   believe there's one more case where I

15   testified at trial.  There are some cases

16   where I testified in hearings.

17              And so I think I testified --

18   this was actually remotely -- in a trial in

19   Vermont involving the data provider IQVIA,

20   which at that time was called IMS Health.

21         Q.     Okay.  From your work, you

22   understand what a branded drug manufacturer

23   is, right?

24         A.     I do.

25         Q.     Can you just give very briefly

Meredith B. Rosenthal, Ph.D.

```
 1      your one-sentence definition, if you think
 2      that's appropriate, of what a branded drug
 3      manufacturer is?
 4           A.     Sure.
 5                  A branded drug manufacturer
 6      typically is a firm that engages in the
 7      process of sometimes research but definitely
 8      development of new drugs to launch them in
 9      various markets, the US being one of them,
10      and typically markets those new drugs over
11      their lifecycle.
12                  So I would say that the things
13      that distinguish a brand drug manufacturer
14      from a generic manufacturer, sort of the
15      research and development side and the
16      marketing side.
17           Q.     You agree that my client,
18      Gilead Sciences, is a branded drug
19      manufacturer, right?
20           A.     Yes, it is.
21           Q.     And your role in this case is
22      to testify on behalf of a number of
23      plaintiffs who are litigating against the
24      branded drug manufacturer, right?
25           A.     That's correct.
```

1       Q.      Outside of this case, you have

2   vast experience on behalf of the parties

3   litigating against branded drug

4   manufacturers, correct?

5               MR. O'CONNOR:  Objection.

6       Form.

7               THE WITNESS:  Yes, I'm not sure

8       exactly what you mean.  You mean I

9       have experience working for

10      plaintiffs?

11  BY MR. CASAZZA:

12      Q.      Yes, plaintiffs who were suing

13  branded drug manufacturers.  You've testified

14  on behalf of plaintiffs suing branded drug

15  manufacturers on a number of occasions prior

16  to today, correct?

17      A.      I have done so.  I've also

18  testified on behalf of plaintiffs suing

19  generic manufacturers.

20      Q.      But you've testified on behalf

21  of generic drug manufacturers as well,

22  correct?

23      A.      I cannot recall a case where

24  the plaintiff that I was working for was the

25  generic manufacturer.  Notwithstanding that

Meredith B. Rosenthal, Ph.D.

1    my memory is not perfect, the cases that I

2    have worked on have often involved generic

3    entry, but I have testified on behalf of end

4    payers, which include consumers, and

5    third-party payers, and sometimes direct

6    purchasers, which are typically wholesalers

7    and large pharmaceutical -- sorry, retailers.

8         Q.     You mentioned earlier that

9    you've been retained as an expert in

10   antitrust litigation, correct?

11        A.     I have.

12        Q.     Am I correct that most of your

13   work in antitrust cases has been on behalf of

14   government entities litigating against a

15   branded drug manufacturer?

16        A.     I don't think that's true.  I

17   think most of my work has been on behalf of

18   those end payer plaintiffs, and sometimes the

19   direct purchaser plaintiffs, but I think more

20   often than not I'm working on behalf of

21   consumers and third-party payers.

22        Q.     In all of those cases, in all

23   the antitrust cases, though, you have been

24   adverse to branded drug manufacturers,

25   correct?

1          A.     I -- in those antitrust

2     matters, the defendants are -- almost always

3     include -- I think maybe they always include

4     branded drug manufacturers, and in some cases

5     they also include generic manufacturers.

6          Q.     You said that you were

7     sometimes testifying on behalf of consumers.

8     Do I have that right?

9          A.     I very typically testify on

10    behalf of consumers, yes.

11         Q.     Okay.  But consumers don't

12    typically pay your legal fees in those

13    engagements, do they?

14         A.     Well, I'm not a lawyer, but as

15    I understand class action suits, to the

16    extent that there are settlements or awards,

17    some share of them go to the lawyers to pay

18    for their experts and pay for their own time.

19              So as an economist, I would say

20    consumers do -- they don't prospectively pay

21    my fees, but if there's an award, some part

22    of it does end up being used to compensate my

23    fees.

24         Q.     But you get paid whether or not

25    the consumers recover anything, correct?

Meredith B. Rosenthal, Ph.D.

1        A.      That is correct.

2        Q.      Okay.  You're paid by the law

3   firm purportedly representing the consumers,

4   correct?

5        A.      I am paid by the law firm.  I

6   don't know what you mean by "purportedly,"

7   but I think those law firms are representing

8   consumers in those cases.

9        Q.      Okay.  Since 2003,

10  approximately how much money have you made

11  testifying as an expert witness all in?

12       A.      I don't know the answer to

13  that.  That's a -- what is that, 19 years?  I

14  don't know exactly.  Perhaps something like

15  200,000 a year during that period.

16       Q.      So across 19 years, maybe,

17  approximately, $4 million from testifying as

18  an expert witness?

19       A.      That sounds like the right

20  math.  Again, I haven't made that

21  calculation.

22       Q.      Have you ever testified as an

23  expert in patent litigation?

24       A.      I have not testified as an

25  expert in patent litigation, no.

Meredith B. Rosenthal, Ph.D.

1          Q.     Do you recall being an expert

2     in a case captioned Krueger v. Wyeth,

3     Incorporated?

4          A.     That is really familiar, but

5     unfortunately those captions don't mean

6     anything to me.  I need to know the name of

7     the drug, and the older the case the poorer

8     my memory is.

9                 As I paused to answer your

10    previous question, I was thinking, many of my

11    cases involve a patent issue because they

12    relate to so-called paragraph 4, generic

13    entry.

14                I don't think any of my cases

15    were technically patent litigation, but there

16    is very often an issue about the strength of

17    a patent.

18         Q.     Paragraph 4, generic entry,

19    you're referring to paragraph 4 under the

20    Hatch-Waxman Act, right?

21         A.     That's correct.

22         Q.     Other than this case, have you

23    ever testified as an expert in products

24    liability litigation?

25                MR. O'CONNOR:  Objection so far

Meredith B. Rosenthal, Ph.D.

```
1            as it calls for a legal conclusion.
2                 THE WITNESS:  I'm sorry.  I
3         don't think so.  Yes, I don't think
4         so.
5                 Again, in some of my cases,
6         harms were part of the foundation for
7         the case in that, for example, in the
8         allegedly unlawful promotion of the
9         atypical antipsychotic drug Risperdal
10        and Zyprexa, the case was brought
11        partly because of the harms to
12        patients from those drugs.
13                But I think that the cases that
14        I was actually retained in were not
15        personal injury matters themselves.
16   BY MR. CASAZZA:
17        Q.    As far as you know, you have
18   never been, prior to this case, retained on
19   behalf of plaintiffs who themselves contend
20   they were physically injured by a drug,
21   correct?
22        A.    As far as I know, that is
23   correct.
24        Q.    Have you ever testified on
25   behalf of a branded drug manufacturer?
```

1          A.     I have not.  I have not been

2     asked to testify on behalf of a branded drug

3     manufacturer.

4          Q.     You're currently a professor at

5     Harvard, correct?

6          A.     That's correct.

7          Q.     Your principal research

8     interests concern the economics of the

9     healthcare industry, including

10    pharmaceuticals?

11         A.     That's correct.

12         Q.     You offer opinions in this case

13    about product switching, correct?

14         A.     I do, yes.

15         Q.     Can you please define what a

16    product switch is?

17         A.     Yes.  A product switch is a

18    deliberate business strategy by a brand-name

19    drug manufacturer to move patients who are on

20    one of the manufacturer's drugs to a

21    follow-on product in order to do what's known

22    as evergreening in the industry, to lengthen

23    the effective life of that franchise.

24         Q.     You used the term

25    "evergreening."  Can you define evergreening?

1          A.     Yes.  So evergreening is just a

2     colloquial term that's used for this idea of

3     being able to extend a product's life, but

4     really not the specific product, but the

5     family of products.

6               And so I think it refers to the

7     notion, we think about trees having a

8     lifecycle and we think about drugs having a

9     lifecycle, they get green, then the leaves

10    die and fall off, and we start all over again

11    in the spring.  So that's what

12    evergreening...

13              And as we were talking about

14    that, I recalled another case where I

15    testified at trial, which is the Nexium case

16    in Massachusetts, actually relating not to

17    evergreening, but that was an antitrust

18    matter.

19         Q.     Thank you.

20              Is a product switch the same

21    thing as a product hop?

22         A.     Yes, they refer to the same

23    thing.  The product hop has been used in some

24    of -- in some of the papers, and so I use

25    those terms.  I think I actually define them

Meredith B. Rosenthal, Ph.D.

1    as meaning the same thing in my report.

2         Q.      So today it's okay if I use

3    those terms interchangeably, there's no --

4    you're not drawing any distinction between a

5    product switch and a product hop?

6         A.      I'm not, as I'm sure we may

7    talk about there are -- when people use the

8    term "product hop," sometimes they mean a

9    kind of product switch where the original

10   product is withdrawn, a hard hop, and

11   sometimes they mean something that looks more

12   like the kind of product switch that we're

13   talking about in this case where the original

14   product is not withdrawn.

15        Q.      We'll get into more detail

16   about your opinions throughout the day, but

17   in this case your conclusion is that Gilead's

18   conduct was consistent with the economic

19   logic of a product switch to extend market

20   exclusivity and thereby maximize profits,

21   right?

22        A.      That's right.

23        Q.      You would agree that this case

24   has allegations related to Gilead's efforts

25   to extend its market exclusivity of a branded

Meredith B. Rosenthal, Ph.D.

1    drug, right?

2        A.    Yes.  Although, again, as a

3    personal injury case, I think the allegations

4    go beyond that.  But that is the part of the

5    allegations that pertain to my opinion.

6        Q.    Is it correct that you've been

7    retained as an expert in other cases

8    involving similar allegations relating to the

9    product switch allegations, that is, where a

10   party alleges that a branded drug

11   manufacturer has taken improper efforts to

12   extend market exclusivity?

13            MR. O'CONNOR:  Objection.

14            THE WITNESS:  I have been

15        involved in other matters that related

16        to product switches, and in those

17        matters there were also allegations

18        about other ways of delaying generic

19        entry that enabled the product switch.

20            I believe all of those cases

21        involved those kinds of dual

22        allegations.  First, the brand-name

23        manufacturer did things to prevent

24        generic entry and, in the meanwhile,

25        launched the follow-on product in --

Meredith B. Rosenthal, Ph.D.

1                  early enough to move patients to that

2                  new product.

3        BY MR. CASAZZA:

4             Q.     Is it your opinion that product

5        switching is illegal?

6             A.     It is not my opinion that

7        product switching is illegal, no.

8             Q.     Is it your opinion that product

9        switching is in some other way improper?

10            A.     "Improper" is not a word that I

11       would use as in the matter of health

12       economics.  So I have opinions about what

13       some kind of product switches do for consumer

14       welfare, and I have opinions about their

15       profitability, but improper, I would say I

16       don't have an opinion about whether it's

17       improper or not improper.

18                  MR. O'CONNOR:  And I object --

19       BY MR. CASAZZA:

20            Q.     So you're not offering an

21       opinion --

22                  MR. O'CONNOR:  -- to form on

23            top of that -- sorry.

24                  Objection to the form of the

25            past question.  My fault, Kyle.

Meredith B. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2         Q.    So you're not offering an

3    opinion in this case that Gilead did anything

4    improper, are you?

5              MR. O'CONNOR:  Objection, form.

6         Objection insofar as it misstates

7         Dr. Rosenthal's report.

8              THE WITNESS:  That is not part

9         of my assignment, nor do I offer an

10        opinion on whether Gilead's behavior

11        is improper, no.

12   BY MR. CASAZZA:

13        Q.    Are you offering an opinion on

14   whether Gilead did anything wrong in this

15   case?

16             MR. O'CONNOR:  Same objections.

17             THE WITNESS:  I am not a

18        lawyer.  I am not offering an opinion

19        about whether Gilead did anything

20        wrong.

21   BY MR. CASAZZA:

22        Q.    Going back to the other cases

23   in which a party has alleged that branded

24   drug manufacturers had taken steps to extend

25   market exclusivity, as an expert witness in

Meredith B. Rosenthal, Ph.D.

1    those cases, have you ever taken the position

2    that the branded drug company's conduct was

3    not consistent with an effort to prolong

4    market exclusivity?

5         A.    I don't believe I was given

6    that assignment before, so I haven't offered

7    an opinion one way or another in those cases.

8         Q.    In cases in which you've been

9    an expert involving an alleged product

10   switch, you've always testified that the drug

11   company's conduct was done to prolong market

12   exclusivity, correct?

13        A.    I believe in those cases what I

14   would have testified to is that the defendant

15   was able to earn more money by introducing

16   the new product.  But again, those cases are

17   quite different from this case.

18        Q.    Is it your opinion in this case

19   that Gilead was able to earn more money by

20   delaying the launch of TAF?

21        A.    It's my opinion that there was

22   an economic incentive in the sense of Gilead

23   being able to earn more money by delaying the

24   launch of TAF.

25             We can go over exactly what the

Meredith B. Rosenthal, Ph.D.

1    scope of my assignment is, but I don't think

2    my opinions take exactly the form of the

3    question that you just asked.

4         Q.    That's what I'm trying to

5    understand.

6              You haven't analyzed whether

7    Gilead actually did earn more money than it

8    otherwise would have by delaying the launch

9    of TAF, did you?

10        A.    I did not.  That was not part

11   of my assignment.

12             So my assignment was to explain

13   to the Court and the jury how there could be

14   an economic incentive for a company in

15   Gilead's position to delay the launch of a

16   new product, given that Gilead factually,

17   whether or not it was illegal, delayed the

18   launch of TAF.

19        Q.    And it's your opinion that

20   there was an economic incentive for Gilead to

21   delay the launch of TAF, correct?

22        A.    I believe that is exactly the

23   form of my conclusion, yes.

24        Q.    Did you consider that Gilead

25   had any economic incentives to launch TAF

Meredith B. Rosenthal, Ph.D.

1    sooner?

2         A.    I considered the range of

3    alternatives and concluded, again, based on

4    the fact that Gilead actually delayed the

5    launch of TAF and based on the economics of

6    product switches, that they had an incentive

7    to delay.

8               So by definition, I considered

9    the alternative of not delaying.

10        Q.    So it is your opinion that

11   Gilead actually delayed the launch of TAF?

12        A.    It is my opinion that the

13   launch of TAF was delayed, observably.  So I

14   don't have an opinion about whether that was

15   illegal, but TAF was clearly known earlier

16   and development was paused.  That's what I'm

17   describing, that behavior.

18        Q.    But you're not offering an

19   opinion on when Gilead could have released

20   TAF, are you?

21        A.    I am not offering an opinion on

22   when Gilead could have released TAF, no.

23        Q.    And I want to make sure I

24   understand your opinion.  Is it your opinion

25   that Gilead deliberately delayed the launch

1    of TAF to make more money?

2              MR. O'CONNOR:  Objection

3         insofar as it calls for a legal

4         conclusion.

5              THE WITNESS:  I do not have an

6         opinion about whether Gilead

7         deliberately delayed TAF.  That is not

8         part of my opinion.

9    BY MR. CASAZZA:

10        Q.     Okay.  But you are opining that

11   Gilead delayed TAF.  What's the difference?

12        A.     It is observably true that TAF

13   did not launch until the end of 2015, and

14   therefore its launch was delayed because, as

15   I accept some of -- I accept the allegations

16   in the Complaint that TAF was known before

17   that time.

18              So what I look at is the actual

19   launch, and I consider whether if it were

20   possible for TAF to have launched earlier it

21   might have made sense to delay.

22              I don't -- because I'm not an

23   expert in the areas that I would need to say

24   whether, in fact, TAF could have been

25   launched earlier, I don't have an opinion

Meredith B. Rosenthal, Ph.D.

1    about that.  I'm simply considering the

2    economic incentives to delay, and in light of

3    the fact that TAF did not launch until 2015.

4         Q.     So you don't know whether, in

5    fact, TAF could have been launched any sooner

6    than 2015, do you?

7         A.     No.  That is not part of my

8    expertise, nor is it part of my opinion, no.

9         Q.     Is your opinion that Gilead had

10   an economic incentive to deliberately delay

11   TAF based on plaintiffs' -- strike that.

12              Is your opinion that Gilead had

13   an economic incentive to delay TAF based on

14   plaintiffs' allegation that Gilead knew by

15   2004 that TAF was safer than TDF?

16        A.     As any expert, I base my -- I

17   start with my opinions at the point that

18   plaintiffs will prove their case.

19              In order to make an economic

20   opinion about whether delay could be

21   profitable, I have to make an assumption that

22   there is an earlier alternative.  That's

23   really the only assumption I make, is that

24   there's an earlier alternative.  And then I

25   describe the way in which a product switch

Meredith B. Rosenthal, Ph.D.

1    that would be consistent with that delay

2    could be profitable to Gilead.

3              So I don't think my analysis

4    rests on specific assumptions about what

5    Gilead knew.  It does rest on the assumption

6    that TAF could have launched earlier.

7         Q.    If Gilead did not know by 2004

8    that TAF was any safer than TDF, is it still

9    your opinion that Gilead had an economic

10   incentive to delay the release of TAF?

11             MR. O'CONNOR:  Objection, form.

12        Objection, speculation.

13             THE WITNESS:  I didn't consider

14        a specific scenario in which -- in

15        which the allegations could not be

16        proven true, so that opinion is not

17        contained in my report.

18             What is critical in the

19        economics of the product switch is the

20        timing, and the timing, launching

21        almost exactly two years before

22        generic entry for Viread, is what it

23        is, it happened in that way in the

24        unfolding events.

25             So as I -- while it's not part

Meredith B. Rosenthal, Ph.D.

1           of the opinions that I've offered in

2           this case, as I sit here, that would

3           remain the same.

4    BY MR. CASAZZA:

5           Q.    So the opinions contained in

6    your report depend on plaintiffs being able

7    to prove their allegation that Gilead knew by

8    2004 that TAF was safer than TDF, correct?

9           A.    My opinions are framed around

10   the allegations being proven.  If there

11   were -- if -- as I understand this case, the

12   allegations around what Gilead knew, those

13   allegations are sort of the foundation for

14   the personal injury component of this.

15           As a matter of economics, the

16   profitability of delay for a new brand-name

17   drug that is going to take market share from

18   an existing brand-name drug, those economics

19   are unaffected by what Gilead knew when.

20           However, my report is not

21   framed around a scenario in which Gilead was

22   not aware that TAF had the potential to be

23   superior.

24           Q.    Can we agree that there's a

25   difference between being aware that TAF had

1    the potential to be superior to TDF and

2    knowing that TAF is superior to TDF?

3              MR. O'CONNOR:  Objection.

4         Foundation.

5              THE WITNESS:  That sounds like

6         a legal conclusion to me.  I honestly

7         don't know.  Those sound like the same

8         things to me.

9    BY MR. CASAZZA:

10        Q.    Something -- a drug having a

11   potential to be safer than another drug

12   sounds like -- strike that.

13             It sounds the same to you that

14   a drug having potential to be safer than

15   another drug, that sounds the same to you as

16   another drug actually being safer than

17   another drug?

18             MR. O'CONNOR:  Same objections.

19        I also add, calls for a legal

20        conclusion.

21             THE WITNESS:  As an economist,

22        I would say what you're talking about

23        is how much uncertainty is there

24        around something.  But as I'm thinking

25        about the expected profitability,

Meredith B. Rosenthal, Ph.D.

1           that's -- we think expectations are

2           literally taken at the mean.

3                So the expected profitability

4           in those two scenarios is the same.

5           You're talking about uncertainty, and

6           so that may certainly affect

7           decision-making but it doesn't affect

8           the net present value.

9    BY MR. CASAZZA:

10        Q.    You didn't do a net present

11   value calculation in this case, correct?

12        A.    No, I did not.  I did not need

13   to for my assignment.

14        Q.    You didn't undertake a

15   quantitative financial analysis of any kind

16   for this case, correct?

17        A.    No, I did not.  I was asked to

18   explain the economic incentives for this

19   delay.  I was not asked to analyze Gilead's

20   data one way or another to draw a conclusion

21   from those data.

22        Q.    But it's your opinion that the

23   alleged delay was profitable for Gilead,

24   right?

25             MR. O'CONNOR:  Objection

Meredith B. Rosenthal, Ph.D.

1          insofar as it misstates her report,

2          her opinion, and form.

3               THE WITNESS:  It is my opinion

4          that the alleged delay allowed Gilead,

5          looking across all of their data, to

6          grow the TDF product line to more than

7          $6 billion a year in the US, and then

8          to launch the TAF product line and,

9          you know, begin to grow that product

10         line in a similar direction, and that

11         the sum of those two product life

12         cycles is surely larger than an

13         earlier entry.

14     BY MR. CASAZZA:

15         Q.    Wouldn't the expected

16     profitability of TAF depend on whether it

17     were superior to TDF?

18               MR. O'CONNOR:  Objection.

19         Outside the scope, foundation, form.

20               THE WITNESS:  The expected

21         profitability of TAF before the fact

22         would depend on those assumptions.

23         The profitability of delay is all

24         about what happens to TDF.

25               ///

Meredith B. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2         Q.    I just want to understand that

3    I heard that correctly.

4              It's your opinion that the

5    profitability of delay of TAF to Gilead is

6    all about what happens to TDF?

7         A.    Yes.  And the ability of Gilead

8    to continue to grow the TDF product line over

9    an additional ten years before switching to a

10   TAF product line, that is what makes the

11   product switch profitable, that the

12   ability -- it makes the delay profitable.

13   It's the ability to grow the original

14   profit -- the original product line all the

15   way up to a period just before generic entry,

16   and then to add on to that with this new

17   product line.

18        Q.    You're aware that plaintiffs in

19   this case allege that TAF was much safer than

20   TDF, correct?

21        A.    I am aware of that, yes.

22        Q.    And you're aware that

23   plaintiffs allege that Gilead knew by 2004

24   that TAF was much safer than TDF, correct?

25        A.    Yes --

```
 1                    MR. O'CONNOR:  Object to the
 2         form.
 3                    THE WITNESS:  -- I understand.
 4                    MR. O'CONNOR:  Sorry.
 5    BY MR. CASAZZA:
 6         Q.      If Gilead knew that TAF were
 7    safer than TDF in 2004, wouldn't Gilead have
 8    made more money if it had released TAF sooner
 9    than it did --
10                    MR. O'CONNOR:  Objection.
11         Q.      -- in 2015?
12                    MR. O'CONNOR:  Sorry, Kyle.
13                    Objection.  Incomplete
14         hypothetical, form.
15                    THE WITNESS:  I don't believe
16         so, no.  I think that properly
17         considered, the delay allowed Gilead
18         to grow TDF, again, to more than
19         $6 billion a year across all the
20         combinations, and then also have this
21         TAF platform that has been growing
22         since 2015.  So it could have its cake
23         and eat it too by delaying.
24    BY MR. CASAZZA:
25         Q.      You would agree that if TAF is
```

Meredith B. Rosenthal, Ph.D.

1    safer than TDF, that TAF has a larger

2    potential patient base than TDF, right?

3          A.     I believe that that should be

4    true, yes, as a health economist.  Just to be

5    clear, I'm not a clinician.

6          Q.     Right.

7          A.     If it is superior, as it

8    appears to be, it should have a larger

9    patient base, and that patient base will

10    replace TDF in addition to supplying new

11    patients.

12          Q.     If that patient base would

13    replace TDF in addition to supplying new

14    patients, then wouldn't it have been more

15    profitable for Gilead to switch patients to

16    TAF sooner than 2015?

17               MR. O'CONNOR:  Objection.

18          Incomplete hypothetical.

19               THE WITNESS:  No.  I disagree

20          completely.  I'm sure we will get into

21          talking about Professor Lakdawalla's

22          analysis, but he -- in his projection

23          of what happens in delay, he assumes

24          that there's no growth in TDF.  And

25          again, the profitability of delay is

Meredith B. Rosenthal, Ph.D.

1          all about the potential for TDF.

2                  If you reflect anything like

3          what Gilead actually realized in TDF

4          profits over that period, delay is

5          drastically more profitable than

6          launching right away.

7     BY MR. CASAZZA:

8          Q.      But couldn't that growth in TDF

9     profits have instead been realized by Gilead

10    in the form of a growth in TAF profits had

11    TAF been released sooner?

12                 MR. O'CONNOR:  Same objections.

13                 THE WITNESS:  Yes, and then

14         there would be no TDF.  So again, why,

15         if you're a company, would you not

16         want both if you can have both.  It's

17         very simple.  You have two product

18         life cycles, you can either stack one

19         on top of the other and only get the

20         incremental profit, or you can put

21         them side by side and get the sum of

22         it, and that's clearly what Gilead

23         realized.

24                 Again, I have no opinion about

25         the legal basis, but as an economist,

Meredith B. Rosenthal, Ph.D.

1          it's very clear that they profited by

2          delaying or by having this delay that

3          they made more money, because they

4          enjoyed the full lifecycle of those

5          TDF products.  And now TAF is growing

6          as the new product line.  It's clearly

7          more profitable.

8    BY MR. CASAZZA:

9          Q.     But patients don't take both

10   TAF and TDF medications, correct?

11         A.     Not to my knowledge.  Again,

12   I'm not a clinician.

13         Q.     And it's your understanding

14   from the allegations in this case that the

15   plaintiffs allege that anyone who is taking a

16   TDF medication should instead have been

17   taking a TAF medication, correct?

18         A.     I don't know that I could

19   restate the allegations in that way.  I

20   understand the allegations are that patients

21   did not -- were not able to take a TAF

22   medication and, therefore, were harmed.  I

23   don't know if that's exactly the same as what

24   you just said.

25         Q.     The lifecycle of TAF

Meredith B. Rosenthal, Ph.D.

1    medications is independent of the lifecycle

2    of TDF medications, correct?

3              MR. O'CONNOR:  Objection to

4         form.

5              THE WITNESS:  Well, to the

6         extent that plaintiffs can prove that

7         TAF's entry was delayed, they are

8         clearly dependent.  Had there been no

9         TDF, there would be no delay, again,

10        assuming the allegations are proven

11        true.

12             So they're dependent in that

13        sense, but I don't know if you're

14        referring to a different sense.

15   BY MR. CASAZZA:

16        Q.    I asked a bad question.

17             The endpoint of the market

18   exclusivity for TAF does not depend on the

19   market exclusivity for TDF, correct?

20             MR. O'CONNOR:  Objection.

21        Form.

22             THE WITNESS:  I don't think so.

23        I mean, clearly the endpoints have to

24        do with the patents, and the

25        combination drugs bring in new

Meredith B. Rosenthal, Ph.D.

1          patents, but I don't think that has to
2          do with TDF.
3     BY MR. CASAZZA:
4          Q.     Is it your opinion that Gilead
5     realized the full lifecycle of its TDF
6     medications before it released TAF?
7          A.     It's my opinion that TAF was
8     launched at precisely -- almost precisely two
9     years before Viread experienced generic
10    competition, and so that's what I mean by the
11    full lifecycle.  Essentially the TDF products
12    were allowed to grow up to that point.
13          Now, of course, the later TDF
14    products were relatively early in their
15    lifecycle, but because they all depend on
16    that same TDF component it's really the
17    lifecycle of the Viread piece of it that I'm
18    talking about.  But, of course, there were
19    not only the three versions of the TDF drugs
20    that were launched early, but then there was
21    Complera and Stribild that helped grow the
22    TDF franchise.
23          Q.     But to be clear, the expiration
24    of the patents on Gilead's TAF medications
25    did not depend on when the patents expired on

Meredith B. Rosenthal, Ph.D.

1   Viread, correct?

2       A.    The patents are what the

3   patents are.  They just depend on when they

4   were -- I guess when they were recognized by

5   the patent office.  That's as little as I

6   know about patents.

7            But I know that they don't

8   depend on one another.  They have to do with

9   the science and when a patent was granted for

10  the particular -- I guess for the particular

11  molecule.

12      Q.    If plaintiffs' allegations are

13  true and patients who had taken TDF

14  medications could have taken TAF medications

15  to treat their HIV, wouldn't it have been

16  more profitable for Gilead to release the TAF

17  medications sooner, given that the expiration

18  date for market exclusivity for those TAF

19  medications was independent of the expiration

20  date for the patents on Viread?

21           MR. O'CONNOR:  Objection.

22       Form, asked and answered, foundation.

23           THE WITNESS:  No.  Again,

24       because Gilead could earn all of the

25       profits on TDF up to the point where

Meredith B. Rosenthal, Ph.D.

1          the product switch made launch of TAF

2          made sense two years before generic

3          entry, they would get all of those

4          profits, and then they would get the

5          TAF profits on top of that.  So it

6          would be -- they would be considering

7          the sum of those two things.

8                What your statement mistakes,

9          that profits include the TDF profits,

10         not just the TAF profits.  If you only

11         focus on the TAF profits, you're

12         missing half of what's important here.

13         And, really, all of what a product

14         switch is about is about capitalizing

15         on as much of the lifecycle of the

16         first product as possible before

17         launching the second product.

18    BY MR. CASAZZA:

19         Q.    But there would have been more

20    TAF profits if TAF had been released sooner,

21    correct?

22                MR. O'CONNOR:  Objection.

23         Incomplete hypothetical.

24                THE WITNESS:  To say that is --

25         I mean, it's tautologically true that

1          if you take those same profits and

2          move them earlier, yes, but that

3          doesn't mean that there was an

4          economic incentive to launch early,

5          no.

6     BY MR. CASAZZA:

7          Q.     Well, if TAF were safer than

8     TDF, Gilead could have charged more for TAF

9     than it did for its TDF medications, right?

10         A.     There are various scenarios

11    around pricing that I've seen, but that --

12    the pricing does not overcome the fact of the

13    ten years of TDF sales that are essentially

14    lost.  Again, I don't have a specific date,

15    so eight to ten years of TDF profits that are

16    lost by an early launch.  So those price

17    effects would not compensate for all of those

18    sales.

19         Q.     But you're not offering an

20    opinion on when Gilead could have launched

21    TAF, so is there any reason that those TDF

22    profits prior to the 2015 launch of TAF

23    couldn't have been TAF profits had Gilead

24    launched TAF sooner?

25         A.     Again, I think tautologically

Meredith B. Rosenthal, Ph.D.

1    if TAF had launched sooner, some of the TDF

2    profits would have been TAF profits, and then

3    the sum across over time of all those profits

4    would have been less because they would be --

5    you would subtract the TDF from the TAF.

6              Whereas, again, if you distance

7    the product launches as much as possible,

8    then you get the least overlap in those sales

9    and the largest sum total.

10        Q.    But without doing a

11   quantitative analysis, you don't know whether

12   subtracting the TDF products from TAF profits

13   would result in a number that was either

14   larger or smaller than what Gilead realized

15   in the actual world, right?

16             MR. O'CONNOR:  Objection.

17        Form.

18             THE WITNESS:  I did not conduct

19        a net present value analysis, in light

20        of the fact that TAF's launch was

21        delayed.  I was asked to explain to

22        the Court and any other fact-finder

23        how that could be economically

24        rational, and that is what my report

25        does.

1            And I show that, in fact, this

2        is a common practice in the industry,

3        that's how it can be economically

4        rational.

5            So those are the nature of my

6        opinions in this case.  Having

7        analyzed Professor Lakdawalla's

8        analysis, I conclude that the data are

9        supportive of the idea that it was

10       much more profitable for Gilead to

11       delay.  And with all the data we have

12       now, there is no question in my mind

13       that it was much more profitable to

14       delay.

15   BY MR. CASAZZA:

16       Q.    For your opinions in this case,

17   you started with the assumption that TAF's

18   launch was delayed, and from that assumption,

19   you opine and explain how that could be

20   economically rational, correct?

21       A.    I assume that plaintiffs will

22   prove their case.  Again, the fact that TAF

23   did not launch until '15, to 2015, I think

24   that's an empirical observable fact, we can

25   see that.  Whether and when they could have

1    launched TAF is something I understand that

2    plaintiffs will prove through other experts.

3              So I assumed that they would

4    prove an earlier launch was possible, yes.

5    Otherwise, the comparison doesn't make sense.

6         Q.    You would agree with me that as

7    a matter of economic logic, that if the

8    incremental growth in potential patients for

9    TAF were sufficiently larger than TDF, then

10   it would have been more profitable for Gilead

11   to launch TAF sooner than TDF, right?

12             MR. O'CONNOR:  Objection.

13        Incomplete hypothetical, and form.

14             THE WITNESS:  In my review of

15        the projections that Gilead undertook

16        and the analysis that Dr. Lakdawalla

17        puts forward, there are no scenarios

18        in which the TAF profits would

19        overwhelm the lost TDF profits.  Is it

20        mathematically possible that you could

21        construct a scenario like that?  Sure.

22   BY MR. CASAZZA:

23        Q.    If Gilead could charge a

24   sufficiently high price premium for TAF,

25   wouldn't it have been more profitable for

Meredith B. Rosenthal, Ph.D.

1    Gilead to release TAF sooner than it did?

2              MR. O'CONNOR:  Same objections.

3         Incomplete hypothetical, and form.

4              THE WITNESS:  I haven't -- I

5         have seen the forecasts that

6         Dr. Lakdawalla cites that have a lower

7         and higher pricing scenario.  Those

8         are obviously -- those are a range of

9         prices that they're considering in

10        their analyses.

11             But again, I haven't seen

12        anything that would suggest prices for

13        TAF such that the loss of eight to ten

14        years of TDF franchise growth would be

15        compensated by an earlier launch.

16             So is it possible to construct

17        a scenario?  Perhaps.  But we don't

18        have a market test for that scenario,

19        and when TAF launched it launched

20        roughly at pricing parity.  So we

21        don't have a sense, and even today the

22        price of TAF drugs is not double the

23        price of TDF drugs.

24   BY MR. CASAZZA:

25        Q.    You testified a moment ago,

Meredith B. Rosenthal, Ph.D.

1    "With all the data we have now, there is no

2    question in my mind that it was much more

3    profitable to delay."

4              Correct?

5       A.    Yes.  Just looking at their

6    10-Ks, yes.

7       Q.    So you would disagree with the

8    assertion that with the benefit of hindsight

9    Gilead would have made more money had it

10   launched TAF sooner?

11      A.    I -- the data I have seen does

12   not support the idea that with hindsight,

13   again looking at their 10-Ks, that they would

14   have made more money had it launched sooner,

15   no.

16      Q.    But again, you haven't

17   undertaken any quantitative analysis in this

18   case of any kind, correct?

19              MR. O'CONNOR:  Objection to

20         form.

21              THE WITNESS:  No.  I was asked

22         to explain the economic incentives,

23         not to draw conclusions from

24         forecasts, no.

25              ///

Meredith B. Rosenthal, Ph.D.

```
1    BY MR. CASAZZA:
2         Q.    A moment ago you referred to
3    some Gilead forecasts that Dr. Lakdawalla
4    identified in his reports, indicating that it
5    would have been more profitable to launch TAF
6    sooner.
7              Do you recall that?
8         A.    There are a range of forecasts
9    that he reviews.  He rejects some that show
10   that it would have been more profitable to
11   delay, and then he constructs his own
12   comparison.
13             So the forecasts that he uses
14   is for an early launch, and he constructs a
15   later launch.  He doesn't use that
16   head-to-head comparison; he makes his own
17   later launch.  And it's the assumptions of
18   his later launch that drive his conclusions.
19        Q.    The forecasts on which he
20   relied, you hadn't seen those at the time you
21   wrote your report, had you?
22        A.    I don't believe I did, no.  I
23   cite some other related documents, but not
24   those specific documents, no.
25        Q.    Going back to a question I had
```

Meredith B. Rosenthal, Ph.D.

1    asked you earlier in the deposition, this is

2    the first case you believe where you've been

3    testifying on behalf -- directly on behalf of

4    plaintiffs who contend they were physically

5    harmed by the drug at issue, correct?

6         A.    I believe so, yes.

7         Q.    In other cases you opined that

8    a newer product harmed consumers financially

9    because they had to pay more for it, right?

10        A.    Newer brand-name product?

11        Q.    Yes.

12        A.    I don't recall in specific

13   cases, but -- and I'm sure we'll talk about

14   this more, but in other instances of product

15   switches, they are -- they have been in the

16   past very similar to the original product,

17   but costing consumers much more, and

18   therefore, based on clinical expertise

19   suggesting that there were no incremental

20   benefits, I have concluded that the product

21   switch caused harm.  I couldn't tell you

22   exactly which cases I've offered that

23   specific opinion.

24        Q.    But you'd agree that those

25   factual scenarios are meaningfully different

```
 1    than what's alleged in this case where the
 2    plaintiffs are alleging that the newer
 3    branded product is clinically a substantial
 4    improvement over the prior product, right?
 5              MR. O'CONNOR:  Objection, form.
 6         Objection insofar as it calls for a
 7         legal conclusion.
 8              THE WITNESS:  I understand that
 9         plaintiffs in this case are focused
10         very much on the potential benefits of
11         TAF had it been available earlier, and
12         that is different from some cases that
13         I've been involved in where the line
14         extension did not provide benefits,
15         and that that difference only enhances
16         the impact on a company in Gilead's
17         position.
18              A superior drug would really
19         likely do a really good job of
20         substituting for the old drug and,
21         therefore, threaten that franchise
22         even more than line extensions that
23         are only modest improvements or not at
24         all.
25              ///
```

```
 1   BY MR. CASAZZA:
 2        Q.     And you testified a few moments
 3   ago that if TAF were safer than TDF, it would
 4   not only be a substitute for TDF, that new
 5   patients would likely be able to take it,
 6   right?
 7              MR. O'CONNOR:  Objection
 8         insofar as it misstates prior
 9         testimony.
10              THE WITNESS:  Again, I'm not a
11         clinical expert, but that -- as a
12         health economist, I would say a better
13         product and a safer product by common
14         sense should be available to more
15         patients, because patients, for
16         example, with those kidney risks maybe
17         couldn't take the TDF-based products.
18         Again, I'm not a clinician so I don't
19         want to stray too far because maybe
20         there's no alternative.
21              But as I understand it -- and
22         certainly Gilead in the forecasts and
23         the documents that I cited in my
24         report, they talk about incremental
25         growth as well as cannibalization and
```

1           not just cannibalization.

2      BY MR. CASAZZA:

3           Q.     As a matter of health

4      economics, though, you'd agree, generally

5      speaking, that for a safer drug more patients

6      can take it, both because more patients can

7      take it initially for the kinds of reasons

8      you discussed, and then there would

9      potentially be fewer discontinuations of

10     patients taking the medication?

11               MR. O'CONNOR:  Object to form.

12               THE WITNESS:  Again, I'm not a

13          clinician, but as someone who applies

14          economics to this field, I would

15          imagine that there would both be more

16          patients starting and, having read the

17          Complaint, fewer patients having to

18          discontinue because of problems, yes.

19     BY MR. CASAZZA:

20          Q.     In this case you're not

21     offering any opinion that consumers were

22     harmed because they had to pay more for TAF

23     medications, are you?

24          A.     I am not offering any opinion

25     about consumer harm, per se.  I'm offering an

1    opinion about the economic incentives for a

2    manufacturer to delay entry of a drug that

3    would cannibalize a prior drug.

4         Q.    Have you authored any journal

5    articles, essays, or book chapters about

6    product switches?

7         A.    I have not.

8         Q.    Have you conducted any research

9    about product switches separate from this

10   case?

11              MR. O'CONNOR:  Objection.

12              THE WITNESS:  Well -- sorry, go

13        ahead.

14              In other cases I have looked at

15        product switches, sometimes with

16        empirical data on sales of those

17        product line extensions.

18   BY MR. CASAZZA:

19        Q.    But outside of your role as an

20   expert witness, you've never conducted any

21   research regarding product switches, correct?

22        A.    I have not, no.

23        Q.    As a healthcare economist,

24   would you agree that payers will generally

25   pay more for a safer drug than a less safe

Meredith B. Rosenthal, Ph.D.

1    alternative?

2              MR. O'CONNOR:  Objection.

3         Form, vague.

4              THE WITNESS:  I would say all

5         things equal, payers will be willing

6         to pay more for a safer drug.  The

7         market as a whole.

8              So there are two -- there are

9         the list prices that manufacturers --

10        as they think about setting their list

11        prices, sort of their relative

12        benefits and harms compared to other

13        products is part of the decision to

14        set those list prices, and then payers

15        can decide whether or not to cover the

16        product conditional on those prices.

17             But, yes, in general the

18        characteristics of a drug are related

19        to its price; although, those prices

20        are not competitively set.

21   BY MR. CASAZZA:

22        Q.    And as we discussed a moment

23   ago, in general, if a drug is safer it has a

24   larger base of potential patients, right?

25             MR. O'CONNOR:  Objection.

Meredith B. Rosenthal, Ph.D.

```
 1            Asked and answered.
 2                 THE WITNESS:  All things equal,
 3            if a drug is safer, it should be
 4            desirable to a larger base of patients
 5            and used by a larger base of patients.
 6    BY MR. CASAZZA:
 7            Q.    So all things equal, if a drug
 8    is safer, a drug company could sell a higher
 9    quantity of that safer drug and charge more
10    for it, right?
11                 MR. O'CONNOR:  Objection.
12            Incomplete hypothetical.
13                 THE WITNESS:  Potentially.
14            Maybe one or the other.  It's not
15            obvious that a better drug gets both a
16            higher price and more sales, so it
17            depends on the demand response, but
18            it's possible.
19    BY MR. CASAZZA:
20            Q.    But if the company could make
21    the higher price selling the safer drug, it
22    wouldn't make sense to wait to sell that
23    drug, would it?
24            A.    It absolutely 100 percent
25    could.  Again, if the company is going to
```

Meredith B. Rosenthal, Ph.D.

1    lose a lot of sales on this prior product, it

2    could absolutely make sense to delay.

3         Q.    But it could also make sense to

4    not delay, right?  I mean, if the company

5    waits, it has less time to sell the safer

6    drug before the patent on the safer drug

7    expires?

8              MR. O'CONNOR:  Objection.

9         Compound.

10             THE WITNESS:  It is possible to

11        construct a scenario where it's better

12        to launch.  I mean, that's the whole

13        point of constructing the scenarios.

14             Given that TAF delayed until

15        2015, and looking at the data we have

16        now, it's my opinion that the profits

17        of the entire TDF franchise were so

18        enormous that delay was profitable.

19   BY MR. CASAZZA:

20        Q.    But you didn't calculate what

21   the profits of the TAF and TDF franchises

22   combined might have been had Gilead released

23   TAF medications sooner, correct?

24        A.    I did not.  I described the way

25   in which that could be profitable.  And

Meredith B. Rosenthal, Ph.D.

1    again, my opinion is responsive to my

2    assignment, which is that the plaintiffs

3    asked me to describe how competition works in

4    the context of the way pharmaceuticals are

5    regulated and the way they can be marketed,

6    and describe how there could be an economic

7    incentive to delay.

8                     I understand that plaintiffs

9    will prove -- intend to prove their case

10   through other evidence and experts, and so I

11   described how it could be profitable.  I was

12   not asked to make a particular -- to assume

13   certain particular launch dates or other

14   assumptions to demonstrate that it is always

15   profitable.

16                    So you can come up with

17   scenarios like the one Professor Lakdawalla

18   constructed where essentially TDF has no

19   growth in both the scenario where TAF

20   launches early and late, and you can show a

21   scenario where launching early is more

22   profitable.  That scenario looks nothing like

23   what actually happened.

24        Q.     Just to make sure I understand,

25   in this case you're opining how delay could

Meredith B. Rosenthal, Ph.D.

1    be profitable and not that delay necessarily

2    was profitable under the alleged facts of

3    this case, right?

4         A.    The main part of my opinion --

5    my opinion, really, is that there was an

6    economic incentive to delay.  At the end of

7    my report I say looking from 2022, we can see

8    how profitable delay, if there was -- if

9    plaintiffs can prove there was a delay, how

10   profitable that delay was.

11        Q.    And when you say "if plaintiffs

12   can prove there was a delay," you mean if

13   plaintiffs can prove that Gilead could have

14   launched TAF sooner than it did and made a

15   deliberate choice to not launch TAF sooner,

16   correct?

17             MR. O'CONNOR:  Objection to

18        form.  Objection insofar as it calls

19        for a legal conclusion.

20             THE WITNESS:  I'm not a lawyer,

21        but I assume that that's part of -- we

22        talked before about sort of what

23        Gilead knew and with what degree of

24        certainty.

25             I assume that the fact that

Meredith B. Rosenthal, Ph.D.

1          they could have launched earlier -- I

2          mean, I've read the Complaint.  That's

3          part of their allegations.

4               So that -- if that is, in fact,

5          possible, then looking at the

6          profitability of TDF and of what the

7          launch of TAF looks like, I can see

8          that the profitability of delay is

9          very high.

10              You know, I offer those

11         reflections at the end of my report --

12         I'm sure we'll get to that -- in the

13         closing paragraphs about what happened

14         when TAF ultimately launched, and a

15         scenario like the one that actually

16         happened where the TDF franchise grew

17         dramatically over those eight to ten

18         years.

19              And then TAF came in and carved

20         out in, you know, the first full year

21         a significant share of that TDF

22         market, that that was more profitable

23         than launching earlier.  Because if

24         TAF had launched earlier, there's no

25         growth of TDF.  And so the later

1            launch allows Gilead to have its cake
2            and eat it too.
3    BY MR. CASAZZA:
4        Q.      In this case, you understand
5    that plaintiffs are not challenging the legal
6    validity of any of Gilead's patents, right?
7        A.      Well, I'm not a lawyer.  I
8    don't recall any allegations like that,
9    but -- I don't know for sure, but nothing
10   that I read suggests that to me.
11       Q.      You understand that these cases
12   are not challenging whether Gilead complied
13   with the Hatch-Waxman Act, right?
14       A.      I don't believe so, no.  I
15   don't believe there are any allegations
16   related to the Hatch-Waxman Act.
17              And maybe you're on a roll, but
18   I was thinking that a break, whenever makes
19   sense, would be good about now.  It's been --
20       Q.      That's fine.  Let's go ahead
21   and take a break.
22       A.      Okay.
23       Q.      Want to come back on the record
24   at 8:35 -- 11:35 Eastern?
25       A.      Yes, that sounds great.  And

Meredith B. Rosenthal, Ph.D.

```
 1      good for you, quick math.  All right.  I'll
 2      be back at 11:35.
 3                   MR. O'CONNOR:  Are we going to
 4           go off the record?
 5                   THE VIDEOGRAPHER:  The time
 6           right now is 11:29 a.m.  We are off
 7           the record.
 8                   (Whereupon, a recess was
 9           taken.)
10                   THE VIDEOGRAPHER:  The time
11           right now is 11:35 a.m.  We are back
12           on the record.
13      BY MR. CASAZZA:
14           Q.     Dr. Rosenthal, you're not
15      offering any opinions in this case on whether
16      Gilead complied with the Hatch-Waxman Act,
17      right?
18           A.     I believe I answered that
19      before we broke, but I am not offering any
20      opinions about whether they complied with the
21      Hatch-Waxman Act, no.
22           Q.     You're not offering any
23      opinions on whether Gilead complied with the
24      patent act?
25           A.     No.
```

Meredith B. Rosenthal, Ph.D.

```
 1                  MR. O'CONNOR:  Objection to the
 2          extent it calls for a legal
 3          conclusion.
 4                  THE WITNESS:  No, I am not.
 5   BY MR. CASAZZA:
 6          Q.      You're not offering any
 7   opinions on whether Gilead complied with the
 8   Sherman Act or any other antitrust laws, are
 9   you?
10          A.      No, I am not.
11          Q.      You're not offering any
12   opinions on whether Gilead complied with any
13   laws or regulations, correct?
14                  MR. O'CONNOR:  Objection.  Same
15          objection, calls for a legal
16          conclusion.
17                  THE WITNESS:  That is correct,
18          I am not offering any opinion about
19          compliance with any law.
20   BY MR. CASAZZA:
21          Q.      And, Dr. Rosenthal, we marked
22   your expert report as Exhibit 1.
23                  MR. CASAZZA:  Derek, if you
24          wouldn't mind bringing that up again.
25          Q.      Dr. Rosenthal, this document
```

1    contains all of the opinions you intend to

2    offer at trial in this case, right?

3          A.    At this time, yes, it does.

4          Q.    If we could turn to numbered

5    page 3 of your report, paragraph 8.  In the

6    middle of the paragraph, you write that,

7    "Attachment B is a listing of the materials I

8    relied on in forming the opinions included in

9    this report."

10               Do you see that?

11         A.    I do.

12         Q.    And then if we could flip about

13   25 more pages, or 30 pages or so, into

14   Exhibit 1.  Let's get to Exhibit B.  I'm

15   sorry, Attachment B.

16               MR. CASAZZA:  Derek, what

17         numbered page of the PDF is this?  I

18         see it's page B1 of the document.

19               I think Derek is on mute.  He

20         just went off mute.

21               Derek, what numbered page of

22         the PDF is this, just for the record?

23               TRIAL TECHNICIAN:  Give me one

24         second.  It's not showing up on that

25         screen.

```
 1              MR. CASAZZA:  I'll just move
 2        on.  It's fine.
 3   BY MR. CASAZZA:
 4        Q.    Dr. Rosenthal, here beginning
 5   at page B1 is the Attachment B you referenced
 6   in paragraph 8 of your report.  It is the
 7   listing of the materials you relied on in
 8   forming the opinions included in your report,
 9   right?
10        A.    That's right.
11              MR. CASAZZA:  And for the
12        record, I'll note this is page 47 of
13        the PDF.
14        Q.    Dr. Rosenthal, have you
15   reviewed every page of every document on
16   Attachment B?
17        A.    I'm not sure that I reviewed
18   every page of every document.  I had access
19   to the complete documents, but in these
20   documents I was focused on the particular --
21   well, if you look in the text, you know, some
22   of them relate to particular language around
23   business plans and forecasts, so I don't use
24   every page of these.
25        Q.    When you say you had access to
```

Meredith B. Rosenthal, Ph.D.

1    the complete documents, you mean you had

2    access to the complete documents listed here

3    in Attachment B, right?

4         A.    Yes.  And my staff had access

5    to the documents produced in this matter.

6         Q.    Okay.  But you only had access

7    to the documents listed in Attachment B,

8    correct?

9         A.    I personally relied on these

10   documents.  I could have asked for other

11   documents, so I think -- but these were the

12   documents that I relied on, that I actually

13   opened and looked at.

14        Q.    Okay.  To form your opinion,

15   you did not review any documents that are not

16   listed here on Attachment B, correct?

17        A.    That is correct.

18             MR. O'CONNOR:  Objection to

19        form.

20   BY MR. CASAZZA:

21        Q.    So Attachment B is a complete

22   list of all of the documents that you

23   reviewed in forming your opinions in this

24   case?

25             MR. O'CONNOR:  Object to the

Meredith B. Rosenthal, Ph.D.

1              form.  Misstates prior testimony.

2                   THE WITNESS:  That's correct.

3      BY MR. CASAZZA:

4          Q.     How long did you spend

5      reviewing the materials on Attachment B prior

6      to issuing your report in this case?

7          A.     Well, as you know, perhaps if

8      you look through the other documents, that

9      list, many of those are documents that I have

10     used to describe incentives in the industry,

11     to describe the Hatch-Waxman Act.

12                  So many of those documents were

13     not documents that I reviewed anew for this

14     case because I have relied on them in many

15     cases to describe the incentives in the

16     pharmaceutical industry.

17                  I maybe spent a couple of hours

18     on the Bates-numbered documents.

19         Q.     So that was going to be my next

20     question.

21                  The 14 Gilead internal

22     documents, the Bates documents listed on

23     Attachment B, you reviewed those for the

24     first time for this litigation, right?

25         A.     Certainly those Bates-numbered

Meredith B. Rosenthal, Ph.D.

```
1    documents, yes.
2         Q.    How much time did you spend
3    reviewing those 14 documents?
4         A.    Well, I just said an hour or
5    two.  I don't track my time separately for
6    document review and other tasks that I'm
7    working on in preparing my report, writing,
8    editing, that sort of thing.  So I don't know
9    exactly, but I would say an hour or two.
10        Q.    You did not read any deposition
11   testimony in forming your opinions in this
12   case, correct?
13        A.    No, I did not.
14        Q.    Did you ask to see any
15   deposition transcripts?
16        A.    No, I did not.
17        Q.    You don't know how many current
18   and former Gilead employees have been deposed
19   in connection with this litigation, do you?
20        A.    No.  That was not relevant to
21   forming my opinions, which were about the
22   economic incentives, and so I did not examine
23   depositions.
24        Q.    You haven't reviewed so much as
25   a page of a transcript of deposition
```

Meredith B. Rosenthal, Ph.D.

1    testimony from any Gilead employee, have you?

2         A.    I have not.

3         Q.    You've served as an expert

4    witness before, right?

5         A.    Yes, I have.

6         Q.    From your prior litigation

7    experience, you knew there had been fact

8    discovery in this case, right?

9         A.    I could have assumed it.  Yes,

10   but I don't know whether that always happens

11   in a particular sequence.

12        Q.    But you knew that Gilead

13   employees had been deposed, right?

14        A.    I don't know -- I don't know

15   how to answer that question.  That's not

16   something I considered, because I was

17   considering the facts of the TDF and TAF

18   markets, the allegations and the economics of

19   the industry.

20        Q.    But from your other

21   litigations, you knew that many of the people

22   who wrote the documents on which you relied

23   would have been deposed, right?

24             MR. O'CONNOR:  Objection.

25        Form, assumes facts not in evidence,

Meredith B. Rosenthal, Ph.D.

```
1              argumentative.
2                   THE WITNESS:  I don't know
3              that's -- I could not have told you
4              that the documents necessarily
5              correspond to fact witness
6              depositions.  I know in these cases
7              there are fact witness depositions,
8              but I think beyond that I couldn't
9              have told you what the scope is.
10   BY MR. CASAZZA:
11        Q.      For example, you relied on a
12   memorandum from Peter Virsik, you recall,
13   regarding a so-called patent extension
14   strategy, correct?
15        A.      Yes, I did.
16        Q.      But you didn't read
17   Mr. Virsik's testimony, did you?
18        A.      No, I did not, nor would that
19   have changed my opinion.
20        Q.      Before issuing your expert
21   report in this case, did you review any
22   expert reports?
23        A.      No, I did not.
24        Q.      So other than the documents
25   listed on Attachment B, there are no other
```

1    materials you reviewed for this litigation

2    prior to issuing your report, correct?

3          A.     That's correct.

4          Q.     And of the materials on

5    Attachment B, you spent, by your estimation,

6    one or two hours reviewing the 14 Gilead

7    documents listed underneath Bates documents,

8    correct?

9          A.     That's correct.

10         Q.     Going back to your report, if

11   we can turn to numbered page 18,

12   paragraph 40.  Right there at the beginning

13   of paragraph 40 you opine that, "Documentary

14   evidence reveals that Gilead understood the

15   launch of its TAF-based drugs as a means of

16   maintaining sales in the tenofovir market and

17   avoiding the effects of generic TDF-based

18   drugs."

19               Right?

20         A.     I'm sorry, I was just confused

21   about the way that was put together.  I see

22   you brought paragraph 40 up from the previous

23   page.  Very impressive.

24               Yes.

25         Q.     The term "documentary evidence"

1    in paragraph 40 of your report refers to the

2    14 Gilead-produced documents on your reliance

3    list and the three publicly available

4    documents that you also cite in Section VII

5    of your report, correct?

6         A.    Yes, I'm showing examples of

7    where the documents that were produced and

8    public statements are consistent with their

9    understanding of the potential

10   cannibalization of TDF from a TAF launch.

11             MR. O'CONNOR:  Objection

12        insofar as it misstates her report.

13   BY MR. CASAZZA:

14        Q.    In this same paragraph 40, you

15   go on to use the phrase "documents produced

16   in this matter."  Again, there you're

17   referring to the 14 Gilead-produced documents

18   listed on your reliance list, right?

19        A.    Yes, because I am showing

20   examples of language that is consistent with

21   the incentives that are the main subject of

22   my report.

23        Q.    Okay.  You're not referring to

24   any Gilead documents that are not listed in

25   appendix -- sorry, Attachment B to your

Meredith B. Rosenthal, Ph.D.

```
1    report, right?
2         A.    That's correct.  I am not
3    referring to documents beyond those examples.
4         Q.    Do you know how many documents
5    Gilead has produced in this case?
6         A.    I do not specifically, no.
7         Q.    You would expect it's more than
8    14, right?
9         A.    Absolutely.  And my assignment
10   was not to weigh the documentary evidence, my
11   assignment was to explain the economic
12   incentives, and I used examples of documents
13   that reflect those economic incentives.  I
14   was in no way trying to count all of the
15   documents that reference those incentives.
16        Q.    But those are the only 14
17   Gilead documents you reviewed before writing
18   your report, right?
19        A.    That is correct.  And my
20   opinion about the economic incentives in this
21   matter do not require that I review all of
22   the documents or some number of the documents
23   beyond those examples.
24        Q.    Were those 14 documents given
25   to you by plaintiffs' counsel?
```

Meredith B. Rosenthal, Ph.D.

1        A.        I asked my staff to search for

2   documents that would describe the strategy

3   for launching TAF.  The staff may have gotten

4   documents from counsel in addition to doing

5   keyword searches.  I don't know for sure.

6        Q.        So you don't know how your

7   staff got the 14 documents that were

8   ultimately given to you by your staff?

9        A.        I don't know for sure which

10  ones came from counsel, no.

11       Q.        Toward the bottom of

12  paragraph 40, you claim that a 2010 document,

13  which you described as a 15-year plan for

14  Gilead's HIV franchise, supports your opinion

15  that Gilead understood the launch of its

16  TAF-based drugs as a means of maintaining

17  sales in the tenofovir market and avoiding

18  the effects of generic TDF-based drugs.

19       A.        Yes.  I'm sorry, you faded away

20  just a little bit at the end.

21       Q.        Yeah, sorry.  I'll ask it

22  again.

23                 In paragraph 40 of your report,

24  you claim that a 2010 document, which you

25  call a 15-year plan for Gilead's HIV

Meredith B. Rosenthal, Ph.D.

1    franchise, supports your opinion that Gilead

2    understood the launch of its TAF-based drugs

3    as a means of maintaining sales in the

4    tenofovir market and avoiding the effects of

5    generic TDF-based drugs, right?

6          A.     Yes.

7                 MR. CASAZZA:  And then if we

8          could just bring up paragraph 41 on to

9          the screen.

10         Q.     In paragraph 41, you opine that

11   Gilead prepared to mitigate the loss of

12   patent protection by applying a strategy with

13   some product switch features to their first

14   TAF product, right?

15                MR. O'CONNOR:  Objection

16         insofar as it misstates what the

17         document states.  That is not quoting

18         it entirely.

19                THE WITNESS:  Yes.  I said,

20         "Gilead apparently prepared," based on

21         what the document says and, in

22         particular, the quotation that I cite

23         there that begins with GS-7340, "may

24         provide an additional four years of

25         market exclusivity..."

1    BY MR. CASAZZA:

2         Q.     Okay.  And I want to make sure

3    I understand the distinction you were drawing

4    there, and from counsel's objection.

5              You were not opining that

6    Gilead actually prepared to mitigate the loss

7    of patent protection by applying a strategy

8    with some product switch features to its

9    first TAF product; you are, instead, opining

10   that Gilead apparently prepared to mitigate

11   the loss of patent protection by applying a

12   strategy with some product switch features to

13   their first TAF product, right?

14        A.     Yes, and because I'm not a

15   lawyer I cannot tell you what evidence the

16   Court or the jury would find compelling or

17   would accept as proof.  As a health economist

18   reading those sentences, it in plain language

19   says exactly what I conclude, which is that

20   delaying the launch of the TAF products would

21   extend Gilead's franchise.

22        Q.     In paragraph 41, you support

23   your initial statement by referencing a 2003

24   financial analysis, right?

25        A.     Yes.

Meredith B. Rosenthal, Ph.D.

1          Q.      You would agree that a plan
2     Gilead developed in 2010 came approximately
3     seven years later than the 2003 financial
4     analysis, right?
5                  MR. O'CONNOR:  Objection
6          insofar as it calls for -- strike
7          that.
8                  Objection.  Incomplete
9          hypothetical.
10                 THE WITNESS:  Based on my
11         understanding of when the documents
12         were prepared, yes, they were seven
13         years apart.
14    BY MR. CASAZZA:
15         Q.      But the 2010 plan you cite in
16    paragraph 40 doesn't mention the 2003
17    financial analysis you cite in paragraph 41,
18    does it?
19         A.      I would have to review it, but
20    I certainly don't cite that part of the
21    document.  So as I sit here, I don't know for
22    sure.  I'm happy to look at it, or -- but I
23    just -- I don't know for sure as I sit here.
24         Q.      Without looking at it, you
25    don't know whether that 2010 plan even

Meredith B. Rosenthal, Ph.D.

1    mentions any financial analysis of TAF, do

2    you?

3           A.      I don't, no.

4           Q.      Let's take a look at it.

5                   MR. CASAZZA:  Derek, can you

6           please bring up tab 10?  And we'll go

7           ahead and mark this as Exhibit 2.

8                        -      -      -

9                   (Whereupon, Rosenthal Exhibit

10          Number 2 was marked for

11          identification.)

12                       -      -      -

13   BY MR. CASAZZA:

14          Q.      Dr. Rosenthal, this is the

15   document you cite in paragraph -- sorry.

16                  Dr. Rosenthal, this is the

17   document you cite in footnote 78 of your

18   report from paragraph 40, correct?

19          A.      It looks familiar, yes.

20          Q.      You only mention the

21   introduction to this document in your report,

22   right?

23          A.      I believe I only quote it, yes.

24          Q.      The document says that it was

25   written to the Board of Directors from John

Meredith B. Rosenthal, Ph.D.

1    Milligan and Norbert Bischofberger.

2                Do you see that?

3         A.    I do.

4         Q.    In 2010, what was John

5    Milligan's role at Gilead?

6         A.    I don't know.

7         Q.    In 2010, what was Norbert

8    Bischofberger's role at Gilead?

9         A.    I don't know.

10        Q.    You never read either of their

11   depositions, did you?

12        A.    I did not.

13        Q.    So you don't know whether or

14   not they were asked about this document,

15   right?

16        A.    I don't, no, nor would it

17   affect the way I use this document, which is,

18   again, to show that they use language that

19   recognizes the importance of evergreening, in

20   essence.

21        Q.    This document doesn't say

22   "evergreening" on it, though, does it?

23        A.    It does not.

24        Q.    And again, you don't know what

25   John Milligan or Norbert Bischofberger

Meredith B. Rosenthal, Ph.D.

1    actually said about this document, do you?

2              MR. O'CONNOR:  Objection.

3         Form.

4              THE WITNESS:  I don't know.

5    BY MR. CASAZZA:

6         Q.     Do you see the first sentence

7    on page 1 underneath the heading "HIV

8    Franchise," it says, "The current HIV

9    franchise will have sustained revenues

10   through 2018 extending beyond 2025"?

11        A.     Yes.

12        Q.     And then the memo says that

13   Viread would lose exclusivity in major

14   markets in 2018, right?

15        A.     That's right.

16        Q.     The memo does not say that all

17   of Gilead's TDF medications would lose

18   exclusivity; it just says that Viread would

19   lose exclusivity in 2018, right?

20        A.     Consistent with what I

21   understand the patents involve, yes.

22        Q.     So at this time in 2010, you

23   understand that there were TDF medications on

24   the market other than Viread, right?

25        A.     I do.

Meredith B. Rosenthal, Ph.D.

```
 1              Q.     Do you know which ones?

 2              A.     Truvada and Atripla.  I think

 3    Complera launches after that.

 4              Q.     And Stribild launches after

 5    this as well, too, right?

 6              A.     Yes, Stribild launches after

 7    Complera.

 8              Q.     Do you know where Gilead was

 9    with respect to developing Complera and

10    Stribild at the time John Milligan and

11    Norbert Bischofberger wrote this memo in

12    2010?

13                    MR. O'CONNOR:  Objection to

14         form.

15                    THE WITNESS:  I don't

16         specifically, no.  But based on what I

17         know as a non-expert in drug

18         development, that those products would

19         be in the pipeline.

20    BY MR. CASAZZA:

21              Q.     And you know that some of

22    Gilead's TDF medications have exclusivity

23    beyond 2025, right?

24              A.     I do.  I think 2032 or '33 is

25    the latest.
```

Meredith B. Rosenthal, Ph.D.

```
 1          Q.     So let's pull back to the
 2   document itself.
 3                 Underneath "HIV Franchise," it
 4   briefly notes that Gilead would develop three
 5   single-tablet regimens.
 6                 Do you see that?
 7          A.     Yes.
 8          Q.     I think the third one is on the
 9   next page, if we bring it up.
10          A.     Right.
11          Q.     And none of those three
12   single-tablet regimens are TAF, right?
13                 MR. O'CONNOR:  Objection.
14   Form.
15          A.     The three -- I'm sorry, Derek
16   highlighted a bigger piece of it.  But, yes,
17   none of those three are TAF.
18          Q.     On page 2, it goes on to list
19   three new agents that Gilead would develop,
20   right?
21          A.     Yep.
22          Q.     One of those three is TAF,
23   right?
24          A.     The first one.
25          Q.     Do you know if the other two
```

Meredith B. Rosenthal, Ph.D.

1    new agents were ever developed?

2         A.    I don't.  I don't for sure.  I

3    don't believe so.

4         Q.    This document titled "Gilead

5    Vision 2025," Exhibit 2, it doesn't mention

6    product switching, does it?

7         A.    It doesn't mention product

8    switching.  It mentions patent expiration and

9    the threat of generic entry.  That's what I

10   used it for.

11        Q.    But it doesn't say that Gilead

12   decided back in 2003 or 2004 to delay

13   development of TAF to later extend its HIV

14   franchise, does it?

15             MR. O'CONNOR:  Objection.

16             THE WITNESS:  It doesn't say

17        exactly that, no.

18   BY MR. CASAZZA:

19        Q.    It doesn't mention that TAF had

20   always been part of some kind of patent

21   extension strategy, does it?

22             MR. O'CONNOR:  Same objection.

23             THE WITNESS:  It doesn't say

24        that.  I think if the document said

25        that, I would have quoted that

Meredith B. Rosenthal, Ph.D.

```
 1              exactly.  Nonetheless, I was asked to
 2              provide an economic context for
 3              Gilead's alleged behavior, not to find
 4              the best evidence in the documents to
 5              prove plaintiffs' case.
 6      BY MR. CASAZZA:
 7          Q.    But you're not opining that
 8      product switching is illegal, right?
 9              MR. O'CONNOR:  Objection.
10              Asked and answered.
11              THE WITNESS:  I am not opining
12              that product switching is illegal.
13              I'm opining that it is profitable.
14      BY MR. CASAZZA:
15          Q.    So from your perspective,
16      you're not aware of any reason why Gilead
17      wouldn't have mentioned product switching as
18      its strategy in documents if that's what it
19      were taking as a strategy, correct?
20              MR. O'CONNOR:  Objection, form.
21              Objection, incomplete hypothetical.
22              Objection, foundation.  Objection,
23              misstates prior testimony.
24              THE WITNESS:  Just to be clear,
25              while this document does not use the
```

Meredith B. Rosenthal, Ph.D.

1          words "product switching," it does not

2          refer back to the 2003 plan, it does

3          say GS-7340 would replace tenofovir

4          disoproxil fumarate -- I don't say

5          that as well as you -- in

6          single-tablet regimens.  That is a

7          product switch.

8     BY MR. CASAZZA:

9          Q.     If we could go back to your

10    report in paragraph 41.

11              MR. CASAZZA:  That's 40.  We

12          can take down 40 completely and just

13          go to 41.

14          Q.     In the first sentence of

15    paragraph 41, you write that, "Gilead

16    apparently prepared to mitigate this loss by

17    applying a strategy with some product switch

18    features to their first TAF product."

19              What product switch features

20    are you referencing in that paragraph?

21          A.     Essentially the delaying of the

22    launch of the new product until closer to

23    patent expiration.

24          Q.     Are you opining here with the

25    use of the phrase "some product switch

Meredith B. Rosenthal, Ph.D.

1    features," that Gilead implemented certain

2    aspects of a product switch strategy but not

3    others?

4         A.    As we've discussed earlier and

5    I acknowledge in my report, TAF is -- at

6    least if the plaintiffs can prove their case,

7    TAF was known to be a superior product.  Many

8    product switches don't involve superior

9    products, but again, that only enhances the

10   extent to which it will cannibalize the first

11   product.

12             So in that way, it is different

13   from some of those papers that I cite that

14   describe line extensions that do not have

15   significant benefits to patients.

16        Q.    And as we discussed earlier, if

17   the later product is superior to the former

18   product, it might not only cannibalize the

19   former product, but might grow a patient base

20   from what the former product targeted,

21   correct?

22        A.    It might as well, but that

23   doesn't change the fact that timing it to

24   minimize cannibalization can increase

25   profits.

Meredith B. Rosenthal, Ph.D.

1        Q.     In paragraph 41 you refer to a

2   2003 Gilead financial analysis, titled

3   "financial analysis of GS-7340," as a

4   tenofovir exclusivity extension, right?

5        A.     Yes.

6               MR. CASAZZA:  Let's go ahead

7          and mark that and bring it up.  Derek,

8          if we can please bring up tab 7, and

9          we'll mark this as Exhibit 3.

10                     -     -     -

11              (Whereupon, Rosenthal Exhibit

12         Number 3 was marked for

13         identification.)

14                     -     -     -

15   BY MR. CASAZZA:

16        Q.     This is the financial analysis

17   to which you were referring in paragraph 41

18   of your report, correct, Dr. Rosenthal?

19        A.     That's correct, from Peter

20   Virsik.

21        Q.     If I slip up and call this the

22   Virsik memo or Virsik memorandum, you'll

23   understand that I'm referring to Exhibit 3?

24        A.     Yes, I do.

25        Q.     You didn't review any other

Meredith B. Rosenthal, Ph.D.

1    memos by Mr. Virsik, did you?

2         A.    No, I did not.

3         Q.    On the first page, underneath

4    the heading "Summary," do you see the second

5    sentence begins, "While the product profile

6    of GS-7340 is not yet solidified, GS-7340 may

7    provide an additional four years of market

8    exclusivity compared to tenofovir disoproxil

9    fumarate (TDF)."

10             Do you see that?

11        A.    I do.

12        Q.    You agree that as of September

13   2003, the product profile of TAF was not

14   solidified?

15             MR. O'CONNOR:  Objection

16        insofar as it calls for -- objection.

17        Foundation.

18             THE WITNESS:  I do not have an

19        opinion about what Gilead knew and how

20        to characterize it.  I agree that

21        those words are on this page, but I

22        believe what you're talking about is a

23        legal conclusion about the weight of

24        the evidence.

25                 ///

Meredith D. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2         Q.    As of September 2003, according

3    to the face of this document, Gilead did not

4    know whether TAF would be safer than TDF,

5    right?

6              MR. O'CONNOR:  Objection.

7         Foundation.

8              THE WITNESS:  Again, I can

9         report what the document says, and I

10        will have to look at other parts of

11        the document, but the product profile

12        not being yet solidified could mean

13        many things in addition to safety.

14             There are some projections --

15        and I don't know if this is one of

16        them; we can look further -- where

17        they talk about different patient

18        subgroups that it might be targeted

19        to, and so I think of profile as being

20        partly science and partly marketing.

21             But again, I don't have an

22        opinion about whether this document is

23        trying to convey a scientific opinion

24        or a degree of scientific certainty.

25             ///

Meredith B. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2         Q.     As of September 2003, Gilead

3    did not know whether TAF would be more

4    effective as an antiviral than TDF, did it?

5              MR. O'CONNOR:  Objection,

6         foundation.  Objection, incomplete

7         hypothetical.

8              THE WITNESS:  Again, that's

9         beyond the scope of my expertise.

10   BY MR. CASAZZA:

11        Q.     But you reviewed this memo and

12   know that the memo goes on to make

13   assumptions about safety and efficacy, right?

14        A.     The memo goes on to make

15   assumptions about how those safety and

16   efficacy profiles would affect sales.  That's

17   what I think is -- those words are

18   specifically in the sense of the extent to

19   which it will substitute for the TDF products

20   and the extent to which it will grow over and

21   above that.

22        Q.     But the memo is making

23   assumptions about safety and efficacy because

24   the safety and efficacy of TAF were not known

25   to Gilead at the time of this memo, right?

Meredith B. Rosenthal, Ph.D.

```
 1              MR. O'CONNOR:  Objection,
 2         foundation.  Objection, form.
 3         Objection insofar as it calls for a
 4         specific part of the document that's
 5         being quoted, that that be shown to
 6         Dr. Rosenthal.
 7              THE WITNESS:  Again, I can see
 8         the words on the page in front of me,
 9         but I -- it is beyond the scope of my
10         expertise and beyond the scope of my
11         assignment to conclude what Gilead
12         knew and when they knew it.  I believe
13         plaintiffs have other experts and
14         evidence that they will use to prove
15         their allegations.
16    BY MR. CASAZZA:
17         Q.    Getting back to the sentence we
18    looked at before, the second sentence
19    underneath "Summary," part of it said that,
20    "GS-7340 may provide an additional four years
21    of market exclusivity compared to tenofovir
22    disoproxil fumarate (TDF)."
23              That additional four years, you
24    understand that to be the result of a later
25    patent expiration for TAF than the patent
```

Meredith B. Rosenthal, Ph.D.

1    expiration for Viread, correct?

2         A.    Yes, but when they talk about

3    an additional four years of market

4    exclusivity, it's with regard to the whole

5    franchise.  But yes.

6         Q.    But that four years, in your

7    understanding, has nothing to do with what's

8    called NCE under the Hatch-Waxman Act, right?

9         A.    The four years is a function of

10   the patents, as -- again, I'm not a patent

11   expert, but as I understand it as a health

12   economist, the additional four years is

13   related to the patents for what the product

14   that -- well, the TAF -- the first TAF

15   product that at this point they anticipated

16   launching.

17        Q.    That additional period of

18   exclusivity that you're referring to here

19   does not refer to NCE exclusivity under the

20   Hatch-Waxman Act, correct?

21             MR. O'CONNOR:  Objection, form,

22        insofar as NCE is not defined.

23             THE WITNESS:  Yes, I don't know

24        for sure what you're talking about

25        with -- I know in the Hatch-Waxman

Meredith B. Rosenthal, Ph.D.

```
 1          Act, what I describe in my report, is
 2          that there's -- one of the, sort of,
 3          balances that the Hatch-Waxman Act
 4          provides is a minimum exclusivity
 5          term.  I don't know if that's the same
 6          as the NCE exclusivity that you're
 7          talking about.
 8   BY MR. CASAZZA:
 9          Q.     Have you ever heard the phrase
10   "NCE exclusivity" or "new chemical entity
11   exclusivity" in the context of the
12   Hatch-Waxman Act?
13          A.     I think I have, but I don't
14   know if that's the same as the additional
15   five years of exclusivity -- not the
16   additional, but the minimum of five years of
17   exclusivity that the FDA provides.
18                 I think in the case of an NCE,
19   of a new chemical -- sorry, what's the E
20   again?
21          Q.     Entity.
22          A.     Entity.
23                 So that's my understanding, is
24   that's the minimum that is the same.  But I
25   am not an expert on the law, so the way I've
```

Meredith B. Rosenthal, Ph.D.

1  described it is -- in my report, is that the

2  FDA, in providing a number of ways to speed

3  up generic entry, also wanted to provide some

4  balance to brand-name drug manufacturers.

5  And this five-year minimum, I believe that it

6  may well be the NCE exclusivity that you're

7  talking about.

8       Q.    But in any event, your

9  understanding of the document we're reviewing

10 here at Exhibit 3, that this is referring to

11 exclusivity that would be provided to TAF by

12 virtue of patents on TAF rather than

13 Hatch-Waxman exclusivity, correct?

14      A.    I believe so.  I believe so,

15 yes.

16      Q.    In the 14 Gilead documents you

17 reviewed for your report, you didn't see any

18 evidence that Gilead considered Hatch-Waxman

19 exclusivity in connection with its

20 development of TAF, did you?

21           MR. O'CONNOR:  Objection in

22      terms of mischaracterizing the

23      documents reviewed.

24           THE WITNESS:  And you're

25      talking about -- the five-year minimum

Meredith B. Rosenthal, Ph.D.

1          that I was referring to, you're

2          calling that Hatch-Waxman exclusivity?

3     BY MR. CASAZZA:

4          Q.     Correct.

5          A.     Just to be clear, because

6     there's some description of pediatric

7     exclusivity in some of these documents, but

8     you're not thinking about that as being part

9     of what we're discussing?

10         Q.     I'm not, but if you'd prefer to

11    use a different shorthand, let me know.  I

12    pivoted to Hatch-Waxman exclusivity because

13    you and your counsel had taken issue with my

14    using NCE exclusivity.  So --

15         A.     That's fine.  I just wanted to

16    be 100 percent clear I understood what you

17    meant.

18         Q.     Okay.  I'll ask the question

19    differently.

20              In the 14 Gilead documents you

21    reviewed for your report, you didn't see any

22    evidence that Gilead considered the five-year

23    period of exclusivity under Hatch-Waxman in

24    connection with its development of TAF, did

25    you?

Meredith B. Rosenthal, Ph.D.

```
 1              MR. O'CONNOR:  Same objection
 2        insofar as the description of Gilead
 3        documents meaning Gilead-produced
 4        documents.
 5              THE WITNESS:  As I sit here, I
 6        don't recall.  But I also -- I
 7        don't -- I don't go into that part of
 8        my understanding of the evidence to
 9        use it to corroborate my economic
10        analysis of the incentive, so I'm not
11        sure if that were in those documents
12        that I would necessarily have picked
13        it up and cited it.
14              But as I sit here, I don't know
15        of any cites in those documents
16        pertaining to the additional five
17        years of -- or the minimum five years
18        of exclusivity we were discussing.
19   BY MR. CASAZZA:
20        Q.    You're not offering an opinion
21   that Gilead timed its launch of TAF being
22   five years of exclusivity under Hatch-Waxman,
23   are you?
24        A.    That is not part of my opinion,
25   no.
```

Meredith B. Rosenthal, Ph.D.

1        Q.      Your opinion is that the

2   economic incentive for Gilead to delay the

3   launch of TAF -- strike that.

4              Insofar as your opinion depends

5   on a market exclusivity for TAF-containing

6   medications, the market exclusivity on which

7   you are relying for your opinions is from the

8   patents on TAF, correct?

9        A.      My opinion relates to the

10  question of whether delay could be

11  profitable, and that, as we talked about

12  earlier, has to do with the TDF profitability

13  during that delay.

14              The TAF profitability, that

15  relates, to some extent, as to when the

16  last -- you know, when it would face generic

17  competition, and in this memo, they're

18  talking about an additional four years.

19  Obviously that's not how it unfolded, but in

20  2003, they're talking about the patents on

21  TAF as opposed to on Genvoya.

22              And so my understanding is that

23  the -- none of my analysis requires that TAF

24  have exclusivity beyond its patents, so I

25  guess that's the best way of answering your

Meredith B. Rosenthal, Ph.D.

1    question.  I'm not assuming anything beyond

2    that patent life.

3         Q.    And you're not offering an

4    opinion that TAF would have faced generic

5    competition any sooner than the length of its

6    patent life, are you?

7         A.    I am not offering an opinion

8    about that, no.

9         Q.    Going back to Exhibit 3, a few

10   lines down into the introduction there's a

11   sentence that begins "we have assumed."

12             Do you see that?

13             It says, "We have assumed a

14   product profile for GS-7340 that is

15   incrementally improved from TDF with respect

16   to antiviral potency."

17             Do you see that?

18        A.    I see that.  I do.

19        Q.    Now, first, "assumed" does not

20   mean proven, does it?

21        A.    I don't know.  It's an

22   assumption, a projection.  My understanding

23   of the word "assumed" is that, again, there's

24   uncertainty, and one possible assumption is

25   incremental improvement.  I think in other

Meredith B. Rosenthal, Ph.D.

1    forecasts, not surprisingly, around the same

2    time, they make other assumptions.

3              So there are things that can

4    vary because they reflect uncertainty.

5         Q.    In this context, in this memo

6    in Exhibit 3, "incrementally" means

7    minimally, right?

8              MR. O'CONNOR:  Objection.

9         Foundation.

10             THE WITNESS:  I think that is

11        true, but I don't know.  I think we'd

12        have to look further.  I don't know if

13        they quantify that in this document as

14        opposed to some of the forecasts we

15        look at where there's essentially a

16        quantification in the sense of there's

17        an assumption about growth.

18   BY MR. CASAZZA:

19        Q.    What do you understand

20   "incrementally" to mean in this document?

21        A.    That it is better than TDF.  I

22   don't think I drew a conclusion beyond that

23   about whether it was a small benefit or a

24   large benefit.  Incrementally, I think, in

25   common English usually means a small benefit.

Meredith B. Rosenthal, Ph.D.

1          Q.      But this September 2003

2    memorandum, it's not assuming that TAF would

3    be a meaningful clinical improvement over

4    TDF, is it?

5                  MR. O'CONNOR:  Objection.

6          Foundation, form.

7                  THE WITNESS:  I don't know -- I

8          don't know what that means.

9          Clinically meaningful, meaningful to

10         patients' lives?  It says

11         "incrementally."

12   BY MR. CASAZZA:

13         Q.      If we could turn to page 2 of

14   Exhibit 3, you see there are a number of key

15   assumptions of the analysis listed?

16         A.      Yes, I do.

17         Q.      And you'd agree that this memo

18   and the analysis contained within it rests on

19   a number of these assumptions about TDF and

20   TAF, right?

21         A.      I think it explicitly states

22   that it -- that those assumptions were used

23   for calculating the benefits of this

24   exclusivity extension strategy, yes.

25         Q.      The first category of

Meredith B. Rosenthal, Ph.D.

1    assumptions specifically concerns

2    exclusivity, right?

3           A.      Yes.

4           Q.      The first assumption is that

5    GS-7340 -- which you understood that GS-7340

6    was Gilead's internal development name for

7    TAF, right?

8           A.      Yes, I did.

9           Q.      The first assumption is that

10   TAF maintains exclusivity through July 2021

11   in the US and the EU, right?

12          A.      Right.

13          Q.      As we discussed a few moments

14   ago, that July 2021 date was based on the

15   anticipated expiration of patents relating to

16   TAF, right?

17          A.      That's right.

18          Q.      That July 2021 date in the

19   assumptions is not based on when Gilead would

20   seek FDA approval of TAF, right?

21          A.      Yes, that's right, because this

22   is an analysis about when to seek approval.

23          Q.      Right.

24                  And the assumptions here, they

25   don't mention exclusivity under the

Meredith B. Rosenthal, Ph.D.

1    Hatch-Waxman Act, do they?

2         A.    They don't here, no.

3         Q.    The next category --

4               MR. O'CONNOR:  Objection

5         insofar as the document speaks for

6         itself.

7               Sorry for the late objection.

8    BY MR. CASAZZA:

9         Q.    The next category of

10   assumptions is about the product profile of

11   TAF.

12              Do you see that?

13        A.    Oh sorry, I thought you were

14   still under the first one.

15              Yes.

16        Q.    And if we could bring up the

17   bullet points from the next page, there are

18   three bullet points reflecting assumptions

19   about the product profile of TAF, right?

20        A.    Yes.

21        Q.    The first key assumption is

22   that TAF would exhibit incrementally better

23   efficacy than Viread?

24              MR. O'CONNOR:  Objection

25        insofar as it mischaracterizes the

Meredith B. Rosenthal, Ph.D.

1          document.

2                    THE WITNESS:  Yes, I see that.

3          And also they define "incrementally,"

4          which is "greater antiviral log

5          reduction when taken as a

6          monotherapy," so that's something.

7    BY MR. CASAZZA:

8          Q.     The second key assumption here

9    is that the in vivo efficacy of TAF against

10   virus containing the K65R mutation of

11   thymidine analog mutations would be similar

12   to Viread, right?

13         A.     I see that, yes.

14         Q.     "In vivo" refers to animal

15   studies, right?

16                   MR. O'CONNOR:  Objection.

17                   THE WITNESS:  Yes, it does.

18   BY MR. CASAZZA:

19         Q.     Those studies had not been

20   completed yet, right?  That's why this is an

21   assumption.

22                   MR. O'CONNOR:  Objection.

23         Foundation.

24                   THE WITNESS:  Well, again, I am

25         not an expert in reviewing the

Meredith B. Rosenthal, Ph.D.

```
1        clinical studies.  It is an
2        assumption, so I assume that it was
3        not completed for that reason.  But I
4        don't -- I don't know as a matter of
5        having reviewed all the facts, nor
6        would I be an expert enough to know,
7        you know, what in vivo studies would
8        be required to show that TAF was
9        similar to TDF.
10   BY MR. CASAZZA:
11        Q.    "Similar" does not mean better
12   than, does it?  We can agree on that?
13             MR. O'CONNOR:  Objection.
14             THE WITNESS:  I don't think it
15        means better than, no.  I believe that
16        assumption is similar efficacy.
17   BY MR. CASAZZA:
18        Q.    Do you know how that assumption
19   of similar efficacy compared to TAF's actual
20   performance?
21        A.    TAF's actual performance --
22   again, I'm not a clinical researcher or a
23   clinician, but I believe that TAF's actual
24   performance was substantially better than
25   TDF -- is, I should say.
```

Meredith B. Rosenthal, Ph.D.

1    Q.    The third key assumption of

2  Mr. Virsik's analysis is that the safety

3  profile of TAF is comparable to TDF's safety

4  profile.

5          Do you see that?

6    A.    I do.

7    Q.    "Comparable" does not mean

8  better than, right?

9    A.    It does not.  In plain English

10  it does not, no.

11    Q.    So this analysis is not

12  assuming that TAF is safer than TDF, is it?

13    A.    It does not appear to be

14  assuming that, no.  It does assume that it

15  exhibits incrementally better efficacy,

16  greater antiviral log reduction when taken as

17  monotherapy.  And again, I'm not a clinician,

18  but from my understanding of the Complaint,

19  that that is related to the safety profile of

20  the drug.

21    Q.    Your understanding is that

22  TAF's greater antiviral log reduction is

23  related to its allegedly being safer than

24  TDF?

25    A.    Again, as a non-expert, as I

Meredith B. Rosenthal, Ph.D.

1   read the Complaint, it suggests that because

2   TAF is more effective at lower doses, that

3   patients can be successfully controlled at

4   lower doses and, therefore, experience less

5   toxicity.

6        Q.    But here the assumption is only

7   that TAF's safety profile would be comparable

8   to TDF's, right?

9        A.    That's correct.

10       Q.    You'd also agree that at this

11  time, September 2003, then Gilead wouldn't

12  know that TAF is safer than TDF?

13            MR. O'CONNOR:  Objection.

14       Foundation.

15            THE WITNESS:  I am -- it's

16       beyond the scope of my expertise and

17       the scope of my opinion to draw a

18       conclusion about what Gilead knew and

19       when it knew it.

20  BY MR. CASAZZA:

21       Q.    But it would make no sense for

22  Gilead to assume that TAF's safety profile

23  were only comparable to TDF's if it knew at

24  this time that TAF were safer than TDF,

25  right?

Meredith B. Rosenthal, Ph.D.

```
 1                MR. O'CONNOR:  Objection.
 2        Foundation, speculation.
 3                THE WITNESS:  I have not
 4        evaluated that proposition, and Gilead
 5        is not a monolith, so what this memo
 6        shows as assumptions -- again, it's
 7        beyond my expertise to evaluate the
 8        evidence, but I would imagine that
 9        there are other types of evidence that
10        may be relevant.
11   BY MR. CASAZZA:
12        Q.    So you would agree that
13   evaluating Gilead's documentary evidence is
14   beyond your expertise?
15        A.    I use the evidence to show that
16   they frame their strategy using the same
17   concepts as a product hop.  I don't use their
18   evidence to prove their guilt.  I use their
19   evidence to show that they recognize that
20   there are trade-offs in the timing of a
21   launch of a new product that will cannibalize
22   an old product.  That's what these documents
23   show.
24        Q.    But you don't contend that your
25   education and training render you uniquely
```

Meredith B. Rosenthal, Ph.D.

1    qualified to interpret Gilead's internal

2    documents, do you?

3              MR. O'CONNOR:  Objection to

4         form.

5              THE WITNESS:  My education and

6         training render me qualified to

7         examine the economic incentives facing

8         a manufacturer in Gilead's position,

9         and to draw conclusions about whether

10        there were economic benefits to delay.

11        That is what my expertise qualifies me

12        to do.  And I could do that with or

13        without the documents.

14             The documents show that the

15        folks involved in planning the launch

16        of TAF recognized the importance of

17        generic entry and the importance of

18        the relationship between an older

19        generation drug and a newer generation

20        drug that serve the same community of

21        patients.

22   BY MR. CASAZZA:

23        Q.    What was Mr. Virsik's role at

24   Gilead in 2003?

25        A.    I don't know what his title

Meredith B. Rosenthal, Ph.D.

1    was.

2         Q.    Do you know what his role was

3    at all?

4         A.    I do not.

5         Q.    So you don't know what his role

6    was in the development of TAF, do you?

7         A.    Not -- as I sit here, I could

8    not tell you what his role was.  This

9    document which was produced by Gilead shows

10   Gilead personnel contemplating the launch of

11   TAF, and that is the benefit to explaining

12   how the theory of product switches, how that

13   relates to this matter.

14        Q.    On page 3, you see there are a

15   number of assumptions about sales and

16   marketing?

17        A.    Sorry, I don't have page

18   numbers.

19        Q.    Sorry.  So we only have the

20   third page up there.  But underneath the

21   development assumptions, there are

22   assumptions about sales and marketing.

23             Do you see those?

24        A.    I do.

25        Q.    The second bullet point assumes

Meredith B. Rosenthal, Ph.D.

1    that TAF would be priced at parity to Viread,

2    right?

3         A.      That's right.

4         Q.      That means that TAF would cost

5    the same as Viread?

6         A.      That's correct.

7         Q.      If TAF were safer or more

8    effective than TDF, couldn't Gilead charge

9    more for TAF?

10              MR. O'CONNOR:  Objection.

11         Incomplete hypothetical.

12              THE WITNESS:  Pricing relates

13         to a number of incentives, and for a

14         firm in Gilead's position, yes, they

15         could -- for a better drug, they could

16         raise the price, but they would decide

17         whether or not to do so based on the

18         nature of demand.

19              All price increases are not

20         better for profits, and to the extent

21         that they reduce use, then they can

22         lower profits.

23              So they may have anticipated

24         being able to charge a higher price if

25         TAF were better, but many line

Meredith B. Rosenthal, Ph.D.

```
 1              extensions do, in fact, launch at
 2              parity in order to convince patients
 3              to switch to the new drug.
 4    BY MR. CASAZZA:
 5         Q.      But if TAF were a lot safer
 6    than TDF, as plaintiffs allege in these
 7    lawsuits, you'd agree that Gilead could
 8    charge more for TAF than TDF, right?
 9              MR. O'CONNOR:  Objection.
10              Incomplete hypothetical.
11              THE WITNESS:  Generally
12              speaking, if a product is, all things
13              equal, safer, it should command a
14              higher price.  Whether or not charging
15              that higher price is profit-maximizing
16              depends on other market dynamics.
17    BY MR. CASAZZA:
18         Q.      But generally speaking, if a
19    product is all things equal, safer, it should
20    command a higher price, right?
21              MR. O'CONNOR:  Objection.
22              Form, incomplete hypothetical.
23              THE WITNESS:  All things equal,
24              if a product is safer and that's
25              something that patient's care about,
```

Meredith B. Rosenthal, Ph.D.

1          which clearly they do, it should

2          command a higher price.

3               Again, there are other market

4          dynamics, the ability to get included

5          on formularies, that could offset

6          those dynamics.

7     BY MR. CASAZZA:

8          Q.     The third bullet point says

9     that, "The launch of TAF would not expand

10    patient market share for the tenofovir

11    franchise, but would only cannibalize

12    existing patients."

13              Do you see that?

14         A.     I do.

15         Q.     This assumption, you'd agree,

16    is consistent with the assumption that TAF

17    would only be comparable in safety to TDF and

18    not safer than TDF, right?

19         A.     I think that is true, that --

20    unless there are other differences.  But it

21    seems like this particular projection is

22    based on the assumption that TAF is

23    essentially a replacement for TDF.

24         Q.     But if TAF were safer than TDF,

25    TAF would expand Gilead's patient market

Meredith B. Rosenthal, Ph.D.

1    share, right?

2                MR. O'CONNOR:  Objection.

3        Incomplete hypothetical.

4                THE WITNESS:  Presumably, yes.

5        So you said before that they would

6        charge a premium price and expand the

7        market.  They maybe could do a little

8        of each, but that's the way prices are

9        set, is thinking about the extent to

10       which higher prices will drive

11       patients away versus allow for higher

12       marginal profits on each unit.

13   BY MR. CASAZZA:

14       Q.    But if TAF were safer than TDF,

15   it would expand Gilead's patient market

16   share, right?

17       A.    If TAF were safer, as it is --

18   I think that seems to be acknowledged -- then

19   it can expand the group of patients that are

20   being treated, yes.

21       Q.    If TAF were more effective than

22   TDF, TAF would also expand Gilead's market

23   share, right?

24       A.    Presumably, yes.  The same

25   caveats as to, you know, whether prices are

Meredith B. Rosenthal, Ph.D.

1    higher or market share is higher, both

2    potentially could be higher.

3          Q.    But there would presumably be

4    more demand for a drug that were more

5    effective, right?

6          A.    That I agree with, yes.

7          Q.    Mr. Virsik's financial analysis

8    of TAF as a tenofovir exclusivity extension

9    is assuming that TAF is no safer and only

10   incrementally more effective than TDF, right?

11              MR. O'CONNOR:  Objection

12         insofar as it mischaracterizes the

13         document.

14              THE WITNESS:  I think we

15         reviewed the plain language of the

16         assumptions, and the plain language of

17         the assumption appears to be that

18         there's some greater efficacy, but

19         similarity, in the in vivo studies and

20         in the safety profile.

21   BY MR. CASAZZA:

22         Q.    And that's why it's assuming

23   that TAF would not expand patient market

24   share and that TAF would only be priced at

25   parity, right?

Meredith B. Rosenthal, Ph.D.

```
1          A.     I don't know if that's why, but
2     it seems consistent with that, yes.
3          Q.     The memo goes on to note that
4     if the product profile --
5               MR. CASAZZA:  If we can turn to
6          page 4, the next page of the memo,
7          bring it up.  And scroll down
8          underneath "Financial Analysis
9          Results."
10         Q.     The last sentence of the
11    paragraph, it says that, "If the product
12    profile of TAF is better than our
13    assumptions, then the pricing and development
14    timeline assumptions may be more favorable."
15              Right?
16         A.     Yes.  It also -- it says a
17    number of other things in this as well.  It
18    starts by talking about the importance of the
19    market share of TDF-containing regimens in
20    2015.
21              And, obviously, part of these
22    calculations depends on, you know, when we --
23    when Gilead could launch TAF, is it
24    cannibalizing mostly its own products or is
25    it taking market share from other products.
```

Meredith B. Rosenthal, Ph.D.

1    Q.    Right.  But he does write at

2  the end of the memo that if the product

3  profile of TAF is better than the

4  assumptions, then, among other things, the

5  development timeline assumptions may be more

6  favorable, right?

7    A.    Yes.  I -- there are

8  projections that make different assumptions

9  and come to different conclusions in the data

10  around, sort of, how much of additional

11  growth TAF would have maintained.

12            The actual forecast that

13  Dr. Lakdawalla cites has a different set of

14  assumptions, where TAF does have incremental

15  growth over and above TDF.

16    Q.    If we can go back to page 3,

17  there's a heading with "Development," it

18  includes development assumptions.

19            Do you see that?

20    A.    Yes, I do.

21    Q.    And from what we just read,

22  you'd agree that if the TAF product profile

23  ended up showing that TAF was not just the

24  same or a little better than TDF, but

25  significantly better, that could change these

Meredith B. Rosenthal, Ph.D.

1    development assumptions, right?
2                MR. O'CONNOR:  Objection
3           insofar as it mischaracterizes the
4           document.
5                THE WITNESS:  I would say that
6           the development assumptions, to me,
7           seem a little bit different than some
8           of the other assumptions.  Development
9           and sales and marketing, they're about
10          actions that Gilead could take, and so
11          this projection is based on actions
12          that Gilead could take, such as aiming
13          to launch in 2015 with a six-year
14          path.
15               So that to me, again in plain
16          English, it seems like they're talking
17          about, okay, there will be six years
18          of development, getting through the
19          process of getting the product
20          launched, and all of the requirements
21          thereof.
22               So these are assumptions about
23          actions as opposed to assumptions
24          about outcomes that are uncertain.
25                    ///

Meredith B. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2         Q.    Isn't it possible that if TAF

3    were significantly better than TDF, the

4    development would be accelerated for an

5    earlier launch?

6              MR. O'CONNOR:  Objection.

7         Incomplete hypothetical.

8              THE WITNESS:  Well, I guess,

9         again, these are things that Gilead

10        could do.  They could start the

11        development sooner.  And I don't -- as

12        a health economist, I don't know

13        whether they can -- I don't know what

14        the shortest timeline is.  That's

15        beyond the scope of my expertise, as

16        we talked about earlier.

17   BY MR. CASAZZA:

18        Q.    Now, you haven't performed any

19   financial analysis for this case of any kind,

20   correct?

21        A.    I did not perform an

22   analysis -- a financial analysis to come to

23   the conclusion that there was an economic

24   incentive for Gilead to delay if, in fact,

25   such delay was possible, if that can be

Meredith B. Rosenthal, Ph.D.

1    proven by plaintiffs.  No, I did not need to

2    perform a financial analysis to come to that

3    conclusion.

4            Q.     And you did not, in fact,

5    perform any financial analysis, correct?

6                    MR. O'CONNOR:  Objection to

7            form.

8                    THE WITNESS:  I did not.

9    BY MR. CASAZZA:

10           Q.     Other than the Virsik

11   memorandum, Exhibit 3, which we just

12   reviewed, at the time you signed your report

13   in this case, did you know whether Gilead had

14   prepared other financial analyses for TAF

15   before stopping TAF development in 2004?

16           A.     I did not rely on any other

17   analyses.  I don't know if -- I don't know if

18   I knew that others existed.  It was not

19   relevant to my opinions in this matter.

20                   I recognize that there can be a

21   range of assumptions in those kinds of

22   forecasts, and so I -- again, I rely on this

23   document to demonstrate that in Gilead's

24   analysis, they took account of the factors

25   that are relevant for a product switch.

Meredith B. Rosenthal, Ph.D.

1    That's what I rely on, not for the specific

2    conclusion.

3                I understand that scenarios

4    exist that would give different financial

5    flows, but that's -- so I don't rely on any

6    other forecasts because I don't need to.

7         Q.    And at the time you signed your

8    report, you hadn't seen any other forecasts,

9    right?

10        A.    Not that I know of, no.  I

11   didn't use them in developing my opinions.

12        Q.    Since you've signed your

13   report, you have subsequently learned that

14   Gilead did prepare other financial analyses

15   for TAF before stopping development in 2004,

16   right?

17        A.    I reviewed those forecasts that

18   Dr. Lakdawalla produced as part of his

19   report.  So in that sense I learned that they

20   existed, yes.

21        Q.    I want to make sure I

22   understand this.

23                Did you review Dr. Lakdawalla's

24   report, or did you also review the Gilead

25   documents Dr. Lakdawalla cited in his report?

Meredith B. Rosenthal, Ph.D.

```
 1         A.      I reviewed those documents.

 2         Q.      Which documents were those?

 3         A.      The ones that he cites in his

 4    footnote, I believe it's 142.  That's the one

 5    that he uses primarily.  But I looked at the

 6    other documents that he cites that he says he

 7    rejected.

 8                 And so I can see that there are

 9    a range of different forecasts that exist,

10    but which is not surprising.

11         Q.      And how much time have you

12    spent reviewing Dr. Lakdawalla's report, the

13    report itself?

14         A.      Well, the report itself

15    probably took me a couple of hours to read,

16    and then I went and looked at some of the

17    underlying documents, and I reviewed his

18    calculations with help from my staff, because

19    not everything was produced with his report

20    so we recreated his calculations.

21         Q.      How many hours did you spend

22    reviewing the documents that were cited in

23    his report?

24         A.      I don't know.  Again, I don't

25    track my time by each task.  I think that I
```

Meredith B. Rosenthal, Ph.D.

1    have spent a total of about eight hours

2    reviewing his report, Dr. Dow's report, and

3    trying to understand his calculations and the

4    underlying documents from which -- on which

5    they are based.

6          Q.    So you think you spent

7    approximately eight hours reviewing

8    Dr. Lakdawalla's report, reviewing Dr. Dow's

9    report, reviewing the underlying documents

10   cited in those reports, and evaluating the

11   calculations Dr. Lakdawalla made in his

12   report, correct?

13         A.    Yes.

14         Q.    Do you recall, in terms of

15   number of documents, how many of the

16   documents cited in Dr. Lakdawalla's report

17   that you reviewed?

18         A.    In particular --

19              MR. O'CONNOR:  Object to --

20         sorry, Doctor.

21              Objection insofar as certain

22         documents may be presented to her and

23         the report could be shown to her to

24         help her corroborate this number to

25         make it not an estimation, but...

Meredith B. Rosenthal, Ph.D.

1              THE WITNESS:  Yes, fair.

2              I specifically reviewed the

3         documents that he cites both as the

4         basis for his calculations and the

5         documents that he rejected as an

6         alternative basis.  So I think

7         that's -- there were five total

8         documents that he cites.

9              MR. O'CONNOR:  I'll just say on

10        the record that I believe

11        Dr. Rosenthal referred to footnote 142

12        of Dr. Lakdawalla's report, but it's

13        143 contains a list of --

14             THE WITNESS:  The other ones,

15        yes.

16   BY MR. CASAZZA:

17        Q.    So, Dr. Rosenthal, since you

18   signed your expert report in this case, you

19   subsequently learned that Gilead did, in

20   fact, analyze incremental revenues that it

21   could make from TAF if it were sold earlier

22   than 2015, right?

23             MR. O'CONNOR:  Objection

24        insofar as it mischaracterizes the

25        documents stated.

Meredith B. Rosenthal, Ph.D.

1              THE WITNESS:  Since I filed my
2          report, I have seen specific examples
3          of these forecasts.  It is -- I
4          understand that pharmaceutical
5          companies make forecasts at different
6          times and with different assumptions
7          when they're launching products.
8              So this is not a surprise that
9          there's a range of forecasts with
10          different assumptions, so to say that
11          I learned this for the first time I
12          don't think would be correct.
13              But I had not reviewed those
14          documents before.  And upon reviewing
15          those documents, my opinion remains as
16          it was in my report, that if the
17          allegations are proven that Gilead
18          could have launched TAF sooner, that
19          it had an economic incentive to delay.
20      BY MR. CASAZZA:
21          Q.    So the other Gilead financial
22      forecasts that you have reviewed projecting
23      revenues from TAF earlier than 2015, it's
24      your position that those are still consistent
25      with your opinion that there was an economic

Meredith B. Rosenthal, Ph.D.

```
1    incentive for Gilead to delay development of
2    TAF?
3                MR. O'CONNOR:  Objection.
4         Form.
5                THE WITNESS:  I did not ever
6         suggest that every forecast came to
7         the same conclusion, not at all.
8         Instead, given that TAF launch
9         happened later, and if the allegations
10        are proven true that it could have
11        happened earlier, it is my opinion
12        that a product switch provides an
13        economic incentive whereby that could
14        be profitable.
15               That's not the same as saying
16        under every scenario that one would
17        forecast that to be profitable, just
18        like Dr. Lakdawalla picks a particular
19        scenario where it's not profitable.
20               And the assumptions he makes --
21        and these are assumptions.  It's not
22        what he found in the documents.  He
23        makes assumptions about what TDF's
24        franchise would have looked like had
25        TAF delayed, and he assumes,
```

Meredith B. Rosenthal, Ph.D.

1          basically, that there's no growth in

2          that franchise in the latter years,

3          which is completely inconsistent with

4          reality.

5              And so, sure, there are some

6          assumptions you can make that make an

7          earlier launch make sense.  In light

8          of what really happened, and if

9          plaintiffs can prove their

10          allegations, it's my opinion that a

11          delay provides -- would provide --

12          again, with full information, would

13          provide more profits, given the

14          enormous success of the TDF franchise,

15          that being able to sequence the two

16          franchises rather than replace TDF

17          with TAF is more profitable.

18     BY MR. CASAZZA:

19          Q.     But under some assumptions, an

20     earlier launch would be more profitable,

21     right?

22          A.     If you make the assumption,

23     like Dr. Lakdawalla did, that TDF is not

24     going to grow, then, yes, you can show that

25     it's better to speed up TAF.

Meredith B. Rosenthal, Ph.D.

1           But that assumption makes no

2    sense, even if you ignore all the later drugs

3    and only count the first three TDF drugs.

4        Q.     But isn't the assumption that

5    TDF is not going to grow consistent with the

6    expectation that TAF would cannibalize TDF

7    sales?

8        A.     It is, yes.  Thank you for

9    noticing that.  And that's where it comes

10   from.

11          So in Dr. Lakdawalla's analysis

12   he uses that assumption, which is only being

13   offered for an early launch scenario, but he

14   uses the same assumption about TDF's growth

15   in the later launch scenario, as if Gilead

16   would just let TDF be flat when it hasn't

17   launched TAF.

18          So that is the fundamental

19   mistake of his analysis.

20       Q.     But if Gilead could make more

21   from each dose of TAF than it could from each

22   dose of TDF, wouldn't it be more profitable

23   for Gilead to sell TAF sooner so that it

24   could realize those profits sooner?

25              MR. O'CONNOR:  Objection.

Meredith B. Rosenthal, Ph.D.

1           Incomplete hypothetical.

2                THE WITNESS:  Not necessarily.

3           Again, in fact, in the way that the

4           market played out in reality, TDF

5           sales continued to grow.  By 2009, the

6           first three products alone were more

7           than $3 billion, unlike

8           Dr. Lakdawalla's assumption that they

9           never exceed 1.025 billion.

10               And so what's happened is

11          Gilead got the full benefit of ten

12          years of those high profits, which

13          exceeded 6 billion at the peak, and

14          now will enjoy all the entire stream

15          of TAF products as well.

16               So what you just said, sure,

17          it's possible that there's a scenario

18          in which launching TAF earlier is

19          beneficial.  It's inconsistent with

20          what actually happened in this market,

21          where clearly Gilead was able to enjoy

22          both TDF revenues and TAF revenues and

23          did not have to choose between them.

24     BY MR. CASAZZA:

25          Q.    But to model what would have

Meredith B. Rosenthal, Ph.D.

1   happened in a world in which TAF were

2   launched sooner, one necessarily has to make

3   some assumptions, correct?

4        A.    One necessarily does, and that

5   is why I said, of course, we could make

6   parameter assumptions that are extreme in

7   either case.

8             But what drives

9   Dr. Lakdawalla's analysis is this assumption

10  that TDF basically has reached its maximum by

11  about 2010.  That seems like an assumption

12  that -- it makes no sense.  Again, it's a

13  complete disconnect in reality.

14            And at the point that Gilead

15  allegedly made the decision to delay, they

16  already had Atripla, that the agreement to

17  launch Atripla was signed.

18            So even if they could never

19  have envisioned Complera and Stribild, they

20  could certainly have envisioned Atripla,

21  which is, you know, the third TDF drug.

22            So it makes no sense to me to

23  make an assumption that TDF will essentially

24  have no growth.

25        Q.    But if TAF were a lot safer

Meredith B. Rosenthal, Ph.D.

1    than TDF, wouldn't doctors have switched

2    patients from TDF to TAF as soon as TAF came

3    out, whenever it was launched?

4         A.    That's the cannibalization

5    concern, yes.

6         Q.    So why, then, in your view

7    would TDF sales have continued to grow once

8    TAF was released?

9         A.    It's not my view.  My view is

10   if TAF were delayed, as it was in reality,

11   TDF sales would continue to grow.

12   Dr. Lakdawalla is the one who assumes that

13   TDF sales don't grow in the delay scenario.

14   But the whole point of the delay is to allow

15   TDF to grow.  And indeed, Dr. Dow says the

16   same thing.

17              We're getting a little close to

18   East Coast lunchtime.

19        Q.    We can take a break if you'd

20   like.

21        A.    Does that work for you?  Could

22   we come back at 10:30 your time?

23        Q.    That should be fine.

24              MR. O'CONNOR:  Go off the

25        record.

Meredith B. Rosenthal, Ph.D.

1           MR. CASAZZA:  We've been on the

2       record just a little under three

3       hours, I think about two hours and

4       50 minutes, so I have about four hours

5       left.  I just want to make sure we

6       finish by your hard stop, Doctor.

7           THE WITNESS:  I do, too.  I

8       think I need a half an hour for lunch,

9       however.

10          MR. CASAZZA:  Okay.

11          THE VIDEOGRAPHER:  The time

12      right now is 12:56 p.m.  We are off

13      the record.

14          (Whereupon, a luncheon recess

15      was taken)

16

17

18

19

20

21

22

23

24

25

Meredith B. Rosenthal, Ph.D.

1                    AFTERNOON SESSION

2

3             THE VIDEOGRAPHER:  The time

4        right now is 1:30 p.m.  We are back on

5        the record.

6    BY MR. CASAZZA:

7        Q.     Good afternoon, Dr. Rosenthal.

8             Did you communicate with any of

9    your lawyers during the lunch break?

10       A.     Just about the time discussion

11   we had, nothing of substance.

12       Q.     Okay.  Before we broke we were

13   talking about financial analyses of TAF.  You

14   recall that, right?

15       A.     Yes, I do.

16       Q.     And you learned after you

17   signed your report in this case that Gilead

18   had analyzed the incremental revenues that it

19   received from TAF if it had started selling

20   TAF earlier than 2015, right?

21       A.     Again, I think I knew that they

22   had analyzed the incremental revenues.  I

23   hadn't looked at those specific forecasts.

24   But I cite other documents that suggest that

25   they had analyzed incremental revenues.

Meredith B. Rosenthal, Ph.D.

1          Q.     But you hadn't seen a forecast

2     of Gilead analyzing incremental revenues from

3     TAF at the time you signed your report,

4     correct?

5          A.     I had not reviewed those

6     specific documents.  I don't know if the

7     other documents that I reviewed, where I cite

8     some statements about a market exclusivity

9     strategy, whether they also contained

10     forecasts.  But I didn't rely on them in my

11     analysis.

12          Q.     Okay.

13              MR. CASAZZA:  Derek, if you can

14     please pull up tab 6.  We'll mark this as

15     Exhibit 4.

16                   -      -      -

17              (Whereupon, Rosenthal Exhibit

18         Number 4 was marked for

19         identification.)

20                   -      -      -

21     BY MR. CASAZZA:

22          Q.     Dr. Rosenthal, this is not one

23     of the documents you relied on for your

24     report, correct?

25          A.     I don't think so.  When Derek

Meredith B. Rosenthal, Ph.D.

1    makes it a little bit bigger, then I can --

2    I'm pretty sure that this is the e-mail cover

3    letter for the forecasts that Dr. Lakdawalla

4    relies on.

5         Q.    So Exhibit 4 is one of the

6    documents that you reviewed after you

7    reviewed Dr. Lakdawalla's report, correct?

8         A.    That's correct.

9         Q.    That was the first time you had

10   seen this document and its attachments,

11   right?

12        A.    That's correct.

13        Q.    Do you know who Mr. Delagneau

14   is?

15        A.    I do not.

16        Q.    Do you know who Bill Lee is?

17        A.    Aside from being a Red Sox

18   pitcher from the '60s, no.

19        Q.    You don't understand Bill Lee

20   at Gilead to be the same individual, right?

21        A.    I understand that this Bill Lee

22   is very unlikely to be the same individual.

23        Q.    Understood.

24             Based on what you see in this

25   document, it appears Bill Lee was asking

Meredith B. Rosenthal, Ph.D.

1    Bruno Delagneau to prepare some financial

2    analyses related to TAF development, right?

3         A.    That's right, and both assume

4    an early launch.

5         Q.    Right.

6               The second sentence of the

7    first paragraph of Mr. Delagneau's e-mail

8    says that, "Both assume an 'early launch' or

9    a 2007 single agent launch followed by a dual

10   agent (FTC plus GS-7340) launch in 2010 as we

11   have discussed at the project team level."

12              Do you see that?

13        A.    I do.

14        Q.    So "early launch" refers to a

15   date prior to 2007 here in Exhibit 4, right?

16              MR. O'CONNOR:  Objection.

17         Foundation.

18              THE WITNESS:  Well, I

19         actually -- I mean, the documents have

20         a 2007 launch, so I read this cover as

21         saying an early launch or, in other

22         words, a 2007 launch of a single plus

23         dual.

24   BY MR. CASAZZA:

25        Q.    Okay.  But in any event, we're

Meredith B. Rosenthal, Ph.D.

1    talking about a launch much earlier than
2    2015, right?
3         A.    Yes.  Earlier than 2015,
4    mm-hmm.
5         Q.    Okay.  The next paragraph in
6    Mr. Delagneau's e-mail states, "In both cases
7    the analysis is favorable and argues in favor
8    of moving forward with the compound,
9    extremely so in the price premium case."
10            Do you see that?
11        A.    Yes.  And again, these are not
12   in comparison to a delayed launch.  They are
13   early launch forecasts.  So just to be clear,
14   they don't anticipate a delayed launch.  They
15   are --
16        Q.    Understood.
17        A.    -- more no launch.
18        Q.    But these are calculating the
19   incremental revenues that Gilead would
20   realize if it launched TAF in 2007?
21            MR. O'CONNOR:  Objection.
22        Form.
23            THE WITNESS:  That's right, as
24        compared to never launching TAF, not
25        as compared to a delayed launch.

Meredith B. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2        Q.      But you haven't done the

3    financial analysis to calculate whether a

4    delayed launch would have yielded more

5    revenues for Gilead than what Mr. Delagneau

6    projects here, right?

7        A.      In my report I didn't do a

8    specific analysis that would rely on one set

9    of assumptions.  I, instead, describe how it

10   can be profitable for a company in Gilead's

11   position to delay.

12              This analysis has a specific

13   set of assumptions, and again, it's about

14   profitability compared to never launching.

15   What Dr. Lakdawalla does with it is then

16   tries to use it to compare profitability with

17   a delayed launch.  He does that in a way that

18   makes no sense with everything else that I

19   have seen about what really happened in terms

20   of Gilead's statements about the TDF

21   franchise.

22              So I did not do this analysis,

23   but I do know, having analyzed

24   Dr. Lakdawalla's analysis, that his

25   assumption about the lack of growth of the

Meredith D. Rosenthal, Ph.D.

1    TDF franchise is critical to his conclusion

2    that early was better than delay.

3         Q.    Going back to the e-mail, in

4    that second paragraph, the reference to the

5    compound and moving forward with the

6    compound, the compound Mr. Delagneau is

7    talking about is TAF, right?

8         A.    Right.  Are you talking -- in

9    this document, the dual agent, is that what

10   you mean when you say "compound"?

11        Q.    No.  It's the sentence --

12        A.    You mean the compound in the

13   next sentence?

14        Q.    Yes.

15        A.    Yes, right.  So again, this is

16   an analysis of launch early, never launch.

17   There's no counterfactual except a world in

18   which there's only TDF.

19        Q.    There's no mention of delaying

20   TAF anywhere in this e-mail, right?

21        A.    There is no mention of delaying

22   TAF.  The only clue might be the word "early"

23   suggests that there's late, perhaps, but in

24   any case the analysis in these spreadsheets

25   compares the profitability of this -- of

Meredith B. Rosenthal, Ph.D.

1    these two scenarios of launching TAF starting

2    in 2007.  It compares that with a scenario

3    that, you know, essentially assumes there's

4    no TAF.

5        Q.    Now, Mr. Delagneau attaches

6    both analyses to his e-mail, right?

7        A.    That's right.

8        Q.    You reviewed these after you

9    reviewed Dr. Lakdawalla's report, right?

10       A.    Right.

11       Q.    And if we can just --

12             MR. CASAZZA:  Let's go ahead

13       and flip to the -- let's start with

14       the first attachment, but I'm asking a

15       question about both of them.

16       Q.    Both include a line item for

17   Viread revenue loss, right?

18       A.    That's right.

19       Q.    So Mr. Delagneau's financial

20   analyses from Exhibit 4 account for the fact

21   that TAF is going to cannibalize revenues

22   from Viread, right?

23             MR. O'CONNOR:  Objection.

24       Foundation.

25             THE WITNESS:  I would say yes,

Meredith B. Rosenthal, Ph.D.

```
1            that the revenue loss is about
2            cannibalization.  So that is what that
3            third row captures, a particular -- in
4            each cell there's a particular
5            percentage that starts at something
6            like 15 percent and grows.
7   BY MR. CASAZZA:
8       Q.     And even after that
9   cannibalization, Mr. Delagneau's analyses
10  show that Gilead could still make substantial
11  revenues selling TAF, right?
12      A.     It does.
13             MR. O'CONNOR:  Objection.
14      Form.
15             MR. CASAZZA:  If we could go
16      ahead a page to a second analysis.
17  BY MR. CASAZZA:
18      Q.     In Mr. Delagneau's second
19  analysis, even after discounting to present
20  value, Mr. Delagneau is projecting that
21  Gilead's incremental revenues from launching
22  TAF in 2007 would be more than a billion
23  dollars, right?
24      A.     That net present value number,
25  yes, it looks at TAF's contribution minus the
```

Meredith B. Rosenthal, Ph.D.

1    Viread revenue loss.

2         Q.     Right.  So it's not just TAF's

3    contribution, it's the overall incremental

4    revenue.  So it's TAF's revenues even after

5    you back out the cannibalization of Viread

6    that would result from selling TAF earlier?

7         A.     That's correct.  And again,

8    these spreadsheets on which Dr. Lakdawalla

9    bases his analysis assume that total TDF

10   revenues never exceed 1.025 billion, when, in

11   fact, by 2009 they were more than three times

12   that.

13        Q.     But Mr. Delagneau wouldn't have

14   known that in 2003 when he prepared these

15   forecasts, right?

16        A.     He might not have known 2009 in

17   2003, but at the time that Gilead made the

18   decision, allegedly, to pause TAF

19   development, Atripla was proceeding to the

20   market.  It would have included Atripla in

21   its forecasts.

22        Q.     But you would agree that

23   Gilead's revenues from TDF medications in

24   2009 would have been lower had Gilead

25   released TAF in 2007, right?

Meredith B. Rosenthal, Ph.D.

1                MR. O'CONNOR:  Objection.

2      Incomplete hypothetical.

3                THE WITNESS:  Yes, precisely.

4    BY MR. CASAZZA:

5      Q.      And you haven't done anything

6    to calculate how much lower Gilead's TDF

7    revenues would have been had it launched TAF

8    earlier, have you?

9      A.      Well, just to be 100 percent

10   clear, since TAF did not launch earlier, I

11   can observe TDF revenues.  So the calculation

12   of what TDF revenues were in a launch, never

13   or later, is very clear.

14                And again, even if you only

15   account for the three products that Gilead

16   clearly knew about, to me, since I only know

17   that -- I know they had signed the agreement

18   for Atripla.  Even if you only account for

19   those, those TDF revenues were many times

20   more than these revenues.

21                And so as I understand the

22   allegations, in late 2004, more than a year

23   after these calculations were made, that is

24   when plaintiffs allege that Gilead made the

25   decision to pause the TAF launch.

Meredith B. Rosenthal, Ph.D.

1                 So these conclusions and

2    Professor Lakdawalla's analysis that

3    extrapolates from them are driven entirely by

4    these very low TDF revenues, which suggest

5    that Gilead, sort of, had nothing to lose by

6    launching TAF earlier, when in reality TDF

7    grew to be an enormous franchise, and even as

8    early as 2005, 2006 well exceeds these

9    productions.

10        Q.    So is it your opinion that

11   Mr. Delagneau's forecast here is valid?

12        A.    I have no opinion about

13   Mr. Delagneau's forecasting ability.  I think

14   if we try to rely on this forecast to

15   establish that Gilead had no economic

16   incentive to delay launch in 2004, as

17   plaintiffs allege, I think that is flawed.

18        Q.    To know whether delaying launch

19   would be more profitable from Gilead, you

20   would need to quantitatively model the

21   but-for world in which Gilead launched TAF

22   sooner than it did, wouldn't you?

23             MR. O'CONNOR:  Objection.

24        Incomplete hypothetical.

25             THE WITNESS:  I don't believe

Meredith B. Rosenthal, Ph.D.

1        to answer the question I was asked you

2        would need to do a single quantitative

3        model.

4              I was asked, given that the

5        launch of TAF was delayed and Gilead

6        allegedly could have launched earlier,

7        was there an economic incentive to do

8        so.  And it is very clear to me that

9        there's an economic incentive for any

10       brand-name manufacturer looking to

11       launch a second generation product

12       that is going to substantially

13       cannibalize its first generation

14       product.

15              And as I stated earlier, one

16       could make projections with high

17       prices, low prices, one could make

18       projections with high or low

19       cannibalization rates, and surely we

20       could come up with a different set of

21       answers depending on what those

22       projections show.

23              However, in looking at the

24       totality, I would say, one, I see the

25       documents demonstrate language that is

Meredith B. Rosenthal, Ph.D.

1           consistent with understanding the

2           trade-offs between an early and late

3           launch in exactly the way that a

4           product switch works, and I can see

5           the profitability from the TDF line

6           versus the TAF line and the way Gilead

7           profits benefited from that delay.

8                And so that is my assignment,

9           is to describe how that motivation

10          works and explain those economics, not

11          to say that this one forecast is

12          exactly the right forecast.

13     BY MR. CASAZZA:

14          Q.     So you can't rule out that

15     launching TAF earlier might have been more

16     profitable for Gilead?

17          A.     With the benefit of

18     hindsight -- I guess I can't rule it out

19     100 percent, but with the benefit of

20     hindsight, it seems nearly impossible given

21     how much TDF grew and given what we saw when

22     TAF actually launched with better safety

23     claims.  Its prices were not double TDF.

24                From all the data, in my

25     professional opinion, it's very unlikely that

Meredith B. Rosenthal, Ph.D.

1    Gilead lost money by delaying if the

2    allegations are true.

3         Q.    But you would need to model the

4    but-for world to know for sure what route

5    would have been more profitable, right?

6              MR. O'CONNOR:  Objection.

7         Asked and answered.

8              THE WITNESS:  A but-for

9         analysis is not necessary for me to

10        reach my conclusions, and any but-for

11        analysis will have -- it will rely on

12        certain assumptions, because a but-for

13        analysis is not done with the benefit

14        of hindsight.

15             So a but-for analysis was,

16        again, outside of the scope of my

17        assignment.  My assignment was to

18        describe the motivation for a company

19        like Gilead to delay the launch of a

20        follow-on product, and I do that in my

21        report, and a but-for analysis would

22        just give one version of that.

23             But I've established that these

24        incentives exist, and if the

25        plaintiffs can prove their

Meredith B. Rosenthal, Ph.D.

```
1              allegations, then that supports the

2              kinds of assumptions in any but-for

3              analysis that would lead to the

4              conclusion that delay was profitable.

5    BY MR. CASAZZA:

6         Q.    From an economic perspective,

7    you have no basis to dispute that

8    Mr. Delagneau's analyses here make economic

9    sense, right?

10             MR. O'CONNOR:  Objection.

11        Form, speculation.

12   BY MR. CASAZZA:

13        Q.    If TAF were better than TDF,

14   Gilead could make more money selling TAF

15   sooner even if it loses some TDF sales, as a

16   general proposition?

17        A.    These are mathematical

18   calculations.  They embody a certain set of

19   assumptions.  We talked about assumptions

20   from some other calculations.  The

21   assumptions about the growth of TDF revenues

22   absent the launch of TAF make no sense to me.

23             (Cross-talking.)

24        Q.    But Gilead could have saved

25   money by not developing later TDF medications
```

Meredith B. Rosenthal, Ph.D.

1   if it went to TAF earlier, right?

2                  MR. O'CONNOR:  Objection.

3                  THE WITNESS:  That is not --

4                  MR. O'CONNOR:  Objection

5       insofar as her last answer was cut

6       off, but go ahead.

7                  THE WITNESS:  I'm sorry.  I'm

8       afraid that in the afternoon I am not

9       as good at pausing.  I will redouble

10      my efforts to take a deep breath after

11      anyone else speaks.

12                 If Gilead launched TAF earlier,

13      it presumably would have saved money

14      in the development of TDF, and it

15      would have lost a lot of revenues.

16                 And so that is the issue here,

17      is this -- because the comparison is

18      essentially a world in which TAF never

19      launches and TDF is the only thing on

20      the market, this is -- assumes a

21      scenario in which the TDF franchise

22      has very little potential.

23                 And that is inconsistent with

24      reality, and it's inconsistent with

25      reality in 2004 before the launch of

Meredith B. Rosenthal, Ph.D.

1           Atripla, which was described as the

2           most successful HIV medication ever.

3           Would they really have projected that

4           their growth would have essentially

5           been nothing after the launch of

6           Atripla?  That makes no sense to me.

7    BY MR. CASAZZA:

8           Q.     You don't dispute that this was

9    an actual forecast, what we're looking at

10   here, done by Gilead in 2003 in connection

11   with its development of TAF, right?

12          A.     I do not dispute that it was an

13   actual forecast in the spring of 2003.

14   Again, as I understand the allegations, the

15   decision to pause TAF was made in late 2004.

16          Q.     Have you seen any evidence that

17   Gilead learned between the time of this

18   forecast and the time it made its decision to

19   stop TAF in 2004 that it concluded that

20   delaying TAF would yield more than

21   $1.1 billion in net present value to Gilead?

22          A.     I think you're asking the wrong

23   question, because this 1.128 is, again, the

24   difference between launching TAF in 2007

25   versus never launching it, and the relevant

Meredith B. Rosenthal, Ph.D.

1    question is whether launching early versus

2    delayed would have been profitable.

3            Q.      Right.

4                    Have you ever seen a

5    quantification in the Gilead documents that

6    launching later would be more profitable for

7    Gilead than launching in 2007?

8            A.      There are -- I'd have to go to

9    my report.  I cite statements to that effect.

10   I don't have forecast documents like this

11   one, but Dr. Lakdawalla produces some

12   forecasts that show the opposite conclusion.

13   He just decides to reject them.

14           Q.      Going back to your report --

15                   MR. CASAZZA:  Let's bring that

16           up.  Exhibit 1, if we can go to

17           paragraph 44.

18           Q.      In paragraph 44, you begin,

19   "The timing element to maximize revenues is

20   clearly present here as Gilead explicitly

21   timed their launch of TAF-based products in

22   relation to anticipated TDF generic entry."

23                   Right?

24           A.      Yes.

25           Q.      To make sure I understand your

Meredith B. Rosenthal, Ph.D.

1  opinion, when is it that you contend Gilead

2  decided to time its launch of TAF-based

3  products in relation to anticipated generic

4  entry?

5       A.    I think there are statements at

6  various times.  I'm not -- my opinion is not

7  about a particular time that they made that

8  decision.

9            As I show here, in 2003 they

10  recognize the timing, that the timing is

11  important relative to patent expiration, and

12  then in the 2010 document that we looked at

13  earlier they also recognize it.

14            It's outside the scope of my

15  opinion about whether Gilead first made that

16  decision at a particular point in time.

17       Q.    So it's not your opinion that

18  Gilead decided in 2003 to time its launch of

19  TAF-based products in relation to anticipated

20  TDF generic entry?

21       A.    In 2003, in a document, they

22  recognize that the launch needs to be enough

23  in advance of TDF's patent expiration to be

24  able to capture a significant share of the

25  market.

Meredith B. Rosenthal, Ph.D.

1    Q.    So you are opining that Gilead

2  decided in 2003 to time its launch of TAF?

3            MR. O'CONNOR:  Objection.

4    Mischaracterizes testimony.

5  BY MR. CASAZZA:

6    Q.    Right?

7    A.    If you read my opinions, that's

8  not one of them.  When I am describing these

9  Gilead documents, I'm talking about how their

10  statements in these documents are consistent

11  with a manufacturer in Gilead's position

12  being conscious of the importance of timing

13  the launch of the follow-on product.

14            They essentially say that in

15  this statement, they say it in other

16  statements, and I use that to corroborate my

17  comparison of Gilead's behavior to other

18  types of product switches.

19    Q.    So to make sure I understand

20  you correctly, you are not offering an

21  opinion on when Gilead decided to time its

22  launch of TAF?

23            MR. O'CONNOR:  Objection to

24        form.

25            THE WITNESS:  I am producing --

Meredith B. Rosenthal, Ph.D.

1            I am describing statements in

2            documents that happened at particular

3            points in time, but I'm not a lawyer

4            and I've not been asked to prove the

5            allegations.

6                  And this is me as an economist

7            first talking about economic theory,

8            then talking about empirical evidence

9            from other drugs, and now showing that

10           statements in Gilead's documents are

11           reflective of those patterns in the

12           literature.  It's not an opinion about

13           a particular point in time.

14      BY MR. CASAZZA:

15           Q.     In paragraph 44, the documents

16      you cite are exclusively from 2003.  Are you

17      opining in paragraph 44 that Gilead decided

18      in 2003 to time its launch of TAF-based

19      products in relation to anticipated TDF

20      generic entry?

21                  MR. O'CONNOR:  Objection

22           insofar as it mischaracterizes the

23           professor's report.

24                  THE WITNESS:  My opinion is

25           that Gilead had an economic incentive

Meredith B. Rosenthal, Ph.D.

1              to time the launch of TAF relative to

2              the expiration of the Viread patents,

3              and I believe these documents

4              illustrate Gilead's recognition of

5              that incentive.  In plain language,

6              they talk about the timing and how

7              it's important.  I --

8    BY MR. CASAZZA:

9         Q.    The documents -- sorry, go

10   ahead.

11        A.    I am not offering an opinion

12   about 2003 versus a different time period,

13   but again, as the document we looked at

14   earlier from 2010 showed, this question of

15   timing resurfaced.  And again, it is

16   factually true that the TAF -- first TAF

17   product launched two years before Viread's

18   patent expired.

19        Q.    One of the documents you cite

20   in paragraph 44 is the Virsik memorandum that

21   we just looked at, right?

22        A.    Yes.

23              MR. CASAZZA:  Let's go ahead

24        and mark another one of those.  Derek,

25        if you could please pull up tab 3.

Meredith B. Rosenthal, Ph.D.

```
 1              And we'll mark this as Exhibit 5.
 2                        -       -      -
 3                   (Whereupon, Rosenthal Exhibit
 4         Number 5 was marked for
 5         identification.)
 6                        -       -      -
 7    BY MR. CASAZZA:
 8         Q.     Dr. Rosenthal, Exhibit 5 is the
 9    third document you cite in footnote 83 of
10    your report, right?
11         A.     That's right.
12         Q.     It's an April 4th, 2003 e-mail
13    from Jung Choi to Peter Virsik, right?
14         A.     That's right.
15         Q.     Who is Jung Choi?
16         A.     I don't know Jung Choi's
17    position.
18         Q.     Ms. Choi writes that, "As a
19    separate exercise (this is outside the scope
20    of Business Review), Norbert asked us to
21    explore the 7340 potential as an IP extension
22    strategy for Viread."
23                Do you see that?
24         A.     I do.
25         Q.     That capitalized term,
```

Meredith B. Rosenthal, Ph.D.

1    "Business Review," what's Ms. Choi referring

2    to there?

3          A.    I have seen some documents

4    titled "Business Review" which, to me, seemed

5    like strategic planning documents.

6          Q.    Gilead's 2003 business review

7    for TAF is one of the 14 Gilead-produced

8    documents on your reliance list, isn't it?

9          A.    Yes.  Like I said, I have seen

10   those documents.

11              MR. CASAZZA:  Okay.  Let's

12        please pull up tab 19, and we'll mark

13        that as Exhibit 6.

14                  -       -     -

15              (Whereupon, Rosenthal Exhibit

16        Number 6 was marked for

17        identification.)

18                  -       -     -

19   BY MR. CASAZZA:

20         Q.    The first page of Exhibit 6,

21   Dr. Rosenthal, it says "2003 Business

22   Review," right?

23         A.    Yes.

24         Q.    And the footer throughout this

25   document says "GS-7340 2003 Business Review,"

Meredith B. Rosenthal, Ph.D.

1    right?

2        A.    That's right.

3        Q.    This is the business review

4    that Ms. Choi was referring to in her e-mail

5    in Exhibit 5, right?

6        A.    That's right.

7             MR. O'CONNOR:  Objection.

8        Foundation.

9             THE WITNESS:  I believe it

10       appears to be consistent, yes.

11   BY MR. CASAZZA:

12       Q.    So in her e-mail in Exhibit 5,

13   Ms. Choi was asking Mr. Virsik to do an

14   analysis as a separate exercise outside the

15   scope of this business review in Exhibit 6,

16   right?

17            MR. O'CONNOR:  Objection.

18       Foundation.

19            THE WITNESS:  I believe that's

20       what the e-mail says, yes.

21   BY MR. CASAZZA:

22       Q.    This business review forecasts

23   a TAF launch in 2007, doesn't it?

24       A.    It may well, yes.  Again, there

25   are lots of projections with that 2007

Meredith B. Rosenthal, Ph.D.

1   launch.

2       Q.    And this business review

3   assumes that TAF could achieve a significant

4   premium price that could be justified by hard

5   clinical data, right?

6           MR. O'CONNOR:  Objection.

7           THE WITNESS:  I think you have

8       to show me that specific projection.

9       I have absolutely seen projections

10      like that, but again, they have

11      different scenarios.

12  BY MR. CASAZZA:

13      Q.    So let's take a look at page 5

14  of Exhibit 6.  The first bullet point,

15  "Commercial Assumptions," next to "Price" is,

16  "Assumes significant premium price that can

17  be justified by hard clinical data."

18          Do you see that?

19      A.    I do.  And it's exactly the

20  opposite of what we saw in the other forecast

21  that we looked at for Virsik.  So again, it

22  is not surprising that they explored

23  different forecasts based on different

24  assumptions.

25      Q.    And we saw in Exhibit 5 that

Meredith B. Rosenthal, Ph.D.

```
 1    Ms. Choi was having Virsik do the Virsik memo
 2    as a separate exercise outside the scope of
 3    Gilead's business review for TAF, right?
 4                MR. O'CONNOR:  Objection.
 5          Foundation.
 6                THE WITNESS:  That's what the
 7          words on the page said, yes.
 8    BY MR. CASAZZA:
 9          Q.    This business review, these
10    projections, these also don't assume that TAF
11    is any safer than TDF, do they?
12                MR. O'CONNOR:  Objection.
13          Foundation.
14                THE WITNESS:  I'm looking for
15          that statement on this page.  Can you
16          point me to it?
17    BY MR. CASAZZA:
18          Q.    Actually, we'll go back one.
19    Go to page 4.  Underneath the "Target Product
20    Profile" for TAF, it says it would be "at
21    least as safe as Viread."
22                Do you see that?
23          A.    It also says, "In combination
24    safer and more convenient than a triple
25    combo."
```

Meredith B. Rosenthal, Ph.D.

1    Q.    Right.  But it just says that

2    it would be "at least as safe as Viread,"

3    right?

4    A.    Well, I can see the words on

5    the page, but I think that's a little

6    ambiguous.

7    Q.    Okay.  But you didn't read any

8    of the deposition testimony about this

9    document to learn more about what the words

10   on the page meant, did you?

11        MR. O'CONNOR:  Objection.

12        Foundation.

13        THE WITNESS:  No, I did not.

14        As we talked about earlier, an

15        assumption of a premium price seems

16        suggestive of some premium qualities.

17   BY MR. CASAZZA:

18   Q.    If we could go to page 6 of 15,

19   as part of this business review, Gilead was

20   forecasting hundreds of millions of dollars

21   in TAF revenues beginning as early as 2007,

22   right?

23        MR. O'CONNOR:  Objection

24        insofar as this isn't the complete

25        part of the chart.  It says, "Revenue

Meredith B. Rosenthal, Ph.D.

1          Potential (continued)."

2              THE WITNESS:  Yes, again, I've

3          been focused on the US, given the

4          case.  But, yes, they forecast sales

5          getting up to about a billion in 2020.

6    BY MR. CASAZZA:

7          Q.    And hundreds of millions,

8    multiple hundreds of millions of dollars just

9    in the US as early as 2008, right?

10         A.    That's true, and TDF sales were

11   in excess of a billion at that point.

12         Q.    Right.

13              So to model the incremental

14   benefit to Gilead of launching TAF early, you

15   would need to subtract TDF sales like

16   Mr. Delagneau did in his analysis that we

17   just reviewed, right?

18         A.    I don't --

19              MR. O'CONNOR:  Objection.

20              THE WITNESS:  Sorry.

21              MR. O'CONNOR:  Not a problem.

22              Objection.  Form and

23         foundation.

24              THE WITNESS:  I was just

25         reading the footnote.  I think these

Meredith B. Rosenthal, Ph.D.

1        numbers don't do the subtraction,

2        right?  They note that it needs to,

3        but they don't do that.

4   BY MR. CASAZZA:

5        Q.    Right.

6              But Mr. Delagneau's analysis

7   actually did that, right?  That's what we

8   just looked at?

9        A.    They do the subtraction, yes.

10             MR. CASAZZA:  Let's go ahead

11       and pull up tab 4 and mark it as

12       Exhibit 7.

13                    -      -     -

14             (Whereupon, Rosenthal Exhibit

15       Number 7 was marked for

16       identification.)

17                    -      -     -

18   BY MR. CASAZZA:

19       Q.    This is another one of the

20   e-mails you cite in footnote 83 of your

21   report, right, Dr. Rosenthal?

22       A.    Yes.

23       Q.    This is the second of the three

24   e-mails you cite in that footnote, right?

25       A.    Well, I don't have the footnote

Meredith B. Rosenthal, Ph.D.

1  in front of me, but I will take your word for

2  it.

3          Q.      Okay.  This is an e-mail chain

4  between Mr. Virsik, Jung Choi, John Milligan,

5  and Phil Zack also from April 2003, right?

6          A.      Yes.

7          Q.      Now, if we can go to the second

8  page, there's an e-mail from Peter Virsik to

9  Jung Choi and John Milligan referring to a

10  net present value of developing TAF as a

11  patent extension strategy for Viread.

12                 Do you see that?

13          A.      I do.

14          Q.      And it says in the e-mail that

15  there was an Excel spreadsheet attached.

16                 Do you see that?

17          A.      I do.

18          Q.      Did you ever review that

19  spreadsheet in forming your opinion?

20          A.      I -- not that I know of.

21  Certainly not for preparing my report.  I

22  don't know if that's one of the ones that

23  Dr. Lakdawalla put together.

24          Q.      So sitting here, you don't know

25  what assumptions went into Mr. Virsik's NPV

Meredith B. Rosenthal, Ph.D.

1    model, do you?

2              MR. O'CONNOR:  Objection.

3         Foundation, form.

4              THE WITNESS:  I don't know the

5         specific assumptions, no.  But again,

6         I understand that companies use a

7         range of assumptions, and the

8         documents I cite cite different

9         assumptions about benefits and risks,

10        and I did not rely on a specific

11        forecast to form my opinions.

12   BY MR. CASAZZA:

13        Q.    You don't know how the final

14   numbers in Mr. Virsik's model compare to the

15   numbers in Mr. Delagneau's forecast that we

16   just looked at, do you?

17        A.    Well, I don't know what you

18   mean by "final."  This is still April of

19   2003, and I understand that plaintiffs intend

20   to prove that the decision happened in late

21   2004, so I don't know that this is final in

22   any sense.

23        Q.    But you don't know whether

24   Mr. Virsik's net present value of developing

25   TAF as a patent extension strategy was

Meredith B. Rosenthal, Ph.D.

1    greater than the $1.1 billion in net present

2    value that Mr. Delagneau calculated in his

3    forecast, do you?

4              MR. O'CONNOR:  Objection.

5         Assumes facts not in evidence.

6              THE WITNESS:  I don't know.

7         And we looked at one of two forecasts

8         earlier, so I do know that there was a

9         premium pricing forecast that

10        obviously has higher net present

11        value, because you just multiply by

12        the difference in price.

13   BY MR. CASAZZA:

14        Q.    Are you testifying that

15   Mr. Virsik's net present value was -- strike

16   that.

17             Are you testifying that

18   Mr. Virsik's net present value of developing

19   TAF as a patent extension strategy was higher

20   than the lower of the two Delagneau

21   forecasts?

22        A.    No.  I'm not testifying to that

23   at all.  I'm just saying earlier when we

24   looked at the two projections that

25   Dr. Lakdawalla relies on, there's -- there

Meredith B. Rosenthal, Ph.D.

1    are two different net present value numbers.

2                 I thought that you were asking

3    me whether this one was higher than one of

4    those, and I just wanted to be clear that

5    there are two different numbers there.

6         Q.    If we go back to your report,

7    paragraph 45, you cite a March 2004 e-mail as

8    evidence that -- strike that.

9                 In paragraph 45, you cite a

10   March 2004 e-mail among employees at Gilead

11   mentioning a scenario of TAF as a base case

12   patent-extension strategy.

13                Do you see that in the middle

14   of the paragraph?

15        A.    Yes, I do.  Again, I cite that

16   as an example of where their documents

17   demonstrate the use of language consistent

18   with a product switch.

19                MR. CASAZZA:  Okay.  Let's go

20        ahead and mark that e-mail.  Can we

21        pull up tab 20 and mark that as

22        Exhibit 7, please?

23                TRIAL TECHNICIAN:  I think

24        we're on 8, Kyle.

25                MR. CASAZZA:  Okay.  Mark tab

Meredeuth B. Rosenthal, Ph.D.

1            20 as Exhibit 8, please.

2                    -       -      -

3                (Whereupon, Rosenthal Exhibit

4        Number 8 was marked for

5        identification.)

6                    -       -      -

7    BY MR. CASAZZA:

8        Q.      Now, Dr. Rosenthal, you failed

9    to mention in your report that the base-case

10   scenario is one of three scenarios being

11   discussed along with positioning in resistant

12   patients and positioning in naive patients,

13   right?

14       A.      I can -- I did not mention.  I

15   don't know about "failed to mention."  I was

16   describing how they use the patent-extension

17   strategy as a base case, end of story.  I

18   didn't describe other scenarios.

19              As we've talked about, in

20   planning to launch new products, companies

21   frequently have multiple scenarios.

22       Q.      You'd agree that some of those

23   scenarios are not consistent with the delay

24   strategy that you're offering as your opinion

25   in this case, right?

1         A.     As I understand -- again, I do

2    not claim that every scenario that a company

3    in Gilead's position would show delay is

4    profitable, only that delay is often

5    profitable for manufacturers that are

6    concerned about a second generation product

7    that will take over their first generation

8    product.

9              These other strategies,

10   positioning in resistant patients and

11   positioning in naive patients, those are

12   strategies that are outside -- they

13   essentially minimize the overlap simply by

14   positioning.

15             So of course, yes, there are

16   scenarios in which delay would not be the

17   most profitable alternative.  We've seen

18   those forecasts.  That does not change my

19   conclusion that a company in Gilead's

20   position would have had an incentive to

21   delay.

22        Q.    Did you review the attachment

23   to this e-mail to evaluate the context of the

24   base-case patent-extension strategy?

25        A.     I believe it's all part of the

1    same document in discovery.

2        Q.    Okay.  I'll go ahead and just

3    mark the attachment, then, and we'll take a

4    look at it.

5        A.    Right.  So it's the PowerPoint?

6        Q.    Yes.

7            MR. CASAZZA:  So tab 16, we'll

8    separately mark it as Exhibit 9.

9                -      -      -

10           (Whereupon, Rosenthal Exhibit

11       Number 9 was marked for

12       identification.)

13               -      -      -

14    BY MR. CASAZZA:

15        Q.    But do you recognize this as

16    the attachment to the e-mail we just looked

17    at as Exhibit 8?

18        A.    You know, I'm not 100 percent

19    sure.  But I reviewed a document that

20    specifically looked at this base-case

21    scenario, but I'm not sure if it's the

22    PowerPoint or a strategy document that

23    references these.

24        Q.    Okay.  So you don't know

25    whether or not you reviewed this PowerPoint

1    prior to signing your report?

2         A.    I think I did, but I'm just not

3    100 percent sure.  Maybe you can show me what

4    you want to show me.

5         Q.    Okay.  The third bullet point

6    here notes, "Additional development scenarios

7    beyond the base case assume increased

8    incremental value of TAF versus Viread within

9    specific patient populations."

10              Right?

11        A.    Right.  Those were the other

12   scenarios that we talked about, yes.

13        Q.    So it logically follows from

14   that that the base-case scenario assumes

15   there is no additional value of TAF over TDF,

16   right?

17              MR. O'CONNOR:  Objection.

18        Mischaracterizes evidence,

19        mischaracterizes the document.

20              THE WITNESS:  In plain English,

21        "beyond" means that.  Again, my

22        recollection from reviewing documents

23        is that they considered scenarios in

24        which they targeted marketing of TAF

25        to those groups and not as a

Meredith B. Rosenthal, Ph.D.

1             replacement for TDF.

2      BY MR. CASAZZA:

3             Q.     But in plain English, you'd

4      agree that this document is setting forth

5      that the base case is assuming that there is

6      no increased clinical benefit of TAF versus

7      Viread, right?

8                    MR. O'CONNOR:  Objection.

9             Misstates what the document states,

10            form, foundation.

11                   THE WITNESS:  I understand that

12            there are different scenarios, and in

13            the non-base-case scenarios, there are

14            assumptions that don't exist in the

15            base case about the incremental value.

16                   Again, my recollection of

17            reading about these analyses is that

18            there were also assumptions about

19            targeted marketing and/or labeling of

20            the 7340 for those specific

21            populations, and I don't know if

22            that's present here as well.

23                   MR. CASAZZA:  Let's turn to

24            page 10 of Exhibit 9.

25            Q.     Dr. Rosenthal, this page

Meredith B. Rosenthal, Ph.D.

1    discusses the patent-extension scenario,

2    right?

3         A.    "Treatment-Naive Patient

4    Population Viread Patent Extension."  So it

5    seems to be for the treatment-naive patient

6    population.

7              MR. CASAZZA:  And, Derek, if

8         you wouldn't mind just slowly flipping

9         through this.

10        Q.    And, Dr. Rosenthal, you know,

11   let me know when you've seen what you need,

12   but would you agree that this PowerPoint deck

13   sets forth the three scenarios that were

14   discussed in the e-mail, and that slide 10 is

15   where the discussion of the third scenario of

16   TAF as a Viread patent extension begins?

17             MR. O'CONNOR:  Objection.

18             THE WITNESS:  I'm going to just

19        go to the document itself,

20        notwithstanding Derek's excellent

21        skills.

22             MR. CASAZZA:  I keep forgetting

23        that you have the link.  Please.

24             Derek, actually go ahead and

25        just leave it on the slide 10.

Meredith B. Rosenthal, Ph.D.

1          THE WITNESS:  Leave it on

2     slide 10.  Okay.  I will meet you in

3     slide 10 if you just give me a couple

4     minutes.

5          MR. CASAZZA:  Yep.

6          (Witness reviewing document.)

7     A.     Okay.  I'm with you on

8  slide 10.

9          Again, the way the slide deck

10  unfolds, which is consistent with my

11  recollection, is that there were questions

12  about targeting the labeling and marketing of

13  TAF for a particular patient population, the

14  treatment-experienced population versus

15  treatment-naive population, where it would

16  cannibalize Viread more.

17  BY MR. CASAZZA:

18     Q.     But slide 10 here, this is

19  where the presentation begins the discussion

20  of the patent-extension scenario, right?

21          MR. O'CONNOR:  Objection.

22     Foundation.

23          THE WITNESS:  I think this is

24     the first slide with patent extension

25     in the label.  I think the

Meredith B. Rosenthal, Ph.D.

```
1              calculations, as I understand them,

2              are comparing these alternatives that

3              relate in some way both to, sort of,

4              the size of the TAF market, but also

5              the extent to which it would restrict

6              the TDF market.

7       BY MR. CASAZZA:

8              Q.      Right.

9                      But this slide here is

10      describing the base-case patent-extension

11      strategy that you were describing in

12      paragraph 45 of your report, and then citing

13      to the e-mail that attaches this PowerPoint

14      presentation, right?

15             A.      I believe -- it does not say

16      "base case" on this slide, but this is the

17      first patent-extension strategy slide in the

18      deck beyond where it was described in the

19      beginning, so I believe that's true.

20             Q.      And in this scenario, TAF is

21      merely demonstrating equivalence to Viread,

22      right?

23             A.      It says, "For this purpose

24      would need to demonstrate at least

25      equivalence."
```

Meredith B. Rosenthal, Ph.D.

```
1         Q.     So this is the scenario that
2    would present itself if study results weren't
3    positive enough to support developing the
4    drug under the other two scenarios, right?
5                  MR. O'CONNOR:  Objection.
6         Assumes facts not in evidence,
7         incomplete hypothetical.
8                  THE WITNESS:  I think we just
9         have to look at those other two
10        scenarios; they all have these lists
11        of assumptions.
12                 And I can't recall exactly what
13        the assumptions are, but for the --
14        again, the idea of the
15        treatment-experienced population, that
16        that is a case where TAF would be used
17        in place of TDF, where for the
18        treatment-naive population, that is
19        where TAF would be used alongside TDF,
20        but not in place of it.
21                 And so the strategy pros and
22        cons that they list in these slides,
23        they describe, you know, different
24        potential outcomes of the evidence in
25        terms of what I would assume they
```

Meredith B. Rosenthal, Ph.D.

1          could market the drug so that they

2          could actually have on their label and

3          use in marketing, and some of those

4          assumptions relate to equivalence.

5                But again, this is -- this is

6          about a scenario where the focus is on

7          the treatment-naive population.

8    BY MR. CASAZZA:

9          Q.    But as of March 2004, Gilead

10   was evaluating the possibility that TAF might

11   show more positive results than TDF in

12   certain clinical studies, and if so, Gilead

13   planned to launch TAF sooner, right?

14               MR. O'CONNOR:  Objection,

15          compound.  Objection, foundation.

16               THE WITNESS:  Again, they have

17          three different scenarios here with

18          different implications for launch, and

19          that one of the base case is --

20          involves understanding that TAF could

21          be used as a patent extension or, as

22          we saw in other documents, exclusivity

23          extension or IP extension.

24               So these are alternatives, and

25          the scenarios, they differ in terms of

Meredith B. Rosenthal, Ph.D.

1           their assumptions and, therefore,

2           their conclusions.

3     BY MR. CASAZZA:

4           Q.     You don't mention the other two

5     scenarios in your report; you only mention

6     the base case, right?

7           A.     In my report, I make reference

8     to this to show that Gilead understood that a

9     patent-extension strategy could be

10    profitable, not to show that it always found

11    it to be profitable.

12          Q.     Right.

13                 The other two scenarios, the

14    two scenarios that were not the base-case

15    scenario, they don't support your hypothesis,

16    do they?

17          A.     My hypothesis is that a company

18    in Gilead's position would have had an

19    economic incentive to use a product like TAF

20    as a patent extension or a market-exclusivity

21    extension in the way that product switches

22    operate, not that all scenarios would support

23    that particular strategy.

24                 But again, given that TAF did

25    not launch until 2015, and if the allegations

1    are true, then the incentives to delay are

2    very consistent with what actually happened.

3         Q.    If we could please go back to

4    your report and pull out paragraph 46.

5             MR. CASAZZA:  Actually, go to

6    the next page.

7         Q.    Do you see the sentence

8    beginning "And under the 'Viread patent

9    extension strategy,'" Dr. Rosenthal?

10        A.    Yes.

11        Q.    There you repeat the notion

12   that the Viread patent extension strategy

13   became the base case, right?

14        A.    It was literally called the

15   "base case."

16        Q.    Okay.  You site to a March 2004

17   document at the end of that sentence, right?

18        A.    Are we in footnote 90 or 91?

19        Q.    Footnote 91.

20        A.    Yes.

21             MR. CASAZZA:  Okay.  Let's go

22        ahead and mark that.

23             THE WITNESS:  Yes.

24             ///

25             ///

Meredith B. Rosenthal, Ph.D.

```
1                    -      -      -

2                (Whereupon, Rosenthal Exhibit

3        Number 10 was marked for

4        identification.)

5                    -      -      -

6                MR. CASAZZA:  Gourdin, can you

7        give the right tab to Derek?  It will

8        be Exhibit 10.

9                MR. SIRLES:  There's not a tab

10       number, it's just in the file system.

11       It's the document that ends in -- what

12       footnote was that again?

13               THE WITNESS:  91.

14               MR. CASAZZA:  Footnote 91.  So

15       it ends in Bates 1721.

16   BY MR. CASAZZA:

17       Q.    Dr. Rosenthal, Exhibit 10 is

18   the document you cite in footnote 91 of your

19   report, right?

20       A.    I believe so.  I'm just opening

21   it up, too, if you don't mind.  I'm going to

22   look at the whole document.

23       Q.    Sure.

24       A.    I have it open.  Yes, this is

25   the one with all the red lines in it, yes.
```

Meredith B. Rosenthal, Ph.D.

1    Q.    Your report says that Gilead

2    stated in this document that TAF development

3    would be delayed in order to maximize the

4    life cycles of Viread and FTC, right?

5    A.    Yes.

6    Q.    And you mentioned that this

7    document has a lot of red lines in it.  Does

8    that indicate to you that this is a draft?

9    A.    It certainly was edited.  I

10   don't know whether it's final or not.  And

11   again, I am not intending to suggest that

12   there was only one projection.

13   Q.    Okay.  If we could turn to the

14   second page, under the heading "GS-7340

15   Potential Development and Positioning," do

16   you see that heading?

17   A.    I do.

18   Q.    The first sentence of this

19   section in the "Executive Summary" states,

20   "The Core Team supports aggressive

21   development of GS-7340 in treatment

22   experienced patients."

23             Right?

24   A.    Right.

25   Q.    Now, if we could turn to page 4

Meredith B. Rosenthal, Ph.D.

1   of 10 of Exhibit 10, and go toward the bottom

2   of the page, after describing two other

3   scenarios, again, it discusses "Base Case:

4   Viread Patent Extension."

5              Do you see that?

6   A.     Yes.

7   Q.     Underneath the heading "Base

8   Case:  Viread Patent Extension," after

9   discussing two other scenarios earlier in the

10  document, Exhibit 10 states that,

11  "Positioning of TAF as a patent extension

12  strategy for Viread will occur if the results

13  of the two proof of concept studies for

14  Treatment Experienced Population and

15  Treatment Paradigm Shift strategies are not

16  positive."

17             Did I read that correctly?

18  A.     Yes.

19             MR. O'CONNOR:  Objection to the

20        document insofar as the

21        characterization of the document --

22        earlier characterization of the

23        document speaks for itself.

24  BY MR. CASAZZA:

25  Q.     Dr. Rosenthal, you didn't

Meredith B. Rosenthal, Ph.D.

1    provide any of this context about the Viread

2    patent extension base-case scenario in your

3    report, did you?

4         A.    Again, I use this report in my

5    report to demonstrate that the defendant

6    contemplated maximizing the lifecycles of

7    Viread and FTC, the development of GS-7340

8    would be delayed.  That is a statement that

9    is entirely consistent with the incentives

10   that I'm talking about.

11             I am not intending to prove

12   that one scenario is the correct scenario,

13   but instead, if, in fact, plaintiffs can

14   prove their case, this demonstrates that

15   there was an economic incentive by

16   considering the interaction between the TDF

17   and TAF revenues, that that is why a delay

18   could be profitable.

19        Q.    You mentioned the red lines in

20   this document a moment ago.  You don't know

21   that this document is, in fact, a draft

22   document, do you?

23        A.    Well, I think given that it has

24   red lines and we can see two versions, we

25   know that it was edited.  I don't know if all

Meredith B. Rosenthal, Ph.D.

1    those edits were accepted and it became the

2    final document.

3         Q.    Did you ask your research

4    assistants or plaintiffs' lawyers to get you

5    a final version of this document?

6         A.    I did ask whether there was a

7    final version, and my staff -- they're PhD

8    economists, I think -- they did not have a

9    final version of that.

10             Nor again, for the reason I'm

11    using it, because again, I'm not trying to

12    point to a single place that has one

13    projection that shows delay is more

14    profitable than launch.

15             But the way that I'm using this

16    document is to demonstrate that the framework

17    of a product switch is exactly the framework

18    in which Gilead considered its decisions

19    about the interaction between TAF and TDF.

20         Q.    You asked your staff if there

21    were a final version of this document, and

22    they told you that there was not one,

23    correct?

24         A.    They weren't able to find one,

25    no.

Meredith B. Rosenthal, Ph.D.

```
 1              MR. CASAZZA:  Okay.  Let's mark
 2         the final version of this document.
 3         Derek, if you could please bring up
 4         the document ending in Bates 8474.
 5         We'll mark that as Exhibit 11.
 6                   -      -      -
 7              (Whereupon, Rosenthal Exhibit
 8         Number 11 was marked for
 9         identification.)
10                   -      -      -
11              THE WITNESS:  So much for my
12         PhD staff.
13    BY MR. CASAZZA:
14         Q.     So, Dr. Rosenthal, having not
15    reviewed Mr. Virsik's deposition, you don't
16    know, for example, that Mr. Virsik talks
17    about the final version of this document in
18    his deposition?
19         A.     I do not, nor would it change
20    my opinions.
21         Q.     Okay.  That's not something
22    that you brought to your staff's attention
23    when you were having them look for the final
24    version of this particular memorandum?
25         A.     I don't know what you mean by
```

1    brought to my staff's attention.  As we

2    talked about earlier, I did not review those

3    depositions.

4                And again, my opinion about the

5    profitability of a delay strategy does not

6    rely on whether this document is a draft or a

7    final one.  My opinion is corroborated by the

8    fact that apparently, based on the words on

9    the page, Gilead understood there was a

10   trade-off between TDF revenues and TAF

11   revenues, and it made forecasts consistent

12   with a product switch.

13               TRIAL TECHNICIAN:  I'm sorry to

14        interrupt, Kyle.  I don't have

15        anything, unless there's a tab number

16        with a different description that ends

17        in 8474.

18               MR. CASAZZA:  Gourdin, can you

19        go ahead and e-mail that to Derek so

20        we can get that in the tray?

21               MR. SIRLES:  It's coming

22        through now.

23               TRIAL TECHNICIAN:  Just

24        received it.  Give me just a minute to

25        get it loaded up.

Meredith B. Rosenthal, Ph.D.

```
 1                    (Pause.)

 2    BY MR. CASAZZA:

 3          Q.     Dr. Rosenthal, what's been

 4    marked for this deposition as Exhibit 11

 5    should now be up on the screen in front of

 6    you.  It has a sticker, Exhibit 13, from what

 7    we used in Mr. Virsik's deposition.

 8                 Do you see it?

 9          A.     I do.

10          Q.     Now, I'll represent to you that

11    this is the final version of the March 2004

12    HIV Business Review Recommendations.

13                 You've never seen this document

14    before right now, have you?

15          A.     I have not.

16          Q.     On the first page, the first

17    sentence under "Recommendations," like the

18    draft, it still states, "The team supports

19    aggressive development of TAF in treatment

20    experienced patients."

21                 Right?

22          A.     It does.

23          Q.     I want you to please scroll

24    through this, but I have a very simple

25    question.
```

Meredith B. Rosenthal, Ph.D.

1           Gilead removed the base-case

2    Viread patent-extension section entirely,

3    didn't it?

4           A.    I don't know.  I'm not looking

5    at both documents at the same time, so I

6    haven't -- should I enter this document and

7    go through it myself?

8           Q.    I would say go ahead and take a

9    look at Exhibit 11, but if I could just ask

10   you to please confirm that the section about

11   the base-case Viread patent extension is no

12   longer in the memorandum, it's not in the

13   final version.

14          A.    I will.  Let me look at the

15   full document.

16              (Witness reviewing document.)

17          A.    I don't see that.  I still see

18   in the Viread section it talks about the

19   launch of subsequent combination pills.

20   There are a number of differences in this.

21          Q.    Right.

22              But in Exhibit 11, there's no

23   reference at all to the base-case Viread

24   patent-extension strategy, right?

25          A.    I don't see the words "base

Meredith B. Rosenthal, Ph.D.

1    case," no.

2         Q.    Okay.  So where in your report

3    in paragraph 46 you cited a draft version of

4    this document for the proposition that the

5    Viread patent-extension strategy became

6    Gilead's base case in 2004, having now seen

7    the final version of this March 2004 HIV

8    Business Review Recommendations, you'd agree

9    that your report is incorrect in that

10   respect, right?

11        A.    It's not incorrect.

12             MR. O'CONNOR:  Objection.

13        Mischaracterizes the document and the

14        report, the facts that are in it.

15             THE WITNESS:  It's not

16        incorrect in the way that I use that

17        document to show that Gilead

18        contemplated market exclusivity

19        extension based on launching TAF

20        later, and that it recognized that a

21        benefit of this scenario was to

22        maximize the lifecycle of the two

23        product lines.

24             I recognize at different times

25        the documents reflect different

Meredith B. Rosenthal, Ph.D.

1          assumptions, different

2          recommendations, that there was not a

3          single recommendation over time, and I

4          understand that plaintiffs intend to

5          prove that Gilead did delay TAF

6          launch.

7                    And if, in fact, they chose to

8          do so, it might be confusing for

9          someone not familiar with the industry

10         to understand how that could possibly

11         be profitable, and in my report I

12         describe the economic incentives and

13         show how a delay could be profitable.

14                   And the fact that it was

15         written in the draft means that there

16         were people talking about this.  The

17         fact that they removed it from the

18         final does not -- does not negate that

19         fact.

20    BY MR. CASAZZA:

21         Q.    Dr. Rosenthal, you had asked

22    your research assistants to find the specific

23    document we're now reviewing as Exhibit 11,

24    right?

25         A.    I did.

Meredith B. Rosenthal, Ph.D.

1        Q.     And even though this document

2    had been marked in Peter Virsik's deposition

3    in this case, they were unable to find it,

4    right?

5        A.     It's true.  I wonder -- I don't

6    know.  I asked if there was a final version

7    of that document, and I wonder if because it

8    was produced in a deposition that's why they

9    couldn't find it.

10       Q.     You understand that the

11   documents were all produced before they were

12   used in depositions, right, from prior

13   litigations?

14       A.     I don't actually know the

15   history of when the documents were produced,

16   no.

17       Q.     Knowing that the final version

18   of this March 2004 memo did exist and was

19   used in a deposition in this case, does that

20   give you any concerns about the research that

21   was done by the assistants who supported you

22   in preparing your report?

23       A.     No, it does not.  It was

24   clearly an oversight.  But seeing the final

25   version of the document does not change my

Meredith B. Rosenthal, Ph.D.

```
1    opinion, nor does my opinion rely on the

2    whole of the documentary evidence in this

3    matter, the whole of the evidence that

4    plaintiffs will bring to prove their case.

5              These documents are used to

6    illustrate how the economic theory and

7    empirical studies around product switches are

8    reflected in the communications that are part

9    of this matter.

10        Q.    But Exhibit 11, the final

11   March 19, 2004 HIV Business Review

12   Recommendations, not the draft, Exhibit 11

13   does not support your hypothesis --

14              MR. O'CONNOR:  Objection.

15   BY MR. CASAZZA:

16        Q.     -- does it?

17              MR. O'CONNOR:  Sorry, Kyle.

18              Objection insofar as it

19        mischaracterizes the document and its

20        authorship.

21              THE WITNESS:  It does not

22        contradict my hypothesis.

23   BY MR. CASAZZA:

24        Q.    But that wasn't my question,

25   Dr. Rosenthal.
```

Meredith B. Rosenthal, Ph.D.

1              It doesn't support it, does it?

2       A.     It does not have those

3  statements.  It certainly contemplates the

4  interaction between Viread and TAF launch.

5       Q.     If we could go back to your

6  report, paragraph 45 specifically.

7  Paragraph 45 of your report, you cite an

8  April 2004 development committee memo,

9  correct?

10       A.     Yes.

11       Q.     You contend that this memo

12  supports your opinion that Gilead

13  deliberately delayed the development of TAF

14  to extend its HIV franchise.

15       A.     I --

16              MR. O'CONNOR:  Objection

17       insofar as it mischaracterizes the

18       report and her opinion.

19              THE WITNESS:  I use this

20       document to show that Gilead employees

21       in documents talked about the TAF

22       launch as a way of extending market

23       exclusivity.

24  BY MR. CASAZZA:

25       Q.     But it says right here in the

Meredith B. Rosenthal, Ph.D.

1    part that you quote that the use of TAF as a

2    patent-extension strategy would only be

3    pursued if TAF were not efficacious in a

4    treatment-experienced population, right?

5         A.    That's correct.

6         Q.    So this memo that you're

7    quoting from is also discussing multiple

8    scenarios for the development of TAF

9    medications, right?

10              MR. O'CONNOR:  Objection.

11         Misstates the document.

12              THE WITNESS:  As all of these

13         documents that are strategy documents,

14         I think business strategy documents

15         always contemplate a range of

16         scenarios, in my experience, the ones

17         that I've read.

18              And these, like the other ones

19         that we've looked at, some of them

20         have scenarios that are favorable to

21         an earlier launch, some of them have

22         scenarios that are favorable to a

23         later launch.

24    BY MR. CASAZZA:

25         Q.    In paragraph 45, after the word

1    "moreover," just below halfway through the

2    paragraph, you write that, "Gilead revealed

3    in April 2003 Development Committee meeting

4    minutes that 'the recommendation...was to

5    stop development due to the likelihood that

6    TAF would ultimately cannibalize Viread

7    regardless of its efficacy and safety

8    profile.'"

9              Right?

10   A.      Right.

11   Q.      And paragraph 46, you rely on

12   that same document in support of your opinion

13   that "concern about cannibalization of TDF

14   sales 'regardless of [TAF's] safety and

15   efficacy profile' caused Gilead to stop the

16   TAF development program until the patent

17   extension strategy could be considered."

18             Right?

19   A.      I should have said appeared to

20   have caused Gilead, because that is what the

21   document says.

22   Q.      Okay.  Let's take a look at the

23   document.

24             MR. CASAZZA:  Derek, if you'll

25       please pull up tab 5, we'll mark that

Meredith B. Rosenthal, Ph.D.

1          as Exhibit 12.

2                       -       -      -

3                  (Whereupon, Rosenthal Exhibit

4          Number 12 was marked for

5          identification.)

6                       -       -      -

7     BY MR. CASAZZA:

8          Q.     Dr. Rosenthal, do you know who

9     wrote this document?

10         A.     I do not.  You know, I can see

11    the names that are listed at the top under

12    the "Development Committee," those names that

13    we've seen a number of times in these

14    communications, but I don't know if that

15    means that they wrote it.

16         Q.     What was Gilead's process for

17    making development committee executive

18    reports?

19                 MR. O'CONNOR:  Objection.

20         Foundation.

21                 THE WITNESS:  Yeah, I don't

22         know.

23    BY MR. CASAZZA:

24         Q.     You don't know how that process

25    might differ from meeting minutes, right?

Meredith B. Rosenthal, Ph.D.

1        A.      I don't know.

2        Q.      If you could please turn to

3    page 2 of the document, underneath the

4    heading "GS-7340."  The first sentence

5    references a prior review committee meeting

6    on April 3rd, 2003, right?

7        A.      Right.

8        Q.      The second sentence begins,

9    "The recommendation of the Review Committee

10   was to stop development."

11               Right?

12       A.      Yes.

13       Q.      You do know that Gilead's

14   review committee is different than the

15   development committee, right?

16       A.      They have different names, but

17   those differences are not consequential for

18   my use of this document.

19       Q.      Do you know how Gilead's review

20   committee is different than Gilead's

21   development committee?

22       A.      I do not.

23       Q.      The development committee

24   executive report we're reviewing here, it

25   does not say that Gilead stopped development

Meredith B. Rosenthal, Ph.D.

1    of TAF, does it?

2           A.    No.  It says here that the

3    review committee recommended to stop

4    development due to the likelihood that TAF

5    would ultimately cannibalize Viread

6    regardless of its efficacy and safety

7    profile.

8           Q.    And earlier today we looked at,

9    in the Delagneau analyses, that Gilead in

10   April 2003 was continuing to study the

11   financial forecasts associated with continued

12   development of TAF, right?

13                MR. O'CONNOR:  Objection.

14          Foundation.

15                THE WITNESS:  We saw a set of

16          forecasts, yes, that were about

17          whether to launch TAF in 2007

18          particularly, I think those are the

19          ones that we were looking at, but

20          there are forecasts at different times

21          with different assumptions that come

22          to different conclusions.

23                What I'm citing here are Gilead

24          employees talking about a

25          recommendation to stop development

Meredith B. Rosenthal, Ph.D.

1            precisely because of the concern that

2            TAF would cannibalize Viread

3            regardless of its efficacy and safety

4            profile, which is consistent with my

5            opinion that a company in Gilead's

6            position had an economic incentive to

7            delay.

8    BY MR. CASAZZA:

9            Q.    Let's go back to Exhibit 4.

10            Dr. Rosenthal, again, this is

11   the Delagneau e-mail and forecasts from the

12   same time period in April 2003.

13            In April 2003, Gilead was still

14   assessing the possibility of an early launch

15   of TAF, right?

16        A.    Yes.  That's what those NPVs

17   are about, yes.

18        Q.    Okay.  And those NPVs included

19   analyses of cannibalization, right?

20        A.    They did, yes.

21        Q.    So concerns about

22   cannibalization did not cause Gilead to stop

23   development of TAF in 2003, did they?

24            MR. O'CONNOR:  Objection.

25        Assumes facts not in evidence,

Meredith B. Rosenthal, Ph.D.

1          incomplete hypothetical.

2                  THE WITNESS:  As far as I know,

3          Gilead did not stop development at

4          that point.  Plaintiffs intend to

5          prove that Gilead stopped development

6          in late 2004.

7                  The documents I cite to

8          describe a recommendation to stop

9          development on the basis of an

10         analysis, much like the one I do, that

11         contemplates cannibalization as a

12         potential cost and exclusivity

13         extension as a potential benefit from

14         delay.

15    BY MR. CASAZZA:

16         Q.    But that's not what you wrote

17    in paragraph 46 of your report.  You wrote

18    that in 2003, concern about cannibalization

19    of TDF sales caused Gilead to stop TAF

20    development.

21         A.    I should have said caused them

22    to recommend stopping development.  It was

23    that recommendation that I was citing.

24         Q.    While I have you today, are

25    there any other corrections you'd like to

Meredith B. Rosenthal, Ph.D.

1    make to your report?

2         A.    Not to my knowledge, no.  I see

3    that that was not as clear as it could have

4    been, but I don't know of any other

5    instances.

6         Q.    If we go back to Exhibit 12,

7    page 2, under the heading "GS-7340," toward

8    the middle of the paragraph do you see where

9    it says, "One reason for

10   continuing/restarting development would be to

11   obtain patent extension"?

12        A.    Yes.

13        Q.    It doesn't say that patent

14   extension would be the only reason for

15   continuing or restarting development of TAF,

16   does it?

17        A.    It does not.

18        Q.    And as we've seen across

19   multiple documents today, Gilead had looked

20   at a number of scenarios for the development

21   of TAF, right?

22              MR. O'CONNOR:  Object to the

23         form.

24              THE WITNESS:  Yes.  I think

25         this particular statement about

Meredith B. Rosenthal, Ph.D.

1     continuing or restarting is a separate

2     thing than sort of trade-offs, because

3     this is about if one delays should

4     there be any restart, and different

5     from some of the assumptions that we

6     looked at.

7              But, yeah, I don't know what

8     more to say.  One reason.

9              MR. CASAZZA:  Let's pull up tab

10    20 and mark that as Exhibit 13.

11             MR. O'CONNOR:  Kyle, we've been

12    going for about an hour and a half, so

13    maybe it's time for a break soon after

14    this.

15             MR. CASAZZA:  Okay, sure.  And,

16    actually, I think we've previously

17    marked tab 20, so I can check that on

18    the break as well.

19             Want to come back at 12:05

20    Pacific, 3:05 Eastern?

21             MR. O'CONNOR:  Okay.

22             THE WITNESS:  Sounds good.

23             THE VIDEOGRAPHER:  The time

24    right now is 2:58 p.m.  We are off the

25    record.

Meredith B. Rosenthal, Ph.D.

1           (Whereupon, a recess was

2       taken.)

3           THE VIDEOGRAPHER:  The time

4       right now is 3:06 p.m.  We're back on

5       the record.

6  BY MR. CASAZZA:

7       Q.    Dr. Rosenthal, just so the

8  record is clear, I'd like to bring up

9  paragraph 46 of your report so we can just

10 pin down the clarification and correction

11 that you'd like to make.

12      A.    Yes.

13           THE WITNESS:  And, Derek, will

14 you do that so then we're all looking at it

15 together?

16           MR. CASAZZA:  Yes.

17           THE WITNESS:  Yes.

18      Q.    I believe it starts with the

19 sentence "In 2003," the third sentence, but

20 correct me -- please let us know what your

21 report should instead say, Dr. Rosenthal.

22      A.    Yes.  I think it should say

23 "apparently caused Gilead to recommend

24 stopping the TAF development program."

25      Q.    Okay.  In the sentence -- so

Meredith B. Rosenthal, Ph.D.

1    instead of "caused Gilead to stop the TAF

2    development program," it should read

3    apparently caused Gilead to recommend

4    stopping the TAF development program?

5         A.    Yes.

6         Q.    And we saw that the next

7    sentence beginning "And under the 'Viread

8    patent extension strategy,'" now having seen

9    the final version of the March 2004

10   memorandum, that sentence is no longer

11   correct either, is it?

12             MR. O'CONNOR:  Objection.

13        Misleading.

14             THE WITNESS:  I disagree.  The

15        draft document exists, and it contains

16        that language.  I don't think I would

17        change anything about that.

18   BY MR. CASAZZA:

19        Q.    If you wouldn't change anything

20   about that, then why did you even ask your

21   research team to look for the final?

22        A.    Because the document clearly

23   had a lot of red lines in it, and it seemed

24   like there might be a version where those red

25   lines were accepted, and that would be

1    cleaner as a reference.
2         Q.    Having now seen the final
3    draft, you would agree by the time of the
4    final draft, the Viread patent-extension
5    strategy was no longer the base case, right?
6              MR. O'CONNOR:  Objection.
7         Misstates the evidence, misstates the
8         documents, and misstates the report.
9              THE WITNESS:  It certainly was
10        not described that way in the final
11        document.  I guess I don't know from
12        the final document if the --
13        conceptually that was still the most
14        likely scenario.  That I don't know.
15             MR. CASAZZA:  Let's go ahead
16        and let's mark tab 9.  And I believe
17        we are on Exhibit 14, is that right?
18             MR. O'CONNOR:  I think actually
19        13, but I could be wrong.
20             TRIAL TECHNICIAN:  I have 13 as
21        well.
22             MR. CASAZZA:  Mark tab 9 as
23        Exhibit 13.
24             ///
25             ///

Meredith B. Rosenthal, Ph.D.

```
1                    -      -      -

2                 (Whereupon, Rosenthal Exhibit

3         Number 13 was marked for

4         identification.)

5                    -      -      -

6    BY MR. CASAZZA:

7         Q.     And this is a September 2004

8    TAF Development Plan Update.

9               Dr. Rosenthal, do you recognize

10   this document as one of the 14

11   Gilead-produced documents from your reliance

12   list?

13        A.     I would really have to check

14   the corresponding numbers in my report.  I'm

15   happy to do that.  But there are -- I do

16   recall seeing the information about the

17   toxicology study, but I'm not sure it was

18   exactly this document or not.  I am happy to

19   open my report.

20               MR. CASAZZA:  Gourdin, do we

21        have a Bates-numbered version of this

22        handy?

23               MR. O'CONNOR:  I think this one

24        has a Bates on it.

25               MR. SIRLES:  Yes, it does.
```

Meredith B. Rosenthal, Ph.D.

```
 1              MR. CASAZZA:  Am I just not

 2         seeing it in what's being -- in my

 3         view in --

 4              MR. O'CONNOR:  I see it at the

 5         very bottom, Kyle, so, yeah, maybe

 6         it's your view.  It ends in 0990.

 7              THE WITNESS:  Sorry, I'm just

 8         bringing up the Bates numbers in my

 9         report now in Exhibit 2 here, so --

10              MR. CASAZZA:  I see it now in

11         the Zoom.

12              THE WITNESS:  It will just take

13         me a second to get to Attachment B.

14    BY MR. CASAZZA:

15         Q.    I just want to confirm,

16    Dr. Rosenthal, that this document ending in

17    Bates 990 is one of the 14 Gilead-produced

18    documents?

19         A.    Yes, it is.

20              (Cross-talking.)

21         Q.    Okay.  Dr. Rosenthal, this

22    document from September --

23              MR. SIRLES:  Excuse me, it's at

24         the very bottom.

25                   ///
```

Meredith B. Rosenthal, Ph.D.

```
 1      BY MR. CASAZZA:
 2           Q.     Dr. Rosenthal, this document
 3      from September 16th, 2004 is closest in time
 4      to Gilead's press release about stopping
 5      development of TAF than anything else on
 6      which you relied for your report, right?
 7           A.     That sounds right.
 8           Q.     This document outlines
 9      different development scenarios for TAF,
10      right?
11           A.     Yes.
12           Q.     Page 1 references a TAF full
13      development scenario, right?
14           A.     That's right.
15           Q.     And that scenario is predicated
16      on obtaining positive results from study
17      GS-120-0103, right?
18           A.     Yes.
19                  MR. CASAZZA:  If we can turn to
20          page 8 of the PDF, please.
21           Q.     Dr. Rosenthal, do you see the
22      heading "Viread Extension/Replacement
23      Scenario"?
24           A.     Yes.
25           Q.     That's a different scenario
```

Meredith B. Rosenthal, Ph.D.

1    from the full development scenario, right?

2        A.     That's right.

3        Q.     Your expert report does not

4    mention that in September 2004 Gilead still

5    had a full development scenario for TAF, does

6    it?

7        A.     I don't think it denies that

8    there were -- they were still contemplating

9    full development.  I mean, these scenarios

10   are used in comparison to one another.

11            A decision at the point in time

12   that I understand plaintiffs intend to prove

13   that it was made would require comparing

14   those scenarios.

15       Q.     You reviewed this whole

16   document before writing your report, right?

17       A.     I did.

18       Q.     For the Viread

19   extension/replacement scenario, the document

20   notes that, "This strategy would be

21   implemented if TAF did not demonstrate

22   additional antiviral activity versus Viread."

23            Right?

24       A.     That's right.

25            MR. CASAZZA:  If you could turn

Meredith B. Rosenthal, Ph.D.

1           to page 10 of the PDF, please, Derek.

2           Q.      Under the heading "Development

3      Assumptions," on the last full paragraph of

4      the page, do you see where it says, "Under

5      the full development scenario filing of the

6      NDA was projected for Quarter 4, 2007, with

7      approval of TAF in Quarter 2, 2008 and

8      approval of the TAF/FTC combination product

9      in Quarter 3, 2008."

10              Do you see that, Dr. Rosenthal?

11          A.      I do.

12          Q.      And it says, "Under the Viread

13     extension/replacement scenario, filing of the

14     NDA was projected for Quarter 4 2011, with

15     approval of both TAF and the TAF/FTC

16     combination product in Quarter 3 2012."

17              Do you see that?

18          A.      I do.

19          Q.      Neither of those scenarios are

20     what actually happened, are they?

21          A.      They are not.

22          Q.      Dr. Rosenthal, did you consider

23     that Gilead decided to stop TAF development

24     because of negative preclinical results?

25          A.      I did not rule out -- my

Meredith B. Rosenthal, Ph.D.

1    opinion is not about proving what Gilead

2    considered or didn't consider.  It is about

3    whether a company in Gilead's position would

4    have had an incentive to delay and whether

5    what actually happened, which was a delay or

6    an alleged delay, if I am a little more

7    formal, a late launch in 2015 that was

8    exactly two years before the Viread generic

9    entry was set to happen, and that, in my

10   opinion, is consistent with a product switch

11   strategy.

12             So I recognize in my report and

13   in this deposition that there are other

14   scenarios that Gilead explored, and it's not

15   my assignment to prove a particular analysis

16   that Gilead did that led to the decision

17   allegedly to delay, but to explain how it

18   could be profitable to delay in a

19   circumstance like the one Gilead found itself

20   in.

21        Q.    Dr. Rosenthal, where in your

22   report do you recognize the possibility that

23   there are other scenarios that Gilead --

24   strike that.

25             Dr. Rosenthal, where do you

Meredith B. Rosenthal, Ph.D.

1    recognize in your report that Gilead explored

2    other scenarios?

3        A.    I mean, including these

4    documents that show that they are looking at

5    trade-offs, and we could look at my

6    document -- sorry, my report where I talk

7    about clearly there's a trade-off in a

8    company's strategy, enter early and

9    potentially cannibalize the existing product,

10   delay -- I mean, that is the whole economics

11   of a product switch, is all about trade-offs.

12   I'm not --

13       Q.    But, Dr. Rosenthal --

14   Dr. Rosenthal, I'm asking a slightly

15   different question.

16           The text of your report is

17   literally silent on Gilead having

18   contemplated releasing TAF sooner than 2015,

19   right?

20       A.    Right.  My assignment was to

21   explain the economic incentive to delay,

22   so --

23       Q.    Again, Dr. Rosenthal, I wasn't

24   asking you what your assignment was.  I'm

25   asking about the text of your report.

Meredith B. Rosenthal, Ph.D.

1                    The text of your report does
2    not say that Gilead contemplated releasing
3    TAF sooner than 2015, does it?
4                    MR. O'CONNOR:  Objection.
5         Asked and answered.
6                    THE WITNESS:  It does not.
7         That writing about the fact that they
8         contemplated that would not be helpful
9         to explain how there could be an
10        economic incentive to delay.  Again,
11        I --
12   BY MR. CASAZZA:
13        Q.    Writing about Gilead having
14   considered other times for releasing TAF
15   wouldn't have been helpful to support your
16   theory that Gilead deliberately delayed the
17   release of TAF?
18                   MR. O'CONNOR:  Objection
19        insofar as counsel cut off the
20        witness's last answer.
21                   Please answer.
22                   THE WITNESS:  You misstated my
23        opinion, which is that given that
24        there was an observable delay, whether
25        or not it was unlawful, I was asked to

Meredith B. Rosenthal, Ph.D.

1          describe how there could be an

2          incentive to delay.  And so I

3          described that incentive.

4               It is not my role in this case

5          to prove that there was a particular

6          scenario that Gilead analyzed and

7          acted based on that.  Plaintiffs

8          intend to prove their allegations

9          through a variety of evidence and

10          experts, and my role is to explain the

11          economic motivation for delay.

12   BY MR. CASAZZA:

13     Q.    Doctor, you'd agree that it's

14   possible that Gilead didn't pursue any of the

15   development scenarios that were discussed in

16   the 2003 and 2004 time frame, right?

17               MR. O'CONNOR:  Objection.

18          Vague as to time and to

19          (indiscernible).

20               THE WITNESS:  These are plans,

21          so, yes, it is possible that they

22          didn't pursue any of them.

23               MR. CASAZZA:  If we could turn

24          to the next page of Exhibit 13.

25               ///

Meredith B. Rosenthal, Ph.D.

```
 1      BY MR. CASAZZA:
 2           Q.      Doctor, do you see the section
 3      entitled "Revenue Projections"?
 4           A.      I do.
 5           Q.      Is this something you reviewed
 6      before signing your report?
 7           A.      I reviewed this entire
 8      document.
 9           Q.      This presents revenue
10      projections for TAF beginning in 2008, right?
11           A.      That's right.
12           Q.      And it projects that TAF will
13      produce an incremental increase in revenue of
14      954,600,000 -- strike that.
15              It projects that TAF will
16      produce an incremental increase in revenue of
17      $954,600,000 above Viread and Truvada from
18      2008 through 2013, right?
19           A.      It does.
20           Q.      In other words, Gilead is
21      projecting that it would make nearly a
22      billion dollars more if it released TAF in
23      2008?
24           A.      Over those years.
25           Q.      Right.
```

Meredith B. Rosenthal, Ph.D.

1          A.     Yes.

2          Q.     Is the fact that Gilead

3     projected it would make nearly a billion

4     dollars in incremental revenue above Viread

5     and Truvada something you considered in

6     forming your opinion?

7          A.     Yes.  I understand that there

8     are assumptions that lead to projections of

9     increased profitability, and there are

10    assumptions that are much more consistent

11    with what actually happened that would lead

12    to projections about a superior performance

13    from delay.

14                So my opinion is not dependent

15    on a particular scenario.  Obviously, there

16    are scenarios that they describe where delay

17    makes more sense, and in retrospect those

18    scenarios proved much more consistent with

19    the market potential for -- because of the

20    growth of TDF that actually occurred between

21    2018 and 2013.

22         Q.     But Exhibit 13 right here, this

23    is the closest in time Gilead produced

24    document on which -- strike that.

25                Exhibit 13 right here, this is

Meredith B. Rosenthal, Ph.D.

1    the closest in time Gilead produced document

2    to Gilead's announcement that it stopped

3    development of TAF that appears on your

4    reliance list, right?

5          A.    I believe that is true.  That

6    does not change my opinion about it.  This

7    period of increased revenue predates any of

8    the patent expiration that would affect TDF,

9    so it doesn't include any potential benefit

10   from a patent-extension strategy.

11         Q.    But you didn't do any financial

12   analysis to compare this projection of

13   $954 million to what Gilead would realize if

14   it delayed development of TAF, did you?

15              MR. O'CONNOR:  Objection.

16         Form.

17              THE WITNESS:  I did not need to

18         do that analysis to reach my

19         conclusions, and so I did not, because

20         I do not intend to prove that there is

21         one scenario that Gilead relied on.

22         That's not my job.  I'm not proving

23         plaintiffs' case.  Plaintiffs will

24         prove their case.

25              What I am doing is explaining

Meredith B. Rosenthal, Ph.D.

1          if the allegations are true, given

2          what we know, is it possible that

3          Gilead did this alleged delay to

4          increase profits, and it's my opinion

5          that it's very possible.

6              And with what we know about the

7          success of TDF during this period,

8          2008 until Genvoya entered in 2015,

9          it's very consistent with a product

10         switch strategy, such that Gilead made

11         more money by delaying than by

12         launching early, notwithstanding other

13         projections.

14    BY MR. CASAZZA:

15         Q.    So you are not opining that

16    Gilead did delay the development of TAF to

17    increase profits; rather, it's your opinion

18    that it's possible that Gilead delayed the

19    development of TAF to increase profits?

20         A.    It's my opinion, as I've stated

21    in my report, that Gilead had an economic

22    incentive to delay in order to minimize the

23    cannibalization of TDF, and that a delay

24    would be entirely consistent with those

25    economic incentives.

Meredith B. Rosenthal, Ph.D.

1          Again, looking at the evidence

2    in terms of the amount of revenues it earned

3    before Genvoya launched with the promise of

4    the entire TAF franchise to follow, my

5    conclusion is that, in fact, Gilead --

6    there's good evidence that Gilead earned more

7    money by delaying than by entering earlier.

8          Q.     But a moment ago when you said

9    "if the allegations are true," you're talking

10    about the allegations that Gilead

11    deliberately delayed the development of TAF,

12    right?

13          A.     That's correct.  And again, the

14    allegations as we've discussed are broader

15    than that.  They include allegations about

16    the benefits of TAF that allegedly Gilead

17    would have known about.

18          So again, the assumptions that

19    go into those projections would have been

20    based on that as well.

21          Q.     Right.

22          But yes or no, you are not

23    opining about whether Gilead did, in fact,

24    deliberately delay the development of TAF?

25    That's an allegation of the plaintiffs that

Meredith B. Rosenthal, Ph.D.

1    you are assuming is true for purposes of your

2    opinion, right?

3          A.    That's correct.  And my opinion

4    is about the economic incentives and whether

5    Gilead's conduct was consistent with a

6    product switch.

7                And it is my conclusion that

8    they had an economic incentive to delay the

9    launch of TAF in order to minimize the impact

10   on TDF, and that their behavior delaying

11   until two years before generic entry for

12   Viread was consistent with a product switch.

13         Q.    Let's go back to your report

14   and go back to paragraph 46, please.  The

15   second sentence of paragraph 46, you write

16   that, "From the beginning of TAF development,

17   Gilead's documents stated that TAF 'should

18   not be allowed to cannibalize the TDF

19   program.'"

20               Do you see that?

21         A.    Yes.

22         Q.    When you say "cannibalize" here

23   in paragraph 46, you're talking about

24   cannibalizing sales of TDF drugs, right?

25         A.    That's correct.

Meredith B. Rosenthal, Ph.D.

1        Q.      But the document you cite here,

2   it's not talking about cannibalizing sales,

3   is it?

4        A.      These documents talk about

5   cannibalizing sales in two ways:  One in a

6   static way, TAF enters, patients switch; and

7   another in a dynamic way, in that the company

8   focuses its investments on TAF and does not

9   focus on extending the TDF franchise.

10       Q.      Does your definition of

11  "cannibalization," then, include

12  cannibalization of Gilead employees who were

13  working on TDF?

14       A.      What cannibalization means to

15  me as a health economist -- and perhaps we

16  should use a different word, except that I'm

17  afraid we're stuck with this word because

18  it's in my report and in the documents.

19              But what it means to me as a

20  health economist is that it would diminish

21  the profit stream from the TDF franchise,

22  which can be both about introducing new

23  combination TDF drugs and the development

24  associated with launching those new drugs

25  like Complera and Stribild, and it would be

Meredith B. Rosenthal, Ph.D.

1    about switching patients, anything that
2    affected TDF's profits over time.
3         Q.    In paragraph 47 of your report
4    you opine that Gilead's internal documents
5    contradict its public justification for the
6    delay of TAF, right?
7         A.    That's correct.
8         Q.    By "public justification,"
9    you're referring to the statement in Gilead's
10   press release from October 2004 that Gilead
11   did not believe that TAF has a profile that
12   differentiates it from TDF to an extent that
13   supports its continued development?
14        A.    That's correct.
15        Q.    You claim in your report that,
16   "Internal documents around this period
17   repeatedly contradict this statement."
18             Right?
19        A.    Yes.  I think we've looked at
20   some of those documents today.
21        Q.    In your report, you rely on
22   four internal Gilead documents that
23   supposedly support your view that Gilead's
24   public justification for discontinuing TAF
25   was contradicted by internal documents,

Meredith B. Rosenthal, Ph.D.

```
 1    right?

 2         A.     That's correct.

 3         Q.     You contend that those four

 4    documents contradict Gilead's statement that

 5    it did not believe that TAF has a profile

 6    that differentiates it from TDF to an extent

 7    that supports its continued development,

 8    right?

 9         A.     That's correct.

10         Q.     The next page of your report,

11    if we can go to numbered page 23, you write

12    that, "Gilead documents from as far back as

13    2002 appear to show how that Gilead knew of

14    TAF's improved safety potential."

15              Do you see that?

16         A.     Yes.

17         Q.     Are you opining that Gilead

18    actually knew, not just hoped or suspected,

19    but knew by 2002 that TAF was safer than TDF?

20         A.     As I stated before, my -- I do

21    not draw a conclusion about whether the

22    plaintiffs can prove what Gilead knew

23    precisely.

24              I say here their documents

25    appear to show that.  Their documents reflect
```

Meredith B. Rosenthal, Ph.D.

1    statements that show that whoever was writing

2    the document believed there were benefits --

3    potential benefits to TAF.

4              But it is not in the scope of

5    my opinion to prove what Gilead knew from a

6    legal perspective.

7         Q.    And you are not drawing a

8    distinction between potential safety benefits

9    from TAF and actual safety benefits from TAF,

10   right?

11             MR. O'CONNOR:  Objection.

12        Form.

13             THE WITNESS:  I guess because

14        these are prospective -- it's before

15        TAF was launched, they are prospective

16        in that sense, so they're potential

17        benefits.

18   BY MR. CASAZZA:

19        Q.    Potential benefits are not the

20   same thing as actual benefits, right?

21        A.    I think the statement in their

22   press release is about potential, and these

23   are about potential as well.  I think they're

24   all potential benefits.

25        Q.    That wasn't my question,

Meredith B. Rosenthal, Ph.D.

1    Dr. Rosenthal.  I was asking you whether

2    potential benefits are the same thing as

3    actual benefits.

4              MR. O'CONNOR:  Objection.

5         Form.

6    BY MR. CASAZZA:

7         Q.    Potential benefits are not the

8    same thing as actual benefits, are they?

9              MR. O'CONNOR:  Same objection.

10             THE WITNESS:  Potential

11        benefits are about information under

12        uncertainty, they're -- I guess it

13        depends on what you consider -- what's

14        your threshold for actual benefits.

15        So some evidence or evidence at the

16        level of FDA approval for a label

17        claim.

18             Again, I cite the documents.  I

19        don't intend to prove plaintiffs' case

20        that these documents are sufficient to

21        show what Gilead knew, but the writers

22        of those documents made statements

23        about benefits.

24    BY MR. CASAZZA:

25        Q.    None of the documents cited in

Meredeuth B. Rosenthal, Ph.D.

1    your report say that TAF is safer than TDF,

2    do they?

3         A.    I'd have to look through them.

4    I don't think -- I do think that they talk

5    about intermediate outcomes as having the

6    potential for safety implications.

7              You know, we looked at the

8    other -- that other set of projections that

9    talked about the difference between the

10   efficacy endpoints and the in vivo studies,

11   so these are different pieces of evidence,

12   and it's just hard for me to say when

13   potential becomes actual because there's

14   always uncertainty in all these estimates.

15   But these are preliminary, preliminary

16   evidence of improved safety.

17        Q.    But while these are

18   "preliminary evidence of improved safety," in

19   your opinion, you agree there is still

20   uncertainty during this time frame as to

21   whether TAF is safer than TDF, right?

22              MR. O'CONNOR:  Objection.

23        Form.

24              THE WITNESS:  Well, I think

25        we're getting a little outside of my

Meredith B. Rosenthal, Ph.D.

1              expertise, but I would say the

2              documents appear to reflect

3              uncertainty in that they have

4              alternative assumptions, as we talked

5              about, while at the same time there

6              are these statements consistent with

7              beliefs that there are expectations on

8              improved safety.

9                   But I'm not a clinical expert

10             or clinical trials expert, so I don't

11             want to go beyond the way I interpret

12             these documents.

13      BY MR. CASAZZA:

14             Q.    At trial in this case you will

15      not be telling the jury that by 2004 Gilead

16      knew that TAF was safer than TDF, will you?

17             A.    I will not.

18             Q.    You will not be telling the

19      jury that Gilead knew at any point in time

20      that TAF was safer than TDF?  That's outside

21      your area of expertise, right?

22             A.    That is outside my area of

23      expertise.

24                   Again, I cite these documents

25      to show consistency between what unfolded and

Meredith B. Rosenthal, Ph.D.

1    the economic framework that I use for a

2    product switch.

3          Q.    But we looked at a number of

4    documents today that you also reviewed for

5    your report that assumed that TAF would be no

6    safer or comparable in safety to TDF,

7    correct?

8                MR. O'CONNOR:  Objection.

9          Mischaracterizes prior documents and

10         prior testimony.

11               THE WITNESS:  There are

12         documents that we looked at that have

13         projections that are based on those

14         assumptions.  Yes, there are.  But

15         those are -- right, those are

16         assumptions for forecast documents.

17         They're not contradictory.

18   BY MR. CASAZZA:

19         Q.    If we could turn back to

20   Exhibit 13 and bring that up, please, the

21   September 16th, 2004 TAF Development Plan

22   Update.

23         A.    You say it's Exhibit 13?

24         Q.    Yes.

25         A.    I was just trying to -- there

Meredith B. Rosenthal, Ph.D.

1    it is.  I just needed to refresh again.

2           Q.     Dr. Rosenthal, in addition to

3    this being the latest in time to the press

4    release in which Gilead announced it was

5    stopping development of TAF, this document is

6    also the latest-in-time Gilead-produced

7    document that you cited for your opinion that

8    Gilead's public-facing reason for

9    discontinuing TAF was contradicted by

10   internal documents, right?

11          A.     Yes.

12          Q.     The first page of this document

13   discusses new data from a nine-month dog

14   toxicology study.

15                 Do you see that?

16          A.     Yes.

17          Q.     The first sentence of that

18   section states that the high dose of TAF was

19   not well tolerated and resulted in a death.

20                 Do you see that?

21          A.     Yes.

22          Q.     We've already discussed how

23   this document evaluates different development

24   scenarios for TAF, right?

25          A.     That's right.

Meredith B. Rosenthal, Ph.D.

```
 1            Q.    The full development scenario
 2   discussed in this document was predicated on
 3   obtaining positive results for TAF compared
 4   to Viread from a clinical study, right?
 5            MR. O'CONNOR:  Objection.
 6        Foundation.
 7            THE WITNESS:  I think if you
 8        could show me -- I know we looked at
 9        there is a list of assumptions.
10   BY MR. CASAZZA:
11        Q.    Well, the first full sentence
12   of the document, underneath the heading TAF
13   "Full Development Scenario" says, "This
14   scenario is predicated on obtaining positive
15   results from study GS-120-0103 demonstrating
16   antiviral activity of TAF versus Viread."
17            Do you see that?
18        A.    Right, but that's a particular
19   study.  I'm sorry, I thought you said from
20   clinical studies.
21        Q.    Gilead didn't have this
22   clinical study data at the time of this
23   document, did it?
24            MR. O'CONNOR:  Object to
25        foundation.
```

Meredith B. Rosenthal, Ph.D.

1            THE WITNESS:  That is what that

2       first sentence implies, yes.

3  BY MR. CASAZZA:

4       Q.    You can't say that Gilead

5  knew -- at the time of the latest document

6  cited in your report in paragraph 47, that

7  Gilead knew TAF was safer than TDF, can you?

8            MR. O'CONNOR:  Objection.

9       Form.

10            THE WITNESS:  I believe I've

11       said many times that I do not intend

12       to offer an opinion about what Gilead

13       knew and when, which I understand

14       plaintiffs will prove through other

15       evidence and experts.  I cite these

16       documents as having indications of the

17       potential safety benefits for TAF.

18  BY MR. CASAZZA:

19       Q.    Without understanding what

20  Gilead actually knew regarding the safety of

21  TAF at the time it stopped TAF development,

22  how is it that you're able to assert in your

23  report that Gilead's internal documents are

24  contradictory?

25       A.    From statements in those

Meredith B. Rosenthal, Ph.D.

1    documents.

2         Q.     But none of those statements in

3    the documents state that Gilead actually knew

4    that TAF was safer, right?

5         A.     The documents are -- they

6    focus -- I'm trying to find the specific

7    places.  Many of these documents, these

8    documents that I cite particularly here, I

9    think there are -- actually, we could be more

10   precise by looking at what part of the

11   document that I cite in my report where they

12   make statements about the potential benefits

13   of TAF, and including the documents that we

14   looked at earlier, the talk about the

15   efficacy studies and their implications for

16   safety, notwithstanding that some of these

17   specific clinical studies were not completed

18   yet.

19        Q.     But again, even if there were

20   potential benefits from TAF, the use of the

21   word "potential" in those documents reflects

22   that there was uncertainty and that Gilead

23   did not know that TAF would be safer than

24   TDF?

25             MR. O'CONNOR:  Objection.

1          Asked and answered.

2               THE WITNESS:  I think you're

3          using "know" in a legal sense, and I

4          want to be clear that I do not intend

5          to offer an opinion to prove knowledge

6          in a legal sense.

7               I cite to documents that

8          describe the potential safety benefits

9          from TAF due to what they did know

10         about efficacy.

11    BY MR. CASAZZA:

12         Q.    If we could turn back in your

13    report, in Exhibit 1, to paragraph 13.

14    Section III(B) of your report generally

15    discusses the allegations in this matter.

16              Do you agree that that

17    discussion of the allegations in this matter

18    begins with paragraph 13 of your report?

19         A.    Yes.  But I would say that

20    previous paragraphs described a timeline of

21    events that are not allegations, but yes.

22         Q.    You rely solely on plaintiffs'

23    Complaint for each point in Section III(B) of

24    your report, right?

25         A.    I do, yes, as experts in

Meredith B. Rosenthal, Ph.D.

1    similar matters do rely on the assumption

2    that plaintiffs will prove their allegations.

3         Q.     So you didn't do anything to

4    verify plaintiffs' allegations from their

5    Complaint, correct?

6         A.     I am not a lawyer or a

7    clinician.  I -- proving these allegations is

8    beyond my expertise.

9         Q.     You accepted these allegations

10   at face value, right?

11        A.     I assume that the allegations

12   will be proven as the basis for my

13   assignment, which is to explain what economic

14   incentives would have caused a company in

15   Gilead's position to allegedly delay.

16        Q.     So if we could go ahead to

17   paragraph 17 of your report.  If you look at

18   the last sentence of paragraph 17, you accept

19   as true the allegation that, "While patent

20   protection on Gilead's TDF products would

21   expire no later than 2018, market exclusivity

22   of the Gilead HIV franchise could be extended

23   with the introduction of TAF-based treatments

24   until as late as 2032."

25              Right?

Meredith B. Rosenthal, Ph.D.

```
1            A.      I do, and I think as we
2    talked -- as we discussed earlier today, the
3    "as late as" information evolves as the new
4    combination products become possible.
5            Q.      What did you do to investigate
6    whether patent protection for Gilead's TDF
7    products expired no later than 2018?
8            A.      These allegations are -- these
9    are -- well, these are factual statements
10   from the allegations when the patents expire,
11   and I assumed that they were correct in the
12   Complaint.  I did not do an investigation of
13   them.  I'm not a patent expert.
14           Q.      So you assumed it was correct,
15   for purposes of formulating your opinion,
16   that patent protection for Gilead's TDF
17   products would expire in 2018?
18           A.      I did.
19                   MR. O'CONNOR:  Objection to
20           form --
21                   THE WITNESS:  It's --
22                   MR. O'CONNOR:  -- and it
23           mischaracterizes the report.
24                   THE WITNESS:  Right.  Sorry.
25                   It's no later than -- I think
```

1          the actual patent expiration is in
2          2017, but the Complaint says no later
3          than 2018.
4   BY MR. CASAZZA:
5          Q.     But in any event, your opinion
6   is, based on assuming the allegation to be
7   true, that patent protection on Gilead's TDF
8   products would expire no later than 2018,
9   right?
10         A.     Yes, that's absolutely
11  consistent with everything I consider in my
12  opinion.  And in reality, the first generic
13  for a TDF product entered in the middle of
14  December 2017.
15         Q.     If patent protection on
16  Gilead's TDF products expired later than
17  2018, that would call into question your
18  opinions regarding the economic incentives
19  for Gilead to delay development of TAF,
20  right?
21         A.     It might or might not.  It
22  depends on what you mean by "later."
23         Q.     Do you actually know when the
24  patents on Gilead's different TDF medications
25  expire?

Meredith B. Rosenthal, Ph.D.

1          A.      It's my understanding that the

2     patent protection on Viread expired in 2017,

3     and the generic launched in the middle of

4     December 2017.

5                  And just to be clear, the

6     documents that we've looked at today talk

7     about generic entry being expected in 2017,

8     so that's consistent with those documents as

9     well.

10         Q.      But that's generic entry of

11    Viread, right?

12         A.      That's right.

13         Q.      You are aware that Gilead has

14    TDF medications other than Viread that are

15    still patent-protected, right?

16         A.      I am, yes.

17         Q.      Do you know which Gilead TDF

18    medications are still patent-protected?

19         A.      Complera and Stribild.

20         Q.      So you're aware that there's

21    still no generic version of Stribild?

22         A.      I am.

23         Q.      And when I say ANDA, you know

24    what an ANDA is, correct?

25         A.      Excuse me.  I just heard

Meredith B. Rosenthal, Ph.D.

1    someone coming in.  I'm going to shut the

2    door.  Sorry about that.

3                Would you please repeat the

4    question?

5        Q.    Do you know what an ANDA is in

6    the context of the Hatch-Waxman Act?

7        A.    An abbreviated new drug

8    application.

9        Q.    No ANDA has even been filed for

10   Stribild yet, right?

11       A.    As far as I know, that is true,

12   and that would be entirely consistent with

13   the incentives for generic entry.  Now that

14   TAF has entered, Stribild has lost

15   substantial market share.

16       Q.    But there's still no generic

17   version of Stribild, right?

18       A.    Yes, there is still no generic

19   version of Stribild.  I do not assume that

20   there is a generic version of Stribild in

21   2017.

22       Q.    Do you know when the patent

23   protection on Stribild expires?

24       A.    I don't know it as I sit here,

25   no.  I know that Truvada and Atripla had

Meredith B. Rosenthal, Ph.D.

1    generic entry in 2020, and I looked up when

2    Stribild would be eligible, when the patent

3    expires, but I don't recall as I sit here.

4         Q.    There is a TAF analog for

5    Stribild, right, a medication that contains

6    the other components of Stribild but

7    substitutes TAF for TDF?

8         A.    That's Genvoya.

9         Q.    Why didn't Gilead wait until

10   closer to Stribild's patent expiration to

11   release Genvoya if it were undertaking a

12   deliberate delay strategy?

13        A.    Given that Stribild had already

14   launched -- I have not separately analyzed

15   this question, but given that Stribild had

16   already launched, it would appear to me that

17   it would make no sense for Gilead to go back

18   to the older combination drugs rather than

19   launch Genvoya.  And then subsequently it

20   launched the TAF versions of Viread and

21   Truvada.

22             So I -- it certainly makes

23   sense that it would be profit-maximizing to

24   launch the product that represents the most

25   recent combination.

Meredith B. Rosenthal, Ph.D.

1      Q.      But you haven't separately

2   analyzed the question of Gilead's timing of

3   releasing the different TAF analogs compared

4   to the patent expirations of the different

5   TDF medications?

6      A.      I haven't separately analyzed

7   why Gilead launched the TAF version of

8   Stribild versus the TAF version of Viread

9   when it did so in 2015, no.

10      Q.      If Gilead wanted to have its

11   cake and eat it too, as you testified

12   earlier, why not wait to launch the TAF

13   version of Stribild until closer to

14   Stribild's patent expiration date?

15              MR. O'CONNOR:  Objection.

16          Incomplete hypothetical.

17              THE WITNESS:  I told you what I

18          believe is likely the explanation.  It

19          is evident in looking at the sales of

20          each of those drugs over time that

21          each new combination cannibalized the

22          previous combination, and then added

23          some as well.

24              But because of that, the,

25          perhaps, logical place to start was

Meredith B. Rosenthal, Ph.D.

1           with the most recent combination

2           rather than going back to the TAF-only

3           molecule, which they didn't, or the

4           earlier combinations.

5    BY MR. CASAZZA:

6           Q.    So if it's evident in looking

7    at the sales of each of the drugs over time

8    that each new cannibalization -- strike that.

9              If it's evident in looking at

10   the sales of each of those drugs over time

11   that each new combination cannibalized the

12   previous combination, why, then, wouldn't it

13   have been more profitable for Gilead to have

14   launched a TAF version of Atripla earlier

15   than 2015?

16           MR. O'CONNOR:  Objection.

17       Foundation.

18           THE WITNESS:  As opposed to

19       continuing to launch Stribild?

20   BY MR. CASAZZA:

21           Q.    And Complera, right.

22              Earlier you had repeatedly

23   cited Gilead's contractual obligations

24   relating to Atripla as a reason for Gilead

25   not launching TAF sooner.

```
 1                    MR. O'CONNOR:  Objection.
 2          Mischaracterizes testimony.
 3                    THE WITNESS:  Again, I haven't
 4          separately analyzed these incentives
 5          over time as opposed to looking at the
 6          launch delay scenario, but the
 7          economics are fundamentally the same.
 8                    Once Gilead launched TAF, if
 9          the allegations are true and those
10          TAF-based drugs are viewed as safer by
11          the market, then there's no reason to
12          launch Complera and Stribild.
13                    But if it delays, Gilead could
14          profit from Complera and Stribild,
15          which it did, and then also profit
16          from the TAF franchise which now has,
17          I think, four elements to it.
18     BY MR. CASAZZA:
19          Q.    But couldn't Gilead have made
20     even more money if it went from Atripla to a
21     TAF-based Atripla?
22                    MR. O'CONNOR:  Objection.
23     BY MR. CASAZZA:
24          Q.    Or, alternatively, had it gone
25     straight from Atripla to Genvoya and never
```

Meredith B. Rosenthal, Ph.D.

1    developed Complera and Stribild --

2                MR. O'CONNOR:  Objection --

3    BY MR. CASAZZA:

4        Q.     -- if each combination

5    cannibalized and grew on the previous

6    combination?

7                MR. O'CONNOR:  Sorry, Counsel.

8                Objection.  (Indiscernible)

9           hypothetical.

10               Please --

11               THE WITNESS:  The answer to

12          that question is really the same as

13          the answer to the question that I was

14          asked to address, which is why would a

15          company when they could launch this

16          allegedly -- a product that they

17          allegedly knew was safer, why would

18          they delay that.

19               So the delay in 2004 is not

20          dissimilar to the delay after Atripla.

21          There is a pipeline of TDF sales that

22          Gilead could obtain, and by launching

23          after Stribild it was able to enjoy

24          those TDF sales and then the

25          subsequent TAF sales.

1    BY MR. CASAZZA:

2         Q.    For purposes of your opinion,

3    you're assuming plaintiffs' allegation that

4    Gilead knew in 2004 that TAF was safer than

5    TDF, right?

6              MR. O'CONNOR:  Objection.

7         Asked and answered upwards of five

8         times at this point.

9              THE WITNESS:  For purposes of

10        my conclusions I am assuming that

11        plaintiffs will prove their

12        allegations --

13   BY MR. CASAZZA:

14        Q.    Okay.

15        A.    -- that Gilead knew the product

16   was safer.

17        Q.    I'd like you to assume instead

18   that Gilead did not know in 2004 that TAF was

19   safer than TDF.  If you assume that is the

20   case, then isn't there a more plausible

21   explanation for Gilead's conduct than

22   deliberately delaying the release of TAF to

23   make more money?

24              MR. O'CONNOR:  Objection.

25        Incomplete hypothetical.

Meredith B. Rosenthal, Ph.D.

```
 1              THE WITNESS:  A product -- a
 2         product switch does not require
 3         superiority, as I describe in my
 4         report.  There are product switches
 5         with modest to debatable benefits, and
 6         still they provide more revenues under
 7         certain circumstances.
 8              So it is not -- it is not
 9         required that a product is superior.
10         I understand that plaintiffs intend to
11         prove that, and that's part of their
12         allegations, but to be -- to benefit
13         from a delayed launch of a follow-on
14         drug, the manufacturer needs only be
15         able to convince doctors and patients
16         to switch to it.
17    BY MR. CASAZZA:
18         Q.    Do you know when the first
19    generic TDF medication became available?
20         A.    It's roughly December 15th --
21    to the day, I don't know -- of 2017.
22         Q.    Do you recall what the product
23    was?
24         A.    It's the generic version of
25    Viread.
```

Meredith B. Rosenthal, Ph.D.

1    Q.    Do you recall whether it was

2    for HIV?

3    A.    I believe it was labeled for

4    HIV, but I know that Viread is also labeled

5    for hepatitis B.

6    Q.    And you don't know whether the

7    first generic TDF-containing medication was

8    for HIV or hepatitis B, do you?

9    A.    I don't.  I don't know whether

10   the label included both or just one.

11   Q.    In the factual allegations

12   section of your report, you state that Gilead

13   filed a provisional patent for TAF on

14   July 21st, 2000, right?

15   A.    Yes.  That's my understanding

16   from the Complaint.

17   Q.    Once Gilead filed its patent

18   application on TAF, the clock on its patent

19   term for TAF began to run, right?

20   A.    That's correct.

21   Q.    When an inventor files a patent

22   application, if that application is granted,

23   generally speaking, the inventor gets patent

24   protection for 20 years from the date of the

25   application, right?

Meredith B. Rosenthal, Ph.D.

```
1              A.      That is what I understand.

2              Q.      That was true when Gilead filed

3     its patent application for TAF, right?

4                      MR. O'CONNOR:  Objection

5              insofar as it calls for a legal

6              conclusion.

7                      THE WITNESS:  That's how I

8              understand the patent, yes.

9     BY MR. CASAZZA:

10             Q.      Your understanding is that

11    patent lives are fixed, right?

12             A.      I believe I wrote that in my

13    report, but, yes, that is my understanding of

14    the way patents works.

15             Q.      Once Gilead files its patent

16    application, that patent term can't get

17    extended because of anything Gilead does,

18    right?

19                     MR. O'CONNOR:  Object to form.

20                     THE WITNESS:  Not to my

21             knowledge.  I'm not a lawyer, but I

22             know there are such things as

23             additional patents that get filed

24             after a product is approved, and then,

25             of course, there are the other kinds
```

Meredith B. Rosenthal, Ph.D.

1          of marketing exclusivities that we

2          discussed earlier today.

3                    But I believe the original

4          patent is fixed.

5     BY MR. CASAZZA:

6          Q.     Again, you wrote in your report

7     "patent lives are fixed."  Those were your

8     words, right?

9          A.     That is my understanding, yes.

10         Q.     If we could flip ahead to

11    Section VI of your report.  Section VI in

12    your report is a specific discussion on brand

13    manufacturer strategies to extend market

14    exclusivity, right?

15         A.     That's correct.

16         Q.     Paragraph -- strike that.

17                In this case it's your opinion

18    that Gilead's conduct, if you accept

19    plaintiffs' allegations to be true, is

20    consistent with a product switch, right?

21         A.     Yes.

22         Q.     Paragraph 32 of your report

23    talks about a number of strategies that you

24    contend that branded drug manufacturers use

25    to extend market exclusivity, right?

Meredith B. Rosenthal, Ph.D.

```
 1              A.      Yes.
 2              Q.      Are you offering any opinions
 3      in this case that Gilead used legal
 4      challenges?
 5              A.      I am not.
 6              Q.      Are you offering any opinions
 7      in this case that Gilead used patent
 8      thickets?
 9              A.      I am not.
10              Q.      Are you offering an opinion in
11      this case that Gilead used line extensions?
12              A.      This is, in effect, a line
13      extension.  I think it's better captured as a
14      product switch, but many product switches are
15      line extensions.
16              Q.      Okay.  And that gets into what
17      I'd like to better understand, because
18      paragraph 34 of your report discusses line
19      extensions specifically, and I just want to
20      understand, from your perspective, how you
21      were distinguishing between a line extension
22      and a product switch.
23              A.      Yes.  I'm sorry, was that a
24      question?  Yes.
25              Q.      It may be, but I'll ask a
```

Meredith B. Rosenthal, Ph.D.

1    better one.

2                I mean, are you offering an

3    opinion in this case that Gilead used line

4    extensions?

5         A.    Line extensions, I think, are

6    typically defined as the same molecule and a

7    different formulation, and including extended

8    release versions.

9                So I would say this is not,

10   strictly speaking, a line extension.  It's

11   not the same molecule because TAF is

12   different from TDF.  They -- the way the

13   relationship between these drugs gets

14   described in the documents by Gilead and also

15   in the Complaint is that they're both

16   derivative from tenofovir, and so they're

17   cousins in some sense, but they're not the

18   same molecule in the way that line extensions

19   typically are.

20        Q.    When you say "they're cousins,

21   in some sense," again, you're not a chemist,

22   right?

23        A.    I don't think a chemist would

24   say that.  I am absolutely not a chemist.

25        Q.    You would agree that TAF is a

Meredith B. Rosenthal, Ph.D.

1    different molecule than TDF, right?

2         A.     Yes.

3              MR. O'CONNOR:  Objection to

4         form.

5              THE WITNESS:  I would agree,

6         and they are obviously both in the HIV

7         portfolio for Gilead; although, again,

8         they have these other indications for

9         PrEP, which is also HIV, but

10        preventative, and for hepatitis B.

11             So they're not the same

12        molecule.  They do -- they are

13        intended for use in the same patient

14        population.

15   BY MR. CASAZZA:

16        Q.    Do I understand you correctly

17   that because TAF and TDF are different

18   molecules, using your terminology, you are

19   not alleging that Gilead employed a line

20   extension with respect to its TAF

21   medications, right?

22             MR. O'CONNOR:  Objection

23        insofar as it mischaracterizes prior

24        testimony.

25             THE WITNESS:  Right.  I hope

Meredith B. Rosenthal, Ph.D.

1          that I didn't use that word in

2          different ways in different places.

3                  But what my opinion is is that

4          Gilead's conduct is consistent with a

5          product switch or a product hop.  I

6          don't think I specifically said it's a

7          line extension.

8                  They don't -- those two things

9          are not different in ways that are

10         important for my opinions.  My

11         opinions rest on the substitutability

12         of the two drugs and the possibility

13         that TAF can replace TDF in some

14         substantial number of patients.

15                 So that could be true for a

16         line extension, but it's also true for

17         these different products that are

18         intended to treat the same patient

19         populations.

20    BY MR. CASAZZA:

21         Q.    Again, I assure you I'm not

22    trying to be cute or clever here.

23                 Are you saying that Gilead's

24    conduct was consistent with a product switch

25    but was not consistent with a line

Meredith B. Rosenthal, Ph.D.

1    extension --

2         A.    No, I'm --

3         Q.    -- but that other product

4    switches may be line extension?

5         A.    Right.  So the product switch

6    is about when the new product comes out and

7    the considerations of cannibalization, and

8    that -- for many of the product switches that

9    have been studied, those dynamics happen in

10   the context of a line extension.

11              So, I mean, I don't know, I'm

12   not claiming that this is a line extension --

13   I don't think I used that improperly here --

14   but it also doesn't really make a difference

15   whether I call it a product hop or a line

16   extension.  What's important is that there's

17   profitability to delay, and that there is a

18   timing advantage to launching prior to

19   generic entry for the original product.

20        Q.    You're not offering any

21   opinions in this case that Gilead used any

22   pay-for-delay arrangements, right?

23        A.    No, I am not.

24        Q.    Other than a product switch,

25   which you said earlier that you're using

Meredith B. Rosenthal, Ph.D.

```
1    interchangeably with product hop, are you
2    opining that Gilead used any other strategy
3    to extend -- strike that.
4              Other than a product switch
5    which you've testified is interchangeable --
6    strike that.
7              Other than a product switch
8    which you've testified that you're using
9    interchangeably with product hop, are you
10   opining that Gilead's conduct was consistent
11   with any other kind of strategy to extend the
12   market exclusivity of its HIV drugs?
13        A.    No, I am not.
14        Q.    So paragraph 33, you define
15   product switching, right?
16        A.    Yes.
17        Q.    According to your report,
18   product switching has several features,
19   right?
20              MR. O'CONNOR:  Objection.
21        Form.
22              THE WITNESS:  I'm sorry, was
23        that a question?
24   BY MR. CASAZZA:
25        Q.    Yes.
```

Meredith D. Rosenthal, Ph.D.

1           A.      Wait.

2           Q.      I'll just reask it.

3                   According to your report, a

4    product switch has several features, right?

5                   MR. O'CONNOR:  Same objection.

6                   THE WITNESS:  Yes, a product

7           switch has several features.  I

8           believe I began with that preamble.

9    BY MR. CASAZZA:

10          Q.      And you write here in

11   paragraph 33 that, "In a product switch,

12   brand drug manufacturers introduce a slightly

13   modified version of the original product."

14                  Do you see that?

15          A.      That's typically what happens,

16   yes.

17          Q.      By "slightly modified," you're

18   describing a change to the product that does

19   not enhance the drug safety or efficacy,

20   right?

21                  MR. O'CONNOR:  Objection, form.

22          Objection, foundation.  Objection

23          (indiscernible).

24                  THE WITNESS:  So the literature

25          and the term has been used very

Meredith B. Rosenthal, Ph.D.

```
 1              frequently in cases where the
 2              improvements are debatable.
 3                   As far as the companies that
 4              launch them, they, I think without
 5              exception, make claims that the new
 6              version is better than the old one.
 7              And the papers that I cite here raise
 8              concerns that those benefits are
 9              modest.
10                   And as we talked about hours
11              ago, I have been involved in some
12              cases that have concerns about the
13              benefit side of these things, which is
14              different from this case, which I
15              noted earlier and also note in my
16              report.
17         BY MR. CASAZZA:
18              Q.    So you appreciate that if
19         plaintiffs' allegations in this case are
20         true, that the factual scenario presented in
21         this case is different than the product
22         switches discussed in all of the literature
23         you cite in your paper; namely, that the
24         plaintiffs here contend that TAF is a
25         substantial clinical improvement over TDF,
```

1    right?

2        A.    Yes.  And that does not change

3    my opinions about whether they could profit

4    from delay.

5             And fundamentally, as I know

6    you're going to ask me about what makes a

7    product hop or product switch what it is,

8    it's about a single company essentially

9    trying to cannibalize its own product for the

10   benefit of protecting sales from generic

11   entry.

12       Q.    In a factual scenario where

13   it's debatable about whether the newer

14   product is better than the old product, you

15   would not expect it to be the case that there

16   would be a larger potential market for the

17   newer product, right?

18            MR. O'CONNOR:  Objection.

19        Incomplete hypothetical, form.

20            THE WITNESS:  That is the

21        opposite of what the literature shows.

22        So the literature shows that in these

23        cases, the switch -- even when the

24        benefits are small or debatable, the

25        product switch is successful, and

272 of 349

Meredith B. Rosenthal, Ph.D.

1          ultimately manufacturers are able to

2          raise prices on the line extension in

3          those cases where it's a line

4          extension.

5                 And so, in fact, for a product

6          such as is alleged in this case that

7          is better, the extent of

8          cannibalization would be even greater,

9          presumably.  But, in fact,

10         manufacturers are able to convince

11         doctors to switch their patients, or

12         in the case of a hard hop, which is

13         not alleged here, they mechanically

14         switch patients by pulling the brand

15         drug, the original one.

16    BY MR. CASAZZA:

17         Q.     In the literature you cite,

18    because the changes to the newer product were

19    debatable as to whether they were

20    improvements to the product, the expectations

21    for those products were that, at best, they

22    would cannibalize the market for the prior

23    product, right?

24         A.     I don't think --

25                MR. O'CONNOR:  Objection to

Meredith B. Rosenthal, Ph.D.

1        form.

2    BY MR. CASAZZA:

3        Q.    Did you understand the

4    question?

5        A.    I think I do.

6              I think it goes back to what we

7    were talking about when we talked about

8    Gilead's forecasts, and all things equal, one

9    would expect a better product to command a

10   higher price.  But I think what you have to

11   keep in mind in this market is that better

12   can be about marketing as well.

13             And so companies that have

14   successfully marketed line extensions have

15   done so on relatively small or questionable

16   benefits, but have successfully convinced

17   doctors to switch patients to those drugs and

18   then have raised those prices despite the

19   lack of significant benefit.

20             So again, in a case where there

21   is a greater benefit, as is alleged in this

22   case, the extent to which patients would move

23   away from the older drug would presumably be

24   greater even if the market is not perfect,

25   but presumably more people would move away,

Meredith B. Rosenthal, Ph.D.

1    therefore yielding bigger cannibalization

2    results, providing a stronger motivation to

3    delay.

4         Q.    We can agree that all of the

5    products and the articles cited in your

6    report involve products with either small or

7    questionable benefits compared to the

8    previous generation of products, right?

9              MR. O'CONNOR:  Objection.

10        Form.

11             THE WITNESS:  I think those

12        articles that I cite, they are focused

13        on the welfare effects of these small

14        or questionable benefits as compared

15        to the cost, and so they are focused

16        on those products.

17             There are surely other product

18        switches that have bigger benefits,

19        but they are intending to show harm

20        from increased spending with smaller

21        questionable health benefits.

22   BY MR. CASAZZA:

23        Q.    So the articles you cite

24   discuss products where there were either

25   small or questionable benefits, but that's

Meredith B. Rosenthal, Ph.D.

1    different than what's alleged in this case

2    with respect to TAF, right?

3         A.    That's correct.  The dynamics

4    of the product switch are the same, but

5    the -- well, what we know today and what

6    plaintiffs intend to prove Gilead knew

7    earlier is that there is a substantial safety

8    benefit to TAF, and recognizing that and its

9    effect on a product switch scenario, I would

10   say that would imply that the extent of

11   cannibalization would be greater.

12        Q.    Do you have an opinion on

13   whether TAF is superior to TDF?

14        A.    That is outside of my

15   expertise.

16             I can observe what happened

17   when it launched, and it was very successful

18   at launch, and it took away a lot of sales

19   from TDF, and that suggests that the market,

20   perhaps because of marketing, but for other

21   reasons as well, that the market believed it

22   to be better.

23        Q.    You would agree that TAF is not

24   merely a slightly modified version of TDF,

25   right?

Meredith B. Rosenthal, Ph.D.

1        A.      TAF is not a slightly -- well,

2    again, I'm not a chemist, but I understand

3    that they are different chemical entities.

4    That I understand.

5        Q.      So TAF is not a slightly

6    modified version of TDF, right?

7                MR. O'CONNOR:  Objection.

8                THE WITNESS:  I don't think so.

9        I don't think I have claimed that.

10   BY MR. CASAZZA:

11       Q.      If we go back to your report, a

12   feature that defines product switches is that

13   the modified product is released toward the

14   end of the original drug's patent life,

15   right?

16       A.      That's right.

17       Q.      And we talked a few moments ago

18   that you assumed, for purposes of your

19   opinions, that Gilead's patents on TDF and

20   its TDF medications would expire no later

21   than 2018, right?

22       A.      That's right.  But, obviously,

23   that is with regard to Viread, that those

24   subsequent combination medications have

25   different patent expirations.

Meredith B. Rosenthal, Ph.D.

1          Q.     Did you review any of Gilead's

2    patents?

3          A.     No, and I'm not sure what I

4    would have done with that information, not

5    being either a chemist or a patent expert.

6                 MR. CASAZZA:  Let's pull up tab

7          12, and we'll mark this as Exhibit 14.

8                         -      -      -

9                 (Whereupon, Rosenthal Exhibit

10         Number 14 was marked for

11         identification.)

12                        -      -      -

13   BY MR. CASAZZA:

14         Q.     Dr. Rosenthal, do you see that

15   this is Gilead's 10-K?

16         A.     I'm just looking for the year

17   on it.  2014.

18         Q.     And this document wasn't on

19   your reliance list, but other Gilead 10-Ks

20   were, correct?  You did cite a different

21   Gilead 10-K?

22         A.     That's right.

23         Q.     So while you're not an expert

24   in securities registrations, this is a kind

25   of document you read before today, right?

Meredith B. Rosenthal, Ph.D.

1          A.       That is correct.

2          Q.       Okay.  If you could please turn

3     to page 21 of the PDF.  Do you see here on

4     page 21 of Exhibit 14, Gilead's 2014 10-K,

5     that there's a list of Gilead products and

6     patent expiration dates?

7          A.       I do.

8          Q.       The only TDF drug patent

9     expiring in 2018 was Viread.

10                   Do you see that?

11         A.       Yes, I do.  That's consistent

12    with what I understand.

13         Q.       The patent expiration dates for

14    Gilead's other TDF medications are listed

15    here to be later than 2018, right?

16         A.       That's correct.

17         Q.       Atripla, US patent expiration

18    lists 2021, right?

19         A.       It does.  I think --

20         Q.       And Truvada --

21         A.       Yeah.  Sorry, go ahead.

22         Q.       Truvada, it also lists 2021,

23    right?

24         A.       Yes.

25         Q.       Complera, it lists 2023, right?

Meredith B. Rosenthal, Ph.D.

1        A.      Yes.

2        Q.      And then Stribild, it lists

3    2029, right?

4        A.      That's right.

5        Q.      The first generic version of a

6    TDF medication, you testified earlier, was a

7    generic version of Viread, right?

8        A.      I'm sorry, the first generic

9    was, yes, consistent with that having the

10   earliest patent expiration date.

11       Q.      Under a product-switching

12   strategy as you've defined it, then it would

13   have made sense for Gilead to replace Viread

14   with its TAF-based equivalent prior to

15   generic Viread getting released, right?

16       A.      The product --

17            MR. O'CONNOR:  Objection.

18   Misstates --

19            THE WITNESS:  Sorry.

20            MR. O'CONNOR:  Misstates her

21       report, and incomplete hypothetical.

22            THE WITNESS:  My opinion is --

23            COURT STENOGRAPHER:  I'm sorry.

24       Excuse me.  I'm sorry, Mr. O'Connor, I

25       did not hear that at all.

Meredith B. Rosenthal, Ph.D.

```
1                  MR. O'CONNOR:  Objection.

2          Misstates her report, and incomplete

3          hypothetical.

4                  THE WITNESS:  Sorry.  My

5          opinion about the motivation for the

6          alleged delay is perspective from the

7          time of the alleged delay, at which

8          time Stribild didn't exist, and so the

9          allegations about the delay are about

10         looking forward to Viread's patent

11         expiration, as is described in the

12         Gilead documents that I cite.  They

13         all talk about 2017.

14                 And so the question of whether

15         after the fact, as we talked about

16         earlier, Gilead made a decision to

17         launch the TAF version of Stribild

18         first is informed by a set of other

19         economic incentives that existed at

20         the time it made the decision to

21         launch Genvoya.

22                 But that's not inconsistent

23         with my opinion that at the time of

24         the alleged delay in 2004 a product

25         switch framework captures the economic
```

Meredith B. Rosenthal, Ph.D.

1          incentives that a company like Gilead

2          would have faced.

3     BY MR. CASAZZA:

4          Q.     But the release of Genvoya in

5     2015 didn't coincide with the patent

6     expiration for Stribild, did it?

7          A.     No.  I never claimed that it

8     did, no.

9          Q.     So a patent switching -- strike

10    that.

11          So a product switch doesn't

12    explain why Gilead released Genvoya in 2015

13    as opposed to a single-agent TAF medication,

14    does it?

15          MR. O'CONNOR:  Objection,

16          foundation.  Objection, incomplete

17          hypothetical.

18          THE WITNESS:  No.  And that's,

19          again, not part of my opinion.  My

20          opinion is about the economic

21          incentives facing Gilead in 2004.

22    BY MR. CASAZZA:

23          Q.     One of the factors you discuss

24    regarding the timing of product switches is

25    the risk of cannibalization of their own

Meredith B. Rosenthal, Ph.D.

1    sales, right?

2         A.    Yes.

3         Q.    You opined that it's more

4    profitable for a drug manufacturer to

5    strategically delay introducing a

6    reformulation to avoid cannibalizing sales of

7    the old product so long as it has market

8    exclusivity, right?

9         A.    Yes.

10        Q.    If Gilead wanted to avoid

11   cannibalizing sales of its TDF medications

12   while they had market exclusivity, then it

13   doesn't make sense that Gilead would release

14   Genvoya to compete directly with Stribild,

15   does it?

16             MR. O'CONNOR:  Objection.

17        Foundation.

18             THE WITNESS:  You're using

19        logic that is completely separated

20        from the timing of the delay.

21             At the time that Gilead

22        presumably decided to launch TAF, the

23        TDF market has evolved from the point

24        of their decision about delay, and so

25        what to do in terms of the first TAF

1            to launch, again, will look across

2            those incentives.

3                  And the fact that they launched

4            the TAF version of the latest

5            combination drug makes sense to me,

6            not being a clinician or a chemist,

7            that all of those combinations were

8            incremental improvements on one

9            another, and that it doesn't make

10           sense to go back to square one when

11           you launch your TAF enterprise.

12    BY MR. CASAZZA:

13        Q.    If we go back to your report at

14    paragraph 33, another component of your

15    definition of a product switch is that

16    manufacturers spend significant resources to

17    encourage existing patients and prescribers

18    to switch to the new product before generic

19    entry occurs on the original product, right?

20        A.    Yes, that marketing is part of

21    the switch.

22        Q.    None of the 14 Gilead-produced

23    documents that you reviewed prior to signing

24    your report discuss marketing of TAF

25    medications, do they?

Meredith B. Rosenthal, Ph.D.

```
1          A.      I do not specifically analyze
2    the marketing of TAF, no.  In the Complaint,
3    it arises in terms of their claims about TAF
4    when they launched it, but I don't
5    specifically analyze marketing expenses.
6          Q.      You're not offering any
7    opinions on Gilead's marketing of TAF,
8    correct?
9          A.      My opinion really relates to
10   their strategic delay, and the fact that when
11   they launched it, it clearly captured
12   significant market share because of
13   marketing.  That is why new drugs capture
14   significant marketing -- sorry, capture
15   significant market share, because they are
16   marketed upon their launch.
17         Q.      But you're extrapolating that
18   there was significant marketing because of an
19   increase in sales.  You haven't reviewed any
20   actual evidence relating to the marketing,
21   right?
22         A.      I didn't analyze documents
23   related to marketing, no.
24         Q.      Given that Gilead still has
25   market exclusivity on TDF medications, in
```

Meredith B. Rosenthal, Ph.D.

1    some instances for a number of years, if

2    Gilead were just trying to maximize profits,

3    wouldn't Gilead encourage doctors to switch

4    patients to those TDF medications as opposed

5    to spending money developing new TAF

6    medication?

7          A.    I think, again, you're using a

8    framework that assumes that TAF is not viewed

9    as superior to TDF.  In 2022, it doesn't make

10   sense to think about Gilead trying to

11   convince people to use these older drugs and

12   at the same time use TAF's superiority to

13   launch it.  That's inconsistent with reality.

14         Q.    So you can't say that patients

15   were being switched to TAF medications just

16   because TDF patents were expiring, then, can

17   you?

18               MR. O'CONNOR:  Objection to

19         form.

20               THE WITNESS:  Well, the way you

21         just described those mechanics makes

22         no sense to me.

23               So the patents expire, and

24         patients on the drugs that are covered

25         by those patents, Viread, those

Meredith B. Rosenthal, Ph.D.

1          patients are -- the vast majority of

2          them are automatically switched to the

3          AB-rated alternative because of all

4          the incentives that I describe in my

5          report.  Those patients automatically

6          get switched.

7               Now Gilead has launched a drug

8          that is shown to be superior.  It's

9          not trying to keep people on the older

10         drugs that it's just shown to be more

11         toxic.  Patients stay on those drugs,

12         because if patients are on the drugs,

13         it takes a lot to convince them to

14         switch.  Many of them do, but some of

15         them still stay on those drugs.

16               There's no going backwards once

17         you've launched a drug that's safer

18         than the alternative.  That's the

19         whole -- that's the whole reason for

20         delay, is there's no going backwards.

21         Once TAF launches -- and the documents

22         recognize this.

23               Once TAF launches and it's

24         safer, those -- that TDF product line,

25         it's not going to continue to grow,

Meredith B. Rosenthal, Ph.D.

1          it's going to decline.

2    BY MR. CASAZZA:

3          Q.     Because those sales would have

4    instead gone to TAF, right?

5          A.     Those sales go to TAF.

6          Q.     Whenever TAF is launched,

7    correct?

8          A.     It's true, but if TAF is

9    launched later, then you get this whole bolus

10   of TDF sales at 6, $7 billion a year for ten

11   years, and then you get those TAF sales.

12         Q.     But if TAF is launched sooner,

13   then you get greater TAF sales sooner in time

14   than you would otherwise, right?

15         A.     And you eliminate the TDF

16   franchise and you eliminate -- and there's no

17   Stribild, there's no Complera, there's --

18   that entire growth doesn't exist.

19         Q.     But you also eliminate the

20   development and marketing expenses associated

21   with Stribild and Complera, right?

22         A.     The revenues associated with

23   them are in the billions.

24         Q.     To know whether delay would be

25   profitable, you would need to actually

Meredith B. Rosenthal, Ph.D.

1    calculate the value of the incremental

2    revenues from TAF and compare that to

3    revenues from TAF if it were launched later,

4    right?

5                    MR. O'CONNOR:  Objection.

6         Asked and answered.

7                    THE WITNESS:  I disagree with

8         the way you are framing my assignment.

9              So my assignment is, given that

10        TAF does not launch until 2015, how

11        could it have been profitable?  And I

12        show how it could have been

13        profitable.

14             And as we've discussed today,

15        there are scenarios and assumptions

16        that one could make, and that some

17        Gilead projections make where delay is

18        not the most profitable strategy.

19             However, delay happened, and a

20        product switch framework can explain

21        how that could have been profitable.

22        Looking backwards with full

23        information, it appears that it was

24        very profitable for Gilead to have

25        that entire ten-year period during

Meredith B. Rosenthal, Ph.D.

1           which the TDF franchise grew to more

2           than $6 billion a year, and then to

3           launch TAF.

4                So it's very clear that the

5           profits from these drugs outweigh

6           their development, because otherwise,

7           you know, why do pharmaceutical

8           manufacturers develop new drugs?

9    BY MR. CASAZZA:

10        Q.      Your report concludes with the

11   opinion that Gilead's observable conduct was

12   consistent with the economic logic of a

13   product switch, right?

14        A.      Yes.

15        Q.      You'd agree that plaintiffs

16   allege that TAF is superior to TDF, right?

17        A.      Yes.

18        Q.      Gilead never replaced Viread

19   with a single-agent TAF medication, right?

20        A.      That's right.

21        Q.      Gilead has patents on TDF

22   medications that run through 2029, right?

23        A.      That's right.

24                MR. O'CONNOR:  Objection.

25           Asked and answered.

Meredith B. Rosenthal, Ph.D.

1   BY MR. CASAZZA:

2       Q.      Stribild has the

3   latest-to-expire patents of Gilead's TDF

4   medications, right?

5       A.      That's right.

6       Q.      Gilead released Genvoya in

7   2015, only three years after it released

8   Stribild, which is Genvoya's TDF-containing

9   analog, right?

10      A.      That's right.

11      Q.      Genvoya cannibalized sales of

12  TDF-containing products even though those

13  products still had market exclusivity for

14  more than ten years, right?

15      A.      That's right.

16              Could I pause for one second?

17      Q.      Sure.

18      A.      Sorry, just had to open the

19  door for the aforementioned orange cat to

20  exit.

21      Q.      Have you considered the

22  possibility that Gilead's decision to stop

23  the development of TAF in 2004 was not part

24  of a product-switching strategy?

25      A.      Again, I was not asked to prove

Meredith B. Rosenthal, Ph.D.

1    that that decision was because of product

2    switching.  I was asked to offer an opinion

3    about whether product switching could explain

4    that decision.

5              So I have not considered those

6    other motivations explicitly.  I examined how

7    a company in Gilead's position could make

8    more money by delaying rather than launching.

9    I haven't --

10        Q.    So you --

11        A.    Yeah, I haven't looked at some

12   of the what I understand are defendants'

13   arguments about what caused TAF to not be

14   launched until 2015, if that's objectively

15   correct.

16        Q.    So you'd agree that it's

17   possible that Gilead stopped development of

18   TAF in 2004 because Gilead did not know in

19   2004 that TAF would be safer or more

20   effective than TDF?

21              MR. O'CONNOR:  Objection.

22        Foundation.

23              THE WITNESS:  I don't have an

24        opinion about that.  As we've

25        discussed earlier, I understand that

Meredith B. Rosenthal, Ph.D.

1           plaintiffs intend to prove the

2           opposite of that, but I don't have an

3           opinion about whether or not that

4           allegation is correct.

5    BY MR. CASAZZA:

6           Q.     You'd agree it's possible that

7    Gilead restarted development of TAF once it

8    actually had data showing that TAF would

9    fulfill an unmet patient need?

10                 MR. O'CONNOR:  Objection.

11          Foundation.

12                 THE WITNESS:  I don't have an

13          opinion about that one way or another.

14   BY MR. CASAZZA:

15          Q.     Paragraph 48 of your report,

16   you write, "Data on Gilead sales for Genvoya

17   suggest that their product switch strategy

18   was highly profitable."

19                 Right?

20          A.     Yes.

21          Q.     But again, you have not

22   analyzed whether Gilead made more money by

23   introducing Genvoya in 2015 than it would

24   have if it introduced TAF earlier, right?

25                 MR. O'CONNOR:  Objection.

Meredith B. Rosenthal, Ph.D.

1       Asked and answered.

2            THE WITNESS:  I have not -- in

3       my affirmative report, I did not make

4       a calculation of a specific scenario

5       and compare the profits of delay and

6       launch for a specific scenario, no.

7   BY MR. CASAZZA:

8       Q.    You're not opining that

9   Gilead's launch of Genvoya was highly

10  profitable compared to something else; you're

11  just observing that it was, in fact, highly

12  profitable?

13      A.    Yes.  I was observing that,

14  yes, and then I go on to observe how it

15  affected TDF sales.

16      Q.    You compared the sales of

17  Genvoya with the sales of Viread based on

18  Gilead's 2018 10-K, right?

19      A.    I do, and I also talk about all

20  TDF products.

21      Q.    Your conclusion is based on how

22  much money Gilead made after it released

23  Genvoya, right?

24            MR. O'CONNOR:  Objection.

25      Form.

Meredith B. Rosenthal, Ph.D.

1    BY MR. CASAZZA:

2         Q.    And I'll rephrase that.

3               Your conclusion that Gilead's

4    strategy was highly profitable is based

5    solely on how much money Gilead made after

6    launching Genvoya, right?

7         A.    In paragraph 48, I use the

8    actual world data to say -- the actual world

9    data suggests that the strategy was

10   profitable, first, because Genvoya had these

11   substantial sales and growth, and second,

12   because those sales substantially

13   cannibalized the TDF enterprise.

14              It's the interplay between the

15   two things that are suggestive that the

16   product-switch strategy, whether it was

17   intended or not -- but there was an actual

18   delay in the launch.  Let's say, I don't --

19   I'm not intending to prove the allegations,

20   but the delay meant that all of those TDF

21   revenues that were quickly deteriorating

22   after the launch of Genvoya, that those were

23   able to be realized.  That's my conclusion.

24        Q.    Do you know who Ms. Fontein is?

25        A.    I do.

1          Q.      Have you reviewed her report in

2     this case?

3          A.      After I submitted my report I

4     reviewed her report.

5          Q.      Did you ever review any drafts

6     of her report in this case?

7          A.      No, I did not.

8          Q.      Have you spoken with her about

9     the case?

10         A.      I have not.

11         Q.      You do know, from reading her

12    report, that Ms. Fontein believes that Gilead

13    would have made more money had it released

14    TAF sooner?

15         A.      I do not believe --

16              MR. O'CONNOR:  Objection.

17         Mischaracterizes the report.

18              THE WITNESS:  I do not believe

19         she says that, no.

20    BY MR. CASAZZA:

21         Q.      Do you disagree that

22    Ms. Fontein opines that launching TAF sooner

23    would have enabled Gilead to gain a larger

24    share of the market for HIV medications than

25    it did?

Meredith B. Rosenthal, Ph.D.

```
 1              MR. O'CONNOR:  Objection
 2         insofar as it mischaracterizes
 3         Ms. Fontein's report.
 4              THE WITNESS:  I'd have to see
 5         the specific part of her report that
 6         you're referring to, but having read
 7         Ms. Fontein's report, I understand
 8         that she opines that Gilead
 9         underestimated the unmet patient need
10         and, therefore, the potential for TAF,
11         and over-relied on its analysis of the
12         potential loss of TDF sales as a
13         decision-making factor, cared too much
14         about cannibalization, and above all,
15         that Gilead didn't consider patient
16         safety as a deciding factor.  That's
17         my understanding of her opinion.
18              I think she says that TAF
19         revenues would have been greater had
20         it launched earlier, but not total
21         revenues.
22    BY MR. CASAZZA:
23         Q.    How much time did you spend
24    reading her report?
25         A.    I don't know.
```

Meredith B. Rosenthal, Ph.D.

1          Q.      Less than an hour?

2          A.      Probably about an hour.

3          Q.      From reviewing the sales data

4    in Gilead's 2018 10-K, you conclude that

5    Genvoya was a successful drug, right?

6          A.      Yes, I conclude that Genvoya

7    was a successful drug.  I think that is

8    consistent with their 10-K.

9          Q.      And that Viread sales declined

10   after the introduction of Genvoya, right?

11         A.      Yes.

12         Q.      You note that Viread's sales

13   declined by 12 percent in 2017 and 71 percent

14   in 2018, right?

15         A.      Yes.  And the latter, of

16   course, is largely due to generic

17   competition.  Whereas, the 2017 results are

18   due to the launch of Genvoya.

19         Q.      You conclude that the drop in

20   sales of TDF-based treatments started before

21   generic competition began in late 2017,

22   suggesting the decline was from a product

23   switch and not from generic competition,

24   right?

25         A.      In 2017, yes.

Meredith B. Rosenthal, Ph.D.

1    Q.  Now, you'd agree correlation is

2 not the same thing as causation, right?

3    A.  No, but this is -- if a product

4 doesn't exist, it can't really be competing

5 with something.

6    Q.  Generic competition for Viread

7 started in 2017, right?

8    A.  That's correct, and in the last

9 two weeks of the year.

10    Q.  And you noted that Viread sales

11 declined only by 12 percent that year, right?

12    A.  That's correct.

13    Q.  The following year Viread sales

14 declined by 71 percent, the year immediately

15 following entry of generic Viread, right?

16    A.  Right, consistent with the

17 pattern of generic entry.

18    Q.  Did you review any other Gilead

19 10-Ks to check your conclusion that the

20 decline of Viread sales was due to the

21 product switch as opposed to generic

22 competition?

23    A.  Again, there was, for all

24 intents and purposes, no generic in 2017.

25 The last two weeks of the year is a very

Meredith B. Rosenthal, Ph.D.

```
 1    short time frame.
 2         Q.     But did you do anything to
 3    analyze how much of the decline of sales was
 4    attributable to the product switch on the one
 5    hand as opposed to generic competition on the
 6    other?
 7              MR. O'CONNOR:  Objection.
 8         Vague as to time.
 9              THE WITNESS:  I did not.
10              MR. CASAZZA:  If we could go
11         ahead and mark tab 13 as Exhibit 15.
12                  -     -     -
13              (Whereupon, Rosenthal Exhibit
14         Number 15 was marked for
15         identification.)
16                  -     -     -
17    BY MR. CASAZZA:
18         Q.     Dr. Rosenthal, this is Gilead's
19    2016 10-K.  This isn't something you reviewed
20    prior to signing your report, right?
21         A.     I don't believe so, no.
22         Q.     Do you think you've reviewed it
23    prior to right now?
24         A.     I may have looked at it in the
25    context of reviewing Dr. Lakdawalla's report.
```

Meredith B. Rosenthal, Ph.D.

1    I looked at a number of other 10-Ks when I

2    did that.

3         Q.    And this may have been one of

4    them; you're not sure, right?

5         A.    I'm not sure.

6         Q.    If we can please turn to

7    page 82.  You see there's a chart summarizing

8    changes in sales of various Gilead products.

9              Do you see that?

10        A.    I do.

11        Q.    And you see there's a whole

12   section for HIV and other antiviral products,

13   right?

14        A.    I do.

15        Q.    Viread sales actually increased

16   between 2015 and 2016.

17             Do you see that?

18        A.    By 7 percent, yes.

19        Q.    And so did Truvada sales, they

20   also increased between 2015 and 2016, right?

21        A.    That's right.  All of them

22   except for Atripla.

23        Q.    So Atripla was the only TDF

24   medication that saw a decline in sales after

25   Genvoya was introduced, right?

Meredith B. Rosenthal, Ph.D.

1          A.     Well, Atripla saw a decline in

2     sales after Stribild was introduced, and that

3     continued.

4          Q.     But looking at this chart here,

5     Atripla was the only TDF medication that saw

6     a decline in sales in the year following

7     Genvoya's introduction, right?

8               MR. O'CONNOR:  Objection.

9          Mischaracterizes the testimony.

10               THE WITNESS:  Mathematically

11          you are not wrong.  However, logically

12          you miss the point that all of the

13          TDFs showed slower growth when Genvoya

14          was launched.

15               Atripla's was the only one that

16          was negative, but it was already

17          negative because of the launch of

18          Stribild, which company statements

19          around these 10-Ks from when Stribild

20          was launched and Atripla started

21          declining stated that the reason

22          Atripla was declining was because of

23          Stribild and Complera growth.

24               So you only make the

25          observation that it's negative.

Meredith B. Rosenthal, Ph.D.

1           However, the conclusion you draw from

2           it I don't believe is consistent with

3           the data.

4    BY MR. CASAZZA:

5           Q.    Viread's growth wasn't

6    declining, was it?

7           A.    Viread's growth wasn't

8    declining.  It didn't seem to be affected by

9    Stribild's launch in the way that Atripla

10   was.

11          Q.    Your report, the text of your

12   expert report in this case, does not explain

13   why sales of TDF medications would still be

14   increasing after the introduction of TAF,

15   does it?

16              MR. O'CONNOR:  Objection.

17        Form.

18              THE WITNESS:  My report does

19        not need to -- does not at all need to

20        make those kinds of explanations,

21        so --

22   BY MR. CASAZZA:

23          Q.    And it does not make those

24   explanations, does it?

25              MR. O'CONNOR:  Counsel, she

Meredith B. Rosenthal, Ph.D.

```
1              wasn't finished with her answer.
2                   THE WITNESS:  What my report
3              does is it shows that market share for
4              Genvoya included capturing market
5              share from the TDF products on the
6              whole.  And it can do so by slowing
7              the growth in those TDF products, and
8              not just by sending them into negative
9              growth.
10                  I don't undertake that analysis
11             here, and it does not change my
12             opinion.  It does not change the way I
13             cite the information about the clear
14             cannibalization of TDF by TAF.
15        BY MR. CASAZZA:
16             Q.    But the introduction of Genvoya
17        didn't slow the growth for Viread, did it?
18                  MR. O'CONNOR:  Objection.
19             Assumes facts not in evidence.
20                  THE WITNESS:  You're looking at
21             the 5 percent versus the 7 percent
22             growth here and saying -- for Viread,
23             it's the oldest product in the entire
24             portfolio.  It's -- in these numbers,
25             it's the only one that doesn't show a
```

Meredith B. Rosenthal, Ph.D.

```
 1          difference in that direction here.
 2               But again, as we talked about
 3          before, these products build on one
 4          another.  It may well be that the
 5          patients who are on Viread are
 6          different, they're the patients who
 7          didn't switch when the other drugs
 8          weren't available.
 9               On the whole, the TDFs decline.
10          And if you include 2017 in the
11          analysis, they all declined.
12     BY MR. CASAZZA:
13          Q.    If the patients on Viread were
14     less likely to switch, then Gilead should
15     have little reason to be concerned about
16     Viread's patent expiration when it released
17     Genvoya, right?
18               MR. O'CONNOR:  Objection.
19          Incomplete hypothetical.
20               THE WITNESS:  Again, my
21          analysis of the product-switch
22          strategy is about Gilead's incentives
23          in 2004.
24               Its incentives in 2000- --
25          well, I would say 2015, but leading up
```

Meredith B. Rosenthal, Ph.D.

1              to 2015 and its launch of Genvoya, are

2              affected by the combination products

3              it has already launched and it is

4              planning to launch, and the nature of

5              the market as it has evolved at that

6              point.

7                   There's no contradiction with

8              the idea that in 2004, as consistent

9              with many of the documents we've

10             reviewed today, Gilead would be

11             looking to the first patent expiration

12             that related to Viread.

13   BY MR. CASAZZA:

14        Q.     Given that Viread sales

15   increased and the rate of growth increased

16   when Genvoya was introduced, but then Viread

17   sales started to decrease after the

18   introduction of generic Viread, isn't it more

19   possible that generic Viread rather than TAF

20   caused the decline in branded Viread sales?

21        A.     I believe I've answered that

22   question, but I'll answer it again.

23                You're not including 2017 in

24   this chart, and Viread -- all of the products

25   had slower growth in 2017.  In 2017, the

Meredith B. Rosenthal, Ph.D.

```
1    generic was on the market for two weeks, and
2    so I disagree.  That's not what I conclude.
3              I conclude that the entire
4    franchise showed slower growth.  Atripla had
5    negative growth, which was a continuation of
6    negative growth that had happened earlier.
7    But the entire franchise was affected,
8    perhaps Viread least, but that was the nature
9    of the evolution of the market.
10             MR. O'CONNOR:  Counsel, we've
11        been going for nearly two hours.  I
12        don't know if now or soon is time for
13        a break.
14             MR. CASAZZA:  Yeah, we can take
15        a break.
16             THE WITNESS:  Great.
17             MR. CASAZZA:  And then,
18        actually, if the videographer could
19        also give me the run time during the
20        break, that would be great.  Thanks.
21             THE VIDEOGRAPHER:  The time
22        right now is 4:59 p.m.  We are off the
23        record.
24             (Whereupon, a recess was
25        taken.)
```

Meredith B. Rosenthal, Ph.D.

```
1              THE VIDEOGRAPHER:  The time
2         right now is 5:07 p.m.  We're back on
3         the record.
4    BY MR. CASAZZA:
5         Q.    Dr. Rosenthal, before we broke
6    we were talking about sales of TDF
7    medications following the introduction of
8    Genvoya in 2015.
9              Do you recall that?
10        A.    I do.
11        Q.    In paragraph 48 of your report
12   you refer only to sales of Genvoya and
13   Viread, right?
14        A.    Sorry, can I just take a look
15   at the report again?
16        Q.    Yes.
17        A.    I just need to look at the
18   words there, if we could look at that
19   paragraph again.
20              Sorry, I thought you were going
21   to put it on the screen.  I can go back, too.
22        Q.    Sorry.  That might have been
23   Derek waiting on me.
24              MR. CASAZZA:  Derek, would you
25         mind putting up paragraph 48 of the
```

Meredith B. Rosenthal, Ph.D.

1         report?

2              THE WITNESS:  Thank you, Derek.

3         Q.    And for expediency sake, I'll

4    ask this a little differently.

5              TRIAL TECHNICIAN:  Sorry, I

6         forgot that I wasn't sharing.

7              MR. CASAZZA:  No problem.

8         Q.    So, Dr. Rosenthal,

9    paragraph 48, the only TDF medication you

10   mention by name is Viread, right?

11        A.     In the sentence before that I

12   said, As expected, sales of Gilead's

13   TDF-based treatments dropped across the

14   board, so I'm talking about all the TDF-based

15   treatments.  And then I talked about Viread

16   specifically, but the previous sentence

17   refers to all of them.

18        Q.    Why focus on Viread, given that

19   there was never a TAF analog for Viread?

20        A.     Because it was the first

21   TDF-based treatment.

22        Q.    Did you analyze the relative

23   contribution of each of Gilead's

24   TDF-containing medications to Gilead's

25   overall revenues?

Meredith B. Rosenthal, Ph.D.

1          MR. O'CONNOR:  Objection to

2      form.

3          THE WITNESS:  Not for the

4      purpose of my report, no.  Again --

5  BY MR. CASAZZA:

6      Q.    That's not something you've

7  done for purposes other than your report, is

8  it?

9      A.    Well, I -- as I mentioned, I

10 looked through all of these 10-Ks in trying

11 to understand Dr. Lakdawalla's report and

12 some of the statements that he made.  So,

13 yes, I did look at all of their

14 contributions.

15          And I noted earlier that as

16 each new TDF combination entered the market,

17 it cannibalized earlier versions and then

18 continued to grow the total TDF market.  So

19 not surprisingly the earlier products have

20 lower market share than the later ones.

21     Q.    But again, that's not an

22 analysis that you performed prior to signing

23 your report, right?

24     A.    It wasn't something I needed to

25 do to reach my conclusions, no.

Meredith B. Rosenthal, Ph.D.

1        Q.      And you haven't done a

2   quantitative analysis of the relative

3   contribution of each of Gilead's

4   TDF-containing medications to its overall

5   revenues, correct?

6        A.      Again, I looked at all of these

7   drug-by-drug product revenue statements from

8   the 10-Ks, so I don't know what you mean by

9   "haven't done an analysis," but...

10               I haven't computed their market

11   shares.

12       Q.      And you similarly haven't

13   computed the relative contribution of each of

14   Gilead's TAF-containing medications to

15   Gilead's overall revenues, right?

16               MR. O'CONNOR:  Objection.

17               THE WITNESS:  That's correct.

18       Yes, that's right.

19   BY MR. CASAZZA:

20       Q.      For this case, you never

21   evaluated whether Gilead's TDF-containing

22   medications cannibalized prior TDF-containing

23   medications once they were released, right?

24       A.      I didn't specifically analyze

25   that.  I was just trying to reflect on

Meredith B. Rosenthal, Ph.D.

1    whether it came up in my report.  But I don't

2    think so, because I think most of the report

3    is really focused on the world as it looked

4    in 2004, which is before all these -- the

5    later TDF combinations were envisioned.

6         Q.    You also didn't analyze whether

7    Gilead's TAF-containing medications

8    cannibalized earlier TAF-containing

9    medications once they were released, right?

10        A.    I did not.  No, I did not.

11        Q.    If we can take a look at

12   paragraph 35 of your report.  Paragraph 35 of

13   your report, you write, "Product switches

14   rely on the fact that generic substitution

15   laws require that the generic product be

16   bioequivalent to the brand prescribed for

17   automatic substitution to occur."

18              Right?

19        A.    Right.

20        Q.    In your explanation of a

21   product switch, the product switch makes it

22   so pharmacies can't automatically substitute

23   a generic drug for a branded drug, right?

24        A.    That's right.

25        Q.    Now, let's go back to

Meredith B. Rosenthal, Ph.D.

1    paragraph 44 of your report.  In the last

2    sentence you write that, "Gilead recognized

3    the automatic substitution that would follow

4    the arrival of generic TDF drugs, and acted

5    to preempt it by timing the launch of

6    TAF-based drugs for the period before TDF's

7    patent expiry."

8            Do you see that?

9    A.    Yes.

10   Q.    Gilead didn't prevent

11   pharmacies from automatically substituting

12   branded Viread with generic Viread, did it?

13           MR. O'CONNOR:  Objection.

14       Foundation.

15           THE WITNESS:  Again, the way I

16       am looking at these incentives is from

17       the point of view of 2004 and Gilead

18       anticipating generic competition for

19       Viread, and so the products to which

20       is logical there.

21           The way the market evolved,

22       ultimately the combination drugs,

23       Stribild being the latest, and as we

24       talked about before even building on

25       Atripla and Complera, the situation

Meredith B. Rosenthal, Ph.D.

1          had changed at that point.

2               But that doesn't change my

3          opinion that in 2004 that Gilead had

4          an incentive to delay the launch of

5          TAF in order to build the TDF

6          franchise.

7               Had it launched TAF earlier, it

8          would have cannibalized the TDF

9          franchise.  And if the allegations are

10         true that TAF -- that they knew TAF

11         was superior, it would have basically

12         ended the development of the

13         franchise.

14    BY MR. CASAZZA:

15         Q.    Before the break you testified

16    that patients on Viread might be less likely

17    to switch to a fixed-dose combination, right?

18         A.    By the time Genvoya enters in

19    2015, there have been other combination

20    drugs, other fixed-dose combination drugs,

21    and so the patients on Viread are -- they're

22    patients who have not yet, for whatever

23    reason, switched to those fixed-dose

24    combinations.

25               So one would imagine that the

Meredith B. Rosenthal, Ph.D.

1   patients on the TDF-based fixed-dose

2   combination would be more similar to the

3   patients who most readily switched to the

4   TAF-based, not exclusively, not that a

5   patient couldn't switch, but it seems less

6   likely that the launch of Genvoya would

7   affect who is on Viread.

8        Q.    If patients taking Viread were

9   more likely to stick to a single-agent drug,

10  wouldn't it have made sense financially for

11  Gilead to release a single-agent TAF

12  medication to continue capturing some piece

13  of those billion-plus dollars in Viread

14  revenues after generic Viread became

15  available?

16             MR. O'CONNOR:  Objection.

17        Incomplete hypothetical.

18             THE WITNESS:  I didn't do a

19        financial incentive analysis of the

20        decision to launch a single TAF-based

21        drug, so I don't know if what you say

22        is true.  I didn't look at that.

23             MR. CASAZZA:  Let's pull up 24

24        and mark that as Exhibit 16.

25             ///

Meredith B. Rosenthal, Ph.D.

```
1                -     -     -
2              (Whereupon, Rosenthal Exhibit
3         Number 16 was marked for
4         identification.)
5                -     -     -
6    BY MR. CASAZZA:
7         Q.    Dr. Rosenthal, Exhibit 16 is
8    the only invoice you have submitted to
9    plaintiffs' counsel in connection with this
10   case to date, correct?
11        A.    That is correct.
12        Q.    Between April 1st, 2022 and
13   May 31st, 2022, you spent a total of
14   8.75 hours preparing your expert report,
15   right?
16        A.    That is correct.
17        Q.    You didn't start work on your
18   report before April 1st, 2022, right?
19        A.    That's correct.
20        Q.    So 8.75 hours is the sum total
21   of the work you performed on this case before
22   submitting your expert report, right?
23        A.    In addition to directing my
24   staff, whose hours are also connected there,
25   during that time period.  But, yes, my
```

Meredith B. Rosenthal, Ph.D.

```
 1    personal time spent was 8.75 hours.
 2         Q.      One to two of those hours were
 3    spent reviewing the Gilead-produced
 4    documents, right?
 5         A.      Yes.
 6         Q.      And you did not spend
 7    additional time on the case prior to signing
 8    your report that is not reflected on these
 9    invoices, did you?
10         A.      That's correct.
11         Q.      The total number of hours that
12    GMA personnel, including yourself, spent on
13    the report was 247.25 hours, right?
14         A.      I'm sorry, is there a total
15    somewhere on this?
16         Q.      Yeah, sorry.  I wasn't sure if
17    you had opened it.  If you scroll to the end,
18    it should be there.
19         A.      I think it's on the second
20    page.
21         Q.      Actually, it's on the bottom of
22    page 5 of the report.
23         A.      Keep going.
24         Q.      There at the bottom of page 5
25    of the report, it has the total number of
```

Meredith B. Rosenthal, Ph.D.

1    hours that GMA spent on the report before it

2    was signed by you, right?

3         A.    That's correct.

4         Q.    247.25 hours total, correct?

5         A.    That's correct.

6         Q.    And so minus your 8.75 hours,

7    that's 238.5 hours, right?

8         A.    Correct.

9         Q.    Is it fair to say your

10   colleagues spent a lot more time on your

11   expert report than you did?

12        A.    That is mathematically true and

13   very typical of this kind of work, that I

14   work with two PhD staff and one research

15   assistant, and they work under my direction

16   and spend time looking for documents,

17   reviewing literature.  They spend more time

18   than I do.

19        Q.    Of your colleagues who worked

20   on the report, Dr. Garcia Mosqueira spent the

21   most time, right?

22        A.    That's correct.

23        Q.    Does Dr. Garcia Mosqueira still

24   work for GMA?

25        A.    He does.

Meredith B. Rosenthal, Ph.D.

1          Q.      Do you know why he's not listed

2     on the GMA website?

3          A.      I do not.

4          Q.      Do you know if he has any

5     experience with product switches?

6          A.      He has a PhD in health

7     economics.  That is --

8          Q.      But you --

9          A.      That is --

10          Q.      -- don't know whether he's done

11     any specific work on product switches, do

12     you?

13          A.      Sorry, I didn't mean to

14     interrupt you.  I apologize.

15              I don't know.  It's possible

16     that he has since GMA, in addition to my

17     work, has had other product-switch cases, and

18     he has worked for GMA for several years.

19          Q.      But he's never done

20     product-switch work with you, has he?

21          A.      I don't think so.  I'm afraid

22     I'm not great at these memory tests, but I

23     don't think so.

24          Q.      Shane Savage spent the next

25     highest amount of hours on the project,

Meredith B. Rosenthal, Ph.D.

1  right?

2      A.    Is that on the previous page?

3  I'm sorry, I don't have these memorized.

4  Sarah Stone is on this page.

5      Q.    Sure.  And, actually, I'm

6  sorry, I think I have these a little bit out

7  of order.  Actually, scroll back to page 4.

8          Shane Savage -- now carried

9  forward to page 5, Shane Savage spent

10  40.4 hours, and Sarah Stone spent 46.2 hours,

11  right?

12      A.    Right.

13      Q.    What are Mr. Savage's academic

14  qualifications?

15      A.    I believe Mr. Savage is -- he's

16  a research associate, so I believe he has a

17  bachelor's degree, as does Ms. Stone.

18          Renee Rushnawitz has a master's

19  degree in economics.  Dr. Garcia Mosqueira

20  has a PhD in health economics.  And I think

21  Dr. Drake is also on this for a very small

22  amount of time, and he also has a PhD in

23  health policy.

24      Q.    But Ms. Stone and Mr. Savage

25  only have a bachelor's degree, correct?

Meredith B. Rosenthal, Ph.D.

```
 1          A.     That's right.  They are at the
 2   junior level.
 3          Q.     Does Mr. Savage still work for
 4   GMA?
 5          A.     As far as I know.  I am not in
 6   the office these days because of COVID, so as
 7   far as I know he does.
 8          Q.     Do you know why he's not on the
 9   website?
10          A.     I don't think any of the junior
11   RA folks are on the website.  I think the
12   PhDs typically are.
13          Q.     Then do you know why Ms. Stone
14   is on the website?
15          A.     I do not.  I am not in charge
16   of the website, to be clear.
17              MR. CASAZZA:  Derek, if we can
18         please go ahead and mark
19         Dr. Lakdawalla's report.
20                  -     -     -
21              (Whereupon, Rosenthal Exhibit
22         Number 17 was marked for
23         identification.)
24                  -     -     -
25              MR. O'CONNOR:  I think we're on
```

Meredith B. Rosenthal, Ph.D.

1          17.  Right, Kyle?

2                MR. CASAZZA:  Yes, this will be

3          Exhibit 17.

4     BY MR. CASAZZA:

5          Q.    Dr. Rosenthal, you recognize

6     Exhibit 17 as Dr. Lakdawalla's report,

7     correct?

8          A.    I do.

9          Q.    And earlier, correct me if I'm

10    wrong, you testified that you spent eight

11    hours in total reviewing Dr. Lakdawalla's

12    report, reviewing Dr. Dow's report, reviewing

13    documents cited within Dr. Lakdawalla's and

14    Dr. Dow's reports, and analyzing the

15    calculations in Dr. Lakdawalla's report.

16                Do I have that right?

17         A.    99 percent right.  I did not

18    review additional documents that were cited

19    in Dr. Dow's report.  I reviewed his report

20    and documents cited in Dr. Lakdawalla's

21    report.

22         Q.    Okay.  So just to make sure I

23    have it correctly, you spent approximately

24    eight hours reviewing Dr. Lakdawalla's

25    report, reviewing documents cited in

Meredith B. Rosenthal, Ph.D.

```
1     Dr. Lakdawalla's report, reviewing Dr. Dow's
2     report, and analyzing the calculations in
3     Dr. Lakdawalla's report?
4          A.     Yes.
5          Q.     Correct?
6          A.     That's correct.
7          Q.     Earlier I asked you which
8     documents you reviewed that were cited in
9     Dr. Lakdawalla's report.
10               Do you recall that?
11         A.     Yes.
12         Q.     You directed me to a footnote.
13    Counsel identified a different footnote.  I
14    just for the sake of the record want to know
15    what it is that you reviewed.
16               If we could please turn to
17    page 36 of Dr. Lakdawalla's report.  And if
18    starting from there, if you could help me
19    understand which documents you reviewed after
20    reviewing the expert report of
21    Dr. Lakdawalla.
22         A.     Sure.
23               They're in those two footnotes
24    when that comes up.
25               MR. O'CONNOR:  Derek, do you
```

Meredith B. Rosenthal, Ph.D.

```
1          mind jumping to that page?
2               TRIAL TECHNICIAN:  I'm sorry,
3          you broke up.  What page was that?
4               MR. O'CONNOR:  36, right, is
5          what you were citing, Counsel?
6               MR. CASAZZA:  Yes.
7               MR. O'CONNOR:  Yeah.  Thank
8          you.
9               THE WITNESS:  The footnote was
10         -- the other forecast isn't on this
11         page, nope.  Okay.  143 and 142,
12         what's in -- these footnotes, they
13         look a little funny, don't they?
14              But it's basically 142 and 143,
15         and we've talked about 142 today.
16    BY MR. CASAZZA:
17         Q.    Footnote 142 is the April 2003
18    e-mail from Dr. Delagneau to Bill Lee
19    attaching the two TAF financial analyses,
20    correct?
21         A.    That's right.
22         Q.    And so after reading
23    Dr. Lakdawalla's report, you reviewed that
24    e-mail and those forecasts for the first time
25    as well as the other Gilead-produced
```

Meredith B. Rosenthal, Ph.D.

1    documents identified in footnote 143.

2                    Do I have that right?

3          A.      That's right.

4          Q.      And you have reviewed each of

5    the Gilead-produced documents identified in

6    footnotes 142 and 143 of Dr. Lakdawalla's

7    report?

8          A.      I have.

9          Q.      I gather from your earlier

10   testimony you disagree with Dr. Lakdawalla

11   about some of his conclusions about the case?

12         A.      I do.

13         Q.      Can you please walk me through

14   those?

15         A.      Well, perhaps we should walk

16   through his opinions rather than rely on my

17   memory.

18                    Obviously where we are right

19   now is focused on the NPV analysis, so I

20   could start with that one.

21         Q.      Okay.  Why don't we start

22   there.

23         A.      So Dr. Lakdawalla takes one

24   scenario, one set of assumptions, and creates

25   an analysis from what was in footnote 142,

Meredith B. Rosenthal, Ph.D.

1    which had two different scenarios, the

2    premium priced one versus the pricing parity

3    version.

4                But he uses that scenario then

5    to construct his own scenario under the

6    pricing parity assumption of what the

7    profitability of delay would have been, and

8    the assumption that he makes is that the TDF

9    franchise never grows after -- we could put

10   it up in front of us -- I think it's about

11   2009.  It essentially stays flat at about a

12   billion dollars.

13               And what that in effect means

14   is the total profits from TDF in a delay

15   scenario, they're unaffected by the delay,

16   there's no growth.  And so it's not too

17   surprising that a scenario where the market

18   potential of TDF is fixed at a billion

19   dollars means that an earlier launch would be

20   more profitable.  And it's entirely

21   inconsistent with what happened, and it is --

22   it seems inconsistent with what one would

23   even know at that time.

24               But I'm not disputing the

25   designers of that particular scenario, but

Meredith B. Rosenthal, Ph.D.

1    that he concludes from that one scenario that

2    it was clearly more profitable to launch

3    early makes no sense to me, because all of

4    those inputs will affect the profitability.

5                     And the fact that you could

6    create a scenario where launching earlier is

7    more profitable is not a contradiction to my

8    conclusion that a company in Gilead's

9    position could have had an incentive to

10   delay, that there are scenarios where it's

11   more profitable to delay to separate the two

12   franchises.

13                    So I disagree with the

14   assumptions he makes in the delay world.  And

15   they contradict Dr. Dow's report who says

16   that, you know, the reason for the delay is

17   that they wanted to focus on developing the

18   TDF market, but that projection certainly

19   doesn't reflect that.

20                    So we've gone over this earlier

21   today, but mostly I don't think showing one

22   scenario where launching early is more

23   profitable, it defeats the fact that delay

24   can be more profitable.  And given that delay

25   happened, if plaintiffs can prove their case,

Meredith B. Rosenthal, Ph.D.

1    then this provides motivation.

2         Q.    If we can just turn back one

3    page.

4              For brevity's sake,

5    Dr. Rosenthal, would it be -- is it okay if I

6    refer to Dr. Lakdawalla's section --

7    subsection 3 of his report here, the

8    "Economic analysis of Gilead's forecasts

9    contradicts Dr. Rosenthal's claim that

10   delaying the launch of TAF-containing drugs

11   would lead to higher profits."

12             You testified that you were

13   criticizing what I believe you were calling

14   his NPV opinion?

15        A.    Yes.

16        Q.    Other than what you just

17   articulated, do you have further criticisms

18   of his NPV opinion?

19        A.    That is my main criticism.  I

20   mean, I would say first I think it's

21   conceptually wrong.  I think the fact that he

22   can show a scenario where it's more

23   profitable to launch early is no

24   contradiction.  And second, I think the

25   scenario he proposes is implausible.

Meredith B. Rosenthal, Ph.D.

1              So those are two criticisms.

2      Q.    What do you mean by "the fact

3   that he can show a scenario where it's more

4   profitable to launch early is no

5   contradiction"?

6      A.    As I've been discussing my

7   opinions today, I have made it clear that I

8   want to explain to the fact-finder that the

9   incentives in this marketplace leave room for

10  the possibility that delaying the launch of a

11  brand-name drug can be more profitable than

12  launching it immediately, depending on how it

13  cannibalizes an existing product and, also,

14  the nature of subsequent generic entry.

15              And so that is what I have

16  shown, that these incentives are present.

17  And it is observable that no TAF product

18  entered before 2015.  If the allegations are

19  true that's because of a delay, then the --

20  there must be a reason for the delay, and I

21  offer an economic motivation for that.

22              So his finding a scenario where

23  delay is not profitable is no contradiction

24  to the fact that there are scenarios where

25  delay is more profitable, and I explain how

Meredith B. Rosenthal, Ph.D.

1    that can happen and how, in fact, it's

2    consistent with what unfolded in this case.

3              So I just think there is no

4    contradiction here.

5         Q.     What did you mean when you said

6    "the scenario he proposes is implausible"?

7         A.     His scenario, the net present

8    value of delay is less, because during that

9    time period that TAF is not on the market,

10   the TDF market plateaus at a billion dollars

11   a year.  I mean, it grows very modestly from

12   the beginning of the scenario, and then it

13   plateaus.  And that assumption is

14   Dr. Lakdawalla's.

15             And so it suggests that

16   Gilead's not trying to grow the TDF market

17   while the delay is happening.  And again,

18   this is a scenario about a deliberate delay,

19   whether or not there was a deliberate delay,

20   but this is about a deliberate delay.

21             And so a deliberate delay

22   without maximizing the profits for the

23   existing product makes no sense.  And, in

24   fact, what happened was Gilead developed TDF,

25   it developed additional combination drugs,

Meredith B. Rosenthal, Ph.D.

1    and also just the combination drugs that it

2    already knew about in 2004, including

3    Atripla, those grew to more than $3 billion

4    by as early as 2008, 2009.

5              So his assumption that those

6    sales of TDF drugs are only -- they top out

7    at a billion makes no sense to me.

8         Q.    Do you have any other

9    criticisms of Dr. Lakdawalla's NPV opinion

10   other than what you've articulated?

11        A.    Those are the criticisms that I

12   would offer.

13        Q.    Do you have any criticisms of

14   Dr. Lakdawalla's other opinions in his

15   report?

16        A.    So again, we should probably go

17   up and look at the list of them rather than

18   see which ones I can remember at what time.

19        Q.    Sure.  Please ask Derek to

20   scroll through the report on the screen.

21              THE WITNESS:  Derek, if we go

22         up to the top of his report, I believe

23         he has a section where he summarizes

24         his main opinions.

25              MR. O'CONNOR:  I believe it's

Meredith B. Rosenthal, Ph.D.

1          page 4, starting on paragraph 9.

2          Counsel, let me know if you disagree.

3                    THE WITNESS:  Thank you.

4               So he first suggests that

5          Dr. Fontein and I contradict one

6          another.  As I stated earlier, I think

7          there's no contradiction between her

8          opinion and mine.  Her opinion, of

9          course, comes from a different

10         perspective, that of someone who has

11         industry experience in HIV drug

12         development.  She's not offering an

13         economic opinion.

14              And her opinion essentially

15         says that Gilead overlooked the extent

16         of unmet need, excessively focused on

17         cannibalization, and ultimately did

18         not consider patient safety in its

19         decision-making, again, to allegedly

20         delay the launch of TAF.

21              My read of her report, she

22         never says it would have been more

23         profitable to launch early.

24                    MR. CASAZZA:  Okay.  Derek, if

25         you could turn back one page.

Meredith B. Rosenthal, Ph.D.

1          Q.      I believe that's where,

2     Dr. Rosenthal, you've been starting.

3               Do you have other criticisms of

4     Dr. Lakdawalla's opinions?

5          A.      I think paragraph 10

6     essentially is focused on these so-called

7     contradictions.

8               He also says that I contradict

9     myself, and I do not do that.  I describe the

10    literature on product hops, and as we talked

11    about earlier it is focused on these smaller

12    improvements because of concerns about

13    consumer welfare from those instances, but

14    that does not suggest that this is not a

15    similar kind of product switch framework, in

16    that it is all about the trade-offs between

17    the potential cannibalization of a product

18    and the desire to move patients on to a drug

19    that will have longer patent life or market

20    exclusivity, more precisely, before generic

21    entry.

22               So I don't contradict myself

23    there.  I'm simply describing the literature

24    as it is.

25          Q.      Do you have any further

Meredith B. Rosenthal, Ph.D.

1  criticisms of the opinions of Dr. Lakdawalla

2  that are summarized here in paragraphs 9

3  through 11 of his report?

4      A.     Not for paragraphs 9 to 11.

5  Again, I think those are all focused on his

6  perception that there's a contradiction both

7  within and between our reports.

8      Q.     Okay.

9            MR. CASAZZA:  Derek, if we

10         could please flip forward, then, to

11         the next page.

12     Q.     Dr. Rosenthal, do you have any

13  criticisms of Dr. Lakdawalla's opinions that

14  are summarized in paragraphs 12 through 16?

15            (Witness reviewing document.)

16     A.     Well, I think the opinion

17  that's summarized in paragraph 12 is

18  consistent with the questioning that you

19  offered earlier about whether examples of

20  Gilead documents that suggest recommendations

21  to launch early are supported by various

22  financial analyses and other analyses, that

23  those are contradictions.  I don't believe

24  that those are contradictions.

25            Again, my opinion is that if

Meredith B. Rosenthal, Ph.D.

1   the allegations are true, an economic motive

2   for delay is this product-switch theory.  I

3   do not contend that in every conversation or

4   document or business plan that Gilead took

5   that position that delay was preferable to an

6   early launch.  So I see no contradiction

7   there.

8        Q.    Do you have any other

9   criticisms of Dr. Lakdawalla's opinions that

10  are summarized on page 5 of his report?

11       A.    Again, most of these has been

12  covered in our previous questioning.

13       Q.    Okay.

14       A.    So again, paragraph 14 is about

15  the forecasts.  And again, paragraph 15 is

16  just not looking at the whole picture.

17  Obviously, whether or not delay is

18  economically beneficial depends on the

19  trade-off between getting more consumers to

20  switch from TDF to TAF, which an early launch

21  would do, versus the cannibalization.

22            So that's what the analysis is

23  all about, that, of course, the forecasts are

24  focused both on the early -- the benefits of

25  early launch and the benefits of later

Meredith B. Rosenthal, Ph.D.

1    launch, and whether those forecasts lead to

2    recommendations to launch early or late

3    depends on the trade-off between those two

4    things.

5              So I -- this is -- it makes no

6    sense to me, because all of what I'm talking

7    about is the trade-off between those two

8    things.

9         Q.    Do you have any other

10   criticisms of Dr. Lakdawalla's opinions

11   reflected on page 5?

12        A.    Not on page 5.

13        Q.    Okay.  If we could flip ahead

14   to page 6.

15             Do you have any criticisms of

16   Dr. Lakdawalla's opinions that are summarized

17   in the latter half of paragraph 16 and

18   paragraph 17?

19             (Witness reviewing document.)

20        A.    Again, I think you and I have

21   covered all of these issues.  I do not

22   dispute that I did not examine all of the

23   factors that could drive Gilead's decision to

24   stop TAF development, but that was not within

25   the scope of my assignment.  I was asked to

Meredith B. Rosenthal, Ph.D.

1    describe the economic incentives for delay,

2    and so that is what I did.

3              Again, I'm not speaking to his

4    criticisms of Ms. Fontein.  I don't -- have

5    no basis for that.

6         Q.    And is that the extent -- have

7    we now discussed the extent of your

8    criticisms of Dr. Lakdawalla's opinions?

9         A.    I think so.  I mean, there are

10   other places that are in his report where he

11   says things that I disagree with, but they're

12   not here.

13        Q.    Okay.

14        A.    But I think you have raised

15   them all.

16        Q.    Okay.  Did you meet with

17   counsel to prepare for today's deposition?

18        A.    I did.

19        Q.    Virtually or in person?

20        A.    Virtually.

21        Q.    How much time did you spend

22   meeting with counsel to prepare for today's

23   deposition?

24        A.    I believe two hours.

25        Q.    Okay.  Who was -- was it one

Meredith B. Rosenthal, Ph.D.

```
1    two-hour meeting, or was it a series of
2    meetings?
3           A.    It was two one-hour meetings.
4           Q.    And who was present?
5           A.    In the first meeting, Ann
6    Johnson was present and I was.  And in the
7    second meeting, Ben O'Connor and I met
8    together.
9           Q.    You haven't spoken with any
10   other plaintiffs' experts in this litigation
11   in connection with this litigation, have you?
12          A.    I have not.
13          Q.    Besides plaintiffs' attorneys,
14   have you discussed today's deposition with
15   anyone?
16          A.    You're not talking about my
17   staff.  I've obviously talked about -- in
18   preparation for this deposition, I've talked
19   with my staff.
20          Q.    How many hours did you talk
21   with your staff just about this deposition
22   specifically?
23          A.    Maybe an hour in different
24   components.
25          Q.    Okay.
```

Meredith B. Rosenthal, Ph.D.

1        A.      Not all at once.

2        Q.      Who did you speak with about

3   the deposition?

4        A.      Dr. Garcia Mosqueira and

5   Ms. Rushnawitz.

6        Q.      Do you recall ever seeing the

7   deposition notice in this case?

8        A.      I did.

9        Q.      Do you recall that it asked you

10  to search for and produce certain documents?

11       A.      Yes.

12       Q.      And what did you do to search

13  for and produce documents?

14       A.      I spoke with counsel about it,

15  and they produced the requested documents on

16  my behalf.

17       Q.      Okay.  Did you give anything to

18  counsel other than the invoice you reviewed

19  earlier and your engagement letter?

20       A.      That's correct.  And counsel,

21  of course, already had the engagement letter

22  as well.

23       Q.      Fair enough.

24               Your report contains opinions

25  regarding the practices that drug

Meredith B. Rosenthal, Ph.D.

1    manufacturers engage in to extend the

2    exclusivity of their drugs, right?

3         A.    Yes, I do describe that, in

4    addition to the product switch.  As we

5    discussed earlier, I describe an array of

6    those mechanisms.

7         Q.    You're not opining that using

8    those practices to extend drug exclusivity is

9    illegal, are you?

10             MR. O'CONNOR:  Objection.

11         Asked and answered.

12             THE WITNESS:  I have no opinion

13         about the legality of those methods,

14         no.

15   BY MR. CASAZZA:

16         Q.    You're not offering any opinion

17   that Gilead violated any actual law in the

18   development and marketing of any of its

19   products, are you?

20             MR. O'CONNOR:  Same objection.

21             THE WITNESS:  It is beyond the

22         scope of my expertise and opinion to

23         offer such an opinion.

24   BY MR. CASAZZA:

25         Q.    Are you going to tell the jury

Meredith B. Rosenthal, Ph.D.

1    that TDF-containing medications didn't help

2    patients?

3         A.    I am not going to tell the jury

4    that TDF-containing medications didn't help

5    patients.

6         Q.    Is it your opinion that

7    Atripla, the first single tablet regimen to

8    treat HIV, did not fulfill an unmet patient

9    need?

10             MR. O'CONNOR:  Objection.

11        Foundation.

12             THE WITNESS:  I do not hold

13        that opinion.  That is beyond the

14        scope of my expertise.

15   BY MR. CASAZZA:

16        Q.    Is it your opinion that Gilead

17   should have never sold TDF medications for

18   the treatment of HIV in the United States?

19             MR. O'CONNOR:  Same objection.

20             THE WITNESS:  I do not have

21        that opinion, nor do I have the

22        expertise to draw a conclusion one way

23        or another.

24   BY MR. CASAZZA:

25        Q.    Is it your opinion that Gilead

1    should have developed TAF-containing

2    medications instead of TDF-containing

3    fixed-dose combination?

4              MR. O'CONNOR:  Objection.

5         Asked and answered, form, foundation.

6              THE WITNESS:  That is beyond

7         the scope of my expertise, and I do

8         not hold that opinion.

9    BY MR. CASAZZA:

10        Q.    Are you going to tell the jury

11   that Gilead should have stopped developing

12   TDF-containing medications at any point in

13   time?

14        A.    I do not intend to offer such

15   an opinion to the jury, no.

16        Q.    Are you going to tell the jury

17   that Gilead's decision-making regarding TAF

18   was not true to Gilead's mission to advance

19   patient care?

20        A.    I do not intend to offer that

21   opinion, no.

22        Q.    It's your understanding that

23   Gilead's TDF medications have helped millions

24   of people, right?

25              MR. O'CONNOR:  Objection.

Meredith B. Rosenthal, Ph.D.

1          Foundation, form.

2                    THE WITNESS:  I do not know how

3          to answer that question.  It's beyond

4          the scope of my expertise.

5    BY MR. CASAZZA:

6          Q.     During the deposition today,

7    have we discussed all of the opinions that

8    you formulated in connection with this case?

9          A.     Yes, we have.

10         Q.     Have we discussed the bases for

11   all of the opinions that you formulated in

12   connection with this case?

13         A.     Yes, we have.

14         Q.     Have you told me everything you

15   did to prepare in rendering an opinion in

16   this case?

17         A.     Yes, I did.

18         Q.     Have you told me everything you

19   reviewed to render an opinion in this case?

20         A.     Yes, I did.

21         Q.     Have we discussed all of the

22   facts and data on which you base your

23   opinions that you formulated in connection

24   with this case?

25         A.     Yes, we have.

Meredith B. Rosenthal, Ph.D.

1          Q.      Have we discussed all of the
2    assumptions that underlie the opinions you
3    have formulated in connection with this case?
4          A.      Yes, we have.
5          Q.      Is there -- other than the part
6    of your report that you corrected on the
7    record earlier today, is there anything else
8    about your opinions that you wish to expand
9    on, correct, retract, clarify, or otherwise
10   change based on today's deposition?
11         A.      No, there is not.
12                 MR. CASAZZA:  Subject to the
13         questioning that plaintiffs' counsel
14         may have, I have no further questions.
15         Thank you for your time today,
16         Dr. Rosenthal.
17                 THE WITNESS:  Thank you.
18                 MR. O'CONNOR:  We will reserve
19         our questions.  No questions.
20                 MR. CASAZZA:  Again, I believe
21         we -- you know, subject to unforeseen
22         circumstances at this time, I believe
23         we're done with the deposition.
24                 MR. O'CONNOR:  Thank you.
25                 THE WITNESS:  Thank you.

Meredith B. Rosenthal, Ph.D.

```
 1              THE VIDEOGRAPHER:  The time

 2       right now is 5:54 p.m.  We are off the

 3       record.

 4              (Whereupon, the deposition was

 5       concluded.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Meredith D. Rosenthal, Ph.D.

```
 1   COMMONWEALTH OF MASSACHUSETTS )

 2   SUFFOLK, SS.                   )

 3             I, MAUREEN O'CONNOR POLLARD,

 4   Registered Diplomate Reporter and Notary

 5   Public in and for the Commonwealth of

 6   Massachusetts, do certify that on the 3rd day

 7   of August, 2022, at 10:02, the person

 8   above-named was remotely duly sworn to

 9   testify to the truth of their knowledge, and

10   examined, and such examination reduced to

11   typewriting under my direction, and is a true

12   record of the testimony given by the witness.

13   I further certify that I am neither attorney,

14   related or employed by any of the parties to

15   this action, and that I am not a relative or

16   employee of any attorney employed by the

17   parties hereto, or financially interested in

18   the action.

19             In witness whereof, I have

20   hereunto set my hand this 12th day of August,

21   2022.

22   _____

23   MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24   CSR #149108

25
```

Meredith B. Rosenthal, Ph.D.

```
 1              INSTRUCTIONS TO WITNESS

 2

 3        Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8        After doing so, please sign the errata

 9   sheet and date it.  It will be attached to

10   your deposition.

11        It is imperative that you return the

12   original errata sheet to the deposing

13   attorney within thirty (30) days of receipt

14   of the deposition transcript by you.  If you

15   fail to do so, the deposition transcript may

16   be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24

25
```

Meredith B. Rosenthal, Ph.D.

```
1                   - - - - - -

                    E R R A T A

2                   - - - - - -

3    PAGE   LINE   CHANGE

4     59     23    Should say "did not launch until 2015"

5         REASON:   misspoken

6     63     13    "forecasts" should be singular

7         REASON:   misspoken

8     65     18    delete "really"

9         REASON:   misspoken

10    87     20    "opinion" should be plural

11        REASON:   misspoken

12   279      6    add an "a" before perspective

13        REASON:   typo

14   293     15    "are" should be "is"

15        REASON:   misspoken

16    ___   ___    _____

17        REASON:   _____

18    ___   ___    _____

19        REASON:   _____

20    ___   ___    _____

21        REASON:   _____

22    ___   ___    _____

23

24

25
```

Meredith B. Rosenthal, Ph.D.

1
2                  ACKNOWLEDGMENT OF DEPONENT
3
4          I, _Meredith Rosenthal_____, do
       Hereby certify that I have read the foregoing
5      pages, and that the same is a correct
       transcription of the answers given by me to
6      the questions therein propounded, except for
       the corrections or changes in form or
7      substance, if any, noted in the attached
       Errata Sheet.
8
9
       _Meredith Rosenthal_   8/31/22
10     WITNESS NAME                DATE
11
12
13
14
15
16
       Subscribed and sworn
17     To before me this
       _____ day of _____, 20____.
18
       My commission expires: _____
19
20     _____
       Notary Public
21
22
23
24
25

Golkow Litigation Services                          Page 347

Meredith B. Rosenthal, Ph.D.

```
 1                      LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____

25
```