Robert C. Hilliard (*pro hac vice*)
bobh@hmglawfirm.com
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Tel: (361) 882-1612
Fax: (361) 882-3015

Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ADRIAN HOLLEY, *et al.*, | No. 4:18-cv-06972-JST |
| Plaintiffs, | Hon. Jon S. Tigar |
| v. | **NOTICE OF MOTION TO EXCLUDE THE COMMON-ISSUE EXPERT TESTIMONY OF DR. DANIEL KURITZKES, DR. THOMAS CAMPBELL, DR. DAVID PITRAK, AND DR. BABAFEMI TAIWO** |
| GILEAD SCIENCES, INC., | |
| Defendant. | Assigned to: Hon. Jon S. Tigar |
| | Hearing Date: December 8, 2022 |
| | Hearing Time: 2:00 pm |
| | Location: Courtroom 6 (by videoconference) |

1

2

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION ................................................................................................. 1

STATEMENT OF RELIEF SOUGHT ....................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 1

I.      INTRODUCTION.............................................................................................. 1

II.     BACKGROUND................................................................................................ 2

    A.      Gilead's Four Infectious Disease Experts Proffered Nearly Identical
        Reports and Opinions. ........................................................................... 2

    B.      The Infectious Disease Doctors Did Not Review Any Other Expert
        Reports. .................................................................................................. 7

    C.      Gilead Instructed its Infectious Disease Doctors Not to Answer
        Questions About Authorship of the Reports. ....................................... 7

    D.      The Infectious Disease Doctors' Deposition Testimony Indicates
        that the Reports are not their Original Work.......................................... 8

        1.      Dr. Daniel Kuritzkes ............................................................... 8

        2.      Dr. Thomas Campbell .............................................................. 9

        3.      Dr. David Pitrak ...................................................................... 9

        4.      Dr. Babafemi Taiwo ................................................................ 9

    E.      Gilead's Infectious Disease Doctors Spent Limited Time on the
        Reports. ................................................................................................ 10

    F.      The Parties' Meet and Confer Regarding Discovery About
        Authorship of the Infectious Disease Doctors' Reports............................ 10

III.    THE INFECTIOUS DISEASE DOCTORS' OPINIONS SHOULD BE
    EXCLUDED UNDER FEDERAL RULES OF CIVIL PROCEDURE 26
    AND 37 ............................................................................................................ 11

IV.    THE INFECTIOUS DISEASE DOCTORS' OPINIONS ARE
    UNRELIABLE AND SHOULD BE EXCLUDED UNDER FEDERAL
    RULE OF EVIDENCE 702 ............................................................................ 14

    A.      The Infectious Disease Doctors' Opinions are Unreliable Because
        their Reports Do Not Contain their Own Original Work. ......................... 14

PLAINTIFFS' MOTION TO EXCLUDE THE COMMON-ISSUE EXPERT
TESTIMONY OF DRS. KURITZKES, CAMPBELL, PITRAK, AND TAIWO – i
010759-11/2031392 V1

No. 4:18-cv-06972-JST

B.      The Infectious Disease Doctors' Opinions are Unreliable because
the Experts Give Opinions about Documents They Never Reviewed. ...................... 15

V.      CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*,
2022 U.S. Dist. LEXIS 106430 (M.D. Fla. June 14, 2022) ........................................................ 12

*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
2000 U.S. Dist. LEXIS 1318 (W.D. Mich. Feb. 8, 2000) ............................................................ 13

*James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*,
2014 U.S. Dist. LEXIS 59689 (E.D. Ky. Apr. 30, 2014) ............................................................ 11

*Moore v. BASF Corp.*,
2012 U.S. Dist. LEXIS 170411 (E.D. La. Nov. 30, 2012) .......................................................... 15

*Numatics, Inc. v. Balluff, Inc.*,
66 F. Supp. 3d 934 (E.D. Mich. 2014) ........................................................................... 13, 14, 15

*Raymo v. Sec'y of HHS*,
2014 U.S. Claims LEXIS 162 (Fed. Cl. Feb. 24, 2014) ........................................................ 14, 15

*Spiral Direct, Inc. v. Basic Sports Apparel*,
2017 U.S. Dist. LEXIS 225205 (M.D. Fla. Apr. 13, 2017) ........................................................ 14

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) ................................................................................................... 14

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) ................................................................................................... 11

## OTHER AUTHORITIES

Federal Rule of Evidence 702 ....................................................................................... 2, 14, 15

Federal Rule of Civil Procedure Rule 26 ................................................................................. *passim*

Federal Rule of Civil Porcedure Rule 37 ................................................................................ *passim*

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 8, 2022 at 2:00 p.m. before the Honorable Jon S. Tigar, in Courtroom 6 of the United States District Court for the Northern District of California, by videoconference, in accordance with General Order No. 78, Plaintiffs will and hereby do move this Court, under Federal Rules of Civil Procedure 26 and 37 and Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) to exclude the expert testimony of: (1) Dr. Daniel Kuritzkes; (2) Dr. Thomas Campbell; (3) Dr. David Pitrak; and (4) Dr. Babafemi Taiwo.

**STATEMENT OF RELIEF SOUGHT**

Plaintiffs seek an order under Federal Rules of Civil Procedure 26 and 37, Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) excluding the expert testimony of four nephrologist experts retained by Defendant Gilead Sciences, Inc.: (1) Dr. Daniel Kuritzkes; (2) Dr. Thomas Campbell; (3) Dr. David Pitrak; and (4) Dr. Babafemi Taiwo. Given the substantial similarities in the experts' language, opinions, citations—even typos—the experts' testimony should be excluded under Rules of Civil Procedure 26 and 37 because the reports were not "prepared … by the witness[es]." The experts' testimony should also be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) because the likelihood that the reports do not contain the experts' original work renders the experts' opinions unreliable.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Gilead has proffered the expert reports of four infectious disease doctors, Drs. Kuritzkes, Campbell, Pitrak, and Taiwo, that contain identical and nearly identical language. The similarities between and among the reports' structure, language, opinions, and citations are so striking that the only plausible explanations can be that the experts plagiarized from one another or the reports were ghostwritten by Gilead or Gilead's attorneys. Because these experts did not review any other Gilead expert reports in forming their opinions, that leaves Gilead ghostwriting as the only possible reason

1   these four infectious disease doctors could have separately produced reports that contain the same

2   language and opinions. Expert reports that were not "prepared" by the expert violate Rule 26(a) and

3   should be excluded under Rule 37(c). Moreover, because the reports do not contain the experts'

4   original work, the experts' opinions are unreliable under Federal Rule of Evidence 702. Plaintiffs

5   respectfully request that the Court exclude these experts pursuant to its gatekeeping powers and

6   prevent these infectious disease doctors from speaking to the jury as Gilead's avatar.

## II.    BACKGROUND

### A.    Gilead's Four Infectious Disease Experts Proffered Nearly Identical Reports and Opinions.

The similarities between and among the four Gilead infectious disease doctors' reports are

evident from the very beginning of their reports.[1] The Table of Contents for Dr. Campbell's and

Dr. Taiwo's May 27, 2022 reports are nearly identical, with Sections I-IV being in fact identical.

May 27, 2022 Expert Report of Thomas Campbell; ("Campbell Rpt."), attached as Ex. B to

Declaration of Emily J. Beeson ("Beeson Decl."), at (i); May 27, 2022 Expert Report of Babafemi

Taiwo ("Taiwo Rpt."), attached as Ex. C to Beeson Decl., at (i). The Tables of Contents for

Dr. Kuritzkes' and Dr. Pitrak's reports are substantively identical to the others, with only minor

differences in wording. May 27, 2022 Report of Daniel Kuritzkes ("Kuritzkes Rpt."), attached as

Ex. D to Beeson Decl., at (i) (Section VII labeled "Glossary" rather than "Key Terms and

Background"); May 27, 2022 Expert Report of David Pitrak ("Pitrak Rpt."), attached as Ex. E to

Beeson Decl., at (i) (Section XI labeled "TDF Package Inserts Warned of Kidney and Bone Risks"

instead of "TDF Product Labeling Warned of Kidney and Bone Risks").

Each of the preface or background sections of the four reports begins with nearly identical

paragraphs: "AIDS is caused by HIV. The World Health Organization ("WHO") estimates that since

the beginning of the AIDS epidemic, 79.3 million people have been diagnosed with HIV and 36.3

million people have died because of HIV." Ex. D, Kuritzkes Rpt. ¶18; Ex. E, Pitrak Rpt. ¶20; Ex. C,

---

[1] Plaintiffs have attached as Exhibit A to the Declaration of Emily J. Beeson a chart that allows a side-by-side comparison of the four infectious disease doctors' expert reports. Plaintiffs discuss in this section certain of the similarities for illustrative purposes.

Taiwo Rpt. ¶16 (adding the terms "infection by"); Ex. B, Campbell Rpt. ¶16 (adding the terms "infection by" and inserting a single extra sentence compared to the other three reports). The four experts include an additional one-to-two paragraphs containing the same information and citing to the same sources, with the exception of Dr. Pitrak, who added a citation for the statement included in all four reports that "[a]ntiretrovirals have been shown to be highly effective in both preventing transmission of HIV and preventing AIDS and death in persons living with HIV." Ex. D, Kuritzkes Rpt. ¶19; Ex. E, Pitrak Rpt. ¶21; Ex. C, Taiwo Rpt. ¶17; Ex. B, Campbell Rpt. ¶¶17-18 (adding statement regarding Long-Term Non-Progressors). They each state the following identical conclusion: "Despite extensive efforts over the past 40 years, a vaccine to prevent HIV has not been developed yet, and ART remains the most effective way to prevent and treat HIV." *Id.*

The "key terms" or "glossary" sections of each report define the same terms, with very few exceptions. Each report cites to the same source for information provided in the definition for "HIV-1 vs HIV-2," the only defined term that contains its own specific citation in any of the reports. Ex. D, Kuritzkes Rpt. ¶45, FN 18; Ex. E Pitrak Rpt. ¶53, FN 20; Ex. B, Campbell Rpt. ¶37, FN 11; Ex. C, Taiwo Rpt. ¶36, FN 17.

Each report also contains a section discussing HIV treatments before TDF. Ex. D, Kuritzkes Rpt., p. 18, "IX. Early HIV/AIDS Medications;" Ex. E, Pitrak Rpt., p. 23, "VII. HIV Treatments Before TDF;" Ex. B, Campbell Rpt., p. 18, "X. Limitations of Early Antiretroviral Treatments for HIV/AIDS;" Ex. C, Taiwo Rpt., p. 18, "VIII. Treatments for HIV/AIDS Before TDF Approval." Within this section are paragraphs containing the headings "Dosing/Half-Life," "Toxicity/Side Effects," "Clinical Efficacy/Viral Resistance." Ex. D, Kuritzkes Rpt. ¶¶66-68; Ex. E, Pitrak Rpt. ¶¶71-73; Ex. B, Campbell Rpt. ¶¶62-64; Ex. C, Taiwo Rpt. ¶¶57-59. The paragraphs regarding "Dosing/Half-Life" begin with identical sentences among the reports: "Because the early NRTIs required frequent dosing in combination with other drugs, patients struggled to comply with optimal dosing recommendations." *Id*. At least three of the four reports contain numerous substantively identical sentences within this section. *See* Ex. D, Kuritzkes Rpt. ¶70 ("The degree of adherence that is required of people with HIV to achieve durable viral suppression is much higher than that required

1    for control of other medical conditions"), Ex. E, Pitrak Rpt. ¶75 (same), Ex. C, Taiwo Rpt. ¶61

2    (same); Ex. D, Kuritzkes Rpt. ¶71 ("To avoid the issues associated with NRTIs, the HIV-treatment

3    community began to look at other classes of compounds to treat HIV, including PIs and NNRTIs.

4    Development of PIs and NNRTIs continued into the late 1990s and 2000s"), Ex. E, Pitrak Rpt. ¶76

5    (same, except for replacing "began to look" with " was looking"), Ex. C, Taiwo Rpt. ¶62 (slightly

6    different wording); Ex. D, Kuritzkes Rpt. ¶75 ("As a result, the HIV-treatment community continued

7    to search for drugs with improved pharmacokinetics, resulting in lower dosages and a less frequent,

8    more convenient dosing regimen that would increase adherence with treatment-naïve and treatment-

9    experienced patients alike, and for drugs with a high barrier to resistance"), Ex. E, Pitrak Rpt. ¶80

10   (same, but reference to high barrier to resistance in different location), Ex. B, Campbell Rpt. ¶69

11   (same, but no reference to high barrier to resistance); Ex. C, Taiwo Rpt. ¶69 (same, with slightly

12   different wording).

13          Sequentially the next section of each expert report discusses the introduction of TDF

14   medications. Ex. D, Kuritzkes Rpt., p. 25 "TDF for HIV Treatment;" Ex. E, Pitrak Rpt., p. 29, "TDF

15   was Groundbreaking for People Living with HIV;" Ex. B, Campbell Rpt., p. 23 "The Impact of TDF

16   on HIV Treatment;" Ex. C, Taiwo Rpt., p. 27 "TDF was an Important Development for People

17   Living with HIV." Again, three of four infectious disease doctors include identical headings, using

18   the exact same bolded and italicized emphasis, within this section: "TDF has better clinical efficacy,"

19   "TDF required less frequent dosing," "TDF was better for resistance," and "TDF came with fewer

20   side effects." Ex. D, Kuritzkes Rpt. ¶¶78-82; Ex. B, Campbell Rpt. ¶¶72-74; Ex. C, Taiwo Rpt. ¶¶73-

21   77. And again, numerous nearly identical sentences fill the pages of this section: "*TDF required less*

22   *frequent dosing*. TDF's active diphosphate metabolite confers a long intracellular half-life in vivo in

23   excess of 60 hours, which, along with its long elimination half-life that averages 17 hours in serum,

24   enables a once-daily dosing regimen;" Ex. D, Kuritzkes Rpt. ¶80; Ex. E, Pitrak Rpt. ¶74; Ex. B,

25   Campbell Rpt. ¶84; Ex. C, Taiwo Rpt. ¶75; "*TDF was better for resistance*. TDF-containing

26   medications not only improved adherence but also prevented the emergence of drug-resistant strains

27

28

1  due to its "forgiveness" margin;" Ex. D, Kuritzkes Rpt. ¶81; Ex. B, Campbell Rpt. ¶85; Ex. C, Taiwo

2  Rpt. ¶76; *and see* Ex. A, Chart, at pp. 15-18.

3       The following section of each report addresses the introduction of fixed-dose combinations

4  ("FDCs") and single-tablet regimens ("STRs"), containing nearly identical data, citing the same

5  sources, and including the same chart showing "Gilead TDF-Containing Medications for HIV

6  Treatment." Ex. D, Kuritzkes Rpt. ¶¶83-89; Ex. E, Pitrak Rpt. ¶87-92; Ex. B, Campbell Rpt. ¶75-81;

7  Ex. C, Taiwo Rpt. ¶78-84. All reports cite in error to the same source for the statement "One

8  retrospective study demonstrated that patients receiving a STR were more likely to achieve 95%

9  adherence, and this was associated with a 23% decrease in hospitalizations and a 17% reduction in

10  overall health care costs." Ex. D, Kuritzkes Rpt. ¶87, FN 48; Ex. E, Pitrak Rpt. ¶90, FN 51; Ex. B,

11  Campbell Rpt. ¶79, FN 34; Ex. C, Taiwo Rpt. ¶82, FN 43. The first STR to become available for

12  treatment of HIV was Atripla, which was approved in 2006. Ex. D, Kuritzkes Rpt., ¶86. However,

13  the article cited by each doctor in support of this statement was published in 2000 and contains no

14  support for the statement to which all of the doctors associate it, which the doctors all admitted to

15  during depositions. Deposition Transcript of Thomas Campbell ("Thomas Dep. Tr."), Beeson Decl.,

16  Ex. F at 42:23-47:4; Deposition of Babafemi Taiwo ("Taiwo Dep. Tr."), Beeson Decl., Ex. G, at

17  168:1-175:18; Deposition of Daniel Kuritzkes ("Kuritzkes Dep. Tr."), Beeson Decl., Ex. H, 53:15-

18  36:5; Deposition of David Pitrak ("Pitrak Dep. Tr."), Beeson Decl., Ex. I, at 134:25-135:13.

19       Where the experts discuss TDF's risks and benefits, two reports contain the exact same four-

20  sentence statement: "By controlling HIV and preventing progression, TDF enhanced patients' quality

21  of life in numerous ways. By creating viral suppression, TDF protected patients from immune

22  deficiencies that allowed opportunistic infectious to take root, thus avoiding the cosmetic side effects

23  and weight loss associated with infections such as Kaposi sarcoma, and the deadly result of

24  treatment-resistant HIV/AIDS. Viral suppression also allowed people living with HIV/AIDS to enjoy

25  intimate relations without fear of transmitting the virus to others. And by offering a better alternative

26  to earlier NRTIs, such as AZT, patients avoided the toxicities associated with earlier regimens,

27  thereby increasing patient quality of life even more." Ex. C, Taiwo Rpt., ¶86 and Ex. E, Pitrak Rpt.,

28

¶94; *see also* Ex. D, Kuritzkes Rpt., ¶91 (using only slightly different language). In support of their conclusions that TDF has a favorable risk-benefit profile, three of the four infectious disease doctors' reports cite the same facts in a series of nearly identical paragraphs. Ex. C, Taiwo Rpt., ¶¶87-92, Ex. D, Kuritzkes Rpt., ¶¶92-96, and Ex. E, Pitrak Rpt., ¶¶95-99. Within these paragraphs the three doctors express that "Phase 2 and Phase 3 trials of TDF were adequately designed to detect the incidence of adverse renal events; these studies demonstrated a significantly lower incidence of renal events with TDF than with adefovir dipivoxil." Ex. C, Taiwo Rpt., ¶87; Ex. D, Kuritzkes Rpt., ¶92, and Ex. E, Pitrak Rpt., ¶95. In association with the risk of TDF patients developing kidney dysfunction, all four infectious disease doctors cite the same source and use the same words: that TDF carries a "risk of renal impairment" but "the risk of severe renal toxicity is low." Ex. E, Pitrak Rpt., ¶97 (citing Mark R. Nelson et al., *The Safety of Tenofovir Disoproxil Fumarate For the Treatment of HIV in Adults: The First 4 Years*, 21 AIDS 1273-1281 (2007)); Ex. B, Campbell Rpt., ¶84 (same); Ex. C, Taiwo Rpt., ¶87 (same); Ex. D, Kuritzkes Rpt., ¶94 (same),

The reports next discuss the product labeling of TDF medications. Ex. B, Campbell Rpt., p. 89 ("XIV. TDF Product Labeling Warned of Kidney and Bone Risks"); Ex. C, Taiwo Rpt., p. 37 (same), Ex. D, Kuritzkes Rpt., p. 34 ("XIII. TDF Label Warnings of Kidney and Bone Risks"). Ex. E, Pitrak Rpt., p. 39 ("XI. TDF Package Inserts Warned of Kidney and Bone Risks"). Three out of four reports include identical language in the second paragraph of this section, with the fourth having only slightly different wording, asserting that "[s]ince Viread was approved by FDA in 2001," the label warned of "risk of kidney and bone adverse events and the need to monitor patients." Ex. B, Campbell Rpt. ¶88; Ex. C, Taiwo Rpt., ¶94; Ex. D, Kuritzkes Rpt. ¶98; Ex. E, Pitrak Rpt. ¶101. *See also* Ex. A, Chart at pp. 26. The doctors go on to use the exact same examples from Viread labels to illustrate their conclusion that the labels are updated with "new information" that "treating physicians" use to gain "information" that is "necessary" to "appropriately care for and monitor [] patients' health." Ex. B, Campbell Rpt., ¶¶88-89; Ex. C, Taiwo Rpt., ¶¶94-95; Ex. D, Kuritzkes Rpt., ¶¶98-99; Ex. E, Pitrak Rpt., ¶¶101-102. In all four reports, this section concludes with some variation of the statement "I continue to rely on the labels of HIV medications when making prescribing

PLAINTIFFS' MOTION TO EXCLUDE THE COMMON-ISSUE EXPERT
TESTIMONY OF DRS. KURITZKES, CAMPBELL, PITRAK, AND TAIWO – 6
010759-11/2031392 V1

No. 4:18-cv-06972-JST

decisions today." Ex. B, Campbell Rpt., ¶90 (identical); Ex. C, Taiwo Rpt., ¶96 (identical); Ex. D, Kuritzkes Rpt., ¶100 (identical); Ex. E, Pitrak Rpt., ¶103 ("When making HIV medication prescriptions today, I continue to review and rely on the FDA-approved labels of those medications").

Three of four reports have a section titled "HIV Treatment Today," with the fourth report describing the same information in a section titled "Current Goals of HIV Therapy." Ex. B, Campbell Rpt., p. 32; Ex. C, Taiwo Rpt., p. 39; Ex. D, Kuritzkes Rpt., p. 39; Ex. E, Pitrak Rpt., p. 41. These sections of the reports are remarkably similar to one another. The reports state that "TDF remains an often-used treatment for HIV/AIDS;" "TAF is a prodrug of tenofovir that has demonstrated high antiviral efficacy similar to TDF;" "One TAF-containing medication, Biktarvy, is widely used[.]" Ex. B, Campbell Rpt. ¶¶92-94; Ex. C, Taiwo Rpt., ¶¶99-101; Ex. D, Kuritzkes Rpt. ¶¶108-110; Ex. E, Pitrak Rpt. ¶¶126-128; Ex. A, Chart at pp. 27-28. In concluding their reports, all four doctors state that "[w]e still have work to do to ensure patients the best outcomes and quality of life" for people living with HIV. Ex. B, Campbell Rpt. ¶97; Ex. C, Taiwo Rpt., ¶¶104; Ex. D, Kuritzkes Rpt. ¶114; Ex. E, Pitrak Rpt. ¶132; Ex. A, Chart at p. 29

**B.      The Infectious Disease Doctors Did Not Review Any Other Expert Reports.**

Gilead's infectious disease doctors did not indicate in their reports that anyone else had participated in preparing the reports nor did they include any other Gilead infectious disease expert reports among their reliance materials. Ex. B, Campbell Rpt. Sec. II; Ex. C, Taiwo Rpt., Sec. II; Ex. D, Kuritzkes Rpt. Sec. II; Ex. E, Pitrak Rpt. Sec. II. Similarly, the infectious disease doctors testified that they did not review any other Gilead expert reports in forming their opinions. *See, e.g.*, Ex. F, Campbell Dep. Tr. at 47:6-48:7, 111:2-113:7; Ex. H, Kuritzkes Dep. Tr. at 83:23-84:4; Ex. I, Pitrak Dep. Tr. at 114:2-22.

**C.      Gilead Instructed its Infectious Disease Doctors Not to Answer Questions About Authorship of the Reports.**

On July 9, 2021, the Court entered the parties' Stipulation and Order Regarding Expert Discovery (ECF No. 732) ("Expert Order"). That Order, among other things, lists categories of expert-related documents and communications that are not discoverable, including: notes and other

writings taken or prepared by or for an expert witness (id. ¶ 5(a)); draft reports or other draft

materials prepared by or for an expert witness (id. ¶ 5(b)); and communications between an expert

witness and their staff, other experts, or attorneys for the party that retained them (id. ¶ 5(c)). The

Order also states that these exclusions from discovery do not apply to any information, documents,

or communications which the expert relies upon as a basis for forming their opinions. Id. ¶ 6(b)(i).

During the infectious disease doctors' depositions, Gilead's counsel instructed the witnesses

not to answer questions about whether they wrote their own opinions. *See, e.g.*, Ex. F, Campbell

Dep. Tr. at 18:9-19:22; Ex. H, Kuritzkes Dep. Tr., 18:21-20:9, 24:10-23, 27:5-19, 49:23-50:11; Ex. I,

Pitrak Dep. Tr. at 17:17-18:12, 116:8-25, 125:9-126:5. Gilead's counsel took the position that Rule

26 and the Expert Order prohibited questioning about the report drafting process. *Id.*, *see also* Ex. G,

Taiwo Dep. Tr. at 147:16-21.

**D.      The Infectious Disease Doctors' Deposition Testimony Indicates that the Reports are
          not their Original Work.**

Gilead blocked Plaintiffs from discovering whether the infectious disease doctors drafted

their own reports and whether the reports contain the experts' original work product. Although

Gilead permitted the experts to answer whether they "prepared" their reports generally, the experts

were instructed not to answer what role they had in crafting language or selecting references for their

reports. Even when the infectious disease doctors occasionally answered "yes" they "prepared" their

reports, such testimony was revealed to be semantic gamesmanship. For example, when asked if they

prepared their reports, Dr. Campbell testified that he "worked in preparing the report," and Dr.

Taiwo testified that he is "responsible for the entire content of the report." Gilead's counsel

instructing the experts not to answer whether they "prepared" specific parts of their reports renders

meaningless any testimony that they prepared their entire reports. Further, when confronted with

numerous portions of Dr. Taiwo's report that were identical to his own, Dr. Kuritzkes was unable to

identify which portions of his report reflect opinion rather than factual background.

Given the obvious similarities between and among the reports, the experts' testimony

provides zero assurance that the work or the opinions are truly their own.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.     Dr. Daniel Kuritzkes

Gilead's counsel instructed Dr. Kuritzkes not to answer whether he selected the documents referenced in his report. Ex. H, Kuritzkes Dep. Tr. at 18:21-20:20, 49:23-50:11. When asked to distinguish between sections of his report that contain background factual information versus his opinion on the issues, Dr. Kuritzkes stated "One can't have an opinion on a set of facts[.]" *Id*. at 21:20-23:4. However, after presented with portions of Dr. Taiwo's report identical to his own, he testified that the information in paragraph 18 of his report "is both background and [his] opinion," and goes on to list numerous statements in his reports that are both "opinions" and "fact." *Id*. at 95:15-97:25. After an embattled attempt at defining what constitutes an opinion, Dr. Kuritzkes could identify only a single paragraph that contained opinions rather than factual data. *Id*. at 98:2-102:11; *see also id*. at 105:21-106:6 (answering "Not at this time" to the question of whether he had additional opinions beyond the factual data in his report and the opinion that TDF has always had a favorable risk-benefit profile). Dr. Kuritzkes could not provide the source, and admitted that he did not know how to access the data, regarding investigational new drug application filing dates, despite having cited to it in his report. *Id*. at 26:13-28:4.

### 2.     Dr. Thomas Campbell

Dr. Campbell admitted that he had not read all of the documents referenced in his report. Ex. F, Campbell Dep. Tr. at 17:18-25. Counsel for Gilead instructed Dr. Campbell not to answer questions about whether he selected the references contained in his report. *Id*. at 18:9-19:23; 77:5-12. When questioned about the significance of his signature on the report bearing his name, Dr. Campbell testified that "It signifies that I have reviewed the report and that the opinions in the report are my opinions." *Id*. at 16:1-6. Throughout the deposition he waffled on whether he prepared his report. *Id.* at 16:7-9 (refusing to answer whether prepared his report and stating instead that "I worked in preparing this report."); *id*. at 76:22-24 (stating that he did prepare this report).

### 3.     Dr. David Pitrak

When presented with Dr. Taiwo's expert report, Dr. Pitrak denied that there was anything unusual about the similarities between his reports and those of Gilead's other nephrologists. In

response to questions about identical or nearly identical sentences in the two reports, he stated, "Correct statements that summarized the development in that time period;" Ex. I, Pitrak Dep. Tr. at 118:4-5; "There was only the one initial label;" *id.* at 121:8-9; and "The two of us had the same points to make." *Id.* at 124:1-2. Counsel for Gilead instructed Dr. Pitrak not to answer questions regarding the preparation of his report. *Id.* at 125:9-20.

### 4.    Dr. Babafemi Taiwo

Dr. Taiwo also repeatedly hedged on claiming responsibility for the preparation of the report, preferring to say that the content of the report reflects his opinions, e.g., Ex. G, Taiwo Dep. Tr. at 12:20-13:15, 17:15-18:3, 158:1z9-159:4. Counsel would not permit Dr. Taiwo to confirm what role, if any, he had in preparing the list of items to which he intended to provide opinion testimony. *Id.* at 17:15-18:3.

Dr. Taiwo furthermore could not identify, for example, any studies supporting his contention that TAF may in fact not be safer than TDF because of the increased levels of the active compounds reaching the target cells. *Id.* at 29:17-35:10. When asked whether he was aware of any studies supporting that contention, Dr. Taiwo embarked on a theoretical diatribe without identifying any supportive studies, and ultimately retracted a statement from his written report that TAF had the "benefit of producing higher levels of intracellular tenofovir in HIV-infected cells". *Id.* at 85:4-86:2.

### E.    Gilead's Infectious Disease Doctors Spent Limited Time on the Reports.

Dr. Campbell spent 10 hours "review[ing] expert report" and just 3 hours "review[ing] and revis[ing] expert report." Dr. Campbell Invoices, Beeson Decl., Ex. J. Dr. Taiwo "wrote/reviewed summary" over the course of about 21 hours, with no designated time for reviewing literature. Dr. Taiwo Invoices, Beeson Decl., Ex. K. Dr. Kuritzkes spent 6 hours "draft[ing]/revis[ing]" his report, with no time allocated for reviewing literature. Dr. Kuritzkes Invoices, Beeson Decl., Ex. L. Dr. Pitrak likewise spent just 6 hours on report preparation, identified as "reviewing literature and writing," Dr. Pitrak Invoices, Beeson Decl., Ex. M.

**F.      The Parties' Meet and Confer Regarding Discovery About Authorship of the Infectious Disease Doctors' Reports**

On August 12, 2022, Plaintiffs' counsel wrote to Gilead's counsel seeking additional depositions of the infectious disease doctors regarding authorship of the infectious disease doctors' reports. *See* August 12, 2022 Letter, Beeson Decl., Ex. N. Plaintiffs recognized the limits that Rule 26 and the Expert Order place on discovery into expert work product but explained that the Expert Order expressly permits inquiry into "any information, communications, or documents" which "the expert relies upon a basis for forming their opinions." *See id*. at 2, quoting Expert Order at ¶ 6(b)(i). Plaintiffs explained that because the experts did not view one another's reports, the similarities between and among the experts' opinions could only be explained by the experts' reliance on "information, communications, and/or documents" that came from Gilead's counsel. *Id.*

Gilead's counsel responded on August 19, 2022, arguing, among other things, that reopening depositions would be improper because no Gilead expert testified that they had relied upon communications with counsel or other experts. *See* August 19 Letter, Beeson Decl., Ex. O.

On August 24, 2022, the parties met and conferred. Counsel for Gilead suggested that additional depositions would be a waste of the parties' time because the infectious disease doctors would testify that they did not rely on any information, communications and/or documents that came from Gilead's counsel. *See* Declaration of Anne F. Johnson ("Johnson Decl.") at ¶2. Gilead's counsel offered declarations from the experts stating that they did not rely on any information, communications and/or documents from Gilead's counsel. *Id.* at ¶2.

Plaintiffs subsequently informed Gilead that they would not seek to reopen the infectious disease doctors' depositions in light of Gilead's representation that, if deposed again, the experts would testify that they did not rely on any information, communications, or documents from Gilead's counsel. *Id.* at ¶2 Aug. 26, 2022 email from A. Johnson, Beeson Decl., Ex. P. Plaintiffs stated that the Court had sufficient information to decide whether to credit the experts' statements that they did not rely on anything beyond what is included in their reliance materials (even though they separately submitted nearly identical reports). *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    THE INFECTIOUS DISEASE DOCTORS' OPINIONS SHOULD BE EXCLUDED UNDER FEDERAL RULES OF CIVIL PROCEDURE 26 AND 37

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires that expert testimony be accompanied by a written report "prepared and signed by the witness." Although attorneys may provide experts with some assistance in preparing the reports (Advisory Comm. Notes for Fed. R. Civ. P. 26), the Rule does not permit a party to "prepare the report for the witness." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 2014 U.S. Dist. LEXIS 59689, *19 (E.D. Ky. Apr. 30, 2014). When the disclosure requirements of Rule 26(a) are violated, Rule 37 mandates preclusion of the evidence unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c). It is Gilead's burden to show that its failure was substantially justified or harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

Multiple courts have excluded expert testimony under Rules 26 and 37 where the expert's report is substantially similar to another document written by or with assistance from the same counsel. *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, 2022 U.S. Dist. LEXIS 106430, at *8 (M.D. Fla. June 14, 2022) involved an expert report that was substantially identical to another expert report submitted by the party's attorneys in another case. The expert had spent approximately 20 hours reviewing documents and discussing his opinions with counsel. *Id*. at *2. Although counsel drafted the report, the expert testified that counsel drafted the report after first consulting with him, the report reflected his conclusions, he agreed with the report, and he took "ownership" of it. *Id*. at *2. The court held that "Rule 26 requires more." *Id*. at *10. While the court accepted that the expert "agrees with the report and desires to adopt it," it explained that an "expert cannot merely adopt counsel provided information" as their own opinions, nor can they simply adopt the attorney's opinions as their own. *Id*. Despite some evidence that the expert had participated in the preparation of his report, the court found that similarities between the expert's report and a report submitted by the party's attorneys in another case suggested that the report primarily reflected counsel's opinions, not the expert's. *Id*.

Addressing the "striking resemblance" between the two reports, the court could have been describing the infectious disease doctors' reports here:

> Despite the different signatures at the bottom, much of the Report is identical to [the other expert's report]. The headings and structure are the same. So are the typos in the second footnote. Much of what is not identical is very similar. Many of the sections, such as the ones on the standard of care and on follow-up examinations are almost entirely drawn from the [other expert's report]. Most important, the opinions and conclusions are largely the same, using slightly different wording.

*Id*. at \*10-11 (internal citation and quotation omitted). And as here, the expert testified that he had not read the report whose content so closely matched his own. *Id*. at \*12-13.

That the expert's report "borrow[ed] so heavily from sources that [the expert] has not read indicates that [the expert] did not contribute much to it" and "raises questions as to whose opinions these actually are." *Id*. at \*13 (internal citations and quotation omitted). Given the "blatant signs of ghostwriting," the court held that the attorneys exceeded the level of assistance permitted by Rule 26 and exclusion under Rule 37 was the proper sanction. *Id*. at \*14-15.

Similarly, *Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 945 (E.D. Mich. 2014) involved an expert's report on issues of patent invalidity that was "nearly indistinguishable" from the party's invalidity contentions, which had been disclosed a few months before the expert signed his report. The court described the similarities: "The pictures, charts, and diagrams are the same. The citations are identical. The prose is indistinguishable down to the punctuation, leading to only one possible conclusion: the report was ghost-written by [the party's] attorneys as a legal brief disguised (thinly) as an expert disclosure." *Id*. Given these similarities, the court reached the "inescapable" conclusion that the expert was "nothing more than a highly qualified puppet and the opinions in his report [did] not reflect his own reasoned views of the case." *Id*. (internal quotation omitted).

Finally, *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 2000 U.S. Dist. LEXIS 1318, \*3 (W.D. Mich. Feb. 8, 2000) held that "undeniable substantial similarities between [the expert's] report and the report of another expert prepared with assistance of the same counsel in an unrelated case, demonstrate[d] that counsel's participation so exceeded the bounds of legitimate 'assistance' as to negate the possibility that [the expert] actually prepared his own report within the meaning of Rule 26(a)(2)." The court further found that the expert's "misleading and evasive answers" to questions about the report's authorship justified the sanction of exclusion under Rule 37. *Id*. at \*5.

As in the above cases, there are obvious and striking similarities between and among the infectious disease doctors' reports. The structures are the same. The opinions are the same. The citations are the same. The typos are the same. And what is not identical is substantially similar. *See supra* at II.A. It simply cannot be that the infectious disease doctors independently "prepared" four nearly identical reports. Instead, the extent and nature of these similarities leads to the "inescapable" conclusion that Gilead's attorneys overstepped the bounds of permissible attorney involvement under Rule 26. The infectious disease doctors "surrendered [their] role to defense counsel, and that is not how the adversary process works." *Numatics*, 66 F. Supp. 3d at 942. Exclusion under Rule 37 is the proper sanction here. Gilead cannot meet its burden to show that proffering four nearly identical expert opinions was either justified or harmless.

## IV.   THE INFECTIOUS DISEASE DOCTORS' OPINIONS ARE UNRELIABLE AND SHOULD BE EXCLUDED UNDER FEDERAL RULE OF EVIDENCE 702

### A.   The Infectious Disease Doctors' Opinions are Unreliable Because their Reports Do Not Contain their Own Original Work.

A qualified witness may testify regarding their opinion if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence." Fed. R. Evid. 702(a). "An expert witness who is merely a party's lawyers' avatar contributes nothing useful to the decisional process." *Numatics*, 66 F. Supp. 3d at 941. Pursuant to Federal Rule of Evidence 702, courts must ensure that all expert testimony admitted into evidence is both relevant and reliable. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).

Multiple courts have excluded expert testimony as unreliable under Federal Rule of Evidence 702 where the expert's report did not contain the expert's original work. *Spiral Direct, Inc. v. Basic Sports Apparel*, 2017 U.S. Dist. LEXIS 225205, *6-8 (M.D. Fla. Apr. 13, 2017) concerned an expert that had copied and pasted a large section of her report from a report written by another expert retained by the same party in another case. Although the expert attached and cited hundreds of pages of sources she relied upon, she "provided no hint whatsoever that she relied on" another expert's report and did not "provide any citation or attribution" to the other expert as the "source of large sections of her report." *Id*. at *6. When confronted at her deposition, the expert revealed her

plagiarism but the court remained concerned that it "could have been led to believe that [the expert's report] was entirely her original work." *Id*. at *7. The court concluded that "[d]ue to [the expert's] attempt to appropriate the opinions of [another expert] and play them off as her own, [the expert's report] is unreliable and must be excluded."

*Raymo v. Sec'y of HHS*, 2014 U.S. Claims LEXIS 162, *45-50, 57 (Fed. Cl. Feb. 24, 2014) also concerned an expert that copied portions of his report from another expert report submitted in another case. The court compared the two reports and found that they were "virtually identical." *Id*. at *49. The court was disturbed by the fact the expert tried to "pass another's work product off as his own and, more significantly, testify in a manner that attempted to mislead the court about the origin of the opinions expressed in the report bearing his signature." *Id*. at *50. The court determined that it could not rely on the expert's opinions because the expert: "did not tell the "whole truth"; "demonstrated a lack of candor that … reflect[ed] [his] willingness to, at the very least, shade the truth"; and "attempted to pass off another's work as his own." *Id*. at *57.

*Moore v. BASF Corp.*, 2012 U.S. Dist. LEXIS 170411, *22 (E.D. La. Nov. 30, 2012) involved an expert that copied his conclusions about the warnings the defendant should have placed on its products from the report of another expert. Although the expert originally testified that the report was his original drafting, he later conceded that he saw the other expert's report and "at the very least took notes." *Id*. at *23. The court held: "The likelihood that substantial portions of [the expert's] report do not reflect his original work is yet another reason the Court finds that [the expert's] opinions in general are unreliable." *Id*.; *see also Numatics*, 66 F. Supp. 3d at 945-6 (excluding expert opinion under Federal Rule of Evidence 702 in addition to Rules 26 and 37 because, among other reasons, the expert "did not furnish a report that even approximated his original work in this case").

Here, none of the Gilead infectious disease doctors has attributed any part of their reports to the work of another expert; all continue to try to pass off virtually identical reports as their own original work. But <u>four virtually identical reports cannot be the original work of all four experts</u>.

Given the likelihood that substantial portions of the infectious disease doctors' reports do not contain their original work, the infectious disease doctors' opinions are unreliable and should be excluded.

**B.      The Infectious Disease Doctors' Opinions are Unreliable because the Experts Give Opinions about Documents They Never Reviewed.**

Another glaring sign that the infectious disease doctors' opinions lack reliability and original authorship is that the reports provide opinions about documents the experts never reviewed. For example, the infectious disease doctors offer opinions that "the Phase 2 and Phase 3 trials of TDF were adequately designed to detect the incidence of adverse renal events." Ex. C, Taiwo Rpt., ¶87; Ex. D, Kuritzkes Rpt. ¶¶92; Ex. E, Pitrak Rpt. ¶95. Yet none of the experts viewed any internal Gilead documents, about trial design or otherwise, and based their opinions solely on publicly available information published in journal articles. Ex. F, Campbell Dep. Tr. at 23:1-7; Ex. G, Taiwo Dep. Tr. at 16:22-17:5, 57:21-59:14; Ex. H, Kuritzkes Dep. Tr. at 41:3-11; Ex. I, Pitrak Dep. Tr. at 19:9-19, 46:12-24.

In their sections on the introduction of TDF, each report contains the following identical statements: "In March 1997, Gilead filed with FDA an investigational new drug application for TDF, seeking FDA approval to move from preclinical trials to clinical trials, which would involve testing in human beings. Four years later, Gilead filed a new drug application seeking to market and sell the first TDF medication, Viread, which is a single-agent dose of TDF that would be taken in combination with other antiretrovirals. FDA approved that application in October 2001." Ex. B, Campbell Rpt. ¶71; Ex. C, Taiwo Rpt. ¶72; Ex. D, Kuritzkes Rpt. ¶77; Ex. E, Pitrak Rpt. ¶82. However, none of the infectious disease experts cites to any source for this very concrete information. *Id.* When asked whether the date of Gilead's IND filing for TDF is part of their general knowledge, two of three doctors asked answered that it is not, thus admitting that they did not independently review any documents containing this information. Ex. H, Kuritzkes Dep. Tr. at 26:13-27:18 (admitting that he could not independently cite to the date of the filing, but not identifying a source); Ex. G, Taiwo Dep. Tr. at 35:22-37:5 (same); Ex. F, Campbell Dep. Tr. at 32:4-15 (stating that the date of the TDF IND filing is within his general knowledge). Interestingly, none of the three doctors asked could identify the date of the filing of Gilead's IND for TAF, further

clarifying that the date of the IND filings of HIV medications is not within their general knowledge as an infectious disease doctor. *Id.*

Although the doctors generally testified that they had read all of the references cited in their reports, when asked whether they had selected their own references counsel for Gilead would not permit the witnesses to testify. Ex. I, Pitrak Dep. Tr. at 18:14 (stating that he reviewed each document referenced in his report); Ex. G, Taiwo Dep. Tr. at 22:4 (same); Ex. H, Kuritzkes Dep. at 18:11-20 (same), 18:21-20:20 (Gilead's counsel instructing Dr. Kuritzkes not to answer whether he selected the documents cited in his report); Ex. F, Campbell Dep. Tr. at 18:9-19:22 (Gilead's counsel instructing Dr. Campbell not to answer whether he selected the documents cited in his report). Dr. Campbell testified that he did not even read all of the documents cited in his own report. Ex. F, Campbell Dep. Tr. at 17:16-18:6.

Further, the infectious disease experts provided rebuttal reports without reviewing documents cited by the plaintiffs' expert whose report they sought to rebut. Ex. G, Taiwo Dep. Tr. at 129:23-130:3, 134:5-10, 143:23-144:3; Ex. H, Kuritzkes Dep. Tr. at 78:24-79:6; Ex. I, Pitrak Dep. Tr. at 78:1-16.

Three of the four doctors provide the opinion that "the warnings on TDF labeling advised physicians of the renal and bone risks known at the time based on existing clinical data[.]" Ex. C, Taiwo Rpt., ¶89; Ex. D, Kuritzkes Rpt. ¶¶93; Ex. E, Pitrak Rpt. ¶96. However, the doctors testified that they had not seen internal documents or communications between Gilead and FDA, and thus had no way to know what information Gilead had, and whether it provided all information in its possession to FDA. Ex. F, Campbell Dep. Tr. at 48:10-49:14; Ex. G, Taiwo Dep. Tr. at 68:14-69:1; Ex. I, Ex. H, Kuritzkes Dep. Tr. at 40:4-42:11; Pitrak Dep. Tr. at 42:8-44:25.

None of these experts can reliably opine on whether Phase 2 and Phase 3 studies of TDF were adequately designed to detect renal adverse events because the experts never saw any documentations outside of publicly available reports. Moreover, given these experts never saw any internal Gilead documents, they cannot provide an opinion regarding the accuracy or adequacy of

1    labeling because they cannot say whether Gilead accurately reported information in its possession to

2    FDA during the approval or postmarketing processes.

3                                 **V.    CONCLUSION**

4            Plaintiffs respectfully request that the Court exclude the expert opinions of Dr. Daniel

5    Kuritzkes, Dr. Thomas Campbell, Dr. David Pitrak, and Dr. Babafemi Taiwo in their entirety.

6

7            DATED: September 16, 2022          HILLIARD MARTINEZ GONZALES LLP

8
                                                By:   */s/ Robert C. Hilliard*
9                                                     Robert C. Hilliard (*pro hac vice*)
                                                      Katrina R. Ashley (*pro hac vice*)
10                                                    719 S. Shoreline Blvd.
                                                      Corpus Christi, TX 78401
11                                                    Telephone: (361) 882-1612
                                                      Facsimile: (361) 882-3015
12                                                    Email: bobh@hmglawfirm.com
                                                      Email: kashley@hmglawfirm.com
13

14

15                                                    Steve W. Berman (*pro hac vice*)
16                                                    Anne F. Johnson (*pro hac vice*)
                                                      HAGENS BERMAN SOBOL SHAPIRO LLP
17                                                    1301 Second Avenue, Suite 2000
                                                      Seattle, WA 98101
18                                                    Telephone: (206) 623-7292
                                                      Facsimile: (206) 623-0594
19                                                    Email: steve@hbsslaw.com
                                                      Email: annej@hbsslaw.com
20
                                                      Shana E. Scarlett (SBN 217895)
21                                                    715 Hearst Avenue, Suite 202
                                                      Hagens Berman Sobol Shapiro LLP
22                                                    Berkeley, CA 94710
                                                      Telephone: (510) 725-3000
23                                                    Facsimile: (510) 725-3001
                                                      Email: shanas@hbsslaw.com
24
                                                      *Attorneys for Plaintiffs*
25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I, Robert C. Hilliard, hereby certify that I caused a copy of the foregoing document to be filed electronically via the Court's electronic filing system on September 16, 2022.  Those attorneys who are registered with the Court's electronic filing system may access this filing through the Court's system, and notice of this filing will be sent to these parties by operation of the Court's electronic filing system.

*/s/ Robert C. Hilliard*
Robert C. Hilliard